No. 19-2005

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INC.,
*Plaintiff-Appellant,*

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Massachusetts

## JOINT APPENDIX
## VOLUME VIII

Adam K. Mortara
J. Scott McBride
Krista J. Perry
BARTLIT BECK LLP
54 W. Hubbard St., Ste. 300
Chicago, IL 60654
(312) 494-4469

John M. Hughes
Katherine L.I. Hacker
Meg E. Fasulo
BARTLIT BECK LLP
1801 Wewatta St., Ste. 1200
Denver, CO 80202
(303) 592-3140

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com

Patrick Strawbridge
CONSOVOY MCCARTHY PLLC
10 Post Office Sq., 8th Fl., PMB #706
Boston, MA 02109
(617) 227-0548

*Counsel for Appellant Students for Fair Admissions, Inc.*

# TABLE OF CONTENTS

**Volume I**

Docket Sheet ............................................................................................JA1

Notice of Appeal (Doc. 674) ....................................................................JA106

Complaint (Doc. 1) ..................................................................................JA108

Dispositive Motion Exhibits

    Motion to Dismiss for Lack of Subject-Matter Jurisdiction

        Declaration of William S. Consovoy

            Exhibit I (Doc. 205-9) ....................................................JA228

    Cross-Motions for Summary Judgment

        Declaration of Felicia H. Ellsworth

            Exhibit 2 (Doc. 419-2) ....................................................JA230

            Exhibit 85 (Doc. 419-85) ................................................JA244

            Exhibit 86 (Doc. 419-86) ................................................JA251

            Exhibit 87 (excerpts) (Doc. 419-87) ..............................JA254

            Exhibit 88 (excerpts) (Doc. 419-89) ..............................JA285

            Exhibit 89 (Doc. 419-89) ................................................JA330

            Exhibit 91 (Doc. 419-91) ................................................JA347

            Exhibit 92 (Doc. 419-92) ................................................JA370

        Declaration of Michael Connolly

            Exhibit 237 (Doc. 421-237) ............................................JA399

            Exhibit 238 (Doc. 421-238) ............................................JA418

            Exhibit 239 (Doc. 421-239) ............................................JA425

            Exhibit 240 (Doc. 421-240) ............................................JA427

            Exhibit 241 (Doc. 421-241) ............................................JA431

            Exhibit 242 (Doc. 421-242) ............................................JA434

            Exhibit 250 (Doc. 421-250) ............................................JA436

            Exhibit 251 (Doc. 421-251) ............................................JA440

Trial Transcripts

    Day 1 (Doc. 631) ...................................................................................JA443

    Day 2 (Doc. 632) ...................................................................................JA630

## Volume II

Trial Transcripts (cont.)

    Day 3 (Doc. 633) ...................................................................................JA722

    Day 4 (Doc. 635) ...................................................................................JA952

    Day 5 (Doc. 636) .................................................................................JA1198

## Volume III

Trial Transcripts (cont.)

    Day 6 (Doc. 638) .................................................................................JA1459

    Day 7 (Doc. 640) .................................................................................JA1690

    Day 8 (Doc. 642) .................................................................................JA1918

## Volume IV

Trial Transcripts (cont.)

    Day 9 (Doc. 644) .................................................................................JA2163

    Day 10 (Doc. 646) ...............................................................................JA2413

    Day 11 (Doc. 648) ...............................................................................JA2535

    Day 12 (Doc. 650) ...............................................................................JA2752

## Volume V

Trial Transcripts (cont.)

    Day 13 (Doc. 652) ..................................................................JA2937

    Day 14 (Doc. 654) ..................................................................JA3143

    Day 15 (Doc. 656) ..................................................................JA3404

    Closing Arguments (Doc. 666)................................................JA3559

Trial Exhibits

    Plaintiff's Trial Exhibits

        Request for Judicial Notice (excerpts) (Doc. 577)......................JA3688

        Notice of Deposition Designations Played in Court (Doc. 597-1)............JA3708

## Volume VI

    Plaintiff's Trial Exhibits (cont.)

    PX1 ...................................................................................JA3723

    PX2 ...................................................................................JA3741

    PX9 ...................................................................................JA3742

    PX12 .................................................................................JA3759

    PX13 .................................................................................JA3802

    PX14 .................................................................................JA3845

    PX15 .................................................................................JA3848

    PX16 .................................................................................JA3940

    PX17 .................................................................................JA3941

    PX19 .................................................................................JA3943

    PX21 .................................................................................JA3944

    PX23 .................................................................................JA3948

    PX24 .................................................................................JA3951

    PX26 .................................................................................JA3954

    PX28 .................................................................................JA3963

PX29  .................................................................................................JA3971

PX35  .................................................................................................JA3972

PX36  .................................................................................................JA3979

PX41  (excerpts) ..................................................................................JA3980

PX50  .................................................................................................JA4002

PX57  .................................................................................................JA4008

PX68  .................................................................................................JA4011

PX71  .................................................................................................JA4012

PX72  .................................................................................................JA4028

PX75  .................................................................................................JA4075

PX81  .................................................................................................JA4079

PX88 (excerpts) ...................................................................................JA4080

PX95  .................................................................................................JA4084

PX96  .................................................................................................JA4090

PX99  .................................................................................................JA4097

PX106 ...............................................................................................JA4109

PX111 ...............................................................................................JA4110

PX147 ...............................................................................................JA4112

PX148 ...............................................................................................JA4113

PX149 ...............................................................................................JA4115

PX150 ...............................................................................................JA4116

PX152 ...............................................................................................JA4124

PX153 ...............................................................................................JA4128

PX154 ...............................................................................................JA4130

PX155 ...............................................................................................JA4131

PX156 ...............................................................................................JA4132

PX157 ...............................................................................................JA4133

PX163 ...............................................................................................JA4134

PX164 ................................................................................................JA4138

PX165 ................................................................................................JA4142

PX167 ................................................................................................JA4145

PX177 ................................................................................................JA4147

PX182 ................................................................................................JA4154

PX200 ................................................................................................JA4156

PX218 ................................................................................................JA4158

PX225 ................................................................................................JA4196

PX227 ................................................................................................JA4199

PX230 ................................................................................................JA4200

PX236 ................................................................................................JA4201

PX238 ................................................................................................JA4203

PX265 ................................................................................................JA4206

PX279 ................................................................................................JA4209

PX287 ................................................................................................JA4212

PX288 (excerpts) .............................................................................JA4214

PX299 ................................................................................................JA4382

PX300 ................................................................................................JA4389

PX302 ................................................................................................JA4390

PX312 ................................................................................................JA4412

PX316 ................................................................................................JA4413

PX319 ................................................................................................JA4432

PX324 ................................................................................................JA4449

**Volume VII**

Plaintiff's Trial Exhibits (cont.)

PX340.................................................................................................JA4451

PX461.................................................................................................JA4454

PX465.................................................................................................JA4460

PX467.................................................................................................JA4461

PX509.................................................................................................JA4464

PX555.................................................................................................JA4475

PX604.................................................................................................JA4521

PX618.................................................................................................JA4523

PX619.................................................................................................JA4524

PX620.................................................................................................JA4525

PX621.................................................................................................JA4527

PX622.................................................................................................JA4528

PX623.................................................................................................JA4530

PX624.................................................................................................JA4531

PX625.................................................................................................JA4532

PX626.................................................................................................JA4533

PX628.................................................................................................JA4534

PX629.................................................................................................JA4535

PX630.................................................................................................JA4536

PX631.................................................................................................JA4537

PX633.................................................................................................JA4538

PX634.................................................................................................JA4558

PX656.................................................................................................JA4559

PX657.................................................................................................JA4561

PX659.................................................................................................JA4562

PX696.................................................................................................JA4563

PX705 ...................................................................................JA4564

PX720 ...................................................................................JA4565

PX721 ...................................................................................JA4566

PX722 ...................................................................................JA4585

PX723 ...................................................................................JA4586

PX741 ...................................................................................JA4606

PX749 ...................................................................................JA4607

PX755 ...................................................................................JA4625

PX767 ...................................................................................JA4627

Defendant's Trial Exhibits

DX2    ...................................................................................JA4628

DX3 (excerpts) ....................................................................JA4738

DX4    ...................................................................................JA4888

DX5    ...................................................................................JA4889

DX12 ...................................................................................JA4936

DX13 ...................................................................................JA4939

DX19 ...................................................................................JA4978

DX24 ...................................................................................JA5031

DX25 ...................................................................................JA5044

DX26 ...................................................................................JA5205

## Volume VIII

Defendant's Trial Exhibits (cont.)

DX27 ................................................................................................JA5244

DX36 ................................................................................................JA5272

DX39 ................................................................................................JA5346

DX40 ................................................................................................JA5376

DX41 ................................................................................................JA5462

DX42 ................................................................................................JA5463

DX44 ................................................................................................JA5479

DX47 ................................................................................................JA5484

DX53 ................................................................................................JA5508

DX55 ................................................................................................JA5546

DX56 ................................................................................................JA5596

DX60 ................................................................................................JA5597

DX76 ................................................................................................JA5598

DX79 ................................................................................................JA5599

DX80 ................................................................................................JA5600

DX81 ................................................................................................JA5601

DX82 ................................................................................................JA5602

DX83 ................................................................................................JA5603

DX84 ................................................................................................JA5611

DX100................................................................................................JA5612

DX103................................................................................................JA5615

DX106................................................................................................JA5617

DX109................................................................................................JA5620

DX119................................................................................................JA5623

DX133................................................................................................JA5633

DX139................................................................................................JA5647

DX669 ................................................................................................ JA5684

DX670 ................................................................................................ JA5685

DX671 ................................................................................................ JA5686

DX672 ................................................................................................ JA5689

DX673 ................................................................................................ JA5690

DX674 ................................................................................................ JA5691

DX677 ................................................................................................ JA5692

DX678 ................................................................................................ JA5693

DX679 ................................................................................................ JA5694

DX680 ................................................................................................ JA5696

DX681 ................................................................................................ JA5697

DX683 ................................................................................................ JA5699

DX685 ................................................................................................ JA5701

DX686 ................................................................................................ JA5702

DX688 ................................................................................................ JA5706

DX692 ................................................................................................ JA5711

DX694 ................................................................................................ JA5720

DX695 ................................................................................................ JA5721

DX699 ................................................................................................ JA5722

DX702 ................................................................................................ JA5723

DX703 ................................................................................................ JA5725

DX704 ................................................................................................ JA5726

DX705 ................................................................................................ JA5728

DX706 ................................................................................................ JA5731

DX707 ................................................................................................ JA5732

DX708 ................................................................................................ JA5733

DX709 ................................................................................................ JA5734

DX711 ................................................................................................ JA5735

DX713 ...........................................................................................JA5743

DX715 ...........................................................................................JA5745

DX716 ...........................................................................................JA5746

DX718 ...........................................................................................JA5747

DX720 ...........................................................................................JA5748

DX721 ...........................................................................................JA5749

DX722 ...........................................................................................JA5754

DX723 ...........................................................................................JA5759

DX724 ...........................................................................................JA5764

DX725 ...........................................................................................JA5765

DX726 ...........................................................................................JA5767

DX727 ...........................................................................................JA5772

DX728 ...........................................................................................JA5776

DX729 ...........................................................................................JA5779

DX730 ...........................................................................................JA5791

DX740 ...........................................................................................JA5793

DX742 ...........................................................................................JA5875

DX743 ...........................................................................................JA5892

DX744 ...........................................................................................JA5908

DX746 ...........................................................................................JA5926

## Volume IX

Amici's Exhibits

AO4   ...........................................................................................JA5927

AO6   ...........................................................................................JA5978

AO17 ...........................................................................................JA5979

AO28 ...........................................................................................JA5980

AO31 ...........................................................................................JA5981

Trial Demonstratives

Plaintiff's Demonstratives

PD20 ........................................................................................JA5982

PD25 ........................................................................................JA5983

PD27 ........................................................................................JA5984

PD29 ........................................................................................JA5985

PD31 ........................................................................................JA5986

PD32 ........................................................................................JA5987

PD33 ........................................................................................JA5988

PD38 (excerpts) ......................................................................JA5989

Defendant's Demonstratives

DD1 (excerpts) ......................................................................JA6030

DD10 (excerpts) ....................................................................JA6032

DD10A .....................................................................................JA6156

DD10B .....................................................................................JA6157

DD12 ........................................................................................JA6158

| | |
|---|---|
| **From:** | admiss_fin_aid_all_staff-list-bounces@lists.fas.harvard.edu on behalf of Donahue, Sally |
| **Sent:** | Tuesday, July 01, 2014 5:15:57 PM |
| **To:** | admiss_fin_aid_all_staff-list@lists.fas.harvard.edu |
| **Subject:** | [To All Admissions and Financial Aid Staff:] FW: HFAI/First Gen presentation |
| **Attachments:** | HFAI_FirstGen_Retreat2014New.pptx; ATT00001.txt |

And here is the HFAI/First Gen presentation from yesterday!

CONFIDENTIAL

United States District Court
District of Massachusetts

**DX 27**

Case No. _____ 1:14-cv-14176 (ADB)
Date Entered _____
By _____
Deputy Clerk

HARV00019748

**JA5244**
DX027.0001

admiss_fin_aid_all_staff-list mailing list
admiss_fin_aid_all_staff-list@lists.fas.harvard.edu
https://lists.fas.harvard.edu/mailman/listinfo/admiss_fin_aid_all_staff-list

CONFIDENTIAL

HARV00019749

**JA5245**
DX027.0002

# HFAI & FIRST GEN INITIATIVES

## Trends, Outreach, and Community-Building

CONFIDENTIAL

HARV00019750

**JA5246**

DX027.0003



THE HARVARD CRIMSON
MAY 2014

The Harvard Crimson    The Gates Within

FACEBOOKLOGO

The Gates Within

As Harvard College tears down financial barriers to entry, its low-income students say they still wonder if they have a place inside the Ivory Tower.

CONFIDENTIAL

HARV00019751

**JA5247**
DX027.0004

# THE HARVARD CRIMSON
## MAY 2014

The Harvard Crimson    The Gates Within    FACEBOOKLOGO

## HARVARD'S INCOME GAP

Harvard is undoubtedly a national leader in offering financial aid to its undergraduates, a fact well-broadcasted both within its gates and beyond them. Launched in 2004, the Harvard Financial Aid Initiative today gives 20 percent of undergraduates—those with household incomes less than $65,000—the chance to attend the College almost for free, with no expected parental contribution.

Administrators tout the program as key to promoting class diversity at Harvard. And as the University celebrates the initiative's 10-year anniversary, it also prepares to welcome its most racially diverse class of students ever to campus this fall.

"Harvard is much more diverse today than it was even a few years ago and we continue to bolster our efforts to make Harvard even more diverse in the years ahead," Dean of Admissions and Financial Aid William R. Fitzsimmons '67 writes in an email.

Indeed, Harvard goes beyond any legal obligation in providing financial assistance to its students and promoting accessibility to its educational resources. Even so, despite the rise in socioeconomic diversity the College has seen since starting the Financial Aid Initiative a decade ago, its student body today is still far from representative of the country's income distribution as a whole, as Harvard students are disproportionately upper class.

In The Crimson's 2013 survey of the Class of 2017, 15 percent of respondents reported an annual family income of less than $40,000—a much smaller proportion than the U.S. as a whole. Meanwhile, 14 percent of respondents reported family incomes of more than $500,000, by contrast, less than 1 percent of American households fall within this range.

Even Harvard's middle-income students earn at least two and a half times the amount that the median American household brings in during a given year, the survey shows. About 70 percent of respondents said their family income was over $80,000. The median household income in the U.S., by point of comparison, was just $51,371 in 2012, according to the U.S. Census Bureau.

Those statistics offer a glimpse of a freshman class disproportionately filled with students from upper-middle and upper-class households, and comparatively few on the other end of the spectrum, leaving disadvantaged students to navigate a campus dominated—statistically, at least—by peers who hail from backgrounds more affluent than their own.

## THROUGH THE GATES



Family Income Distribution

(y-axis: Percentage — 30, 25, 20, 15, 10, 5, 0)

(x-axis: Below $40k | Between $40k and $80k | Between $80k and $115k | Between $115k and $250k | Between $250k and $550k | Over $550k)



CONFIDENTIAL

# COLLEGE DEGREES BY INCOME (U.S., 2011)

Postsecondary Education
Opportunity, No. 245, Nov. 2012

■ No College Degree

■ College Degree

CONFIDENTIAL

HARV00019754

**JA5250**

DX027.0007

# HFAI OUTREACH/RECRUITMENT

- **Student run**
  - 8 term-time, 4 summer coordinators
- **Search letter**
  - Postcard converted to web form as of earlier this year
- **Hometown recruitment program**
  - 13-14: 13 students visiting 15—20 high schools and middle schools
- **Local Outreach**
  - 13-14: nearly 600 students with most groups ranging from 15-40
  - Broader area:
    - College Match from Los Angeles
    - Harlem Center for Education in New York City

CONFIDENTIAL

HARV00019755

**JA5251**

DX027.0008

# NEW RECRUITMENT STRATEGIES

- **Targeted Emails**
  - College Board Low SES list

- **Social media**
  - Two HFAI coordinators on student social media committee
  - Highlights our financial aid program and HFAI events
  - Planned: Virtual sessions specifically for financial aid questions

CONFIDENTIAL

HARV00019756

**JA5252**

DX027.0009

# Campus support for HFAI students

## Financial Aid Awarding

- Low summer allowance
- Blue Cross Blue Shield coverage
- Winter Coat Fund
- Free trips for Visitas
- Mid Year reconsiderations
- Officer of the Day program
- Extended office hours in April

## Advertised Resources

- HFAI dinners & events
- HFAI newsletter
- Student Events Fund
- Shoestring Guide (updates in progress!)
- Beneficiary Aid
- Computer loan program
- Financial Aid 101 sessions
- Freshman reception

## Internal Programs

- Wheelock Fund
- Joslyn Fund
- Commencement assistance
- Senior expenses
- Tax withholding refunds for international students

CONFIDENTIAL

HARV00019757

**JA5253**

DX027.0010

# FINANCIAL AID AWARDING




- Low summer allowance
- Blue Cross Blue Shield coverage
- Winter Coat Fund
- Free trips for Visitas
- Mid Year reconsiderations
- Officer of the Day program
- Extended office hours in April

CONFIDENTIAL

# ADVERTISED RESOURCES



- HFAI dinners & events (4 dinners per year)
- HFAI newsletter (7 per year)
- Student Events Fund
- Shoestring Guide (updates in progress!)
- Beneficiary Aid
- Computer loan program
- Financial Aid 101 sessions
- Freshman reception

CONFIDENTIAL

# INTERNAL PROGRAMS



- Wheelock Fund
- Joslyn Fund
- Commencement assistance
- Senior expenses
- Tax withholding refunds for international students

CONFIDENTIAL

HARV00019760

**JA5256**

DX027.0013

# STUDENT FEEDBACK ON HFAI & SOCIOECONOMIC DIVERSITY ON CAMPUS

**Q: What types of HFAI events would you like to attend?**

*"Discussions on how to bridge the gap between low income students and the privileged."*

*"Lectures about SES issues nationwide, but also discussions about SES specifically at Harvard."*

**Q: How do you feel about the dialogue around socioeconomic status/financial aid on campus?**

*"Most people assume that people are upper-middle class."*

*"I feel like a lot of the time in casual conversation it's ignored completely."*

**Feedback for HFAI**

*"Thanks for the food! HFAI is amazing because it (almost?) actually gives us a sense of privilege. My roommates are always so jealous about the awesome food!"*

CONFIDENTIAL

HARV00019761

**JA5257**

DX027.0014



CONFIDENTIAL

HARV00019762

**JA5258**
DX027.0015

Research partnership with Brown, Duke, Georgetown, and Harvard

# THE FIRST GENERATION STUDENT SUCCESS PROJECT

CONFIDENTIAL

HARV00019763

**JA5259**

DX027.0016

# FIRST GEN STUDENT RESPONSES ABOUT ACADEMICS

- Surprised by the level of academic rigor

- Shared experiences of academic difficulties more frequently

- Reported more frequent and more positive interactions with academic advisers

- Spoke of "catching up" in terms of skills and content

CONFIDENTIAL

HARV00019764

**JA5260**

DX027.0017

# FIRST GEN RESPONSES ABOUT SOCIAL EXPERIENCES

- Conveyed higher range of satisfaction

- Reported higher numbers of extracurricular activities, including more ethnic organizations

- Avoided "comping" for activities

- Characterized successes more in terms of group belonging

- Addressed issues of class more frequently

CONFIDENTIAL

HARV00019765

**JA5261**

DX027.0018

# FIRST GEN RESPONSES ABOUT PARENT INVOLVEMENT

- Reported very little specific advice about course selection, concentration choice, internships, study abroad or summer plans

- Described challenges in "translating" their college experience to parents

- Conveyed lower levels of specific academic advice

CONFIDENTIAL

HARV00019766

**JA5262**

DX027.0019

# NEXT STEPS

## For the Research Group

- Interviewing the continuing generation and first generation students next year (in their senior year) who were the first cohort of interviewees for the research project

- Introducing findings to larger public and inviting more schools to participate

## For Harvard to consider

- Adding more academic resources specifically for first gen students

- Finding ways to translate the college experience to parents at home

- Considering more programs—using Georgetown as a model—to create support for first gen students

CONFIDENTIAL

HARV00019767

**JA5263**

DX027.0020

# GEORGETOWN PROGRAMS

## Community Scholars Program

- 5 week residential academic experience

- Introduction to deans, FAO, campus administrators

- $1700 scholarship for 3 years

- Academic support and other support for 4 years

## G'town Scholarship Program

- Programming much like HFAI

- "Dare to Thrive" challenge to earn a $25 gift card

- "Dress for Success" evening for job interviews attire

CONFIDENTIAL

HARV00019768

**JA5264**
DX027.0021

## I'M FIRST



CONFIDENTIAL

HARV00019769

**JA5265**

DX027.0022

# WWW.IMFIRST.ORG

- **Center for Student Opportunity**

- **College advice, college information, sharing stories, student blogs**

- **Harvard student, Jesse Sanchez '14, blogged for them**







CONFIDENTIAL

HARV00019771

MICHELLE OBAMA ON "I'M FIRST"



CONFIDENTIAL

HARV00019772

**JA5268**

DX027.0025

# HARVARD RESOURCES

## In place now...

- HFAI support

- First Generation Student Union (2013)

- First Generation Harvard Alumni Shared Interest Group (2012)

- Bureau of Study Counsel

## To come...

- Web page on our Admissions website

- 1st generation staff checkbox on reader rating form

- Continued partnering with SIG and FGSU

- Generating updated data for the "I'm First" website

CONFIDENTIAL

# ADMISSIONS PROCESS – LOOKING FORWARD

- National Partnership for Educational Access list of CBOs

- +/- rating and comments on reader sheet

- Ratings rubric for non-traditional activities
  - Boost either the EC or Athletic rating from "3" range to "2" range
  - "5" should be used if otherwise might be rated a 3- or 4

CONFIDENTIAL

HARV00019774

**JA5270**

DX027.0027

# HFAI & FIRST GEN INITIATIVES

## Trends, Outreach, and Community-Building

CONFIDENTIAL

HARV00019775

**JA5271**

DX027.0028



# Selected Topics in Casework and Diversity

United States District Court
District of Massachusetts

**DX 36**

Case No.    1:14-cv-14176 (ADB)
Date Entered
By                    Deputy Clerk

HARV00025279

DX036.0001

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

JA5272

- **U.S. Context**
  - Demographics
  - Educational Attainment
  - Testing Distributions

- **Native Americans**
  - Historical Context
  - Demographics
  - Applicant pool
  - Campus Life

- **Latinos**
  - Geographic Distribution
  - Demographic Distribution
  - Identity
  - Campus Life

HARV00025280

DX036.0002

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Demographics

HARV00025281

DX036.0003

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Population by Race and Ethnicity



White
64%

Hispanic
16%

Black
12%

Asian
5%

Other
3%

Notes:   Racial groups include only non-Hispanics. Hispanics are of any race.

Source: Pew Hispanic Center tabulations of U.S. Census Bureau Redistricting_Files-PL_94-171 for states

*PEW HISPANIC CENTER*

HARV00025282

DX036.0004

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Figure 1.
Real Median Household Income by Race and Hispanic Origin: 1967 to 2010

Note: Median household income data are not available prior to 1967. For information on recessions, see Appendix A.
Source: U.S. Census Bureau, Current Population Survey, 1968 to 2011 Annual Social and Economic Supplements.

HARV00025283

DX036.0005

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA5276**



**Most common languages**

Counties where at **least 10 percent** of people speak a language other than English at home:

- Spanish
  708 counties
- Native American languages
  29 counties
- German
  21 counties
- French
  15 counties
- Pacific Island languages
  12 counties
- Other languages*
  11 counties
- English is spoken in at least 90 percent of homes in 2,347 counties.

SOURCE: Census American Community Survey 2007-2011.

*Other includes Chinese, Portuguese or Portuguese Creole, Hindi, Hmong, Other Indo-European languages and Russian. This category was added to the map on Aug. 20.

**JA5277**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00025284

DX036.0006

HARV00025285

DX036.0007

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Racial and Ethnic minorities accounted for **91.7**% of the nation's growth between 2000 and 2010.



Educational Attainment

HARV00025286

DX036.0008

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Educational Attainment Rates

Legend:
- Doctorate
- Professional
- Masters
- Graduate School, No Degree
- Bachelors
- Associates
- Some College
- High School/GED
- Less Than High School

Categories: White, Black, Asian American, Hispanic

Axis: 0% to 100%

Source: U.S. Census Bureau, Current Population Survey, 2012 Annual Social and Economic Supplement

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00025287

DX036.0009

**JA5280**



HARV00025288

DX036.0010

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA5281**



Native American Educational Attainment

- No HS Diploma or GED
- HS Diploma or GED
- BA
- MA, Professional, PhD

HARV00025289

DX036.0011

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Demographics of HS Graduates

White
60%

Native Am/Alaskan Native
1%

Asian American
6%

Black
15%

Hispanic
18%

HS Graduates: 3,053,966

HARV00025290

DX036.0012

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



# Testing Distributions

HARV00025291

DX036.0013

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SAT Test-Takers: 2012

- White 53%
- Latino 8%
- Mexican American 7%
- Puerto Rican 2%
- Black 13%
- Asian American 12%
- Other 4%
- Native Am/Alaskan Native 1%

HARV00025292

DX036.0014

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA5285**



HARV00025293

DX036.0015

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HARV00025294

DX036.0016

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00025295

DX036.0017

# Approximate number of students based on percentiles

| Above 600 | Total | CR | M | W |
|---|---|---|---|---|
| White | 852,150 | 213,050 | 255,650 | 187,450 |
| Latino | 136,600 | 12,300 | 15,050 | 10,950 |
| Mexican American | 108,250 | 7,600 | 10,800 | 6,500 |
| Puerto Rican | 27,800 | 2,500 | 2,500 | 1,950 |
| Black | 217,650 | 10,900 | 10,900 | 8,700 |
| Asian American | 192,600 | 53,900 | 102,050 | 61,700 |
| Native American | 9,700 | 1,350 | 1,650 | 970 |
| Other | 62,350 | 12,450 | 16,850 | 12,450 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00025296

DX036.0018

# Approximate number of students based on percentiles

| Above 700 | Total | CR | M | W |
|---|---|---|---|---|
| White | 852,150 | 51,150 | 59,650 | 42,600 |
| Latino | 136,600 | 2,750 | 2,750 | 1,350 |
| Mexican American | 108,250 | 1,100 | 1,100 | 1,100 |
| Puerto Rican | 27,800 | 280 | 280 | 280 |
| Black | 217,650 | 2,180 | 2,180 | 2,180 |
| Asian American | 192,600 | 17,350 | 48,150 | 21,200 |
| Native American | 9,700 | 290 | 290 | 290 |
| Other | 62,350 | 3,100 | 5,000 | 3,100 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00025297

DX036.0019

**JA5290**

# Native Americans in the United States

## Tribal Sovereignty, Demographics, and Indigenizing Veritas

HARV00025298

DX036.0020

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00025299

DX036.0021

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA5292**

HARV00025300

DX036.0022

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# 1800s: Forced Removal



Figure 1.3 Movement of Indian tribes into Oklahoma. Some of the tribes—such as the Kiowa, Arapaho, Cheyenne, and Comanche—moved on their own volition; others were pressured to move; and some, such as the Seminole, were forcibly moved. (Courtesy U.S. Public Health Service, Division of Indian Health)



The Arapaho tribe
The Cayuga tribe
The Cherokee tribe
The Cheyenne tribe
The Chickasaw tribe
The Choctaw tribe
The Creek tribe
The Delaware tribe
The Ioway tribe
The Kaw tribe
The Miami/Peoria tribe
The Missouria-Otoe tribe
The Modoc tribe
The Ottawa tribe
The Pawnee tribe
The Ponca tribe
The Potawatomi tribe
The Quapaw tribe
The Sac and Fox tribe
The Seneca tribe
The Shawnee tribe
The Wyandotte tribe
The Tonkawa tribe
The Yuchi tribe



HARV00025301

DX036.0023

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**American Indian Reservations**

MAP KEY

Federal American
Indian Reservations

State American
Indian Reservations

HARV00025302

DX036.0024

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# 566
## federally recognized tribes

HARV00025303

DX036.0025

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Tribal Enrollment

- Blood quantum

- Lineal descent



HARV00025304

DX036.0026

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00025305

DX036.0027

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Indian Termination Policies



- Dissolution of over 100 tribal nations from 1953-1964
- Ex. Menominee Termination Act
- Indian Relocation Act of 1956
- Assimilation
- Encouraged movement to government-designated cities



# Native American and Alaska Native Demographics

HARV00025306

DX036.0028

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# DEFINITION OF AMERICAN INDIAN OR ALASKA NATIVE USED IN THE 2010 CENSUS

*According to OMB, "American Indian or Alaska Native" refers to a person having origins in any of the original peoples of North and South America (including Central America) and who maintains tribal affiliation or community attachment.*

*The American Indian and Alaska Native population includes people who marked the "American Indian or Alaska Native" checkbox or reported entries such as Navajo, Blackfeet, Inupiat, Yup'ik, or Central American Indian groups or South American Indian groups.*

HARV00025307

DX036.0029

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Population of Native American & Alaska Natives in the United States

2010: 5.2 million people

- 1.7% of population

2010: ~70% of people who self-identify as Native American *do not* live in Native American and Alaska Native areas.

HARV00025308

DX036.0030

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HARV00025309

DX036.0031

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00025310

DX036.0032

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# States with the highest percentage of Native Americans

*California, 13.9%

*Oklahoma, 9.2%

*Arizona, 6.8%

*Texas, 6.0%

*New York, 4.2%

# Cities with the largest number of Native Americans

Table 3.

**Ten Places With the Largest Number of American Indians and Alaska Natives: 2010**
(For information on confidentiality protection, nonsampling error, and definitions, see www.census.gov/prod/cen2010/doc/pl94-171.pdf)

| Place | Total population | American Indian and Alaska Native | | | | | |
|---|---|---|---|---|---|---|---|
| | | Alone or in combination | | Alone | | In combination | |
| | | Rank | Number | Rank | Number | Rank | Number |
| New York, NY. . . . . . . . . . . | 8,175,133 | 1 | 111,749 | 1 | 57,512 | 1 | 54,237 |
| Los Angeles, CA . . . . . . . . | 3,792,621 | 2 | 54,236 | 3 | 28,215 | 2 | 26,021 |
| Phoenix, AZ . . . . . . . . . . . | 1,445,632 | 3 | 43,724 | 2 | 32,366 | 7 | 11,358 |
| Oklahoma City, OK . . . . . . | 579,999 | 4 | 36,572 | 7 | 20,533 | 3 | 16,039 |
| Anchorage, AK . . . . . . . . | 291,826 | 5 | 36,062 | 5 | 23,130 | 6 | 12,932 |
| Tulsa, OK. . . . . . . . . . . . . | 391,906 | 6 | 35,990 | 6 | 20,817 | 4 | 15,173 |
| Albuquerque, NM. . . . . . . | 545,852 | 7 | 32,571 | 4 | 25,087 | 16 | 7,484 |
| Chicago, IL . . . . . . . . . . . | 2,695,598 | 8 | 26,933 | 10 | 13,337 | 5 | 13,596 |
| Houston, TX. . . . . . . . . . . | 2,099,451 | 9 | 25,521 | 8 | 14,997 | 8 | 10,524 |
| San Antonio, TX. . . . . . . . | 1,327,407 | 10 | 20,137 | 11 | 11,800 | 11 | 8,337 |
| Tucson, AZ. . . . . . . . . . . . | 520,116 | 11 | 19,903 | 9 | 14,154 | 24 | 5,749 |
| Philadelphia, PA. . . . . . . . | 1,526,006 | 13 | 17,495 | 25 | 6,996 | 9 | 10,499 |
| San Diego, CA. . . . . . . . . | 1,307,402 | 12 | 17,865 | 23 | 7,696 | 10 | 10,169 |

Source: U.S. Census Bureau, 2010 Census Redistricting Data (Public Law 94-171) Summary File, Table P1.

HARV00025311

DX036.0033

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00025312

DX036.0034

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

States with highest proportions of Native Americans

AK, 14.8%

NM, 9.4%

SD, 8.8%



**JA5305**

# Largest Tribal Nations

## Cherokee: 16%
- 820,000

## Navajo: 6.5%
- 332,000

## Choctaw: 3.8%
- 195,000

## Mexican American Indian: 3.4%
- 175,000

## Chippewa : 3.3%
- 170,000

HARV00025313

DX036.0035

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



*Applicant Pool*

HARV00025314

DX036.0036

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00025315

DX036.0037

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

- Reservations and Native lands

- "Urban Indian" applicants

1.7% of U.S. population



## Population by area: "West"

AK, AZ, CA, CO, HI, ID, MT, NV, NM, OR, UT, WA, WY

Dockets B, Z, A, C

| | |
|---|---|
| % of Native Population | 41% |
| | |
| % of Native Applicants: | 35% |
| % of Native Admits: | 43% |
| Yield: | 50% |

HARV00025316

DX036.0038

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Population by area: "South"

AL, AR, DE, District of Columbia, FL, GA, KY, LA, MD, MI, NC, OK, SC, TN, TX, VA, WV

Dockets D, G, H, I, J

| | |
|---|---|
| % of Native Population | 33% |
| % of Native Applicants: | 33% |
| % of Native Admits: | 26% |
| Yield: | 75% |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00025317

DX036.0039

**JA5310**



## Population by area: "Midwest"

IL, IN, IA, KS, MI, MN, MO, NE, ND, OH, SD, WI

Dockets E, F

| | |
|---|---|
| % of Native Population | 17% |
| % of Native Applicants: | 13% |
| % of Native Admits: | 17% |
| Yield: | 63% |

HARV00025318

DX036.0040

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



# Population by area: "Northeast"

CT, ME, MA, NH, NJ, NY, PA, RI, VT

Dockets P, L, N, K, S, T, R,

| | |
|---|---|
| % of Native Population | 8% |
| % of Native Applicants: | 18% |
| % of Native Admits: | 13% |
| Yield: | 100% |

HARV00025319

DX036.0041

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



*Campus Life*

HARV00025320

DX036.0042

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HARV00025321

DX036.0043

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HARV00025322

DX036.0044

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA5315**

# Latinos in the U.S.

*Demography, Geography and Identity*

HARV00025323

DX036.0045

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

- Latinos are nation's largest minority group

- Accounted for **56%** of population growth in U.S. from 2000-2010

- 51.9 Million Hispanics in 2011

- **17%** of U.S. Population

HARV00025324

DX036.0046

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HARV00025325

DX036.0047

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Two-thirds** *of Hispanics live in just five states...*

**1 California**
14.4 million Hispanics
28% of all Hispanics

*Nearly half (47%) live in California and Texas alone.*

**2 Texas**
9.8 million Hispanics
19% of all Hispanics

**5 Illinois**
2.1 million Hispanics
4% of all Hispanics

**4 New York**
3.5 million Hispanics
7% of all Hispanics

**3 Florida**
4.4 million Hispanics
8% of all Hispanics

Pew Research Hispanic Center tabulations of 2011 American Community Survey (1% IPUMS)

HARV00025326

DX036.0048

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA5319**



...but **five** other states have seen the fastest growth since 2000.

**4 Minnesota**
257,000 Hispanics
120% growth

**2 Kentucky**
132,000 Hispanics
132% growth

**5 North Carolina**
828,000 Hispanics
120% growth

**1 South Carolina**
241,000 Hispanics
154% growth

**3 Arkansas**
190,000 Hispanics
123% growth

Pew Research Hispanic Center tabulations of 2000 Census (5% IPUMS) and 2011 American Community Survey (1% IPUMS)

HARV00025327

DX036.0049

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

*Latino population accounted for ALL growth in following states:*

**Illinois**

**Louisiana**

**Massachusetts**

**New Jersey**

**New York**

**Rhode Island**

HARV00025328

DX036.0050

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Proportions of Latino Populations by State



Percent
- 1.2 - 1.6
- 1.6 - 2.0
- 2.0 - 2.7
- 2.7 - 3.5
- 3.5 - 6.7
- 6.7 - 13
- 13 - 24
- 24 - 46

HARV00025329

DX036.0051

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Top 10 States with the highest proportions of Latinos

| State | Percentage |
|-------|-----------|
| New Mexico | 46.7% |
| Texas | 38.1% |
| California | 38.1% |
| Arizona | 30.1% |
| Nevada | 27.1% |
| Florida | 22.8% |
| Colorado | 20.9% |
| New Jersey | 18.1% |
| New York | 18.0% |
| Illinois | 16.1% |

HARV00025330

DX036.0052

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

JA5323



*Demographics*

HARV00025331

DX036.0053

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Distribution of Latino Population by Origin: 2010

Central American 71%

Other Hispanic 8%

Caribbean 16%

South American 5%

HARV00025332

DX036.0054

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA5325**



# U.S. Hispanic Population, by Origin, 2010
*(in thousands)*

| | | % of Hispanics |
|---|---|---|
| All Hispanics | 50,730 | |
| Mexicans | 32,916 | 64.9 |
| Puerto Ricans | 4,683 | 9.2 |
| Cubans | 1,884 | 3.7 |
| Salvadorans | 1,827 | 3.6 |
| Dominicans | 1,509 | 3.0 |
| Guatemalans | 1,108 | 2.2 |
| Colombians | 972 | 1.9 |
| Hondurans | 731 | 1.4 |
| Ecuadorians | 665 | 1.3 |
| Peruvians | 609 | 1.2 |

Note: Total U.S. population is 309,350,000 (rounded to the nearest thousand).

Source: Pew Hispanic Center tabulations of the 2010 ACS (1% IPUMS)

PEW RESEARCH CENTER

HARV00025333

DX036.0055

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



*The Hispanic population is the nation's **youngest** major racial or ethnic group.*

Median age of...

Whites 42

Asians 36

Blacks 33

Hispanics 27

25    30    35    40

Pew Research Hispanic Center tabulations of 2011 American Community Survey (1% IPUMS)

HARV00025334

DX036.0056

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA5327**



HARV00025335

DX036.0057

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Figure 3**

Hispanic Population, by Generation, for Children

Population in Each Generation (thousands)

Source: For 1980 to 2007, Pew Hispanic Center tabulations of the Decennial Census and 2007 American Community Survey Integrated Public Use Micro Samples. For 2010 to 2025, projections done by Pew Hispanic Center senior demographer Jeffrey S. Passel.

HARV00025336

DX036.0058

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Parents' Educational Attainment by Generation

HARV00025337

DX036.0059

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**JA5330**



*Identity*

HARV00025338

DX036.0060

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00025339

DX036.0061

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Latinos made up 97 percent of all those that identified as only "Some Other Race" on the U.S. Census

# Different vs. Shared Cultures

- ■ U.S. Hispanics have different cultures
- ■ U.S. Hispanics share a common culture
- ■ DK/no opinion



69

29

2

HARV00025340

DX036.0062

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

JA5333



Which term do you use to describe yourself? Youth Ages 16-25

Family's Country of Origin 52%

Hispanic/Latino 20%

American 24%

DK/No Opinion 4%

HARV00025341

DX036.0063

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HARV00025342

DX036.0064

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Do you think of yourself as a typical American?

Typical American
47%

DK/No Opinion
6%

Very Different from Typical American
47%

HARV00025343

DX036.0065

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



*Adding to the complexity: History & Context*

HARV00025344

DX036.0066

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Historical Context: Latino Segregation

- Segregation in early 1900s

- "Mexican" Schools- Mexican children not allowed to enroll in white schools
  - Curriculum focused on "Americanization"
  - Usually years behind white students

- 1946- *Mendez, et al v. Westminster School (CA)*
  - Ruled that segregation of Mexican and Mexican-American students unconstitutional
  - First court case that successfully challenged segregation in schools

HARV00025345

DX036.0067

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HARV00025346

DX036.0068

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Present Day: Perceptions of Latinos

"Over 30 percent of non-Hispanics believe a majority (over half) of Hispanics are undocumented. However, the actual figure of undocumented Hispanics in the U.S. is around 18 percent, and only 37 percent of U.S. Hispanics are actually immigrants"

*-NBC Latino*

HARV00025347

DX036.0069

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



*Campus Life*

HARV00025348

DX036.0070

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00025349

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

DX036.0071



Student Examples

HARV00025350

DX036.0072

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



HARV00025351

DX036.0073

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# References

*U.S. Census Bureau*

*Pew Hispanic Center*

*US Dept. of Health & Human Services*

*Collegeboard*

*Margaret E. Montoya, A Brief History of Chicana/o School Segregation: One Rationale For Affirmative Action, 12 La Raza Law Journal 159-172, 162-171 (2001)*

HARV00025352

DX036.0074

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

<div align="center">Memorandum</div>

| | |
|---|---|
| **To:** | Members of the Corporation |
| **From:** | Drew Faust and Mike Smith |
| **Subject:** | Proposed Changes in Admissions Policy |
| **Date:** | February 2, 2011 |

Following up on the analysis and discussion at the January 10 Corporation meeting, we write to request your approval for a restoration of non-binding, single-choice early action as an element of the Harvard College admissions process. This memorandum, together with accompanying attachments, sets forth:

- The specific form the new early action would take, the timeline for its implementation, and the shape of the revised admissions cycle;
- The context for this request, in terms of history and peer practice, and in relation to our decision in 2006 (effective fall of 2007) to eliminate early action in favor of a single admissions cycle;
- The reasons for our judgment that a return to early action is in the best interests of the College and consistent with broader policy goals;
- The mechanics of "new" early action, options considered, and reasons for recommended approach;
- The elements of an enhanced recruiting program to ensure that the return to early action remains true to our goals of access, opportunity, and excellence across the admissions cycle; and,
- A draft press release to give a sense of how we will aim to position this decision with our own constituencies and the broader public.

**Recommended Action**

*The Structure of the Proposed Early Action Program*

We recommend a return to a single-choice, non-binding early action program for this coming fall (2011) (*see Exhibit 1: Early Admission Programs – Models and Peer Practices, and Exhibit 2: Range of Admission Process Options*). This program would be similar in structure to the early action program in effect at Harvard until 2007, but would be accompanied by an enhanced recruiting and outreach program designed to ensure that our goals of access, opportunity, and excellence are served aggressively across our admissions cycle.

The proposed early action program would be structured as follows:

- Students would apply by November 1 and be notified by December 15 of a decision to admit, deny admission, or defer their application for further consideration in the regular decision cycle.
- Students may not apply to other colleges under early action or early decision programs. Harvard will withdraw any offer of admission to a student who does so.
- Students may apply simultaneously to any college under regular decision programs.

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

United States District Court
District of Massachusetts

**DX 39**

Case No. _____ 1:14-cv-14176 (ADB)
Date Entered_____
By_____
Deputy Clerk

HARV00030303

*The Overall Admissions Cycle*

With a return to early action, we would maintain the current "regular decision" deadlines, which require that students apply to Harvard by January 1, are notified by April 1, and have until May 1 to decide about matriculation (*see Exhibit 3: Overview of Proposed Total Admissions Cycle at Harvard*). As noted, because our proposed early action program would be non-binding, all students would have until May 1 to make their decisions.

In the period between the early action and regular decision notifications, we would plan to send more "likely" letters to top candidates who miss our early action deadline but are certain to be admitted on April 1. (*See Exhibit 4: Sample "Likely" Letter.*) These will include students from modest economic backgrounds whose inadequate high school counseling caused them to miss our November 1 deadline. But it would also include candidates from all economic backgrounds who bring the kinds of excellence that Harvard and other selective colleges seek.

Finally, we will continue to maintain a waiting list for applicants from the regular admissions cycle (including early applicants "deferred" to regular admission on December 15), admitting those students on a space available basis between May 1 and July 1.

**Context for Current Recommendation**

*Early Admissions at Harvard:  History and Peer Practice*

The Ivy League first introduced a formal early admissions program in 1977 (Class of 1981), and some form of early action admissions was employed by Harvard College from that date until we eliminated the program in 2007 (Class of 2011). The landscape of early admissions has evolved over time, with changes made in the policies of our closest peers, and with different forms of early action in effect at the College *(see Exhibit 5: History of Early Admissions at Harvard)*. Over this period, early applications increased faster than regular applications, reaching a peak in 2003 at 36% of total applications. In 2004, Harvard moved to single choice early action, controlling the number of early applications received. Harvard has never had an early *decision* program (binding)—based on the principle that it is important that students are able to apply to other colleges, compare financial aid packages and make a more informed choice in May, rather than October, of their senior year.

*The Decision to Eliminate Early Action*

In 2006, the Corporation voted, with the support of FAS Interim Dean Jeremy Knowles and Interim President Derek Bok, to eliminate early action as a part of ongoing efforts to expand access and affordability. (*See Exhibit 6: Press Release, September 12, 2006.*) President Bok outlined the following reasoning for the decision: "The college admissions process has become too pressured, too complex and too vulnerable to public cynicism. We hope that doing away with early admission will improve the process and make it simpler and fairer." (*See Exhibit 7: The Decision to Eliminate Early Action in 2007.*) Specifically, our goals were to:

- Simplify admissions for Harvard and for elite higher education more broadly;
- Eliminate the perceived admissions advantage from applying early;
- Extend the fall recruiting period, allowing Harvard to engage underserved students more intensively in the fall; and

2

- Reinforce Harvard's message regarding access and affordability.

Our thinking in this regard was informed by research showing that early action was being used increasingly by institutions to bolster yield and boost college rankings. Meanwhile, sophisticated students and their parents looked to early decision and early action to increase their chances of admission to selective (and not-so-selective) institutions, because it was understood that the chances of admission were better for early applicants. Research had also demonstrated that early admission programs favored students from more privileged backgrounds, with access to college counseling that provided stronger guidance through the college application process. Early admission programs also distorted the secondary school experience, placing pressure students to make a highly consequential choice prematurely.

Finally, during the early 2000's, certain of our Ivy League peers, most notably Stanford and Yale, had responded to growing concern about the distorting impact of early programs with a move from their long-standing, binding early decision programs to non-binding, single choice early action on Harvard's model. Thus, it seemed worth exploring whether, as part of our broader access agenda, we could use our leadership position in higher education to influence key peers to abandon it altogether.

*An "Experiment" from the Outset*

Understanding that our agenda of simplifying admissions from the student's point of view would only work if key peers followed suit, and understanding, further, that if they did not we might face increased competitive pressures for top students, we announced the elimination of early action as a pilot program. After laying out the plan to eliminate early action, our initial press release specified that: "Harvard will commence the unitary system with a two- to three- year trial period so that it can monitor the impact of this change and make sure that it does not have a negative impact on student quality" (*See press release, Exhibit 6*). As Dean Fitzsimmons put it in the same announcement, "We have always felt that early action avoids the most troublesome aspects of binding early decision while preserving the original aim of early admission – providing students with early notification of admission without binding those who change their minds later in the process…. If, after several years with a single admissions deadline we find ourselves needing to reinstate early admission to improve the quality of our student body, we will return to early action" (*see press release, Exhibit 6*).

**Reasons That We Recommend a Return to Early Action**

We recommend a return to early action for three main reasons. First, the "public policy" dimension of our experiment – to simplify the admissions process from the student point of view – did not succeed, as only Princeton and UVA joined us in eliminating early action (*see Exhibit 8: Summary of Results from the Early Action Experiment*). Thus, a given student arguably faces greater, rather than less, complexity in deciding how to how to navigate the admissions landscape in which Yale and Stanford offer an early option and Harvard and Princeton do not.

Second, since 2007, the trend toward early admissions has intensified, rather than diminished, as uncertainty about the future arising from the economic downturn has created greater anxiety about applying for college. (*See Exhibit 9: Early Applications to All COFHE Schools*). More than ever, students and their families are anxious to seek the best and most affordable options for higher education. This anxiety has led record numbers of students to apply to college both regular decision and early, and college counselors often respond by encouraging students to apply early in order to ensure a spot in a

3

**JA5348**
DX039.0003

selective college.  At some of Harvard's most productive "feeder" high schools, for instance, up to 90% of students apply early somewhere.  By not offering an early admissions option, therefore, Harvard has placed itself at odds with trends in the market.

These forces are visible in admissions results for some of our most desirable students – academically-well prepared first generation, under-represented minority, and low income students, and top students from across the income spectrum who seem to want an early option.  A careful review of admissions results since the end of early action demonstrates that although Harvard has seen a rapid increase in the number of applications it receives, and yield rates have held up remarkably well overall, yield rates have declined meaningfully among some of the most talented and desirable students (*see Exhibits 10-12: Changes in Yield Rates*).  While our "win rate" is still strong against key peers, it has been declining (*see Exhibit 13: Admissions wins versus Yale, Stanford and Princeton*).  Some of this decline may be may be among cross-admitted students, who are admitted early to our peers and are then the target of aggressive recruiting strategies.  In addition to these students, we do not know how many students are admitted through early programs elsewhere and therefore never apply to Harvard.

Of particular interest given the rationale for eliminating early action, our Admissions office is becoming increasingly concerned that not having an early admission option is causing us to lose some of the most academically talented and prepared low-income and underrepresented minority students.  Our new financial aid initiatives have attracted large numbers of low-income students from among the better public and magnet schools, schools in more mixed-income districts, and affluent public schools with bussing options, voluntary open enrollment, or small low-income pockets in their communities.  In fact, many of our low-income and minority students come from our top "feeder" high schools (*see Exhibit 14: Top High Schools Sending Low Income and Minority Students to Harvard*).  Furthermore, many of the best private secondary schools have, like Harvard, provided financial aid to needy but promising students.  As a result, many private schools are considerably more diverse economically and ethnically than many public schools given the real estate prices in affluent towns.  Increasingly, these students are counseled to apply early to their top choice program to better their chances of admission.  This trend was beginning to manifest itself in the years immediately before we eliminated early action resulting in increased diversity among our early applicants and an early pool that looked more like regular admissions pool, and it has likely continued since we eliminated early action. (*See Exhibit 15: Diversity of Harvard's Early Applicants and Exhibit 16: Diversity of Harvard's Early and Regular Applicants.*)

These concerns – the failure to instigate a policy change among our peers, the increasing demand from students for an early admission option, and the decline in yield among the most desirable students, including talented low income and underrepresented minority students – have led us to the conclusion that Harvard should reintroduce early action.  Not to do so potentially puts at risk not only our  access to top minority students and the best students eligible for the low and moderate-income component of the Harvard Financial Aid Initiative, but also our competitive position with regard to the very best candidates from all economic backgrounds.  All of these exceptionally talented students – whether minority, low income, or privileged – help to ensure Harvard's pre-eminence in the Putnam Math Contest, the Rhodes and Marshall competitions, and the production of great performers, athletes and public leaders.

4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Why We Recommend Single Choice Early Action and How We Will Ensure that it is Consistent with Our Goals of Access and Opportunity**

*Options Considered*

As noted, we are proposing that Harvard return to single-choice early action, a non-binding program where students apply by November 1, receive an admissions decision by December 15, and enroll by May 1.  Single choice early action allows students to apply to multiple institutions, compare programs and financial aid packages, and make the best decision for them on May 1 of the senior year of high school.  It will also allow Harvard to recruit early-admitted students in a focused way over an extended period.

Our decision to recommend single-choice, early action is based on our desire to have an early option that is as flexible as possible for students, giving them maximum freedom and time in their senior year to find the college that best suits their needs and talents.  Thus, we would not consider binding early decision, which is contrary to Harvard's history, tradition, and principles regarding admissions, and would be viewed as a very odd choice coming on the heels of our 2006 decision to eliminate early action altogether. (*See again Exhibits 1-2.*)

Likewise, we do not think that a return to a wide-open early application process would serve us well.  Previous experience tells us that open, unrestricted early action would likely increase the number of early applicants to unmanageable levels.  For the Class of 2015, Harvard received almost 35,000 applications, a 15% increase over the previous year.  In the most recent years with a single-choice early action program, fewer than 20% of applicants applied early, but between 2000 and 2004 when Harvard had few or no restrictions on early applications, more than 30% of applicants applied early (*see Exhibit 5*).  That rate would be seriously challenging for the admissions office to handle today.

Finally, given Harvard's leadership position in higher education, we believe that it would be irresponsible to consider an entirely new approach to admissions at Harvard without considerable advance study.  Thus, we believe that it would be unwise at this point to opt for an approach such as rolling admissions, which would be entirely new to the Ivy League and to us. (*See Exhibit 2: Range of Admission Process Options.*)  In a domain in which we have tried to stand for transparency and simplicity, adding this kind of uncertainty and complexity seems to us irresponsible from the point of view of both principle and pragmatism.  That said, we will continue to evaluate a full range of options as we move forward.

*Enhanced Recruiting through "Likely Letters" and other Means*

In addition to reintroducing early action, we also recommend expanding the use of "likely" letters to top students who may have missed the early action deadline but are certain to be admitted.  (*See Exhibit 4: Sample Likely Letter.*) These might include students from modest economic backgrounds whose inadequate high school counseling causes them to miss the November 1 deadline, but would also include the most talented students from all backgrounds.  In particular, we may be able to engage student groups, alumni/ae and faculty members to recruit the top admitted students who typically yield at lower rates including engineers, physical scientists and computer scientists, as well as underserved or underrepresented students.  Harvard sent 335 likely letters to applicants to the Class of 2014, 221 of whom were athletes, pressured by other institutions to respond to "exploding" offers of admission.

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030307

We expect that the combination of early action and an increased use of "likely" letters among targeted groups will be a step in the direction of maintaining our commitment to access. However, this will not be possible without recruiting initiatives targeted toward particular populations of students. The elimination of early action allowed us to extend our recruiting period through the fall and identify strategies and mechanisms to identify and engage talented students from all backgrounds. We plan to continue to use and expand these techniques even with the reintroduction of early action.

Accompanying the reinstatement of early action, we propose to enhance recruiting for top students from families and schools less likely to be "plugged in" to the full range of admissions options. (*See Exhibit 17: Potential New Recruiting Initiatives.*) Dean Fitzsimmons will be working over the next two months to refine and cost out a series of proposals for approval by Deans Smith and Hammonds. At this point, we are thinking about the following kinds of initiatives to expand Harvard's reach to previously underserved populations who have limited exposure to Harvard:

- A new program promoting transparency in college admissions, offering print and web-based guides on how to apply to college, when to apply under early admission programs, as well as information about how colleges make admissions decisions;
- Targeted staff visits to areas where few students apply early to college;
- Greater use of electronic and other outreach to students less likely to apply early (or regular) to selective colleges;
- Increased involvement of Harvard undergraduates throughout the year in three major recruiting efforts: the Harvard Financial Aid Initiative, the Undergraduate Minority Recruitment Program, and the Undergraduate Admissions Council's Return to High School Program;
- Enhanced web features providing families with the ability to calculate the likely net cost to them of sending a child to Harvard and perspectives from financial aid students on life at Harvard;
- Extended fall travel in late October and November to areas with large numbers of under-served students based on the experience of the past few years without early admission; and
- New outreach by Harvard's 12,000 alumni/ae volunteers to high schools that send few students to selective institutions.

These efforts will aim to bring Harvard to groups of students who would not have considered Harvard College a realistic option for them – whether they are low income, from high schools with few students attending four-year colleges, or engineers or physical scientists who do not think of Harvard's programs when considering college. These efforts will improve our ability to identify talented students from all backgrounds and with a full range of interests.

**Conclusion**

For the reasons stated, we respectfully request that you grant approval to the College to reinstate an early action program.

6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Public Announcement of the Decision**

If we make this change, we would propose to announce the decision within the next several weeks.  At the very latest,  we would need to announce it no later than early April when we begin the recruiting season for the Class of 2016 (current high school juniors).  For purposes of recruiting, we need to make sure that the change in policy is reflected in our print and electronic communications and in our live messages to students, parents, and high school guidance counselors across the country.

We are working with Christine Heenan and her team to determine the best timing and strategy for a press announcement in relation to the upcoming announcement about this year's "package" increase. *See draft press release, attached.*

7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030309

**JA5352**

DX039.0007

**DRAFT**

2.01.11

### HARVARD COLLEGE TO RESTORE EARLY ACTION AND CREATE A NEW INIATITIVE
### TO LEVEL THE PLAYING FIELD IN EARLY ADMISSION

Harvard College announced today that it will restore non-binding early action as part of its admissions process next fall (2011) and invest in a significantly enhanced recruiting program to assist talented students from modest economic backgrounds in navigating the admissions process. Harvard will also increase its investment in undergraduate financial aid, maintaining its policy of "zero contribution" from families with normal assets making $60,000 or less annually, and only 0-10% of annual income from those between $60,000-$180,000. Harvard currently spends over $150 million annually from its own funds on financial aid.

In 2007, Harvard eliminated its non-binding early action program on a trial basis and moved to a single admissions deadline, announcing at the time that it would evaluate the impact of the change after several years.

"We piloted the elimination of early action out of concern that college admissions had become too complex and pressured for all students, and out of particular concern for students at under-resourced high schools who might not be able to access the early admissions process," said Harvard President Drew Faust. "Given the economic climate over the past several years, however, interest in early admissions has increased, as students and families from across the economic spectrum seek certainty about college choices and financing. Our goal now is to reinstitute an early action program consistent with our bedrock commitment to access, affordability, and excellence."

"Many highly talented students, including some of the best-prepared low-income and underrepresented minority students – want and expect an early admissions option," said Michael Smith, Dean of the Faculty of Arts and Sciences. "We are concerned that by not having early action these students may be missing out on the opportunity to consider Harvard. We have decided that the College and our students will be best served by restoring an early option."

Harvard's concerns about equity and transparency will continue to guide the structure of its admission program. It will maintain a non-binding approach, which maximizes freedom and flexibility for students. As in the past, students will apply under single- choice early action program by November 1 and will be notified by December 15, at which point students completing financial aid applications will receive notice of their awards. Regular decision will continue to operate as usual, with applications due on January 1 and notification on April 1. All students, whether admitted under early action or regular decision, will have until May 1 to decide whether to attend.

To ensure that the return to early action serves Harvard's commitment to access and diversity across many dimensions, the change in admissions policy will be accompanied by significant enhancements in the College's recruiting program, including:

- A new program promoting transparency in college admissions, offering print and web-based guides on how to apply to college, when to apply under early admission programs, as well as information about how colleges make admissions decisions;
- Targeted staff visits to areas where few students apply early to college;

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030310

**JA5353**

DX039.0008

DRAFT

- Greater use of electronic and other outreach to students less likely to apply early (or regular) to selective colleges;
- Increased involvement of Harvard undergraduates throughout the year in three major recruiting efforts:  the Harvard Financial Aid Initiative, the Undergraduate Minority Recruitment Program, and the Undergraduate Admissions Council's Return to High School Program;
- Enhanced web features providing families with the ability to calculate the likely net cost to them of sending a child to Harvard and perspectives from financial aid students on life at Harvard;
- Extended fall travel in late October and November to areas with large numbers of under-served students based on the experience of the past few years without early admission; and
- New outreach by Harvard's 12,000 alumni/ae volunteers to high schools that send few students to selective institutions.

"The commitment to including first-generation, low-income, and underrepresented minority students in the full spectrum of admissions options is a key feature of this new early action option," said Harvard College Dean Evelynn Hammonds.  "We have made significant gains in recent years in recruiting larger numbers of these students and in supporting them for success once here.  I am very pleased, therefore, that we are able to reconceive early action, not as a retreat from these goals, but as an enhancement, and to work with students based on whatever timetable best meets their needs."

"We continue to be concerned about the pressures on students today, including those associated with college admission," said Harvard College Dean of Admissions and Financial Aid, William R. Fitzsimmons. "In all of our work, we will do everything possible to level the playing field in admissions and encourage all students to make thoughtful choices about how they can best contribute to society."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030311

# Exhibit 1: Early Admission Programs – Models and Peer Practices

PRELIMINARY DRAFT

| Plan | Description | Deadlines | | | Example Institutions Using Practice |
|------|-------------|-----------|---|---|-------------------------------------|
| | | Application | Notification | Enrollment | |
| Binding Early Decision (Fall) | Binding: Student can only apply early to one institution. Must withdraw all other applications if admitted. | November | December | January/February | Brown, Dartmouth, Duke, Columbia, Cornell, Johns Hopkins, Northwestern, U. of Pennsylvania, Rice, U. of Rochester, Washington U., Vanderbilt (+ All COFHE Colleges, Middlebury) |
| Binding Early Decision (Winter) | Second opportunity for binding early decision at schools that also offer fall early decision. Student can only apply early to one institution. Must withdraw all other applications if admitted. | January | February | March | Bryn Mawr, Carleton, Middlebury, Mt. Holyoke, Swarthmore, Wesleyan |
| Single-Choice Early Action | Non-binding: Student can apply to only one early action program, but may apply to any regular decision program.[1] Student is not bound to enroll if admitted to early program. | November | December | May | Stanford , Yale |
| Open/Non-restrictive Early Action | Non-binding: Student can apply to any other institution early or regular. Student is not bound to enroll if admitted to early program. | November | January | May | Cal Tech, Chicago, Georgetown, MIT, Michigan, Trinity, UVA |
| "Likely" Letters | Non-binding: Student receives an early notification of likely admittance prior to April formal notification | October 1 To March 15 | Rolling (April for final decision) | May | Used intensively for athletes and other top admits at all Ivy League institutions including Harvard |
| Accelerated Admission | Students apply regular decision in junior year of high school and are admitted on the same cycle as regular applicants. | January | March/April | May | Pomona, Wellesley |

**Most Restrictive → Least Restrictive**

1. Students are permitted to apply regular decision to other programs because regular decision post-dates early action notification. Some single choice programs such as the one we are proposing Harvard reintroduce, allow students to apply to public institutions with non-binding early action or international programs on any admissions cycle.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00030312

DX039.0010

# Exhibit 2: Range of Admission Process Options

| Plan | Process | Existing and Proposed Harvard Options |
|---|---|---|
| Binding Early Decision | Students apply to only one program early and, if admitted, are bound to enroll. Students apply by November 1, receive notification by December 15. | |
| Single Choice Early Action | Students apply to only one program early and, if admitted, are NOT bound to enroll. Students apply by November 1, receive notification by December 15, and reply by May 1. | Proposed policy for reintroduction |
| Open Early Action | Students apply to multiple non-binding early action programs. Students apply by November 1, receive notification by December 15, and reply by May 1. | |
| Staged Rolling Admission | Admissions conducted over several rounds with fixed dates during which applications are read and students are notified of their admission status. Students choose to apply during one round only. | For example, HBS admits students over three rounds |
| Rolling Admission | Students apply at any point from November 1 to April 1. Decisions are made on a rolling basis. | |
| "Likely" Letters | Students apply and are notified if they are likely to be admitted prior to final notification, which occurs with all regular applicants. The Ivy League permits sending likely letters between October 1 and March 15. Likely letters are typically used with athletes pressured by other universities, but are also often sent to other top admits with superior qualifications. | Currently Harvard sends "likely" notifications to 200 athletes and 100 other top admits. Proposed to continue with "likely" letters to top candidates. |
| Regular Decision | Students apply to as many programs as they want. Students apply by January 1, receive notification on April 1, and reply by May 1. | To continue along with wait list and deferrals. |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030313

## Exhibit 3: Overview of Proposed Total Admissions Cycle at Harvard

| | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun - July | Impact |
|---|---|---|---|---|---|---|---|---|---|
| **Early Action** | Student applies by 11/1 | Harvard notifies by 12/15 | | | | | Student enrolls by 5/1 | | • Allows top students with a strong interest in Harvard to apply and receive early notification<br>• Allows Harvard to begin intensive recruiting of highly desirable students beginning 12/15 |
| **Regular Decision** | | | Student applies by 1/1 | | | Harvard notifies by 4/1 | Student enrolls by 5/1 | | |
| **"Likely" Letters** | Student applies (after early deadline) by 1/1<br>Harvard notifies if "likely admit" | | | | | Harvard confirms decision by 4/1 | Student enrolls by 5/1 | | Allows Harvard to identify top admits in the regular pool and engage them earlier in the admissions process |
| **Waiting List** | | | Student applies by 1/1 or under Early Action | | | Harvard notifies of wait list status by 4/1 | | Students admitted off wait list between 5/1 and 7/1 | Allows Harvard to admit students on a "space available" basis between May 1 and July 1 to ensure enrollment of a full class. |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030314

**Exhibit 4: Sample "Likely Letter"**

January 14, 2011

Dear:

I am delighted to report that the Admissions Committee has asked me to inform you that we will send you a formal letter offering you admission to the Class of 2015 on March 30. We send such an early positive indication only to outstanding applicants. The opinion of the Admissions Committee is not merely that your accomplishments—academic, extracurricular and personal—are impressive, but also that you would be a particularly good match for the opportunities and challenges here. In short, we think you would flourish at Harvard, and we are eager to encourage you to make it your college choice.

In making that decision we assume that you will maintain your current academic and personal standards. Our decision to offer you admission would be altered only by a significant decline in your performance or by conduct that raises serious questions of character or maturity, the conditions on which our admissions offers are made.

There has never been a more exciting time to be at Harvard. Founded in 1636, America's first college has been transformed in recent years by new initiatives that have greatly enhanced the undergraduate experience. Today's students come from all over the nation and the world to attend an extraordinary institution that combines many aspects of a small residential college with the resources of an unparalleled university.

Harvard's foundation rests on the extraordinary strength of the undergraduate college, the historic and physical center of the University in Cambridge. The liberal arts experience of our students is enriched by the scholarship and research of a world-renowned faculty deeply engaged in undergraduate teaching. With over one hundred and thirty Freshman Seminars, renowned small group tutorials, seminars and supervised research in more than forty fields of study, and with twenty or fewer students in over 1000 of our 1360 courses, Harvard offers a highly personalized education.

The academic resources at Harvard are remarkable by any standard. Our students enjoy the world's largest university library system (over 17 million volumes), "cutting-edge" scientific laboratories and thirteen university museums. The participation of undergraduates in faculty research is a hallmark of Harvard's undergraduate education. Students may design their own research plans and work closely with faculty members on many projects of mutual interest.

Harvard's residential system provides a "home away from home" as well as one of our greatest educational assets. Freshmen live together in Harvard Yard, and upperclassmen belong to one of twelve residential Houses. Each House is led by a senior faculty Master, and includes faculty and scholarly associates in a community where the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030315

common life in the dining halls and library is complemented by House athletic competitions, drama, political and musical events, and many other activities. The House experience often provides many of the defining moments of a Harvard education and is one of the major reasons Harvard's graduation rate (96-98%) is always at or near the top of the nation's colleges.

College-wide extracurricular activities are a major focus of commitment for many students. Harvard has long valued musical performance, drama, journalism and public service, to mention only a few of our 450 student organizations. In addition, we offer forty-one intercollegiate sports, the largest number in any Division I program in the country.

Another special feature of Harvard is our location in the Boston area, one of the world's great centers of student and university life known as "America's college town." Internships are readily available to all undergraduates in a wide variety of public and private organizations. Cambridge and Boston also offer superb musical, dramatic and other cultural opportunities alongside the Boston Red Sox, the Celtics, the Bruins, the Patriots, and the Revolution.

Remarkably diverse in their achievements and backgrounds, Harvard students come from public, private and parochial schools, from every state and many foreign countries. Lifelong friendships result from the close interaction students have in the residential Houses, and perhaps the most important part of your education will come from getting to know your fellow classmates. Following graduation, our alumni/ae find themselves well positioned for success in whatever profession or career they have chosen. Admission is determined without regard to financial need, and seventy percent of our students receive financial aid.

We hope you will be able to visit Harvard for our April Visiting Program designed for admitted students or at another time. We very much look forward to seeing you in Cambridge.

Yours sincerely,

William R. Fitzsimmons
Dean of Admissions and
Financial Aid

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030316

# Exhibit 5: History of Early Admissions at Harvard

PRELIMINARY DRAFT

- Early applications rose steadily until 2008, when we moved back to the more restrictive single choice early action
- Since the class of 2000, Harvard has admitted between 813 (2010) and 1186 (2003) students early

## Number of Early Applications and Admit Rate for Early Applicants at Harvard, Selected Years, 1977-2007

Legend: ■ Applications  —◆— Early Applications as % of Total

| Entering Fall: | 1977 | 1988 | 1989 | 1991 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Applications | 1493 | 2075 | 1961 | 1930 | 2352 | 2648 | 2990 | 3909 | 3887 | 4211 | 4589 | 6026 | 6095 | 6126 | 7614 | 3889 | 4214 | 3869 | 4008 |
| Early % of Total | 13% | 14% | 15% | 15% | 17% | 17% | 17% | 22% | 23% | 25% | 25% | 32% | 32% | 31% | 36% | 20% | 18% | 17% | 17% |
| Single-Choice EA | X | | | X | | | | X | | X | X | X | X | X | X | X | X | X | X |
| Open EA[1] | | X | X | | X | X | X | | X | | | | | | | | | | |

Annotations:
- EA and ED begun in Ivy League (1977)
- Harvard, Brown, Yale and Princeton all utilize single-choice early action (1991)
- Harvard and Brown use EA, all other Ivy League uses ED (1995)
- Yale and Stanford move from ED to EA (2003)

1. For entering fall 2000-2002, the only restriction placed on applicants was that they could not apply to an institution binding early decision.
Source: Office of Admissions

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030317

Exhibit 6: Press Release, September 12, 2006



Search the Gazette

Harvard News Office | Photo Reprints | Previous Issues | Contact Us | Circulation

**Published:**
*September 12, 2006*

**News**
News, events, features

**Science/Research**
Latest scientific findings

**Profiles**
The people behind the university

**Community**
Harvard and neighbor communities

**Sports**
Scores, highlights, upcoming games

**On Campus**
Newsmakers, notes, students, police log

**Arts**
Museums, concerts, theater

**Calendar**
Two-week listing of upcoming events

**Subscribe**
Gazette headlines delivered to your desktop

**HARVARD GAZETTE ARCHIVES**



'The college admissions process has become too pressured, too complex, and too vulnerable to public cynicism,' said Harvard interim President Derek Bok. 'We hope that doing away with early admission will improve the process and make it simpler and fairer.' (Staff photo Justin Ide/Harvard News Office)

# Harvard to eliminate early admission

Beginning next year Harvard College will eliminate its early admission program and move to a single application deadline of January 1, the University announced today (September 12). The change in policy, which builds on Harvard's efforts over the past several years to expand financial aid and increase openness in admissions, will take effect for students applying in the fall of 2007 for the freshman class entering in September 2008.

"The college admissions process has become too pressured, too complex, and too vulnerable to public cynicism," said Harvard interim President Derek Bok. "We hope that doing away with early admission will improve the process and make it simpler and fairer.

"Early admission programs tend to advantage the advantaged," Bok continued. "Students from more sophisticated backgrounds and affluent high

University contact:

1 of 4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00030318

**JA5361**

DX039.0016

Exhibit 6: Press Release, September 12, 2006

schools often apply early to increase their chances of admission, while minority students and students from rural areas, other countries, and high schools with fewer resources miss out. Students needing financial aid are disadvantaged by binding early decision programs that prevent them from comparing aid packages. Others who apply early and gain admission to the college of their choice have less reason to work hard at their studies during their final year of high school."

John Longbrake
(617) 495-1585

**FAS contact:**
Robert Mitchell
(617) 496-5399

Many leaders in higher education have spoken publicly about their concerns regarding early admission programs. Harvard will thus delay the shift to a single admissions deadline until the fall of 2007, so that other institutions wishing to make a change will have time to adjust their processes in the same admissions cycle. Furthermore, Harvard will commence the unitary system with a two- to three-year trial period so that it can monitor the impact of this change and make sure that it does not have a negative impact on student quality.

"I am delighted that President Bok and the Corporation have determined that we are in a position to take this excellent step," said Jeremy R. Knowles, interim Dean of the Faculty of Arts and Sciences. "The frenzy that surrounds college admissions threatens important educational values, and early admission programs are part of the problem. These programs distort the high school experience by forcing both students and colleges to commit prematurely, based only upon the record at the end of the student's junior year. Moreover, students who are admitted early receive what often appears to be a 'free pass' for their second semester, sadly encouraging them to disengage from their academic experience.

"I hope that our decision to eliminate early action will help to turn down the heat on admissions, allowing students, parents, and teachers to continue to focus their energies on the joys and rigors of education itself," Knowles continued. "The impact will obviously be greater if other institutions join us in moving to a single, later, admissions cycle. I hope they will."

For students applying this year (fall 2006), Harvard's admission process, including early action, will be unchanged. Beginning in the fall of 2007, the application deadline for all applicants will be January 1. Harvard will maintain its current April 1 notification to students, and May 1, the national common reply date, as its deadline for receiving responses from students.

## 'Early action' versus 'early decision'

Harvard's existing early admission program, adopted over 30 years ago, takes the form of nonbinding "early action," rather than the binding "early decision" used by many colleges with early admission programs. Under Harvard's current early action policy, students who apply by November 1 are notified by December 15 as to whether they are admitted, denied, or deferred to the regular pool. They are not, however, bound to accept an offer of admission, and they have until May 1 - the deadline for regular admissions - to make their decision.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
HARV00030319

Exhibit 6: Press Release, September 12, 2006

Harvard's early action program differs from so-called "binding" early decision programs, whereby a student makes a commitment at the time of application to attend if admitted. Harvard has always had early action rather than early decision because it preserves the ability of students to apply to other colleges during the regular admissions cycle, to compare financial aid packages, and to make a much more informed choice in May, rather than October, of their senior year.

"We have always felt that early action avoids the most troublesome aspects of binding early decision while preserving the original aim of early admission - providing students with early notification of admission without binding those who change their minds later in the process," said William R. Fitzsimmons, Dean of Admissions at Harvard College. "If after several years with a single admissions deadline, we find ourselves needing to reinstate early admission to preserve the quality of our student body, we will return to early action.

"We are concerned, however, that even our non-binding program contributes to the pressures and inequities of the college admissions process," Fitzsimmons continued. "Only the more sophisticated students and families look behind the label of 'early admission' and distinguish early action from binding early decision programs. Thus students from less advantaged backgrounds either fail to take advantage of early admission because they are less well-advised overall, or they consciously avoid our program on the mistaken assumption that they will be unable to compare financial aid packages.

"Under the leadership of Larry Summers, we have worked aggressively over the past several years to expand financial aid, and families with incomes under $60,000 are no longer required to contribute to the cost of a Harvard education," Fitzsimmons added. "An early admission program that is less accessible to students from modest economic backgrounds operates at cross-purposes with our goal of finding and admitting the most talented students from across the economic spectrum."

## Expanded outreach and recruiting

Harvard intends to use the time and capacity freed up by the move to a single admissions cycle to focus more energetically on outreach and recruiting. Fitzsimmons and his admissions staff will travel more widely to make presentations in key cities and other areas to educate students, families, and college counselors about Harvard and the college admissions process more generally. The University will also work with secondary schools in a renewed effort to make applying to college less complicated and less stressful than it is today.

According to Fitzsimmons, this effort is particularly important in light of disparities in access to, and the quality of, college counseling. The average ratio of students to college counselors in the United States is 500/1. In some states, such as California, the ratio is 1000/1, and many high schools have eliminated college counseling altogether.

Some affluent schools, however, have student to counselor ratios as low as 50/1,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
HARV00030320

**JA5363**
DX039.0018

Exhibit 6: Press Release, September 12, 2006

in addition to parents who are more knowledgeable about college admissions and more likely to be able to supplement school counseling with outside help.

"As a person who has worked in college admissions for over 30 years, I am particularly grateful to Dean Knowles, President Bok, and the Harvard Corporation for supporting this move away from early admission," said Fitzsimmons. "I hope and expect that this change will sharpen the focus of the admissions process on its most important goal - helping students find the right college match."



Copyright 2006 by the President and Fellows of Harvard College

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    HARV00030321

**JA5364**
DX039.0019



PRELIMINARY DRAFT

**Exhibit 7: The Decision to Eliminate Early Action in 2007**

**Rationale:**

✓ Simplify admissions for Harvard applicants and more broadly

✓ Eliminate the admissions advantage from applying early

✓ Extend the fall recruiting period

✓ Reinforce Harvard's message regarding access and affordability

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030322

PRELIMINARY DRAFT

**Exhibit 8: Summary of Results from the Early Action Experiment**

**Rationale:**

- ✓ Simplify admissions for Harvard applicants and more broadly
- ✓ Eliminate the admissions advantage from applying early
- ✓ Extend the fall recruiting period
- ✓ Reinforce Harvard's message regarding access and affordability

**Results:**

- Increased applications from all types of students
- Improved recruiting timeline and mechanisms for engaging with previously underserved students
- Higher education did not change with us
  - Princeton and UVA were the only institutions to join us
  - Stanford and Yale maintained early action to their competitive advantage
  - UVA announced in December 2010 a move back to early admissions
  - The current economic and social climate has pushed institutions to further rely on their early action programs
- Declining yield rates, especially among targeted populations—those with high academic and extracurricular ratings, and under-represented minorities

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00030323

PRELIMINARY DRAFT

## Exhibit 9: Early Applications to All COFHE Schools

- Early applications to COFHE institutions have increased almost every year since 1989
- At most, early applications represented 15% of total applications (in 2003). In recent years, early applications as a percent of all applications has declined.

*Number of Early Applications and Early Applicants as a Percent of Total Applicants to All COFHE Schools, Entering Fall 1989 to 2009*

Legend: Early Applications — % of Total Applicants

Bar values (Early Applications):
1989: 20,583; 1990: 19,601; 1991: 22,212; 1992: 24,166; 1993: 23,897; 1994: 22,964; 1995: 26,140; 1996: 32,111; 1997: 32,979; 1998: 34,938; 1999: 34,608; 2000: 41,735; 2001: 45,233; 2002: 45,319; 2003: 50,202; 2004: 46,949; 2005: 48,566; 2006: 51,460; 2007: 51,929; 2008: 50,865; 2009: 54,961

% of Total Applicants line: 8%, 8%, 9%, 10%, 10%, 9%, 9%, 11%, 11%, 12%, 11%, 13%, 14%, 14%, 15%, 14%, 13%, 13%, 12%, 11%, 11%

Last class at Harvard and Princeton with early admission (arrow at 2007)

| Annual % Change: | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Early Applicants | N/A | -5% | 13% | 9% | -1% | -4% | 14% | 23% | 3% | 6% | -1% | 21% | 8% | 0% | 11% | -7% | 4% | 6% | 1% | -2% | 8% |
| Total Applicants | -6% | -3% | 1% | 4% | 0% | 8% | 4% | 5% | 0% | 2% | 3% | 4% | 3% | 0% | 4% | 2% | 7% | 7% | 5% | 9% | 7% |

**Recent results:**
Stanford and Duke have seen record early applications for the Class of 2015, while MIT, Georgetown, and Penn have all had substantial increases over last year. Early applications to Yale are even with last year.

Source: Office of Admissions

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030324

**JA5367**

DX039.0022

# Exhibit 10: Changes in yield rates – Since 2007 (the last class with early action)

- The yield rates for all applicants have declined since the end of early action.
- However, the yield rates for all applicants since the end of early action are higher than the yield rates for regular applicants before the policy change.



*Yield Rate by Application Type, Entering Fall 2003 to Fall 2010*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030325

**JA5368**

DX039.0023

# Exhibit 11: Changes in yield rates – By academic and extracurricular rating

- The yield rate gap between the most high rated (as measured by academic or extracurricular rating) and all other students increased after the end of early action.



*Yield Rates by Academic and Extracurricular Ratings[1], Fall 2003 to Fall 2010*

1. "High" indicates a rating of 1 or 2. Non-high are students with all other ratings.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030326





# Exhibit 12: Change in yield rates – By academic and extracurricular rating and race/ethnicity

- Yield rates for the most highly rated Hispanic, Black and white students declined after the end of early action.
- Yield rates for all Hispanic and white students declined after the end of early action.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030327

DX039.0025

## Exhibit 13: Admissions wins versus Yale, Stanford and Princeton

- For cross-admitted students, Harvard continues to win at less 2 out of every 3 from key peers



*Harvard College Admit "Winning Percentage"*
*Classes Entering Fall 1992, 2004, 2009, 2010*

PRELIMINARY DRAFT

Source: Office of Admissions

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030328

## Exhibit 14: Top High Schools Sending Low-Income and Minority Students to Harvard

**High Schools with Students Enrolling in the Class of 2014**

| High School | Location | Number of Low-Income and/or Minority[1] Students |
|---|---|---|
| Stuyvesant High School | New York, NY | 10 |
| Boston Latin School | Boston, MA | 9 |
| Brooklyn Tech High School | Brooklyn, NY | 7 |
| Phillips Exeter Academy | Exeter, NH | 5 |
| Whitney Young High School | Chicago, IL | 5 |
| Bellaire Senior High School | Bellaire, TX | 3 |
| Hinsdale Township High School | Hinsdale, IL | 3 |
| Loyola High School | Los Angeles, CA | 3 |

- The Class of 2014 has 430 HFAI students and 342 underrepresented minority students
- Twenty-one (21) high schools sent 2 HFAI students and 18 sent 2 underrepresented minority students to Harvard
- Other notable high schools sending HFAI or underrepresented minority students include:
  - Central High School, Philadelphia, PA
  - Collegiate School, New York, NY,
  - Georgetown Day, Washington, D.C.
  - Harvard-Westlake, Los Angeles, CA
  - Milton Academy, Milton, MA
  - North Carolina School of Science and Math, Durham, NC
  - Palos Verdes High School, Palos Verdes Estates, CA

1. Underrepresented minority students included in count. Underrepresented minorities include students identifying as Black, Hispanic, Native American and multiple ethnicities.
Source: Office of Admissions

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Exhibit 15: Diversity of Harvard's Early Applicants

- The racial/ethnicity and income diversity of the early applicant pool increased after Harvard moved from open early action to single-choice early action beginning with the class entering in fall 2008

***Number of Early Applicants by Race/Ethnicity to Harvard College, Entering Fall 2003 - 2007***

100%
90%
80%
70%
60%
50%
40%
30%
20%
10%
0%
7.5%
24.3%
50.3%
7.8%
6.5%
3.5%
8.0%
24.3%
45.4%
11.8%
6.2%
4.2%
11.3%
23.2%
42.8%
11.7%
5.8%
5.2%
11.7%
24.8%
38.6%
12.5%
6.8%
5.7%
10.2%
24.2%
36.3%
16.0%
7.4%
6.0%
Other[1]
Asian
White
International
Hispanic
African American

| | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| Number of Early Applicants | 7,614 | 3,889 | 4,214 | 3,869 | 4,008 |
| % Fee Waiver | 3.5% | 3.5% | 5.8% | 6.4% | 6.1% |

After Harvard moved to single-choice early action for the class entering fall 2008, which reduced the number of early applications Harvard received, the shares of African American, Hispanic, International, and low income students increased.

1. Other includes Native American, Other and Unknown.
Source: Office of Admissions

# Exhibit 16: Diversity of Harvard's Early and Regular Applicants

- Early applicants to the class entering in fall 2003 were much less diverse than regular applicants.
- The demographics of early applicants to the class entering in fall 2007 more closely matched regular applicants that year.



*Number of Early Applicants and Regular Applicants by Race/Ethnicity to Harvard College, Entering Fall 2003 and 2007*

1. Other includes Native American, Other and Unknown.
Source: Office of Admissions

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00030331

**JA5374**
DX039.0029

**Exhibit 17: Potential New Recruiting Initiatives**

1. A new program promoting transparency in college admissions, offering print and web-based guides on how to apply to college, when to apply under early admission programs, as well as information about how colleges make admissions decisions

2. Targeted staff visits to areas where few students apply early to college

3. Greater use of electronic and other outreach to students less likely to apply early (or regular) to selective colleges

4. Increased involvement of Harvard undergraduates throughout the year in three major recruiting efforts: the Harvard Financial Aid Initiative, the Undergraduate Minority Recruitment Program and the Undergraduate Admissions Council <u>Return to High School Program</u>

5. Enhanced features on our website providing families with the ability to calculate the likely net cost to them of sending a child to Harvard and perspectives from financial aid students on life at Harvard

6. Extended fall travel in late October and November to areas with large numbers of under-served students based on the experience of the past few years without early admission

7. New outreach by Harvard's 12,000 alumni/ae volunteers to high schools that send few students to selective institutions

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



THE
PRESIDENT'S
REPORT
1993-1995

HARVARD UNIVERSITY

CONFIDENTIAL

HARV00030365

United States District Court
District of Massachusetts

**DX 40**

Case No. _____1:14-cv-14176 (ADB)_____
Date Entered_____
By_____
Deputy Clerk

JA5376

DX040.0001

Democracy does not seek equality through the discouragement or obliteration of individual diversities. It does not aim at a general average of gifts and powers in humanity. The prairie is not its social ideal. Its conception of social and political equality does not involve a dead level of human gifts, powers, or attainments. On the contrary, democratic society enjoys and actively promotes an immense diversity among its members, and in particular, it increases many fold and with happiest results the difference between the human individual in youth and the same individual in his prime and in old age. A despotic government gives one individual—the ruler—or a few individuals—the ruling family or set—the opportunity of great personal growth and enlargement. Democratic society gives multitudes that precious opportunity.

—Charles William Eliot (1909)


A college would be a dreary place if it were composed of only one type of individual. A liberal education is possible, it seems to me, only in an atmosphere of tolerance engendered by the presence of many [individuals] of many minds.

—James Bryant Conant (1938)

CONFIDENTIAL

HARV00030366

# Diversity and Learning

## I
### Introduction

I have the honor to submit this report to the members of the Board of Overseers.

D URING THE PAST TWO YEARS, we have seen a steady growth in controversy concerning issues of student diversity, university admissions, and affirmative action. Amid this national discussion and debate, specific proposals have been advanced in some quarters to eliminate factors such as race, ethnicity, and gender from consideration in university admissions. Although major policy changes have not yet taken effect, some are scheduled to go forward in at least one major university system in the near future, and others are under active consideration. The climate is one of uncertainty and ferment.

As we look ahead, I believe we need to examine not only current ideas and recommendations, but also the relevant past. We need to remind ourselves that student diversity has, for more than a century, been valued for its capacity to contribute powerfully to the process of learning and to the creation of an effective educational environment. It has also been seen as vital to the education of citizens—and the development of leaders—in heterogeneous democratic societies such as our own. These overarching values

1

CONFIDENTIAL

HARV00030367

DX040.0003

*Harvard University*

have for many decades influenced our approach to admissions, and have provided the rationale for our basic policies.

In the pages that follow, I discuss the emergence of student diversity as an important idea in American higher education, especially as it relates to learning that takes place beyond the classroom and the formal curriculum. I draw largely on the experience of Harvard University, but also on a broader context. I consider why many thinkers, from the mid-nineteenth century to our own time, have placed such a strong emphasis on diversity—and how they have defined the concept. Finally, I indicate why the goal of diversity remains so important to the actual quality and breadth of education for all our students, and why our existing policies continue to offer the most effective and promising pathway to the future.

CONFIDENTIAL

HARV00030368

JA5379

DX040.0004

## II
### Early Ideas of Diversity:
### Nineteenth Century Beginnings

#### 1.

THE WORD *diversity* has been overused in recent years, often to the point of cliché. That is unfortunate, because the term has an important history, and it has no adequate synonym in our language. The word and the idea began to appear in discussions of education at least as early as the mid-nineteenth century. Over the past century and a half the significance of diversity to the process of education has been increasingly recognized. Without at least some reference to this historical development, we cannot fully understand our contemporary notions of diversity— nor can we adequately evaluate the arguments that are shaping the current national debate on affirmative action.

We need to understand how some of the major English and American educators of the nineteenth and early twentieth centuries defined diversity and viewed its contribution to learning. It is also important to see how the concept of diversity affected their ideas about the purposes and structure of educational institutions. We will not find complete answers to such questions, nor should we look for unanimity. But there is enough testimony on the record to be of real use.

Many nineteenth century educators tended to think of diversity in terms of ideas—differences in opinions and views in all the areas of life where actual proof was impossible to achieve. Many would have subscribed to the argument that John Milton had made in the *Areopagitica* when opposing the censorship of books: "Where there is much desire to learn, there of necessity will be much arguing, much writing, many opinions; for opinion in good men is but

3

CONFIDENTIAL

HARV00030369

*Harvard University*

knowledge in the making." The clash of different opinions was often seen to be positive: "that which purifies us is triall, and triall is by what is contrary."

An important variation on this theme emerged in the work of major thinkers during the 1840s and 1850s. John Stuart Mill stressed the value of bringing "human beings in contact with persons dissimilar to themselves, and with modes of thought and action unlike those with which they are familiar."[1] The word *diversity* was very much a part of his lexicon. Many passages in *On Liberty* concern the "causes which make diversity of opinion advantageous, and will continue to do so."[2] It was not enough, moreover, for a person to read about or "be taught" the opinions of others on a given subject:

> That is not the way to do justice to the arguments, or bring them into real contact with his own mind. He must be able to hear them from persons who actually believe them; who defend them in earnest, and do their very utmost for them. He must know them in their most plausible and persuasive form; he must feel the whole force of the difficulty which the true view of the subject has to encounter and dispose of . . . .[3]

For Mill, opinions and ideas were not disembodied abstractions: they were living things that should be encountered in the presence of "persons who actually believe them," and who could argue for them forcefully, based on their own experience and convictions. Diversity, in other words, was most fully realized when it was made visible and present through actual associations among human beings in all their variety.

John Newman's view was less combative than Mill's, but it shared some significant features. Newman envisioned colleges where "a multitude" of students would "come together and freely mix with each other." Under such circumstances,

> they are sure to learn one from another, even if there be no one to teach them; the conversation of all is a series of lectures to each, and they gain for themselves new ideas and views, fresh matter of thought, and distinct principles for judging and acting, day by day.[4]

Newman's university was to be like "the world on a small field": students would "come from very different places, and with widely different notions." Because of such differences, there would be "much to adjust," new "inter-relations to be defined," and rules and

4

CONFIDENTIAL

HARV00030370

**JA5381**

DX040.0006

*The President's Report 1993–1995*

norms to be established, so that a college could in time become unified in spirit, with "one tone and one character."[5] Through a process of association and mutual education, unity would eventually emerge from difference.

Mill may have stressed the friction of human contact, while Newman emphasized reconciliation and wholeness. Yet both regarded direct association among dissimilar people as essential to learning. Both take us beyond any simple concept of diversity defined in purely intellectual or abstract terms. Mill emphasized not only different ideas and opinions, but also different "modes of thought and action." Newman specifically mentioned geographical diversity: students would come from "very different places," bringing their "widely different notions," creating a small-scale version of the world outside. For both Mill and Newman, these forms of diversity are not mere extras; they are integral to true learning at a profound level. They are not dispensable. They shape some of the fundamental ways in which knowledge itself is generated, tested, and transformed into understanding.

## 2.

THE NATION STOOD on the verge of the Civil War when Harvard president C.C. Felton presented his report for the academic year 1859-60. In the midst of this national turmoil, he and others saw a need for colleges and universities to provide an education based on experience with different kinds of people, in the hope of overcoming regional, cultural, and other barriers. One way for Harvard to help achieve this hope, in Felton's view, was to become a truly national institution. "Students from every State and Territory in the Union—without a single exception or secession—will resort to our University," Felton wrote, "no difference whatever being made between the citizens of Massachusetts and the citizens of the remotest part of the country, or of foreign lands." Gathering students together in this way, "from different and distant States[,] must tend powerfully to remove prejudices, by bringing them into friendly relations . . . ," Felton reasoned. "Such influences are especially needed in the present disastrous condition of public affairs."[6]

5

CONFIDENTIAL

HARV00030371

*Harvard University*

For Felton, a national university could aspire to have a nation-wide influence, helping to "remove prejudices" and to reduce the possibility of misunderstanding, conflict, and even war. Geography—or place of residence—thus became, from an early date, a critical component in Harvard's concept of diversity. And this factor had, of course, no inherent relation to individual merit or achievement. The fact that a student came from Carolina or Connecticut indicated nothing about his abilities or accomplishments. The rationale was quite different, and very straightforward: students from many parts of the country (or the world) were likely to have a variety of basic assumptions, experiences, regional or cultural perspectives, and even prejudices. Felton concluded that if he could bring together—in a single institution—young people from different backgrounds who would be educated in association with one another, and who would eventually become leaders in different parts of the nation, then that process could make a difference to the creation of unity throughout the country as a whole.

To some extent, the process was already under way. Henry Adams, class of 1858, graduated not long before Felton's report was submitted. Most of Adams's classmates (about one hundred in all) were from New England, but "chance insisted on enlarging [his] education by tossing a trio of Virginians" into the mix. One of the trio was "Roony" Lee, son of Robert E. Lee. Adams and the Virginians

> knew well how thin an edge of friendship separated them in 1856 from mortal enmity. . . . For the first time Adams's education brought him in contact with new types and taught him their values. He saw the New England type measure itself with another, and he was part of the process.[7]

As events turned out, despite their friendship neither Adams nor Lee was able to reach across the gap between them. Lee "had changed little from the Virginian of a century before; but Adams was himself a good deal nearer the type of his great-grandfather" than to many of his contemporaries—and he was "little more fit than the Virginians to deal with a future America."[8] Both Lee and Adams were constrained by differences in heritage, history, temperament, and culture that were in the end too vast to overcome.

The point, however, is not whether this particular experiment in education was or was not a full success. The point is that Adams—and, from a different perspective, Felton—recognized the impor-

6

CONFIDENTIAL

HARV00030372

DX040.0008

*The President's Report 1993–1995*

tance of the attempt, and saw that this "lesson in education was vital to these young men."[9] It produced an awareness of what might, under different circumstances, have proved possible. It also altered Adams's consciousness, and forced him to confront and assess a type of person he had never before known. It drove him to reach new conclusions about himself and his own limitations, and even led to some understanding (vastly oversimplified) of representative southerners and the South. Chance had "enlarged" his education, almost in spite of himself. Harvard, meanwhile, had begun a modest experiment in diversity that rested on principles and experiences not very different from those described by Mill and Newman. That experiment would continue—and grow in complexity and comprehensiveness—well into the future.

### 3.

DIVERSITY BECAME a more explicit goal—and the word itself was more frequently used—during the last decades of the nineteenth century and the early decades of the twentieth. In the political and educational dialogue of the day, diversity was defined more precisely (as well as expansively); it was sometimes championed; and it was in some places realized more fully than before. It also became a subject of increasing controversy.

Many events contributed to this development. Struggles between differing religions, and between religion and science (particularly the ideas of Darwin), intensified. The movement for women's rights created greater tensions, even as it gathered strength. The social position of black Americans, following the Civil War and Reconstruction, was anything but resolved. Perhaps most significant, successive waves of "new immigrants" had been arriving since the mid-1800s, and this process accelerated in the 1870s and 1880s. Those who came in the last decades of the century were generally poorer, less well-educated, and more culturally heterogeneous than most previous groups. Many were escaping from poverty and continued famine in Ireland, from anti-Semitism and persecution in Russia and Eastern Europe, or from terrible economic and social conditions in southern Italy. There were Catholics, Jews, and mem-

7

CONFIDENTIAL

HARV00030373

DX040.0009

*Harvard University*

bers of the Eastern Orthodox Church; there were Irish, Poles, Hispanics, Greeks, Ukrainians, Armenians, Chinese, and others. They came, moreover, in very great numbers. By the 1890s, for example, the recent immigrant population of Boston (first and second generation combined) accounted for more than two-thirds of the residential community. Social services—to the extent they existed—were saturated. School systems were strained, and often became flash points for religious and other forms of tension.

As we know, this continuous influx of different peoples gave rise to considerable anxieties and fears on the part of the settled population. To some, established institutions and traditions appeared to be under siege, particularly since the newest immigrants were themselves so varied in terms of language and culture. To be sure, some people welcomed the great influx as another infusion of strength into American society. But historians of the period have documented the equally strong movements to curtail immigration, and to limit the opportunities available in education and employment. In Boston and its environs, many civic, political, and religious groups sprang into existence during the 1880s and 1890s: the Massachusetts Society for Promoting Good Citizenship, the Citizens Association, the Citizens Club of Boston, and—more pointed and assertive in its goals—the Immigration Restriction League of Boston (founded in 1894 with the help of three young Harvard graduates from the class of 1889).

This was also a moment when purportedly scientific studies of race proliferated. A steady flow of articles and books set out to define the "races" of mankind, and to assess their relative superiority. There were also the well-known attempts to demonstrate that the origins of democratic or republican laws and institutions lay in the assemblies of ancient Teutonic or Anglo-Saxon tribes. In a quite different sphere, parochial school systems began to develop more rapidly at this time, as did the movement by Episcopalians and other Protestants to found church-related boarding schools, especially in New England. As a result, secondary and even elementary schools functioned somewhat less effectively as potential "melting pots." Instead, religious and social groups began to establish separate institutions to educate their children in accord with their particular cultural and religious traditions.

8

CONFIDENTIAL

HARV00030374

*The President's Report 1993–1995*

In short, the increased diversity of the population produced a variety of responses. New England, Boston, and Harvard constituted one of the main arenas in which conflicting attitudes and forces encountered one another. Meanwhile, Harvard's president, Charles William Eliot, played an important role in defining an expanded conception of diversity in relation to learning.

### 4.

CHARLES ELIOT's PRESIDENCY at Harvard spanned forty years, from 1869 to 1909. More than anyone else, he was responsible for transforming Harvard College into Harvard University. Most of his contributions have been well-documented, but his ideas about diversity have received less attention. Yet diversity was central to Eliot's approach to education. He wrote about it and theorized about it. More than any other leading educator of his time, he stressed the value of cultivating the diverse talents of every individual, while also emphasizing how diversity among individuals and groups can be a major stimulus to learning. He expanded the definition of diversity, in terms of the criteria and considerations to be taken into account. Finally, he regarded diversity as so powerful and far-reaching in its effects—capable of shaping life-long attitudes and habits—that he came to view it as indispensable to the healthy functioning of a democratic society.

Scarcely anyone during his time expressed more confidence than Eliot in the potential of all human talent to flourish, given the freedom and opportunity to do so. It was in society's interest "to make the most of every useful gift or faculty which any member may fortunately possess; and it is one of the main advantages of fluent and mobile democratic society that it is more likely . . . to secure the fruition of individual capacities."[10] A democracy "does not seek equality through the discouragement or obliteration of individual diversities. . . . [It] actively promotes an immense diversity among its members . . . ."[11]

A chief task for colleges and universities, therefore, was to create an atmosphere that would be stimulating in the variety and quality of academic and other offerings or activities. Eliot's com-

9

CONFIDENTIAL

HARV00030375

DX040.0011

*Harvard University*

mitment to the "elective system" was predicated on the conviction that a diversity of interests and talents among students required a corresponding variety of fields of inquiry and opportunities to foster individual development. Flexibility and choice, not prescription, were the keys to serious learning and growth. In the selection of courses (and extracurricular activities), the university should allow its students, "in the main, to govern themselves":

> It must have a large body of students, else many of its numerous courses of highly specialized instruction will find no hearers, and the students themselves will not feel that very wholesome influence which comes from observation of and contact with larger numbers . . . from different nations, States, schools, families, sects, parties, and conditions of life.[12]

For Eliot (as for Mill, Newman, and Felton), direct contact among a heterogeneous (and now also large) group of students was vital to the process of education. And Eliot's list of the "categories" or considerations that contribute to diversity is more detailed than we have seen before. He wanted people from various "nations, States, schools, families, sects, parties, and conditions of life." Some of these categories are by now familiar, but others (such as nations, families, sects, and conditions of life) tend to expand the definition of diversity to include characteristics and types of people (not simply opinions or ideas) that resist easy or strict definition.

In a number of articles and reports, Eliot discussed his views in greater detail. He wanted, as he said, a university "of broad democratic resort." Harvard's students should be children of the "rich and poor," the "educated and uneducated." There was also a need for "diversity in religion."[13] Indeed, Eliot could say with some satisfaction (after three decades in office) that the Harvard of 1900 had "for a generation past" been free from any religious restrictions in admissions and faculty appointments, and was now open to students and faculty of "every religious communion, from the Roman Catholic to the Jew and the Japanese Buddhist." The goal was to foster not only greater knowledge, but actual "respect for each other's religious inheritances."[14] This could be achieved only if students and faculty from different sects or denominations were brought directly together in an institution where they could associate freely and learn about one another:

10

**JA5387**
DX040.0012

*The President's Report 1993–1995*

> The influence of an educated Roman Catholic in an American community is diminished, not increased, if his education has deprived him of all knowledge of his Protestant contemporaries and of the Protestant mode of thought and feeling. Precisely in the same way the influence . . . of the members of the Episcopalian body is diminished, not increased, by their habit of resorting to schools and colleges under the exclusive control of their own religious communion.[15]

For Eliot, Americans would ideally retain many of their differences, and resist becoming "the same." But if they were to lead productive lives as citizens and leaders in a democracy, then they needed to understand the "modes of thought and feeling" of their contemporaries, encountering one another and studying with one another on a daily basis.

Beyond matters of religion, Eliot's Harvard now intended to attract—even more aggressively—students "from a large area, from North and South, from East and West." There would be "Democrats and Republicans, free-traders and protectionists, spoilsmen and reformers, Prohibitionists and high-license advocates."[16] The goal was to create a more open and even disputatious university community where (as in John Stuart Mill) the zeal and zest of argument and debate would be audible and tangible. In addition (as in Newman and Felton), the gains in terms of tolerance, mutual understanding, and camaraderie would be profound and long-lasting. At a university,

> there is . . . a continual ferment and agitation on all questions of public interest. This collision of views is wholesome and profitable; it promotes thought on great themes, converts passion into resolution, cultivates forbearance and mutual respect, and teaches . . . candor, moral courage, and independence of thought on whatever side these noble qualities may be displayed.[17]

Discussion and debate are not purely intellectual processes. They involve emotion and conviction as well as reason and argument. They convert "passion into resolution," and teach candor and moral courage. Education and learning are in this sense human and moral processes concerned ultimately with values and effective action. They are most fully tested when individuals engage others whose ideas, passions, experiences, and beliefs differ from their own.

There are, of course, alternative conceptions of education and learning, with their own important emphases and rewards. Eliot's

11

CONFIDENTIAL

HARV00030377

conception, however, was fashioned explicitly to serve the purposes and needs of a democratic society that was intrinsically diverse, and committed to freedom and equality of opportunity. It was a society that could not function effectively without a considerable level of mutual "forbearance" and tolerance—if not respect and understanding—among its infinitely varied citizenry. Consequently, the university should resemble that larger society in many essential features. Indeed, Eliot never tired of insisting that "the whole organization of college life is intensely democratic" in its determination to minimize "social inequalities," to maximize individual choice and opportunity, and to demonstrate "the intimate dependence of each human individual on a multitude of other individuals, not in infancy alone, but at every moment of life—a dependence which increases with civilization and with the development of urban life."[18]

Diversity, therefore, was central to Eliot's conception of education for citizenship in a democratic society. Moreover, the fruits of diversity would extend well beyond the university through the continuing association of individuals during their lifetimes. In this sense, Eliot expanded on Felton's hopes concerning the power of a truly national institution. "A university of national resort exerts a unifying influence" far and wide, argued Eliot, because of "the mutual knowledge" that students gain from one another, and "hold through life."

> Every year hundreds . . . go out from each of the great American universities and scatter through the whole country. In their several places of residence they ordinarily rise to places of trust and influence; and they remain united for life, however separated by distance; united by common associations, and by bonds of friendship and mutual respect. . . .
>
> Do you ask, Are all these aims of the higher education anywhere attained? Nowhere, as yet. But they surely will be as our republic grows in wealth, wisdom, and true worth.[19]

Once again, Eliot powerfully forges the links between diversity, student learning, and the role of higher education in a heterogeneous democratic society.

12

CONFIDENTIAL

HARV00030378

## III
## *Diversity and Race:*
## *Some Turn-of-the-Century Dilemmas*

### 1.

IT IS DIFFICULT TO DISCUSS the issue of diversity in late nineteenth century America without at least touching upon the complicated set of questions related to race, nationality, religion, and ethnicity. The body of scholarly literature on this broad topic is now substantial and impressive, but it is not so definitive that it yields ready generalizations or relatively uncontested truths. Let me offer just a few observations here.

To begin with, in the late nineteenth century, the concepts of race, religion, and nationality were different from our own in several respects—and the idea of ethnicity, in its contemporary meaning, was scarcely developed at all. There was also considerable overlap among these categories. Although race was often defined in terms of skin color, it was even more widely viewed as a set of characteristics that could include a particular group's native language, geographical home, religion, national identity, temperament, certain physiognomic features, political and cultural traditions, and traditional occupations.

These categories and classifications shifted constantly, however, and they were obviously difficult to apply with rigor and consistency, although many writers tried persistently to do so. For example, the French or French-Canadians could be construed as one or more "races"; yet they could equally be identified as simply part of a larger Celtic racial group. The Italians were "Mediterraneans"; but the Greeks, their southeastern neighbors, were sometimes linked (mistakenly) to an obscure Germanic tribe—because some commentators found it difficult to believe that the great classical Greek civilization could possibly have been Mediterranean in its

13

CONFIDENTIAL

HARV00030379

DX040.0015

*Harvard University*

origins. Finally, religion complicated the picture. Protestants and Catholics were manifestly religious—not racial or national—groups. But it proved difficult in the later nineteenth century to dissociate Protestantism completely from Anglo-Saxons (or from the Teutons, English, or Nordics), just as it was hard to disentangle Catholicism completely from the Irish and Italians.

In short, ideas of race, religion, and nationality interpenetrated one another. Composite types and stereotypes were not only common but also carried potential explosive power in the charged atmosphere that surrounded the immigration controversies of the time. Even the most superficial glance at the titles of many turn-of-the-century books and articles suggests why the situation was potentially volatile: *Are We Celts or Teutons?; The Growth of the French-Canadian Race in America; The Jewish Question; The Irish in American Life; The Races of the Danube; The Coming of the Italian; The Racial Problem in Immigration; The Causes of Race Superiority; The Races of Europe;* and *Immigration and Degradation,* to name just a few.

## 2.

Serious tensions—sparked by immigrant, religious, and national groupings—emerged in Boston (and elsewhere) as early as the 1830s and 1840s, and escalated over the next several decades. The Boston Irish (and other groups) took steps to preserve their own religious tradition, as well as to create their own self-help and cultural organizations. These very actions, however,

> provoked complaints that "instead of assimilating at once with the customs of the country of their adoption, our foreign population are too much in the habit of retaining their own national usages, of *associating too exclusively with each other,* and living in groups together. . . . " The inability of the native-born to understand the ideas of their new neighbors perpetuated this gap between them, rousing the vivid fear that the Irish were "a race that will never be infused into our own, but on the contrary will always remain distinct and hostile."[20]

The reference in this passage to the Irish "race" was by no means casual. The more that Teutons, Anglo-Saxons, and the "Gothic" Germanic peoples continued to press their conception of racial

14

CONFIDENTIAL

HARV00030380

superiority, the more the Irish and others felt the need to respond with racial pronouncements of their own—as well as with more assertive attempts (particularly by the Catholic Church) to maintain traditional values in the face of considerable suspicion and even hostility. Irish writers—such as John McElheran—declared that "the divine spark of genius radiates from the Celtic centre of the world" and shows "the natural tendency of the pure Celtic race, uncontaminated by Gothic bestiality."[21] Given this dynamic of claim and counterclaim, group definitions tended to become stronger, and potential conflict more likely. No single or simple cause triggered the many events that contributed to this situation. But once the process had been set in motion, conciliation was increasingly difficult to achieve. By the mid-1850s,

> the violent phase had passed, [but] the bitterness of conflict and antagonism remained. Out of it had grown a confirmed definition of racial particularism: the Irish were [regarded as] a different group, Celtic by origin, as distinguished from the "true" Americans, who were Anglo-Saxon, of course. Once aroused, hatred could not be turned off at the will of those who had provoked it.[22]

Through at least the 1870s, the Irish and Brahmins in Boston lived uneasily together—essentially at arm's length. The relative lack of immediate major threats or disruptions encouraged some leaders (on various sides) to declare that the major economic, social, and other problems facing immigrants were well on the way to being resolved. Consequently, activities on behalf of identifiable groups were said to be no longer necessary. This position was espoused, for example, by both Henry Cabot Lodge and Patrick Collins (an Irish politician and lawyer who had attended Harvard Law School in the early 1870s). Despite the grim conditions under which the Irish and other groups continued to live,

> there was a resolute effort to pretend that the genuine divisions in the city's life did not exist. Thus, in 1876, Collins . . . declared, "I . . . denounce any man or body of men who seek to perpetuate divisions of races or religions in our midst. . . . I know neither race, color nor creed. Let me say now that there are no Irish voters among us. There are Irish-born citizens like myself . . . [but] Americans we are and Americans we will remain."[23]

To Collins, the nation was to consist in the future of individuals who were all "Americans": hyphenated groups, such as Irish-

CONFIDENTIAL

HARV00030381

*Harvard University*

Americans, were viewed as potential obstacles to further progress, representing interests and values that no longer required special recognition or attention. Historical comparisons are never exact, but some of the parallels between the 1870s and our own time are too obvious to ignore, whatever lessons we may choose to draw from them.

The main issue, of course, was not whether the ideal of a united nation was an appropriate vision for America's future: few people would have seriously questioned such a goal. The more immediate dilemma was whether the difficult social, religious, economic, and other realities of the time had been sufficiently resolved, so that the needs, interests, and even the identity of particular groups should fade—in effect—from national consciousness. One of our foremost social historians has suggested that the views expressed by Collins and others were at best premature: "Collins and Lodge were both inaccurate" in their assessment of the situation; more important, "they knew it, [and] they nevertheless felt the necessity of speaking as they did."[24]

As matters turned out, few of the deep-rooted problems facing Boston (and other cities) had been adequately confronted and addressed. When the next great wave of immigrants began to reach the nation's shores in the 1870s and 1880s, the scene was set for increased tension and conflict—as well as for intensified group identification and differentiation.

## 3.

CHARLES ELIOT SHARED with most of his contemporaries the assumption that there were a number of distinct races, each with its own identifiable characteristics. As has already been suggested, he also believed that the special talents, qualities, and interests of each race should be preserved, insofar as possible. His views on the subject were far from simple, but he held strongly to the idea that each group should be enabled to make its own unique contribution to the diversity of American society. In this sense, he tended to view races rather as he viewed individuals: they should develop freely along their own lines, following their own bent,

16

CONFIDENTIAL

HARV00030382

*The President's Report 1993–1995*

because that would lead to the full realization of their capacities. America had always "drawn to it multitudes from all parts of the habitable earth." For Eliot, therefore, the resulting "great diversity in the population of the United States as regards racial origin" was another important "illustration of the variety which may co-exist with freedom and security under democratic institutions."[25]

Eliot believed that, over time, differences among races that lived together in a single society would be qualified and diminished. But he insisted on maintaining differences, and he was no advocate of deliberate assimilation or amalgamation:

> In general, the ideal of a people made up from many different races and living under free institutions should be the perpetuation of racial diversity, and not the bringing about of a racial blend. The diversities of race need no more be extinguished under free institutions than the diversities between human individuals. Freedom should encourage diversity, not extinguish it.[26]

We may not agree with Eliot on the topic of assimilation—or on his conception of race. He himself had complicated attitudes. For instance, he was not in favor of interracial marriage, and his views seem to have been shaped as much by Anglo-Saxon attitudes and anxieties as by his desire to maintain the distinctive attributes of each separate group. Nevertheless, he identified race as a positive component of diversity, and defined racial diversity as an element that enhances—rather than diminishes—the vitality and strength of a democratic society.

Moreover, given that the new immigrant groups were closely identified with distinct "races," Eliot's affirmation of racial diversity was effectively an indication of his willingness to make room in higher education for at least some of the recent arrivals. In the 1890s, a decision to enroll even a modest number of university students from some of these groups was not uncontroversial. Indeed, when issues of race were at stake in the 1890s and earlier—especially in Boston and Cambridge—the "immigrant wave" was in some ways as complex an issue as the persistent and profound dilemma which W.E.B. Du Bois later identified as "the color line."

In spite of controversy, Eliot introduced several changes at Harvard. And given the ferment of the time, he could not press forward altogether quietly—even if he had wished to do so. Public discussion and articles (like those already cited) were necessary, as

17

CONFIDENTIAL

HARV00030383

DX040.0019

*Harvard University*

was the creation of a university atmosphere that was more open in spirit. Additional financial aid was also needed to assist students from different backgrounds who lacked the means to attend a private college such as Harvard. Some explicit policy changes—especially in the sphere of religion—were also introduced. Compulsory chapel was abolished (after considerable struggle) and was replaced (with the help of the Reverend Phillips Brooks) by a system of voluntary observance, including services offered by ministers from a number of denominations. Since religion was often linked to "race"—as in the case of Jews, Buddhists, and Catholic groups—greater religious inclusiveness also implied greater racial diversity.

Over the course of a quarter-century and more, the results of these efforts were measurable and even striking. In 1870, at the beginning of Eliot's presidency, a survey showed that nearly 80 percent of the 563 undergraduates who responded were Unitarians, Episcopalians, and Congregationalists. Nearly 20 percent were members of other Protestant sects. There were seven Roman Catholics and three Jews.[27]

Certain demographic and economic factors help to explain some of these statistics, but it is also the case that there had been no serious earlier effort by Harvard to encourage the enrollment of individuals from groups that were still very much on the outside. Changing the attitude and policies of the university was a necessary prelude to changing its enrollment patterns. The situation altered steadily during the Eliot years, and it did so largely as a result of actions that were conscious and even conspicuous. By 1908, when Eliot was about to retire, 9 percent of the College's student body was Roman Catholic (compared to 1 percent in 1870); 7 percent was Jewish (compared to 1 percent earlier); and African-American students—who were absent from the student body in 1870—were at least starting to be enrolled, though still in very small numbers. Even in terms of these three categories, the aggregate number by 1909 accounted for about 17 percent of the student population, as contrasted to 2 percent at the beginning of Eliot's tenure.[28]

We should remember, in addition, that Eliot also undertook some significant (if hesitant) initiatives with respect to the educa-

18

CONFIDENTIAL

HARV00030384

**JA5395**

DX040.0020

*The President's Report 1993–1995*

tion of women. The explicit goal in this case had more to do with increasing educational opportunity for the members of a certain group than fostering interaction among different groups—although any greater inclusion of women in university life during the 1890s would have inevitably introduced a broader range of views and perspectives not otherwise present.

Eliot's views on the appropriate education for women—and on the role of women in society—fell short of full equality and were the subject of some intense criticism. Eliot was ambivalent about the entire subject, and it is not clear how far he would have proceeded without very substantial prodding. Early in his tenure, however, he collaborated on a report (with Professor Louis Agassiz and others) recommending the admission of women to the Harvard Medical School. The recommendation ultimately failed, but it represented an important first step. By 1879, Eliot and the Harvard faculty were working with Elizabeth Carey Agassiz to establish the "Harvard Annex," which was to become Radcliffe College. Women were to be educated separately, although taught by Harvard professors; by 1894, 22 Radcliffe women earned A.B. degrees, and three were awarded A.M.'s.

Eliot's efforts in the sphere of diversity were only part of his larger goals. Yet they were fully consistent with his basic approach to education. The results were uneven, and they were certainly not "linear": they came about as a result of struggle and disagreement, including changes in Eliot's own ideas over the course of the four decades of his presidency. What was remarkable about Eliot, in retrospect, is that he responded directly to so many of the conflicting educational issues of his era. He analyzed them with unusual clarity and tenacious logic. He was responsive to emerging challenges and changing circumstances. During his tenure, several important barriers were broken—not completely, but nonetheless significantly. Doors were opened that would be difficult to close entirely in later eras. Some of Eliot's changes "appalled" many people, but they also created a reputation for "diversity, tolerance, and pluralism" which "rested upon solid foundations."[29] From every point of view, diversity had helped to bring about significant advances in the nature, quality, and scope of undergraduate education at Harvard.

19

CONFIDENTIAL

HARV00030385

*Harvard University*

## 4.

THE DEVELOPMENTS just discussed provide some evidence of an increasing emphasis on diversity at Harvard. But were the benefits of diversity apparent to students themselves? On this point, the testimony is necessarily anecdotal and impressionistic—as well as sporadic. As early as the 1850s, the statements of Henry Adams, mentioned earlier, suggest that direct "contact with new types" of people had "for the first time taught [Adams] their values."[30]

Half a century later, John Reed, class of 1910, entered Harvard near the end of Eliot's presidency. He was the polar opposite of Adams in his political views, social background, and point of origin. He soon found himself immersed in the bewildering intricacy of Eliot's cosmopolitan college, with its different types, groups, clubs, and cliques. Reed's own recollection of his Harvard experience, written in 1917, is especially interesting, because it suggests some of the ways in which life in a diverse community can lead to pain, isolation, and separateness, as well as to intellectual exhilaration, greater self-knowledge, and moments of human reconciliation:

> I got to know many fellows to nod to, and a very few intimately; but most of my friends were whirled off and up into prominence, and came to see me no more. One of them said he'd room with me sophomore year—but he was tipped off that I wasn't "the right sort" and openly drew away from me. And I, too, hurt a boy who was my friend. He was a Jew, a shy, rather melancholy person. We were always together, we two outsiders. I became irritated and morbid about it—it seemed I would never be part of the rich splendor of college life with him around—so I drew away from him. . . . It hurt him very much, and it taught me better. Since then he has forgiven it, and done wonderful things for me, and we are friends.[31]

Real learning, in all its dimensions, rarely takes place altogether easily, without friction or pain. Indeed, the educational benefits of diversity are often first experienced as forms of temporary dislocation and disorientation—just as they can eventually lead to increased understanding and friendship. Genuine risks and difficulties are involved, and it would be foolish to pretend otherwise.

In John Reed's case, life at Harvard grew steadily better, and he gradually came to revel in the university. It was a place where strong individuals, as well as groups, coexisted in a milieu that was characteristic of Eliot's open and relatively unstructured institution:

20

CONFIDENTIAL

HARV00030386

*The President's Report 1993–1995*

Harvard University under President Eliot was unique. . . . [A] man who came for a good time could get through and graduate . . . ; but on the other hand, anyone could find there anything he wanted from all the world's store of learning. . . .

All sorts of strange characters, of every race and mind, poets, philosophers, cranks of every twist, were in our class. The very hugeness of it prevented any one man from knowing more than a few of his classmates, though I managed to make the acquaintance of about five hundred of them.[32]

If Reed was hyperbolic and ebullient, W.E.B. Du Bois was remarkably firm and determined. As a member of the class of 1890, he had a spectacularly successful undergraduate career. As an African-American, he too found himself outside the mainstream of college life: by his own testimony, his important relationships were with faculty rather than with classmates. But that did not prevent him from making a place for himself—or from being chosen (by his fellow students) as one of the six commencement orators at the time of graduation. If his years at Harvard were partly defined by his isolation, he did not doubt that the sheer opportunity to observe and learn from a "majority" institution was one of the most significant experiences of his life.

By 1933, Du Bois could look back on his Harvard time with both dispassion and appreciation. He was very clear, for example, about some of the specific forms of diversity—geographic, racial, and socioeconomic—that Eliot had introduced:

Harvard had broadened its earlier ideals. It was no longer simply a place where rich and learned New England gave the accolade to the social élite. It had broken its shell and reached out to the West and to the South, to yellow students and to black. I had for the mere asking been granted a fellowship of $300 . . . .[33]

In addition, Du Bois remembered the university as a place where a broader and more inclusive vision of learning—and of society—was beginning to be publicly articulated:

Men sought to make Harvard an expression of the United States, and to do this by means of leaders unshackled in thought and custom who were beating back bars of ignorance and particularism and prejudice. There were William James and Josiah Royce; Nathaniel Shaler and Charles Eliot Norton; George Santayana; Albert Bushnell Hart, and President Eliot himself. There were at least a dozen men—rebels against convention, unorthodox in religion, poor in money—who for a moment held in their hands the culture of the United States, typified it, expressed it, and pushed it a vast step forward.[34]

21

CONFIDENTIAL

HARV00030387

*Harvard University*

By 1933, the passage of time had almost certainly softened Du Bois's earlier ambivalence about Harvard, and altered the memory of some of his more difficult experiences. Nonetheless, William James, Josiah Royce, and other teachers made a lasting impression on him. They remained in his memory as examples not simply of scholars, but of individuals and leaders who demonstrated that "ignorance and particularism and prejudice" could be overcome—in the nation as well as in the university. These direct encounters between a brilliant young African-American and a cadre of progressive New England academics produced living proof for Du Bois that people of different races could meet and work on common terms, could respect one another, and could strengthen one another's commitment to the important moral as well as intellectual values essential to serious education.

22

CONFIDENTIAL

HARV00030388

JA5399

DX040.0024

*IV*
## Some Twentieth Century Challenges:
*Structures, Admissions, and Tests*

### 1.

IN THE TWENTIETH CENTURY there have been at least two major developments related to the conception of diversity in education, especially outside the classroom and the formal curriculum.

The first had to do with the creation of educational facilities and structures intended to help support the goals that I have been discussing. The second concerned the need to deal with a new problem: how to select students from a pool of highly qualified applicants that was much larger than the available number of places in each entering class. Let me turn first to the matter of facilities and structures.

From many points of view, the basic conception of a residential education has remained the strongest expression of an institution's commitment to educating the "whole person," rather than only the intellect. This idea was embodied in the foundation charters of many American colleges and universities: the purpose was to provide the community with "pious and learned" graduates who would become ministers, lawyers, public servants, and civic leaders in all walks of life. As a result, a young person's character, integrity, industriousness, and other attributes were important in admissions, as well as in the life of the college and the larger community.

The residential nature of a college also allowed the benefits of a diverse student body to be more fully realized. If a college provided proper facilities and assistance—while creating an open atmosphere of free inquiry and mutual respect—then it could more confidently take the step of bringing together many kinds of students

23

CONFIDENTIAL

HARV00030389

**JA5400**
DX040.0025

*Harvard University*

from different places. Initiatives of this kind were introduced in at least some colleges and universities by the mid- to late nineteenth century, and were developed much more systematically in the twentieth. New institutional structures enabled students to form close and more continuing associations with their peers, joining organizations and societies of every type. At Harvard, students began living in residential "Houses" that provided social and dining facilities, faculty "masters" and associates, and graduate student tutors. Participation in such units—and in associated extracurricular activities—was rightly seen as much more than a mere adjunct to education. It became part of the fabric of daily life in residential university communities, and one of the primary ways that students learned from one another.

President A. Lawrence Lowell was clearly very different from Eliot, and in some ways sought to limit Eliot's concept of diversity. For example, he called for quotas on the number of Jewish students admitted to Harvard. At the same time, he went further than Eliot in providing facilities that could sustain the more democratic ideals which had gradually been established at the university. In developing the residential House system during the late 1920s, Lowell specifically sought to diminish the tendency of students to form "cliques based upon similarity of origin and upon wealth."[35] The goal of the Houses was "to bring into contact a body of students with diverse interests" who would "provoke" one another to think freshly about many subjects.[36] Although intellectual diversity was one aim of the Houses, Lowell insisted that the new structures were not fundamentally academic, but "a social device for a moral purpose":

> So far as subjects of concentration, pecuniary means, and residence in different parts of the country are concerned, each House should be as nearly as possible a cross-section of the College.[37]

President James Conant later expanded on some of Lowell's themes. As early as 1936-37, he was asking whether there is "any surer way of finding the truth" than by having it debated by students "of differing opinions": "Have we not in each of our [Houses] a band of scholars who educate one another?" If our future lawyers, doctors, poets, teachers, scientists, and historians "all lunch and dine together day after day, then the most powerful of the forces making for a liberal education are set at work."[38]

24

CONFIDENTIAL

HARV00030390

DX040.0026

*The President's Report 1993–1995*

Part of Conant's program involved a reenergizing of Harvard's academic life, especially in advanced learning and research. This initiative took many forms, but the conscious recruitment and enrollment of a more diverse student body was one of its important aspects. From one point of view, diversity meant a stress on intellectual values to Conant, and he recognized that his goals could be achieved only if there was a significant change in admissions, signaling new forms of openness at Harvard. Students from an even wider range of socioeconomic, geographic, and ethnic groups (requiring more outreach, and more financial aid) would be attracted to the university only if special steps were taken—and if the university made clear that the newcomers would indeed be welcome.

The Harvard National Scholarships were created as part of this process. Meanwhile, at a more local level, a broad range of urban commuter students were invited to join Conant's collegium. Many of these bright, adventurous, and non-establishment undergraduates earned the ambiguous label "meatballs." The distinguished journalist and chronicler Theodore H. White, class of 1938, was one such student, and he has left us a vivid description of life in President Conant's diversified institution:

> Conant was the first president to recognize that meatballs were Harvard men, too, and so he set apart a ground floor room at Dudley Hall where we could bring our lunches in brown paper bags and eat at a table, or lounge in easy chairs between classes. The master of this strange enclave of commuting Irish, Jewish, and Italian youngsters from Greater Boston was a young historian named Charles Duhig, whose argument was that the most revolutionary force in history was the middle class.[39]

Not only were the "meatballs" distinguished by their ethnic backgrounds; they also tended to come from low-income families and were frankly upwardly mobile:

> Most of us, largely Boston Latin School graduates, knew more about poverty than anyone from Beacon Hill or the fashionable East Side of New York. We hated poverty; and meant to have no share in it. . . . Harvard had the keys to the gates; what lay behind the gates I could not guess, but all that lay there was to be looted. . . . There were museums to be seen, libraries and poetry rooms of all kinds to tarry in—and stacks and stacks and stacks of books.[40]

If Conant created something of a new immigrant-urban stew in the College, he also expressed the hope that the Houses (which

25

CONFIDENTIAL

HARV00030391

JA5402

DX040.0027

*Harvard University*

charged extra room and board rates) would one day be affordable to all Harvard undergraduates. In addition, he proposed that similar House-like arrangements be created for graduate and professional school students. Finally, after the war—at a time when the double challenge of securing democracy and sustaining peace was very substantial—he urged that students should learn "not only *the facts about* life, but a worth-while *way* of life . . . . We must learn *how* to live together." It was important to remember that "centuries of academic history have shown that it is not primarily through the curriculum that a student learns a worth-while way of life":

> Tolerance, honesty, intellectual integrity, courage, friendliness are virtues not to be learned out of a printed volume but from the book of experience; and the content of this book for a youth is largely determined by the mode of his association with contemporaries. So, too, are those attitudes so essential for the survival of a modern democracy . . . .[41]

Here, Conant—like Eliot—stresses the clear linkage between certain values (such as tolerance) fostered in a residential college, and the civic virtues essential to citizenship and leadership in a democracy. Learning to live together was a central goal of university life; and although Conant's primary interests were academic and intellectual, he was unreserved in pointing out that "the development of the character and philosophy of life of an undergraduate is quite as much a product of his extracurricular activities as of his experience in the lecture hall, classroom, or library."[42]

Much "development of the character and philosophy of life" happens in unpredictable and spontaneous ways. But as Lowell, Conant, and many others have realized, colleges and universities can do much to shape their students' opportunities for personal growth by paying close attention to the structure and ambiance of life outside—as well as inside—the classroom. Norms and expectations must be articulated, fundamental institutional values must be stated clearly, and considerable guidance must be provided. During the course of the last century, many institutions have invested heavily in these extracurricular aspects of education, and have rightly emphasized their significance time and again.

26

CONFIDENTIAL

HARV00030392

DX040.0028

*The President's Report 1993–1995*

## 2.

The years after World War II presented new challenges to Harvard and to higher education in general. During the presidency of Nathan M. Pusey in the 1950s and 1960s, questions about admissions were rather different. With the establishment of very high standards and an ever-growing number of exceptional applicants, how should the university select students in order to create the best educational environment possible, so that undergraduates and graduate students alike could learn as much as a residential institution might offer them? Granted that high academic capability and achievement were central considerations, what other characteristics and qualities should be taken into account—and how should they be evaluated and weighted? Now that the university could be far more selective than ever before, it became important to define the university's admissions criteria with greater clarity, and to describe the linkage between those criteria and the environment for learning.

The dilemma was created in part by the fact that many colleges and universities began to rely more heavily on aptitude tests (especially SATs), grade point averages (GPAs), and class-rank indices. When difficult choices are involved, one response is to search for "objective" criteria that can help in decision making, as well as in the explanation and justification of decisions. When the issue is such as to arouse strong feelings—and few things in life arouse stronger feelings in us than the hopes that we have for our children—the search for a way to base decisions on apparently objective information can become unusually intense. The increased use of standardized test scores and GPAs was neither surprising nor unnatural, even though it was an imperfect and inadequate substitute for informed, experienced judgment that relied on a wider variety of factors.

While Harvard placed a very high value on academic standards throughout this period (and while President Conant was indirectly involved in the establishment of the Educational Testing Service[43]), the university continued to strike a balance between numerical measures and more complex forms of assessment in admissions. The annual Harvard College admissions reports of the

27

CONFIDENTIAL

HARV00030393

**JA5404**

DX040.0029

*Harvard University*

late 1950s and the 1960s offer a helpful guide to the major issues and their resolution—a resolution that was fundamentally consistent with Harvard's past practice. The faculty was of course instrumental in the shaping and articulation of admissions policies and procedures at the university; the reports of the admissions committee, therefore, reflect significantly the views of the faculty, as well as other groups within the institution.

As early as 1961 the admissions committee reported that an analysis of the SAT scores for the past three incoming classes showed that the previous "pattern of steadily rising scores seems to have been broken":

> From this and other evidence it seems clear that in choosing among candidates who are academically qualified the Committee continues to give less weight to the so-called objective factors (rank in class and test scores) and more weight to other evidence, not only of intellectual promise but of other qualities and kinds of promise as well.[44]

Harvard had already begun a series of studies analyzing the "objective factors" of students at the time of admission, in relation to their academic performance in college. In 1963-64, a more explicit assessment of the situation was included in the admissions report:

> The high quality and variety of talents in recent candidate groups have led us to expect the distributions of scores to shift up and down.... Test scores and other objective criteria of academic performance are most relevant to our discussions only at the extremes of our academic range....[45]

The debate about test scores, grades, and other "objective" indicators has intensified even further in the past quarter-century. This is not the place for an extended discussion of the many factors that bear on this complex issue, but I want to mention a few considerations that I believe are important.

- There is a broad consensus that standardized test scores can be valuable as one factor, among several, in helping to assess candidates for admission. Their greatest use is in providing some evidence about the likely academic performance of students, especially during their first two years (approximately) at college or university. In the United States, tests of this kind can offer comparative information difficult to gather in other ways, because we do not have a standard nationwide curriculum, with uniform national examinations in specific academic subjects.

28

CONFIDENTIAL

HARV00030394

*The President's Report 1993–1995*

National curricula and examinations present their own problems, of course, and can lead to early (often narrow) forms of specialization. They do, however, facilitate certain kinds of assessment across school systems and regions in a country. Standardized aptitude tests—such as SATs—are different from uniform national exams in specific subjects, but they too can be helpful in making some forms of comparative evaluation possible.

The correlation between SAT scores and future academic performance, however, is far from exact. It is not uncommon for individuals to outperform (or underperform) what the tests "predict"—often by significant margins. In addition, the predictive power of the tests diminishes over time. After one or two years, SAT scores and similar indices used at the point of admission tend to be less informative about continued academic performance. For some students, the correlation can remain quite strong; for others, it weakens substantially.

- Standardized tests are designed to assess certain academic capacities and achievements, but they obviously do not attempt to evaluate many other critical qualities. They do not, for example, measure a student's ability to exercise good judgment in different situations, or to understand other human beings; nor do they assess qualities such as competitiveness, decisiveness, and cooperativeness—or creativity and imagination.

- In addition, the test scores of individuals fluctuate over time, and some of these changes are due to the quality of a student's educational opportunities and preparation. This point is crucial. We know, for example, that the SAT scores of students tend to increase with more (and better) schooling—as well as with more practice in test-taking. That is one reason why so many secondary school students take the SATs two or three (or more) times. Special courses, coaching, and pre-exam preparation books can also help to improve scores.

In other words, students who have had less consistent access to good education (and who lack the money to pay for extra "prepping") will frequently do less well on standardized tests. Opportunities, not just abilities, are a critical issue here. Individuals who have unusual drive, curiosity, and a strong

29

CONFIDENTIAL

HARV00030395

*Harvard University*

sense of purpose can compensate for lower test scores, and they regularly demonstrate that they can succeed admirably in a university—and in life—if they are given the chance. To curtail the admission of such students, mainly because they have somewhat lower SATs, would discount what we know about the real abilities of human beings and their exceptional capacity for continued growth and development.

- A final point: not only do the test scores of individuals vary over time, but so do the average scores of particular groups. During the course of decades, for example, selected subgroups within our population have performed better on standardized tests, depending upon their access to educational opportunities and (in the case of immigrants) on the amount of time they and their families have lived in the United States. More schooling, more time for acculturation, and increased access to higher education are clearly some of the important factors that have led to this phenomenon of rising scores.

  Similarly, we know that the average test scores of African-Americans (and those of certain other minorities) are currently below the average "majority" scores. We also know, however, that African-American SAT averages have steadily risen since the mid-1970s, while the figures for white students have remained essentially level (dipping for several years, and then recovering). There is no single explanation that accounts for these trends, but some improved access to better primary and secondary schooling (especially in the private school sector) has almost certainly made a difference in the case of minority students. This change in the level of educational opportunity—however limited, and however precarious—has begun to show tangible results.

These general observations about standardized tests have led—at Harvard and many other institutions—to an admissions approach which takes relevant "objective" data into account, but is not driven primarily by them. Average scores among students admitted to Harvard remain very high, but they vary from year to year. In addition, the range of individual test scores within the student body continues to be broad. Consequently, as the admissions

30

CONFIDENTIAL

HARV00030396

**JA5407**

DX040.0032

*The President's Report 1993–1995*

staff evaluates candidates, it looks carefully at letters of recommendation from teachers and others; at the actual quality of a student's academic work (not simply the grades); at evidence of character and commitment; at each student's written personal statement; and at assessments of the nature and quality of a student's contributions in specific extracurricular activities or employment situations. These and other factors—including those characteristics that can enable individual students to contribute something distinctive to the diversity of the student body—create the framework for admissions to Harvard College, and they provide a much sounder basis for informed decisions than reliance on any one or two indicators could conceivably supply.

Although the situation of the 1990s differs in some respects from the late 1950s and the 1960s, the fundamental approach to admissions does not. Passages from the detailed admissions committee report of 1964–65 can still stand as a reasonable summary of Harvard's basic approach to the use of SATs and similar indices:

> We pay attention to test scores and Predicted Rank List [PRL] but, helpful as they are, what they tell us . . . is quite limited, even in the intellectual area. For some school and college people this is a hard proposition to accept, but each of the studies we have done of the performance of students in Harvard College seems to support it . . . . Our crude approximation of personal strengths . . . correlates as well as test scores and PRL with completion of the A.B. degree and comes close to correlating as well with graduation with honors. In short, our research gives support to the common sense notion that effective intelligence depends as much on such personal characteristics as energy, imagination and ability to channel one's energies as it does on the qualities the aptitude and achievement tests measure.[46]

3.

IF THERE WERE broad conceptual shifts concerning diversity during the post–World War II period, they occurred in two areas. First, diversity was seen as comprising a somewhat wider range of attributes and factors. Second, there was a fuller appreciation of the effect that a diverse student body could have, not simply upon individuals, but upon an entire entering class of students, and on an institution as a whole.

31

CONFIDENTIAL

HARV00030397

*Harvard University*

The earliest postwar change in admissions—and in the nature of diversity—occurred with the GI Bill. Suddenly, colleges and universities were enriched by thousands of veterans who brought with them different talents and kinds of experience that added immensely to the quality of education. At about the same time (in 1946), Harvard provost Paul Buck called for "an extended organization for making contact with the 500 to 1,000 schools that now send us students, often only occasionally." Over the next two decades, Harvard College developed a greatly expanded national and international network of volunteers to assist the admissions staff.

As a result, it was soon possible to seek, actively and affirmatively, students in rural, urban, and suburban areas across the country. Candidates from regions throughout the nation were deliberately recruited, as were (for example) pianists, biologists, classicists, poets, football players, and student government leaders. More women enrolled through Radcliffe, and although the process was slow, Radcliffe and Harvard Colleges were on the way to becoming a fully coeducational enterprise. Meanwhile, the pool of African-American applicants expanded substantially during the 1960s, and the number of enrolled minority students increased over the next decades. Students from abroad also enrolled in greater numbers—as did those from low-income and middle-income families.

In other words, a greater degree of openness and inclusiveness, along many dimensions, was becoming part of the rhythm and life of the university. It did not simply happen; it was the result of purposeful efforts to reach out, in order to identify and attract the most promising, capable, and diverse group of students possible.

A second shift that took place during the 1950s and 1960s had to do with a sharpening sense of how diversity could contribute broadly to education within an entire university. Student diversity was seen as "stimulating to the Faculty" and "more relevant to liberal education."[47] Moreover, the composition of each entering class became, explicitly, a consideration in its own right. Every new class was viewed more and more as an ensemble, rather than a simple aggregation of individuals chosen one by one without any significant reference to the pattern produced by the whole.

In this regard, the admissions reports of this period return strongly to the theme that the "measure of a class" consists largely

32

CONFIDENTIAL

HARV00030398

*The President's Report 1993–1995*

in "how much its members are likely to learn from each other—the real beginning of learning, both intellectually and emotionally."[48] The range of undergraduate "interests, talents, backgrounds and career goals affects importantly the educational experience of our students," because "a diverse student body is an educational resource of coordinate importance with our faculty and our library, laboratory and housing arrangements."[49]

This conception of a diverse student body as an "educational resource"—comparable in importance to the faculty, library, or science laboratories—is the most direct expression of an idea that we have seen emerging over the course of more than a century. Cardinal Newman once suggested, perhaps more wittily than seriously, that a "University which had no professors or examinations at all," but merely brought together a group of students with different notions from different places, would be preferable to "a so-called University" that dispensed with the residential and tutorial aspects of college life and "gave its degrees to any person who passed an examination in a wide range of subjects."[50] The Harvard admissions statement quoted above may lack Newman's wit and some of his deliberate hyperbole, but it demonstrates the continuing emphasis on the value of what students themselves, in all their heterogeneity, can contribute to one another's education.

4.

A S THE POOL of college applicants grew in the 1950s and 1960s (and later), more questions began to arise concerning fairness in admissions. In the eyes of some people, there was a growing sense that measurable credentials—especially test scores and GPAs—ought to be the essential determinants for admission. Others were concerned that an emphasis on numerical indices and narrowly defined "objective" criteria would screen out large numbers of candidates who were needed not only by the universities, but by the nation: exceptional human beings who were unusually capable students, and whose combined qualities would make them effective leaders both in college and in later life.

33

CONFIDENTIAL

HARV00030399

JA5410

DX040.0035

*Harvard University*

These different views about admissions represented long-standing tensions. They had begun to develop long before the postwar era, and were even evident in the differing approaches taken successively by Presidents Eliot (expansive on many fronts), Lowell (very restrictive on some fronts), and Conant (especially assertive on the academic front).

Despite these differences of emphasis, however, Harvard remained basically committed to enrolling a broad mix of students. One consequence of maintaining this approach in the postwar period, however, has been the plain fact that admissions decisions have become far more difficult to make—and to explain—in the face of huge increases in excellent applications. Disappointed applicants (with their families, teachers, and other supporters) have asked for detailed reasons, especially if their test scores and grades were, by most standards, high. The gap between institutional decisions (on the one hand) and candidate expectations (on the other) has grown, leading in many cases to misunderstanding and anger.

These reactions are understandable, but there is another set of important considerations that must be borne in mind. A college or university should be consistent and equitable in the way it makes admissions decisions. But the university also has guiding educational purposes that are ultimately the source of its admissions policies, and that create the framework for the development of admissions criteria. These criteria, as we have seen, have for many generations included considerations of diversity, primarily because of the ways in which diversity enhances the environment for learning. The beneficiaries of such an approach are the students actually chosen for admission—the students to whom an institution owes its primary responsibility, and for whom the composition of a diverse student body pays significant educational dividends. Given this fact, colleges and universities must be able to exercise their best judgment, applying a broad range of criteria and considerations, in making final admissions decisions. Only in this way can they take full advantage of the important values that diversity can and does provide.

34

CONFIDENTIAL

**JA5411**
DX040.0036

# V

## *Civil Rights Legislation and the* Bakke *Case*

### 1.

Although diversity had become a significant goal in much of American higher education before World War II, substantial parts of our population still remained largely outside the doors of excellent educational institutions. Throughout much of this nation's history, and in all sectors of the country, many people had been excluded—or made to feel unwelcome—because of characteristics such as their religion, race, gender, and ethnicity. African-Americans provide the clearest example. But Jews, Latinos, Native Americans, and others also found, for a very long period, only limited ports of entry. And while women had access to outstanding single-sex colleges, they were denied admission to the many private colleges and universities that remained all male.

This situation began to change during the postwar period. But even those institutions of higher education that were committed in principle to diversity have had uneven records of accomplishment—Harvard included. In addition, a sizable proportion of colleges and universities in the United States had been founded to serve particular groups or constituencies. Some institutions were, for example, explicitly church-related. Others were intentionally local or regional in nature. Some were largely devoted to students of a particular race or ethnic group. Others emphasized a specific set of intellectual or cultural traditions—in science and technology, or the creative arts, or in "great books."

The Civil Rights Act of 1964 (and related initiatives) represented a major effort on the part of the federal government to promote equal opportunity for all Americans, in many occupations and spheres of life. This legislation followed—by a decade—the Supreme Court's landmark decision in *Brown v. Board of*

35

CONFIDENTIAL

HARV00030401

DX040.0037

*Harvard University*

*Education.* In *Brown*, as we know, separate public schools designated by law for children of different races had been declared inherently "unequal." Under the 1964 Civil Rights Act, admissions (and other specific activities) in colleges and universities that received federal funding became subject to requirements of nondiscrimination. The legislative history of the Act reveals deep and passionate divisions in the Congress, and in the country. Proponents argued that government had a special responsibility to make certain that programs and activities supported by federal funds were free of discrimination. Opponents foresaw a future in which controversies about race or ethnicity—and later, about gender—would create continuing unrest, discontent, and litigation.

As in the case of any genuine dilemma, the real issues were beyond immediate resolution, and they contained the seeds of continuing disagreement. In higher education, a variety of programs related to affirmative action were designed during the late 1960s and 1970s. Some of these programs soon met with legal challenges. Perhaps the most conspicuous involved the University of California, in a case brought by Allan Bakke. In 1978, the Supreme Court in *Bakke* issued what remains its most significant statement concerning questions of race and admissions in higher education.

The Medical School of the University of California at Davis had a policy of reserving 16 of the 100 places in each class for members of certain minority groups. Candidates for these spaces were considered separately from others, and were held to a different standard of admissions. The process was largely but not exclusively quantitative in nature, with precise "benchmark" scores and "cutoff" points being used. Bakke contended that he was not admitted because of his race: that as a white student, he had been unfairly excluded from competing for one of the 16 places reserved for minorities, even though his test scores and other indices were stronger than those of students admitted under the special admissions program.

The *Bakke* case was especially significant because it dealt directly with the matter of quotas or set-asides in admissions, as well as with the question of whether race or ethnicity can be used as a factor in admissions decisions. The Court decided, in a 5-4 vote, that the admissions process at the Davis Medical School was unaccept-

36

CONFIDENTIAL

**JA5413**
DX040.0038

*The President's Report 1993–1995*

able. The clear separation of 84 "regular" admissions places from 16 "special" places for minorities, together with the use of different numerical cutoff points for the two groups, was held to be unlawful. Allan Bakke prevailed, essentially because he was judged to have been denied the opportunity to compete fairly in a full field that included all applicants and all 100 spaces.

Several of the opinions, by different Justices of the Court,[51] restated the view that racial categories and preferences—even if "benign" in purpose—are problematic, given the broad and unqualified language of the equal protection clause of the Fourteenth Amendment. While the original initiative that led to the Amendment's adoption in 1868—and ultimately to the Civil Rights Act of 1964—was clearly intended to break systematic patterns of discrimination against African-Americans, the basic constitutional and legislative goals involved equal protection for *all* persons, whatever their race.

In his pivotal opinion in *Bakke*, Justice Powell concluded that "racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination."[52] But while any use of racial or ethnic categories requires special care and scrutiny, the categories are not in all circumstances excluded from conscious consideration, according to a majority of the Court. Under the *Bakke* ruling, it was judged permissible to take race explicitly into account as one factor in making university admissions decisions, provided that the institution can show that the practice is necessary to promote a substantial interest.[53]

This particular aspect of Justice Powell's opinion was, of course, extraordinarily significant, and it remains so. The California Superior Court, and the Supreme Court of California (both of which had previously decided in favor of Bakke), had specifically declared racial considerations to be impermissible in admissions decisions. By contrast, Justice Powell stated clearly that conscious consideration of race or ethnicity in decision making is not intrinsically unconstitutional, even though its use must be strictly circumscribed:

> In enjoining petitioner [the University of California] from ever considering the race of any applicant, . . . the courts below failed to recognize that the State has a substantial interest that may legitimately be served by a properly

37

CONFIDENTIAL

HARV00030403

*Harvard University*

devised admissions program involving the competitive consideration of race and ethnic origin.[54]

In addressing the question of what constitutes a sufficiently substantial interest, Justice Powell was unpersuaded by several arguments that the University of California had advanced.[55] The rationale that Justice Powell found persuasive was based directly on educational grounds: the presence of minority students contributed—along with the presence and contributions of other students—to diversity, and therefore to the total educational environment of an institution, as well as to the education of all its members. In short, some consideration of racial and ethnic characteristics was judged to be appropriate, because "the interest of diversity is compelling in the context of a university's admissions program."[56]

This conclusion was grounded in part on considerations of academic freedom. Justice Powell relied on the long-standing definition of academic freedom used by Justice Frankfurter in *Sweezy v. New Hampshire:*

> "It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail 'the four essential freedoms' of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study."[57]

While none of these freedoms can be judged to be absolute, they have "long . . . been viewed as a special concern of the First Amendment"[58]—and the specific capacity to decide "who may be admitted to study" was obviously of direct relevance in *Bakke.* Justice Powell also quoted from another earlier opinion of the Supreme Court, *Keyishian v. Board of Regents:*

> "Our Nation is deeply committed to safeguarding academic freedom which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment. . . . The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of an authoritative selection.'"[59]

In his discussion of these issues, Justice Powell not only mentioned the "robust exchange of ideas," but also emphasized the

38

CONFIDENTIAL

HARV00030404

**JA5415**

DX040.0040

*The President's Report 1993-1995*

broader concept of student exposure to the "mores"—the customs, habits, and outlooks—of fellow students who are "as diverse as this Nation of many peoples."[60] While the educational benefits of such exposure may appear to be most striking during a student's university years, their long-term significance was held to be equally valuable: "The Nation's future depends upon leaders trained" in this way,[61] and the results of such training can have a lasting effect on individuals, and therefore on the society of which they are a part.

In the course of Justice Powell's exposition, one can hear echoes of Mill's insistence on "robust" exchanges, or Eliot's commitment to educating future leaders of a heterogeneous democratic society. Indeed, Justice Powell's pivotal opinion in *Bakke* has its roots in a long tradition of thought concerning the nature of learning and education. That tradition preceded, by more than a century, the advent of affirmative action programs and the passage of the Civil Rights Act of 1964. It is a tradition that is still vital, and still crucial to our nation's future.

### 2.

IF IT IS PERMISSIBLE to take race and ethnicity into account as one factor in an admissions process, but generally not permissible to "set aside" places (or to use a set of differently defined standards) exclusively for members of a particular ethnic or racial group (or groups), how can one design and administer an appropriate process? In *Bakke*, the Justices devoted considerable attention to this issue.

Justice Powell drew extensively on Harvard College's policy statement on admissions, which he quoted at length in his opinion and added in full as an appendix. This policy, shaped by Harvard's faculty and admissions committee, carried the strong endorsement of President Derek Bok, whose constant efforts in behalf of diversity and affirmative action helped to determine Harvard's goals and extend its progress throughout the 1970s and 1980s. Two passages from the Harvard statement are particularly pertinent. The first concerns the way in which different criteria can be weighed simultaneously in making admissions decisions; the second concerns the

39

CONFIDENTIAL

HARV00030405

*Harvard University*

question of so-called "critical mass," including the issue of quotas as contrasted to approximate (and flexible) goals:

> When the Committee on Admissions reviews the large middle group of applicants who are 'admissible' and deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor just as geographic origin or a life spent on a farm may tip the balance in other candidates' cases. . . .[62]
>
> In Harvard College admissions the Committee has not set target-quotas for the number of blacks, or of musicians, football players, physicists or Californians to be admitted in a given year. At the same time the Committee is aware that if Harvard College is to provide a truly heterog[e]neous environment that reflects the rich diversity of the United States, it cannot be provided without some attention to numbers. It would not make sense, for example, to have 10 or 20 students out of 1,100 whose homes are west of the Mississippi. Comparably, 10 or 20 black students could not begin to bring to their classmates and to each other the variety of points of view, backgrounds and experiences of blacks in the United States. . . . Consequently, when making its decisions, the Committee on Admissions is aware that there is some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted. But that awareness does not mean that the Committee sets a minimum number of blacks or of people from west of the Mississippi who are to be admitted.[63]

Distinctions between the Harvard College program and the University of California at Davis program were discussed in some detail in *Bakke*. Justice Blackmun wrote that, while he saw the advantages of the Harvard program, he was not convinced that the difference between the two was "very profound or constitutionally significant." Justice Blackmun concluded that the Harvard program was "better formulated than Davis' two-track system," but he added:

> The cynical, of course, may say that under a program such as Harvard's one may accomplish covertly what Davis concedes it does openly. I need not go that far, for despite its two-track aspect, the Davis program, for me, is within constitutional bounds, though perhaps barely so.[64]

In his pivotal opinion, however, Justice Powell insisted on the fundamental difference between a two-track process involving set-asides and a unitary process that judged all candidates by the same set of criteria, applied in a way that considered each applicant as an individual with a complex set of talents, interests, characteristics, qualities, and achievements:

40

CONFIDENTIAL

HARV00030406

DX040.0042

*The President's Report 1993–1995*

In such an admissions program, race or ethnic background may be deemed a "plus" in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats. The file of a particular black applicant may be examined for his potential contribution to diversity without the factor of race being decisive when compared, for example, with that of an applicant identified as an Italian-American if the latter is thought to exhibit qualities more likely to promote beneficial educational pluralism. Such qualities could include exceptional personal talents, unique work or service experience, leadership potential, maturity, demonstrated compassion, [or] a history of overcoming disadvantage. . . . Indeed, the weight attributed to a particular quality may vary from year to year depending upon the "mix" both of the student body and the applicants for the incoming class.

This kind of program treats each applicant as an individual in the admissions process.[65]

### 3.

Finally, it is important to note that in his decisive opinion in *Bakke*, Justice Powell took into account the contribution of diversity to education at the graduate as well as the undergraduate level. While acknowledging differences in the specific educational purposes to be served (and in the admissions selection criteria) at the two different levels, he concluded that there was sufficient similarity between the two to warrant similar approaches: "Even at the graduate level, our tradition and experience lend support to the view that the contribution of diversity is substantial."[66] Law schools, for example, were seen not only as academic institutions, but as "the proving ground for legal learning and practice"—places that "cannot be effective in isolation from the individuals and institutions with which the law interacts. Few students and no one who has practiced law would choose to study in an academic vacuum . . . ."[67]

A similar perspective was relevant to medicine. "Physicians serve a heterogeneous population," wrote Justice Powell, and

an otherwise qualified medical student with a particular background—whether it be ethnic, geographic, culturally advantaged or disadvantaged—may bring to a professional school of medicine experiences, outlooks, and ideas that enrich the training of its student body and better equip its graduates to render with understanding their vital service to humanity.[68]

41

CONFIDENTIAL

HARV00030407

*Harvard University*

This important issue—of graduate and professional school admissions—deserves some additional discussion, even though it cannot receive adequate attention in the present context. Generalizing about admissions criteria across very different disciplines is obviously difficult, because programs vary widely in the nature of the required preparation. A Ph.D. program in statistics or plasma fusion, for instance, will undoubtedly have technical requirements for admission that would ordinarily not have clear parallels in a program such as English literature or European history. Similarly, medicine differs from law in the nature and extent of preparation normally required—just as there are substantial variations in the kinds of specialization usually expected in fields as diverse as government, divinity, and business administration.

Nonetheless, if we want a society in which our physicians, teachers, architects, public servants, and other professionals possess a developed sense of vocation and calling; if we want them to be able to gain some genuine understanding of the variety of human beings with whom they will work, and whom they will serve; if we want them to think imaginatively and to act effectively in relation to the needs and values of their communities, then we shall have to take diversity into account as one among many significant factors in graduate and professional school admissions and education.

We need to remember, for instance, that many Ph.D. students in physics or sociology—like master's degree candidates in public health or education—will one day carry responsibilities that affect people from many different backgrounds. The Ph.D. student who becomes a teacher of science, art, or economics at an undergraduate college—no less than the general practitioner of medicine, or the inner-city minister—must be prepared to understand and work with many individuals, over decades, who will have a multiplicity of opinions, cultural perspectives, and convictions about life. Relevant academic training and expertise are indispensable to such practitioners. But such training and expertise can take one only so far in many of the situations that are now the substance of everyday professional life, and the realities of our time require forms of education that are broad in their human dimensions, as well as powerful in their intellectual content.

42

CONFIDENTIAL

HARV00030408

*The President's Report 1993–1995*

President Conant was once asked how he would measure the quality of Harvard's undergraduate program. Conant, as we have noted, was hardly averse to reliance on tests, and he was unambiguous in his concern for high academic standards. But he replied that he would "reject all informational tests" that might be given to "recent graduates as indicative of the effectiveness of our general education. Whether a liberal education has been a success or failure should be measured by the student's breadth of vision fifteen or twenty years after graduation."[69]

Graduate and professional education—like undergraduate education—plays a central role in helping to expand (or to constrain) an individual's "breadth of vision." Indeed, student diversity must be taken consciously into account at the graduate school level, because education at that level so strongly affects a student's conception of professional vocation, as well as the capacity to work with a variety of fellow professionals. The need to sustain rigorous academic standards in graduate and professional programs is clear. The more difficult and genuine challenge, in many respects, is to ensure that other significant values—ethical, professional, and civic—also receive the serious attention that they so clearly deserve.

43

CONFIDENTIAL

HARV00030409

JA5420

DX040.0045

# VI
## *Possible Future Directions*

A S WE MOVE FURTHER in the post-*Bakke* era, there are various policy alternatives concerning student diversity and admissions.

We can continue with admissions policies that take many individual qualities and factors into careful account (including a person's ethnicity, race, or gender). These policies have served us extremely well for a very long time, and have enhanced the educational mission of our universities.

Alternatively, institutions may choose on their own to take less account of race, ethnicity, and gender in admissions; or they may find themselves prohibited from doing so by legislative or other actions (at either the state or federal level). The Board of Regents of the University of California has recently endorsed a complex series of prohibitions along these lines, although the precise interpretation of the recommendations remains unclear. More generally, there has obviously been widespread debate about—and some expressed opposition to—affirmative action programs during the past two years, not only in California but throughout the nation.

My own view—as suggested throughout these pages—is that the main question to be addressed in this context is not so much affirmative action in itself, but the broader matter of diversity as it relates to the quality, breadth, and texture of student learning. The primary purpose of diversity in university admissions, moreover, is not the achievement of abstract goals, or an attempt to compensate for patterns of past societal discrimination. It represents now, as it has since the mid-nineteenth century, positive educational values that are fundamental to the basic mission of colleges and universities. It is also, as I have emphasized, extremely important to the development of important civic virtues—and of future leaders—vital to the health and effective functioning of our democracy.

44

CONFIDENTIAL

HARV00030410

*The President's Report 1993–1995*

The most constructive and well-conceived admissions programs are those that view affirmative action in relation to the educational benefits of diversity. They may take various characteristics such as race, ethnicity, or gender into account as potential "plus" factors (among many others) when evaluating candidates, but they do not assign such characteristics an overriding value. Nor do they aim to achieve specific numerical targets, either through the use of set-asides or quotas. They involve energetic efforts in outreach, but not mandated outcomes. Programs of this kind, when they are carefully designed and implemented, preserve an institution's capacity—with considerable flexibility—to make its own determinations in admissions. This capacity and flexibility have been critical in the past, and will continue to be so in the future.

With these general considerations in mind, let me comment briefly on some of the main arguments that have recently been advanced by thoughtful critics of affirmative action in university admissions:

*One such argument suggests that affirmative action programs in admissions were important during an interim stage as a step toward greater equality of opportunity and the creation of a "level playing field," but that we have now reached a point where discrimination has been so significantly reduced that African-Americans (or other historically under-represented groups) no longer face serious obstacles of this kind.*

There have clearly been increased opportunities for members of historically underrepresented groups in colleges and universities during the past quarter century. Positive steps of this kind, however, are very recent, and are far from secure. Twenty-five to thirty years of improved access to higher education is a very brief time span. It is scarcely one generation—barely long enough for graduates of the late 1960s to have had children who are now reaching college age.

To understand more precisely what has been achieved, it is helpful to consider some of the data concerning (for example) African-Americans in higher education programs during the past two to three decades. While the focus must remain on the broad concept of diversity as it relates to learning—as distinct from any narrowly quantitative search for "equal outcomes"—such data are useful in assessing the extent of actual progress in achieving diversity, along one important dimension, during an era when

45

CONFIDENTIAL

HARV00030411

*Harvard University*

intensified efforts have been made to enhance opportunities for historically underrepresented groups in both undergraduate and graduate education.

- In 1964, only 4 percent of African-Americans 25 years or older had completed at least four years of college, compared to 10 percent of whites in the same age group. By 1993, the figures had risen to 12 percent for African-Americans and 23 percent for whites—indicating a significant advance by both groups, but also a persistent gap.[70]

- In 1975, African-Americans received about 1,000 (3.8 percent) of the roughly 26,000 doctoral degrees awarded by American universities to U.S. citizens of known race or ethnicity. After periods of modest increase and decline in that percentage, African-Americans received about 1,100 (4.2 percent) of the roughly 26,000 such degrees awarded in 1993.

  If attention is confined to doctorates in the basic arts and sciences disciplines (excluding business, communications, education, and certain other fields), the percentages are smaller—roughly 2 percent in 1975 and 3 percent in 1993. Indeed, in 1993 a total of roughly 600 doctorates were awarded to African-Americans (or black permanent residents) in the basic arts and sciences nationwide. That figure includes, for example, 8 doctorates in mathematics, 9 in physics and astronomy, 31 in chemistry, 74 in the biological sciences, 20 in economics, 29 in sociology, 19 in history, and 15 in music.[71]

- In the field of law, blacks received 5.7 percent of first-professional degrees awarded by American universities in 1992-93, compared to 4.0 percent in 1976-77. In medicine, the comparable figure was 5.9 percent in 1992-93, up from 5.3 percent in 1976-77. In business, blacks received 5.3 percent of the master's degrees awarded in 1991-92, up from 3.8 percent in 1976-77.[72]

However we interpret these statistics—and there are many considerations that must be taken into account—two main conclusions seem to me to be clear.

First, since the advent of affirmative action programs at colleges and universities in the late 1960s and 1970s, there has been

46

CONFIDENTIAL

HARV00030412

**JA5423**

DX040.0048

*The President's Report 1993–1995*

marked improvement in the participation of African-Americans (as well as other historically underpresented minorities) in higher education. Particularly at the undergraduate level, but also (far more selectively) at some advanced levels, there have been genuine gains.

Second, in spite of these gains, the figures show that we are still very much "in process." There is substantial unrealized potential in each of the different degree programs and fields of study just cited. In addition, the gaps in certain areas are startling, and they highlight critical shortages that are exceptionally troubling from a national point of view. The doctoral situation in the arts and sciences shows only glacial change—from a very low baseline—over time. The situation is a matter of major concern, and it illustrates the need for continued and focused attention in the years ahead. While the data for professional education are more encouraging, they are at best mixed. The overall numbers are not robust, and the representation of African-Americans in some fields is clearly very modest.

As we think about the long run, we need to remember that the number of degrees awarded at the doctoral and professional school level are likely to grow only if the numbers at the undergraduate level continue to increase. Progress in advanced education depends directly on the gains achieved at previous stages. This is a classic "pipeline" problem, where the linkages in the entire system are crucial, and where a weakening or breakdown at any juncture along the way has major implications for the possibilities at every successive phase.

Hence, we cannot expect to find—in two or three decades—noticeably more African-Americans (or members of other underrepresented groups) in Ph.D. programs or in professional schools unless access to excellent undergraduate education remains very strong—and indeed expands. The nation's ability to achieve diversity at advanced levels in education will depend ultimately on continued progress at earlier levels. So will our ability to assure a reasonable presence of historically underrepresented groups in the major professions—including a strong presence on the faculties of our colleges and universities. We need no precise numerical conception of diversity in order to reach the intuitive conclusion that

47

CONFIDENTIAL

HARV00030413

*Harvard University*

approximately 600 African-American doctoral graduates, in all arts and sciences fields, is clearly inadequate. Far from having reached a point where we can feel confident about the gains that have been made since the 1960s, we are still very much in the process of creating the conditions necessary for continuous long-range sustainability. The achievements to date are real, but they are also too recent, too fragile, and too incomplete for any relaxation of effort. At times in our past, there has been a temptation to believe we had moved past the point where continued attention to the particular problems and available opportunities of different racial or ethnic groups was necessary to make further progress in economic and educational areas—but the judgment proved premature.[73] At this moment in our history, we should be mindful of the progress that has been made; but we should not mistake that progress for the full realization of a durable success.

*A second argument sometimes advanced concerning affirmative action programs in higher education suggests that, however well-intentioned they may be, they are focused on the wrong target; our attention and resources should instead be devoted to solving more basic social and economic difficulties, by investing in children's health, improved schools, better housing, and school-to-work transitional programs.*

Large-scale social investments intended to solve social and economic (and educational) problems might well make a significant difference. But I do not see evidence that such investments, on a major scale, are likely to be forthcoming, at least not in the near future. Even if they were to be developed, we would need to monitor them over a considerable span of years in order to make certain that they were having a real impact, and that they would be continued.

The question, therefore, is not whether appropriate forms of affirmative action in higher education represent an adequate response to the large-scale social problems that have been identified. Few, if any, people would make such a claim. Instead, the question is whether programs that are well-designed and administered can be helpful as one part of a more general approach. Moreover, to appreciate the full contribution of these programs, we should remember that they have several far-reaching effects beyond any results that can be measured simply in terms of admissions decisions or their ability to contribute to diversity and learning.

48

CONFIDENTIAL

HARV00030414

DX040.0050

*The President's Report 1993–1995*

They stimulate, for example, outreach efforts on a national scale, and therefore play a key role in the identification of talented candidates, as well as in the formation of expanded pools of applicants from underrepresented groups. Teachers, guidance counselors, and alumni volunteers (among others) are all part of this process. They make clear to young students that increased educational opportunities do in fact exist—in hundreds of institutions, not just a few. This signal is itself catalyzing, and has become a powerful source of motivation for thousands of students who previously saw far less reason for hope.

As we evaluate the effects of affirmative action in higher education, therefore, we should not underestimate the role it plays in creating an entire cycle of activity involving outreach, advice, and professional guidance. It has helped to foster aspiration and to strengthen the conviction that young people who have talent and determination can in fact find opportunities in higher education, and can then go on to make their way successfully in our society.

*A third argument made against affirmative action programs in university admissions is that such programs run the risk of stigmatizing and thus injuring the very people they are designed to assist and protect.*

The concern about stigmatization is serious and troubling. Some of the Justices in *Bakke* considered this issue, but clearly did not give it decisive weight. I would place greater importance on this point if I were more convinced about two matters.

First, I would find the argument more compelling if there were a strong consensus, especially among those who have been assisted by affirmative action programs, that the difficulties resulting from stigmatization were sufficiently clear and substantial as to outweigh the increased opportunities and protections. I know of no calculus that can resolve such an issue at the present time. Although opinion is to some extent divided, my own observation suggests that the greater weight of informed views—particularly views from members of underrepresented groups—remains substantially in favor of well-designed and carefully administered affirmative action initiatives in admissions, because of their demonstrated positive effects.

Second, I would see greater force in the argument concerning stigmatization if the most injurious and long-lasting forms of racial

49

CONFIDENTIAL

HARV00030415

*Harvard University*

stigma appeared to result from affirmative action—particularly affirmative action in higher education—rather than from other causes. The difficulty, unfortunately, is that racial stigmatization is clearly the inheritance of discriminatory attitudes and behavior that reach far back into history. These attitudes were powerfully reinforced by the destructive racial theories and renewed legalized discrimination that developed in the late nineteenth and early twentieth centuries, during the Reconstruction period and afterward. Some significant progress in racial and ethnic relations has clearly been made since World War II. But discrimination and stigmatization remained very visibly operative during the turbulent years preceding (and following) the 1964 Civil Rights Act, and they continue to be persistent today. It seems doubtful that a phenomenon of such force and durability would be seriously mitigated because affirmative action programs—created as recently as the late 1960s and 1970s—were eliminated. Very little if any evidence, based on the experience of the past, would lead us to expect a result of this kind.

*According to a fourth argument, affirmative action programs in university admissions can create unfairness, particularly when students with high test scores (or grades) are denied admission in favor of students with less impressive "objective" records.*

The potential for unfairness exists, and needs to be taken scrupulously into account. That, of course, was the main reason for the Supreme Court's insistence in *Bakke* that any use of racial or ethnic categories must be subject to exacting judicial scrutiny. At the same time, at least two other considerations are important to bear in mind.

First, as I suggested earlier, any definition of qualifications or merit that does not give considerable weight to a wide range of human qualities and capacities will not serve the goal of fairness to individual candidates (quite apart from groups) in admissions. Nor will it serve the fundamental purposes of education. The more narrow and numerical the definition of qualifications, the more likely we are to pass over (or discount) applicants—of many different kinds—who possess exceptional talents, attributes, and evidence of promise that are not well measured by standardized tests.

50

CONFIDENTIAL

HARV00030416

*The President's Report 1993–1995*

Second (and also mentioned earlier), a college or university is responsible first and foremost to the applicants it chooses to admit, and it must attempt to create the best possible educational environment for them. One major consideration in the creation of that environment is the composition of an entering class—and entire student body. Admissions decisions are not isolated, atomistic events. They focus on individuals, but each decision is made in the context of others, where the pattern of the whole is also taken into account. This pattern contributes significantly to student diversity—and diversity, as we have seen, is strongly linked to the quality of learning.

The way to proceed in the future is not to introduce absolute prohibitions on the consideration of race (or other factors) in admissions, but to treat such characteristics with the same care and scrupulousness that we have historically given to so many aspects of diversity. That is what we are doing now. That is what we have done in the past—well before the advent of affirmative action programs in the late 1960s.

51

CONFIDENTIAL

HARV00030417

JA5428

DX040.0053

*Harvard University*

# VII
## *Admissions: The 1990s and Beyond*

### 1.

To sustain our policies in the future will require the same kind of care that we have traditionally devoted to them. In the present situation, it is important not only to take stock, but also to describe briefly the general principles that should continue to guide Harvard's practice in the years ahead.

It should be recognized at the outset that there is—regrettably—no ideal, friction-free way to arrive at decisions regarding admissions, and no effective way to explain such decisions to the thousands of individuals who are affected by them.

This situation is a direct outgrowth of the post-World War II boom in higher education, and in our collective national expectations concerning full access to educational opportunities. During the past half-century, there have been far more applicants than anyone would once have imagined possible. Even if the total number of places in our higher educational system were equal to the number of potential students, a good number of individual colleges and universities would still remain oversubscribed, and would have to turn away many qualified applicants. Therefore, with or without consideration of race, ethnicity, gender, geographic location, income level, or various other factors, there will be thousands of disappointed candidates.

When such a large proportion of applicants are barely distinguishable on statistical grounds, SAT scores and GPAs are clearly of only limited value. Admissions processes, therefore, must remain essentially human. They must depend on informed judgment rather than numerical indices. And they will be subject to all the inevitable pressures and possible misconceptions that any exceptionally competitive selection process involves.

In order to sustain a balanced, consistent, and highly attentive process, long-established basic principles continue to offer the best guidance.

52

CONFIDENTIAL

HARV00030418

**JA5429**

DX040.0054

*The President's Report 1993–1995*

- Our commitment to excellence means that we will continue to admit students as individuals, based on their merits: on what they have achieved academically, and what they seem to promise to achieve; on their character, and their energy and curiosity and determination; on their willingness to engage in discussion and debate, as well as their willingness to entertain the idea that tolerance, understanding, and mutual respect are goals worthy of persons who have been truly educated.

In assessing individual merit, we will—as we have in the past—take a number of criteria into account. Grades, test scores, and class rank will be given appropriate consideration in admissions, but they will be viewed in the context of each applicant's full set of capabilities, qualities, and potential for future growth and effectiveness.

- Our commitment to excellence also means that we will seek out—in all corners of the nation, and indeed the world—a diversity of talented and promising students.

Such diversity is not an end in itself, or a pleasant but dispensable accessory. It is the substance from which much human learning, understanding, and wisdom derive. It offers one of the most powerful ways of creating the intellectual energy and robustness that lead to greater knowledge, as well as the tolerance and mutual respect that are so essential to the maintenance of our civic society.

In our world today, it is not enough for us and our students to acknowledge, in an abstract sense, that other kinds of people, with other modes of thought and feeling and action, exist somewhere—unseen, unheard, unvisited, and unknown. We must, in addition, extend ourselves in order to have direct contact with some substantial portion of that larger universe. There must be opportunities to hear different views directly—face to face—from people who believe them and embody them. Much can be learned from reading, from travel, and from formal academic study. But little if anything can substitute for the experience of continued association with others who are different from ourselves, and who challenge us—even as we challenge them.

53

CONFIDENTIAL

HARV00030419

*Harvard University*

- In selecting those students who will be offered places, the whole
  must be seen to be genuinely greater than the sum of the parts.

When an individual student is admitted, the decision is rarely if
ever the result of a circumscribed choice between two—or three, or
a very few—applicants who are viewed as being in direct competi-
tion for a single place. The proper analogy is not a race between a
few individuals, where one wins and the others lose. Once a stan-
dard of high quality has been assured, there are still many more
candidates than there are spaces available. At that point, the ques-
tion is how to admit not only individuals, but also an entire enter-
ing class of students who—in their collective variety—are likely to
have a strong capacity to teach and to learn from one another.

Such a process of selection involves the conscious consideration
of different forms of diversity. In this process—as I stated earlier—
quotas or set-asides in admissions are not acceptable. By the same
token, efforts to prohibit, categorically and absolutely, the consid-
eration of particular characteristics or criteria are no less arbitrary
than to accord such factors a completely sheltered, insulated form
of protection or status.

## 2.

IN CLOSING, I want to emphasize that we need not—and should
not—romanticize the idea of diversity in order to reach a sensi-
ble and realistic assessment of its positive value. Mill, Felton,
Eliot, and others were anything but sentimental in their outlook,
and the complex circumstances of our own historical moment
demand nothing less. Mill understood only too well that unfet-
tered discussion and argument—stimulated by diversity—can
sometimes inflame situations rather than resolve them:

> The tendency of all opinions to become sectarian is not cured by the freest
> discussion, but is often heightened and exacerbated thereby . . . . But it is
> not on the impassioned partisan, it is on the calmer and more disinterested
> bystander, that this collision of opinions works its salutary effect . . . . There
> is always hope when people are forced to listen to both sides . . . .[74]

54

CONFIDENTIAL

HARV00030420

*The President's Report 1993–1995*

For Mill, diversity—and the clash of freely expressed opinions—could be divisive, and he expected no immediate solutions; but he saw that the long-term dangers and risks of insulating or isolating individuals and groups from one another are likely to be greater than the risks of creating opportunities for direct exchange and contact. In the end there are no guarantees. There is only the hope that is created when people "listen to both sides"—or indeed to many sides.

This was precisely President Felton's conclusion, long ago, when Harvard made more conscious efforts to enroll different kinds of students, from different regions of the nation. It seemed clear to Felton that, so long as there were serious regional and other differences straining the fabric of the nation, education should attempt to reduce the hazards of separation and division, rather than reinforcing or perpetuating them. The gains in mutual understanding and tolerance—even in the midst of argument and intermittent tension—would ultimately outweigh the dangers that could so easily result from sustained isolation and lack of even rudimentary understanding.

This perspective surely provides the basis for a response to those of us—and I include myself—who are seriously concerned about fragmentation, sectarianism, and incidents of tension or conflict between groups in our contemporary society. The present situation in the United States is particularly difficult in many respects. At the same time, we need to remember that—from its earliest origins—this nation's experiment in diversity has always been complex, and has involved significant strain as well as episodes of violence. Indeed, by most measures, our contemporary predicament is not more severe, and in some respects is less so, than that which existed throughout much of the nineteenth and early twentieth centuries. In this regard, we should bear in mind the memory of the disruptive and often violent incidents that took place in the decades leading to the Civil War; the terrible War itself; the difficult and divisive history of the Reconstruction; and so much of the turbulence that marked the era of the "new immigrants":

> Outside, the mob battered down the prison gates and spread out into the prison. They hunted through the corridors and corners and found six of the acquitted men in a small courtyard used for exercise. There, men dressed in

55

CONFIDENTIAL

HARV00030421

*Harvard University*

frock coats and derby hats from close range of 20 feet pumped over a hundred rifle shots and gunshot blasts into the six men, tearing their bodies apart while others cheered.[75]

The year was 1891. The acquitted men, so far as we know, were in fact innocent, but feelings and suspicion ran so high that respectable citizens refused to accept the verdict of a court, and administered their own form of justice. One prisoner, still half-alive after the shootings, was dragged several blocks and then, with great deliberation and applause, was hanged from a lamppost.

This incident might well have been described—at the time—in any one of several ways: as an incident involving "foreigners," immigrants, or members of different "racial" groups. But the foreign or racial groups were not white and black. They were Irish and Italians who had settled in the South. As it happened, the victims were southern "Mediterranean" Italians, and the episode was not unique. Three more Italians were lynched in Louisiana in 1896, and five similar lynchings took place in 1899. If the Italians suffered, however, the Irish were also afflicted, as were Jews and other groups. African-Americans, as we know, experienced the most frequent and persistent violence, as well as systematic legal and other forms of discrimination.

All the new immigrant groups and "races" were to some extent at risk. And the risks—as well as the strong sense of group identity—did not disappear as quickly or easily as many of us may now wish to believe. It took the better part of a century, after the 1840s, before some of the new immigrant groups were substantially integrated, and even then many doors remained largely closed—certainly to Jews, but also to large portions of the Irish, Italian, and other populations.

As we know, as late as the early 1960s, many private colleges and universities (not to mention private clubs and other organizations) still retained effective quotas with respect to Jews. Nor were there substantial numbers of Catholics in many of these institutions—quite apart from African-Americans, Asian-Americans, Native Americans, Hispanic-Americans, and other minorities. Women, moreover, were often entirely excluded. In certain cases, this situation was the reflection of expressed individual and group preferences. But few people doubt that there were strong de facto

56

CONFIDENTIAL

HARV00030422

**JA5433**

DX040.0058

*The President's Report 1993–1995*

restrictions in effect—and indeed, in the case of African-Americans, legal restrictions.

Attitudes, habits, and prejudices fade slowly, and perhaps never as completely as we might hope. Moreover, if the better part of a century was required before many "white" groups were able to enter fully into the life of the nation—groups who had experienced neither slavery nor systematic legal discrimination—how much time should be estimated for a similar process to take place with respect to African-Americans, for whom official segregation in many aspects of daily life continued to exist into the 1960s? How soon should we expect forms of group identification—and some patterns of self-separation—to vanish?

The extent of our nation's success in dealing with diversity can be measured only in the full light of our entire history. Without such a long-term view, as well as an informed awareness of what can be achieved in a heterogeneous society (and at what speed), we will almost certainly undervalue all that has been accomplished so far, and we will be tempted to overdramatize the shock effect of periodic incidents: incidents that can easily be interpreted as evidence of crisis or failure, when in fact they are often no more than signs of the inescapable if unsettling stresses which exist in a large and complex democratic society such as ours.

As we try to assess the progress that has been made to date, particularly on our college and university campuses, we ought to ask whether there are ways to evaluate—more systematically—the degree of success that has so far been realized. Are there concrete lessons that can be learned from the experience of the past quarter-century? Are there certain kinds of institutional arrangements, norms, and stated expectations that enhance the experience of diversity and learning for students and others—and are there some that affect it more negatively?

Clearly, we have much more institutional knowledge and experience now than even a decade ago, and far more than we had in 1970. We also have a growing body of alumni (still relatively young) who have graduated since the late 1960s, when Harvard and many other institutions became gradually more inclusive.

Universities—and individual scholars—are now in a position to begin to draw on this cumulative knowledge in an effort to evalu-

57

CONFIDENTIAL

HARV00030423

DX040.0059

*Harvard University*

ate our recent history, and to see which measures have been relatively effective, which have been less fruitful, and which remain uncertain. We will not find definitive answers, but neither should we simply draw blanks. Studies of this kind would not only be useful in themselves, but would help to make clear that our institutions are still very much in the midst of a national experiment in diversity, and that we are committed to learning from it in order to ensure its success.

Meanwhile, as I look at the present situation on many of our campuses, I believe that the achieved level of tolerance and respect—among thousands and thousands of students—is extraordinary. How many of us would have predicted, in 1950 or 1960, that so great a number of talented and dissimilar students would be studying together and learning from one another after so brief a passage of time? No similar transformation has ever before taken place in the long history of higher education, either in this country or elsewhere.

This is not a moment for national self-congratulation. But neither is it a moment to underestimate the substantial human and institutional achievements—in terms of education and diversity—of the past few decades. These achievements have their roots, as we have seen, in ideas and actions that reach back more than a century in our history. The record is impressive. The progress, however imperfect, is inspiring. That progress must be sustained and strengthened. To change course now would be to turn aside from many decades of difficult but steady hope and fulfillment, in order to follow pathways far less bright, and far less full of promise.

CONFIDENTIAL

HARV00030424

DX040.0060

*Notes*

II

EARLY IDEAS OF DIVERSITY:
NINETEENTH CENTURY BEGINNINGS

1. *Principles of Political Economy* (1848), bk. III, ch. XVII, sec. 5.
2. *On Liberty* (1859), pt. II.
3. Ibid.
4. *The Idea of a University* (1852), discourse VI, sec. 9.
5. Ibid.
6. Report of the President to the Board of Overseers 1859-60, 6.
7. *The Education of Henry Adams* (1907), ch. IV.
8. Ibid.
9. Ibid.
10. "The Function of Education in Democratic Society," in *Educational Reform* (New York: Century Co., 1901), 408.
11. "The Contemporary American Conception of Equality Among Men as a Social and Political Ideal" (oration delivered at University of Missouri, June 2, 1909), 17.
12. "Liberty in Education," in *Educational Reform*, 146-47.
13. "The Contemporary American Conception of Equality," 17.
14. "The Aims of the Higher Education," in *Educational Reform*, 237.
15. Ibid., 238.
16. Ibid., 239.
17. Ibid.
18. "The Function of Education in Democratic Society," in *Educational Reform*, 414.
19. "The Aims of the Higher Education," in *Educational Reform*, 240-41, 249.

III

DIVERSITY AND RACE:
SOME TURN-OF-THE-CENTURY DILEMMAS

20. Oscar Handlin, *Boston's Immigrants*, rev. ed. (Cambridge, Mass.: Harvard University Press, 1959), 185 (quoting the *Boston American*, Oct. 21, 1837, and Mayor Theodore Lyman of Boston).
21. Ibid., 144-45.
22. Ibid., 206.

59

CONFIDENTIAL

HARV00030425

**JA5436**
DX040.0061

*Harvard University*

23. Ibid., 226.
24. Ibid.
25. "The Contemporary American Conception of Equality," 19.
26. Ibid., 22.
27. Stephan Thernstrom, "Poor but Hopefull Scholars," in *Glimpses of the Harvard Past* (Cambridge, Mass.: Harvard University Press, 1986), 126.
28. Ibid., 127.
29. Ibid., 126, 128.
30. *The Education of Henry Adams,* ch. IV.
31. "College Is Like the World," in *The Harvard Book,* rev. ed. William Bentinck-Smith (Cambridge, Mass.: Harvard University Press, 1986), 284.
32. Ibid., 284-85.
33. "The Field and Function of the Private Negro College" (1933) in *The Education of Black People,* ed. Herbert Aptheker (Amherst, Mass.: University of Massachusetts Press, 1973), 89.
34. Ibid.

IV

SOME TWENTIETH CENTURY CHALLENGES:
STRUCTURES, ADMISSIONS, AND TESTS

35. Report of the President to the Board of Overseers 1927-28, 10.
36. Ibid., 13.
37. Ibid., 14.
38. Report of the President to the Board of Overseers 1936-37, 19.
39. "Harvard Lies at the End of the Subway," in *The Harvard Book* (1986), 294-95.
40. Ibid., 295.
41. Report of the President to the Board of Overseers 1950-51, 15.
42. Ibid.
43. Nicholas Lemann, "The Structure of Success in America," *Atlantic Monthly,* Aug. 1995, and "The Great Sorting," *Atlantic Monthly,* Sept. 1995.
44. Faculty of Arts and Sciences Admission and Scholarship Committee Report [hereinafter Admission Committee Report] 1960-61, Official Register of Harvard University, vol. LIX, no. 26, 197.
45. Admission Committee Report 1963-64, Official Register of Harvard University, vol. LXII, no. 27, 91.
46. Admission Committee Report 1964-65, Official Register of Harvard University, vol. LXIII, no. 29, 102.
47. Admission Committee Report 1966-67, Official Register of Harvard University, vol. LXV, no. 25, 114.
48. Admission Committee Report 1963-64, 92.
49. Admission Committee Report 1964-65, 100-01.
50. *Idea of a University,* discourse VI, sec. 9.

CONFIDENTIAL

HARV00030426

**JA5437**
DX040.0062

*The President's Report 1993–1995*

V

CIVIL RIGHTS LEGISLATION AND THE *BAKKE* CASE

51. No single opinion represented the views of a majority of the Court, although brief passages of Justice Powell's pivotal opinion stated the judgment of the Court on the key issues in dispute.
52. Regents of the University of California v. Bakke, 438 U.S. 265, 291 (1978) (opinion of Powell, J.); see also ibid., 356–62 (opinion of Brennan, J., et al.).
53. Ibid., 320 (opinion of Powell, J.); see also ibid., 356–62 (opinion of Brennan, J., et al.).
54. Ibid., 320; see also ibid., 355–56 (opinion of Brennan, J., et al.).
55. An attempt, for instance, to compensate for previous general "societal discrimination" against minorities was judged by Justice Powell not to be an adequate reason for giving special consideration to minority candidates in admissions, because there had been no determination that the University of California at Davis had itself engaged in discriminatory practices requiring remedial effort. Ibid., 307-10. Four Justices of the Court—those who along with Justice Powell formed the majority concluding that race could be used as a "plus factor" in university admissions—took a different view of the "societal discrimination" issue. Ibid., 362 (opinion of Brennan, J., et al.) ("remedying the effects of past societal discrimination is . . . sufficiently important to justify the use of race-conscious admissions programs where there is a sound basis for concluding that minority underrepresentation is substantial and chronic, and that the handicap of past discrimination is impeding access of minorities" to the university).
56. Ibid., 314.
57. Ibid., 312 (quoting 354 U.S. 234, 263 (1957) (concurring in result)).
58. Ibid., 312.
59. Ibid., 312 (quoting 385 U.S. 589, 603 (1967)).
60. Ibid., 313.
61. Ibid., 312 (quoting Keyishian v. Board of Regents, 385 U.S. 589, 603 (1967)).
62. Ibid., 316.
63. Ibid., 323-24.
64. Ibid., 406.
65. Ibid., 317-18.
66. Ibid., 313.
67. Ibid., 314 (quoting Sweatt v. Painter, 339 U.S. 629, 634 (1950)).
68. Ibid., 314.
69. Report of the President to the Board of Overseers 1935-36, 10.

61

CONFIDENTIAL

HARV00030427

JA5438
DX040.0063

*Harvard University*

## VI

### POSSIBLE FUTURE DIRECTIONS

70. U.S. Department of Commerce, Bureau of the Census, *Educational Attainment in the United States: March 1993 and 1992*, table 18.
71. National Research Council, *Summary Report 1990: Doctorate Recipients from United States Universities*, tables S-1 and S-2; National Research Council, *Summary Report 1993: Doctorate Recipients from United States Universities*, tables A-2 and B-2.
72. U.S. Department of Education, National Center for Education Statistics, *Digest of Education Statistics 1995*, tables 266 and 261; *Digest of Education Statistics 1980*, tables 112 and 111. Degrees awarded to nonresident aliens are not included.
73. For example, see above, part III.2, pp. 14-16.

## VII

### ADMISSIONS: THE 1990s AND BEYOND

74. *On Liberty*, pt. II.
75. Jerre Mangione and Ben Morreale, *La Storia: Five Centuries of the Italian American Experience* (New York: Harper-Collins, 1992), 209.

CONFIDENTIAL

HARV00030428

**JA5439**

DX040.0064



CONFIDENTIAL

HARV00030429

It is my sad duty to conclude this report with a list of those among the active and retired ranks of the University who died during the calendar years 1993 and 1994. They include Paul Codman Cabot, Treasurer of Harvard College from 1948 to 1965, who died on September 1, 1994, at the age of 95; Albert Lindsay Nickerson, Overseer from 1959 to 1965 and Fellow of Harvard College from 1965 to 1975, who died on August 7, 1994, at the age of 83; and four other former Overseers: R. Ammi Cutter, Overseer from 1966 to 1972 who died on November 28, 1993, at the age of 91; Arthur Theodore Lyman, Overseer from 1979 to 1985, who died on July 1, 1993, at the age of 73; Lewis Thomas, Overseer from 1976 to 1982, who died on December 3, 1993, at the age of 80; and Jerome B. Wiesner, Overseer from 1987 to 1993, who died on October 21, 1994, at the age of 79. Harvard was honored by the distinguished service of these former members of its governing boards, and by that of the men and women named in the pages that follow.

CONFIDENTIAL

HARV00030430

## Necrology

JAMES LUTHER ADAMS, Edward Mallinckrodt, Jr. Professor of Divinity, *Emeritus,* died on July 26, 1994, at the age of 92. An expert on social ethics and a leading Unitarian scholar, Professor Adams began teaching at Harvard Divinity School in 1956. He lectured on religious issues in law, economics, and civic affairs, and was co-director of a Harvard Business School seminar on religion and public-policy decision making. He was keenly interested in issues lying at the intersection of religion, public policy, and social responsibility. Born in Ritzville, Washington, he earned his bachelor's degree from the University of Minnesota in 1924, his master's degree from Harvard in 1930, and his doctorate from the University of Chicago in 1947. He taught at Meadville Theological School in Chicago for 20 years before joining the Harvard faculty. After retiring from Harvard in 1968, Professor Adams began four years as Distinguished Professor of Social Ethics at Andover Newton Theological School. An authority on the philosopher and theologian Paul Tillich, he was the author of *Paul Tillich's Philosophy of Culture, Science, and Religion.* His many other writings include *An Examined Faith: Social Context and Religious Commitment.* He was editor of the *Journal of Liberal Religion, Faith and Freedom, The Christian Register,* and the *Journal of Liberal Ministry.* He served as president of the American Society for Christian Ethics, president of the Society for the Scientific Study of Religion, and chairman of the Massachusetts Civil Liberties Union's committee on church and state. After his ordination to the Unitarian ministry, he was a minister at churches in Massachusetts from 1927 to 1935.

HENRY FREEMAN ALLEN, Henry Willard Williams Clinical Professor of Ophthalmology, *Emeritus,* died on December 23, 1993, at the age of 77. Born in Boston, he graduated from Harvard College in 1939 and from Harvard Medical School in 1943. A sixth-generation surgeon, he was a descendant of the Warren family, whose members helped found the Medical School and the Massachusetts General Hospital. Following service in World War II as a captain in the Army Medical Corps in Germany, Dr. Allen did his residency in ophthalmology at the Massachusetts Eye and Ear Infirmary. He was chief of ophthalmology there from 1968 to 1973. President of the Channing Home from 1956 to 1962, Dr. Allen helped to establish the Channing Laboratory, the William Ellery Channing Professorship, and the Harriet Ryan Albee Professorship at the Medical School. He volunteered his surgical services at the Binder-Schweitzer Hospital in Pucalpa, Peru, as well as in Haiti, Saudi Arabia, and the Sioux Indian Nation in South Dakota. He was a trustee of the Episcopal Divinity School in Cambridge, the Perkins School for the Blind in Watertown, and the Massachusetts Eye and Ear

CONFIDENTIAL

HARV00030431

DX040.0067

*Harvard University*

Infirmary. For 25 years Dr. Allen directed the Lancaster course in ophthalmology at Colby College, which drew faculty from across the United States to teach medical residents from all over the world. His Harvard appointments included Assistant Clinical Professor of Ophthalmology (1957), Associate Clinical Professor of Ophthalmology (1965), Clinical Professor (1968) and the Williams Clinical Professorship of Ophthalmology (1970).

HENRY B. ARTHUR, George M. Moffett Professor of Agriculture and Business, *Emeritus,* died May 16, 1993, at the age of 89. Born in Gloversville, New York, he graduated from Union College in 1926. He received master's and doctoral degrees in economics from Harvard in 1931 and 1935, and began a long career as an economist in industry and government. He served as chief of the Marshall Plan Program Review in Paris, and was a member of the Wage Stabilization Board during the Korean War. He joined the Harvard Business School faculty in 1960 to become the first Moffett Professor of Agriculture and Business. Professor Arthur analyzed management and training programs in India and Central America, and lectured throughout the world. After his retirement in 1970 he wrote on business ethics and developed the first course on the subject at Harvard's Extension School, where he taught from 1984 to 1990. The Henry B. Arthur Fund for Business Ethics was established at the Business School in 1987, and the school awarded him its Distinguished Service Award in 1992.

WILLIAM BENTINCK-SMITH, Honorary Curator of Type Specimens and Letter Design in the Harvard College Library, died on January 19, 1993, three days before his 79th birthday. Mr. Bentinck-Smith served as an administrative officer for more than forty years under Harvard presidents Conant, Pusey, and Bok, and was later an active member of the University Library Visiting Committee. After graduating from Harvard College in 1937, he earned his M.S. in journalism from Columbia University in 1938 and became a reporter for the *Boston Globe.* In 1940 he was named managing editor of the *Harvard Alumni Bulletin* (now *Harvard Magazine*). After three years of decorated service in the Navy during World War II, he returned to the *Bulletin* as its editor. From 1954 to 1971 he served as assistant to President Nathan M. Pusey, and from 1957 to 1964 was also editor of *Harvard Today.* He subsequently became an associate in the Office of the Secretary to the University, working with the governing boards. An authority on Harvard history, Mr. Bentinck-Smith was also the Library's resident expert on type design. Among his historical works are *Building a Great Library: The Coolidge Years* (1976) and *Harvard University History of Named Chairs* (Vol. I, 1991). He was editor of *The Harvard Book* (1953, revised 1982), an anthology of writings about the College and its history, and of *More Lives of Harvard Scholars* (1986), a collection of memorial minutes. His interest in typography was sparked by his friendship with Philip Hofer (1898-1984), founder and curator of the College Library's Department of Printing and Graphic Arts. Mr. Bentinck-Smith gave much of his time to volunteer activities at Harvard and elsewhere. He served as secretary of his College class, secretary of the Charity of Edward Hopkins, a director of the Associated Harvard Alumni, and president of the Signet Associates. In 1987 he was awarded the Harvard Medal for his services to the University.

66

CONFIDENTIAL

HARV00030432

**JA5443**

DX040.0068

*The President's Report 1993–1995*

AMICO BIGNAMI, Professor of Pathology (Neuropathology), died on August 5, 1994, at the age of 64. A Harvard Medical School professor since 1976, Dr. Bignami was internationally known for his contributions to the understanding of brain and spinal cord degeneration and regeneration. For fourteen years he was associate chief of staff for research and development at the Brockton/West Roxbury Veterans Administration Medical Center. Born in Montreux, Switzerland, he graduated from Italy's Instituto M. Massimo and earned his medical degree at the University of Rome. He came to the United States in 1969 and served as Associate Professor of Pathology at Stanford University. The author of more than 200 scientific papers, he was noted for his explication of the pathological mechanisms involved in diseases of the central nervous system, including Jakob-Creutzfeldt disease.

WALTER FRANCIS BOGNER, Professor of Architecture, *Emeritus,* died on June 16, 1993, at the age of 93. Born in Providence and educated in Europe, he studied architecture in Austria and at Harvard. In 1925 he won the Rotch Traveling Fellowship in architecture and spent two years traveling and studying in Europe as a visiting fellow at the American Academy in Rome. He began teaching at the Harvard Graduate School of Design in 1927, became a full professor in 1946, and retired in 1966. Professor Bogner used his Third Year Design studios to develop research programs on postwar problems of housing and school facilities. He wrote urban design manuals, several books on school design, and master planning studies for Boston, Milwaukee, and San Francisco. In 1951 he served as consultant to the German Ministry of Housing for the rebuilding of eleven German cities under the Marshall Plan. Throughout his career he maintained a private practice in Cambridge, designing schools, hospitals, and private homes in New England. His interest in civic improvement led to the Back Bay Center Project for Boston in 1953. Professor Bogner was a fellow of the American Institute of Architects, a member of the Boston Society of Architects, and a founder of the AIA teacher training program through the Association of the Collegiate Schools of Architecture.

UWE KLAUS BRINKMANN, Associate Professor of International Health-Epidemiology in the Faculty of Public Health, died June 19, 1993, while in Fortaleza, Brazil, on field research. He was 52. Born in Hamburg, Germany, he earned a medical degree at the University of Berlin in 1966. He went on to take a degree in tropical public health from the London School of Hygiene and Tropical Medicine in 1970 and a doctorate in epidemiology and tropical medicine from the University of Hamburg in 1981. Dr. Brinkmann attained world stature as a teacher in epidemiology at the Institute of Tropical Medicine in Hamburg from 1974 to 1982, and at the Institute for Tropical Hygiene at Heidelberg. He did much research in developing countries, and served residencies in Togo, Ghana, Ethiopia, Liberia, Burkina Faso, Guatemala, Mali, and Thailand. During the 1980s he taught postgraduate courses throughout Europe. He published nearly one hundred scientific papers on tropical diseases, and was an expert on the impact of malaria on Africa and the transmission of the AIDS virus in Thailand. In 1990 he joined the Harvard School of Public Health faculty in the departments of Epidemiology,

CONFIDENTIAL

HARV00030433

JA5444

DX040.0069

*Harvard University*

Population and International Health, and Tropical Public Health. He led an inter-disciplinary group studying the emergence of new infectious diseases as a result of changes in the global environment, human settlement, and human behavior.

DOUGLAS WALLACE BRYANT, Professor of Bibliography and Librarian, *Emeritus,* and former Director of the University Library, died on June 12, 1994, at the age of 80. Professor Bryant's pioneering work in computerization and resource sharing helped transform library management. Born in Boston, he earned his bachelor's degree from Stanford University and his master's degree in library science from the University of Michigan. He joined Harvard's library staff in 1952, after serving as director of U.S. Information Service libraries at the American Embassy in London. He became University Librarian in 1964 and was appointed director of the library system in 1972. He was named Professor of Bibliography that same year. As director of Harvard's library system he oversaw the establishment of ten new library buildings, including the Countway Library of Medicine and Pusey Library. Under his leadership the Harvard collections grew from 7.25 million to 10 million volumes. He was instrumental in establishing the National Union Catalog of all publications produced in the United States, and in creating a computer-based catalog of works to be made freely available to scholars. This later became a national consortium called the Research Libraries Group. He was honored in 1973 with the establishment of the Douglas W. Bryant Fellowship program, awarded annually to promote scholarly research by Harvard library staff. After retiring from Harvard in 1979, Professor Bryant became executive director of the American Trust for the British Library; from 1990 to 1994 he served as its president. Over the course of his career he had many significant professional associations with UNESCO, the International Federation of Library Associations, the Center for Research Libraries, the Ford Foundation, and the London School of Economics.

FRANK MORTON CARPENTER, Fisher Professor of Natural History, *Emeritus,* and Alexander Agassiz Professor of Zoology, Emeritus, died on January 18, 1994, at the age of 91. A renowned specialist in the evolution of insects, he performed studies of the structures of living and fossil insects that helped reconstruct the past 250 million years of insect life. His life's work, titled *Superclass Hexapoda,* was published by the Geological Society of America in 1992. It is regarded as the first comprehensive work of its kind, covering all the known history of fossil insects. He was also a co-author of *The Classification of Insects,* published in 1954. Born in Boston, he began his affiliation with Harvard at the age of sixteen, when he joined the Cambridge Entomological Club. He graduated from Harvard College in 1926 and remained at the University to earn his master's and doctoral degrees. He held appointments at Harvard for more than 45 years, becoming Agassiz Professor of Zoology in 1945 and Fisher Professor of Natural History in 1969. He served as curator of fossil insects in the Museum of Comparative Zoology from 1936 until his retirement in 1973, and was chairman of the biology department in the 1950s. He also served as acting associate dean of the Graduate School of Arts and Sciences, as acting director of the University Extension program, and as president of the Harvard chapter of Phi Beta Kappa. For nearly 30 years he was managing editor of the entomological

68

CONFIDENTIAL

HARV00030434

*The President's Report 1993–1995*

journal *Psyche.* In 1993 Professor Carpenter received the Thomas Say Award from the Entomological Society of America in recognition of his lifelong contributions to the study of insects. He was awarded the Paleontological Society Medal in 1975, and was an honorary fellow of the Royal Entomological Society.

HOLLIS BURNLEY CHENERY, Thomas D. Cabot Professor of Economics, *Emeritus,* died on September 1, 1994, at the age of 76. An expert on international economics, he served as vice president for development policy at the World Bank between terms as Professor of Economics at Harvard. He was Professor of Economics from 1965 to 1972 and Cabot Professor from 1982 to 1988. During his tenure at Harvard he was associated with the Harvard Development Advisory Service, which later became the Harvard Institute for International Development. Born in Richmond, Virginia, he earned a bachelor's degree in mathematics from the University of Arizona in 1939 and a second bachelor's degree in engineering from the University of Oklahoma in 1942. He worked as an engineer for gas and oil companies before entering the Air Force in 1942 and rising to the rank of captain. After World War II he earned a master's degree in economics from the University of Virginia and a Ph.D. in economics from Harvard. From 1949 to 1953 he worked as an economist with the U.S. Economic Cooperation Administration, directing economic analysis programs in Paris, Rome, and Ankara. He was a professor of economics at Stanford University from 1952 to 1961, and served as co-director of Stanford's Research Center for Economic Growth. He was a Guggenheim Fellow in 1961. In that year he joined the United States Agency for International Development, where he rose to become an assistant administrator. He was the author or co-author of several publications, including *Structural Change and Development Policy; Patterns of Development, 1950-1970;* and *Arabian Oil: America's Stake in the Middle East.*

DAVID GLENDENNING COGAN, Henry Willard Williams Professor of Ophthalmology, *Emeritus,* died September 9, 1993, at the age of 85. Born in Fall River, Massachusetts, Dr. Cogan graduated from Dartmouth College in 1929 and earned his medical degree at Harvard Medical School. He completed his residency in ophthalmology at the Massachusetts Eye and Ear Infirmary, where he later became director of the ophthalmic laboratories and director of the eye pathology department. Dr. Cogan's first appointment at Harvard Medical School began in 1935; from 1943 to 1973 he was director of its Howe Laboratory of Ophthalmology. He became Professor of Ophthalmology in 1955, and from 1962 to 1968 he chaired the Department of Ophthalmology. Dr. Cogan was widely recognized as one of the world's leading clinical ophthalmologists and educators. His textbook *Neurology and the Visual System* was published in 1966; it remains an important reference work for ophthalmologists and neurologists. His studies of atomic bomb victims in Hiroshima and Nagasaki led to significant findings on cataract development and radiation damage to the eyes. Dr. Cogan retired from Harvard in 1974 and joined the National Eye Institute in Bethesda, Maryland, where he was chief of neuro-ophthalmology from 1974 to 1985 and senior medical officer from 1985 until his death. He was a founder of the American Ophthalmic History Society and the recipient of many professional awards, including the

69

CONFIDENTIAL

HARV00030435

*Harvard University*

Procter Medal of the Association for Research in Vision, the Howe Medal of the American Ophthalmological Society, and the Gonin Medal of the International Council of Ophthalmology.

OLIVER COPE, Professor of Surgery, *Emeritus,* died on April 30, 1994, at the age of 91. A Massachusetts General Hospital physician for more than 60 years, Dr. Cope was the first chief of staff of the Shriners Burns Institute. His wide range of expertise covered endocrinology, treatments for burn victims, diseases of the breast, and psychosomatic illness. Born in Germantown, Pennsylvania, he graduated from Harvard College in 1923 and from Harvard Medical School in 1928. He began his thirty-nine-year affiliation with Harvard Medical School in 1930 as an Assistant in Surgery, was appointed Professor of Surgery in 1963 and assumed emeritus status in 1969. After the bombing of Pearl Harbor in 1941, Dr. Cope helped develop the use of petroleum jelly wraps and intravenous fluids for burn management, which became the method of treatment used by the U.S. military. At the end of the war he turned his attention to the treatment of burned children. In the 1940s Dr. Cope questioned the routine prescription of radical mastectomies and advocated lumpectomies combined with radiation and drug therapy. After retiring in 1969, he devoted his time to improving the physical and emotional care of women with breast cancer. Dr. Cope urged medical educators to place more emphasis on the behavioral sciences and on the mental and emotional aspects of illness. He was the author of several books, including *Management of the Coconut Grove Burns at the Massachusetts General Hospital; The Breast;* and *Man, Mind and Medicine: The Doctor's Education.*

BERNARD DAVID DAVIS, Adele Lehman Professor of Bacteriology and Immunology, *Emeritus,* died on January 14, 1994, at the age of 78. Dr. Davis was one of the first scientists to suggest that penicillin could be used to isolate bacterial mutants. His groundbreaking research was fundamental in advancing the study of genetics. Born in Franklin, Massachusetts, he graduated from Harvard College in 1936 and from the Medical School in 1940. From 1942 to 1954 he worked for the U.S. Public Health Service, where he headed a tuberculosis research lab. He came to Harvard Medical School in 1957 to head the department of bacteriology and immunology, and was appointed to the Lehman Professorship of Bacteria and Immunology in 1962. In the 1970s he published essays in scientific journals and in the lay press on the relations between science and society. Through op-ed pieces in *The Wall Street Journal* and *The New York Times* he defended the value of scientific research. His many awards include the 1989 Hoechst-Roussel Award for his research on antibiotics, and the 1989 Selman A. Waksman Award in Microbiology from the National Academy of Sciences for his technique in isolating bacterial mutants. He was the author of *Storm Over Biology* and a textbook on microbiology, and was a member of the National Academy of Science and the American Academy of Arts and Sciences.

RUSSELL GERARD DAVIS, Professor of Education, *Emeritus,* died April 30, 1993, at the age of 70. Born and raised in Hopkinton, Massachusetts, he graduated *cum laude* from Holy Cross in 1943. He also attended classes at Dartmouth College. He served as a Marine rifleman from 1942 to 1946 and fought in the Peleliu and Okinawa

70

CONFIDENTIAL

HARV00030436

*The President's Report 1993–1995*

campaigns. His experiences were the basis for his novel *Marine at War*, which deglamorizes war and the military. From 1946 to 1951, he taught at the Cranwell School in Lenox. He began graduate studies in linguistics at Harvard in 1951, but was called to service as a visiting expert for the Army in Okinawa, Japan, and Korea. He completed his master's degree in education at Harvard in 1953 and his doctorate in education in 1955. Between 1955 and 1957, he served as a diplomat in Ethiopia with the U.S. International Cooperation Administration. His experience led to the publication of two collections of children's stories, *Ten Thousand Desert Swords* and *The Lion's Whiskers*, and a romantic novel, *Strangers in Africa*. Between 1957 and 1960, he was an assistant professor of education at Boston College and director of the Office of Research. In 1962 he organized the Center for Studies in Education and Development at Harvard, and in 1967 was named Professor of Education and Development. He served on the Gardner Commission to Vietnam in 1968, and from 1968 to 1969 was director of the Peace Corps in East Asia and the Pacific regions. Professor Davis was also director of a $3 million project to improve education planning in developing nations from 1976 to 1980. His activities at Harvard were interdisciplinary: he joined the Center for Population Studies in the School of Public Health in 1969 and the Harvard Institute for International Development in 1974. Professor Davis retired in 1989. He was a fellow of the American Academy of Sciences and a member of several professional organizations.

CHARLES WILLIAM ELIOT II, former Charles Eliot Professor of Landscape Architecture and Professor of City and Regional Planning, died March 16, 1993, at the age of 93. Born in Cambridge, he was the grandson of Charles William Eliot, Harvard's president from 1869 to 1909. He attended the Browne and Nichols School and served in World War I in the American Red Cross Ambulance Service in Italy and in the U.S. Army Field Artillery. He graduated from Harvard College in 1920 and received a master's degree from the Harvard School of Landscape Architecture in 1923. After a year of additional study in Europe, he returned to Boston and drafted plans for Arlington, Bedford, Duxbury, and Yarmouth. He then went to Washington, D.C., to become city planner and director of the National Capital Park and Planning Commission. From 1933 to 1943 he was executive officer and director of the National Resources Planning Board in the executive office of the President. When the board was dissolved in 1943, he went to California as director of the Haynes Foundation. In the early 1950s he returned to Harvard, where he was appointed Charles Eliot Professor of Landscape Architecture. The chair is named for his uncle, a landscape artist who worked with Frederick Law Olmsted to develop the Boston park system. Professor Eliot retired from the School of Design in 1966 and became a planning consultant. He served on the boards of numerous organizations, including the National Parks Association, the National Symphony Orchestra, the American Society of Planning Officials, and the Metropolitan Area Planning Council.

KENDALL EMERSON, JR., Professor of Medicine, *Emeritus*, died April 20, 1993, at the age of 86. Born in Worcester, Dr. Emerson was a 1929 graduate of Yale University and 1933 graduate of Harvard Medical School. After an internship at

71

CONFIDENTIAL

HARV00030437

*Harvard University*

Presbyterian Hospital in New York City, he became a research fellow in the department of pharmacology at Johns Hopkins Medical School. Dr. Emerson did his residency in the metabolic study unit there. From 1939 until 1942 he worked at the Rockefeller Institute for Medical Research in New York City. As a lieutenant in the Navy he was stationed in the Pacific during World War II. In 1946 he joined the department of medicine at Peter Bent Brigham Hospital (now Brigham and Women's Hospital) as an associate in medicine. He became an assistant professor at the Medical School in 1949. He subsequently became Associate Clinical Professor and, in 1967, Clinical Professor of Medicine. From 1960 until 1967 he was a visiting physician to the Boston Lying-In Hospital, where he was chief of medicine from 1967 until his retirement from the Medical School in 1973. He was later appointed physician to the University Health Services at Harvard Law School. Dr. Emerson was a member of the Royal Society of Medicine, the American Society for Clinical Investigation, the Federation for Clinical Research, the American Diabetic Association, the American Clinical and Climatological Association, the Endocrine Society, and the American College of Physicians.

ERIK HOMBURGER ERIKSON, Professor of Human Development, *Emeritus*, died on May 12, 1994, at the age of 91. A psychoanalyst who profoundly reshaped views of human development, he was best known for his theory that each stage of life, from infancy and early childhood on, is associated with a specific psychological struggle that contributes to a major aspect of personality. Born in Frankfurt am Main, Germany, he graduated from the Vienna Psychoanalytic Institute in 1933 and emigrated to the United States the same year. He became a naturalized citizen in 1939. From 1933 to 1935 he taught and did research at Harvard Medical School. He then joined the faculty at Yale University's School of Medicine, and moved to the University of California at Berkeley in 1939. He returned to Massachusetts in 1951 to become associated with the Austen Riggs Center in Stockbridge. In 1960 he rejoined the Harvard faculty as Professor of Human Development. He retired in 1970, but was Godkin Lecturer at Harvard in 1972. He was the author of many books, including *Childhood and Society* (1950), the first of several books exploring the development of human personality and ways in which various societies deal with stages of the life cycle. Another book, *Gandhi's Truth*, won the National Book Award in philosophy and science, the Pulitzer Prize for general nonfiction, and the Melcher Award of the Unitarian Universalist Association. Professor Erikson was a trustee of Radcliffe College and a Fellow of the American Academy of Arts and Sciences; a member emeritus of the National Academy of Education; a life member of the American Psychoanalytic Association; an honorary member of Phi Beta Kappa; and a member of the Cambridge Science Club and the Signet Society.

HOWARD BARRACLOUGH FELL, Professor of Invertebrate Zoology, *Emeritus*, died on April 21, 1994, at the age of 76. He joined the Harvard faculty in 1964, became Professor of Invertebrate Zoology in 1965, and served as curator of invertebrate zoology at the Museum of Comparative Zoology. His research focused on evolution, general problems of marine biogeography, biology of deep-sea bottom faunae, and systematics, morphology and paleontology of the Echinodermata. Born in

CONFIDENTIAL

HARV00030438

DX040.0074

*The President's Report 1993–1995*

Lewes, England, he earned his bachelor's and master's degrees from the University of New Zealand, and his doctorate in zoology from the University of Edinburgh. He taught at the University of Victoria in New Zealand before coming to Harvard. His honors included the Hector Medal and Prize and the Hutton Medal.

FRANK BURT FREIDEL, JR., Charles Warren Professor of American History, *Emeritus,* died January 25, 1993, at the age of 76. Born in Brooklyn, New York, he received his bachelor's degree from the University of Southern California in 1937. He earned his master's degree in 1939 and his doctorate in 1942 from the University of Wisconsin. After teaching at several colleges he came to Harvard in 1955 as a full professor. He was appointed Charles Warren Professor of American History in 1972. In 1981 he retired from Harvard, and served as Bullitt Professor of History at the University of Washington in Seattle until 1986. Professor Freidel wrote twelve books and was co-author or editor of several more. Having come of age in the Depression, he was an admirer of President Franklin D. Roosevelt, about whom he published six books and was writing a seventh at the time of his death. The seventh book was to have been a short biography of Roosevelt for college use. Among his other works were *Splendid Little War,* a pictorial history of the Spanish-American War; *America in the Twentieth Century;* and the two-volume *A History of the United States.* Professor Freidel was a past president of the Organization of American Historians, and a member of the New England History Teachers' Association, the Massachusetts Historical Society, the Southern Historical Association, and the Colonial Society. He was a fellow of the American Academy of Arts and Sciences, and a member of the American Historical Association and the American Antiquarian Society.

DANIEL HERTZ FUNKENSTEIN, Professor of Psychiatry, *Emeritus,* died on January 28, 1994, at the age of 83. Born in Atlanta, he attended the University of Georgia and received his medical degree from Tulane University in 1934. He was briefly in private practice before volunteering as a flight surgeon in the Army Air Corps. His four years of service in World War II brought him decorations that included the Silver Star and Bronze Star. In 1946 he moved to Boston and retrained in psychiatry at the Massachusetts Mental Health Center, where he later served as director of education and research. He was also director of research for the Harvard University Health Services. He held appointments in the Harvard Medical School from 1946 until his retirement in 1976. He served on the school's admissions committee from 1952 until 1976, and contributed to the development of the combined M.D.-Ph.D. program for Harvard and MIT. After retiring, he was chief of staff at the Brockton Veterans' Administration Medical Center, where he had been a consultant for 30 years. Dr. Funkenstein was the author of numerous articles and two books in the areas of psychophysiology and medical education. He also had a private psychiatry practice, which included counseling students interested in medical careers. He was an active member of the American Psychiatric Association for more than two decades.

PARK SPEARIN GERALD, Professor of Pediatrics, *Emeritus,* died July 9, 1993, at the age of 72. Dr. Gerald was born in Omaha and graduated in 1943 from Iowa State

CONFIDENTIAL

HARV00030439

DX040.0075

*Harvard University*

College. He took his medical degree from Creighton University School of Medicine, Omaha, in 1947. He received training in cytogenetics in the Galton Laboratory of London's University College, where he was an honorary research assistant. In 1959, after service in the Army Medical Corps, he became a clinical fellow and resident at Children's Hospital Medical Center. There he developed the clinical genetics unit, and served as its chief. He also taught pediatrics at Harvard Medical School. His research into genetic disturbances and birth defects led to the authorship of more than a hundred scientific papers and seats on the editorial boards of the *New England Journal of Medicine* and other leading medical journals. After his retirement in 1991, Dr. Gerald was active in the Boston Computer Society.

Erwin Nathaniel Griswold, Langdell Professor of Law, *Emeritus,* died on November 19, 1994, at the age of 90. Dean of Harvard Law School for 21 years, Professor Griswold also served as solicitor general of the United States under two presidents. Born in East Cleveland, Ohio, he earned his bachelor's and master's degrees from Oberlin College before entering Harvard Law School, where he received his LL.B. in 1928 and a doctorate the next year. After graduating he served as special assistant to the attorney general in Washington. He returned to Harvard as an assistant professor in 1934, and became Professor of Law the following year. He was appointed to the Charles Stebbins Fairchild chair in law and became dean in 1946. Under his leadership the Law School developed its International Legal Studies Program and International Tax Program. He doubled the size of the faculty without appreciably increasing the size of the student body, and oversaw the enrollment of the first women students in 1950. Professor Griswold left Harvard to serve as solicitor general under Presidents Johnson and Nixon. He served on the U.S. Civil Rights Commission and was an expert witness for Thurgood Marshall in cases that laid the foundation for the Supreme Court's desegregation order in *Brown v. Board of Education.* In 1979 the Law School dedicated Griswold Hall in honor of his contributions. Professor Griswold held leadership positions in many organizations, and was a trustee of Oberlin College and the Harvard Law Review Association.

Harriet Louise Hardy, Clinical Professor of Occupational Health in the Department of Preventive Medicine, *Emerita,* died October 13, 1993, at the age of 87. Born in Arlington, Dr. Hardy graduated from Wellesley College in 1928 and earned her medical degree at Cornell University Medical School in 1932. She began her medical career as physician at the Northfield School in western Massachusetts; in 1939 she became college physician at Radcliffe College. Throughout her career Dr. Hardy fought against diseases caused by occupational exposure to dangerous substances. In the 1940s she identified beryllium as the source of an often fatal respiratory illness contracted by workers in plants manufacturing fluorescent lamps. She also worked with the Atomic Energy Commission to study hazards of nuclear energy. Dr. Hardy established an occupational medicine clinic at Massachusetts General Hospital in 1947, and she was its director until her retirement in 1971. She also established the National Beryllium Registry, a unit that became a model for tracking occupational hazards and establishing guidelines for their control. She led the Occupational Medical Service at MIT for more than twenty years and was an

74

CONFIDENTIAL

HARV00030440

*The President's Report 1993–1995*

advisor on safety considerations relating to the institute's first nuclear reactor. In 1971 she was named clinical professor in the Harvard Medical School's Department of Medicine—the first woman appointed to a full professorship at the school. Dr. Hardy published her memoirs, *Challenging Man-Made Disease,* in 1983. Among her awards were the American Medical Women's Association's Medical Woman of the Year, the Award of Merit of the American Academy of Occupational Medicine, the Alice Hamilton Award of the New York Academy of Science, and awards from the American Public Health Association.

DWIGHT EMARY HARKEN, Clinical Professor of Surgery, *Emeritus,* died August 27, 1993, at the age of 83. Born in Osceola, Iowa, Dr. Harken earned his bachelor's and medical degrees at Harvard, trained at Bellevue Hospital in New York City, and then went to London on a New York Academy of Medicine fellowship. During World War II he remained in London, served with the Army Medical Corps, and did pioneering work in cardiac surgery. He is recognized as the first surgeon to have had repeated success in wartime heart surgery: he removed bullets and shrapnel from the hearts of about 130 wounded soldiers without a single fatality. Dr. Harken taught at Tufts University for two years and then came to Harvard, where he taught and practiced from 1948 to 1970. He was chief of thoracic surgery at Peter Bent Brigham Hospital, now Brigham and Women's Hospital, and held a parallel post at Mt. Auburn Hospital in Cambridge. In 1951 he opened the world's first intensive care unit at the Brigham; he later opened a second unit, which was named for him, at Mt. Auburn Hospital. In the 1960s Dr. Harken and his colleagues developed the first pacemaker, artificial valves, and other devices to help imperfect hearts function normally. Dr. Harken also addressed the emotional concerns of his patients and gathered four of his cardiac patients to form a support group. That effort grew into Mended Hearts, an international organization with tens of thousands of members. Dr. Harken also helped found Action on Smoking and Health, Heart House, and the American Board of Thoracic Surgery. He wrote or edited more than two hundred scientific articles and several books, and served on the boards of eight journals. Dr. Harken was a former president of the American College of Cardiology and the Association for the Advancement of Medical Instrumentation.

EINAR INGVALD HAUGEN, Victor S. Thomas Professor of Scandinavian and Linguistics, *Emeritus,* died on June 20, 1994, at the age of 88. He was born to Norwegian immigrant parents in Sioux City, Iowa. His interest in Scandinavian culture began in boyhood, during a two-year visit to his parents' home town of Opdal in central Norway. He earned his bachelor's degree from St. Olaf College and his master's and Ph.D. degrees from the University of Illinois. He taught Scandinavian languages at the University of Wisconsin for 29 years before joining the Harvard faculty in 1960. He retired in 1975. His work to promote the study and understanding of Scandinavian culture in the United States earned him the Order of St. Olaf, First Class, the highest honor bestowed by the Norwegian Government. He was also honored by Sweden, which named him a commander of the North Star. He lectured at various universities in the United States, Europe, and Japan, and was the author of many books, dictionaries, and biographies.

75

CONFIDENTIAL

HARV00030441

**JA5452**
DX040.0077

*Harvard University*

RICHARD JULIUS HERRNSTEIN, Edgar Pierce Professor of Psychology, died on September 13, 1994, at the age of 64. He was an experimental psychologist whose theories on the inheritance of intelligence and criminal behavior catalyzed a national debate. Born in New York City, he graduated from City College of New York in 1952 and earned his doctorate at Harvard in 1955. He conducted research at the Walter Reed Army Institute of Research and was a lecturer in psychology and a research associate at the University of Maryland before joining the Harvard faculty in 1958. Professor Herrnstein taught psychology for 36 years at Harvard. After serving as Associate Professor of Psychology and director of the Psychological Laboratories, he became chairman of the Department of Psychology, a position he held until 1971. He was appointed Professor of Psychology in 1967. He served on many departmental and University committees, including the Harvard-Radcliffe Admissions Committee, the Advisory Committee on Honorary Degrees, and the Committee on the Use of Human Subjects in Research. Professor Herrnstein's controversial article *I.Q.*, published in the September 1971 issue of *The Atlantic Monthly*, contended that I.Q. is largely inherited and cannot be significantly enhanced by social programs. His 1973 book *IQ and Meritocracy* spurred a debate on the merits of I.Q. testing. He was also co-author of *Crime and Human Nature* and of *The Bell Curve: Intelligence and Class Structure in American Life*, published shortly after his death. He was a Guggenheim Fellow, a Sloan Foundation Fellow, a Russell Sage Foundation Fellow, and a recipient of the Lewis P. and Linda L. Geyser Prize.

PETER HESS, Professor of Cellular and Molecular Physiology, died March 4, 1993, at the age of 41. Born in Switzerland in 1951, Dr. Hess earned his medical degree in 1979 from the University of Bern, Switzerland. A biophysicist, he was best known for his research on ion channels in nerve and cardiac muscle cells. He was appointed a faculty member at Harvard Medical School in 1986 and became a full professor in 1992. Dr. Hess was an active promoter of the School's M.D.-Ph.D. program, and he served on the program's admissions committee for six years. An accomplished violinist, he often performed at Medical School events.

THORKILD JACOBSEN, Professor of Assyriology, *Emeritus*, died on May 2, 1993, at the age of 88. Born and schooled in Denmark, he came to America in 1927 on a $1,000 fellowship offered by the University of Chicago. After completing his doctorate he directed the 1930 excavation of the 2,600-year-old Sennacherib aqueduct at Jerwan, Iraq, which was the world's oldest known aqueduct at the time. In 1950 he helped unearth Sumerian clay tablets and translate cuneiform compositions written 3,800 years earlier. His team also discovered a 6,000-year-old irrigation canal that paralleled the Euphrates River. He became professor of Assyriology at Harvard in 1962, and retired in 1974. He dedicated his life to deciphering poetry and religious writings composed in Sumerian, a 3,000-year-old Mesopotamian language with no known precursor or offspring. He compiled dictionaries, explicated ancient hymns, poems, and epics, and edited professional journals including *Sennacherib's Aqueduct at Jerwan, Sumerian Poetry in Translation, The Assyrian Dictionary of the Oriental Institute,* and *The Journal of Cuneiform Studies*. Professor Jacobsen was a member of the Royal Danish Academy of the Arts and Sciences, the American

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL

HARV00030442

*The President's Report 1993–1995*

Philosophical Society, and the American Academy of Arts and Sciences. He retired as president of the American Oriental Society only days before his death. His fifteen fellowships and dozen positions included a fellowship at the National Humanities Center and a visiting professorship at the University of London.

WILLIAM DOUGLAS KAPLAN, Professor of Radiology, died on March 30, 1994, at the age of 56. He was chief of oncologic nuclear medicine at the Dana-Farber Cancer Institute for more than 15 years and was credited with popularizing the use of nuclear medicine to trace the lymphatic system in preparation for radiation therapy. He was also widely known for his contributions to brain tumor imaging. Born in Washington, D.C., he graduated from the University of Maryland and the University of Maryland School of Medicine. After an internship in internal medicine and a residency in diagnostic radiology at Washington Hospital Center, he completed his training in nuclear medicine at Peter Bent Brigham and Children's Hospital in Boston. He began his twenty-three-year affiliation with Harvard Medical School in 1971 as a Clinical Fellow in Radiology and became Professor of Radiology in 1992. Deeply concerned about the education of nuclear medicine technologists, Dr. Kaplan worked with the training program at the Massachusetts College of Pharmacy and Allied Health Sciences. He bequeathed to the program his collection of nuclear medicine journals. He was a fellow of the American College of Nuclear Physicians and a member of many advisory boards and committees.

ROGER THOMSON KELLEHER, Professor of Psychobiology in the Department of Psychiatry, died on May 19, 1994, at the age of 67. He was a pharmacologist internationally recognized for basic scientific studies on drugs used to modify behavior. Born in New Haven, Connecticut, he was a 1950 graduate of the University of Connecticut. He received his Ph.D. in experimental psychology from New York University in 1955. At the Yerkes Laboratories of Primate Biology in Florida he developed a primate research program based on the behavioral principles advanced by the late B.F. Skinner. In 1957 he conducted research on chlorpromazine and other antischizophrenic drugs at Smith, Kline and French Laboratories. He joined the Department of Pharmacology at Harvard Medical School in 1961 and was appointed professor of psychobiology in 1972, when he also became chairman of the Department of Behavioral Biology at the New England Regional Primate Research Center. His research was concerned with systematic studies of the effects of drug abuse in primates, and the influence of behavioral activities on cardiovascular and other physiological functions. He was a fellow of the American Association for the Advancement of Science and a director of the Society for the Experimental Analysis of Behavior.

JOHN ARTHUR KIRKPATRICK, JR., Professor of Radiology, died on May 8, 1994, at the age of 68. Born in Waynesboro, Pennsylvania, he graduated from Franklin and Marshall College and earned his medical degree in 1949 from Temple University School of Medicine, where he began his radiology residency after service in the U.S. Navy. He completed his training at Children's Hospital in Boston and returned to Philadelphia, where he was director of the radiology program at St. Christopher's

77

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL

HARV00030443

*Harvard University*

Hospital and a professor of radiology at Temple University for the next 20 years. In 1974 he returned to Boston to become radiologist-in-chief at Children's Hospital and Professor of Radiology at Harvard Medical School. Fellows who trained with him established the Kirkpatrick Society in his honor in 1991. Children's Hospital and Harvard Medical School established the John A. Kirkpatrick Professorship in 1994. He was president of the American Roentgen Ray Society, the Society for Pediatric Radiology, and the International Skeletal Society, and was a member of the National Academy of Sciences and an honorary member of sixteen medical societies overseas. He was awarded gold medals from several organizations, including the American College of Radiology and the Society for Pediatric Radiology. He also received the Waldo E. Nelson Achievement Award from St. Christopher's Hospital for outstanding contributions to children's health care. He was the author of 108 scientific papers and 43 books and chapters on pediatrics and radiology.

HARVEY LEIBENSTEIN, Andelot Professor of Economics and Population, *Emeritus*, died on February 28, 1994, at the age of 71. Professor Leibenstein developed several original economic theories, including the concept of X-efficiency analysis. Born in Russia, raised and educated in Montreal, he earned degrees from Northwestern and Princeton Universities. He taught economics at Princeton and the University of California at Berkeley before joining the Harvard faculty in 1966 as a visiting professor of economics. He was appointed to the Andelot Professorship of Economics and Population in 1967. He was an active member of Harvard's Hillel community and an honorary associate of Leverett House. The author of nine books on economic theory, he was particularly interested in the economic development of low-income countries and organizational analysis. His 1987 book, *Inside the Firm: The Inefficiencies of Hierarchy*, challenged many established theories of organizational management. A Guggenheim Fellow, he was also a member of the Institute for Advanced Study, Princeton.

HARRY TUCHMAN LEVIN, Irving Babbitt Professor of Comparative Literature, *Emeritus*, died on May 29, 1994, at the age of 81. Professor Levin was considered a founder of comparative literature as a discipline and played a central role in the development of Harvard's department of comparative literature. Born in Minneapolis, Minnesota, in 1912, he graduated from Harvard College in 1933 and began his first teaching appointment at Harvard in 1939 as an instructor in English. He was an associate of Eliot House and Walter Channing Cabot Fellow in the Faculty of Arts and Sciences. Named to the Babbitt Professorship of Comparative Literature in 1960, he assumed emeritus status in 1983. He was a leading authority on Shakespeare and the author of many books, including *James Joyce: A Critical Introduction*. Published in 1941, it was considered the first major study on the works of Joyce. He received many honorary degrees, including degrees from Oxford University, the University of Paris-Sorbonne, and the University of St. Andrews.

HAROLD DAVID LEVINE, Clinical Professor of Medicine, *Emeritus*, died April 8, 1993, at the age of 85. He was a graduate of Brookline (Mass.) High School, a 1929 graduate of Harvard College, and a 1932 graduate of Harvard Medical

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL                                                                                          HARV00030444

**JA5455**

DX040.0080

School, where he was elected to the Boylston Medical Society. He interned in pathology at Beth Israel Hospital, then completed an internship and assistant residency in medicine at Peter Bent Brigham Hospital (now Brigham and Women's Hospital). From 1934 until 1941 Dr. Levine was a general practitioner and surgeon in Bristol, New Hampshire. He served on the medical staff of Franklin Hospital in Franklin, New Hampshire, and the Margaret Pillsbury Hospital in Concord, New Hampshire. During World War II he served with the Army Medical Corps in Harvard units at Fort Dix, New Jersey, and in the South Pacific, New Guinea, and in the Philippines as chief of the Medical Service of the 35th General Hospital. In 1946 he began a cardiac consultation practice in Boston and headed the Electrocardiographic Laboratory at the Brigham. He worked at Brigham and Women's for many years and concluded his practice at Deaconess Hospital in 1989. His Harvard faculty appointments included Assistant Clinical Professor in 1958, Associate Clinical Professor in 1967, and Clinical Professor from 1973 until his retirement in 1974. He was president of the Massachusetts chapter of the American Heart Association.

JAMES JOSEPH LINGANE, Professor of Chemistry, *Emeritus,* died on March 14, 1994, at the age of 84. A specialist in analytical chemistry, he was appointed an instructor in chemistry at Harvard in 1941. He became Professor of Chemistry in 1952 and assumed emeritus status in 1976. He served as a member of the Board of Freshman Advisers from 1942 until 1972. Born in St. Paul, Minnesota, he received his doctorate from the University of Minnesota in 1938. His many awards included the Gordon Research Conference Award from the American Association for the Advancement of Science, and the Fisher Award from the American Chemistry Society. He was a member of the American Chemistry Society, and the American Academy of Arts and Sciences, and an honorary member of the British Society of Analytical Chemists.

LYNN HAROLD LOOMIS, Dwight Parker Robinson Professor of Mathematics, *Emeritus,* died on June 9, 1994, at the age of 79. Born in Afton, New York, he graduated from Rensselaer Polytechnic Institute in 1937, and earned his master's degree in 1938 and a Ph.D. in 1942, both from Harvard. He began teaching at Harvard in 1938 and joined the Society of Fellows as a Junior Fellow the following year. He was appointed Associate Professor of Mathematics with tenure in 1946, became Professor of Mathematics in 1956, and assumed emeritus status twenty-seven years later. His research, initially in function theory, turned to abstract analysis, and he published a number of articles on the subject, and the book, *Abstract Harmonic Analysis.* He was also the author of several texts on calculus. He was a member of the American Academy of Arts and Sciences.

JEAN MAYER, former Professor of Nutrition and Lecturer in the History of Public Health, died January 1, 1993, at the age of 72. One of the world's leading nutritionists, he left Harvard in 1976 to assume the presidency of Tufts University. He was born in Paris and educated at the University of Paris, where he earned two baccalaureate degrees, master's degrees in physics and biology, and a doctor of science degree.

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL

HARV00030445

**JA5456**

DX040.0081

*Harvard University*

After service in the French army in World War II, when he was fourteen times decorated, he emigrated to the United States. He received his Ph.D. from Yale University in 1948 and joined the Harvard faculty in 1950. He became an American citizen in 1957. He was appointed Professor of Nutrition in 1965, and in 1973 was named Master of Dudley House. As a researcher he was particularly noted for his pioneering studies of obesity and the regulation of hunger. A founder of the National Council on Hunger and Malnutrition, he was a consultant to agencies of the United Nations and to three U.S. presidents. In 1969 he organized the White House Conference on Food, Nutrition, and Health. For his efforts to improve American nutritional standards and alleviate world hunger, he received two presidential awards.

MARIAN WILKINS ROPES FIELDING, Associate Clinical Professor of Medicine, *Emerita,* died on December 24, 1994, at the age of 91. A specialist in the treatment of arthritis and lupus, she was born in Salem, Massachusetts, and graduated from Smith College. She earned a master's degree at MIT before graduating from Johns Hopkins Medical School in 1931. She began her sixty-year affiliation with Harvard Medical School in 1934 as a research fellow, was appointed Associate Clinical Professor of Medicine in 1962, and assumed emerita status in 1970. Dr. Ropes Fielding wrote two books on lupus, and articles published in medical journals. She was a member of the board of directors of the New England Home for the Deaf.

ROBERT OSHER SCHLAIFER, William Ziegler Professor of Business Administration, *Emeritus,* died on July 24, 1994, at the age of 79. An expert on decision analysis and managerial economics, Professor Schlaifer was a member of the Business School faculty from 1948 until his retirement in 1985. Born in Vermillion, South Dakota, he graduated from Amherst College and earned his doctorate in ancient history at Harvard. He was appointed an instructor in history in 1939; in 1943 he served as a physics instructor and physicist at Harvard's Underwater Sound Laboratory. He was the author of several books, including *Probability and Statistics for Business Decisions* and *Applied Statistical Decision Theories.* He had recently completed work on a computer program called AQD, which is designed to make statistical data analysis accessible to the non-expert.

NATHAN BILL TALBOT, Charles Wilder Professor of Pediatrics, *Emeritus,* died on June 7, 1994, at the age of 84. An authority on child development and the prevention of psychological and behavioral disorders in children, Dr. Talbot was chief of children's service at Massachusetts General Hospital for 15 years. Born in Boston, he graduated from Harvard College and Harvard Medical School. He specialized in pediatric endocrinology and developed Boston's first pediatric endocrinology clinic and laboratory at Children's Hospital. During World War II he was a member of the task force that developed optimal life-raft rations for the army and navy. He was appointed an assistant professor at the Medical School in 1945 and Professor of Pediatrics in 1962. Dr. Talbot wrote extensively on child development and strove to integrate the social, behavioral, and biological aspects of child health. He was the author of five books, including *Raising Children in Modern America.* He was the recipient of the Mead Johnson and Borden awards from the American Academy of Pediatrics.

80

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL

**JA5457**
DX040.0082

*The President's Report 1993–1995*

KIRIL TARANOVSKY, Professor of Slavic Languages and Literatures, *Emeritus,* died January 18, 1993, at the age of 81. He was born in Yuriev, Russia (now Tartu, Estonia), and grew up in Tartu, St. Petersburg, and Kharkov. In the aftermath of the Bolshevik revolution and during the ensuing civil war, the Taranovsky family moved to Yugoslavia, where he graduated from high school and received a law degree from the University of Belgrade in 1933. He worked briefly translating Russian poetry into Serbo-Croatian and returned to the university to earn a degree in Slavic languages in 1936. After teaching at the University of Belgrade for more than two decades, he came to Harvard as a visiting lecturer in 1958. He taught at the University of California, Los Angeles, from 1959 to 1963 and then returned to Harvard as Professor of Slavic Languages and Literatures until his retirement in 1981. After retiring from Harvard, he taught at the University of Wisconsin and at the University of Belgrade, where he continued his work on the analysis of Russian poetry.

SAMUEL EDMUND THORNE, Charles Stebbins Fairchild Professor of Legal History, *Emeritus,* died on April 7, 1994, at the age of 86. An authority on English legal history and common law, Professor Thorne wrote the five-volume work *Bracton on the Laws and Customs of England* which serves as the basis for the continuing study of the relationship between sociopolitical history and the evolution of English common law in the twelfth century. Born in New York, he graduated from City College in 1927 and Harvard Law School in 1930. After teaching at Northwestern and Yale universities, he became a professor at Harvard Law School in 1956. He retired in 1978. He was awarded honorary degrees from Yale, Wesleyan, and Cambridge universities, and was a member of the American Historical Society, the American Society of Legal Historians, and the Guggenheim Foundation.

JOHN GORDON TORREY, Charles Bullard Professor of Forestry, *Emeritus,* and former Director of the Harvard Forest, died January 7, 1993, at the age of 71. Born in Philadelphia, he graduated from Williams College in 1942, and received a master's degree in 1947 and a Ph.D. in 1950, both from Harvard. He was a captain in the Army Medical Administration Corps during World War II, serving with the 317th Station Hospital in Europe from 1943 to 1946. He taught at the University of California, Berkeley, from 1949 to 1960 and came to Harvard as Professor of Botany in 1960. He was director of the Maria Moors Cabot Foundation for Botanical Research from 1966 to 1976, and director of the Harvard Forest in Petersham, Massachusetts, from 1984 to 1991. He held the Charles Bullard Professorship of Forestry from 1984 until his retirement in 1991. Professor Torrey studied and conducted research in England, Germany, Scotland, Australia, and the United States. He published widely, and was a member of, or adviser to, many scientific policy boards and agencies, serving on the editorial boards of several scientific journals.

DONALD THEODORE TRAUTMAN, Henry Shattuck Professor of Law, died September 18, 1993, at the age of 69. Born in Cleveland, Ohio, he earned his bachelor's degree in economics at Harvard College in 1946 and his law degree in 1951 from Harvard Law School, where he was case editor of the *Harvard Law Review.* After graduation he clerked for Supreme Court Justice Felix Frankfurter.

81

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL

HARV00030447

**JA5458**

DX040.0083

*Harvard University*

Appointed Assistant Professor of Law at Harvard Law School in 1953, he became Professor of Law in 1956. He was named Charles Stebbins Fairchild Professor of Law in 1980 and Shattuck Professor of Law in 1981. A specialist in accounting, choice of law, and admiralty law especially pertaining to issues of federal jurisdiction, Professor Trautman was co-author of two texts, *Materials on Accounting* (1959) and *Law of Multistate Problems* (1965). He held a Guggenheim Fellowship in 1969. He was a leader in the use of computers in legal education and served as faculty adviser to the Law School's Education Technology Department. He had been president, vice president, and editorial chairman of the Center for Computer Assisted Legal Instruction and was a member of the State Department's Advisory Committee on Private International Law.

JAMES ROLAND WARE, Associate Professor of Chinese, *Emeritus*, died February 27, 1993, at the age of 91. After receiving bachelor's and master's degrees from the University of Pennsylvania, he earned his Ph.D. from Harvard in 1932. Professor Ware joined the Harvard University faculty in 1936 as an assistant professor of Chinese. He was Associate Professor from 1939 until his retirement in 1968. For many years he taught literary Chinese and edited many texts used in language classes. He also translated the sayings of Confucius and Chuang Chou into English.

AMOS NIVEN WILDER, Hollis Professor of Divinity, *Emeritus*, died May 1, 1993, at the age of 97. Born in Madison, Wisconsin, he spent much of his boyhood in China, where his father was American consul in Hong Kong and Shanghai. After serving in World War I as an ambulance driver and artillery corporal, he took his bachelor's degree at Yale University in 1920. He was a Belgian-American Fellow at the University of Brussels and a divinity student at Mansfield College, Oxford; at Oxford he met Albert Schweitzer and served as his secretary. Wilder completed his bachelor's degree in divinity at Yale Divinity School in 1924, and received his Ph.D. in 1933. While finishing his dissertation, he taught at Hamilton College and then joined the faculty of Andover Newton Theological School. He taught at the Chicago Theological Seminary and the Federated Faculty of the University of Chicago from 1943 to 1954. Professor Wilder came to Harvard that year as Professor of New Testament Interpretation at the Divinity School. He was Hollis Professor of Divinity from 1956 until his retirement in 1963. His scholarly work reflected the literary interest he shared with his brother, the late Thornton Wilder. He advocated a literary approach to biblical studies, with an emphasis on comparative literature. Among his many publications are *Eschatology and Ethics in the Teaching of Jesus; The Spiritual Aspects of the New Poetry; Early Christian Rhetoric: The Language of the Gospel; The New Voice: Religion, Literature, Hermeneutics; The Bible and the Literary Critic;* and *Armageddon Revisited: A World War I Journal.* Professor Wilder was chairman of the Society for the Arts, Religion, and Contemporary Culture in Chicago.

DONALD WYMAN, Horticulturist, *Emeritus*, died September 6, 1993, at the age of 89. Born in Templeton, California, he graduated from Pennsylvania State University and earned his doctorate in ornamental horticulture from Cornell

82

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL

HARV00030448

*The President's Report 1993–1995*

University in 1935. He was appointed Horticulturist of the Arnold Arboretum in 1936, a position he held until his retirement in 1970. During his career he wrote approximately one hundred articles for horticultural magazines in the United States, Canada, and Great Britain; for 29 years he was editor of *Arnoldia*, the magazine of the Arnold Arboretum Mr. Wyman also wrote the reference work *Wyman's Gardening Encyclopedia*. He earned some of the most prestigious awards in his field, including the Liberty Hyde Bailey Medal (American Horticultural Society), the George Robert White Medal (Massachusetts Horticultural Society), and the Veitch Memorial Gold Medal (Royal Horticultural Society of London). He served as president, director, and trustee of the American Horticultural Society and trustee of the Massachusetts Horticultural Society.

ALONZO SMYTHE YERBY, Professor of Health Services Administration in the Faculty of Public Health, *Emeritus*, died on February 16, 1994, at the age of 72. A distinguished figure in public health at the state, federal, and international levels, Dr. Yerby was committed to community welfare. Born in Augusta, Georgia, he graduated from the University of Chicago and attended Meharry Medical College, receiving his M.D. in 1946. In 1948, he received a master's degree in public health from Harvard. He served as director of the Health Insurance Plan of Greater New York, as department commissioner for medical affairs for the New York State Department of Welfare, and as executive director of New York City's Department of Public Welfare. He joined the Harvard School of Public Health in 1966 as Professor and Chairman of the Department of Health Services Administration, and served as Associate Dean for Community Affairs from 1969 to 1974. After assuming emeritus status at Harvard in 1982, he became Professor of Preventive Medicine and Biometrics and director of the Division of Health Services Administration in the School of Medicine, Uniformed Services University of the Health Sciences in Maryland. In honor of Dr. Yerby's service, the School of Public Health established the Alonzo Yerby Public Health Award and Distinguished Lecture Series. In 1964 he received the City of New York Public Service Award for Professional Achievement.

LOUIS ZETZEL, Clinical Professor of Medicine, *Emeritus*, died on September 13, 1993, at the age of 84. Born in Chelsea, Dr. Zetzel graduated from Harvard College in 1929 and received his medical degree from Harvard Medical School in 1934. After completing his medical training with fellowships in New York and Philadelphia, he joined the staff at Beth Israel Hospital, where he was chief of gastroenterology from 1956 to 1968. During World War II he served in the Army Medical Corps. Dr. Zetzel was an expert on diseases of the digestive tract. From 1936 to 1975 he held appointments at the Harvard Medical School, where he sat for many years on the admissions committee. He became Clinical Professor of Medicine in 1967. On his 75th birthday, a visiting professorship in gastroenterology was established in his name at the Medical School. After retiring from Harvard in 1975, Dr. Zetzel continued in private practice; he continued to make house calls until his retirement in 1986.

83

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL                                                                HARV00030449

**JA5460**
DX040.0085

*Harvard University*

Special mention is made of the following members of the Harvard community who served the University with dedication and distinction:

Glenn Ewing Behringer, former Associate Clinical Professor of Surgery, who died on March 10, 1994, at the age of 72; Doris Ruth Bennett, Clinical Instructor of Pediatrics, who died on April 22, 1994, at the age of 70; Paul Donham, former Associate Professor of Business Administration, who died on April 15, 1993, at the age of 78; Robin Michael Evans, Lecturer in Architecture, who died on February 19, 1993, at the age of 48; Kenneth William Haskins, former Senior Lecturer on Education, who died on December 13, 1994, at the age of 71; Ralph Lazzaro, former Director of Language Studies in the Divinity School and Lecturer on Church History, who died on September 10, 1994, at the age of 79; Abraham Pollen, former Assistant Clinical Professor of Ophthalmology, who died on June 28, 1994, at the age of 80; Hugo H. Montero, former Senior Lecturer on Romance Languages and Literatures, who died on September 17, 1994, at the age of 72; Eugene Rossitch, Jr., Assistant Professor of Surgery, who died on November 18, 1994, at the age of 35; Mark A. Saroyan, Assistant Professor of Government, who died on July 21, 1994 at the age of 34; Julius Silberger, Assistant Clinical Professor of Psychiatry, who died on October 31, 1994, at the age of 65; Vincent Solomita, former Assistant Professor of Design, who died on March 11, 1994, at the age of 73; Denise Jouasset Strieder, Associate Professor of Pediatrics, who died on October 17, 1994, at the age of 65; George Putnam Sturgis, former Assistant Clinical Professor of Medicine, who died on March 11, 1993, at the age of 87; Demetrius George Traggis, former Assistant Professor of Pediatrics at the Sidney Farber Cancer Center, who died on May 4, 1994, at the age of 77; and Rudolph William Vollman, Associate Clinical Professor of Surgery, who died on March 26, 1994, at the age of 59.

Neil L. Rudenstine
*President*

January 1996

Lists containing all resignations accepted during the academic years 1993-94 and 1994-95, all promotions, elections to established chairs, and all appointments without limit of time voted during the academic years 1993-94 and 1994-95, as well as lists of visiting professors and lecturers, are on deposit in the office of the Secretary to the University, and in the Archives.

Harvard University - Harvard University Archives / Harvard University. The President's report

CONFIDENTIAL                                                                                          HARV00030450

**JA5461**
DX040.0086

| Admissions Calendar 2013-2014 | |
|---|---|
| **September – October** | Joint Travel |
| **Early October** | |
| | Admissions Office begins processing applications; interview requests sent to School Committee chairs. |
| **October 24 - 25** | Cambridge Admissions Conference |
| **November 1** | Early Action application deadline (postmark) |
| **November 16 - 23** | Subcommittees meet. Please try to complete all interview requests and send interview reports to Cambridge in time for subcommittee meetings. |
| **November 16** | E S T |
| **November 18** | B D F |
| **November 19** | I L Z |
| **November 20** | H K R |
| **November 21** | J P U |
| **November 22** | A C G |
| **November 23** | N V |
| **November 25 - December 6** | Full committee meets. All interview reports must be completed and sent to Cambridge. |
| **December 13** | Decision letters mailed and emailed. |
| **December 14** | Decision lists available on website for Schools Committee chairs. |
| **January 1** | Final deadline for applications (postmark) |
| **January 22 - March 1** | Subcommittees meet. Please try to complete all interview requests and send interview reports to Cambridge in time for subcommittee meetings. |
| **January 22 - 25** | E S T |
| **January 28 - 31** | B D F |
| **February 3 - 6** | I L Z |
| **February 8 - 12** | H K R |
| **February 14 - 18** | J P U |
| **February 20 - 24** | A C G |
| **February 25 - March 1** | V |
| **February 26 - March 1** | N |
| **March 3 - 14** | Full committee meets. All interview reports must be completed and sent to Cambridge. |
| **March 3** | General Overview |
| **March 4** | E S |
| **March 5** | T B |
| **March 6** | D F |
| **March 7** | I L |
| **March 8** | Z H |
| **March 10** | K J |
| **March 11** | R P |
| **March 12** | U A |
| **March 13** | C G |
| **March 14** | N V |
| **March 17 - 19** | Final Review |
| **March 27** | Decision letters mailed and e-mailed. |
| **March 28** | Decision lists available on website for Schools Committee chairs. |
| **April 26 - 28** | Visiting Program in Cambridge for admitted students |
| **May 1** | Candidates' reply deadline |
| **May** | Spring joint travel |
| **mid-May to June 30** | Wait list meetings |

United States District Court
District of Massachusetts

**DX 41**

Case No. 1:14-cv-14176 (ADB)
Date Entered
By
Deputy Clerk

**Demographic Breakdown of Applicants, Admits, and Matriculants 1**

**Class of 2000**

| | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 3683 | 20.3% | 340 | 16.4% | 274 | 17.0% |
| African Am | 964 | 5.3% | 185 | 8.9% | 137 | 8.5% |
| Hispanic Am | 1140 | 6.3% | 171 | 8.2% | 122 | 7.6% |
| Nat Am/Nat HI | 129 | 0.7% | 16 | 0.8% | 8 | 0.5% |
| Other | 453 | 2.5% | 22 | 1.1% | 17 | 1.1% |
| Unknown | 2470 | 13.6% | 359 | 17.3% | 279 | 17.3% |
| White | 6991 | 38.4% | 863 | 41.6% | 690 | 42.8% |
| Int'l Citz | 2353 | 12.9% | 118 | 5.7% | 87 | 5.4% |
| Total | 18183 | | 2074 | | 1614 | |

**Class of 2001**

| | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 3314 | 20.0% | 367 | 17.0% | 287 | 17.5% |
| African Am | 909 | 5.5% | 184 | 8.5% | 131 | 8.0% |
| Hispanic Am | 1111 | 6.7% | 185 | 8.6% | 141 | 8.6% |
| Nat Am/Nat HI | 165 | 1.0% | 15 | 0.7% | 11 | 0.7% |
| Other | 472 | 2.8% | 22 | 1.0% | 17 | 1.0% |
| Unknown | 2172 | 13.1% | 378 | 17.6% | 292 | 17.8% |
| White | 6138 | 37.0% | 867 | 40.3% | 648 | 39.5% |
| Int'l Citz | 2316 | 14.0% | 135 | 6.3% | 115 | 7.0% |
| Total | 16597 | | 2153 | | 1642 | |

**Class of 2002**

| | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 3321 | 19.7% | 375 | 18.0% | 312 | 18.9% |
| African Am | 1005 | 6.0% | 205 | 9.8% | 146 | 8.8% |
| Hispanic Am | 1138 | 6.8% | 174 | 8.3% | 128 | 7.8% |
| Nat Am/Nat HI | 136 | 0.8% | 13 | 0.6% | 12 | 0.7% |
| Other | 456 | 2.7% | 13 | 0.6% | 8 | 0.5% |
| Unknown | 1942 | 11.5% | 278 | 13.3% | 223 | 13.5% |
| White | 6587 | 39.2% | 912 | 43.7% | 725 | 43.9% |
| Int'l Citz | 2233 | 13.3% | 116 | 5.6% | 96 | 5.8% |
| Total | 16818 | | 2086 | | 1650 | |

**Class of 2003**

| | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 3537 | 19.5% | 339 | 16.4% | 285 | 17.4% |
| African Am | 1081 | 6.0% | 202 | 9.8% | 129 | 7.9% |
| Hispanic Am | 1270 | 7.0% | 177 | 8.6% | 129 | 7.9% |
| Nat Am/Nat HI | 173 | 1.0% | 22 | 1.1% | 14 | 0.9% |
| Other | 364 | 2.0% | 15 | 0.7% | 13 | 0.8% |
| Unknown | 1679 | 9.2% | 188 | 9.1% | 163 | 10.0% |
| White | 7652 | 42.1% | 997 | 48.2% | 793 | 48.5% |
| Int'l Citz | 2405 | 13.2% | 128 | 6.2% | 108 | 6.6% |
| Total | 18161 | | 2068 | | 1634 | |

**Class of 2004**

| | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 3637 | 19.5% | 332 | 15.9% | 274 | 16.7% |
| African Am | 1177 | 6.3% | 202 | 9.7% | 129 | 7.9% |
| Hispanic Am | 1185 | 6.3% | 181 | 8.7% | 126 | 7.7% |
| Nat Am/Nat HI | 170 | 0.9% | 20 | 1.0% | 9 | 0.5% |
| Other | 415 | 2.2% | 13 | 0.6% | 13 | 0.8% |
| Unknown | 2246 | 12.0% | 237 | 11.4% | 205 | 12.5% |
| White | 7372 | 39.4% | 968 | 46.5% | 779 | 47.4% |
| Int'l Citz | 2491 | 13.3% | 129 | 6.2% | 107 | 6.5% |
| Total | 18693 | | 2082 | | 1642 | |

**Class of 2005**

| | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 3736 | 19.6% | 297 | 14.1% | 238 | 14.5% |
| African Am | 1139 | 6.0% | 185 | 8.8% | 118 | 7.2% |
| Hispanic Am | 1415 | 7.4% | 187 | 8.9% | 138 | 8.4% |
| Nat Am/Nat HI | 196 | 1.0% | 24 | 1.1% | 19 | 1.2% |
| Other | 337 | 1.8% | 11 | 0.5% | 10 | 0.6% |
| Unknown | 2125 | 11.2% | 281 | 13.3% | 217 | 13.3% |
| White | 7420 | 39.0% | 969 | 45.9% | 771 | 47.1% |
| Int'l Citz | 2646 | 13.9% | 156 | 7.4% | 126 | 7.7% |
| Total | 19014 | | 2110 | | 1637 | |

Apps/Admits/Matrics - Old Methodology

United States District Court
District of Massachusetts

**DX 42**

Case No.    1:14-cv-14176 (ADB)
Date Entered
By
Deputy Clerk

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032509

**JA5463**

DX042.0001

**Demographic Breakdown of Applicants, Admits, and Matriculants**

**Class of 2006**

|  | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 4022 | 20.5% | 340 | 16.5% | 284 | 17.5% |
| African Am | 1226 | 6.3% | 183 | 8.9% | 112 | 6.9% |
| Hispanic Am | 1396 | 7.1% | 162 | 7.8% | 117 | 7.2% |
| Nat Am/Nat HI | 204 | 1.0% | 24 | 1.2% | 11 | 0.7% |
| Other | 324 | 1.7% | 16 | 0.8% | 11 | 0.7% |
| Unknown | 1227 | 6.3% | 140 | 6.8% | 122 | 7.5% |
| White | 8643 | 44.1% | 1055 | 51.1% | 840 | 51.7% |
| Int'l Citz | 2566 | 13.1% | 146 | 7.1% | 127 | 7.8% |
| Total | 19608 | | 2066 | | 1624 | |

**Class of 2007**

|  | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 4459 | 21.2% | 339 | 16.2% | 285 | 17.4% |
| African Am | 1277 | 6.1% | 209 | 10.0% | 139 | 8.5% |
| Hispanic Am | 1690 | 8.1% | 180 | 8.6% | 127 | 7.8% |
| Nat Am/Nat HI | 217 | 1.0% | 20 | 1.0% | 12 | 0.7% |
| Other | 230 | 1.1% | 8 | 0.4% | 8 | 0.5% |
| Unknown | 1288 | 6.1% | 129 | 6.2% | 102 | 6.2% |
| White | 8974 | 42.8% | 1049 | 50.1% | 824 | 50.4% |
| Int'l Citz | 2852 | 13.6% | 161 | 7.7% | 138 | 8.4% |
| Total | 20987 | | 2095 | | 1635 | |

**Class of 2008**

|  | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 4290 | 21.7% | 403 | 19.1% | 326 | 19.9% |
| African Am | 1263 | 6.4% | 211 | 10.0% | 145 | 8.9% |
| Hispanic Am | 1681 | 8.5% | 194 | 9.2% | 144 | 8.8% |
| Nat Am/Nat HI | 189 | 1.0% | 19 | 0.9% | 18 | 1.1% |
| Other | 240 | 1.2% | 9 | 0.4% | 9 | 0.5% |
| Unknown | 1044 | 5.3% | 103 | 4.9% | 79 | 4.8% |
| White | 8195 | 41.5% | 994 | 47.1% | 767 | 46.8% |
| Int'l Citz | 2850 | 14.4% | 177 | 8.4% | 150 | 9.2% |
| Total | 19752 | | 2110 | | 1638 | |

**Class of 2009**

|  | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 4804 | 21.1% | 371 | 17.6% | 304 | 18.5% |
| African Am | 1716 | 7.5% | 221 | 10.5% | 153 | 9.3% |
| Hispanic Am | 1906 | 8.4% | 173 | 8.2% | 120 | 7.3% |
| Nat Am/Nat HI | 209 | 0.9% | 22 | 1.0% | 14 | 0.9% |
| Other | 344 | 1.5% | 10 | 0.5% | 8 | 0.5% |
| Unknown | 1940 | 8.5% | 165 | 7.8% | 123 | 7.5% |
| White | 8492 | 37.3% | 957 | 45.5% | 763 | 46.5% |
| Int'l Citz | 3385 | 14.8% | 183 | 8.7% | 155 | 9.5% |
| Total | 22796 | | 2102 | | 1640 | |

**Class of 2010**

|  | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 4865 | 21.4% | 375 | 17.6% | 322 | 19.1% |
| African Am | 1984 | 8.7% | 220 | 10.4% | 156 | 9.3% |
| Hispanic Am | 2084 | 9.2% | 207 | 9.7% | 146 | 8.7% |
| Nat Am/Nat HI | 253 | 1.1% | 30 | 1.4% | 20 | 1.2% |
| Other | 354 | 1.6% | 8 | 0.4% | 7 | 0.4% |
| Unknown | 2020 | 8.9% | 202 | 9.5% | 168 | 10.0% |
| White | 7761 | 34.1% | 899 | 42.3% | 713 | 42.3% |
| Int'l Citz | 3433 | 15.1% | 184 | 8.7% | 152 | 9.0% |
| Total | 22754 | | 2125 | | 1684 | |

**Class of 2011**

|  | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 4803 | 20.9% | 411 | 19.5% | 336 | 20.3% |
| African Am | 2052 | 8.9% | 221 | 10.5% | 144 | 8.7% |
| Hispanic Am | 2180 | 9.5% | 208 | 9.9% | 149 | 9.0% |
| Nat Am/Nat HI | 245 | 1.1% | 31 | 1.5% | 20 | 1.2% |
| Other | 302 | 1.3% | 6 | 0.3% | 6 | 0.4% |
| Unknown | 1854 | 8.1% | 200 | 9.5% | 159 | 9.6% |
| White | 7659 | 33.4% | 838 | 39.8% | 678 | 40.9% |
| Int'l Citz | 3860 | 16.8% | 193 | 9.2% | 167 | 10.1% |
| Total | 22955 | | 2108 | | 1659 | |

Apps/Admits/Matrics - Old Methodology

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032510

DX042.0002

## Demographic Breakdown of Applicants, Admits, and Matriculants

### Class of 2012

| | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 5378 | 19.6% | 415 | 19.1% | 348 | 21.0% |
| African Am | 2765 | 10.1% | 217 | 10.0% | 139 | 8.4% |
| Hispanic Am | 2675 | 9.7% | 193 | 8.9% | 118 | 7.1% |
| Nat Am/Nat HI | 261 | 1.0% | 25 | 1.1% | 16 | 1.0% |
| Other | 452 | 1.6% | 13 | 0.6% | 10 | 0.6% |
| Unknown | 2831 | 10.3% | 266 | 12.2% | 202 | 12.2% |
| White | 8594 | 31.3% | 853 | 39.2% | 652 | 39.3% |
| Int'l Citz | 4506 | 16.4% | 193 | 8.9% | 173 | 10.4% |
| Total | 27462 | | 2175 | | 1658 | |

### Class of 2013

| | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 5784 | 19.9% | 380 | 17.5% | 317 | 19.1% |
| African Am | 2975 | 10.2% | 226 | 10.4% | 159 | 9.6% |
| Hispanic Am | 2974 | 10.2% | 231 | 10.6% | 152 | 9.1% |
| Nat Am/Nat HI | 267 | 0.9% | 28 | 1.3% | 17 | 1.0% |
| Other | 463 | 1.6% | 9 | 0.4% | 7 | 0.4% |
| Unknown | 2997 | 10.3% | 266 | 12.2% | 203 | 12.2% |
| White | 9190 | 31.6% | 837 | 38.5% | 641 | 38.5% |
| Int'l Citz | 4464 | 15.3% | 198 | 9.1% | 167 | 10.0% |
| Total | 29114 | | 2175 | | 1663 | |

### Class of 2014

| | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 6872 | 22.5% | 437 | 19.8% | 359 | 21.6% |
| African Am | 2953 | 9.7% | 244 | 11.1% | 156 | 9.4% |
| Hispanic Am | 3037 | 10.0% | 195 | 8.8% | 127 | 7.6% |
| Nat Am/Nat HI | 367 | 1.2% | 38 | 1.7% | 25 | 1.5% |
| Other | 40 | 0.1% | 2 | 0.1% | 1 | 0.1% |
| Unknown | 740 | 2.4% | 90 | 4.1% | 78 | 4.7% |
| White | 11474 | 37.6% | 1005 | 45.6% | 758 | 45.6% |
| Int'l Citz | 5006 | 16.4% | 194 | 8.8% | 160 | 9.6% |
| Total | 30489 | | 2205 | | 1664 | |

### Class of 2015

| | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 7767 | 22.2% | 423 | 19.3% | 346 | 20.8% |
| African Am | 3624 | 10.4% | 254 | 11.6% | 162 | 9.8% |
| Hispanic Am | 3613 | 10.3% | 242 | 11.1% | 153 | 9.2% |
| Nat Am/Nat HI | 318 | 0.9% | 25 | 1.1% | 19 | 1.1% |
| Other | 18 | 0.1% | 3 | 0.1% | 3 | 0.2% |
| Unknown | 1174 | 3.4% | 79 | 3.6% | 66 | 4.0% |
| White | 12422 | 35.5% | 942 | 43.1% | 718 | 43.2% |
| Int'l Citz | 6014 | 17.2% | 220 | 10.1% | 194 | 11.7% |
| Total | 34950 | | 2188 | | 1661 | |

### Class of 2016

| | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 7011 | 20.4% | 422 | 20.3% | 369 | 22.2% |
| African Am | 3342 | 9.7% | 208 | 10.0% | 154 | 9.3% |
| Hispanic Am | 3464 | 10.1% | 194 | 9.3% | 130 | 7.8% |
| Nat Am/Nat HI | 346 | 1.0% | 23 | 1.1% | 12 | 0.7% |
| Other | 2 | 0.0% | 1 | 0.0% | 1 | 0.1% |
| Unknown | 2464 | 7.2% | 161 | 7.8% | 119 | 7.2% |
| White | 11346 | 33.1% | 851 | 41.0% | 694 | 41.7% |
| Int'l Citz | 6328 | 18.4% | 216 | 10.4% | 185 | 11.1% |
| Total | 34303 | | 2076 | | 1664 | |

### Class of 2017

| | Apps | % of Apps | Admits | % Admits | Matrics | % Class |
|---|---|---|---|---|---|---|
| Asian Am | 7133 | 20.4% | 400 | 19.5% | 338 | 20.4% |
| African Am | 3440 | 9.8% | 233 | 11.4% | 156 | 9.4% |
| Hispanic Am | 3514 | 10.0% | 213 | 10.4% | 156 | 9.4% |
| Nat Am/Nat HI | 356 | 1.0% | 30 | 1.5% | 23 | 1.4% |
| Other | 1 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Unknown | 2747 | 7.8% | 167 | 8.2% | 140 | 8.4% |
| White | 11415 | 32.6% | 794 | 38.8% | 661 | 39.8% |
| Int'l Citz | 6417 | 18.3% | 210 | 10.3% | 185 | 11.2% |
| Total | 35023 | | 2047 | | 1659 | |

Apps/Admits/Matrics - Old Methodology

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032511

**JA5465**

DX042.0003

## Applicants, Admits, and Matriculants - Old Methodology NLNA

### Class of 2000 — Overall

| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
|---|---|---|---|---|---|---|---|---|
| Asian Am | 3683 | 20.3% | 340 | 16.4% | 9.2% | 274 | 17.0% | 80.6% |
| African Am | 964 | 5.3% | 185 | 8.9% | 19.2% | 137 | 8.5% | 74.1% |
| Hispanic Am | 1140 | 6.3% | 171 | 8.2% | 15.0% | 122 | 7.6% | 71.3% |
| Nat Am/Nat HI | 129 | 0.7% | 16 | 0.8% | 12.4% | 8 | 0.5% | 50.0% |
| Other | 453 | 2.5% | 22 | 1.1% | 4.9% | 17 | 1.1% | 77.3% |
| Unknown | 2470 | 13.6% | 359 | 17.3% | 14.5% | 279 | 17.3% | 77.7% |
| White | 6991 | 38.4% | 863 | 41.6% | 12.3% | 690 | 42.8% | 80.0% |
| Int'l Citz | 2353 | 12.9% | 118 | 5.7% | 5.0% | 87 | 5.4% | 73.7% |
| Total | 18183 | | 2074 | | 11.4% | 1614 | | 77.8% |

### Class of 2000 — NLNA

| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
|---|---|---|---|---|---|---|---|---|
| Asian Am | 3642 | 21.3% | 322 | 19.6% | 8.8% | 262 | 20.6% | 81.4% |
| African Am | 915 | 5.3% | 170 | 10.4% | 18.6% | 126 | 9.9% | 74.1% |
| Hispanic Am | 1119 | 6.5% | 165 | 10.0% | 14.7% | 117 | 9.2% | 70.9% |
| Nat Am/Nat HI | 127 | 0.7% | 16 | 1.0% | 12.6% | 8 | 0.6% | 50.0% |
| Other | 437 | 2.6% | 18 | 1.1% | 4.1% | 13 | 1.0% | 72.2% |
| Unknown | 2238 | 13.1% | 252 | 15.3% | 11.3% | 196 | 15.4% | 77.8% |
| White | 6363 | 37.1% | 604 | 36.8% | 9.5% | 481 | 37.8% | 79.6% |
| Int'l Citz | 2296 | 13.4% | 95 | 5.8% | 4.1% | 70 | 5.5% | 73.7% |
| Total | 17137 | | 1642 | | 9.6% | 1273 | | 77.5% |

### Class of 2001 — Overall

| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
|---|---|---|---|---|---|---|---|---|
| Asian Am | 3314 | 20.0% | 367 | 17.0% | 11.1% | 287 | 17.5% | 78.2% |
| African Am | 909 | 5.5% | 184 | 8.5% | 20.2% | 131 | 8.0% | 71.2% |
| Hispanic Am | 1111 | 6.7% | 185 | 8.6% | 16.7% | 141 | 8.6% | 76.2% |
| Nat Am/Nat HI | 165 | 1.0% | 15 | 0.7% | 9.1% | 11 | 0.7% | 73.3% |
| Other | 472 | 2.8% | 22 | 1.0% | 4.7% | 17 | 1.0% | 77.3% |
| Unknown | 2172 | 13.1% | 378 | 17.6% | 17.4% | 292 | 17.8% | 77.2% |
| White | 6138 | 37.0% | 867 | 40.3% | 14.1% | 648 | 39.5% | 74.7% |
| Int'l Citz | 2316 | 14.0% | 135 | 6.3% | 5.8% | 115 | 7.0% | 85.2% |
| Total | 16597 | | 2153 | | 13.0% | 1642 | | 76.3% |

### Class of 2001 — NLNA

| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
|---|---|---|---|---|---|---|---|---|
| Asian Am | 3259 | 21.0% | 340 | 20.8% | 10.4% | 265 | 21.7% | 77.9% |
| African Am | 869 | 5.6% | 164 | 10.0% | 18.9% | 116 | 9.5% | 70.7% |
| Hispanic Am | 1089 | 7.0% | 176 | 10.7% | 16.2% | 133 | 10.9% | 75.6% |
| Nat Am/Nat HI | 157 | 1.0% | 13 | 0.8% | 8.3% | 9 | 0.7% | 69.2% |
| Other | 453 | 2.9% | 18 | 1.1% | 4.0% | 14 | 1.1% | 77.8% |
| Unknown | 1940 | 12.5% | 260 | 15.9% | 13.4% | 191 | 15.7% | 73.5% |
| White | 5475 | 35.3% | 562 | 34.3% | 10.3% | 402 | 33.0% | 71.5% |
| Int'l Citz | 2253 | 14.5% | 105 | 6.4% | 4.7% | 89 | 7.3% | 84.8% |
| Total | 15495 | | 1638 | | 10.6% | 1219 | | 74.4% |

### Class of 2002 — Overall

| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
|---|---|---|---|---|---|---|---|---|
| Asian Am | 3321 | 19.7% | 375 | 18.0% | 11.3% | 312 | 18.9% | 83.2% |
| African Am | 1005 | 6.0% | 205 | 9.8% | 20.4% | 146 | 8.8% | 71.2% |
| Hispanic Am | 1138 | 6.8% | 174 | 8.3% | 15.3% | 128 | 7.8% | 73.6% |
| Nat Am/Nat HI | 136 | 0.8% | 13 | 0.6% | 9.6% | 12 | 0.7% | 92.3% |
| Other | 456 | 2.7% | 13 | 0.6% | 2.9% | 8 | 0.5% | 61.5% |
| Unknown | 1942 | 11.5% | 278 | 13.3% | 14.3% | 223 | 13.5% | 80.2% |
| White | 6587 | 39.2% | 912 | 43.7% | 13.8% | 725 | 43.9% | 79.5% |
| Int'l Citz | 2233 | 13.3% | 116 | 5.6% | 5.2% | 96 | 5.8% | 82.8% |
| Total | 16818 | | 2086 | | 12.4% | 1650 | | 79.1% |

### Class of 2002 — NLNA

| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
|---|---|---|---|---|---|---|---|---|
| Asian Am | 3278 | 20.8% | 345 | 22.0% | 10.5% | 285 | 23.4% | 82.6% |
| African Am | 944 | 6.0% | 181 | 11.5% | 19.2% | 128 | 10.5% | 70.7% |
| Hispanic Am | 1115 | 7.1% | 166 | 10.6% | 14.9% | 120 | 9.9% | 72.3% |
| Nat Am/Nat HI | 129 | 0.8% | 12 | 0.8% | 9.3% | 11 | 0.9% | 91.7% |
| Other | 444 | 2.8% | 9 | 0.6% | 2.0% | 5 | 0.4% | 55.6% |
| Unknown | 1723 | 10.9% | 175 | 11.2% | 10.2% | 139 | 11.4% | 79.4% |
| White | 5926 | 37.7% | 590 | 37.6% | 10.0% | 455 | 37.4% | 77.1% |
| Int'l Citz | 2180 | 13.9% | 91 | 5.8% | 4.2% | 74 | 6.1% | 81.3% |
| Total | 15739 | | 1569 | | 10.0% | 1217 | | 77.6% |

NLNA - Old Methodology

Page 1 of 6

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032512

DX042.0004

**Applicants, Admits, and Matriculants - Old Methodology NLNA**

### Class of 2003

**Overall**

| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
|---|---|---|---|---|---|---|---|---|
| Asian Am | 3537 | 19.5% | 339 | 16.4% | 9.6% | 285 | 17.4% | 84.1% |
| African Am | 1081 | 6.0% | 202 | 9.8% | 18.7% | 129 | 7.9% | 63.9% |
| Hispanic Am | 1270 | 7.0% | 177 | 8.6% | 13.9% | 129 | 7.9% | 72.9% |
| Nat Am/Nat HI | 173 | 1.0% | 22 | 1.1% | 12.7% | 14 | 0.9% | 63.6% |
| Other | 364 | 2.0% | 15 | 0.7% | 4.1% | 13 | 0.8% | 86.7% |
| Unknown | 1679 | 9.2% | 188 | 9.1% | 11.2% | 163 | 10.0% | 86.7% |
| White | 7652 | 42.1% | 997 | 48.2% | 13.0% | 793 | 48.5% | 79.5% |
| Int'l Citz | 2405 | 13.2% | 128 | 6.2% | 5.3% | 108 | 6.6% | 84.4% |
| Total | 18161 | | 2068 | | 11.4% | 1634 | | 79.0% |

**NLNA**

| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
|---|---|---|---|---|---|---|---|---|
| Asian Am | 3493 | 20.5% | 313 | 20.2% | 9.0% | 262 | 21.9% | 83.7% |
| African Am | 1031 | 6.1% | 183 | 11.8% | 17.7% | 114 | 9.5% | 62.3% |
| Hispanic Am | 1249 | 7.3% | 167 | 10.8% | 13.4% | 120 | 10.0% | 71.9% |
| Nat Am/Nat HI | 167 | 1.0% | 19 | 1.2% | 11.4% | 12 | 1.0% | 63.2% |
| Other | 354 | 2.1% | 11 | 0.7% | 3.1% | 9 | 0.8% | 81.8% |
| Unknown | 1486 | 8.7% | 110 | 7.1% | 7.4% | 91 | 7.6% | 82.7% |
| White | 6902 | 40.5% | 652 | 42.0% | 9.4% | 509 | 42.5% | 78.1% |
| Int'l Citz | 2343 | 13.8% | 97 | 6.3% | 4.1% | 81 | 6.8% | 83.5% |
| Total | 17025 | | 1552 | | 9.1% | 1198 | | 77.2% |

### Class of 2004

**Overall**

| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
|---|---|---|---|---|---|---|---|---|
| Asian Am | 3637 | 19.5% | 332 | 15.9% | 9.1% | 274 | 16.7% | 82.5% |
| African Am | 1177 | 6.3% | 202 | 9.7% | 17.2% | 129 | 7.9% | 63.9% |
| Hispanic Am | 1185 | 6.3% | 181 | 8.7% | 15.3% | 126 | 7.7% | 69.6% |
| Nat Am/Nat HI | 170 | 0.9% | 20 | 1.0% | 11.8% | 9 | 0.5% | 45.0% |
| Other | 415 | 2.2% | 13 | 0.6% | 3.1% | 13 | 0.8% | 100.0% |
| Unknown | 2246 | 12.0% | 237 | 11.4% | 10.6% | 205 | 12.5% | 86.5% |
| White | 7372 | 39.4% | 968 | 46.5% | 13.1% | 779 | 47.4% | 80.5% |
| Int'l Citz | 2491 | 13.3% | 129 | 6.2% | 5.2% | 107 | 6.5% | 82.9% |
| Total | 18693 | | 2082 | | 11.1% | 1642 | | 78.9% |

**NLNA**

| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
|---|---|---|---|---|---|---|---|---|
| Asian Am | 3584 | 20.4% | 299 | 19.1% | 8.3% | 242 | 20.1% | 80.9% |
| African Am | 1131 | 6.4% | 178 | 11.4% | 15.7% | 113 | 9.4% | 63.5% |
| Hispanic Am | 1153 | 6.6% | 170 | 10.9% | 14.7% | 115 | 9.6% | 67.6% |
| Nat Am/Nat HI | 162 | 0.9% | 16 | 1.0% | 9.9% | 6 | 0.5% | 37.5% |
| Other | 403 | 2.3% | 7 | 0.4% | 1.7% | 7 | 0.6% | 100.0% |
| Unknown | 2011 | 11.5% | 145 | 9.3% | 7.2% | 120 | 10.0% | 82.8% |
| White | 6664 | 38.0% | 647 | 41.3% | 9.7% | 513 | 42.7% | 79.3% |
| Int'l Citz | 2431 | 13.9% | 103 | 6.6% | 4.2% | 86 | 7.2% | 83.5% |
| Total | 17539 | | 1565 | | 8.9% | 1202 | | 76.8% |

### Class of 2005

**Overall**

| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
|---|---|---|---|---|---|---|---|---|
| Asian Am | 3736 | 19.6% | 297 | 14.1% | 7.9% | 238 | 14.5% | 80.1% |
| African Am | 1139 | 6.0% | 185 | 8.8% | 16.2% | 118 | 7.2% | 63.8% |
| Hispanic Am | 1415 | 7.4% | 187 | 8.9% | 13.2% | 138 | 8.4% | 73.8% |
| Nat Am/Nat HI | 196 | 1.0% | 24 | 1.1% | 12.2% | 19 | 1.2% | 79.2% |
| Other | 337 | 1.8% | 11 | 0.5% | 3.3% | 10 | 0.6% | 90.9% |
| Unknown | 2125 | 11.2% | 281 | 13.3% | 13.2% | 217 | 13.3% | 77.2% |
| White | 7420 | 39.0% | 997 | 45.9% | 13.1% | 771 | 47.1% | 79.6% |
| Int'l Citz | 2646 | 13.9% | 156 | 7.4% | 5.9% | 126 | 7.7% | 80.8% |
| Total | 19014 | | 2110 | | 11.1% | 1637 | | 77.6% |

**NLNA**

| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
|---|---|---|---|---|---|---|---|---|
| Asian Am | 3675 | 20.6% | 268 | 17.4% | 7.3% | 214 | 18.3% | 79.9% |
| African Am | 1100 | 6.2% | 166 | 10.8% | 15.1% | 102 | 8.7% | 61.4% |
| Hispanic Am | 1378 | 7.7% | 172 | 11.1% | 12.5% | 124 | 10.6% | 72.1% |
| Nat Am/Nat HI | 187 | 1.0% | 19 | 1.2% | 10.2% | 14 | 1.2% | 73.7% |
| Other | 331 | 1.9% | 9 | 0.6% | 2.7% | 8 | 0.7% | 88.9% |
| Unknown | 1902 | 10.7% | 178 | 11.5% | 9.4% | 135 | 11.5% | 75.8% |
| White | 6694 | 37.5% | 602 | 39.0% | 9.0% | 470 | 40.2% | 78.1% |
| Int'l Citz | 2588 | 14.5% | 130 | 8.4% | 5.0% | 103 | 8.8% | 79.2% |
| Total | 17855 | | 1544 | | 8.6% | 1170 | | 75.8% |

NLNA - Old Methodology

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032513

**Applicants, Admits, and Matriculants - Old Methodology NLNA**

### Class of 2006

| | Overall | | | | | | | | NLNA | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian Am | 4022 | 20.5% | 340 | 16.5% | 8.5% | 284 | 17.5% | 83.5% | 3970 | 21.6% | 323 | 21.1% | 8.1% | 269 | 23.1% | 83.3% |
| African Am | 1226 | 6.3% | 183 | 8.9% | 14.9% | 112 | 6.9% | 61.2% | 1164 | 6.3% | 151 | 9.9% | 13.0% | 89 | 7.6% | 58.9% |
| Hispanic Am | 1396 | 7.1% | 162 | 7.8% | 11.6% | 117 | 7.2% | 72.2% | 1368 | 7.4% | 150 | 9.8% | 11.0% | 105 | 9.0% | 70.0% |
| Nat Am/Nat HI | 204 | 1.0% | 24 | 1.2% | 11.8% | 11 | 0.7% | 45.8% | 196 | 1.1% | 20 | 1.3% | 10.2% | 9 | 0.8% | 45.0% |
| Other | 324 | 1.7% | 16 | 0.8% | 4.9% | 11 | 0.7% | 68.8% | 312 | 1.7% | 11 | 0.7% | 3.5% | 7 | 0.6% | 63.6% |
| Unknown | 1227 | 6.3% | 140 | 6.8% | 11.4% | 122 | 7.5% | 87.1% | 1063 | 5.8% | 83 | 5.4% | 7.8% | 70 | 6.0% | 84.3% |
| White | 8643 | 44.1% | 1055 | 51.1% | 12.2% | 840 | 51.7% | 79.6% | 7814 | 42.5% | 667 | 43.6% | 8.5% | 511 | 43.8% | 76.6% |
| Int'l Citz | 2566 | 13.1% | 146 | 7.1% | 5.7% | 127 | 7.8% | 87.0% | 2505 | 13.6% | 124 | 8.1% | 5.0% | 106 | 9.1% | 85.5% |
| Total | 19608 | | 2066 | | 10.5% | 1624 | | 78.6% | 18392 | | 1529 | | 8.3% | 1166 | | 76.3% |

### Class of 2007

| | Overall | | | | | | | | NLNA | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian Am | 4459 | 21.2% | 339 | 16.2% | 7.6% | 285 | 17.4% | 84.1% | 4397 | 22.2% | 317 | 19.5% | 7.2% | 265 | 21.7% | 83.6% |
| African Am | 1277 | 6.1% | 209 | 10.0% | 16.4% | 139 | 8.5% | 66.5% | 1227 | 6.2% | 184 | 11.3% | 15.0% | 119 | 9.7% | 64.7% |
| Hispanic Am | 1690 | 8.1% | 180 | 8.6% | 10.7% | 127 | 7.8% | 70.6% | 1658 | 8.4% | 166 | 10.2% | 10.0% | 117 | 9.6% | 70.5% |
| Nat Am/Nat HI | 217 | 1.1% | 20 | 1.0% | 9.2% | 12 | 0.7% | 60.0% | 212 | 1.1% | 19 | 1.2% | 9.0% | 11 | 0.9% | 57.9% |
| Other | 230 | 1.1% | 8 | 0.4% | 3.5% | 8 | 0.5% | 100.0% | 222 | 1.1% | 7 | 0.4% | 3.2% | 7 | 0.6% | 100.0% |
| Unknown | 1288 | 6.1% | 129 | 6.2% | 10.0% | 102 | 6.2% | 79.1% | 1148 | 5.8% | 78 | 4.8% | 6.8% | 58 | 4.7% | 74.4% |
| White | 8974 | 42.8% | 1049 | 50.1% | 11.7% | 824 | 50.4% | 78.6% | 8185 | 41.2% | 719 | 44.1% | 8.8% | 528 | 43.2% | 73.4% |
| Int'l Citz | 2852 | 13.6% | 161 | 7.7% | 5.6% | 138 | 8.4% | 85.7% | 2794 | 14.1% | 139 | 8.5% | 5.0% | 118 | 9.6% | 84.9% |
| Total | 20987 | | 2095 | | 10.0% | 1635 | | 78.0% | 19843 | | 1629 | | 8.2% | 1223 | | 75.1% |

### Class of 2008

| | Overall | | | | | | | | NLNA | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian Am | 4290 | 21.7% | 403 | 19.1% | 9.4% | 326 | 19.9% | 80.9% | 4233 | 22.7% | 378 | 23.3% | 8.9% | 305 | 25.1% | 80.7% |
| African Am | 1263 | 6.4% | 211 | 10.0% | 16.7% | 145 | 8.9% | 68.7% | 1210 | 6.5% | 183 | 11.3% | 15.1% | 120 | 9.9% | 65.6% |
| Hispanic Am | 1681 | 8.5% | 194 | 9.2% | 11.5% | 144 | 8.8% | 74.2% | 1648 | 8.8% | 182 | 11.2% | 11.0% | 133 | 10.9% | 73.1% |
| Nat Am/Nat HI | 189 | 1.0% | 19 | 0.9% | 10.1% | 18 | 1.1% | 94.7% | 183 | 1.0% | 16 | 1.0% | 8.7% | 15 | 1.2% | 93.8% |
| Other | 240 | 1.2% | 9 | 0.4% | 3.8% | 9 | 0.5% | 100.0% | 232 | 1.2% | 6 | 0.4% | 2.6% | 6 | 0.5% | 100.0% |
| Unknown | 1044 | 5.3% | 103 | 4.9% | 9.9% | 79 | 4.8% | 76.7% | 912 | 4.9% | 47 | 2.9% | 5.2% | 30 | 2.5% | 63.8% |
| White | 8195 | 41.5% | 994 | 47.1% | 12.1% | 767 | 46.8% | 77.2% | 7446 | 39.9% | 657 | 40.4% | 8.5% | 477 | 39.2% | 72.6% |
| Int'l Citz | 2850 | 14.4% | 177 | 8.4% | 6.2% | 150 | 9.2% | 84.7% | 2811 | 15.1% | 156 | 9.6% | 5.5% | 130 | 10.7% | 83.3% |
| Total | 19752 | | 2110 | | 10.7% | 1638 | | 77.6% | 18675 | | 1625 | | 8.7% | 1216 | | 74.8% |

NLNA - Old Methodology

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032514

**Applicants, Admits, and Matriculants - Old Methodology NLNA**

### Class of 2009

| | Overall | | | | | | | | NLNA | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian Am | 4804 | 21.1% | 371 | 17.6% | 7.7% | 304 | 18.5% | 81.9% | 4741 | 21.8% | 348 | 21.1% | 7.3% | 284 | 22.9% | 81.6% |
| African Am | 1716 | 7.5% | 221 | 10.5% | 12.9% | 153 | 9.3% | 69.2% | 1657 | 7.6% | 190 | 11.5% | 11.5% | 126 | 10.2% | 66.3% |
| Hispanic Am | 1906 | 8.4% | 173 | 8.2% | 9.1% | 120 | 7.3% | 69.4% | 1875 | 8.6% | 161 | 9.8% | 8.6% | 110 | 8.9% | 68.3% |
| Nat Am/Nat HI | 209 | 0.9% | 22 | 1.0% | 10.5% | 14 | 0.9% | 63.6% | 203 | 0.9% | 18 | 1.1% | 8.9% | 11 | 0.9% | 61.1% |
| Other | 344 | 1.5% | 10 | 0.5% | 2.9% | 8 | 0.5% | 80.0% | 336 | 1.5% | 9 | 0.5% | 2.7% | 7 | 0.6% | 77.8% |
| Unknown | 1940 | 8.5% | 165 | 7.8% | 8.5% | 123 | 7.5% | 74.5% | 1766 | 8.1% | 112 | 6.8% | 6.3% | 77 | 6.2% | 68.8% |
| White | 8492 | 37.3% | 957 | 45.5% | 11.3% | 763 | 46.5% | 79.7% | 7799 | 35.9% | 648 | 39.3% | 8.3% | 489 | 39.4% | 75.5% |
| Int'l Citz | 3385 | 14.8% | 183 | 8.7% | 5.4% | 155 | 9.5% | 84.7% | 3328 | 15.3% | 163 | 9.9% | 4.9% | 136 | 11.0% | 83.4% |
| Total | 22796 | | 2102 | | 9.2% | 1640 | | 78.0% | 21705 | | 1649 | | 7.6% | 1240 | | 75.2% |

### Class of 2010

| | Overall | | | | | | | | NLNA | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian Am | 4865 | 21.4% | 375 | 17.6% | 7.7% | 322 | 19.1% | 85.9% | 4812 | 22.3% | 353 | 21.7% | 7.3% | 302 | 24.3% | 85.6% |
| African Am | 1984 | 8.7% | 220 | 10.4% | 11.1% | 156 | 9.3% | 70.9% | 1916 | 8.9% | 188 | 11.6% | 9.8% | 129 | 10.4% | 68.6% |
| Hispanic Am | 2084 | 9.2% | 207 | 9.7% | 9.9% | 146 | 8.7% | 70.5% | 2039 | 9.4% | 186 | 11.4% | 9.1% | 126 | 10.2% | 67.7% |
| Nat Am/Nat HI | 253 | 1.1% | 30 | 1.4% | 11.9% | 20 | 1.2% | 66.7% | 245 | 1.1% | 24 | 1.5% | 9.8% | 15 | 1.2% | 62.5% |
| Other | 354 | 1.6% | 8 | 0.4% | 2.3% | 7 | 0.4% | 87.5% | 348 | 1.6% | 6 | 0.4% | 1.7% | 5 | 0.4% | 83.3% |
| Unknown | 2020 | 8.9% | 202 | 9.5% | 10.0% | 168 | 10.0% | 83.2% | 1847 | 8.5% | 128 | 7.9% | 6.9% | 104 | 8.4% | 81.3% |
| White | 7761 | 34.1% | 899 | 42.3% | 11.6% | 713 | 42.3% | 79.3% | 7033 | 32.5% | 583 | 35.9% | 8.3% | 433 | 34.9% | 74.3% |
| Int'l Citz | 3433 | 15.1% | 184 | 8.7% | 5.4% | 152 | 9.0% | 82.6% | 3385 | 15.7% | 157 | 9.7% | 4.6% | 127 | 10.2% | 80.9% |
| Total | 22754 | | 2125 | | 9.3% | 1684 | | 79.2% | 21625 | | 1625 | | 7.5% | 1241 | | 76.4% |

### Class of 2011

| | Overall | | | | | | | | NLNA | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian Am | 4803 | 20.9% | 411 | 19.5% | 8.6% | 336 | 20.3% | 81.8% | 4731 | 21.7% | 383 | 23.9% | 8.1% | 315 | 26.0% | 82.2% |
| African Am | 2052 | 8.9% | 221 | 10.5% | 10.8% | 144 | 8.7% | 65.2% | 1986 | 9.1% | 196 | 12.2% | 9.9% | 124 | 10.2% | 63.3% |
| Hispanic Am | 2180 | 9.5% | 208 | 9.9% | 9.5% | 149 | 9.0% | 71.6% | 2140 | 9.8% | 186 | 11.6% | 8.7% | 130 | 10.7% | 69.9% |
| Nat Am/Nat HI | 245 | 1.1% | 31 | 1.5% | 12.7% | 20 | 1.2% | 64.5% | 237 | 1.1% | 28 | 1.7% | 11.8% | 18 | 1.5% | 64.3% |
| Other | 302 | 1.3% | 6 | 0.3% | 2.0% | 6 | 0.4% | 100.0% | 297 | 1.4% | 5 | 0.3% | 1.7% | 5 | 0.4% | 100.0% |
| Unknown | 1854 | 8.1% | 200 | 9.5% | 10.8% | 159 | 9.6% | 79.5% | 1679 | 7.7% | 124 | 7.7% | 7.4% | 94 | 7.8% | 75.8% |
| White | 7659 | 33.4% | 838 | 39.8% | 10.9% | 678 | 40.9% | 80.9% | 6904 | 31.7% | 517 | 32.3% | 7.5% | 387 | 31.9% | 74.9% |
| Int'l Citz | 3860 | 16.8% | 193 | 9.2% | 5.0% | 167 | 10.1% | 86.5% | 3816 | 17.5% | 162 | 10.1% | 4.2% | 139 | 11.5% | 85.8% |
| Total | 22955 | | 2108 | | 9.2% | 1659 | | 78.7% | 21790 | | 1601 | | 7.3% | 1212 | | 75.7% |

NLNA - Old Methodology

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032515

## Applicants, Admits, and Matriculants - Old Methodology NLNA

### Class of 2012

| | Overall | | | | | | | | NLNA | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian Am | 5378 | 19.6% | 415 | 19.1% | 7.7% | 348 | 21.0% | 83.9% | 5295 | 20.1% | 382 | 22.6% | 7.2% | 320 | 26.3% | 83.8% |
| African Am | 2765 | 10.1% | 217 | 10.0% | 7.8% | 139 | 8.4% | 64.1% | 2705 | 10.3% | 192 | 11.4% | 7.1% | 117 | 9.6% | 60.9% |
| Hispanic Am | 2675 | 9.7% | 193 | 8.9% | 7.2% | 118 | 7.1% | 61.1% | 2633 | 10.0% | 176 | 10.4% | 6.7% | 105 | 8.6% | 59.7% |
| Nat Am/Nat HI | 261 | 1.0% | 25 | 1.1% | 9.6% | 16 | 1.0% | 64.0% | 257 | 1.0% | 24 | 1.4% | 9.3% | 15 | 1.2% | 62.5% |
| Other | 452 | 1.6% | 13 | 0.6% | 2.9% | 10 | 0.6% | 76.9% | 440 | 1.7% | 12 | 0.7% | 2.7% | 9 | 0.7% | 75.0% |
| Unknown | 2831 | 10.3% | 266 | 12.2% | 9.4% | 202 | 12.2% | 75.9% | 2627 | 10.0% | 179 | 10.6% | 6.8% | 125 | 10.3% | 69.8% |
| White | 8594 | 31.3% | 853 | 39.2% | 9.9% | 652 | 39.3% | 76.4% | 7920 | 30.1% | 566 | 33.5% | 7.1% | 389 | 31.9% | 68.7% |
| Int'l Citz | 4506 | 16.4% | 193 | 8.9% | 4.3% | 173 | 10.4% | 89.6% | 4441 | 16.9% | 157 | 9.3% | 3.5% | 139 | 11.4% | 88.5% |
| Total | 27462 | | 2175 | | 7.9% | 1658 | | 76.2% | 26318 | | 1688 | | 6.4% | 1219 | | 72.2% |

### Class of 2013

| | Overall | | | | | | | | NLNA | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian Am | 5784 | 19.9% | 380 | 17.5% | 6.6% | 317 | 19.1% | 83.4% | 5702 | 20.4% | 342 | 20.4% | 6.0% | 282 | 23.2% | 82.5% |
| African Am | 2975 | 10.2% | 226 | 10.4% | 7.6% | 159 | 9.6% | 70.4% | 2914 | 10.4% | 198 | 11.8% | 6.8% | 133 | 11.0% | 67.2% |
| Hispanic Am | 2974 | 10.2% | 231 | 10.6% | 7.8% | 152 | 9.1% | 65.8% | 2932 | 10.5% | 213 | 12.7% | 7.3% | 137 | 11.3% | 64.3% |
| Nat Am/Nat HI | 267 | 0.9% | 28 | 1.3% | 10.5% | 17 | 1.0% | 60.7% | 257 | 0.9% | 24 | 1.4% | 9.3% | 13 | 1.1% | 54.2% |
| Other | 463 | 1.6% | 9 | 0.4% | 1.9% | 7 | 0.4% | 77.8% | 454 | 1.6% | 5 | 0.3% | 1.1% | 3 | 0.2% | 60.0% |
| Unknown | 2997 | 10.3% | 266 | 12.2% | 8.9% | 203 | 12.2% | 76.3% | 2768 | 9.9% | 172 | 10.2% | 6.2% | 121 | 10.0% | 70.3% |
| White | 9190 | 31.6% | 837 | 38.5% | 9.1% | 641 | 38.5% | 76.6% | 8529 | 30.5% | 551 | 32.8% | 6.5% | 380 | 31.3% | 69.0% |
| Int'l Citz | 4464 | 15.3% | 198 | 9.1% | 4.4% | 167 | 10.0% | 84.3% | 4424 | 15.8% | 175 | 10.4% | 4.0% | 144 | 11.9% | 82.3% |
| Total | 29114 | | 2175 | | 7.5% | 1663 | | 76.5% | 27980 | | 1680 | | 6.0% | 1213 | | 72.2% |

### Class of 2014

| | Overall | | | | | | | | NLNA | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian Am | 6872 | 22.5% | 437 | 19.8% | 6.4% | 359 | 21.6% | 82.2% | 6778 | 23.1% | 404 | 23.4% | 6.0% | 332 | 26.9% | 82.2% |
| African Am | 2953 | 9.7% | 244 | 11.1% | 8.3% | 156 | 9.4% | 63.9% | 2887 | 9.8% | 215 | 12.5% | 7.4% | 128 | 10.4% | 59.5% |
| Hispanic Am | 3037 | 10.0% | 195 | 8.8% | 6.4% | 127 | 7.6% | 65.1% | 2991 | 10.2% | 177 | 10.3% | 5.9% | 112 | 9.1% | 63.3% |
| Nat Am/Nat HI | 367 | 1.2% | 38 | 1.7% | 10.4% | 25 | 1.5% | 65.8% | 364 | 1.2% | 38 | 2.2% | 10.4% | 25 | 2.0% | 65.8% |
| Other | 40 | 0.1% | 2 | 0.1% | 5.0% | 1 | 0.1% | 50.0% | 36 | 0.1% | 1 | 0.1% | 2.8% | 1 | 0.1% | 100.0% |
| Unknown | 740 | 2.4% | 90 | 4.1% | 12.2% | 78 | 4.7% | 86.7% | 673 | 2.3% | 56 | 3.3% | 8.3% | 46 | 3.7% | 82.1% |
| White | 11474 | 37.6% | 1005 | 45.6% | 8.8% | 758 | 45.6% | 75.4% | 10659 | 36.3% | 666 | 38.7% | 6.2% | 460 | 37.2% | 69.1% |
| Int'l Citz | 5006 | 16.4% | 194 | 8.8% | 3.9% | 160 | 9.6% | 82.5% | 4952 | 16.9% | 166 | 9.6% | 3.4% | 132 | 10.7% | 79.5% |
| Total | 30489 | | 2205 | | 7.2% | 1664 | | 75.5% | 29340 | | 1723 | | 5.9% | 1236 | | 71.7% |

NLNA - Old Methodology

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032516

## Applicants, Admits, and Matriculants - Old Methodology NLNA

### Class of 2015

| | Overall | | | | | | | | NLNA | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian Am | 7767 | 22.2% | 423 | 19.3% | 5.4% | 346 | 20.8% | 81.8% | 7666 | 22.7% | 378 | 22.1% | 4.9% | 308 | 25.0% | 81.5% |
| African Am | 3624 | 10.4% | 254 | 11.6% | 7.0% | 162 | 9.8% | 63.8% | 3559 | 10.5% | 228 | 13.3% | 6.4% | 140 | 11.4% | 61.4% |
| Hispanic Am | 3613 | 10.3% | 242 | 11.1% | 6.7% | 153 | 9.2% | 63.2% | 3552 | 10.5% | 214 | 12.5% | 6.0% | 126 | 10.2% | 58.9% |
| Nat Am/Nat HI | 318 | 0.9% | 25 | 1.1% | 7.9% | 19 | 1.1% | 76.0% | 314 | 0.9% | 23 | 1.3% | 7.3% | 17 | 1.4% | 73.9% |
| Other | 18 | 0.1% | 3 | 0.1% | 16.7% | 3 | 0.2% | 100.0% | 16 | 0.0% | 2 | 0.1% | 12.5% | 2 | 0.2% | 100.0% |
| Unknown | 1174 | 3.4% | 79 | 3.6% | 6.7% | 66 | 4.0% | 83.5% | 1101 | 3.3% | 52 | 3.0% | 4.7% | 44 | 3.6% | 84.6% |
| White | 12422 | 35.5% | 942 | 43.1% | 7.6% | 718 | 43.2% | 76.2% | 11659 | 34.5% | 621 | 36.4% | 5.3% | 431 | 35.0% | 69.4% |
| Int'l Citz | 6014 | 17.2% | 220 | 10.1% | 3.7% | 194 | 11.7% | 88.2% | 5961 | 17.6% | 190 | 11.1% | 3.2% | 165 | 13.4% | 86.8% |
| Total | 34950 | | 2188 | | 6.3% | 1661 | | 75.9% | 33828 | | 1708 | | 5.0% | 1233 | | 72.2% |

### Class of 2016

| | Overall | | | | | | | | NLNA | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian Am | 7011 | 20.4% | 422 | 20.3% | 6.0% | 369 | 22.2% | 87.4% | 6904 | 20.8% | 369 | 23.1% | 5.3% | 319 | 26.1% | 86.4% |
| African Am | 3342 | 9.7% | 208 | 10.0% | 6.2% | 154 | 9.3% | 74.0% | 3271 | 9.9% | 186 | 11.7% | 5.7% | 134 | 10.9% | 72.0% |
| Hispanic Am | 3464 | 10.1% | 194 | 9.3% | 5.6% | 130 | 7.8% | 67.0% | 3409 | 10.3% | 174 | 10.9% | 5.1% | 111 | 9.1% | 63.8% |
| Nat Am/Nat HI | 346 | 1.0% | 23 | 1.1% | 6.6% | 12 | 0.7% | 52.2% | 336 | 1.0% | 22 | 1.4% | 6.5% | 11 | 0.9% | 50.0% |
| Other | 2 | 0.0% | 1 | 0.0% | 50.0% | 1 | 0.1% | 100.0% | 0 | 0.0% | 0 | 0.0% | 0.0% | 0 | 0.0% | 0.0% |
| Unknown | 2464 | 7.2% | 161 | 7.8% | 6.5% | 119 | 7.2% | 73.9% | 2350 | 7.1% | 120 | 7.5% | 5.1% | 84 | 6.9% | 70.0% |
| White | 11346 | 33.1% | 851 | 41.0% | 7.5% | 694 | 41.7% | 81.6% | 10591 | 32.0% | 540 | 33.9% | 5.1% | 411 | 33.6% | 76.1% |
| Int'l Citz | 6328 | 18.4% | 216 | 10.4% | 3.4% | 185 | 11.1% | 85.6% | 6266 | 18.9% | 184 | 11.5% | 2.9% | 154 | 12.6% | 83.7% |
| Total | 34303 | | 2076 | | 6.1% | 1664 | | 80.2% | 33127 | | 1595 | | 4.8% | 1224 | | 76.7% |

### Class of 2017

| | Overall | | | | | | | | NLNA | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian Am | 7133 | 20.4% | 400 | 19.5% | 5.6% | 338 | 20.4% | 84.5% | 7021 | 20.7% | 347 | 22.7% | 4.9% | 290 | 24.3% | 83.6% |
| African Am | 3440 | 9.8% | 233 | 11.4% | 6.8% | 156 | 9.4% | 67.0% | 3363 | 9.9% | 190 | 12.5% | 5.6% | 119 | 10.0% | 62.6% |
| Hispanic Am | 3514 | 10.0% | 213 | 10.4% | 6.1% | 156 | 9.4% | 73.2% | 3460 | 10.2% | 187 | 12.3% | 5.4% | 131 | 11.0% | 70.1% |
| Nat Am/Nat HI | 356 | 1.0% | 30 | 1.5% | 8.4% | 23 | 1.4% | 76.7% | 345 | 1.0% | 26 | 1.7% | 7.5% | 20 | 1.7% | 76.9% |
| Other | 1 | 0.0% | 0 | 0.0% | 0.0% | 0 | 0.0% | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0% | 0 | 0.0% | 0.0% |
| Unknown | 2747 | 7.8% | 167 | 8.2% | 6.1% | 140 | 8.4% | 83.8% | 2633 | 7.8% | 119 | 7.8% | 4.5% | 98 | 8.2% | 82.4% |
| White | 11415 | 32.6% | 794 | 38.8% | 7.0% | 661 | 39.8% | 83.2% | 10690 | 31.6% | 480 | 31.5% | 4.5% | 379 | 31.8% | 79.0% |
| Int'l Citz | 6417 | 18.3% | 210 | 10.3% | 3.3% | 185 | 11.2% | 88.1% | 6357 | 18.8% | 177 | 11.6% | 2.8% | 154 | 12.9% | 87.0% |
| Total | 35023 | | 2047 | | 5.8% | 1659 | | 81.0% | 33869 | | 1526 | | 4.5% | 1191 | | 78.0% |

NLNA - Old Methodology

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032517

| SAT Averages - Old Methodolgy | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Class of 2000 | | | Class of 2001 | | | Class of 2002 | | |
| | Apps | Admits | Matrics | Apps | Admits | Matrics | Apps | Admits | Matrics |
| Asian Am | 717 | 763 | 762 | 718 | 762 | 761 | 720 | 767 | 765 |
| African Am | 627 | 693 | 692 | 630 | 696 | 693 | 630 | 692 | 690 |
| Hispanic Am | 647 | 717 | 720 | 645 | 701 | 700 | 647 | 714 | 714 |
| Nat Am/Nat HI | 646 | 719 | 698 | 648 | 707 | 702 | 653 | 712 | 711 |
| Other | 672 | 746 | 741 | 677 | 737 | 731 | 681 | 759 | 758 |
| Unknown | 711 | 747 | 745 | 708 | 747 | 744 | 703 | 744 | 744 |
| White | 703 | 739 | 737 | 701 | 738 | 736 | 708 | 743 | 740 |
| Int'l Citz | 652 | 705 | 698 | 648 | 698 | 695 | 656 | 697 | 697 |
| Total | 692 | 737 | 735 | 690 | 734 | 732 | 694 | 738 | 736 |

| | Class of 2003 | | | Class of 2004 | | | Class of 2005 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Apps | Admits | Matrics | Apps | Admits | Matrics | Apps | Admits | Matrics |
| Asian Am | 723 | 769 | 768 | 724 | 771 | 768 | 720 | 764 | 764 |
| African Am | 633 | 698 | 693 | 630 | 705 | 702 | 630 | 696 | 693 |
| Hispanic Am | 652 | 712 | 707 | 653 | 719 | 720 | 650 | 703 | 702 |
| Nat Am/Nat HI | 650 | 696 | 690 | 655 | 690 | 690 | 661 | 714 | 713 |
| Other | 681 | 744 | 737 | 678 | 743 | 743 | 676 | 708 | 702 |
| Unknown | 699 | 738 | 736 | 710 | 740 | 739 | 707 | 742 | 738 |
| White | 711 | 747 | 743 | 711 | 745 | 744 | 710 | 741 | 739 |
| Int'l Citz | 658 | 702 | 702 | 660 | 703 | 698 | 657 | 712 | 708 |
| Total | 696 | 739 | 737 | 697 | 739 | 739 | 695 | 735 | 733 |

| | Class of 2006 | | | Class of 2007 | | | Class of 2008 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Apps | Admits | Matrics | Apps | Admits | Matrics | Apps | Admits | Matrics |
| Asian Am | 721 | 767 | 766 | 727 | 769 | 768 | 730 | 768 | 768 |
| African Am | 628 | 706 | 703 | 633 | 697 | 696 | 636 | 708 | 705 |
| Hispanic Am | 651 | 716 | 709 | 656 | 720 | 720 | 659 | 720 | 721 |
| Nat Am/Nat HI | 645 | 713 | 696 | 654 | 714 | 713 | 679 | 715 | 715 |
| Other | 674 | 720 | 719 | 666 | 741 | 741 | 680 | 745 | 745 |
| Unknown | 696 | 735 | 732 | 701 | 727 | 721 | 698 | 728 | 720 |
| White | 712 | 745 | 741 | 718 | 750 | 745 | 720 | 748 | 743 |
| Int'l Citz | 666 | 717 | 715 | 673 | 712 | 710 | 676 | 721 | 718 |
| Total | 697 | 740 | 737 | 703 | 740 | 738 | 704 | 742 | 739 |

| | Class of 2009 | | | Class of 2010 | | | Class of 2011 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Apps | Admits | Matrics | Apps | Admits | Matrics | Apps | Admits | Matrics |
| Asian Am | 730 | 767 | 765 | 727 | 764 | 763 | 728 | 768 | 768 |
| African Am | 630 | 707 | 702 | 613 | 697 | 692 | 611 | 708 | 706 |
| Hispanic Am | 654 | 719 | 715 | 650 | 716 | 712 | 644 | 716 | 710 |
| Nat Am/Nat HI | 656 | 702 | 697 | 658 | 702 | 700 | 652 | 711 | 705 |
| Other | 676 | 757 | 759 | 658 | 731 | 728 | 666 | 740 | 740 |
| Unknown | 719 | 748 | 742 | 713 | 749 | 746 | 719 | 745 | 738 |
| White | 718 | 749 | 745 | 712 | 744 | 739 | 712 | 743 | 739 |
| Int'l Citz | 678 | 717 | 714 | 674 | 719 | 715 | 677 | 718 | 716 |
| Total | 703 | 742 | 739 | 696 | 738 | 735 | 695 | 739 | 737 |

SAT Averages - Old Methodology

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032518

**JA5472**

DX042.0010

|  | Class of 2012 | | | Class of 2013 | | | Class of 2014 | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Apps | Admits | Matrics | Apps | Admits | Matrics | Apps | Admits | Matrics |
| Asian Am | 726 | 765 | 764 | 730 | 766 | 765 | 733 | 769 | 768 |
| African Am | 603 | 702 | 696 | 605 | 705 | 698 | 616 | 711 | 702 |
| Hispanic Am | 643 | 724 | 713 | 647 | 718 | 711 | 649 | 725 | 721 |
| Nat Am/Nat HI | 639 | 711 | 705 | 670 | 705 | 705 | 663 | 734 | 728 |
| Other | 668 | 721 | 712 | 677 | 747 | 744 | 648 | 720 | 700 |
| Unknown | 717 | 753 | 749 | 724 | 754 | 749 | 707 | 739 | 735 |
| White | 713 | 746 | 740 | 715 | 743 | 737 | 719 | 747 | 741 |
| Int'l Citz | 677 | 710 | 708 | 678 | 719 | 719 | 688 | 719 | 717 |
| Total | 693 | 740 | 737 | 696 | 739 | 736 | 701 | 742 | 739 |

|  | Class of 2015 | | | Class of 2016 | | | Class of 2017 | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Apps | Admits | Matrics | Apps | Admits | Matrics | Apps | Admits | Matrics |
| Asian Am | 732 | 765 | 763 | 733 | 767 | 766 | 733 | 768 | 766 |
| African Am | 614 | 713 | 705 | 611 | 716 | 710 | 620 | 717 | 708 |
| Hispanic Am | 647 | 724 | 717 | 646 | 725 | 719 | 652 | 727 | 725 |
| Nat Am/Nat HI | 672 | 727 | 732 | 666 | 724 | 727 | 668 | 725 | 721 |
| Other | 681 | 703 | 703 | NA | | | NA | | |
| Unknown | 701 | 733 | 728 | 725 | 758 | 754 | 732 | 758 | 755 |
| White | 716 | 745 | 739 | 713 | 746 | 742 | 717 | 746 | 742 |
| Int'l Citz | 682 | 722 | 719 | 684 | 724 | 720 | 686 | 731 | 730 |
| Total | 696 | 740 | 736 | 697 | 744 | 741 | 700 | 744 | 742 |

SAT Averages - Old Methodology

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032519

**JA5473**

DX042.0011

**Demographic Makeup of Applicants, Admits, and Matrics - New Methodology vs IPEDS**

| New Methodology | Class of 2014 | | Class of 2015 | | Class of 2016 | | Class of 2017 | |
|---|---|---|---|---|---|---|---|---|
| **Applicants** | 30489 | % Apps | 34950 | % Apps | 34303 | % Apps | 35023 | % Apps |
| Asian American | 6449 | 21.2% | 7310 | 20.9% | 7082 | 20.6% | 7244 | 20.7% |
| African American | 2925 | 9.6% | 3604 | 10.3% | 3339 | 9.7% | 3439 | 9.8% |
| Hispanic American | 3434 | 11.3% | 3981 | 11.4% | 3905 | 11.4% | 3969 | 11.3% |
| Native American | 614 | 2.0% | 605 | 1.7% | 626 | 1.8% | 685 | 2.0% |
| Native Hawaiian | 98 | 0.3% | 89 | 0.3% | 96 | 0.3% | 109 | 0.3% |
| Multiracial | 3403 | 11.2% | 3977 | 11.4% | 3883 | 11.3% | 4240 | 12.1% |
| White | 13202 | 43.3% | 14895 | 42.6% | 14636 | 42.7% | 15056 | 43.0% |
| Unknown | 2489 | 8.2% | 2782 | 8.0% | 2518 | 7.3% | 2757 | 7.9% |
| Foreign Citizens | 5006 | 16.4% | 6014 | 17.2% | 6328 | 18.4% | 6417 | 18.3% |

| Admits | Class of 2014 | | | Class of 2015 | | | Class of 2016 | | | Class of 2017 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | % Admits | Ad Rate | | % Admits | Ad Rate | | % Admits | Ad Rate | | % Admits | Ad Rate |
| **Admits** | 2205 | | 7.2% | 2188 | | 6.3% | 2076 | | 6.1% | 2047 | | 5.8% |
| Asian American | 394 | 17.9% | 6.1% | 385 | 17.6% | 5.3% | 425 | 20.5% | 6.0% | 407 | 19.9% | 5.6% |
| African American | 242 | 11.0% | 8.3% | 253 | 11.6% | 7.0% | 208 | 10.0% | 6.2% | 233 | 11.4% | 6.8% |
| Hispanic American | 221 | 10.0% | 6.4% | 264 | 12.1% | 6.6% | 231 | 11.1% | 5.9% | 235 | 11.5% | 5.9% |
| Native American | 57 | 2.6% | 9.3% | 40 | 1.8% | 6.6% | 35 | 1.7% | 5.6% | 45 | 2.2% | 6.6% |
| Native Hawaiian | 10 | 0.5% | 10.2% | 4 | 0.2% | 4.5% | 10 | 0.5% | 10.4% | 11 | 0.5% | 10.1% |
| Multiracial | 256 | 11.6% | 7.5% | 278 | 12.7% | 7.0% | 271 | 13.1% | 7.0% | 313 | 15.3% | 7.4% |
| White | 1052 | 47.7% | 8.0% | 1082 | 49.5% | 7.3% | 1077 | 51.9% | 7.4% | 1077 | 52.6% | 7.2% |
| Unknown | 319 | 14.5% | 12.8% | 241 | 11.0% | 8.7% | 171 | 8.2% | 6.8% | 167 | 8.2% | 6.1% |
| Foreign Citizens | 194 | 8.8% | 3.9% | 220 | 10.1% | 3.7% | 216 | 10.4% | 3.4% | 210 | 10.3% | 3.3% |

| Matrics | Class of 2014 | | | Class of 2015 | | | Class of 2016 | | | Class of 2017 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | % Matrics | Yield | | % Matrics | Yield | | % Matrics | Yield | | % Matrics | Yield |
| **Matrics** | 1664 | | 75.5% | 1661 | | 75.9% | 1664 | | 80.2% | 1659 | | 81.0% |
| Asian American | 321 | 19.3% | 81.5% | 311 | 18.7% | 80.8% | 372 | 22.4% | 87.5% | 341 | 20.6% | 83.8% |
| African American | 154 | 9.3% | 63.6% | 162 | 9.8% | 64.0% | 154 | 9.3% | 74.0% | 156 | 9.4% | 67.0% |
| Hispanic American | 145 | 8.7% | 65.6% | 169 | 10.2% | 64.0% | 154 | 9.3% | 66.7% | 167 | 10.1% | 71.1% |
| Native American | 36 | 2.2% | 63.2% | 25 | 1.5% | 62.5% | 19 | 1.1% | 54.3% | 30 | 1.8% | 66.7% |
| Native Hawaiian | 6 | 0.4% | 60.0% | 3 | 0.2% | 75.0% | 9 | 0.5% | 90.0% | 9 | 0.5% | 81.8% |
| Multiracial | 163 | 9.8% | 63.7% | 189 | 11.4% | 68.0% | 194 | 11.7% | 71.6% | 227 | 13.7% | 72.5% |
| White | 760 | 45.7% | 72.2% | 801 | 48.2% | 74.0% | 853 | 51.3% | 79.2% | 871 | 52.5% | 80.9% |
| Unknown | 263 | 15.8% | 82.4% | 196 | 11.8% | 81.3% | 128 | 7.7% | 74.9% | 140 | 8.4% | 83.8% |
| Foreign Citizens | 160 | 9.6% | 82.5% | 194 | 11.7% | 88.2% | 185 | 11.1% | 85.6% | 185 | 11.2% | 88.1% |

New Methodology vs IPEDS

Page 1 of 2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032520

**JA5474**

DX042.0012

**Demographic Makeup of Applicants, Admits, and Matrics - New Methodology vs IPEDS**

| IPEDS | Class of 2014 | | | Class of 2015 | | | Class of 2016 | | | Class of 2017 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Applicants** | 30489 | % Apps | | 34950 | % Apps | | 34303 | % Apps | | 35023 | % Apps | |
| Asian American | 5415 | 17.8% | | 6146 | 17.6% | | 6045 | 17.6% | | 6138 | 17.5% | |
| African American | 2316 | 7.6% | | 2879 | 8.2% | | 2646 | 7.7% | | 2688 | 7.7% | |
| Hispanic American | 3434 | 11.3% | | 4065 | 11.6% | | 3905 | 11.4% | | 3969 | 11.3% | |
| Native American | 125 | 0.4% | | 88 | 0.3% | | 104 | 0.3% | | 90 | 0.3% | |
| Native Hawaiian | 22 | 0.1% | | 18 | 0.1% | | 22 | 0.1% | | 24 | 0.1% | |
| Multiracial | 1350 | 4.4% | | 1549 | 4.4% | | 1415 | 4.1% | | 1528 | 4.4% | |
| White | 10332 | 33.9% | | 11445 | 32.7% | | 11320 | 33.0% | | 11412 | 32.6% | |
| Unknown | 2489 | 8.2% | | 2746 | 7.9% | | 2518 | 7.3% | | 2757 | 7.9% | |
| Foreign Citizens | 5006 | 16.4% | | 6014 | 17.2% | | 6328 | 18.4% | | 6417 | 18.3% | |
|  | | % Admits | Ad Rate | | % Admits | Ad Rate | | % Admits | Ad Rate | | % Admits | Ad Rate |
| **Admits** | 2205 | | 7.2% | 2188 | | 6.3% | 2076 | | 6.1% | 2047 | | 5.8% |
| Asian American | 332 | 15.1% | 6.1% | 311 | 14.2% | 5.1% | 350 | 16.9% | 5.8% | 322 | 15.7% | 5.2% |
| African American | 172 | 7.8% | 7.4% | 188 | 8.6% | 6.5% | 147 | 7.1% | 5.6% | 172 | 8.4% | 6.4% |
| Hispanic American | 221 | 10.0% | 6.4% | 268 | 12.2% | 6.6% | 231 | 11.1% | 5.9% | 235 | 11.5% | 5.9% |
| Native American | 12 | 0.5% | 9.6% | 7 | 0.3% | 8.0% | 8 | 0.4% | 7.7% | 8 | 0.4% | 8.9% |
| Native Hawaiian | 1 | 0.0% | 4.5% | 1 | 0.0% | 5.6% | 0 | 0.0% | 0.0% | 7 | 0.3% | 29.2% |
| Multiracial | 123 | 5.6% | 9.1% | 120 | 5.5% | 7.7% | 108 | 5.2% | 7.6% | 131 | 6.4% | 8.6% |
| White | 831 | 37.7% | 8.0% | 835 | 38.2% | 7.3% | 845 | 40.7% | 7.5% | 795 | 38.8% | 7.0% |
| Unknown | 319 | 14.5% | 12.8% | 238 | 10.9% | 8.7% | 171 | 8.2% | 6.8% | 167 | 8.2% | 6.1% |
| Foreign Citizens | 194 | 8.8% | 3.9% | 220 | 10.1% | 3.7% | 216 | 10.4% | 3.4% | 210 | 10.3% | 3.3% |
|  | | % Matrics | Yield | | % Matrics | Yield | | % Matrics | Yield | | % Matrics | Yield |
| **Matrics** | 1664 | | 75.5% | 1661 | | 75.9% | 1664 | | 80.2% | 1659 | | 81.0% |
| Asian American | 280 | 16.8% | 84.3% | 253 | 15.2% | 81.4% | 311 | 18.7% | 88.9% | 277 | 16.7% | 86.0% |
| African American | 106 | 6.4% | 61.6% | 121 | 7.3% | 64.4% | 111 | 6.7% | 75.5% | 122 | 7.4% | 70.9% |
| Hispanic American | 145 | 8.7% | 65.6% | 172 | 10.4% | 64.2% | 185 | 11.1% | 80.1% | 164 | 9.9% | 69.8% |
| Native American | 9 | 0.5% | 75.0% | 4 | 0.2% | 57.1% | 3 | 0.2% | 37.5% | 6 | 0.4% | 75.0% |
| Native Hawaiian | 0 | 0.0% | 0.0% | 1 | 0.1% | 100.0% | 0 | 0.0% | #DIV/0! | 6 | 0.4% | 85.7% |
| Multiracial | 82 | 4.9% | 66.7% | 89 | 5.4% | 74.2% | 84 | 5.0% | 77.8% | 95 | 5.7% | 72.5% |
| White | 619 | 37.2% | 74.5% | 634 | 38.2% | 75.9% | 688 | 41.3% | 81.4% | 661 | 39.8% | 83.1% |
| Unknown | 263 | 15.8% | 82.4% | 193 | 11.6% | 81.1% | 128 | 7.7% | 74.9% | 140 | 8.4% | 83.8% |
| Foreign Citizens | 160 | 9.6% | 82.5% | 194 | 11.7% | 88.2% | 185 | 11.1% | 85.6% | 185 | 11.2% | 88.1% |

New Methodology vs IPEDS

Page 2 of 2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032521

**JA5475**

DX042.0013

**Applicants, Admits, and Matriculants - New Methodology NLNA**

**Class of 2014**

| | Overall | | | | | | | | NLNA | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian American | 6449 | 21.2% | 394 | 17.9% | 6.1% | 321 | 19.3% | 81.5% | 6363 | 21.7% | 368 | 21.4% | 5.8% | 300 | 24.3% | 81.5% |
| African American | 2925 | 9.6% | 242 | 11.0% | 8.3% | 154 | 9.3% | 63.6% | 2861 | 9.8% | 214 | 12.4% | 7.5% | 128 | 10.4% | 59.8% |
| Hispanic American | 3434 | 11.3% | 221 | 10.0% | 6.4% | 145 | 8.7% | 65.6% | 3377 | 11.5% | 200 | 11.6% | 5.9% | 128 | 10.4% | 64.0% |
| Native American | 614 | 2.0% | 57 | 2.6% | 9.3% | 36 | 2.2% | 63.2% | 604 | 2.1% | 51 | 3.0% | 8.4% | 31 | 2.5% | 60.8% |
| Native Hawaiian | 98 | 0.3% | 10 | 0.5% | 10.2% | 6 | 0.4% | 60.0% | 95 | 0.3% | 10 | 0.6% | 10.5% | 6 | 0.5% | 60.0% |
| Multiracial | 3403 | 11.2% | 256 | 11.6% | 7.5% | 163 | 9.8% | 63.7% | 3308 | 11.3% | 219 | 12.7% | 6.6% | 134 | 10.8% | 61.2% |
| White | 13202 | 43.3% | 1052 | 47.7% | 8.0% | 760 | 45.7% | 72.2% | 12422 | 42.3% | 741 | 43.0% | 6.0% | 491 | 39.7% | 66.3% |
| Unknown | 2489 | 8.2% | 319 | 14.5% | 12.8% | 263 | 15.8% | 82.4% | 2288 | 7.8% | 215 | 12.5% | 9.4% | 169 | 13.7% | 78.6% |
| Foreign Citizens | 5006 | 16.4% | 194 | 8.8% | 3.9% | 160 | 9.6% | 82.5% | 4952 | 16.9% | 166 | 9.6% | 3.4% | 132 | 10.7% | 79.5% |
| Total | 30489 | | 2205 | | 7.2% | 1664 | | 75.5% | 29340 | | 1723 | | 5.9% | 1236 | | 71.7% |

**Class of 2015**

| | Overall | | | | | | | | NLNA | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian American | 7310 | 20.9% | 385 | 17.6% | 5.3% | 311 | 18.7% | 80.8% | 7211 | 21.3% | 342 | 20.0% | 4.7% | 276 | 22.4% | 80.7% |
| African American | 3604 | 10.3% | 253 | 11.6% | 7.0% | 162 | 9.8% | 64.0% | 3539 | 10.5% | 227 | 13.3% | 6.4% | 140 | 11.4% | 61.7% |
| Hispanic American | 3981 | 11.4% | 264 | 12.1% | 6.6% | 169 | 10.2% | 64.0% | 3906 | 11.5% | 229 | 13.4% | 5.9% | 135 | 10.9% | 59.0% |
| Native American | 605 | 1.7% | 40 | 1.8% | 6.6% | 25 | 1.5% | 62.5% | 595 | 1.8% | 36 | 2.1% | 6.1% | 21 | 1.7% | 58.3% |
| Native Hawaiian | 89 | 0.3% | 4 | 0.2% | 4.5% | 3 | 0.2% | 75.0% | 88 | 0.3% | 3 | 0.2% | 3.4% | 2 | 0.2% | 66.7% |
| Multiracial | 3977 | 11.4% | 278 | 12.7% | 7.0% | 189 | 11.4% | 68.0% | 3845 | 11.4% | 222 | 13.0% | 5.8% | 140 | 11.4% | 63.1% |
| White | 14895 | 42.6% | 1082 | 49.5% | 7.3% | 801 | 48.2% | 74.0% | 14079 | 41.6% | 750 | 43.9% | 5.3% | 505 | 41.0% | 67.3% |
| Unknown | 2782 | 8.0% | 241 | 11.0% | 8.7% | 196 | 11.8% | 81.3% | 2636 | 7.8% | 171 | 10.0% | 6.5% | 136 | 11.0% | 79.5% |
| Foreign Citizens | 6014 | 17.2% | 220 | 10.1% | 3.7% | 194 | 11.7% | 88.2% | 5961 | 17.6% | 190 | 11.1% | 3.2% | 165 | 13.4% | 86.8% |
| Total | 34950 | | 2188 | | 6.3% | 1661 | | 75.9% | 33828 | | 1708 | | 5.0% | 1233 | | 72.2% |

**Class of 2016**

| | Overall | | | | | | | | NLNA | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian American | 7082 | 20.6% | 425 | 20.5% | 6.0% | 372 | 22.4% | 87.5% | 6973 | 21.0% | 370 | 23.2% | 5.3% | 320 | 26.1% | 86.5% |
| African American | 3339 | 9.7% | 208 | 10.0% | 6.2% | 154 | 9.3% | 74.0% | 3268 | 9.9% | 185 | 11.7% | 5.7% | 134 | 10.9% | 72.0% |
| Hispanic American | 3905 | 11.4% | 231 | 11.1% | 5.9% | 154 | 9.3% | 66.7% | 3839 | 11.6% | 208 | 13.0% | 5.4% | 133 | 10.9% | 63.9% |
| Native American | 626 | 1.8% | 35 | 1.7% | 5.6% | 19 | 1.1% | 54.3% | 612 | 1.8% | 34 | 2.1% | 5.6% | 19 | 1.6% | 55.9% |
| Native Hawaiian | 96 | 0.3% | 10 | 0.5% | 10.4% | 9 | 0.5% | 90.0% | 92 | 0.3% | 9 | 0.6% | 9.8% | 8 | 0.7% | 88.9% |
| Multiracial | 3883 | 11.3% | 271 | 13.1% | 7.0% | 194 | 11.7% | 71.6% | 3754 | 11.3% | 213 | 13.7% | 5.8% | 146 | 11.9% | 67.0% |
| White | 14636 | 42.7% | 1077 | 51.9% | 7.4% | 853 | 51.3% | 79.2% | 13768 | 41.6% | 720 | 45.1% | 5.2% | 529 | 43.2% | 73.5% |
| Unknown | 2518 | 7.3% | 171 | 8.2% | 6.8% | 128 | 7.7% | 74.9% | 2399 | 7.2% | 126 | 7.9% | 5.3% | 89 | 7.3% | 70.6% |
| Foreign Citizens | 6328 | 18.4% | 216 | 10.4% | 3.4% | 185 | 11.1% | 85.6% | 6266 | 18.9% | 184 | 11.5% | 2.9% | 154 | 12.6% | 83.7% |
| Total | 34303 | | 2076 | | 6.1% | 1664 | | 80.2% | 33127 | | 1595 | | 4.8% | 1224 | | 76.7% |

New Methodology - NLNA

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00032522

**JA5476**

DX042.0014

Applicants, Admits, and Matriculants - New Methodology NLNA

Class of 2017

|  | Overall | | | | | | | Class of 2017 NLNA | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield | Apps | % Apps | Admits | % Admits | Ad Rate | Matrics | % Class | Yield |
| Asian American | 7244 | 20.7% | 407 | 19.9% | 5.6% | 341 | 20.6% | 83.8% | 7131 | 21.1% | 353 | 23.1% | 5.0% | 292 | 24.5% | 82.7% |
| African American | 3439 | 9.8% | 233 | 11.4% | 6.8% | 156 | 9.4% | 67.0% | 3362 | 9.9% | 190 | 12.5% | 5.7% | 119 | 10.0% | 62.6% |
| Hispanic American | 3969 | 11.3% | 235 | 11.5% | 5.9% | 167 | 10.1% | 71.1% | 3909 | 11.5% | 206 | 13.5% | 5.3% | 141 | 11.8% | 68.4% |
| Native American | 685 | 2.0% | 45 | 2.2% | 6.6% | 30 | 1.8% | 66.7% | 670 | 2.0% | 39 | 2.6% | 5.8% | 25 | 2.1% | 64.1% |
| Native Hawaiian | 109 | 0.3% | 11 | 0.5% | 10.1% | 9 | 0.5% | 81.8% | 106 | 0.3% | 11 | 0.7% | 10.4% | 9 | 0.8% | 81.8% |
| Multiracial | 4240 | 12.1% | 313 | 15.3% | 7.4% | 227 | 13.7% | 72.5% | 4094 | 12.1% | 236 | 15.5% | 5.8% | 160 | 13.4% | 67.8% |
| White | 15056 | 43.0% | 1077 | 52.6% | 7.2% | 871 | 52.5% | 80.9% | 14192 | 41.9% | 689 | 45.2% | 4.9% | 524 | 44.0% | 76.1% |
| Unknown | 2757 | 7.9% | 167 | 8.2% | 6.1% | 140 | 8.4% | 83.8% | 2642 | 7.8% | 119 | 7.8% | 4.5% | 98 | 8.2% | 82.4% |
| Foreign Citizens | 6417 | 18.3% | 210 | 10.3% | 3.3% | 185 | 11.2% | 88.1% | 6357 | 18.8% | 177 | 11.6% | 2.8% | 154 | 12.9% | 87.0% |
| Total | 35023 |  | 2047 |  | 5.8% | 1659 |  | 81.0% | 33869 |  | 1526 |  | 4.5% | 1191 |  | 78.0% |

New Methodology - NLNA

Page 2 of 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00032523

**JA5477**

DX042.0015

| SAT Averages - New Methodology | | | | | |
|---|---|---|---|---|---|
| | Class of 2014 | | | Class of 2015 | | |
| | Apps | Admits | Matrics | Apps | Admits | Matrics |
| **Asian American** | 731 | 768 | 768 | 728 | 761 | 760 |
| **African American** | 617 | 712 | 703 | 614 | 713 | 705 |
| **Hispanic American** | 648 | 724 | 720 | 647 | 723 | 716 |
| **Native American** | 646 | 719 | 717 | 647 | 725 | 728 |
| **Native Hawaiian** | 682 | 743 | 742 | 672 | 685 | 677 |
| **Multiracial** | 681 | 733 | 727 | 675 | 732 | 728 |
| **White** | 712 | 745 | 739 | 707 | 743 | 738 |
| **Unknown** | 724 | 745 | 740 | 722 | 748 | 743 |
| **Foreign Citizens** | 688 | 719 | 717 | 682 | 722 | 719 |
| **Total** | 701 | 742 | 739 | 696 | 740 | 736 |
| | Class of 2016 | | | Class of 2017 | | |
| | Apps | Admits | Matrics | Apps | Admits | Matrics |
| **Asian American** | 732 | 767 | 766 | 732 | 767 | 766 |
| **African American** | 612 | 716 | 710 | 620 | 717 | 708 |
| **Hispanic American** | 646 | 725 | 718 | 651 | 728 | 726 |
| **Native American** | 644 | 718 | 725 | 648 | 727 | 724 |
| **Native Hawaiian** | 665 | 731 | 728 | 670 | 723 | 727 |
| **Multiracial** | 672 | 734 | 730 | 676 | 737 | 734 |
| **White** | 705 | 744 | 740 | 709 | 744 | 740 |
| **Unknown** | 726 | 759 | 755 | 733 | 758 | 755 |
| **Foreign Citizens** | 684 | 724 | 720 | 686 | 731 | 730 |
| **Total** | 697 | 744 | 741 | 700 | 744 | 742 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    HARV00032524

**JA5478**
DX042.0016



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS
REGION I
JOHN W. McCORMACK POST OFFICE AND COURTHOUSE, ROOM 701
POST OFFICE SQUARE
BOSTON, MASSACHUSETTS 02109-4557

DEC 1 4 2001

Dr. Lawrence H. Summers, President
Harvard University
Massachusetts Hall, Harvard Yard
Cambridge, Massachusetts 02138

RE: Complaint No. 01-01-2029

Dear Dr. Summers:

The Office for Civil Rights (OCR) has completed its investigation of the above-referenced complaint that was filed against Harvard University (Harvard). The Complainant alleged that Harvard discriminated against his son (Applicant) on the basis of race and national origin by denying him admission to Harvard's undergraduate program, and by using racial and regional or geographic quotas. The Complainant also alleged that Harvard disregarded criteria such as grade point average (GPA), class rank, Scholastic Aptitude Tests (SATs) and other achievements, and instead favored applicants who are privileged with political power, social relationships and money. The Complainant indicated that the Applicant was denied admission at Harvard despite his outstanding academic and extracurricular achievements.

The allegations involving geographic quotas, political power, social relationships and wealth are not within our jurisdiction, and therefore we did not address them. Consequently, we investigated only the allegations of race and national origin discrimination under Title VI of the Civil Rights Act of 1964 (Title VI).

During the course of our investigation we gathered information about the admissions processes used by Harvard and how the Applicant's application was processed at Harvard. We considered information provided by the Complainant as well as the information that Harvard provided about the Applicant's application and how he compared with other applicants. Based on all of the information we received, we determined that Harvard provided legitimate nondiscriminatory reasons for not accepting the Applicant. Stated differently, we found insufficient evidence to establish that Harvard's reasons for not accepting the Applicant were in any way related to his race or national origin. The information we gathered did not indicate that Harvard used any quota or ceiling to deny the Applicant admission as an Asian American, or more specifically, as a Taiwanese/Formosan - American. The bases for our determinations are set out in more detail below.

**Legal Standards**

The regulation implementing Title VI at 34 C.F.R. Section 100.3(a) and (b)(1)(iii) provides that no person, on the basis of race, color, or national origin, shall be excluded from participation in,

*Our Mission is to Ensure Equal Access to Education and to Promote Educational Excellence throughout the Nation*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



United States District Court
District of Massachusetts

**DX 44**

Case No. _____ 1:14-cv-14176 (ADB)
Date Entered _____
By _____
Deputy Clerk

HARV00033220

**JA5479**

DX044.0001

Page 2 - Dr. Lawrence H. Summers, President, Complaint No. 01-01-2029

be denied the benefits of, or otherwise be subjected to discrimination. In order to find a violation of Title VI in this case, OCR must initially find facts to indicate that Harvard rejected the Applicant based on his race or national origin, or that it used criteria which had the purpose or effect of discriminating against him on the basis of his race or national origin. If OCR finds evidence of different treatment or a disparate effect on the basis of race, Harvard would be responsible for articulating a legitimate, nondiscriminatory justification for its challenged conduct. OCR would then scrutinize Harvard's justification to determine whether it is a pretext for discrimination on the basis of race.

**General Overview of Admissions**

The information we gathered from Harvard indicated that each applicant is evaluated in a number of areas, including both academic and nonacademic areas. Harvard considered a variety of factors in both areas, including but not limited to grades, test scores, rank in class and teacher recommendations under academics, and extra-curricular activities, athletics, geographical location, academic areas of interest and other factors under non-academics. Harvard also has its own numerical rating system based on these and other factors. Admissions staff at Harvard read applications and assign numerical ratings to each applicant based on his or her achievements as compared with other applicants. Below is a summary of the specific procedures and factual information related to the Applicant.

**Allegation One: Harvard discriminated against the Applicant on the bases of his race and/or national origin in the admissions process when it denied him admission**

Harvard provided information to OCR indicating that Harvard received 19,014 applications for 1,650 places in the class of 2005, offering admission to 2,079, or less than 11 percent, of the applicants. Harvard stated that it did not offer the Applicant in this complaint admission because it determined that other candidates presented stronger qualifications.

Harvard reported to us that it considered the Applicant's application for admission in accordance with its standard admissions process. Harvard explained that the first reader of an applicant's folder generally is an "area" admissions officer. This person is a staff member whom Harvard assigns to a particular geographic area of the country. If an application is not a clear rejection after the first read, it may be sent to a second reader for further assessment.

The readers rate applications on a scale of one to four, with the highest score being one and the lowest score being four. The four categories that are rated are academic achievement, extracurricular activities, athletics, and personal qualities. Harvard does not use numerical equivalents or formulas in its rating system. Instead, Harvard derives the academic rating from an assessment of both objective and subjective factors, such as test scores, class rank, teacher recommendations, and responses to questions on the application. According to Harvard, based on teacher reports and other academic information, an applicant with perfect SAT scores of 800 could be rated as one, two, or three in academic achievement. The readers also assign each applicant a preliminary overall rating that reflects their judgment as to the applicant's likelihood of admission based on the applicant's other ratings and the readers' sense of whether the applicant is a strong candidate or a weak candidate.

Next, a subcommittee reads each applicant's folder. A subcommittee generally consists of four to eight people, including area admissions officers, the second readers assigned to that area, and a senior member of the admissions office staff, who serves as the chair. So that staff members are acquainted with the schools, guidance counselors, and special characteristics of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00033221

Page 3 - Dr. Lawrence H. Summers, President, Complaint No. 01-01-2029

the region, most subcommittees are formed around geographical areas. At the subcommittee meeting, the first reader has the entire folder present to which to refer as needed, and all members of the subcommittee have a summary of the readers' evaluations. The subcommittee makes a recommendation that is considered at a full committee meeting.

The full committee consists of 35 people, including all admissions officers, certain faculty members, and high level administrators. The committee reviews all subcommittee recommendations. The final decision on whether or not to offer an applicant admission is made by the standard majority vote process.

Harvard informed OCR that it did not offer admission the Applicant in this complaint because it determined that other applicants presented stronger credentials for admission. Harvard determined that, when viewed as a whole, the Applicant's application did not exhibit particularized areas of excellence that would have set him apart from other students who applied.

Harvard explained to us that it does not base admissions decisions solely on test scores, but it pointed out that a comparison of the Applicant's scores with the scores of the admitted class illustrates one of the reasons why his application was not as strong as others' applications. For the admitted class, the median SAT verbal and math scores were 750 and 740, respectively; the mean SAT verbal and math scores were 733 and 735, respectively; and the median and mean SAT2 scores were 753 and 739, respectively. Of the 2,079 applicants to whom Harvard offered admission, 74 percent had SAT verbal scores greater or equal to 700, 75 percent had SAT math scores greater or equal to 700, 62 percent had SAT math and verbal scores greater or equal to 700, and 80 percent had average SAT2 scores greater or equal to 700. In comparison, the Applicant's SAT scores of 660 in verbal and 690 in math, and his SAT scores of 660 in chemistry, 700 in math, and 590 in writing, fell below the median and mean scores of the applicants to whom Harvard offered admission.

The Applicant's placement as second in his high school graduating class, while good, also did not make his application distinctive among applicants to Harvard. Of the 19,104 applications that Harvard received for admission, 2,891 were from applicants who ranked first in their high school graduating class at schools that chose to rank students. The median academic rating for applicants to whom Harvard offered admission was "2". The Applicant's overall academic achievement rating was "3" and took into account his test scores, grades, teacher recommendations, responses to questions on the application, and his personal interview.

In addition to the above, Harvard reported to us that it looks for candidates who have distinguished themselves from the many other academically talented candidates by demonstrating excellence outside of the classroom. Harvard determined that others in the applicant pool demonstrated (through letters of recommendation, essays, interview, and other personal data) stronger extracurricular, athletic, and personal accomplishments than the Applicant. While the Applicant was involved in a number of extracurricular activities and varsity sports, Harvard concluded that his accomplishments did not rise to the level of excellence displayed by the applicants to whom Harvard offered admission. The median ratings for applicants to whom Harvard offered admission were "2" for extracurricular activities, "3" for athletics, and "2" for personal qualities. The Applicant's rating was a "3" for each category.

Harvard further indicated that it viewed the Applicant's letters of recommendation positively, but no more so than those of most of the other applicants. The admissions committee assigned the recommendations from the Applicant's teachers a rating of "3" and the recommendation from

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00033222

Page 4 - Dr. Lawrence H. Summers, President, Complaint No. 01-01-2029

assigned him a personal and overall rating of "3". The Applicant received a preliminary overall rating of "4", which reflected the reader's opinion that the Applicant's chances of admission were "slim."

Based on our evaluation of all of the information provided, we determined that Harvard provided legitimate nondiscriminatory reasons, that were unrelated to race or national origin, as the bases for denying the Applicant admission.   Specifically, Harvard provided data that suggested that while the Applicant's academic and non-academic credentials were impressive, they were simply not among the best in Harvard's very competitive applicant pool.  Accordingly, OCR found insufficient evidence to support the allegation that the Applicant was denied admission to Harvard based on his race or national origin.

**Allegation Two: Harvard discriminated against the Applicant on the basis of national origin by using quotas to limit the number of Taiwanese/Formosan applicants.**

The Complainant also alleged that Harvard used quotas that had the effect of denying the Applicant admission on the basis of his national origin (Asian American and, more specifically, Taiwanese/Formosan American).  OCR has gathered information from Harvard concerning this allegation.  Harvard denied that it uses or has any quota or ceiling in its admissions process based on national origin or race.  Although Harvard indicated that it gathers voluntary data on admissions of Asian Americans, it also indicated that it neither gathers nor maintains separate records of admission of Taiwanese or Formosan applicants.  OCR notes that there is no Title VI requirement that national origin statistics be kept.   OCR's investigation revealed no information that contradicted Harvard's assertion, and the Complainant provided no data or evidence to support the allegation of Harvard's use of a quota or ceiling based on national origin.  Consequently, OCR found no basis for determining that Harvard used a quota or ceiling in its admissions process that served to deny admission to the Applicant because of his Taiwanese/ Formosan descent.

In a letter to us dated June 26, 2001, the Complainant provided information containing the names of nine valedictorian students from various high schools in the Long Island area, and their grade point averages who were accepted to Harvard.  This information was provided to us as comparative data to support the Complainant's belief that the Applicant was discriminated against based on his race and/or national origin.  The Complainant asserted that this data showed that applicants with no better qualifications than the Applicant were accepted to Harvard.

OCR determined that the comparative information provided by the Complainant does not give a complete picture of each applicant's individual strengths or qualifications.   Additionally, even on its face, this information shows that all of the applicants had a *higher* rank in class than the Applicant had, and therefore, at least with respect to that academic element, were more qualified than the Applicant.  Furthermore, it is impossible to determine from this data the races or national origins of these applicants.  Finally, nothing in the data suggests that any of the named students was *not* qualified for admission, or that any of these students was admitted to Harvard with substantially weaker credentials than the Applicant.  Consequently, we did not view these students as valid comparators with the Applicant, and therefore we did not request further information about their credentials.  Accordingly, we have determined that this comparative information does not offer credible support for the allegation that Harvard discriminated against the Applicant in its admissions processes on the bases of either his race or national origin.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00033223

Page 5 - Dr. Lawrence H. Summers, President, Complaint No. 01-01-2029

**Summary and Conclusions**

In analyzing all of the facts surrounding the processing of the Applicant's application to Harvard, and Harvard's decision to deny him admission, OCR did not find evidence to suggest that the Applicant's race or national origin were factors in the decision not to admit him. Harvard provided statistical and other specific information showing that the Applicant, while highly qualified and accomplished, was simply not among the best in its applicant pool. There was no indication at Harvard that the Applicant's race or national origin was used as a factor to deny him admission. OCR found that Harvard offered credible, non-pretextual reasons, unrelated to race or national origin, for denying him admission.

With respect to the allegation that the Applicant was discriminated against based on his Taiwanese/Formosan national origin, OCR found no evidence suggesting that Harvard gathers or maintains separate data or that it considers Taiwanese/Formosan national origin in any way in its admissions process. Accordingly, we cannot find any evidence to suggest that the Applicant's Taiwanese/Formosan national origin was a factor in the admissions process, or that Harvard discriminated against him on the basis of his race or national origin in violation of Title VI.

Accordingly, we are closing this case effective the date of this letter and we would like to take this opportunity to thank you and Harvard's legal counsel, Lori Silver for your cooperation with our investigation of this complaint. If you have any questions you may contact me at (617) 223-9667 or Mr. Eric Olick at (617) 223-9709.

Sincerely,

Thomas J. Hibino
Director

Cc:    Lori B. Silver, Esq.
       Office of the General Counsel
       Harvard University
       Holyoke Center Suite 980
       1350 Massachusetts Avenue
       Cambridge, MA 02138-3834

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00033224

**JA5483**
DX044.0005

*Harvard Admissions Office*
*Undergraduate Minority Recruitment Program*
*Summer 2012*

# Coordinator Manual
*"Five Divisions, One Goal"*

Updated by:
Lucerito Ortiz '10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

United States District Court
District of Massachusetts

**DX 47**

Case No. _____ 1:14-cv-14176 (ADB) _____
Date Entered_____
By_____
Deputy Clerk

HARV00036378

**JA5484**
DX047.0001

# Undergraduate Minority Recruitment Program
## UMRP

### *The Basics*

#### Our Role in Recruitment

The UMRP at Harvard College is not directly involved in the admissions process or any decisions concerning the acceptance of prospective students. The function of the UMRP is to attract and recruit potential applicants to further explore their possibilities at Harvard College. The program is a resource, which aids in fielding questions, hosting students, and welcoming interested students. As such a resource, the UMRP does not promise acceptance to the College or any other special treatment to any prospective students.

#### Our Goal

The goal is to bring information to the most talented students of African-American, Asian American, Latino/a, Mexican American, and Native American heritage who might not ordinarily think of applying to schools such as Harvard. The UMRP seeks to maintain thriving communities at the college so that a diversity of cultures exists, in addition to extending access to information and support to students who may not ordinarily have it. The program supports the Admissions Office in an attempt to achieve diversity within Harvard College by doing the following:

- Contacting prospective students through direct mail, telephone, e-mail, and hosting
- Sending current undergraduates to their hometowns to speak with prospective students
- Responding to inquiries about student life at Harvard
- Serving as a liaison between prospective students and student organizations and the Admissions Office
- Creating and maintaining relationships with organizations geared towards furthering college access

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036379

### What We Do

1. Reach out to prospective students and respond to e-mails and phone calls
2. Field questions about Harvard, student life, academics, the application process, etc. that students and/or parents may have
3. Organize and oversee prospective student on-campus visits.
4. Outreach to cultural groups on campus about opportunities for involvement with the UMRP
5. Organize and execute information sessions and tours for visiting groups.
6. Organize and execute recruitment trips across the country.
7. Make calls to prospective and admitted minority students.

### What We Can Do For Prospective Students

The UMRP can provide information concerning the minority experience at Harvard, as well as field questions concerning the application process, student life, student organizations, the visiting program, and plan on-campus visits and information sessions for groups.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                        HARV00036380

**JA5486**
DX047.0003

# ___INTRODUCTION___

Welcome to the Undergraduate Minority Recruitment Program (UMRP)!

As a UMRP Coordinator, you are undertaking an important task.  Our program aids the Harvard Admissions Office in maintaining the diversity of incoming classes by encouraging minority students to consider applying to Harvard College.  The UMRP provides information to the most talented students of African American, Asian American, Latino/a, Mexican American, and Native American heritage.  We are especially concerned with recruiting students who might not readily and ordinarily think of applying to schools such as Harvard, or who may not have the information or support necessary to do so.  In the process, we try to dispel myths about the College, reduce some of the anxiety students and parents feel about such schools, and share insights about academic and student life at Harvard and the application process.

___It is essential to remember that, although we are students, we also have the responsibility to treat this job in a thoroughly professional manner, especially since our efforts (successes AND failures) carry potential impact on this program, the Admissions Office, and the College.___

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                      HARV00036381

**JA5487**
DX047.0004

# ***THE LOGISTICS***

### ***Office***

All coordinators are required to be in attendance from 9am until 5pm Mondays-Fridays, with one hour for lunch.

During your office hours, you will mainly be answering e-mails/phone calls and responding to questions from students, parents, and counselors.  Please familiarize yourself with the Harvard brochure (known as the Murr) in order to offer accurate information to prospective students.  Also be sure to visit the Harvard College Admissions web site (www.admissions.college.harvard.edu); It is a great source of information on the College, academics, extracurricular activities, financial aid, and the application process.  You will have to field questions not pertaining to your division or specialty, so familiarize yourself at least broadly with various opportunities on campus and beyond. It may be helpful to keep a list of people specializing in different things that you can refer students to if a student wishes for more specific information. Be ready to share your experiences at the College.  Remember to be honest, but keep in mind that the keyword is RECRUITMENT!  Sometimes students will ask very specific questions, and if you do not know the answer, BE HONEST and admit it.  Do not give out false information.  If the inquiry concerns concentrations, you can refer them to the *Handbook for Students*.

## ***Office Protocol:***

- **Check phone messages**
- **Call all students on the "Messages" spreadsheet in chronological order**
- **Check, label, and answer UMRP e-mails**
- **Take all incoming calls**
- **Clean up and organize office space**

# ***HOW TO***

- **Log into computers**
  - If there is a gray screen when the computer comes on, enter UMRPpassword into the text box, then press ENTER

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036382

- o Windows Log-in:
  - ▪ Username: the first part of your @college address
  - ▪ Password: will be given at log-in
- **<u>Check phone messages</u>**
  - o To check voicemail:
    - ▪ Dial [Redacted: PII/SPI]
    - ▪ Press the pound key (#)
    - ▪ Enter Mailbox number: [Redacted: PII/SPI]
    - ▪ Enter Password [Redacted: PII/SPI]
  - o Enter all message information in the Google spreadsheet accessible through the UMRP g-mail account.
    - ▪ Date
    - ▪ Caller Name
    - ▪ Phone number
    - ▪ Message
    - ▪ Division (If known)
    - ▪ Coordinator taking message
    - ▪ Notes
  - o Immediately call **<u>all</u>** students back in chronological order, unless they request to speak with a specific coordinator/division, in which case this should be written in the "Notes" section.
  - o Once a student is called back and any connection is made, even if a message is left, **highlight** the message from the spreadsheet and enter notes. Only leave messages blank when you do not have time or cannot attend to it. Any specific instructions may be written in the "Notes" section

- **<u>Take all incoming calls</u>**
  - o To transfer calls, if necessary:
    - ▪ Hold
    - ▪ Press another line
    - ▪ Press transfer
    - ▪ Press original call (blinking)
    - ▪ Transfer
    - ▪ Press second line (also blinking)
  - o To make calls:
    - ▪ Press 9
    - ▪ Press1, then area code + phone number

- **<u>Check UMRP in-box on G-mail</u>**
  - o user name: umrp.staff
  - o Password: [Redacted: PII/SPI]
  - • LABEL all e-mails in the inbox accordingly. Any e-mail that needs a response should be marked as **UNREAD**. Make sure to

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036383

respond to all e-mails within no more than **TWO DAYS**. This will require than you constantly check e-mails even when not in the office.
- Archive labeled e-mails in the inbox and try to clear it as much as possible
- Attend to e-mails from your division, but also to e-mails marked as **GENERAL**, Once you respond to an e-mail in the "General" inbox, label it with your own division so the response goes more directly to you. Conversely, if an e-mail lands in the "General" inbox but is directed to a specific coordinator, label it with that coordinator's division regardless of the students' ethnicity.
- It is recommended that you keep an updated sheet of templates on googledocs for a variety of questions. There are many questions that are very common, and it is helpful to have a general template ready to cut and paste with modifications rather than re-writing answers every time

Keep the UMRP g-mail account open on your computer at all times for easy access

- ***GROUP VISITS:***
  - WE ARE UNABLE TO ACCOMMODATE **ANY** SPECIAL GROUPS OR SESSIONS THIS SUMMER DUE TO CONSTRUCTION AT OUR VISITOR CENTER


- **Computer files and Documents**
  - Save all necessary files in their appropriate folder
  - DO NOT leave any personal documents or forms on the computers- they will be DELETED
  - Make sure the Computer desktop and folders are organized and delete all irrelevant, unnecessary, or personal documents
  - If you need to make something accessible to all coordinators, be sure to save documents to the S:(student) Drive

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036384

# *PROFESIONALISM*

**Remember that you are acting as an agent of Harvard College. It is IMPERATIVE that you remain professional and responsible <u>at all times</u>. Although we are college students, we are working in a full time, professional office and are responsible for meeting certain standards. You are expected to be on-time to your office hours every day, and to remain present for the entirety of your hours. Timeliness is also expected for staff meetings, tours and information sessions, and any other meetings related to this office. Any time you are available, it is expected that you assist your fellow coordinators when needed. For many people you contact, their only encounter with Harvard College will be their interactions with you, so it is expected that you make them as pleasant and satisfactory as possible.**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY　　　　　　　　　　HARV00036385

While we have 5 divisions in order to more efficiently reach our goals, it is important to remember that our overall goal is minority student recruitment, which means:

**ALL COORDINATORS SHOULD ASSIST EACH OTHER THROUGHOUT THE YEAR:**

**WE ARE A TEAM!**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036386

# <u>*IMPORTANT INFORMATION*</u>

## People to know in the Admissions Office:

- Roger Banks, Senior Admissions Officer & Director of the UMRP
- Lucerito Ortiz, Admissions Officer & Assistant Director of the UMRP
- William Fitzsimmons, Dean of Admissions and Financial Aid
- Marlyn McGrath, Director of Admissions
- Sally Donahue, Director of Financial Aid
- David Evans, Senior Admissions Officer
- Precious Eboigbe, Admissions and Financial Aid Officer & Co-Director of HFAI
- Monica Del-Toro Brown, Admissions and Financial Aid Officer & Co-Director of HFAI
- Haley Frampton, Supervisor of the Mail Room
- Anthony Grant, Information Services Supervisor
- Marcia Morgan, Department Administrator
- Elizabeth Adams, Liaison to the Schools and Scholarships Committee
- Ian Anderson, Records Room Supervisor/Admissions Officer

## Important Phone Numbers:

Admissions office: (617) 495-1551
Financial Aid Office: (617) 495-1581
Harvard Financial Aid Initiative: (617) 384-8213
Lucerito Ortiz: (617) 495-3634
Transfer Office: (617) 495-5309

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036387

**JA5493**
DX047.0010

### *Some Statistics:*

- Class of 2016 stats:
  http://www.admissions.college.harvard.edu/apply/statistics.html

## *Class Profile*

| Students | Total |
|---|---|
| Applicants | 34,302 |
| Admitted | 2,032 |

| Geographical Breakdown | | Ethnicity | |
|---|---|---|---|
| New England | 17% | African American | 10% |
| Middle Atlantic | 22% | Asian American | 21% |
| South | 19% | Hispanic or Latino | 11% |
| Midwest | 10% | Native American or Pacific Islander | 2% |
| Pacific | 21% | | |
| International | 11% | | |

**Average Financial Aid Package for Freshman Scholarship Holders 2012-2013**

| | |
|---|---|
| Total Budget | $59,200 |
| Parents' Contribution | $11,750 (20%) |
| Student Assets & Summer Work | $1,500 (3%) |
| Harvard, Federal & Outside Scholarships | $43,100 (73%) |
| Job Offer | $2,750 (4%) |

- SAT Scores
  - Most students score above 650 on each section of the SATs
- GPAs
  - Most students are at the top 15% of their graduating class
- For the incoming class of 2016:
  - 34, 285 applications total
    - 4,231 early
  - 2032 admitted total
    - 774 early
- Transfer stats
  - Usually about 1400-1500 applications for about 12 spots

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036388

**JA5494**
DX047.0011

# Common Topics
## I. ACADEMIC LIFE

**The Curriculum**

President Lowell once said, "Every educated person should know a little of everything and something well."

·    On average, students take 4 courses per semester.  We don't count credit hours or semester hours.  By the time one graduates, he/she will have finished 32 courses.

**The Concentration: roughly 50% of the curriculum**
·    Lowell's "knowing something well."
·    Over 45 concentrations in the liberal arts, with opportunities for joint and special concentrations.  There are no "pre-med", "pre-law", "pre-business", or performance-based concentrations.
·    Students declare their concentrations in the middle of the second year; about 1/3 of students will change their concentration at least once.
·    On average, 12-16 courses per student will be in the chosen concentration
·    Joint concentrators are required to write a senior thesis joining the two fields together
·    Concentration advisers and tutors in each department assist with course choice, thesis advising, tutorials starting sophomore year

**The General Education Requirements: roughly 25% of the curriculum**
·    Lowell's "a little of everything."
·    Introduces students to different ways of thinking about knowledge.
·    Eight categories within the General Education Requirements; students must take one class in each category:
  ·    Aesthetic & Interpretive Understanding
  ·    Culture & Belief
  ·    Empirical & Mathematical Reasoning
  ·    Ethical Reasoning
  ·    Science of Living Systems
  ·    Science of the Physical Universe
  ·    Societies of the World
  ·    United States in the World
·    There is a significant amount of choice within each requirement

**Electives: roughly 25% of curriculum**
·    Students can choose remainder of their courses from anything in the course catalog – the catalog has about 3,500 courses listed.
·    Must take Expository Writing and Foreign Language (can be exempt with appropriate AP score of 5, IB score of 7, SAT II Subject Test Score of 700 or greater, or with the Harvard Placement Tests given at the beginning of Freshman Week).
·    Students may take courses at MIT (if Harvard does not already offer the same course) and at all of Harvard's graduate schools except for the Business School.

**Courses and classes**
·    Median Class Size: 12, average class size: 17, student-teacher ratio: 8 to 1.  Average

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036389

amount of time spent in class, section, and lab: 12-15 hours per week, depending on your course selection.
· Opportunities for tutorials, freshman seminars, independent reading and research, etc. Some courses are 2 on 1 – two professors and one student!
· There are more than 140 Freshman Seminars offered currently. These seminars are capped at 12 students and are not letter-graded.
· 75% of courses enroll 20 or fewer students.

**Professors and teaching**
· Professors teach vast majority of courses, with 3 exceptions: Expos (published authors), intro foreign language (native speakers/graduate students), and lower-level math (graduate students)
· Teaching fellows **"supplement, not substitute."** If a course is over 36 students, it will break down into sections with a teaching fellow to lead discussion.
· Many opportunities for interaction with professors: office hours, student-faculty dinners, research positions, house masters, tutorials, thesis advising, etc.

**Medical School Statistics for 2010:**
· Most Harvard applicants to med school were alumni (n=214) rather than seniors (n=91)
· Harvard seniors and alumni were accepted to med school at about twice the rate of national applicants: 87% of Harvard applicants (and 94% with an overall GPA above 3.5) were accepted to at least one med school, while nationwide, 46% of med school applicants were accepted to at least one med school
· Harvard students were admitted to med school with lower GPAs (science and nonscience) than national applicants
· Nonscience concentrators were accepted to medical school at a similar rate as science concentrators
· 32 Harvard seniors and alumni/ae applied to MD/PhD programs. 92% of Harvard senior applicants and 85% of Harvard alumni/ae applicants to MD/PhD programs were accepted.

**Miscellaneous**
· Students can qualify for Advanced Standing with 5's on four or more full-year Advanced Placement exams or 7's on three higher-level International Baccalaureate exams (if earning the full diploma). No credit for individual courses.
· Advanced standing students may pursue a 4th year master's degree in some of our concentrations (most often in science or math-related fields).
· Office of International Programs available to help students study abroad – many opportunities through other schools and programs. Also, many students choose to use the summer rather than term time to travel and live abroad, because they do not wish to give up time here at Harvard. About 60-70% of Harvard students integrate international experience into their undergraduate careers.
· Largest university library system in the world, with about 17 million volumes housed in more than 70 libraries.

### _School of Engineering and Applied Sciences:_

**Growth**

- 45% growth in SEAS over the last 5 years

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                            HARV00036390

- We have 575 undergraduate concentrators (12% of College class)
- Approximately 30 CS concentrators in Class of 2011 with only 3 women vs. approximately 60 CS concentrators in Class of 2013 with 30 women.

**Commonly Asked SEAS Questions:**
**What are the differences between engineering at Harvard vs. engineering at a specialized school, i.e. MIT?**

While you should not comment on MIT directly (as well, you don't go there), you can talk about why you picked Harvard and what engineering at Harvard is like. Unlike some programs in engineering and applied sciences, Harvard undergraduates who pursue the field are not enrolled in a separate school or college. Studying engineering is only one aspect of a student's experience.

**Why attend Harvard for engineering over a technical school, i.e. MIT?**

Harvard, MIT, and a lot of other schools are all fantastic. Ultimately where you go is all about fit. I cannot talk about other schools, but I can give you some information about how Harvard does engineering.

### You are immersed in Harvard College.
The "Harvard experience"—immersion in a multifaceted intellectual setting—is part of what makes learning engineering and applied sciences here a singular experience.

### You can enter the concentration at all levels.
Because of our emphasis on preparing broad-minded students we've designed programs and courses that meet the need of students at multiple levels. The concentration is open to those who might not have had opportunities for rigorous mathematics or exposure to engineering or computer science in high school. At the same time, the program caters to those who dream about taking Math 55 their first year. Unlike some engineering schools, all prospective undergraduate students apply and are admitted to Harvard College and enrolled students do not need to declare their intended concentration until the sophomore year.

### You will be part of a small school with big ideas.
Many of our classes are small, thanks to the 5:1 student/faculty ratio. Professors and administrators are accessible in and outside of class. And, collaborative courses and research with Harvard's world-class programs in the life and physical sciences expose students to the bigger picture, too.

### You can pursue either an A.B. and an S.B. degree.
We offer an A.B. degree option (which is relatively rare among our peers) as well as an ABET-accredited S.B. (in Engineering Sciences only). Moreover, 38% of the A.B. students at Harvard are women, almost double the national average in regular engineering programs.

### Our programs are flexible.
Our concentrations promote flexibility. That means you'll have time to indulge your passion for the yo-yo, push the pigskin down the turf, investigate the wacky world of quantum

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036391

science, or create the next great start-up in your dorm room. Although you can dig deep into specific areas of research, the goal is to train future leaders and thinkers in all fields as well as professionals in engineering and applied sciences.

**What do SEAS do students after college?**

Our curriculum offers excellent preparation, whether you are intending to practice as an engineer, researcher, or physician; are planning for a career in business, education, government, law, or medicine; or have no idea what you want to be when you grow up.

Students go on to be engineers and consultants; work in the software industry (Facebook, Microsoft, Google, IBM, etc.); go to graduate school in science, engineering, law, medicine, and business. Some graduate schools our recent graduates have attended include MIT, Stanford, Caltech, Berkeley, Cornell, etc.

**Can you double major or have a minor?**

Yes. That is called a joint concentration. Students also can pursue secondary fields (Harvard's version of a minor) in mathematical sciences, computer science, and a variety of other fields.

**What are your study abroad programs?**

Harvard offers both term-time and summer study abroad opportunities. Some students event go away during optional winter activities period---as did a group of engineering students who went to Brazil to study the country's energy systems.

**Can pre-med students concentrate in engineering?**

Absolutely. The biomedical engineering degree, in particular, is excellent preparation.

**Does Harvard offer a class that introduces a student to different types of engineering if he/she is not sure what type they are interested in? Alternatively, how easy is it to switch engineering tracks?**

Yes. ES 1 provide a broad-based introduction. CS50 offers the same for those in computer science, and AM 50, offers the same for those in applied math. Switching between engineering tracks is quite easy.

**How hard is it to start doing something, whether academic or extracurricular, that you've never done before?**

Harvard makes it easy, even in the sciences and engineering, to jump right in. The number of extracurricular activities is vast.

# II. RESIDENTIAL LIFE

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**JA5498**

DX047.0015

**Basic information**
· Housing guaranteed all 4 years; freshmen required to live on campus and 97% of students opt to live on campus all four years, unlimited board plan.
· Campus dorms, as well as the Co-op and off-campus options.
· No <u>residential</u> Greek system, no theme houses

**First Year**
· Housing application allows you to provide information on which your roommate match-up is based. First-year rooms/suites in <u>17 dorms</u> range in size from 1 to 6 people.
· Proctors: administrators and graduate students, one per entryway (advise about 16-40 freshmen), serve as residential and often academic advisors.
· Freshman Dean's Office ensures counseling and advising for all freshmen
· All freshmen take their meals in Annenberg
· Easy proximity to academic buildings

**Houses**
· <u>12 upper class houses</u> allow smaller communities within the larger Harvard community; 9 along the Charles River, 3 a few blocks away in the old Radcliffe Quadrangle
· Can choose roommates and blockmates (up to 8 in a group) at end of freshman year; randomly assigned to one of the houses.
· Each house has a dining hall, library, extra facilities, and its own administration headed by a full professor in residence with graduate student tutors, pre-med, pre-law advisors.

**Safety and Security**
· Harvard University Police Department (HUPD): primary resource for campus safety & security
· Walking and driving night-time escorts, shuttle bus services, emergency "blue lights"
· Students swipe into dorms using ID cards, doors to rooms are always locked.

**Commonly Asked Residential Questions**
· Are dorms/houses co-ed?
· Can students choose their houses? How do students pick their roommates?
· Is there a Greek system?
· How safe is the campus? And do you ever feel unsafe?

# III. EXTRACURRICULAR ACTIVITIES

You do not have to know all of them, but familiarizing yourself with the range and scope of activities available is a good idea. A full list is available at http://www.orl.fas.harvard.edu/icb/icb.do?keyword=k65178&pageid=icb.page305611. And remember that personal examples are great illustrators.
Some basic messages that are good to convey about extracurriculars are:

**A wide range of different activities**
· 5 full orchestras, > 75 plays and performances each year, >35 publications, ethnic groups, religious groups, political groups, community service is one of our most popular activities, etc.
· 41 varsity sports teams (NCAA Division I), largest division I program in the United States. Over 75% of our students participate in some level of athletic activity at the Varsity,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036393

JV, Intramural or Club level.

**Depth in activities, beginner to expert**
·    You do not have to have experience in an activity to be involved!  Example: varsity top-level sports, club sports, intramural sports.
·    Vast number of activities means demand for participants – rarely limits on the number of people who can get involved.
·    If there's not already an established club or activity, students are encouraged to start their own group with funding provided by the College.

**Hands-on experience in activities**
·    Harvard Student Agencies, Harvard *Crimson*, managing a singing group or orchestra, etc. – these all give student hands-on experience in organizations that can be very useful in future careers.

**Commonly Asked Extracurricular Questions**
·    Do you have to have a certain level of experience to participate in music and dance?
·    Can freshmen participate in extracurricular activities?
·    How difficult is it to start your own organization?
·    How do you balance extracurriculars and academics?

## About Harvard's Financial Aid Initiative

·    Harvard continues to be need-blind in admissions, completely need-based in financial aid.  No merit-based scholarships.
·    70% of families receive financial assistance of some kind
·    Families with an income of <$60,000/year contribute nothing to the student's education; families making between $60,000 and $180,000 pay between 0-10% of the student's tuition.
·    No loans included in Financial Aid packages (so students may graduate debt-free).  However, student loans are available for those families who want them.

# Cambridge/Boston

**Basic Information**
·    Ultimate college town – more than 50 colleges and universities in the Boston area.
·    Cambridge combines the attractions of a cosmopolitan city w/ charm of a New England town.
·    Shops, restaurants, bookstores, cafés, street performers, theaters, the grassy banks of the Charles River--all surround the College.
·    Boston's inexpensive and convenient subway system:  The subway gives students easy access to the entire metropolitan area: cobblestone streets, colonial church spires, endless museums, shopping, diverse cultures, important arts centers, sports games, etc.
·    Within easy reach of Cambridge and Boston are the beaches of the Atlantic – from Cape Cod to Maine – ski slopes, forests, and numerous historical sites.

# Important Advice from Veteran Greeters

Ø *Look like you care!  Be positive and show energy.*  Some visitors have traveled thousands of miles, and you may be the only student they see.  Sit up straight, dress neatly, and stay

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036394

alert to make a positive impression. We're not trying to make Harvard look like a utopia, but we do want to convey a positive impression of the school. Smile and show energy and enthusiasm.

Ø *Be professional.* Avoiding too many "likes" and "ums," avoiding slang, and making sure your anecdotes and stories are concise and appropriate will help you come across as confident, professional, and believable.

Ø *Keep in mind these are prospective applicants!* Be mindful of bringing up topics that may lead the discussion to tangents. No need to defend topics that the audiences are unaware of (i.e. "The Quad isn't *that* far away"; "you'll always get the class the following year after you are lotteried out"…)

# TOUR GUIDELINES

*First, a few very important things to remember:*

- **You may be the only Harvard undergraduate with whom a family interacts.** **Each tour is extremely important. YOUR ROLE is extremely important.** A friendly, welcoming disposition will be appreciated. A negative attitude or snide remarks will be remembered…

- Make the tour personal. Talk about your own experiences as a student here and make statistics more interesting with specific examples about you, friends, and roommates. **Emphasize personal stories (those of your experience and of your friends).**

- Keep tour information relevant to the things that happen in the area that you are in for the stop. Don't feel pressured to talk about information covered in the session. The tour should be about how students live their lives, so tell them about the areas through which you are traversing.

- It is important that you talk to the people on your tour. Get a sense of what they already know, what they want to know more about, and always offer to answer any questions.

**Logistics:**
**Kindly ask people who have video cameras not to videotape the tour.**

**If the information session group before the tour is very large, figure out which guides will do Widener first then the Yard, versus the Yard then Widener.**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY    HARV00036395

# Tour "Script"

While there is no precise script that you need to follow during the tour, this is a list of guidelines you should cover.  Depending on questions and the natural flow of the tour, include information when you think it most appropriate:

## <u>Tour Outline</u>

Memorial Hall: extracurriculars
Science Center: academics, SEAS
Canaday Courtyard: freshman life, residential advising

Tercentenary Theater: commencement, libraries, resources, security
Old Yard: history of Harvard
Lowell Courtyard: housing, conclusion

## <u>First Stop, Memorial Hall</u>

To be delivered on the green yard behind the building

Welcome everyone to Harvard College, and take a minute to introduce yourself again: hometown, graduation year, concentration, house, etc.  Even if you were the Greeter during the information session, re-introduce yourself, as there may be some people who did not attend the info session. Get a show of hands of those who attended the information session and those who did not, so you have an idea of how much detail you need to cover.

**Bit of historical information**:

- 1870, funded by the families of Harvard students who died fighting for the union in the American Civil War, Mem Hall + Annenberg house the largest collection of secular stained glass in North America (point out that that there are no religious figures, soldier and scholar are what the transept is memorializing, inside Annenberg: Shakespeare, Dante, Virgil, etc.)

**3 purposes of Memorial Hall**: War memorial, Annenberg Hall, Sanders Theater

- o Annenberg is the freshman dining hall
  - ▪ What you liked about Annenberg (always finding someone you know, meeting new freshmen, fun study breaks like Valentine's Day card making, Halloween costume competition, Top Chef Harvard, etc.)
- o Sanders Theater
  - ▪ Classroom in the day
  - ▪ Performance space at night including for Harvard groups

**Extracurriculars**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036396

- What I do and how/why I think extracurriculars are so important to students (avoiding too much factual detail about "there are x groups, y orchestras")
- Over 450 extracurricular groups: from ballet to gumboots, from the Crimson to the Lampoon, athletics (41 DI Varsity sports, largest DI program in country), pre-professional societies (pre-law, Harvard Women in Business, etc.)
- QUESTIONS ABOUT EXTRACURRICULARS?

## Second Stop, Science Center

To be delivered either at the intersection of Kirkland and Oxford or in front of the building

"Welcome to the Science Center! This is one of the most commonly used spaces on campus; something like 10,000 people go in and out of this building every day of the week."

**Academics**

- Home of Math and Science Departments, such as the History of Science
- It's said that no student can go all 4 years without taking at least one course in this building, because of the General Education program (especially if people were not in info session, explain that, for example, non-science majors have to take SPU, SLS).

**SEAS**:
**Growth**

- 45% growth in SEAS over the last 5 years
- We have 575 undergraduate concentrators (12% of College class)
- Approximately 30 CS concentrators in Class of 2011 with only 3 women vs. approximately 60 CS concentrators in Class of 2013 with 30 women.

**Facilities**

- Observatory, computer labs (both PC and Mac), science labs, Mac store, IT services, Freshman Mail Center, Cabot Science Library, Greenhouse Café [mention Board Plus],
- Putnam Gallery of Historical Scientific Instruments (open to the public)
  - A rare mathematical instrument designed by Galileo and given by him to the Duke of Mantua in 1604 (before Galileo became world-famous for his telescopes)
  - Many instruments purchased by Benjamin Franklin on behalf of Harvard, after a great fire destroyed the college's apparatus in 1764
  - The control console of the Harvard cyclotron, which was both a physics research instrument and a pioneering tool for treating cancer

**Optional stories**

- The class of 2012 spent their first night in the Science Center, getting to know our roommates, playing cards with our president, Drew Faust, and getting free food.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036397

- Cool class you have taken in the Science Center (be aware that Science and Cooking is often mentioned in info session)
- Dedicated Professor or TF whom you brought to a Faculty Dinner, who held Office Hours that were helpful to you, etc.
- Professors who were especially helpful to freshmen


- Point out Oxford Street: science labs, Museum of Natural History, Geological Labs, Engineering, Computer Science, Chemistry Labs right behind you
- Lowell Lecture Hall: one of larger lecture halls, hosts classes such as Intro to Comparative Politics during the day, but performance space for student groups at night

*[Stop near base of ramp/tables outside Loker Commons for QUESTIONS ABOUT ACADEMICS. Then walk to back door of Memorial Hall, pointing out shuttle stop/talking about shuttles]*

- point out William James Hall (psychology, sociology, anthropology), mention undergraduate research
- "there are more research positions for undergraduates than undergraduates to fill them"

### Third Stop, Canaday Courtyard

**Freshman Dorms:**

- All building around us are freshman dorms with a couple exceptions: University Hall (office of Dean Evelyn Hammonds), Harvard Hall (a few lecture halls, mostly small classrooms), and Massachusetts Hall (top 2 floors house 30 lucky freshmen who get to say that the president of the university, Drew Faust, worked under them [her office is there])
- Conveniently near classrooms
- All freshmen together (building a sense of community among freshmen)
- Housing questionnaire, hand-picked roommates
- Only freshmen live together in these buildings, allowing first-year students to really get to know their classmates.
- **Talk about freshman experiences in general with PERSONAL stories.**
- Advising linked to residential life (proctor, peer advising fellow, academic advisor)
- At the end of freshman year, you are placed in an upper-class house, which we will see examples of at the end of the tour

### Fourth Stop, Tercentenary Theater

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036398

**Tercentenary Theater**

- Harvard career begins there with Convocation and ends there with Class Day and Commencement (Class Day speakers: from Mother Theresa to Seth MacFarlane, the creator of Family Guy. Amy Poehler in 2011 and Will Ferrell in 2003)
- Memorial Church - a nondenominational church that holds weekly services and daily morning prayers for those who wish to participate but also serves as a venue for various events on campus

**Harry Elkins Widener Memorial Library**

- Harry Elkins Widener was a student at Harvard, graduating in the class of 1907. Shortly after his graduation, Harry traveled to Europe with his family in search of rare books to add to his collection. After a successful trip, the Widener family wanted to travel back to US in style, so they bought two first-class tickets aboard the R.M.S. Titanic. As we all know, the Titanic struck an iceberg and began sinking, so the story goes that Harry and his Mother were able to secure spots on lifeboats. Harry, however, realized that his precious books were still on the sinking ship, so he went back aboard to retrieve them, but was never seen again. Upon her return to the US, Harry's grieving mother decided to honor her son by combining his two greatest loves - Harvard and books - by donating money to Harvard for a library to be built in her son's name. In donating this money, Mrs. Widener had a couple of stipulations. The first stipulation was that Widener Library contain an exact replica of Harry's study from home and that fresh flowers be placed in it every day, and also that a page would be turned in Harry's bible every morning. So there is in fact a room just like it in the library, right down to fresh cut flowers put in daily just as Mrs. Widener would have done in her son's study, and a new page is turned in Harvard's copy of the Gutenberg Bible every day. Lastly, Mrs. Widener feared that years later, someone with even more money would come and that her son's library might be demolished or renamed (ironic because she did just that, demolished a pre-existing library, to build hers), so she demanded that no piece of brick, stone, or mortar of the building ever be changed from the exterior of the building. While this condition at first seemed manageable, Harvard's library collection soon began to outgrow even this massive building, so, upon further investigation, we realized that Mrs. Widener had never mentioned the building's foundation. Thus, Widener library was extended down four stories, meaning that we are all standing on miles of bookshelves right now [if standing close to the library]. There are 55 miles of shelving, to be exact.

**Libraries and Other Resources**

- Biggest Private library in the United States and part of the largest University Library collection, 4th largest library system in the world (after US. Library of Congress, British Public Library, and National Library in France)
- Nearly 17 million volumes, part of system of Harvard's over 70 libraries
- Scan and deliver service allows you to use a chapter of a book without making the book inaccessible to other students, also can use it when not on campus like for summer work.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036399

- Bureau of Study Counsel – procrastinators anonymous group, peer tutoring, individual counseling with professional counselors, etc.
- Office of Career Services
    - Panels and information sessions for jobs, graduate school, fellowships, etc.
- Office of International Programs
    - Study abroad (term and summer)
    - Summer: study abroad, volunteer abroad, work abroad, research abroad, etc.
    - 250+ pre-approved programs to choose from for semester study abroad (and can find your own and get it approved)
    - funding available for summer experiences; financial aid carries over for semester study abroad
- QUESTIONS ABOUT RESOURCES?

*[Walk to the John Harvard statue, between University Hall and Weld. As you walk, talk about **security** (i.e., **blue lights, HUPD, swipe access, escort system, van service**)]*

## Fifth Stop, Old Yard

**John Harvard Statue**
Statue of Three Lies: The front of the statue reads "John Harvard, Founder, 1638."

1. First, John Harvard was not Harvard's founder. Harvard was founded by the Massachusetts Bay Colony as the "Newtowne College." When he died, John Harvard donated half of his estate to the college, so they renamed it in his honor.
2. Second, Harvard was founded in 1636. 1638 was the year in the college was renamed Harvard.
3. Lastly, and perhaps most egregiously, that is not John Harvard. Nobody knows what John Harvard looks like because any known portraits of him burned in a fire when Harvard Hall was the school's library in the early 1700s. There are thus some competing stories about who exactly this man is.

One explanation is that when the sculptor, Daniel Chester French, came to Harvard to work on this statue, he plucked the "most Harvard looking" man from Harvard Yard to be his model. Another story relates to the fact that many of Harvard's upperclass houses are named after former University presidents. For example, Lowell House, where we are heading next, is named after former president Lowell. There was one president, though, that Harvard felt it could not name a house after, and that was president Hoar: H-O-A-R. Could you imagine the PR nightmare if Harvard freshmen excitedly called their parents to tell them they would be living in Hoar House next year? So Harvard chose to honor President Hoar in a different way, by allowing his descendant, Bernard Hoar, to sit for this statue.

*[Walk to the Lowell Courtyard, going down Holyoke Street on the side with UHS. Point out the T station, things you enjoy in the Square, HUHS (24-hour physical and mental health services, 365 days a year), Farkas Hall, the MAC]*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                        HARV00036400

**JA5506**
DX047.0023

## Last Stop, Lowell Courtyard

**Blocking (if this hasn't already been covered in the info session/at previous stop)**

- How it works, don't have to live with your blockmates within the house
- Stay in the house for 3 years, Housing is guaranteed for four years and 97% of students will live on campus all four years.
- Each of the twelve upper-class houses accommodates 300-500 students, and each House staff will include professors, tutors, advisers and visiting faculty.

**Who's in the house**

- House Masters ("parents" of the house), tutors ("big brothers and sisters" of the house, all academic fields and pre-professional), resident dean (academic and residential adviser), know dining staff, security guard, etc.
- re-emphasize residential advising

**What's in the house (facilities)**

- EVERY HOUSE: Dining hall, library, computer lab, laundry room, meeting rooms
- Other: gym, rock-climbing wall, pottery studio, darkroom, dance studio, band room, grille, etc.
  - open to students from all houses AND freshmen
- Athletic facilities are <10 minutes away from here

**House Life** /Why the houses add so much to a student's experience:

- What you love about your house, or what you are most looking forward to about house life
- Talk about what's special about your house (formals, traditions, opera, field days, house masters, etc.)
- You get your diploma at graduation in your house (house masters know you/care/ are proud of you)

## Wrap-Up

Example conclusion: "I'm so glad you're visiting Harvard. It's a really great place. We have amazing opportunities, both inside and outside the classroom, and incredible resources. But above all, pretty much any Harvard student would tell you that the best part of this school is the people (professors, tutors, staff, etc., but especially fellow students)."

- How to get back to the yard and to the square
- Final Questions?  I'll stick around for a few minutes so come talk to me afterward if you need anything.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

HARV00036401

Nos. 02-241 & 02-516

**In the**

## Supreme Court of the United States

BARBARA GRUTTER,

PETITIONER,

*v.*

LEE BOLLINGER, ET AL.,

RESPONDENTS.

JENNIFER GRATZ AND PATRICK HAMACHER,

PETITIONERS,

*v.*

LEE BOLLINGER, ET AL.,

RESPONDENTS.

On Writs Of Certiorari To
The United States Court Of Appeals
For The Sixth Circuit

**BRIEF OF HARVARD UNIVERSITY, BROWN
UNIVERSITY, THE UNIVERSITY OF CHICAGO,
DARTMOUTH COLLEGE, DUKE UNIVERSITY,
THE UNIVERSITY OF PENNSYLVANIA,
PRINCETON UNIVERSITY, AND YALE
UNIVERSITY AS AMICI CURIAE SUPPORTING
RESPONDENTS**

ROBERT W. IULIANO
HARVARD UNIVERSITY
Holyoke Center 980
1350 Massachusetts Ave.
Cambridge, MA 02138
(617) 495-1280

LAURENCE H. TRIBE
*Counsel of Record*
JONATHAN S. MASSEY
1575 Massachusetts Ave.
Cambridge, MA 02138
(617) 495-4621

*Additional Counsel Listed Inside Cover*

United States District Court
District of Massachusetts

**DX 53**

Case No. _____ 1:14-cv-14176 (ADB)_____
Date Entered_____
By _____
Deputy Clerk

HARV00066521

**JA5508**

DX053.0001

ii

BEVERLY LEDBETTER
BROWN UNIVERSITY
110 South Main Street
Providence, RI 02903
(401) 863-9900

BETH A. HARRIS
THE UNIVERSITY OF CHICAGO
5801 South Ellis Avenue
Chicago, IL 60637
(773) 702-7243

ROBERT B. DONIN
DARTMOUTH COLLEGE
14 South Main Street
Suite 2C
Hanover, NH 03755
(603) 646-0101

KATE S. HENDRICKS
DUKE UNIVERSITY
Office of University Counsel
North Pavilion Building
2400 Pratt Street, Suite 400
Durham, NC 27710
(919) 684-3955

WENDY S. WHITE
UNIVERSITY OF
PENNSYLVANIA
133 South 36th Street
Philadelphia, PA 19104
(215) 746-5200

PETER G. MCDONOUGH
LORRAINE SCIARRA
PRINCETON UNIVERSITY
Office of General Counsel
120 Alexander Street
Princeton, NJ 08544
(609) 258-2500

DOROTHY K. ROBINSON
YALE UNIVERSITY
2 Whitney Avenue, 6th Floor
New Haven, CT 06510

HARV00066522

**JA5509**
DX053.0002

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . .  iii

INTEREST OF AMICI  . . . . . . . . . . . . . . . . . . . . . . . . .  1

SUMMARY OF ARGUMENT  . . . . . . . . . . . . . . . . . . . . . .  3

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

I.  CONSIDERATION OF RACE AND ETHNICITY
    IN AN INDIVIDUALIZED ADMISSIONS
    PROCESS SERVES COMPELLING INTERESTS  . . . .  7

    A.  There Is a Broad Consensus On The Important
        Educational Benefits of Diversity . . . . . . . . . . . . . .  7

    B.  Consideration of Race and Ethnicity Grows
        Naturally Out Of The Needs Of The Professions
        and Of American Business  . . . . . . . . . . . . . . . . . . .  10

    C.  The Interests in Diversity and Inclusion That
        Support Well-Designed Programs of Race-Specific
        Affirmative Action in University Admissions
        Do Not Reflect Impermissible Stereotyping . . . . . . .  12

    D.  Advancing The Interests In Diversity and Inclusion
        Is Not Tantamount to Attempting to Remedy
        Societal Discrimination.  . . . . . . . . . . . . . . . . . . . . .  14

II.  STRICT SCRUTINY IS SATISFIED BY
     PROPERLY DESIGNED UNIVERSITY
     ADMISSIONS POLICIES THAT CONSIDER
     RACE AND ETHNICITY  . . . . . . . . . . . . . . . . . . . . . . .  15

     A.  The Distinctive Educational Role of Universities
         Must Be Accommodated in The Application
         Of Strict Scrutiny  . . . . . . . . . . . . . . . . . . . . . . . . .  15

HARV00066523

**JA5510**

DX053.0003

ii

B. Explicit Consideration of Race and Ethnicity In an Individualized Admissions Process Is Fully Capable of Satisfying the Narrow Tailoring Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    1. Petitioners' Arguments Rest on a Misunderstanding of the Admissions Process At Selective Universities . . . . . . . . . . . . . . . . . . 19

    2. The Interest In Racial Diversity Cannot Be Served By Race-Neutral Reliance On Factors, Such As Economic Disadvantage, That Are Already Carefully Considered . . . . . . . . . . . . . 22

    3. The Interest in Racial Diversity Cannot Be Served By The Newer Alternatives Involving Non-Individualized Guaranteed Admissions . . . 23

C. Consideration of Race Does Not Make An Admissions Plan A Quota . . . . . . . . . . . . . . . . . 26

D. Race-Conscious Admissions Programs Are Not Open-Ended Commitments . . . . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

HARV00066524

**JA5511**

DX053.0004

iii

## TABLE OF AUTHORITIES

**Cases**                                         **Page**

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995) . . . . . . . . . . . . . . . . . . . 6, 14, 15-17
*Batson v. Kentucky*, 476 U.S. 79 (1986) . . . . . . . . . . . . . . 26
*Board of Regents v. Southworth*, 529 U.S. 217 (2000) . . . . 15
*Brown v. Bd. of Education*, 347 U.S. 483 (1954) . . . . . . . . 28
*Burson v. Freeman*, 504 U.S. 191 (1992) . . . . . . . . . . . . . 28
*Bush v. Vera*, 517 U.S. 952 (1996) . . . . . . . . . . . . . . . . . . 18
*City of Richmond v. J.A. Croson Co.*,
    488 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
*Dickerson v. United States*, 530 U.S. 428 (2000) . . . . . . . . 8
*Easley v. Cromartie*, 532 U.S. 235 (2001) . . . . . . . . . . . . . 18
*Eldred v. Ashcroft*, 123 S. Ct. 769 (2003) . . . . . . . . . . . . . 28
*Georgia v. McCollum*, 505 U.S. 42 (1992) . . . . . . . . . . . . . 26
*Hills v. Gautreaux*, 425 U.S. 284 (1976) . . . . . . . . . . . . . . 28
*Hunt v. Cromartie*, 526 U.S. 541 (1999) . . . . . . . . . . . . . . 18
*Hunter v. Underwood*, 471 U.S. 222 (1985) . . . . . . . . . . . . 22
*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) . . . . . . 26
*Johnson v. Transportation Agency*, 480 U.S. 616 (1987) . . 17
*Keyishian v. Board of Regents*, 385 U.S. 589 (1967) . . . . . 12
*Metro Broadcasting, Inc. v. FCC*,
    497 U.S. 547 (1990) . . . . . . . . . . . . . . . . . . . . . . . 4, 13, 15
*Mississippi Univ. for Women v. Hogan*,
    458 U.S. 718 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
*Planned Parenthood v. Casey*, 505 U.S. 833 (1992) . . . . . . . 8
*Regents of the University of California v. Bakke*,
    438 U.S. 265 (1978) . . . . . . . . . . . . 1, 7, 8, 14, 16, 25-27
*Regents of the University of Michigan v. Ewing*,
    474 U.S. 214 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
*Shaw v. Reno*, 509 U.S. 630 (1993) . . . . . . . . . . . . . . . . . . 22
*Swann v. Charlotte-Mecklenburg Bd. of Education*,
    402 U.S. 1 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

HARV00066525

**JA5512**

iv

**Cases (continued)**                                        **Page**

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) . . . . . . . . . 16
*United States v. Virginia*, 518 U.S. 515 (1996) . . . . . . . . . . 17
*University of Pennsylvania v. EEOC*,
    493 U.S. 182 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 276 (1986) . . 7, 14


**Miscellaneous**                                           **Page**

ABA REPORT OF THE COMMITTEE ON DIVERSITY
    IN LEGAL EDUCATION (1998) . . . . . . . . . . . . . . . . . . . . . 10
AMA BOARD OF TRUSTEES REPORT, DIVERSITY IN
    MEDICAL EDUCATION (1999) . . . . . . . . . . . . . . . . . . . . . 10
*Appearance and Reality in the Sunshine State*,
    Harvard Civil Rights Project (Feb. 2003) . . . . . . . . . . . 23
Derek Bok, *The Uncertain Future of Race-Sensitive*
    *Admissions* (Jan. 2003) . . . . . . . . . . . . . . . . 10, 11, 23, 25
William G. Bowen & Derek Bok, THE SHAPE OF THE
    RIVER: LONG-TERM CONSEQUENCES OF CONSIDERING
    RACE IN COLLEGE AND UNIVERSITY ADMISSIONS
    (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 21
William G. Bowen & Sarah A. Levin, RECLAIMING
    THE GAME (forthcoming) . . . . . . . . . . . . . . . . . . . . . 21, 29
William G. Bowen & Neil L. Rudenstine,
    *Race-Sensitive Admissions: Back to Basics*,
    CHRONICLE OF HIGHER EDUCATION 87 (Feb. 7, 2003) . . 11
Richard A. Epstein, *A Rational Basis for Affirmative*
    *Action: A Shaky But Classical Liberal Defense*,
    100 MICH. L. REV. 2036 (2002) . . . . . . . . . . . . . . . . . . . 11
Holman W. Jenkins, Jr., *Why the Michigan Case*
    *Matters to Business*, Wall Street Journal,
    Jan. 22, 2003, at A15 . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

HARV00066526

**JA5513**

v

**Miscellaneous (continued)**                                    **Page**

John F. Kain and Daniel M. O'Brien, "Hopwood and the
    Top 10 Percent Law: How Have They Affected the
    College Enrollment Decisions of High School
    Graduates," presented at the National Bureau of
    Economic Research Meeting on Higher Education
    (Boston: Nov. 9, 2001; revised Dec. 2002) . . . . . . . . . . 24
Thomas J. Kane, *Racial and Ethnic Preferences in
    College Admissions*, in THE BLACK-WHITE TEST
    SCORE GAP (Brookings, 1998) . . . . . . . . . . . . . . . . . . . . 23
Glenn Loury, THE ANATOMY OF RACIAL
    INEQUALITY (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
*Percent Plans in College Admissions: A Comparative
    Analysis of Three State Experiences*,
    Harvard Civil Rights Project (Feb. 2003) . . . . . . . . . . . 23
Neil Rudenstine, THE PRESIDENT'S REPORT
    1993-1995: DIVERSITY AND LEARNING . . . . . . . . . . . . . 9
STATISTICAL ABSTRACT OF THE UNITED STATES 2001 . . . 23
Kathleen M. Sullivan, *The Supreme Court,
    1985 Term – Comment: Sins of Discrimination:
    Last Term's Affirmative Action Cases*,
    100 HARV. L. REV. 78 (1986) . . . . . . . . . . . . . . . . . . . . 14

HARV00066527

**JA5514**
DX053.0007

## INTEREST OF AMICI CURIAE

Harvard University, Brown University, the University of Chicago, Dartmouth College, Duke University, the University of Pennsylvania, Princeton University, and Yale University respectfully submit this brief amici curiae in support of respondents.[1]  For the last two-and-a-half decades, highly selective institutions have relied on the approval by five Justices of the favorable consideration of race and ethnicity in the admissions process in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978).  *See id.* at 320 (opinion of the Court per Powell, J.); *id.* at 328 (opinion of Brennan, J., joined by White, Marshall, and Blackmun, JJ., concurring in the judgment in part and dissenting in part) (joining in Part V-C of Justice Powell's opinion).  In *Bakke*, a number of private universities had filed a brief stressing the importance of admissions programs that treat "an applicant's membership in a minority racial group as a favorable factor in the consideration of his application."  Brief of Columbia Univ. *et al.* as *Amici Curiae*, No. 76-811, at 4.  Under this model, amici and other highly selective educational institutions consider an academically qualified student's race or ethnicity as one among many factors in a carefully designed, competitive admissions process that views each applicant as an individual and weighs the capacity of each to contribute to the class as a whole.

The 25 years since *Bakke* have seen extensive efforts by amici and other selective universities to encourage minority applications and expand minority admissions.  The principle underlying *Bakke* has become the basis of well-settled reliance not only by amici, but also by students, alumni, high schools, and businesses.  To abandon *Bakke* now would trigger wrenching disruption.

---

[1] Pursuant to Rule 37.6, amici certify that no counsel for any party authored this brief in whole or in part.  No persons other than the amici curiae or their counsel made a monetary contribution to the preparation or submission of this brief.  Letters reflecting the parties' consent to the filing of this brief have been filed with the Clerk.

HARV00066528

2

Amici's experience during the quarter century since *Bakke* has confirmed the wisdom of that decision. Amici's admissions policies have served compelling pedagogical interests by contributing to a diverse and inclusive educational experience, teaching students to view issues from multiple perspectives, and helping to break down prejudices and stereotypical assumptions. The policies prepare students to work productively in a multiracial environment after they graduate, and the policies meet the demands of business and the professions by preparing a generation of public and private leaders for an increasingly pluralistic national and global economy.

To be sure, the admissions process must not be used to separate, subordinate, or stigmatize students, or to exclude any student from any place in an entering class on account of that student's race. But a prohibition on such illegitimate practices does not justify jettisoning the genius of federalism or replacing the benefits of competition, experimentation, and heterogeneity with the dead hand of a stifling uniformity. So long as they do not employ these illegitimate practices, different universities should be free to craft their own distinctive approaches. Such a course would be especially appropriate if there were any uncertainty or ambiguity about the best means for promoting racial diversity. It is vital that the Constitution be understood to protect – not to eviscerate – the capacity of universities thoughtfully to determine how to fulfill their profound responsibility: educating a diverse array of talented students to reason rigorously, to bridge differences both real and imagined, and to emerge as effective citizens and leaders in a multiracial society.

Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial "discrimination," the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits this Court might place on state university admissions criteria or procedures.

HARV00066529

**JA5516**
DX053.0009

3

Accordingly, amici urge this Court to interpret the Constitution and federal statutes to leave amici and other selective educational institutions with latitude to take race and ethnicity into account as positive factors in their individualized admissions processes.

## SUMMARY OF ARGUMENT

Academically selective universities have a compelling interest in ensuring that their student bodies incorporate the experiences and talents of the wide spectrum of racial and ethnic groups that make up our society. Amici should be free to compose a class that brings together many different kinds of students; that includes robust representation of students from different races and ethnicities; and that prepares graduates to work successfully in a diverse nation. Indeed, highly selective universities have long defined as one of their central missions the training of the nation's business, government, academic, and professional leaders. By creating a broadly diverse class, amici's admissions policies help to assure that their graduates are well prepared to succeed in an increasingly complex and multi-racial society. The policies also make certain that no racial or ethnic group is excluded from that vital process. Nor have amici been educating students to meet a merely imagined need. Every major profession in America has made known a desire for diversity within its ranks. Businesses demand that the graduates of highly selective universities both be diverse and be prepared to work with colleagues from different backgrounds.

There is widespread agreement on these fundamental principles. Thus, even while opposing the particular programs in these cases, the United States recognizes that universities have an important – what it calls "paramount" (U.S. Grutter Br. 16) – interest in attracting students from a wide range of backgrounds, explicitly endorsing the "laudable goals of educational openness and diversity." U.S. Gratz Br. 16. The United States accepts that it is entirely legitimate for universities to concern themselves with "ensur[ing] that [they] are open to all individuals and that student bodies are educationally diverse and broadly

HARV00066530

**JA5517**
DX053.0010

4

representative of the public." *Id.* at 17. In particular, the United States acknowledges that "universities may adopt admissions policies that seek to promote experiential, geographical, political, or economic diversity . . . ." U.S. Grutter Br. 10.

The United States, to be sure, does not expressly include "racial diversity" within its general endorsement. But that reticence cannot reflect any sound limitation on the reach of the "diversity" that is relevant in these cases. It would be a strange, almost otherworldly, version of diversity that recognized the importance of all kinds of differences *except* racial ones. Certainly, American businesses, the professions, and the remaining elements of our society consider racial diversity to be of central importance. This Court should adhere to the principle of *Bakke*, which has been inextricably woven into the American social fabric over the past quarter century.

None of us favors a return to de facto segregation, or anything like it, in our leading universities. The principal issue in this case is the *means* by which racial and ethnic diversity should be achieved. This Court should respect the institutional competence and academic freedom of amici and of other highly selective universities, public and private, regarding the most appropriate means to achieve these agreed-upon ends. Rather than imposing a unitary, top-down model of how to be race-conscious *enough* without being *too* race-conscious, the Court should preserve the flexibility of universities to pursue carefully calibrated admissions policies designed to promote student diversity and the vital educational benefits that flow from it.

It is instructive to contrast the minority broadcast licensing preferences at issue in *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547 (1990). Those preferences necessarily depended for their success on the assumption that differences in the race of station owners would lead to differences in speech; otherwise, the programming at issue would have been unchanged. But the purposes of amici's admissions policies are served whether the views held by individual minority students, or by minority

HARV00066531

5

students on average, turn out to be very different or virtually indistinguishable from those of other students. The policies contemplate simply that being of a particular race, especially a race subject to historical and continuing prejudices, entails experiences that people of other races have not had and ought to understand better. These differences will vary from individual to individual, thus resulting in substantial differences within racial groups as well. Far from reflecting and perpetuating stereotypes, amici's admissions policies are consciously designed to dissolve them.

The critics of Michigan's admissions programs insist that mechanistic approaches – such as guaranteed admission for a specified percentile of high school graduates (as in California, Florida, and Texas) – or softer "race-neutral" proxies (like economic disadvantage) can be deliberately adjusted to replicate the racial and ethnic mix that explicit consideration of race in the admissions process would have achieved. According to the critics, the Constitution forbids overt consideration of race or ethnicity, even as part of a highly individualized admissions process. Instead, the university must be relegated to a purportedly "race-blind" approach – whose very aim, however, is to achieve the same diverse racial and ethnic mix.

Petitioners' proposed alternatives would be infeasible and ineffective. Although petitioners suggest that universities should consider factors like economic circumstances and personal hardships, the truth is that those factors are already taken into account in the typical selective admissions process. Petitioners' proposals for guaranteed admissions plans for the top GPA-achievers among the applicant pool are unworkable for relatively small private universities, which simply cannot promise to admit the top ten percent (or even the top one per cent) of graduating high school seniors. Nor could graduate schools, with fewer available spaces and even more selective criteria, feasibly operate under such formulas.

Petitioners' proposals would also compromise the quality of

HARV00066532

6

student populations at selective universities. Thus, even if a policy of guaranteed admission for students graduating in a specified percentile of their high school class succeeded in admitting a certain number of minority students, it would likely compel the admission of so many other, non-minority applicants as to eliminate available spaces in the college class for those with unusual backgrounds, experiences, and other talents to contribute. Such alternatives are therefore fundamentally incompatible with the commitment to consider each applicant on his or her individual merit, taking into account *all* factors, not just test scores or class rank, that would militate for or against admission to a selective university. Whatever strict scrutiny properly requires, it should not force universities to achieve one vital interest (racial diversity) to the exclusion of another (treatment of students as individuals) and thereby compromise the constitutional imperative of academic freedom.

Nor should strict scrutiny be distorted to require amici to adopt disingenuous admissions policies – policies that would seek to accomplish with a wink and a nod the very diversity that petitioners contend amici are forbidden to achieve directly. Far more consistent with our constitutional traditions is an application of strict scrutiny that honors candor and transparency, that respects individualized evaluation, that recognizes the institutional competence of our nation's many and diverse educational institutions in framing their own learning strategies, and that can, as this Court has put it, distinguish between a "No Trespassing sign" and a "welcome mat." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229 (1995). Such an application of strict scrutiny would regard the asserted ability of alternative methods to approximate the racial diversity that a sensibly designed program of race-based affirmative action can achieve not as proof that such a program should be struck down but as an inadvertent concession that the program is indeed constitutionally justified. Just as imitation is at times the sincerest form of flattery, so in this context petitioners' argument helps establish the breadth of the fundamental consensus that

HARV00066533

7

seeking a racially diverse student body, and attempting to graduate a class of future leaders able to operate effectively within a diverse and pluralistic society, represent neither "reverse discrimination" nor the patronizing use of race to perpetuate stereotypes of inferiority but simply educational measures within the competence and familiar domain of American universities.

Because petitioners' constitutional challenges to the admissions policies in both cases ignore these basic lessons and are deficient as a matter of law, the judgments of the court of appeals in No. 02-241 and of the district court in No. 02-516 should be affirmed.

## ARGUMENT

### I. CONSIDERATION OF RACE AND ETHNICITY IN AN INDIVIDUALIZED ADMISSIONS PROCESS SERVES COMPELLING INTERESTS.

#### A. There Is a Broad Consensus On The Important Educational Benefits of Diversity.

It is appropriate to begin with the substantial common ground in this case: the United States acknowledges that "[e]nsuring that public institutions are open and available to all segments of American society, including people of all races and ethnicities, represents a *paramount government objective*." U.S. Grutter Br. 16 (emphasis added). Indeed, almost twenty-five years ago, this Court held that a university "has a substantial interest that legitimately may be served by a properly devised admissions program involving the competitive consideration of race and ethnic origin." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 320 (1978) (Part V-C, opinion of Powell, J.); *see id.* at 272 (Brennan, White, Marshall, Blackmun, J.J., joining Part V-C); *see also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 276, 286, 289 n.* (1986) (O'Connor, J., concurring in part and concurring in the judgment) (*Bakke* recognized the "compelling" nature of "a state interest in the promotion of racial diversity * * * in the context of higher education").

HARV00066534

8

Tellingly, the United States does not ask this Court to overturn *Bakke*. U.S. Grutter Br. 15 n.4. In fact, the United States maintains that "this case requires this Court to break no new ground." *Id.* at 12. The best way to achieve that objective is to adhere to the core principle of *Bakke*. Since that decision, universities across the country have operated on the well-founded belief that they are free to give favorable consideration to race and ethnicity as part of their individualized admissions programs. To reverse course now, after a quarter century of reliance – to repudiate the importance of seeking racial inclusiveness through a carefully designed program consistent with *Bakke* – would be to upset deeply grounded expectations in a way utterly contrary to the doctrine of *stare decisis. See Dickerson v. United States*, 530 U.S. 428, 442-44 (2000); *Planned Parenthood v. Casey*, 505 U.S. 833, 861-69 (1992).

Amici's experience in the two-and-a-half decades since 1978 confirms the wisdom of *Bakke*'s premise. Selective universities across the country have built their communities mindful of the pedagogical value of multiracial diversity in educational programs. Students are both recipients and providers of the learning that takes place at universities, and amici thus have a vital interest in what students bring to the task of educating each other. In a recent survey, for example, 69 percent of Harvard Law School students and 73.5 percent of Michigan Law School students reported that having "students of different races and ethnicities" was a "clearly positive element of their educational experience."[2] Diversity helps students confront perspectives other than their own and thus to think more rigorously and imaginatively; it helps students learn to relate better to people from different backgrounds; it helps students become better citizens. The educational benefits of student diversity include

---

[2] Gary Orfield and Dean Whitla, DIVERSITY IN LEGAL EDUCATION 16 (1999). *See also* Richard J. Light, MAKING THE MOST OF COLLEGE 9-10, 129, 132-35 (2001).

HARV00066535

9

the discovery that there is a broad range of viewpoint and experience *within* any given minority community – as well as learning that certain imagined differences at times turn out to be only skin deep.

It is surely fitting for universities to undertake to prepare their students to live and work in a global economy within a multiracial world. The challenges of contemporary life demand that students acquire not just traditional forms of knowledge regarding science and the arts, but also techniques of bridging differences in perspective and in personal experience. Amici have concluded, as a matter of reasoned educational judgment, that their admissions policies are well adapted to such learning. This Court has no reason to distrust that judgment or to impose a set of uniform rules on the university admissions processes of the fifty states and of countless private institutions.

Amici have adopted admissions programs seeking racial and ethnic diversity as a natural part of a long and expanding policy of inclusion. Harvard, for example, has been pursuing the idea of student diversity for a period that dates to the nineteenth century. *See* Neil Rudenstine, THE PRESIDENT'S REPORT 1993-1995: DIVERSITY AND LEARNING 3-13. In its early stages, the concept of diversity was rooted primarily in geography. Thus, George Washington's will bequeathed funds for a national university so that "the youth of fortune and talents from all parts" might, "by associating with each other," be "enabled to free themselves in a proper degree" from "local prejudices and habitual jealousies."[3]

Ultimately, amici embraced a broader vision of diversity. Thus, President Charles Eliot declared that students need to "feel that very wholesome influence which comes from observation of and contact with larger numbers . . . from different nations, States, schools, families, sects, parties, and conditions of life."

---

[3] Available at http://gwpapers.virginia.edu/will/text.html.

HARV00066536

**JA5523**

DX053.0016

10

THE PRESIDENT'S REPORT 1993-1995 at 10. As Eliot saw it, Harvard students should be children of the "rich and poor," the "educated and uneducated," rather than representing just one segment of American society. *Id.* Throughout the twentieth century, therefore, the University increasingly accepted students from public, rather than private, schools, and became increasingly, and then fully, coeducational. It also undertook to expand the enrollment of students from different ethnic groups, primarily of European origin, that had previously been represented at Harvard, if at all, in only small numbers. *Id.* at 24-25.

It is against this historical backdrop that selective universities ultimately developed their admissions policies with respect to African-Americans and other minority groups that have been subject to targeted exclusion from many of the benefits of American life. Far from adopting a theory for the convenience of the moment, amici simply recognized, as they had in the past, that students from these minority groups would bring valuable new experiences to the university community.

**B. Consideration of Race and Ethnicity Grows Naturally Out Of The Needs Of The Professions and Of American Business.**

Amici have a special interest in this pair of cases stemming from their distinctive responsibility, since colonial times, to educate leaders in all walks of life. As the United States has explained, "[a] university degree opens the doors to the finest jobs and top professional schools, and a professional degree, in turn, makes it possible to practice law, medicine and other professions." U.S. Grutter Br. 16. Highly selective academic institutions are keenly aware of a responsibility to train not only doctors, lawyers, and accountants, but also corporate, government, social, and academic leaders.

Every major profession in this country has sought greater

HARV00066537

JA5524

11

diversity within its ranks.[4] Businesses have demanded more minority managers and executives, as well as non-minorities who can work well with colleagues from diverse backgrounds. Leading corporations, business groups, professional organizations, and executives have repeatedly called for consideration of race and ethnicity in university admissions.[5] In adopting their admissions policies, universities are responding to "the clearly articulated needs of business and the professions for a healthier mix of well-educated leaders and practitioners from varied racial and ethnic backgrounds. . . . [B]usinesses depend heavily on their ability to recruit broadly trained individuals from many racial backgrounds who are able to perform at the highest level in settings that are themselves increasingly diverse."[6]

Commentators across the political spectrum have recognized and applauded the fact that "[t]he level of affirmative action in the United States in the private sector on grounds of race goes far beyond what is needed to keep firms out of hot water. It represents a sustained and consistent effort to change the dominant practices in the United States." Richard A. Epstein, *A Rational Basis for Affirmative Action: A Shaky But Classical Liberal Defense*, 100 MICH. L. REV. 2036, 2053 (2002). That is why there is broad support in the business community for consideration of race in university admissions. Holman W. Jenkins, Jr., *Why the Michigan Case Matters to Business*, Wall Street Journal, Jan. 22, 2003, at A15 (noting the "dozens of companies" filing briefs in support of Michigan in this case).

Empirical data have confirmed the value of amici's

---

[4] *See* ABA REPORT OF THE COMMITTEE ON DIVERSITY IN LEGAL EDUCATION 7-8 (1998); AMA BOARD OF TRUSTEES REPORT, DIVERSITY IN MEDICAL EDUCATION 2,4 (1999); Derek Bok, *The Uncertain Future of Race-Sensitive Admissions* 4-8 (Jan. 2003) (available at www.nacua.org/documents).

[5] Derek Bok, *The Uncertain Future of Race-Sensitive Admissions* 8-10.

[6] William G. Bowen & Neil L. Rudenstine, *Race-Sensitive Admissions: Back to Basics*, CHRONICLE OF HIGHER EDUCATION 87 (Feb. 7, 2003).

HARV00066538

12

admissions programs in serving this interest. In a study of 45,000 students who matriculated in 1976 and 1989, Derek Bok, former president of Harvard, and William G. Bowen, former president of Princeton, have shown that minority students admitted under these programs were highly successful in completing rigorous academic programs, securing good jobs, and contributing to community life.[7]

As this Court has noted, "[t]he Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'" *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (D.D.C. 1943)). Amici's admissions programs are well adapted to achieving this paramount interest.

### C. The Interests in Diversity and Inclusion That Support Well-Designed Programs of Race-Specific Affirmative Action in University Admissions Do Not Reflect Impermissible Stereotyping.

The interests asserted by amici do not rest on a stereotypical assumption that all members of the same race have had the same or similar experiences, much less that they have the same fixed set of perceptions or beliefs. The interest in ensuring that minorities are not excluded from the professions and positions of future leadership does not hinge at all on any prediction that they

---

[7] The study found that approximately 90 percent of all graduates in 1976 were involved in such civic activities as community service, youth organizations, or cultural and arts activities. The rate of participation for black men is even higher, and black men and women are more likely to serve in a leadership position. *See* THE SHAPE OF THE RIVER: LONG-TERM CONSEQUENCES OF CONSIDERING RACE IN COLLEGE AND UNIVERSITY ADMISSIONS 6-11 (2000). These professionals "are the backbone of the emergent black . . . middle class . . . . [T]hey can serve as strong threads in a fabric that binds their own community together and binds those communities into the larger social fabric as well." *Id.* at 116.

HARV00066539

**JA5526**
DX053.0019

will have particular views or philosophies, let alone that such views are monolithic.

Nor do the pedagogical benefits of diversity depend on stereotypical assumptions. Instead, those benefits rest upon a quite different expectation: that minority students will have had formative experiences that they would not have had as identically situated students of a different race. In the context of higher education, recognition of this real-world difference should be no more impermissible than recognition that gender plays a role, one that differs from individual to individual, in how young men and women grow up.

What those experiences are, and how each student has reacted to them, is part of what amici hope students will explore. Both minority and non-minority students will have the opportunity to reconsider preconceptions and prejudices in the course of obtaining a university education in a diverse environment. Indeed, one of the valuable lessons for non-minorities to discover is that members of a minority group do not all share the same views and opinions; far from it. Thus, amici's admissions policies are central elements in their strategy for *breaking down* racial and ethnic stereotypes. Openness to differing life experiences and perspectives, and the capacity to rethink what has been previously thought, are critical objectives of educational diversity in the first place.

The assumptions underlying the FCC station-ownership program in *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547 (1990), were very different. As devised, that program depended for its very existence on a conclusive presumption that minority station owners would make different broadcast programming choices from those that nonminority owners would make. *See id.* at 566-71. The FCC program also assumed that the views of minority owners about desirable programming would remain static – that is, remain distinctly "minority" views – during the entire period of ownership. Indeed, the FCC's presumption about minority tendencies was so rigid that it expected minority station

HARV00066540

14

owners, by reason of their race alone, to resist the market forces that had shaped broadcast programming up to that point. *See id.* at 626 (O'Connor, J., dissenting). Nothing approaching that sort of presumption is present in amici's admissions programs.

### D. Advancing The Interests In Diversity and Inclusion Is Not Tantamount to Attempting to Remedy Societal Discrimination.

Petitioners seek to equate the promotion of educational diversity with the pursuit of remedies for "societal discrimination," Grutter Br. 40; Gratz Br. 33, a mission this Court has described as too "amorphous" to support a number of race-based measures. *See Adarand Constructors*, 515 U.S. at 220; *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 497-99 (1989) (plurality opinion); *Wygant*, 476 U.S. at 267 (plurality opinion). That the two goals are distinct is shown by the fact that Justice Powell rejected the interest in remedying societal discrimination in both *Bakke* and *Wygant*, but said in *Bakke* that he found educational diversity to be a compelling justification for considering race in university admissions. *See* 438 U.S. at 314. It has been suggested that the remedial interest is backward-looking and may at times even be punitive, while the educational diversity interest is forward-looking and inclusive. *See* Kathleen M. Sullivan, *The Supreme Court, 1985 Term – Comment: Sins of Discrimination: Last Term's Affirmative Action Cases*, 100 HARV. L. REV. 78 (1986). And, most importantly, the educational diversity interest is contextually limited by its link to the teaching mission of the university in a way that an interest in remedying societal discrimination could never be.[8]

---

[8] The same distinction was evident in *Wygant*. *See* 476 U.S. at 276-77 (plurality opinion); *id.* at 288 (O'Connor, J., concurring in part and concurring in the judgment). Importantly, the Court in *Wygant* did not rule out all consideration of race for educational purposes: to the contrary, in her separate opinion, Justice O'Connor expressly distinguished the asserted "remedial" role model justification from the (unasserted) justification in having a racially diverse faculty. *See id.* at 289 & n.* (O'Connor, J., concurring in part and

HARV00066541

15

## II. STRICT SCRUTINY IS SATISFIED BY PROPERLY DESIGNED UNIVERSITY ADMISSIONS POLICIES THAT CONSIDER RACE AND ETHNICITY.

Strict scrutiny is, of course, a two-part test. Having established a compelling reason for consideration of race in decisionmaking as part of carefully calibrated procedures, an institution must also demonstrate that its use of race is "narrowly tailored" to the identified interest. *See Adarand Constructors*, 515 U.S. at 227; *see also Metro Broadcasting*, 497 U.S. at 617 (O'Connor, J., dissenting). This test is met by properly designed university policies that take race and ethnicity into account as part of the individualized and competitive admissions process.

### A. The Distinctive Educational Role of Universities Must Be Accommodated in The Application of Strict Scrutiny.

In addressing a university's choice of a specific admissions process, this Court should accord significant respect to the variety of ways in which our nation's institutions choose to compose their student bodies. Differences over the optimal means for promoting racial diversity suggest that the proper course is to allow each university to pursue its own admissions policy within constitutional constraints that are not so tight as to suffocate all possibilities for variation.

The judicially recognized and constitutionally grounded tradition of academic freedom, and the deeply ingrained practice of deference to educators' judgments on educational matters, combine to make it especially appropriate to defer to amici's well supported assessment that individualized consideration of race and ethnicity in the admissions process is essential for selective universities to perform their broad educational function. *See Board of Regents v. Southworth*, 529 U.S. 217, 233 (2000); *University of Pennsylvania v. EEOC*, 493 U.S. 182, 199 (1990)

---

concurring in judgment).

HARV00066542

## JA5529

16

(noting "importance of avoiding second-guessing of legitimate academic judgments"); *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 226 n.12, 227 (1985) ("Academic freedom thrives on . . . autonomous decisionmaking by the academy itself").

This Court has previously acknowledged "the vital role in a democracy that is played by those who guide and train our youth." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Academic freedom can and should be accorded a role in supporting a degree of judicial deference, particularly with respect to questions regarding the precise fit of the interests in diversity with the universities' other choices about their mission and the availability of alternative means to serve those interests. *See Bakke*, 438 U.S. at 314 (opinion of Powell, J.). Although strict scrutiny is properly demanding, it should not be applied so as to deprive university officials of responsibly exercised discretion to define what the university shall be, "what may be taught, how it shall be taught, and who may be admitted to study." *Id.* at 312 (opinion of Powell, J.) (quoting *Sweezy*, 354 U.S. at 263 (Frankfurter, J., concurring in result).

Nor have this Court's decisions created a paradigm of "strict scrutiny" so rigid as to rule out careful consideration of context. To be sure, this Court has at times spoken as though literally all decisions that consider an individual's race – even for such laudatory purposes as combatting or offsetting the lingering effects of discrimination against racial minorities – are to be equated with the constitutional anathema of racial segregation. In reality if not always in rhetoric, however, the Court has been far more nuanced in its understanding of the many and varied uses of race, making clear that strict scrutiny does not mean that all race-conscious measures are nearly certain to be doomed. "The point of carefully examining the interest asserted by the government in support of a racial classification, and the evidence offered to show that the classification is needed, is precisely to distinguish legitimate from illegitimate uses of race in

HARV00066543

17

government decisionmaking." *Adarand Constructors*, 515 U.S. at 227.

Thus, in *Adarand Constructors*, this Court distinguished between uses of race that literally segregate people into different physical locations or applicant pools on the basis of their race (a "No Trespassing" sign) and uses of race that serve principally to broaden and diversify the set of those who are invited in by rounding out a multi-variabled assessment of individuals (a "welcome mat"). 515 U.S. at 229. In this pair of cases, giving favorable consideration to minority race and ethnicity in individualized admissions processes that *exclude no one from any place in an entering class on account of race* is the proverbial "welcome mat" that does not use race in a segregative or constitutionally offensive way.[9]

In this regard, there is an instructive parallel between legislative redistricting and university admissions. Each activity is part of a process for the formation of groups in the operation of a pluralistic system – whether for lawmaking or for the composition of a diverse student class. Moreover, just as there is usually no way for those drawing legislative district lines to avoid knowing the race and party affiliation of the residents of the voting districts that will be created, so too there is often no way for amici to avoid learning the race and ethnicity of their applicants as part of the individualized admissions processes on

---

[9] The members of this Court have drawn similar distinctions in other contexts, recognizing that use of sometimes problematic classifications does not invariably trigger a uniformly heightened level of constitutional alarm. *See, e.g., United States v. Virginia*, 518 U.S. 515, 533-34 (1996) ("Sex classifications may be used . . . to advance full development of the talent and capacities of our Nation's people."); *Johnson v. Transportation Agency*, 480 U.S. 616, 656 (1987) (O'Connor, J., concurring in the judgment) (gender may be used as a "'plus' factor" in affirmative action plan); *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 728 (1982) ("In limited circumstances, a gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened.").

HARV00066544

18

which amici rely. Through alumni interviews, application essays, and campus visits, amici gain a keen appreciation for the talents and backgrounds of their prospective students. To demand that amici close their eyes to the race and ethnicity of those students – alone among their many relevant characteristics – is as unrealistic as it is unjustified.

There are basic differences, of course, between forming a new legislative district and forming an entering college or law school class. Yet the two processes have enough in common that it is notable that this Court has not merely *upheld* redistricting that takes conscious and deliberate account of race but has actually concluded that "[s]trict scrutiny does not apply" invariably to such redistricting. *Bush v. Vera*, 517 U.S. 952, 958 (1996); *see also Easley v. Cromartie*, 532 U.S. 235, 241 (2001); *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999). In view of this approach to redistricting, it would be surprising to conclude at the same time that, whenever a university class is formed with consciousness of race, strict scrutiny not only *applies* but proves *fatal*. That no such conclusion does follow, and that the contrasts in legal doctrine are not so surprisingly stark after all, is entailed by what is special about universities as places that educate their students, and expect their students to educate each other, to take their place in a multiracial world. This mission enables universities' individualized and competitive consideration of race to satisfy strict scrutiny, while similar uses of race by most other institutions would presumably fail to pass that test.

### B. Explicit Consideration of Race and Ethnicity in an Individualized Admissions Process Is Fully Capable of Satisfying the Narrow Tailoring Requirement.

The arguments raised by petitioners and their amici are beset by intractable contradictions. On the one hand, they complain that university admissions policies have impermissible collateral effects on those displaced by supposedly less qualified minorities. On the other, they contend that supposedly race-

HARV00066545

**JA5532**
DX053.0025

19

neutral alternatives can advance the same compelling interests in producing equally diverse and racially inclusive student populations. But if petitioners are correct that the alternatives will result in essentially the same levels of minority enrollments, then the impact on displaced non-minorities will, at minimum, be the same (and may even be worse, given the imprecise and overbroad nature of petitioners' alternatives). And if petitioners are not correct, as amici's experience strongly suggests, then their alternatives will not suffice. Either way, petitioners' arguments fail.

Moreover, petitioners' mechanistic, by-the-numbers proposals would threaten the ability of selective universities to ensure *non*-racial diversity in their student bodies – whether in terms of musical talents, unusual personal experiences, or other kinds of contributions. These proposals are anti-meritocratic and utterly contrary to amici's individualized admissions philosophies. Under petitioners' approach, the composition of an entering class will be changed for the worse, to the detriment of every student and the educational objectives of amici.

### 1. *Petitioners' Arguments Rest on a Misunderstanding of the Admissions Process at Selective Universities.*

An understanding of amici's admissions programs makes clear why petitioners' arguments are fundamentally misguided. The purpose of a university admissions process is not simply to identify the students who, if admitted, would be likeliest to earn the highest grade-point averages. Quite apart from the impossibility of reliably making that prediction, pursuit of so narrow a goal would be unlikely to yield a student body that any sensible university would wish to enroll. While amici continue to place the highest priority on academic rigor, they have always sought to enroll a broad cross-section of students who can bring a critical mix of experiences and perspectives into the university community and who can leave it well prepared to serve as future leaders of our society.

The factors considered in amici's individualized admissions

HARV00066546

20

programs are extraordinarily varied, wide-ranging, and notoriously difficult to quantify. Although petitioners and the United States sometimes give the impression that university admissions officers consider just test scores, class rank, and race, little could be more misleading. At Harvard College, for example, every application is read individually by at least one admissions officer and often two or more. All applicants are further considered, and any who are serious contenders for admission are discussed by a multi-member admissions subcommittee.[10] Candidates are reviewed and discussed yet again by the entire admissions committee, consisting of approximately 30 members, often supplemented by faculty members in relevant departments. All this review and discussion is necessary precisely because the admissions process seeks to form a class that is diverse along multiple dimensions, of which race is but one – a class that is more than the sum of its individual student parts.

Admission factors begin, of course, with the core academic criteria, including not just grades and test scores but teacher recommendations and state, regional, national, and international awards. In some cases, those criteria will be all but decisive, either positively (very rarely) or negatively (more often). In the vast majority of cases, however, they are not themselves decisive, and the process continues. Admissions officials give special attention to, among others, applicants from economically and/or culturally disadvantaged backgrounds, those with unusual athletic ability, those with special artistic talents, those who would be the first in their families to attend any college, those whose parents are alumni or alumnae, and those who have overcome various identifiable hardships. The committee also extends favorable consideration to applicants who write

---

[10] Well before they begin reviewing applications, amici engage in extensive recruiting efforts to encourage talented students, including those from minority backgrounds, to apply.

HARV00066547

**JA5534**

21

exceptionally well, to applicants who show a special dedication to public service, and to those who demonstrate unusual promise in a wide variety of fields.

These factors have a common feature: they provide evidence that particular students – all of whom have academic records very similar to many other highly capable students – are likely to add something distinctive to the university and, post-graduation, to the larger society. The decisions about whom to admit are typically made not head-to-head but sequentially, with an eye to the composition of the overall class. Each factor becomes part of the case for a particular applicant, just as other factors increase the chances for competing applicants. No one factor, including race, is dispositive, as empirical data make clear.[11]

By the same token, the individualized admissions process means that simply eliminating the consideration of minority race and ethnicity would not significantly increase any given non-minority student's odds of gaining admission to an academically selective university. Data from a representative sample of selective colleges and universities demonstrate that the admissions rate for white students would rise by less than two percentage points, from roughly 25 percent to 26.5 percent.[12]

---

[11] Analysis of data from leading private research universities for the undergraduate class entering in 1999 indicates that, among male minority applicants with combined SAT scores in the 1200-1299 range (within the top 10 percent of minority test-takers and the top 20 percent of all test-takers), the probability of admission was only about 35 percent. In other words, roughly two in three of these minority candidates were denied admission. At the very top of the SAT range (1400+), nearly two out of five were rejected. Indeed, the data show that recruited athletes at many selective colleges are far more likely to be admitted at a given SAT level than are minority candidates. *See* William G. Bowen & Sarah A. Levin, RECLAIMING THE GAME (forthcoming).

[12] Bowen and Bok, THE SHAPE OF THE RIVER 26, 36.

HARV00066548

22

**2.** ***The Interest In Racial Diversity Cannot Be Served By Race-Neutral Reliance On Factors, Such As Economic Disadvantage, That Are Already Carefully Considered.***

Petitioners argue that race-conscious admissions decisions are unnecessary because suitable attention to race-neutral factors will do just as well. The United States urges (as one solution) that universities look to such factors as special economic hardship instead of race. *See* U.S. Grutter Br. 24-25. But the decisive fact is that all of the suggested race-neutral factors, and many more besides, already enter into admissions decisions.[13] Consideration of those factors alone does not achieve the distinctly *racial* diversity that amici seek in their student bodies. To accomplish that goal, admissions committees must give favorable consideration to minority race *in addition* to those other factors, not *instead* of them.

To "tweak" the race-neutral factors emphasized by petitioners – for example, by deliberately tilting individual admissions toward "hardship" students in the hope of thereby selecting a large enough increment of minority students to make up for the losses that would result from race-blind admissions – would be disingenuous at best. Such an approach would in truth be a race-based policy and not a race-neutral alternative at all. Indeed, such programs, if adopted to assure increased minority enrollment, would be based on race in a causal sense and would thus raise obvious constitutional questions of their own. *See Shaw v. Reno*, 509 U.S. 630, 643-44 (1993); *Hunter v. Underwood*, 471 U.S. 222, 228-33 (1985). And no one is well

---

[13] The United States cites, as possible factors, "a history of overcoming disadvantage, geographic origin, socioeconomic status, challenging living or family situations, reputation and location of high school, volunteer and work experiences, exceptional personal talents, leadership potential, communication skills, commitment and dedication to a particular cause, extracurricular activities, extraordinary expertise in a particular area, and individual outlook as reflected by essays." U.S. Grutter Br. 25. Amici already give significant favorable consideration to all of these factors.

HARV00066549

23

served, especially in a university setting animated by respect for truth, by preferring covert processes to those that are candid, open, and forthright.

In any event, such programs would interfere with or profoundly alter what a university is seeking to achieve, not merely serve the goal in an alternative way. A race-neutral preference for economically disadvantaged students, for example, would admit many more whites than non-whites, because of sheer demographic realities.[14] And, of course, the university interest in admitting minority students goes well beyond just admitting minority students from disadvantaged backgrounds.

### 3. *The Interest in Racial Diversity Cannot Be Served By The Newer Alternatives Involving Non-Individualized Guaranteed Admissions.*

There are related, and no less serious, problems with plans – like those in Florida, Texas, and California – that guarantee admission to students who graduate in a certain percentile of their class. Available research suggests that the impact of these plans on minority admissions is quite limited and due in significant part to lingering racial segregation in secondary schools – itself a deeply problematic state of affairs.[15]

---

[14] See Columbia Brief in *Bakke* at 19; *see also* STATISTICAL ABSTRACT OF THE UNITED STATES 2001, at 442-43, Tables 679, 682 (1999 figures: 21.9 million Whites below poverty line; 8.36 million Blacks; 1.16 million Asians and Pacific Islanders; 7.4 million Hispanics); Thomas J. Kane, *Racial and Ethnic Preferences in College Admissions*, in THE BLACK-WHITE TEST SCORE GAP 448 (Brookings, 1998).

[15] See *Appearance and Reality in the Sunshine State*, Harvard Civil Rights Project (Feb. 2003) (available at www.civilrightsproject.harvard.edu); *Percent Plans in College Admissions: A Comparative Analysis of Three State Experiences*, Harvard Civil Rights Project (Feb. 2003) (available at www.civilrightsproject.harvard.edu); Derek Bok, *The Uncertain Future of Race-Sensitive Admissions* at 34 (reporting that while the number of black applicants to the University of Texas (Austin) rose by more than 20 percent

HARV00066550

24

Moreover, these proposals would plainly be impractical for relatively small, academically selective universities. For example, even if a college were to guarantee admission only to valedictorians in high schools across the country, the program simply could not work: according to the U.S. Department of Education, there are well over 30,000 high schools in the United States. In 2002, almost 2,900 valedictorians applied to Harvard, but the number of applicants offered admission to the freshman class was only 2,066. Over 1,600 applicants scored a perfect 800 on their verbal SATs, and over 2,100 scored a perfect 800 on the math portion. Harvard College could not accept all applicants in either category and would not wish to do so.

Nor could guaranteed admissions plans feasibly operate at the graduate level, where the pools of applicants are very different and the entering classes much smaller. Applicants to graduate schools are competing for far fewer spaces, making the problems of guaranteeing admission slots all but insurmountable. Notably, while petitioners and the United States endorse these plans, they make no real effort to show how the experience of a handful of large States would be transferable to other, very different, public and private institutions.

Practicalities aside, the allocation of guaranteed places is incompatible with the long-standing policies and practices of any truly selective university. Guaranteed admission plans would deny admissions officers the critical capacity to consider each applicant as an individual on his or her overall merits in the context of the admitted group as a whole. For example, a black student with lower class standing from a rigorous urban school

between 1996 and 2001, the number of blacks admitted fell by more than 15 percent and that while the number of Hispanic applicants rose by 20 percent, the number admitted dropped by almost 12 percent); John F. Kain and Daniel M. O'Brien, "Hopwood and the Top 10 Percent Law: How Have They Affected the College Enrollment Decisions of High School Graduates," presented at the National Bureau of Economic Research Meeting on Higher Education (Boston: Nov. 9, 2001; revised Dec. 2002).

HARV00066551

**JA5538**
DX053.0031

may well be academically superior to black students who graduate at the top of smaller and less rigorous high schools. In Texas, for example, the average SAT scores of the top 10 percent of University of Texas students dropped from 1242 in 1996 to 1211 in 2000. The percentage of the class with scores under 1000 virtually doubled.[16] In principle, a sensibly selective admissions program should take the strongest students, including the strongest minority students, a result that can be achieved only by amici's genuinely individualized procedures.

A practice of awarding of guaranteed places would thus diminish the ability of selective universities to achieve excellence and non-racial forms of diversity. Even if a "top 10 percent" program succeeded in admitting a significant number of minority students, it would likely compel the admission of so many other "guaranteed" students that it left too few places for those with more unusual talents and experiences to contribute. Squeezing the admissions process into so Procrustean a bed would conflict with the basic approach of selective university admissions as amici understand and have long embraced it. Whatever strict scrutiny properly requires, it should not force public *or* private universities to serve one vital interest (racial diversity) at the expense of another (individualized selection of students) and in the process sacrifice the constitutional imperative of respecting academic freedom.

### C. Consideration of Race Does Not Make An Admissions Plan A Quota.

Properly tailored admissions programs differ from quotas in the critical sense that they do not bar any slot to any individual based on his or her race but fully preserve "individual" consideration (*Bakke*, 438 U.S. at 319-20 (opinion of Powell, J.)), consistent with traditional principles of university admissions. Although amici *consider* minority race and

---

[16] Derek Bok, *The Uncertain Future of Race-Sensitive Admissions*, at 35.

HARV00066552

26

ethnicity, the *impact* of that consideration always depends on the qualifications of all other applicants, including those who receive consideration for being, for instance, the first in their families to attend college or for having persevered in the face of illness or after losing a parent. The consideration of race remains at all times within the bounds of the overall, individualized admissions process.[17]

The California-Davis policy in *Bakke* was quite different. As Justice Powell made clear, *see* 438 U.S. at 315-19, the problem with the California-Davis minority admissions program was not that it sought to enroll an increased number of minority students, or even that it quantified its aspiration candidly, but that the goal of admitting a particular number of qualified minority students effectively became the tail that wagged the dog. Because California-Davis established a prescribed floor for the number of qualified minority students to be admitted, the central admissions question became not how well a particular minority applicant matched up to the overall pool of medical school applicants, but whether he or she was qualified for one of the fixed number of slots set aside for minority applicants alone. No matter how

---

[17] Even in those settings where "[w]e know that, like . . . gender," "race . . . matters," *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 148 (1994) (O'Connor, J., concurring) – where, to offer one suggestive instance, "there is substantial reason to believe" that "minority representation" in a "racially mixed" group "may help to overcome . . . racial bias" on the part of non-minority members of that group, *Georgia v. McCollum*, 505 U.S. 42, 68 (1992) (juries) (O'Connor, J., dissenting from holding that criminal defendants, like the state itself, may not peremptorily strike jurors on the basis of race) – state action to exclude someone altogether from a given position or opportunity on account of the individual's race or gender is ordinarily impermissible as an affront to the equal dignity of the excluded individual. *See J.E.B.*, 511 U.S. at 142 & n.14 (majority opinion); *id.* at 153-54 (Kennedy, J., concurring); *Batson v. Kentucky*, 476 U.S. 79 (1986). It is for this special situation that one should reserve the pejorative term, "quota." But no such dignitary concern is properly triggered when minority race is simply given due consideration as one of many factors in a setting where the fact of the individual's race is no proxy but is itself an independently relevant variable.

HARV00066553

27

outstanding the competing applicants from those groups might have been in a given year, they still could not gain admission to any of the reserved seats unless the university first found an absence of qualified minority candidates to admit.

A properly individualized admissions program does not suffer from this "set-aside" defect. Nor does an individualized admissions process become a "quota" simply because the number of admitted minority students may not vary radically from year to year. Amici's admissions committees do not have fixed targets for any group of admitted students, and the percentages for different groups change over time. Thus, over the past four years at Harvard College, the number of admitted students whose fathers did not attend any college has ranged from 220 to 228 – or from a low of 10.6% of admitted students to a high of 11.0%, or a variation of approximately 3.8%. For the same academic years, the percentage of African-American students among the admitted applicants was as low as 8.76% and as high as 9.92% – approximately a 13% variation. That said, the makeup of any given class does tend to be relatively predictable, simply because the applicant pool tends to be relatively consistent. One would expect, for example, that the number of redheaded students in the entering class would be relatively constant from year to year – but that hardly demonstrates the existence of an "redhead quota."

### D. Race-Conscious Admissions Programs Are Not Open-Ended Commitments.

Petitioners contend that consideration of race and ethnicity will create an ever-expanding precedent that can have no temporal stopping point and that will lead to claims by other groups – whether social, religious, or ideological – for "fair" representation on our university campuses. That misconstrues amici's argument. Amici are not asserting that any group, including African Americans, has a "right" to proportionate representation either in academia or in the professions – only that action by universities to achieve substantial and meaningful

HARV00066554

28

inclusion, if carefully tailored, violates no right on the part of others and no constitutional or statutory commitment of our society. The decision of a university as to which minority groups deserve favorable consideration in an individualized admissions process designed to foster such diverse representation, and the weight of such consideration, are necessarily and appropriately decisions to be made as a matter of educational judgment, taking into account both the university's sense of its mission and its best estimate of the leadership needs it will address – not as a matter of conflicting "rights."

Petitioners and their amici object, finally, that race-conscious university admissions programs have no identifiable time limit. *See* U.S. Grutter Br. 32-34. We question whether this is a cognizable constitutional complaint. Although this Court has at times expressed concern about temporal indefiniteness, it has never held that measures necessary to reach an intended objective – that is, measures otherwise properly tailored to serve a compelling interest – were to be struck down simply because such measures lack a clear exit strategy or a definite "sunset" provision. *See, e.g., Burson v. Freeman*, 504 U.S. 191 (1992) (First Amendment context). The proper constitutional concern would thus seem to be whether the selected means outlast the interest they are designed to serve, not whether they go on "too long" in some abstract, undefined sense. *Cf. Eldred v. Ashcroft*, 123 S. Ct. 769 (2003) (20-year extension of copyright terms held permissible).

In any event, even if there must be an ultimate end to the consideration of race in university admissions, it is surely premature to declare that the end is upon us. We are not so far removed from the days when segregation by race in education, and race discrimination in all sorts of vital opportunities relevant to educational performance, were for many a matter of law. *Brown v. Bd. of Education*, 347 U.S. 483 (1954); *Swann v. Charlotte-Mecklenburg Bd. of Education*, 402 U.S. 1 (1971); *Hills v. Gautreaux*, 425 U.S. 284 (1976). However devoutly we

HARV00066555

**JA5542**

29

might wish it were otherwise, the effects of that history cannot be expected to play themselves out within a single generation. *See* Glenn Loury, THE ANATOMY OF RACIAL INEQUALITY 4 (2002). Progress toward a goal does not mean that the goal has been reached.

But progress there has been. Amici have seen a sharp rise in the number of applications filed by minority students during the past few decades. At the same time, the overall credentials of minority applicants – including the raw numbers on which others place so much emphasis – have increased as well. This is so, in fact, both on an absolute basis and in comparison with other applicants.

Average SAT test scores for minority students rose roughly 130 points at a group of liberal arts colleges studied in 1976 and 1995, and approximately 150 points at a group of research universities.[18] Test scores for non-minority students rose as well, but by much smaller increments (about 30 points at the liberal arts colleges and 70 points at the research universities). If these trends continue, the interest in a racially diverse student body might gradually become decoupled from policies that give favorable consideration to minority race and ethnicity. But hoping that day will come sooner rather than later cannot be translated into a constitutional imperative that the nation's universities act as though that day has already arrived.

---

[18] William G. Bowen & Sarah A. Levin, RECLAIMING THE GAME (forthcoming).

HARV00066556

30

## CONCLUSION

This Court should affirm the judgments of the court of appeals in No. 02-241 and of the district court in No. 02-516.

Respectfully submitted.

ROBERT W. IULIANO
HARVARD UNIVERSITY
Holyoke Center 980
1350 Massachusetts Ave.
Cambridge, MA 02138
(617) 495-1280

LAURENCE H. TRIBE
  *Counsel of Record*
JONATHAN S. MASSEY
1575 Massachusetts Ave.
Cambridge, MA 02138
(617) 495-4621

BEVERLY LEDBETTER
BROWN UNIVERSITY
110 South Main Street
Providence, RI 02903
(401) 863-9900

BETH A. HARRIS
THE UNIVERSITY OF CHICAGO
5801 South Ellis Avenue
Chicago, IL 60637
(773) 702-7243

ROBERT B. DONIN
DARTMOUTH COLLEGE
14 South Main Street
Suite 2C
Hanover, NH 03755
(603) 646-0101

KATE S. HENDRICKS
DUKE UNIVERSITY
Office of University Counsel
North Pavilion Building
2400 Pratt Street, Suite 400
Durham, NC 27710
(919) 684-3955

HARV00066557

31

WENDY S. WHITE
UNIVERSITY OF
PENNSYLVANIA
133 South 36th Street
Philadelphia, PA 19104
(215) 746-5200

DOROTHY K. ROBINSON
YALE UNIVERSITY
2 Whitney Avenue, 6th Floor
New Haven, CT 06510

PETER G. MCDONOUGH
LORRAINE SCIARRA
PRINCETON UNIVERSITY
Office of General Counsel
120 Alexander Street
Princeton, NJ 08544
(609) 258-2500

HARV00066558

**JA5545**
DX053.0038

Supreme Court, U. S.
**F I L E D**

JUN 7 1977
6-7-77
**MICHAEL RODAK, JR., CLERK**

In the

# Supreme Court of the United States

October Term, 1976

---

No. 76-811

---

The Regents of the University of California,

*Petitioner,*

v.

Allan Bakke,

*Respondent.*

---

On Writ of Certiorari to the
Supreme Court of California

---

## BRIEF OF COLUMBIA UNIVERSITY, HARVARD UNIVERSITY, STANFORD UNIVERSITY AND THE UNIVERSITY OF PENNSYLVANIA AS AMICI CURIAE

---

John Mason Harding
Albert J. Rosenthal
 Columbia University
 New York, N. Y. 10027

Daniel Steiner
 Harvard University
 Cambridge, MA. 02138

Iris Brest
James V. Siena
 Stanford University
 Stanford, CA. 94305

Charles J. Meyers
Albert M. Sacks
Michael I. Sovern

Louis H. Pollak
 The University of Pennsylvania
 Philadelphia, PA. 19104

*Of Counsel*

*Counsel for Amici Curiae*

June 7, 1977

United States District Court
District of Massachusetts

**DX 55**

Case No. _____ 1:14-cv-14176 (ADB)
Date Entered _____
By _____
 Deputy Clerk

HARV00066632

# TABLE OF CONTENTS

———————

|  | PAGE |
|---|---|
| INTEREST OF THE AMICI CURIAE | 1 |
| SUMMARY OF ARGUMENT | 8 |
| ARGUMENT | 11 |
| I. The Inclusion of Qualified Minority Group Members in a Student Body Serves Important Educational Objectives | 11 |
| II. Unless Race May Be Considered in Admissions Decisions, Selective Institutions Will Not Be Able to Achieve Adequately Diverse Student Bodies While Maintaining Other Significant Educational Values | 14 |
| A. Minority Status Must Be Considered Independently of Economic or Cultural Deprivation | 17 |
| B. Use of a Racially Neutral Standard of "Disadvantage" Would Reduce the Number of Minority Matriculants | 18 |
| C. Other Alternatives Suggested by the Supreme Court of California Would Also Be Ineffective | 22 |
| III. The Judgment of the Supreme Court of California Should Be Reversed | 24 |
| CONCLUSION | 39 |
| Appendix | 1 |

HARV00066633

**JA5547**

DX055.0002

ii

# TABLE OF AUTHORITIES

*Cases:*                                                         PAGE

*Alevy v. Downstate Medical Center,* 39 N.Y. 326, 348
   N.E. 2d 537, 384 N.Y.S. 2d 82 (1976) . . . . . . . . . . . .     34

*Associated General Contractors of Massachusetts v.
   Altshuler,* 490 F.2d 9 (1st Cir. 1973), *cert. denied,*
   416 U.S. 957 (1974)* . . . . . . . . . . . . . . . . . . . . . . . . . .     29

*Bakke v. Regents of the University of California,* 18
   Cal. 3d 34, 553 P.2d 1152, 132 Cal. Rptr. 680 (1976)       19

*Borden's Farm Products Co. v. Baldwin,* 293 U.S.
   194 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     37

*Brown v. Board of Education,* 347 U.S. 483 (1954)             30

*Califano v. Webster,* 97 S. Ct. 1192 (1977) . . . . . . . .     29

*Carter v. Gallagher,* 452 F.2d 327 (8th Cir.) *(en banc),*
   *cert. denied,* 406 U.S. 950 (1972) . . . . . . . . . . . . . . .     28

*Chastleton Corp. v. Sinclair,* 264 U.S. 543 (1924) . . .   33, 37

*Chicago & Grand Trunk Ry. v. Wellman,* 143 U.S.
   339 (1892) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     37

*City of Hammond v. Schappi Bus Line,* 275 U.S. 164
   (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     37

*Contractors Ass'n of Eastern Pennsylvania v. Secre-
   tary of Labor,* 442 F.2d 159 (3d Cir.), *cert. denied,*
   404 U.S. 854 (1971) . . . . . . . . . . . . . . . . . . . . . . . . .     28

*Craig v. Boren,* 429 U.S. 190 (1976) . . . . . . . . . . . . . .     34

*Dandridge v. Williams,* 397 U.S. 471 (1970) . . . . . . . .     34

*Hamilton v. Regents of University of California,* 293
   U.S. 245 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . .     26

*Kahn v. Shevin,* 416 U.S. 351 (1974) . . . . . . . . . . . . .     29

*Massachusetts Board of Retirement v. Murgia,* 427
   U.S. 307 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . .     35

*McLaurin v. Oklahoma,* 339 U.S. 637 (1950) . . . . . . .     13

HARV00066634

iii

                                                              PAGE

*Missouri ex rel. Gaines v. Canada*, 305 U.S. 337
  (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

*Morales v. New York*, 396 U.S. 102 (1969) . . . . . . . . . .    37

*Morton v. Mancari*, 417 U.S. 535 (1974) . . . . . . . . . . .    29

*Naim v. Naim*, 350 U.S. 891 (1955) . . . . . . . . . . . . . . .    37

*North Carolina State Board of Education v. Swann*,
  402 U.S. 43 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

*Oregon v. Mitchell*, 400 U.S. 112 (1970) . . . . . . . . . . .    35

*Polk Co. v. Glover*, 305 U.S. 5 (1938) . . . . . . . . . . . . . .    37

*Rescue Army v. Municipal Court*, 331 U.S. 549 (1947)    37

*San Antonio Independent School District v. Rodri-*
  *guez*, 411 U.S. 1 (1973) . . . . . . . . . . . . . . . . . . . . . . .    10, 31,
                                                                                   34, 35

*Schlesinger v. Ballard*, 419 U.S. 498 (1975) . . . . . . . .    29

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966)    31

*Swann v. Charlotte-Mecklenburg Board of Educa-*
  *tion*, 402 U.S. 1 (1971) . . . . . . . . . . . . . . . . . . . . . . . .    28, 32

*Sweatt v. Painter*, 339 U.S. 629 (1950) . . . . . . . . . . . .    25

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) . . . . .    10,
                                                                                   25, 26

*Trustees of Dartmouth College v. Woodward*, 4
  Wheat. 518 (1819) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

*United Jewish Organizations of Williamsburgh, Inc.*
  v. *Carey*, 97 S. Ct. 996 (1977) . . . . . . . . . . . . . . . . . .    28,
                                                                                   29, 30

*United States v. Carolene Products Co.*, 304 U.S.
  144 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10,
                                                                                   34, 35

*United States v. Wood, Wire & Metal Lathers Local*
  *46*, 471 F.2d 408 (2d Cir.), *cert. denied*, 412 U.S.
  939 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

HARV00066635

**JA5549**

DX055.0004

iv

| *Statutes:* | PAGE |
|---|---|
| 42 U.S.C. §1981 (1970) .......................... | 6 |
| 42 U.S.C. §2000(d) (1970) ...................... | 5 |

*Miscellaneous:*

Atelsek & Gomberg, *Bachelors Degrees Awarded to Minority Students, 1973-1974* (Higher Education Panel Reports, No. 24, American Council on Education 1977) .................................... — 21

Brief for the Deans of the California Law Schools in Favor of the Petition for Certiorari ............ — 33

Brown, *Minority Enrollment and Representation in Institutions of Higher Education* (Ford Foundation Report by Urban Ed., Inc. 1974) ............ — 21, 28, 34

Brown & Stent, *Black College Undergraduates, Enrollment and Earned Degrees*, 6 J. Black Stud. 5 (1975) .......................................... — 21

B. Caress & J. Kossy, *The Myth of Reverse Discrimination: Declining Minority Enrollment in New York City's Medical Schools* (Health Policy Advisory Center Inc. 1977) ...................... — 20, 23, 28

A. Carlson & C. Werts, *Relationships Among Law School Predictors, Law School Performance, and Bar Examination Results* (E.T.S. 1976) ......... — 22

Educational Testing Service, *Graduate and Professional School Opportunities for Minority Students* (6th ed. 1975-77) ............................ — 21, 34

Frankfurter, *A Note on Advisory Opinions*, 37 Harv. L. Rev. 1002 (1924) .......................... — 38

Gunther, *In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1 (1972) ...................... — 34

HARV00066636

v

| | PAGE |
|---|---|
| Hutchins, Reitman, & Klaub, *Minorities, Manpower, and Medicine*, 42 J. Med. Educ. 809 (1967) | 3 |
| Knauss, *Developing a Representative Legal Profession*, 62 A.B.A. J. 591 (1976) | 21 |
| Law School Admission Council, *Law School Admission Bulletin 1976-1977* (E.T.S.) | 22 |
| M. Miskel, *Minority Student Enrollment*, Research Currents, Nov. 1973 (ERIC Clearing House on Higher Education) | 20 |
| Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363 (1973) | 38 |
| C. Odegaard, *Minorities in Medicine: From Receptive Passivity to Positive Action* (1977) | 3, 20, 21 |
| Overben, *Why Statistics of Growth Don't Tell Everything About Blacks' Enrollment in College*, Christian Science Monitor, March 21, 1977 | 21 |
| Pollak, *Securing Liberty Through Litigation—The Proper Role of the United States Supreme Court*, 36 Mod. L. Rev. 113 (1973) | 38 |
| Sandalow, *Racial Preferences in Higher Education: Political Responsibility and the Judicial Role*, 42 U. Chi. L. Rev. 653 (1975) | 19 |
| Transcript of Argument, *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 97 S. Ct. 996 (1977) | 29 |
| U.S. Bureau of Census, *Statistical Abstract of the United States* (1974) | 19 |
| J. Wellington & P. Gyorffy, *Report of Survey and Evaluation of Equal Education Opportunity in Health Profession Schools* (San Francisco: University of California 1975) | 21 |

HARV00066637

In the

# Supreme Court of the United States

October Term, 1976

---

No. 76-811

---

The Regents of the University of California,

Petitioner,

v.

Allan Bakke,

Respondent.

---

**On Writ of Certiorari to the
Supreme Court of California**

---

## BRIEF OF COLUMBIA UNIVERSITY, HARVARD UNIVERSITY, STANFORD UNIVERSITY AND THE UNIVERSITY OF PENNSYLVANIA AS AMICI CURIAE

---

### INTEREST OF THE AMICI CURIAE

The institutions on whose behalf this brief is submitted are private universities of a particular kind. They are institutions which differ in geography and history, in size, in resources, and in structure; but they are united by a principle which transcends their differences—namely, that the governing standard for establishing and maintaining class-

HARV00066638

2

room and research functions alike is, not quantity or multiplicity, but excellence. Underlying this principle is the conviction that a university's highest function is to give people of great talent and motivation the opportunity to participate, as students and as teachers, in rigorous intellectual training and equally rigorous intellectual inquiry —and thereby simultaneously to enlarge today's corpus of knowledge and creative works, and to develop tomorrow's cohorts of physicians and poets, physicists and planners, philosophers and politicians.

In pursuing this function and these goals, colleges and universities, with rare exceptions, historically have been accorded freedom from external influence and intrusion. Our society has recognized that higher education can flourish only so long as educators have substantial independence to formulate and implement the policies by which it is transmitted.[1] This freedom is not unfettered, and it entails an equal measure of responsibility. When, however, the problem is central to the educational process as is the determination of the qualifications of students, when educators are searching in good faith for solutions, and when applicable legal norms are in doubt, we believe that the cause of education, and hence the welfare of our society, are best served by judicial restraint.

---

[1] In our view, it does not matter for the resolution of the issues in this case whether the Regents and officers of the University of California take a major part in shaping the admissions policies of particular schools or delegate effective authority to the faculties of the several schools. But we would advise the Court that in our institutions faculties have the dominant role in shaping admissions policies. This brief speaks for our institutions as such—not for faculty members collectively or individually. Among other things, we seek in this brief to preserve the substantial independence of our faculties, including the freedom to adopt admissions policies different from those we here defend. (Four of the lawyers whose names appear on this brief are deans of the law schools of the *amici* institutions, and as such have some oversight responsibility for admissions processes; however, they sign this brief not in their decanal capacities, nor as representatives of their faculties, but as individual lawyers.)

HARV00066639

**3**

Up to about a decade ago, it was the fact (not designedly, but the fact nonetheless) that the student bodies of the *amici* institutions were overwhelmingly white,[2] and their faculties almost exclusively so. Belatedly, these institutions —like many other colleges and universities—recognized that they were disserving their educational goals in two important ways: (1) By not enrolling minority students in significant numbers, the *amici* were continuing to deny intellectual house room to a broad spectrum of diverse cultural insights, thereby perpetuating a sort of white myopia among students and faculty in many academic disciplines—most particularly the professions, the social sciences and the humanities. (2) The *amici* were doing next to nothing to enlarge the minute minority fraction (no more than 1% in many fields) of the pool of persons with doctoral-level graduate and professional training—the pool from which the *amici* and comparable institutions draw their faculties, and also the pool from which, increasingly, local and national leaders in the public and private sectors tend to be selected.

---

[2]The *amici* institutions were not unique in this regard. As of the academic year 1955-56, there were only 761 black medical students in the country. This figure rose slightly, to 771, by the 1961-62 academic year, but declined to 715 in 1963. Hutchins, Reitman & Klaub, *Minorities, Manpower, and Medicine*, 42 J. Med. Educ. 809 (1967).

The entering class in medical schools for 1968-69 contained 266 black students, or 2.7% of the total first year enrollment; 3 Native Americans, or 0.03%; 20 Mexican Americans, or 0.2%; and 3 Puerto Rican students, or 0.03%. The 2.7% figure for blacks, small as it is, is somewhat misleading, since fully half of these students were enrolled at the predominantly black institutions of Howard and Mehnrry. Thus, at any particular predominantly white institution, the actual percentage of black students was likely to be significantly smaller. Association of American Medical Colleges enrollment data, *cited in* C. Odegaard, *Minorities in Medicine: From Receptive Passivity to Positive Action* 28-29 (Josiah Macy, Jr. Foundation 1977).

HARV00066640

4

It was to alleviate these serious educational deficiencies in their training and research programs that the *amici* (and numerous other colleges and universities) developed admissions programs designed to increase minority enrollment. Intensive recruitment of minority applicants could not of itself begin to insure a genuinely diverse student body in institutions as selective as the *amici* institutions. Most of the schools in these institutions are highly selective—*i.e.*, there are so many more applicants than places available; and, more important, the number of applicants with a high probability of successful or indeed distinguished academic performance so greatly exceeds the available spaces—that admissions decisions based on racially neutral criteria, which take no account of the educational deficit under which America's non-whites have labored throughout our history, would not yield a large enough number of minority students to achieve substantial diversity. Thus, in choosing among a large number of clearly qualified candidates for admission, these schools are seeking to achieve their educational goals through conscious treatment of an applicant's membership in a minority racial group as a favorable factor in the consideration of his application.[3] The judgment and opinion of the California Supreme Court put the attainment of these goals in jeopardy:

1. The narrow issue for decision in the instant case is whether the medical school of a state university may not only accord favorable consideration to minority applicants

---

[3] "Racial group" and similar phrases are not used in this brief with any pretense of scientific accuracy. When we refer to a racial minority such as blacks we mean a group that is perceived as "black" by most Americans, and has suffered various forms of discrimination and been isolated to some degree from social and cultural contact with white Americans as a conseqence. In particular, no genetic connotations are intended. A large number of American blacks have some white ancestors. Similar observations are appropriate with respect to references to other racial minorities in this brief.

HARV00066641

5

but for this purpose may also establish a special admissions program limited to disadvantaged members of minority racial groups, with the earmarking of 16 places in an entering class of 100 for persons selected through that special program. The decision of this Court may apply narrowly only to a program of the precise kind employed at the Medical School of the University of California at Davis. But the implications of an affirmance of the decision of the Supreme Court of California may threaten many other more flexible types of admissions programs at the *amici* institutions and similar colleges and universities. The threat is perceived as especially serious in light of many of the contentions and observations expressed in the majority opinion of the California Supreme Court.

2. While the instant case involves a state university, we are apprehensive that a judgment of affirmance by this Court would threaten the continuation by private universities of admissions policies that they believe to be educationally vital.

a) Private as well as public universities have various relationships, financial and otherwise, with federal and state agencies. The standards for determining whether a given degree of governmental involvement is sufficient to render the Fourteenth Amendment applicable to otherwise private activity have been pieced out by this Court on a case-by-case basis. While courts have generally declined to apply the Amendment to private universities, we cannot be certain as to the ultimate disposition of this question.

b) A decision of this Court holding the admissions program at Davis unconstitutional under the Fourteenth Amendment might influence the construction of statutory prohibitions against discrimination to which some or all of the *amici* might be subject. These include Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000 (d) (1970), forbidding discrimination in any program receiving federal

HARV00066642

6

financial assistance; 42 U.S.C. § 1981 (1970), prohibiting some forms of discrimination in willingness to enter into contracts, including contracts to provide education; and a number of state and local laws forbidding racial and other discrimination in admissions by educational institutions.

3. Even if private universities are not legally constrained in their freedom to pursue admissions policies that they deem educationally most sound, they will be harmed if public universities are denied similar freedom. Diversity in background, including race, within faculties is important, enriching the interchange of ideas and offering role models to minority students. The pool of outstanding scholars and teachers from which faculties are selected is fed by graduates of both private and state universities. To dry up a major potential source of minority faculty members—minority applicants not admitted to state institutions because their exceptional talents had not yet manifested themselves when they applied for admission—would make achievement of the faculty recruitment objectives of all universities more difficult.

4. If state universities are forbidden to consider race in admissions, private universities, even if free of similar legal constraints, would face uncomfortable choices. It might be felt that programs held by this Court to violate the Fourteenth Amendment if undertaken by state schools could not be pursued in good conscience by private universities. Others might argue that pluralism in American society is sufficiently important that, so long as their actions were not illegal, private universities should feel free to adhere to their principles without regard to what might or might not be permissible for state universities. A third point of view might be that private universities should attempt vastly to increase the number of minority students in order to compensate for the restrictions imposed upon state universities. We would greatly prefer to reach decisions on

HARV00066643

**JA5557**
DX055.0012

7

admissions solely on educational considerations, undistracted by a debate likely to be divisive and destructive.

We hope that our experience and perspectives may be of assistance to the Court in its treatment of the difficult questions raised by this case.

———————

The following private universities have indicated their general support for the arguments advanced in this brief and join the *amici* in urging reversal of the judgment of the California Supreme Court:

> Brown University
> Duke University
> Georgetown University
> Massachusetts Institute of Technology
> University of Notre Dame
> Vanderbilt University
> Villanova University

HARV00066644

8

## SUMMARY OF ARGUMENT

### I.

When a university must choose among many more qualified applicants for admission than it can accept, choices are made on the basis of educational objectives. Expected academic performance is a significant criterion but only one of several. There are important educational values in having a student body with diverse interests and backgrounds. Such factors as extra-curricular activities, employment experience, and geographical distribution have traditionally been taken into account, because a student body with varied backgrounds and interests provides the most stimulating intellectual environment.

For the same reason, many universities regard membership in a minority race as a favorable factor to be considered along with others in deciding whom to admit. The differences in experience that arise out of growing up black, or Chicano, or Puerto Rican, or Native American, enable students who are members of those groups to introduce into the university community important perceptions and understandings. An educational process enriched in this way is not only of great importance to students: it broadens the perspectives of teachers and thus tends to expand the reach of the curriculum and the range of the scholarly interests of the faculty.

Furthermore, by making conscious efforts to include more minority students in their undergraduate and professional programs, universities are better performing the function of providing tomorrow's leaders in all walks of life. If our pluralistic society is to achieve its objective of increasing the number of minority doctors, judges, corporate executives, university faculty members and government officials, universities must make available to qualified minority students the opportunity to gain the necessary education.

HARV00066645

9

## II.

The Supreme Court of California appears to acknowledge the constitutional propriety of selecting a racially diverse student body. But the court has held that this permissible end must be sought without taking race into account—an anomalous circuity insisted upon in the belief, unsupported by the record, that racially random processes would somehow produce a student body of sufficient racial diversity.

We appreciate the concerns which underlie the California court's reluctance to sanction racially defined processes. But we disagree with the California court's conjecture—and it is only conjecture, flatly contradicted by the only testimony of record—that universities can achieve racially diverse student bodies without taking into account the race of those applying for admission. Our institutions' experience confirms that the substitute devices suggested by the California court are incapable of fulfilling this constitutionally legitimate objective.

The principal alternative suggested was the establishment of a larger program for the admission of the "disadvantaged," regardless of race. But disadvantage—whether predicated on cultural or economic criteria—is not synonymous with membership in an ethnic minority. While a disproportionate number of minority group members is disadvantaged, most of the disadvantaged in this country are white. To be sure, programs according favorable treatment to disadvantaged applicants may also serve important educational purposes. If honestly administered, however, and if disadvantage is not treated merely as a euphemism for race, a program for the disadvantaged in lieu of a program of similar scope for minorities would sharply reduce the admission of minority applicants. In order to ensure adequate representation of minority students, the number of disadvantaged students admitted would have to

HARV00066646

**JA5560**
DX055.0015

10

be so increased that the very diversity we are trying to achieve would be destroyed, critical educational goals and standards would be endangered, and the capacities of financial aid programs for students would be overwhelmed.

Other alternatives propounded by the Supreme Court of California would also be ineffective. Total abandonment of attention to grade point averages and test scores would deprive us of tools that are valuable in screening applicants and in comparing applicants of similar backgrounds; in their absence the process of selection would be far more difficult and undoubtedly less effective. The alternative of quickly enlarging or adding to the number of medical schools (or other graduate or undergraduate schools) is politically and fiscally incredible and educationally unsound; moreover, while it would presumably increase the total number of minority students admitted it would not enlarge their proportion in any school or class and thus would not achieve the educational values afforded by diversity in students' racial backgrounds.

### III.

Favorable treatment of minority group members in university admission is sharply different from discrimination against minorities. It is in no way invidious, nor does it work to the disadvantage of groups unable to protect themselves in the political process. *See San Antonio Independent School District* v. *Rodriguez,* 411 U.S. 1, 28 (1973); *United States* v. *Carolene Products Co.,* 304 U.S. 144, 152-53 n. 4 (1938).

Educational policy is an area traditionally accorded, and particularly appropriate for, judicial restraint. *See San Antonio Independent School District* v. *Rodriguez,* 411 U.S. at 42-43; *Sweezy* v. *New Hampshire,* 354 U.S. 234, 263 (1957) (concurring opinion). Needs and goals, as reflected

HARV00066647

11

in admissions policies, vary from university to university and among different schools in the same university. Educators need substantial freedom to search for better solutions to difficult educational problems, freedom denied by the kind of judicial intervention practiced by the Supreme Court of California.

Constitutional questions—particularly those of great moment, as in the instant case—should not be decided in the abstract but only in the context of a full factual record. There was no such record in this case. The decision of the California Supreme Court was based on assumptions of fact not put to proof. On what that court thought to be the critical issue, the availability of less restrictive alternative means to attain concededly valid goals, its decision was predicated solely on its own conjectures and ignored uncontradicted testimony in the record to the contrary. The decision of an important constitutional question involving momentous issues of educational policy should rest on firmer foundations.

## ARGUMENT

### I. The Inclusion of Qualified Minority Group Members in a Student Body Serves Important Educational Objectives.

At our institutions, as at many others, there are far more applicants for admission than there are places in the entering classes. The large majority of applicants are fully qualified, as indicated by factors such as their grade point averages and test scores, to perform successfully the academic work that would be required of them should they be admitted. The most difficult task of the admissions committees is, therefore, to select from among these "qualified" applicants those who will be admitted.

In making this selection, colleges and universities can apply a wide variety of criteria that will vary from in-

HARV00066648

12

stitution to institution and even among schools within a university. The choice of criteria will depend upon educational objectives. In our institutions, particularly in the selection of undergraduates, diversity in the student body has been an important educational objective. In addition to predicted academic performance, factors believed to contribute to diversity and strength of a student body, such as geographical distribution, employment experience, musical skills, extracurricular activities and travel, are all regarded as legitimate and relevant, and usually taken into account without controversy.[4]

Academic ability has not, therefore, been the sole criterion for selecting students at our institutions. In choosing among applicants qualified to do the academic work, factors other than predicted academic performance may well be determinative in reaching admissions decisions. The ultimate question is which candidates from among the "qualified" pool will contribute most, in the context of an entire class, to the achievement of the institution's educational objectives.[5]

A policy of increasing the number of students from minority groups is, in our judgment, the best choice for all of our students because it is the best way to achieve a diverse student body. A primary value of liberal education

---

[4]Although some of our professional schools give great weight to predicted academic performance and hence relatively less weight than our undergraduate and other professional schools to the other factors mentioned here, even in those schools elements of diversity may be decisive in a limited but significant number of cases.

[5]Set forth in the Appendix to this brief is a description of the criteria applied in selecting students for admission to Harvard College, the rationale for the choice of these criteria, and some indication of the relative weight given to different criteria, including minority status, in particular admissions decisions. This description applies generally to the selection of undergraduates at the other three *amici* institutions.

HARV00066649

should be exposure to new and provocative points of view, at a time in the student's life when he or she has recently left home and is eager for new intellectual experiences. Minority students add such points of view, both in the classroom and in the larger university community.

Just as diversity makes the university a better learning environment for the student, so it makes the university a better learning environment for the faculty member. The university's encouragement of variety in ideas is, to the scholar, a most appealing aspect of academic life. It has been the experience of many university teachers that the insights provided by the participation of minority students enrich the curriculum, broaden the teachers' scholarly interests, and protect them from insensitivity to minority perspectives. Teachers have come to count on the participation of those students. Indeed, present faculty support for admissions of more minority students stems in part from an appreciation for past contributions, and from loyalty to friendships with particular individual students whom teachers might otherwise never have come to know.

Finally, there is an additional, related, yet independently compelling, educational purpose served by enlarging the universe of highly trained minority persons—namely, diversifying the leadership of our pluralistic society. The training of leaders has been a traditional and fundamental educational responsibility and one which, with the maturing of our society, rests with special weight on colleges and universities. As Chief Justice Vinson stated for this Court in *McLaurin v. Oklahoma,* 339 U.S. 637, 641 (1950), striking down arbitrary constraints on a black graduate student's free interchange with white fellow students:

> Our society grows increasingly complex, and our need for trained leaders increases correspondingly. Appellant's case represents, perhaps, the epitome of

HARV00066650

14

that need, for he is attempting to obtain an advanced degree in education, to become, by definition, a leader and trainer of others. Those who will come under his guidance and influence must be directly affected by the education he receives.

Today American colleges and universities are taking important steps to meet the "need for trained leaders" identified by this Court twenty-seven years ago. It would be quixotic—and tragic—for this Court now to find that the Constitution prevents academic institutions from taking those steps necessary and proper to fulfillment of an educational responsibility so vital to the welfare of the nation.

By our admissions programs, we are not merely contributing to the cause of increasing the numbers of minority leaders and public servants—although of course we wish very much to do that. We are also broadening the perceptions of our majority students, and we believe that this will be reflected in qualities that they will retain for the rest of their lives. A central function of the teacher is to sow the seeds for the next generation of intellectual leaders, and this, indeed, is a main reason why many university instructors find that an ethnically diverse student body helps them to fulfill their teaching roles. In short, we hope that by these efforts, the leadership of the next generation—majority and minority members alike—will be the better, the wiser and the more understanding.

**II. *Unless Race May Be Considered in Admissions Decisions, Selective Institutions Will Not Be Able to Achieve Adequately Diverse Student Bodies While Maintaining Other Significant Educational Values.***

The educational goals discussed above cannot be realized by any racially neutral procedure known to us. The problem, as we have previously noted, is simply this. Selective institutions such as ours receive applications from

HARV00066651

**JA5565**

DX055.0020

15

many more persons than they have room for.[6] Some of those applicants are plainly not qualified for admission. That is, it cannot be predicted with confidence by looking at their test scores and prior academic performance that they will survive in, much less contribute to, the academic course they wish to pursue. Others, few in number, are so exceptional, by reference to test scores, grades and prior achievement, that their admission is a virtual certainty.

What remains then, from the original pool of applicants,

---

[6]For example, the number of applicants and matriculants at the medical schools of the *amici* institutions for the classes entering in 1973-1976 were as follows:

| 1973 | Applicants | Matriculants |
|------|-----------|--------------|
| Columbia | 3,789 | 147 |
| Harvard | 3,045 | 168 |
| Stanford | 4,131 | 89 |
| Pennsylvania | 3,898 | 160 |
| 1974 | | |
| Columbia | 4,458 | 147 |
| Harvard | 3,258 | 165 |
| Stanford | 4,553 | 94 |
| Pennsylvania | 4,124 | 160 |
| 1975 | | |
| Columbia | 5,042 | 147 |
| Harvard | 3,210 | 165 |
| Stanford | 4,662 | 86 |
| Pennsylvania | 4,895 | 160 |
| 1976 | | |
| Columbia | 4,927 | 148 |
| Harvard | 3,670 | 168 |
| Stanford | 5,117 | 86 |
| Pennsylvania | 5,246 | 160 |

HARV00066652

16

is a large number of applicants, still much larger than
the number of available spaces, who can, on the basis of
relevant predictors, successfully complete the academic
course of their choice. It is from this number that the
balance of the entering class must be selected.

The unfortunate fact of life in this country is that appli-
cants who are members of minority groups tend, as a gen-
eral matter, not to score as well as whites on the standard-
ized tests to which reference is made in the admissions
process. We think it unnecessary to labor here the reasons
for this phenomenon. The educational deprivations which
minorities have suffered in this country are well known to
the Court.

Choosing from among the many who are qualified in
order to achieve, among other things, the racial and ethnic
diversity so important to our institutions, cannot be left
to chance. There are many ways to achieve diversity, per-
haps as many as there are institutions and schools within
institutions which seek such diversity. It is, however, es-
sential to any program designed to serve this end that race
be specifically considered in choosing a student body.

The California Supreme Court chose to ignore the in-
formed views of the educators and suggested instead its
own strategies to reach what it conceded were legitimate
ends. Most prominently, it suggested that colleges and
universities accord preferential treatment to the "disad-
vantaged." It also suggested as possible approaches more
aggressive recruiting, the abandonment of reference to
test scores and grade point averages, and finally, the ex-
pansion of the size or number of educational institutions.
As we attempt to demonstrate below, these suggestions will
not work. If selective colleges and universities are forbid-
den to give weight to the fact that an applicant is a member
of a racial minority group, there will almost certainly be an
abrupt decline in minority enrollments.

HARV00066653

17

### A. Minority Status Must Be Considered Independently of Economic or Cultural Deprivation.

The California Supreme Court has expressed the view that the Davis Medical School's present efforts to achieve a racially mixed class are unconstitutional because there is a less restrictive alternative—namely, admitting a larger number of disadvantaged students without regard to their race. However, criteria based on disadvantage which take no account of race are useful only as a supplement to, and not a substitute for, criteria based on race.

The California court does not define the term "disadvantage" explicitly, but it apparently intends to refer to the Davis criteria having to do with the occupational background and education of the student's parents and the family's financial situation. But being disadvantaged is not synonymous with being black, or Chicano, or Puerto Rican, or Native American. While disproportionate numbers of minority group members are economically disadvantaged, the minority experience is distinct from the experience of poverty. Growing up black—even middle-class black—involves a whole range of different encounters, perceptions, and reactions. To educate all students to deal with the problems of the society that we have, rather than the one we would like to have, we need the contribution of those whose lives have been different because their race is different.[7] Indeed, our institutional needs for diversity would be inadequately met if our minority students included only those from depressed socioeconomic backgrounds.

---

[7] Minority students who are also poor are, in effect, doubly disadvantaged. For, paradoxically, membership in a racial minority can be considered a disadvantage in itself, even while it is a special cultural and social experience which enriches minority individuals and the university communities of which they become part. The prevalent stereotyping of minority group members, which can undermine their academic aspirations and achievements early in life, and the calamitous psychological effects of the continued *de facto* segregation of grade and high schools in this country, suggests that minority applicants should receive particularly careful consideration quite apart from any economic deprivation.

HARV00066654

18

Moreover, since admissions programs that take account of race many have other purposes than, or in addition to, increasing the number of disadvantaged students, disadvantage alone does not go far enough. We have noted that disadvantage is not synonymous with membership in an ethnic minority for the purpose of achieving our shared goal of diversity in our student bodies. In addition, it takes no cognizance of the purpose, to which many colleges and universities subscribe, of providing minority youth with role models, and it does not provide for the benefits only minorities can bring to a profession. Insofar as admissions programs are designed to improve society in any of these ways, racially neutral criteria are beside the point.

The avowed end of the Davis Medical School is to increase the number of disadvantaged minority students in its classes and not merely to adjust applicants' test scores to reflect better their purely academic qualifications. The California Supreme Court assumes the constitutionality of this end, but holds that the Medical School is constitutionally prohibited from achieving it candidly; the court implies instead that universities can bring minority admissions to approximately the level they desire by adjusting the importance attached to various non-racial criteria which are currently used, or might be used, in the admissions process. We respectfully submit that this suggestion is based on ignorance of the fact that adjustments honestly applied cannot go far enough to accomplish concededly legitimate purposes without endangering other critical institutional goals. Alternatively, it is an invitation to colleges and universities to do covertly what they have been forbidden to do openly.

### B. Use of a Racially Neutral Standard of "Disadvantage" Would Reduce the Number of Minority Matriculants.

Use of a racially neutral standard of disadvantage, as urged by the California court, would reduce the number

HARV00066655

19

of places open to minority applicants for admission to American colleges and universities. This is so because most Americans who are disadvantaged—most of the poor and the culturally deprived—are white.[8] Once a color-blind preference for the disadvantaged was implemented white students not currently applying to selective institutions because of the unlikelihood of admission would presumably apply, and qualify for admission, in much greater numbers. If a preference for the disadvantaged were applied honestly, and not as a euphemism for a preference for minority group members, the number of minority applicants admitted would drop off sharply.

Theoretically, the number of disadvantaged admitted could be increased, with the hope than an adequate number of minority members would be picked up in the process. It is difficult to calculate how large a fraction of each class would have to be earmarked for the disadvantaged in order to bring in a sufficient number of minority students to achieve the goal of diversity, but in some schools it might well absorb the entire class. A significant increase in the number of spaces reserved for disadvantaged students would almost surely endanger other critical educational goals and standards. Moreover, there would be no way for universities to support large numbers of disadvantaged students through financial aid.[9] The school would thus be

---

[8] In 1972, of a total of 24.5 million persons who were below the poverty level established by the United States government, 16.2 million were white. U.S. Bureau of Census, *Statistical Abstract of the United States* 389, Table No. 631 (1974). *See also* Sandalow, *Racial Preferences in Higher Education: Political Responsibility and the Judicial Role*, 42 U. Chi. L. Rev. 653, 690 (1975).

[9] This difficulty was noted in the dissenting opinion of the California Supreme Court. *Bakke v. Regents of the Univ. of Cal.*, 18 Cal. 3d 34, 90, 553 P.2d 1152, 1190, 132 Cal. Rptr. 680, 718 (1976). *See also* Sandalow, *supra* note 8, at 691.
The author of one study concludes that, due to the difficulties minority students face in integrating themselves into a culturally

HARV00066656

20

forced to choose between grossly inadequate aid for every-
one admitted under the program—a rather hollow offer of
admission—or reserving to some portion of the disadvan-
taged admittees a subsistence level of support, an effective
exclusion of most of the recruited students. And even if
sufficient financial aid were available, the very diversity
sought to be achieved would be defeated—all for the sake
of complying with the apparent conclusion of the California
Supreme Court that it is proper for an educational institu-
tion to take measures for the purpose of increasing minor-
ity admissions as long as it uses indirect means to do so.

"Seeking out" disadvantaged students of high poten-
tial, as suggested by the Supreme Court of California,
might increase slightly the number of such minority persons·
who apply. Again, unless the search were part of a program
that included favorable weight to minority status, the end
result would be an increase in white, not black or Chicano,
admissions.[10] The California court seems unaware of the
fact that vigorous efforts to identify and recruit talented
minority students have been made by almost all selective
schools for about a decade and that more intensified efforts

---

alien environment, financial burdens fall more heavily on them than
on their economically disadvantaged majority counterparts. M.
Miskel, *Minority Student Enrollment*, Research Currents, Nov. 1973,
at 3 (ERIC Clearing House on Higher Education). *See also* C. Ode-
gaard, *Minorities in Medicine: From Receptive Passivity to Positive
Action* 63-65 (Josiah Macy, Jr. Foundation 1977). Ironically, the
pressure to increase special admissions to include all economically
disadvantaged comes just at a time when general economic condi-
tions and decreased government spending threaten even the limited
programs presently in existence. B. Caress & J. Kossy, *The Myth of
Reverse Discrimination: Declining Minority Enrollment in New
York City's Medical Schools* 6 (Health Policy Advisory Center,
Inc. 1977). A related problem is the cost of providing remedial edu-
cation for admitted students with deprived educational backgrounds.
Odegaard, *supra* at 126.

[10]The same would be true of the court's proposal that remedial
schooling be provided for disadvantaged students of all races.

HARV00066657

**JA5571**
DX055.0026

21

are not likely to have much incremental effect.[11] Indeed, after a certain point the process tends to become a competitive one in which a number of schools all attempt to woo the most promising minority students, rather than adding substantially to the pool of such students to be considered for admission.[12] Even when combined with vigorous recruitment efforts, consideration of disadvantage is no answer to the problems the Davis admissions program sought to solve. Moreover, it seems likely to us that this alternative, like most of the others suggested by the Cali-

---

[11]Every one of the 89 medical schools sampled in one survey undertaken for the Department of Health, Education and Welfare engaged in minority recruitment activities. J. Wellington & P. Gyorffy, *Report of Survey and Evaluation of Equal Education Opportunity in Health Profession Schools* (San Francisco: University of California 1975), *quoted in* C. Odegaard, *Minorities in Medicine: From Receptive Passivity to Positive Action* 99 (Josiah Macy, Jr. Foundation 1977). In addition, the American Association of Medical Colleges has since 1970 administered a Medical Minority Applicant Registry to assist schools in their recruitment efforts. *Odegaard, supra,* at 108. Similar programs exist to assist minority students' entrance into college.

One reason that increased recruitment is not likely to have much effect is that proportionately fewer blacks and other minority group members graduate from four-year colleges of the sort that have traditionally supplied medical schools. Relatively large numbers are concentrated in two-year community colleges. Overbea, *Why Statistics of Growth Don't Tell Everything about Blacks' Enrollment in College,* Christian Science Monitor, March 21, 1977, at 26, col. 1; Brown & Stent, *Black College Undergraduates, Enrollment and Earned Degrees,* 6 J. Black Stud. 5, 10 (1975). In addition, with the exception of Asian-Americans, fewer graduate in fields such as biochemistry and life sciences, which provide the background necessary for medical school. Educational Testing Service, *Graduate and Professional School Opportunities for Minority Students* 4 (6th ed. 1975-77, Princeton); Atelsek & Gomberg, *Bachelors Degrees Awarded to Minority Students, 1973-1974,* at 8 (Higher Educ. Panel Rep., No. 24, American Council on Education, January 1977).

[12]*See* C. Odegaard, *Minorities in Medicine: From Receptive Passivity to Positive Action* 100 (Josiah Macy, Jr. Foundation 1977); Knauss, *Developing a Representative Legal Profession,* 62 A.B.A. J. 591, 593 (May 1976).

HARV00066658

22

fornia Supreme Court, which are discussed below, would, if implemented, diminish the number of spaces available to respondent and to others similarly situated.

### C. Other Alternatives Suggested by the Supreme Court of California Would Also Be Ineffective.

The other alternatives suggested by the California Supreme Court have even less potential. One suggestion was to dispense with numerical criteria completely, and abandon use of test scores and grade point averages. However, with all of their shortcomings, these yardsticks are not irrelevant: when used with restraint and discretion we have found them valuable tools in measuring the probable academic performance of applicants.[13] Test scores and grade point averages help to define the universe of those qualified to do creditable and rewarding work in highly selective academic institutions, and they furnish clues as to those individuals among the qualified group who will gain the most from, and contribute the most to, academic opportunities which must be rationed among a limited number. That is the substantial utility of these numerical indicators.[14]

Total abandonment of numerical standards would result in giving too much weight to such subjective and manipulable factors as personal recommendations and statements of career goals; for some it would constitute an invitation to invidious discrimination. Academic quality would undoubtedly deteriorate, yet without any assurance that an adequate level of minority admissions could be maintained.

---

[13]See, e.g., A. Carlson & C. Werts, *Relationships Among Law School Predictors, Law School Performance and Bar Examination Results* (E.T.S. 1976); Law School Admission Council, *Law School Admission Bulletin 1976-1977* (E.T.S.).

[14]We think it appropriate to add that we know of no empirical demonstration that there is a direct correlation, although our intuition suggests that there is a correlation, between academic performance at such institutions and ultimate career "success," however success may be defined.

HARV00066659

23

Finally, from a purely administrative point of view, even well-endowed colleges and universities such as *amici* can ill afford the substantial diversion of resources to vastly enlarged admissions staffs which abandonment of numerical admissions criteria would require, at least when the benefits are so doubtful and the economic horizon is so bleak.

The Supreme Court of California also suggests that a less restrictive means for enlarging minority admissions would be to increase the size or number of medical schools. It seems unrealistic in the extreme to assume that there would or could be a nationwide or statewide jump in the number of selective schools, medical or otherwise, or in the size of those existing. Quite apart from the staggering costs involved, new institutions of outstanding quality cannot be rolled off an assembly line overnight, nor can existing schools be dramatically expanded in size without severe adverse effects on instruction and scholarship. Moreover, if America's enormous and growing investment in higher education is to continue to be responsibly administered, the aggregate number of persons trained in medicine and other disciplines must turn on the nation's aggregate needs. In contrast, the California court's casual approach would require a major reallocation of resources not to train needed professionals but to accommodate those large numbers of disadvantaged persons only a fraction of whom would constitute the minority student population whose advanced training is of priority educational importance.[15]

In short, the less restrictive means for increasing minority admissions that the Supreme Court of California said

---

[15]In recent years, for example, first year enrollment in U.S. medical schools increased from 10,422 in 1969 to 15,295 in 1975—an increase of almost one half. In spite of rigorous recruitment efforts and minority admissions programs, only 890 of the 4,873 added positions went to minority students. B. Caress & J. Kossy, *The Myth of Reverse Discrimination: Declining Minority Enrollment in New York City's Medical Schools* 5 (Health Policy Advisory Center, Inc. 1977).

HARV00066660

24

were available, and on the basis of which it held the program at Davis unconstitutional, seem to us, on examination, illusory. Unlike our present admissions systems, which preserve the dual goals of diversity and academic achievement, each would fail either to enroll minority students in sufficient numbers or to maintain our present standards of excellence—or both. At least, most educators so conclude. The contrary view of the California court rests, we respectfully submit, on judicial conjecture—certainly not on facts of record, nor on inferences properly drawn from patterns of university experience of which a court might reasonably take judicial notice.

The only evidence in the record on the subject was the uncontradicted declaration of Dr. George H. Lowery, Associate Dean and Chairman of the Admissions Committee at Davis Medical School, that his "experience as Chairman of the Admissions Committee has convinced [him] that there would be few, if any, Black students and few Mexican-Americans, Indians, or Orientals from disadvantaged backgrounds in the Davis Medical School, or any other medical school, if the special admissions program and similar programs at other schools did not exist." (R. 67-68).

The experience of our own institutions both reinforces the judgment of Dr. Lowery that programs taking minority status into account in admissions are necessary, and suggests that the alternatives posited by the Supreme Court of California are entirely unrealistic.

III. *The Judgment of the Supreme Court of California Should Be Reversed.*

The guiding principle of freedom under which American colleges and universities have grown to greatness is that these institutions are expected to assume and exercise

HARV00066661

**JA5575**
DX055.0030

25

responsibility for the shaping of academic policy without extramural intervention. A subordinate corollary principle—critical for this case—is that deciding who shall be selected for admission to degree candidacy is an integral aspect of academic policy-making. The linked principles emerge clearly from the moving manifesto—relied upon by Mr. Justice Frankfurter twenty years ago—of distinguished educators who were vainly seeking to preserve their country's vanishing academic freedom, to wit, the embattled senior scholars of the University of Cape Town and the University of Witwatersrand:

> ...It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail ''the four essential freedoms'' of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study.[16]

The fact that academic institutions are within the ambit of the First Amendment does not mean that they are immune from the law's norms. Indeed, when academic institutions have pursued admissions policies the antithesis of the policy challenged here, this Court has properly brought them to book. *Sweatt* v. *Painter,* 339 U.S. 629 (1950); *Missouri ex rel. Gaines* v. *Canada,* 305 U.S. 337 (1938). But the rarity of instances of judicial intervention in academic affairs proves the rule that governmental displacement of the authority of those primarily vested with academic responsibility is contrary to our traditions. Were it otherwise, as Mr. Webster put it in the memorable argument

---

[16]Quoted by the Justice in his concurring opinion in *Sweezy* v. *New Hampshire,* 354 U.S. 234, 263 (1957), in which Mr. Justice Harlan joined.

HARV00066662

26

which prevailed in this Court in the *Dartmouth College* case,[17]

> learned men will be deterred from devoting themselves to the service of such institutions, from the precarious title of their offices. Colleges and halls will be deserted by all better spirits, and become a theater for the contention of politics. Party and faction will be cherished in the places consecrated to piety and learning. These consequences are neither remote nor possible only. They are certain and immediate.

Nor are the principles of academic freedom protective only of private institutions, such as the *amici*. These principles likewise safeguard the integrity of public institutions, when they or those who are their members are threatened by unwarranted external intrusions. *See Sweezy* v. *New Hampshire*, 354 U.S. 234, 262-63 (1957); *cf. Hamilton* v. *Regents of University of California*, 293 U.S. 245 (1934).

In undertaking to circumscribe the informed and good faith discretion of those vested with authority to determine the admissions policies of the Medical School of the University of California at Davis, the California Supreme Court has trenched upon the freedom of that School to determine for itself crucial questions of academic policy. Moreover, this judicial intrusion has been based upon a constitutional ruling which, with all respect, we believe to be palpably inadequate to the several substantial issues presented by this litigation. As we have argued above, we think that implementation of the California Supreme Court's judgment will predictably preclude the achievement in this century of educational goals of great moment to which hundreds of American colleges and universities are committed.

---

[17] *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, 599 (1819).

HARV00066663

27

We argue below that the court's explanation of its judgment is doctrinally unpersuasive.

As we have demonstrated, the admissions process has never been entirely impersonal, quantifiable, or "objective." What distinguishes this case from all the non-cases that have seldom been thought worth litigating is that the additional element taken into account here is race.

Special treatment based on race touches sensitive nerves. But the reason for this is the long tragic history of attention to race for the purpose of discriminating *against* blacks and other minorities. The problem of admissions programs designed to augment the number of minority students involves delicate issues.[18] But it is not the same as *discrimination against minorities*, and no amount of rhetoric can make it the same.

The purpose of the special treatment of minorities in university admissions, at Davis as elsewhere, is not to discriminate against majority applicants. Indeed, the purpose is not only or even primarily to confer benefits upon members of minorities; where the principal goals are to improve the quality of teaching and learning for majority as well as

---

[18]The special admissions program at Davis set aside 16 places in a class of 100 for disadvantaged members of minority groups. Although we question the wisdom of this aspect of the Davis program, we are not persuaded that such a program is unconstitutional. The choice at Davis was only among, and the designated spaces would only be filled by, qualified applicants, and the percentage of places earmarked for minority members was smaller than their share of the state's population; in this context, designation of a precise number of places may be a reasonable way of ensuring that enough minority applicants are admitted to provide sufficient diversity in the student body.

If, nevertheless, the procedure at Davis should be held unconstitutional, we would urge the Court to limit its decision to that particular technique and to the facts and circumstances pertaining at Davis rather than cast into doubt the wide variety of other more flexible approaches designed to produce truly diverse student bodies.

HARV00066664

28

minority students and to diversify this nation's leadership, the fact that there may be a consequential difference in the effect on different races does not constitute invidious or stigmatic discrimination.[19]

The use of race as a touchstone for governmental action has been upheld in a number of contexts. Racial residential patterns may, and indeed in some cases must, be considered in the assignment of students to schools[20] and in the use of such remedial measures as busing.[21] The use of similar data in delineating legislative districts has also been upheld.[22] Specific attention to race has been permitted, and often required, to achieve equality in employment opportunity.[23] As stated by the United States Court of Appeals for the

[19]In fact, a recent study points out that in every year subsequent to adoption of minority admissions policies by medical schools, the number of spaces available for white applicants has increased. The reason cited is an overall expansion of medical enrollments, of which nonminority students have been the overwhelming beneficiaries. Thus, while "[a] persistent rumor, abetted by recent reverse discrimination law suits, holds that middle class sons cannot get into medical school because of preferential treatment accorded minority applicants . . . [t]he facts simply do not support the case." B. Caress & J. Kossy, *The Myth of Reverse Discrimination: Declining Minority Enrollment in New York City's Medical Schools* 1 (Health Policy Advisory Center, Inc. 1977).

A similar situation exists in undergraduate admissions, where minority gains have not kept pace with the increase in white enrollment. Brown, *Minority Enrollment and Representation in Institutions of Higher Education* 2 (Ford Foundation Report by Urban Ed., Inc. 1974).

[20]*E.g., Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 29-31 (1971); *North Carolina State Bd. of Educ.* v. *Swann*, 402 U.S. 43 (1971).

[21]*E.g., Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971).

[22]*United Jewish Organizations of Williamsburgh, Inc.* v. *Carey*, 97 S. Ct. 996 (1977).

[23]*E.g., United States* v. *Wood, Wire & Metal Lathers Local 46*, 471 F.2d 408 (2d Cir.), *cert. denied*, 412 U.S. 939 (1973); *Carter* v. *Gallagher*, 452 F.2d 327 (8th Cir.) *(en banc), cert. denied*, 406 U.S. 950 (1972); *Contractors Ass'n of E. Pa.* v. *Secretary of Labor*, 442 F.2d 159 (3d Cir.), *cert. denied*, 404 U.S. 854 (1971).

HARV00066665

29

First Circuit, ''our society cannot be completely color-blind in the short term if we are to have a colorblind society in the long term.''[24] And this Court has unanimously sustained a systematic official preference for tribal Native Americans in the allocation of employment opportunities in the Bureau of Indian Affairs. *Morton* v. *Mancari,* 417 U.S. 535 (1974). The unique history and constitutional status of Native Americans, of which this Court properly took account in that case, are surely no more compelling than the unique history and constitutional status of those for whom the Civil War Amendments were written and ratified.

Analogies may also be found in areas other than race, such as sex discrimination, where this Court has upheld favorable treatment of a class because it had previously been discriminated against. *Califano* v. *Webster,* 97 S. Ct. 1192 (1977); *Schlesinger* v. *Ballard,* 419 U.S. 498 (1975); *Kahn* v. *Shevin,* 416 U.S. 351 (1974).

In these cases and others, the courts have shown understanding of the difficulties of legislators and administrators faced with the problems of the real America of today with all its blemishes, rather than conjuring up rules for the ideal, prejudice-free, society that we hope to attain. This Court was certainly not cheered by its knowledge, in *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey,* 97 S. Ct. 996 (1977), that voters tend to choose candidates of their own races, but it recognized the significance of this fact in upholding the legislative districting there challenged.[25]

---

[24] *Associated Gen. Contractors of Mass.* v. *Altschuler,* 490 F.2d 9, 16 (1st Cir. 1973), *cert. denied,* 416 U.S. 957 (1974).

[25] In *Williamsburgh,* counsel for petitioner, on oral argument, challenged racial delineation of legislative districts in the following terms: ''Race is not part of the political process. Race is an impermissible standard....'' *Transcript of Argument,* at 33. Mr. Robert H. Bork, the then Solicitor General, responded: '' And I was astounded

HARV00066666

30

Interestingly, the Supreme Court of California seems to accept at least some of these realities. It assumed *arguendo* that admitting a significant number of minority students served a compelling state interest. Unfortunately, it then embarked on a dead-ended detour in which it contended that the Medical School at Davis should have achieved its purpose of increasing the number of minority students through the use of devices that purported to be doing something else (and which, as shown above, would have been ineffective, disingenuous, or both).

It has been the experience of the *amici*, as we believe it has been that of most educational institutions, that the remedies for the problems resulting from a long history of racial discrimination are elusive. The hopes induced by *Brown v. Board of Education*[26] in 1954, that within a generation racial inequalities in educational opportunity and achievement would be eradicated, have not been realized. Universities need some elbow-room in which to experiment in their quest for solutions. This Court recognized the intractability of the problem of preventing racial discrimination in voting when it upheld the use of extraordinary

---

when Mr. Lewin said that race is not a part of our political process. Race has been *the* political issue in this country since it was founded. And we may regret that that is a political reality, but it is a reality, that's what the Fifteenth Amendment is about, what the Civil War was about, it's what the Constitution was in part about, and it's a subject we struggle with politically today." *Id.,* at 62.

We recognize, and indeed we are profoundly sympathetic with, the concerns underlying the Chief Justice's dissent, and Mr. Justice Brennan's concurrence, in *Williamsburgh.* We believe that the limited use of race for which we here contend is respectful of those concerns. Race is, as Mr. Bork argued, "a reality" which is central to our history. Avoidance of reality is not conducive to sound construction of the Constitution. What the Constitution requires is that majorities not use their power to injure or degrade minorities. That constitutional infirmity does not inhere in this case.

[26]347 U.S. 483 (1954).

HARV00066667

31

measures to cope with it in *South Carolina* v. *Katzenbach*.[27]
A similar response is urgently needed here.

This case would seem to be particularly appropriate for
the exercise of judicial restraint. The policy questions are
difficult, and conscientious educators are dealing with them
to the best of their abilities, undoubtedly making mistakes
but learning as they do, always with the goal of improving
the instructional and scholarly quality of their institutions.
Presumptions of constitutionality, which should always
weigh heavily with this Court, are reinforced by consider-
ations of federalism where states are severally striving for
answers, and further reinforced where the Court is being
asked to substitute its judgment for that of educators.

In *San Antonio Independent School District* v. *Rodriguez*,
411 U.S. 1, 42 (1973), educational policy was described as
an "area in which this Court's lack of specialized knowledge
and experience counsels against premature interference
with the informed judgments made at state and local levels.
Education, perhaps even more than welfare assistance,
presents a myriad of 'intractable economic, social, and even
philosophical problems.' " The problems of racial ine-
quality involved in the instant case are certainly no less
intractable than those of financial inequality that the Court
was considering in *Rodriguez*. Equally applicable here is
the Court's further statement in *Rodriguez* (*Id.* at 43):

> The ultimate wisdom as to these and related problems
> of education is not likely to be divined for all time even
> by the scholars who now so earnestly debate the issues.
> In such circumstances, the judiciary is well advised to
> refrain from imposing on the States inflexible constitu-
> tional restraints that could circumscribe or handicap
> the continued research and experimentation so vital to
> finding even partial solutions to educational problems
> and to keeping abreast of ever-changing conditions.

---

[27] 383 U.S. 301 (1966).

HARV00066668

32

In *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16 (1971), this Court declared:

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities . . . .

Is such discretion appropriate only for elementary and high school authorities, but barred to educators at colleges and graduate schools?

The educational and other values relevant to admissions policy vary from state to state, from university to university, and even among schools in the same university. For example, a liberal arts college or a law school, where a large measure of verbal interchange among students is vital to the educational process, might attach more importance to diversification of background among the student body than would an engineering school. A Hispanic language background might be more important in terms of post-graduation community service in law or medicine than in fields in which oral communication is less important. Such questions of educational policy are therefore necessarily difficult, complex, and inherently not susceptible of simple answers universally applicable. Educators need to be free to make decisions reflecting their professional judgments concerning these values, not subject to the restraints of a judicially imposed strait jacket.[28]

---

[28]As universities, and particularly private universities, we have focused principally in this *amicus* brief upon the educational values upon which our admissions policies are predicated. But we do not wish thereby to be perceived as disparaging additional reasons on the

HARV00066669

33

One of the very purposes of taking minority status into account in admissions programs is to speed the time when that is no longer necessary, when applicants from all races and ethnic groups will have overcome the handicaps of previous generations of prejudice and will be able to compete for admission to selective educational institutions on terms nearly enough equal that special efforts will not be needed in order to acquire sufficiently diverse and representative student bodies. When the time comes, programs like that at Davis and other programs, both similar and distinguishable, all over the country will presumably be terminated. If not, when the need for such programs has ended, this Court can take a fresh look at them. That which is constitutional now may cease to be constitutional then, if facts and circumstances have changed. *E.g.,* *Chastleton Corp.* v. *Sinclair,* 264 U.S. 543 (1924).

There are hopeful signs that the problem may be temporary. In recent years, Japanese-Americans have had sufficiently high grades and test scores that at some institutions the need for their inclusion in special admissions programs is no longer necessary. The same may be true with respect to Chinese-Americans.[20]

We do not know how much vitality remains in the approach, until recently followed by this Court, of dividing

———————————

basis of which other institutions find further justification for such policies.

For example, while we have not based our argument upon the need for ensuring that professional services be made fully and effectively available to minority communities, such concerns would seem to be entirely appropriate for a state government, and thus for that state's universities.

[20] For example, in 1975 the law school of the University of California at Berkeley eliminated Japanese-American participation in its special admissions program and reduced participation of Chinese-Americans in light of the success of these groups in gaining admission through the regular admissions process. Brief for the Deans of the California Law Schools in Favor of the Petition for Certiorari, at 25 n. 8.

HARV00066670

34

equal protection cases into two sharply separated cate-gories;[30] in one, a measure was held valid if it had any rational relationship to a legitimate state objective, while in the other a compelling state interest had to be shown. In the latter situation, a corollary was that the challenged program would be invalid if its purposes could be achieved by less restrictive means.

Cases applying the more stringent standard where racial discrimination was involved have been cases in which the discrimination was against minorities.[31] As noted in this Court's seminal *Carolene Products* footnote, while there is normally a heavy presumption that governmental action is constitutional, "prejudice against discrete and insular mi-

---

In college enrollment Asian-Americans are already more than proportionately represented, Brown, *Minority Enrollment and Representation in Institutions of Higher Education* 2 (Ford Foundation Report by Urban Ed., Inc. 1974), particularly in physical and life sciences. Educational Testing Service, *Graduate and Professional School Opportunities for Minority Students* 4 (6th ed. 1975-77, Princeton). It is therefore unlikely that special admission policies will be necessary in the future, at least for medical schools.

[30]*See, e.g., Craig* v. *Boren,* 429 U.S. 190 (1976), at 210-11 (Powell, J., concurring), and at 211-12 (Stevens, J., concurring); *San Antonio Ind. School Dist.* v. *Rodriguez,* 411 U.S. 1, 98-99 (1973) (Marshall, J., dissenting); *Dandridge* v. *Williams,* 397 U.S. 471, 520-21 (1970) (Marshall J., dissenting); *See also Alevy* v. *Downstate Medical Center,* 39 N.Y. 2d 326, 348 N.E.2d 537, 384 N.Y.S.2d 82 (1976); Gunther, *In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L. Rev. 1, 17-48 (1972).

[31]We recognize that admissions programs designed to include minorities can theoretically be applied to so many minority groups that their cumulative effect might truly be deemed exclusionary towards the white majority, or towards some ethnic sub-groups within that majority. If and when that happens, this Court can deal with it; it has always been capable of recognizing and dealing with differences of degree. But the reservation of 16 places out of 100 at Davis for minorities cannot fairly be thought to be exclusionary of majorities, and any comparison to the quotas once imposed upon Jewish applicants at some schools is clearly hyperbole. Horror cases can be dealt with if they ever arise. Conjuring them up is scarcely a contribution to the analysis of sharply different situations.

HARV00066671

35

norities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry."[32] The distinction strongly suggests that the normal presumption of constitutionality should be applied to measures such as favorable consideration of minority status in state university admissions, since the majority has available the political strength with which to protect itself if it regards its interests as threatened.

Certainly, those applicants assertedly discriminated against at Davis were a class no less amorphous and politically no less powerful than the complainants in *San Antonio Independent School District* v. *Rodriguez,* 411 U.S. 1, 28 (1973) (footnote omitted), concerning whom this Court stated:

> However described, it is clear that appellees' suit asks this Court to extend its most exacting scrutiny to review a system that allegedly discriminates against a large, diverse, and amorphous class, unified only by the common factor of residence in districts that happen to have less taxable wealth than other districts. The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.[33]

[32]*United States v. Carolene Products Co.,* 304 U.S. 144, 152 n.4 (1938).

[33]Compare the refusal to treat 18- to 20-year olds as a "discrete and insular minority" in *Oregon v. Mitchell,* 400 U.S. 112, 295 n.14, 296 (1970) (Opinion of Mr. Justice Stewart, concurred in by Chief Justice Burger and by Mr. Justice Blackmun). As to those over 50, see *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307 (1976).

HARV00066672

36

But whether or not, in a conventional equal protection context, there is one standard for judging, or two, or more, the question remains whether, in a case such as the instant one—in which the attention to race was not invidious, and was beneficial rather than harmful to minorities—it was even constitutionally relevant to inquire whether alternative, non-racially defined, means of achieving the state's benign purposes could be devised. And, if so, should the university have had imposed upon it the burden of proof that there were no less restrictive alternatives that were feasible—and imposed only on appeal, with the university being accorded no opportunity to return to the trial court to introduce evidence on the point?

We think the foregoing questions should be answered in the negative. However they are answered, there remain serious problems concerning the types of procedures appropriate for deciding difficult constitutional questions. Should the California Supreme Court have made its own findings, not based upon anything in evidence, that there were such alternatives? Finally, and most importantly, should this Court let stand a decision, predicated entirely on conjecture, on a constitutional question of great importance —especially where there is every reason to believe that the facts necessary to test (and, we submit, disprove) the feasibility of the state court's hypothetical alternatives are available and could be adduced at a trial?

This case was decided by the Supreme Court of California upon a record almost devoid of relevant evidence. Apart from the pleadings, the record consisted principally of a declaration under oath of Associate Dean Lowery, and Dr. Lowery's deposition taken by plaintiff's attorney. In particular, on those issues crucial to the decision of the court below—the feasibility of other means, not race-oriented, for accomplishing the University's goals—the only evidence was that of Dr. Lowery, and its substance was that there existed no such means. Although uncontra-

HARV00066673

37

dicted, it was disregarded by the Supreme Court of California, which reached its own conclusions presumably on the basis of its own assumed expertise.

In short, one of the most serious constitutional issues of this era is now before this Court on a record that offers no factual basis upon which the conclusions of the California court can be sustained. Whether or not it is appropriate under California procedural doctrines to hold that the burden of proof is on the state to show that there are no less drastic means for accomplishing its ends, a decision by this Court on a vital constitutional issue should not rest upon the niceties of pleading or the vicissitudes of burden of proof.

Perhaps in a lawsuit involving nothing more than the conflicting claims of private parties it is proper that decisions be based upon such factors. This is not such a case. In a long line of decisions, this Court has refused to decide questions of constitutionality in the abstract, without the experience and knowledge that would be added by a full factual record. Especially where facts critical to the determination of a constitutional issue were not in evidence but merely presumed on the basis of pleadings, stipulations, or motions to dismiss or for summary judgment, the Court has remanded so that evidence might be taken.[34]

---

[34] *E.g., Morales v. New York,* 396 U.S. 102 (1969); *Naim v. Naim,* 350 U.S. 891 (1955); *Polk Co. v. Glover,* 305 U.S. 5 (1938); *Borden's Farm Products Co. v. Baldwin,* 293 U.S. 194 (1934); *City of Hammond v. Schaffi Bus Line,* 275 U.S. 164 (1927); *Chastleton Corp. v. Sinclair,* 264 U.S. 543 (1924); *cf. Rescue Army v. Municipal Court,* 331 U.S. 549, 568-76 (1947); *Chicago & Grand Trunk Ry. v. Wellman,* 143 U.S. 339, 346 (1892).

If this Court were to think that remand is appropriate in this case, the *amici* institutions would be willing to furnish facts from their own experience in amplification of the record in such fashion as may be proper under California procedure.

HARV00066674

38

As stated by then Professor Frankfurter in *A Note on Advisory Opinions*, 37 Harv. L. Rev. 1002, 1004-05 (1924): "Concepts like 'liberty' and 'due process' are too vague in themselves to solve issues. They derive meaning only if referred to adequate human facts. Facts and facts again are decisive." The same can surely be said of concepts like "equal protection," "compelling state interest," or "less restrictive means."[35]

---

[35] "The nature of the 'compelling state interest' standard" was specifically referred to as an example of a constitutional area in which facts are vital, in Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L. J. 1363, 1372 (1973). "In our country we have made our wager on a Constitution and a Court. When the Court attends with care to the facts of the controversy before it, and develops the constitutional issues as they arise from those facts, the great principles of liberty are advanced." Pollak, *Securing Liberty Through Litigation—The Proper Role of the United States Supreme Court*, 36 Mod. L. Rev. 113, 127 (1973).

HARV00066675

39

## CONCLUSION

As Mr. Webster advised this Court in the *Dartmouth College* case: "The case before the Court is not of ordinary importance, nor of everyday occurrence. It affects not this college only, but every college...." 4 Wheat. at 599. This case is one in which the California Supreme Court has sought to displace the traditional authority of university faculties, officers, and trustees, who according to our traditions have primary responsibility to determine academic policy. The case is one in which the California court has placed the Fourteenth Amendment athwart the path belatedly opened by America's academic institutions to the very groups to whom the Amendment promised citizenship and equality. The case is one in which the California court has sought to soften its untoward invocation of the Amendment by opining (contrary to the record, and contrary to the clear consensus of responsible university officials) the availability of alternate paths which are, we submit, illusory.

If this Court concludes that the case turns on the reality *vel non* of the alternate paths conjured up by the California Supreme Court, remand for further fact-finding is in order. If however, the Court shares the conviction of the *amici* that the California Supreme Court erred as to the law and ignored facts which are patent and decisive, it is

HARV00066676

40

clear that the judgment of the California Supreme Court
should be reversed.

Respectfully submitted,

JOHN MASON HARDING
ALBERT J. ROSENTHAL
Columbia University
New York, N. Y. 10027

DANIEL STEINER
Harvard University
Cambridge, MA. 02138

IRIS BREST
JAMES V. SIENA
Stanford University
Stanford, CA. 94305

CHARLES J. MEYERS          LOUIS H. POLLAK
ALBERT M. SACKS              The University of Pennsylvania
MICHAEL I. SOVERN            Philadelphia, PA. 19104

*Of Counsel*                 *Counsel for Amici Curiae**

June 7, 1977

―――――――――

*The substantial contributions to this brief of Ms. R. Lea Bril-
mayer, Associate in Law at Columbia University Law School, are
gratefully acknowledged.

HARV00066677

## APPENDIX
## Harvard College Admissions Program

For the past 30 years Harvard College has received each year applications for admission that greatly exceed the number of places in the freshman class. The number of applicants who are deemed to be not "qualified" is comparatively small. The vast majority of applicants demonstrate through test scores, high school records and teachers' recommendations that they have the academic ability to do adequate work at Harvard, and perhaps to do it with distinction. Faced with the dilemma of choosing among a large number of "qualified" candidates, the Committee on Admissions could use the single criterion of scholarly excellence and attempt to determine who among the candidates were likely to perform best academically. But for the past 30 years the Committee on Admissions has never adopted this approach. The belief has been that if scholarly excellence were the sole or even predominant criterion, Harvard College would lose a great deal of its vitality and intellectual excellence and that the quality of the educational experience offered to all students would suffer. Final Report of W. J. Bender, Chairman of the Admission and Scholarship Committee and Dean of Admissions and Financial Aid, pp. 20 *et seq.* (Cambridge, 1960). Consequently, after selecting those students whose intellectual potential will seem extraordinary to the faculty —perhaps 150 or so out of an entering class of over 1,100— the Committee seeks—

variety in making its choices. This has seemed important . . . in part because it adds a critical ingredient to the effectiveness of the educational experience [in Harvard College] . . . *The effectiveness of our students' educational experience has seemed to the Committee to be affected as importantly by a wide variety of interests, talents, backgrounds and career goals as it is by a fine faculty and our libraries, laboratories and housing arrangements.* (Dean of Admissions Fred L. Glimp, Final

HARV00066678

2

Report to the Faculty of Arts and Sciences, 65 Official
Register of Harvard University No. 25, 93, 104-105 (1968)
(emphasis supplied).

The belief that diversity adds an essential ingredient to
the educational process has long been a tenet of Harvard
College admissions. Fifteen or twenty years ago, how-
ever, diversity meant students from California, New York,
and Massachusetts; city dwellers and farm boys; violinists,
painters and football players; biologists, historians and
classicists; potential stockbrokers, academics and politi-
cians. The result was that very few ethnic or racial minori-
ties attended Harvard College. In recent years Harvard
College has expanded the concept of diversity to include
students from disadvantaged economic, racial and ethnic
groups. Harvard College now recruits not only Californians
or Louisianans but also blacks and Chicanos and other
minority students. Contemporary conditions in the United
States mean that if Harvard College is to continue to offer a
first-rate education to its students, minority representation
in the undergraduate body cannot be ignored by the Commit-
tee on Admissions.

In practice, this new definition of diversity has meant
that race has been a factor in some admission decisions.
When the Committee on Admissions reviews the large middle
group of applicants who are ''admissible'' and deemed ca-
pable of doing good work in their courses, the race of an ap-
plicant may tip the balance in his favor just as geographic
origin or a life spent on a farm may tip the balance in other
candidates' cases. A farm boy from Idaho can bring some-
thing to Harvard College that a Bostonian cannot offer.
Similarly, a black student can usually bring something that
a white person cannot offer. The quality of the educational
experience of all the students in Harvard College depends
in part on these differences in the background and outlook
that students bring with them.

HARV00066679

3

In Harvard College admissions the Committee has not set target-quotas for the number of blacks, or of musicians, football players, physicists or Californians to be admitted in a given year. At the same time the Committee is aware that if Harvard College is to provide a truly heterogenous environment that reflects the rich diversity of the United States, it cannot be provided without some attention to numbers. It would not make sense, for example, to have 10 or 20 students out of 1,100 whose homes are west of the Mississippi. Comparably, 10 or 20 black students could not begin to bring to their classmates and to each other the variety of points of view, backgrounds and experiences of blacks in the United States. Their small numbers might also create a sense of isolation among the black students themselves and thus make it more difficult for them to develop and achieve their potential. Consequently, when making its decisions, the Committee on Admissions is aware that there is some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted. But that awareness does not mean that the Committee sets a minimum number of blacks or of people from west of the Mississippi who are to be admitted. It means only that in choosing among thousands of applicants who are not only "admissible" academically but have other strong qualities, the Committee, with a number of criteria in mind, pays some attention to distribution among many types and categories of students.

The further refinements sometimes required help to illustrate the kind of significance attached to race. The Admissions Committee, with only a few places left to fill, might find itself forced to choose between A, the child of a successful black physician in an academic community with promise of superior academic performance, and B, a black who grew up in an inner-city ghetto of semi-literate parents

HARV00066680

4

whose academic achievement was lower but who had demonstrated energy and leadership as well as an apparently-abiding interest in black power. If a good number of black students much like A but few like B had already been admitted, the Committee might prefer B; and vice versa. If C, a white student with extraordinary artistic talent, were also seeking one of the remaining places, his unique quality might give him an edge over both A and B. Thus, the critical criteria are often individual qualities or experience not dependent upon race but sometimes associated with it.

HARV00066681

 HARVARD COLLEGE | Office of Admissions and Financial Aid

MEMORANDUM

TO: Staff
FROM: WRF
DATE: March 14, 2014
RE: Final Choices

Congratulations once again for a great re-run!  Starting back in January, your work in the docket meetings, always the key to great Harvard Classes, has been extraordinary in the face of our nearly 35,000 applicants.

On Monday, March 17, we will begin at 9:30 a.m. with a final review of each sport, followed by a quick overview.  We will then proceed through the dockets in alphabetical order.  We will conclude each day by 6:00 p.m., and we trust that we'll be done sometime on Wednesday.

We need to come in with 2002 (to yield a class of 1662 at 83%) admits.  Attached, you will find the number of lops by docket as a guideline for this year's numbers.  Do the best you can in completing your docket lop list.  If you sat on a docket for only part of the time and cannot come up with the requisite number of names, put down as many names as you can.  If you cannot get the page numbers, still complete the form.  You should give the chairperson of each docket a list of the appropriate number of lops plus half the number beyond the suggested lop number ASAP and no later than 5:00 p.m. Friday.  C, G, V and N will have until 9:00 a.m. Monday.  Dockets might want to meet prior to voting.  The chairperson should then tally the results and give them to me.  If there is no discernible order, the chair should make recommendations about how to create order out of chaos.

Please bring all your potential lops' folders to the meetings.  Be as prepared as possible for the inevitable DDM questions about midyear results, TR2s, interviews, etc.

These are only guidelines.  In the end it will be the quality of the case that decides the issue, not whose case it is or on which docket it resides.  There is a time and place for strong advocacy, but we must put this role aside and think simply about getting the best class.  For the most part, the class has been chosen and there is no reason to do anything other than keep our perspective and sense of humor as we make the final adjustments.

Let's keep it together and end up with a great "final day" as well as a great class...

Attachments

Administrative Office 86 Brattle Street · Cambridge, Massachusetts 02138
Visitor Center Agassiz House · Radcliffe Yard · 5 James Street · Cambridge, Massachusetts 02138

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    HARV00066780



United States District Court
District of Massachusetts

**DX 56**

Case No. _____ 1:14-cv-14176 (ADB)
Date Entered _____
By _____
          Deputy Clerk

**JA5596**
DX056.0001



# HARVARD
### FACULTY OF ARTS AND SCIENCES

Michael D. Smith
Edgerley Family Dean of the Faculty of Arts and Sciences
John H. Finley, Jr. Professor of Engineering and Applied Sciences

University Hall
Cambridge, MA 02138

## MEMORANDUM

To:         Rakesh Khurana and William Fitzsimmons

From:       Michael D. Smith, Edgerley Family Dean of the Faculty of Arts and Sciences

Date:       June 9, 2017

Re:         Committee to Study Race-Neutral Alternatives

cc:         Ara Gershengorn

---

In 2016, the Faculty of Arts and Sciences again emphasized "the central role that student body diversity plays in the achievement of our mission: the education of our students through exposure to novel ideas; to people whose backgrounds, points of view and life experiences are profoundly different from their own; to innovative pedagogy; and to diverse educators – at the front of our classrooms and in the seats, at lectures, in dining halls, in residences, and in the thousands of other structured and informal interactions that make up a Harvard education." The FAS Faculty unanimously reaffirmed its view that student body diversity – including racial diversity – is essential to our pedagogical objectives and institutional mission.

With the benefits to student body diversity in mind and in accordance with Supreme Court case law, I am convening a committee with the assistance and guidance of the Office of the General Counsel and the University's outside litigation counsel. The committee will evaluate whether proposed race-neutral alternatives are available and workable for achieving the benefits that flow from our student body diversity.

I anticipate that this committee's work will take place during the next four to five months, with the completion of this work during the Fall of 2017. The committee will produce a report, and I will share that report with the President of the University.

I hope you will be willing to contribute to this important endeavor.

OFFICE OF THE DEAN    T (617) 495-1566    WWW.FAS.HARVARD.EDU

CONFIDENTIAL



United States District Court
District of Massachusetts
**DX 60**
Case No.    1:14-cv-14176 (ADB)
Date Entered
By
Deputy Clerk

HARV00072381

## JA5597
DX060.0001



# HARVARD
### FACULTY OF ARTS AND SCIENCES

Michael D. Smith
Edgerley Family Dean of the Faculty of Arts and Sciences
John H. Finley, Jr. Professor of Engineering and Applied Sciences

University Hall
Cambridge, MA 02138

## MEMORANDUM

To:         William Fitzsimmons and Rakesh Khurana

From:       Michael D. Smith, Edgerley Family Dean of the Faculty of Arts and Sciences

Date:       August 15, 2017

Re:         Committee to Study Race-Neutral Alternatives

cc:         Ara Gershengorn

---

The next meeting of the Committee to study race-neutral alternatives in Harvard College admissions is scheduled for August 23, 2017, from 2:30-4:00 p.m., on the second floor of University Hall. The agenda for the meeting is as follows:

1.  General updates.

2.  Discussion of proposed race-neutral alternatives suggested in literature and in ongoing litigation.

3.  Discussion of empirical analyses being conducted in ongoing litigation.

4.  Review of a plan for gathering additional pertinent information to inform Committee's deliberations and work.

OFFICE OF THE DEAN    T (617) 495-1566    WWW.FAS.HARVARD.EDU

CONFIDENTIAL



United States District Court
District of Massachusetts
**DX 76**
Case No. _____1:14-cv-14176 (ADB)_____
Date Entered_____
By_____
Deputy Clerk

HARV00095214

**JA5598**
DX076.0001

# HARVARD
### FACULTY OF ARTS AND SCIENCES



Michael D. Smith
Edgerley Family Dean of the Faculty of Arts and Sciences
John H. Finley, Jr. Professor of Engineering and Applied Sciences

University Hall
Cambridge, MA 02138

## MEMORANDUM

| | |
|---|---|
| To: | William Fitzsimmons and Rakesh Khurana |
| From: | Michael D. Smith, Edgerley Family Dean of the Faculty of Arts and Sciences |
| Date: | October 20, 2017 |
| Re: | Committee to Study Race-Neutral Alternatives |
| cc: | Ara Gershengorn |

The next meeting of the committee to study race-neutral alternatives in Harvard College admissions is scheduled for October 26, 2017, from 11:30 AM-12:30 PM, on the second floor of University Hall. The agenda for the meeting is as follows:

I.    General updates.

II.    Discussion of the following race-neutral alternatives:

    1.    Pipeline partnerships.

    2.    Geography-based preferences.

    3.    Changes to Early Action admissions.

    4.    Changes to deferred admissions.

    5.    Eliminating consideration of standardized test scores in admissions.

    6.    Eliminating consideration of service and connection to Harvard in admissions.

    7.    Increased recruiting efforts.

III.    Discussion of SFFA's expert reports and plan for next meeting.

IV.    Discussion of report drafting.

OFFICE OF THE DEAN   T (617) 495-1566   WWW.FAS.HARVARD.EDU

CONFIDENTIAL



HARV00096532

**JA5599**
DX079.0001

# HARVARD
### FACULTY OF ARTS AND SCIENCES



Michael D. Smith
Edgerley Family Dean of the Faculty of Arts and Sciences          University Hall
John H. Finley, Jr. Professor of Engineering and Applied Sciences          Cambridge, MA 02138

## MEMORANDUM

To:          William Fitzsimmons and Rakesh Khurana

From:          Michael D. Smith, Edgerley Family Dean of the Faculty of Arts and Sciences

Date:          October 31, 2017

Re:          Committee to Study Race-Neutral Alternatives

cc:          Ara Gershengorn

The next meeting of the committee to study race-neutral alternatives in Harvard College admissions is scheduled for November 2, 2017, from 12:00 PM-3:00 PM, at the Office of the General Counsel. The agenda for the meeting is as follows:

I.          Discussion of SFFA's expert report and possible responses.

II.          Continue discussion of individual race-neutral alternatives from prior meeting.

III.          Open discussion.

OFFICE OF THE DEAN    T (617) 495-1566    WWW.FAS.HARVARD.EDU

CONFIDENTIAL

United States District Court
District of Massachusetts

**DX 80**

Case No.          1:14-cv-14176 (ADB)
Date Entered
By
Deputy Clerk

HARV00096533

## JA5600
DX080.0001



# HARVARD
### FACULTY OF ARTS AND SCIENCES

Michael D. Smith
Edgerley Family Dean of the Faculty of Arts and Sciences
John H. Finley, Jr. Professor of Engineering and Applied Sciences

University Hall
Cambridge, MA 02138

**MEMORANDUM**

To:         William Fitzsimmons and Rakesh Khurana

From:       Michael D. Smith, Edgerley Family Dean of the Faculty of Arts and Sciences

Date:       January 5, 2018

Re:         Committee to Study Race-Neutral Alternatives

cc:         Ara Gershengorn

---

The next meeting of the committee to study race-neutral alternatives in Harvard College admissions is scheduled for January 8, 2018, from 4:00 PM-6:00 PM, on the second floor of University Hall. The agenda for the meeting is as follows:

I.     Discussion of Card report and the race-neutral alternatives addressed

    1.     Socioeconomic preferences.

    2.     Geography-based preferences.

    3.     Changes to Early Action admissions.

    4.     Changes to deferred admissions.

    5.     Eliminating consideration of standardized test scores.

    6.     Eliminating consideration of service and connection to Harvard.

    7.     Eliminating consideration of whether an applicant is a recruited athlete.

    8.     Increasing transfer admissions.

    9.     Increasing recruiting and financial aid.

II.    Identification of any additional information the committee might need.

III.   Plan for report drafting.

OFFICE OF THE DEAN   T (617) 495-1566   WWW.FAS.HARVARD.EDU

CONFIDENTIAL



United States District Court
District of Massachusetts

**DX 81**

Case No.     1:14-cv-14176 (ADB)
Date Entered_____
By _____
Deputy Clerk

HARV00096538

**JA5601**
DX081.0001

# HARVARD
## FACULTY OF ARTS AND SCIENCES



Michael D. Smith
Edgerley Family Dean of the Faculty of Arts and Sciences
John H. Finley, Jr. Professor of Engineering and Applied Sciences

University Hall
Cambridge, MA 02138

## MEMORANDUM

To:         William Fitzsimmons and Rakesh Khurana

From:       Michael D. Smith, Edgerley Family Dean of the Faculty of Arts and Sciences

Date:       February 13, 2018

Re:         Committee to Study Race-Neutral Alternatives

cc:         Ara Gershengorn

---

The next meeting of the committee to study race-neutral alternatives in Harvard College admissions is scheduled for February 15, 2018, from 8:30 AM-10:00 AM, on the second floor of University Hall. The agenda for the meeting is as follows:

I.      Discussion of Kahlenberg rebuttal report.

II.     Further deliberations concerning race-neutral alternatives in light of Kahlenberg rebuttal report.

III.    Discussion of any additional information the committee will need for its determinations.

IV.     Further discussion of report drafting.

OFFICE OF THE DEAN   T (617) 495-1566   WWW.FAS.HARVARD.EDU

CONFIDENTIAL



United States District Court
District of Massachusetts
**DX 82**
Case No.    1:14-cv-14176 (ADB)
Date Entered
By
Deputy Clerk

HARV00096591

Harvard.edu / Office of the President / President News /

# Office of the President

## Response to the Report of the Task Force on Inclusion and Belonging

**March 26, 2018**

CAMBRIDGE, MASS.

Dear Members of the Harvard Community,

Harvard's commitment to excellence in the advancement and dissemination of knowledge rests upon the foundation of the remarkable people who make up this community. We understand it is essential to open our doors widely to talent from all parts of society, including those that have historically been underrepresented on our campus. Bringing together in one place the broadest range of views, experiences, backgrounds, and beliefs offers the greatest promise of advancing the frontiers of knowledge and understanding.

We increasingly have come to recognize, however, that the benefits that flow from this diversity do not, in the words of the Report of the Task Force on Inclusion and Belonging, "harvest themselves." They require intentionality on the part of the University and by each of us. They emerge from the purposeful creation of a culture, of structures, and of habits that work continually to

United States District Court
District of Massachusetts

**DX 83**

Case No.     1:14-cv-14176 (ADB)

Date Entered_____

By_____

Deputy Clerk

HARV00096592

**JA5603**

DX083.0001

advance our values of belonging and inclusion, as well as from our commitment to enable all members of our community to speak, to listen, to flourish, and to reach their greatest potential. With these obligations and opportunities in mind, I charged the task force in the fall of 2016 to "recommend programs or initiatives based in an assessment of how we can make progress toward our goal of a community in which everyone may participate as a full member and everyone has the opportunity to thrive."

I am deeply grateful for the extraordinary work of the task force and for the insightful, ambitious, and inspiring approaches reflected in its report. The task force's mandate was broad, covering students, staff, and faculty and other academic personnel. Its articulation of four goals and four tools, within the framework of pursuing excellence on a foundation of inclusion, defines an essential path for the University to pursue. Through its eight recommendations, the task force has set out concrete steps to help start us down that path.

Because I am nearing the end of my term as president, I want to ensure that the University's leadership transition does not delay the implementation of the task force's recommendations. In consultation with President-elect Bacow, I have identified actions that can be taken immediately and that I hope will serve to generate momentum for the longer-term strategic work that will extend well beyond my tenure.

To serve as a point person during the presidential transition in bringing the task force report to life and ensuring its enduring impact, I have, with the enthusiastic concurrence of President-elect Bacow, asked John Silvanus Wilson to serve as senior advisor and strategist to the president. Dr. Wilson has generously committed to assist us in our work for the remainder of this academic year and all of the next. He is a talented leader, well-versed in the rhythms and values of higher education. Since September 2017, he has been one of three former presidents to be based at our Graduate School of Education as a "President in Residence," where he is writing a book on the future of higher

HARV00096593

education, with an emphasis on black colleges. Prior to that, he has served as the president of Morehouse College, the executive director of the White House Initiative on Historically Black Colleges and Universities, and a senior administrator at MIT. Dr. Wilson knows Harvard well—as an alumnus of the Divinity School and the Graduate School of Education and as a member of the Board of Overseers, from which he will take a leave in order to serve in this new role. He will return to the Board of Overseers following his service as senior advisor. He is distinctively able to ensure that Harvard's efforts to create a truly inclusive environment for all of its members, guided by the task force report, bear full fruit. Among his responsibilities will be devising the long-term structures and appropriate personnel in the central administration to oversee this work.

In consultation with President-elect Bacow, I am also taking several other immediate steps in response to the task force's report. Some of the more significant are the following:

- I am making an initial allocation of $250,000 to support innovative ideas from across the University that seek to advance belonging and inclusion. The fund is designed to encourage experimentation by faculty, students, and staff, with an eye toward building a broader base of promising practices that can be models for other Schools and units. I have asked Dr. Wilson to take responsibility for recommending the best structure for these grants, the best mechanism for making funding decisions, and the appropriate size of such a fund for the longer term.
- The pursuit of knowledge is not a static exercise; it requires envisioning new intellectual fields, new perspectives into existing fields, and new means of interacting with a dynamic and ever-changing student body. A university achieves this in part by ensuring intellectual renewal within its faculty. I am designating $10,000,000 in presidential funds available to be committed in the coming year, in consultation with the deans, to help fund new faculty hires who have the promise to make a profound impact on our belonging

HARV00096594

and inclusion efforts through their scholarship, teaching, backgrounds, and life experiences. I have asked the senior vice provost for faculty development and diversity to take responsibility for recommending how best to structure and provide resources for these commitments and to recommend how a longer-term fund for these purposes might best be structured and supported.

· The task force report properly observes that the changing nature of our student body may require faculty to develop new skills for teaching in environments that are increasingly diverse on multiple dimensions and for facilitating difficult conversations. As the task force report so powerfully notes, true academic freedom and free speech can thrive only when individuals feel able to express their differing views in an environment of respect and generous listening. I have asked the director of the Harvard Initiative for Learning and Teaching, building off work done at Harvard and elsewhere, to develop programs and pathways for faculty seeking pedagogical techniques and curricular approaches that can support these goals.

· The task force recommends sustained academic study in two areas. As to the first—identity, politics, and culture—I will consult with the provost and constitute a group of Harvard scholars to assess the University's many existing strengths in the study of these topics. The group's ultimate task is to evaluate whether different organizational structures, including the suggestion from the task force of an interfaculty initiative, might permit us to be more integrated, innovative, and effective.

The second area of study recommended by the task force focuses specifically on structures in higher education that have the potential to support belonging and inclusion for diverse populations. The task force notes that industry and the military are in many respects ahead of the academy in understanding how to design policies and organizational models that foster this work. After consultation with members of the faculty, I am persuaded that Harvard's range of intellectual expertise would usefully be extended by

HARV00096595

**JA5606**
DX083.0004

bringing in other voices to determine whether and how to make this an area of sustained study. The Radcliffe Institute has agreed to host a workshop next year led by faculty from Harvard and featuring subject-matter experts from beyond the University. Their deliberations can offer thoughts and guidance about further work to be done and about the feasibility, desirability, and possible shape of a center or an ongoing interfaculty initiative.

· Harvard's excellence rests on many pillars, among them the dedicated efforts of the administrative staff. As the task force notes, it is essential that hiring managers look broadly for talent and create an environment where employees are—and feel that they are—full members of the community. We want to equip all of Harvard's managers with the tools and training on how best to build and nurture a diverse and inclusive work environment. I have therefore asked the executive vice president and the vice president for human resources to create a training module focused on this skill building. This module is to become an integrated part of the Universal Manager Training Program offered by the Center for Workplace Development, which to date has reached more than 1,800 managers from across the University. It will also be made available as an independent session for managers who have already completed the program. On a schedule to be determined by the executive vice president in consultation with the Schools, all hiring managers should be asked to complete the module.

· As the task force has recommended, it is important that University Health Services (UHS) conducts a strategic planning process to determine how it should address the growing need for mental health services on campus. As part of this process, the Office of the Provost and the leadership of UHS have recognized that the demographic changes in our community have implications for the delivery of mental health care. To ensure that UHS is well positioned to meet these new demands, I have provided presidential funds to support its planning process and to hire staff focused on the specific needs of diverse members of our community. The provost and I are committed to ensuring that UHS continues to receive the resources

HARV00096596

**JA5607**
DX083.0005

necessary to provide effective mental health services for our entire community.

- From the beginning of my presidency, I have sought to use campus space as a means of bringing together different parts of the community. From the chairs in the Yard to the Science Center Plaza, my hope has been to encourage the informal interaction through which we begin to know each other. A centerpiece of these efforts is the Smith Campus Center, scheduled to open in the fall. It is designed to be a crossroads, a central place for members of the community to gather, and it offers us the opportunity to embody a number of the task force recommendations in its identity from the outset. I have asked that its art reflect the heterogeneity of today's Harvard. The Smith Campus Center will also be an essential means and locus for helping what the task force has called wayfinding—as an information hub that will help decode those parts of the physical campus that may be unfamiliar to a student, faculty member, or staff member whose work may keep them focused principally elsewhere on campus.

  In addition, convening spaces in the Smith Campus Center have already been scheduled as locations for programs related to issues of inclusion and belonging. Professor Danielle Allen, task force co-chair and the director of the Edmond J. Safra Center for Ethics, is hoping to engage other parts of the University to establish monthly lunch sessions at the Smith Center on "civil disagreement"—open sessions featuring, in her words, "tough-minded conversations on hard issues where broadly divergent opinions are aired and productive discussion is fostered." Both President-elect Bacow and I look forward to working with Professor Allen and others to imagine additional ways in which the Office of the President might help to sponsor community conversations designed with a similar goal of bringing together contrasting points of view on critical questions.

- The task force recommendations on inclusive symbols and spaces obviously extend well beyond the Smith Center, and I have asked the executive vice president and the deans to develop additional guidelines and policies

HARV00096597

designed to improve wayfinding on campus and to ensure that public art on campus reflects our commitment to belonging and inclusion.

· I take seriously the task force's recommendation for assessment, communication, and strategic planning. I have asked the deans and the leadership of the central administration to produce plans, guided by the task force report, about how they will advance belonging and inclusion in their units. To afford time for consultation with students, faculty, and staff, these plans will be due at the end of October 2018. I endorse the use of the survey questions crafted by the task force and recognize the advantage that a common set of questions offers in charting our progress. To that end, I underscore the importance of grounding our decisions in the careful empirical work that the School-based and University-wide institutional research offices provide. Finally, I agree that the University itself should periodically report to the community on our efforts and their results, but I defer to my successor on the best means and schedule on which to do so.

Let me close by underscoring my admiration of and gratitude to the members of the task force, and in particular its indefatigable co-chairs: University Professor Danielle Allen, Professor and HKS Academic Dean Archon Fung, and Vice President Meredith Weenick. Through its work, the task force embodied Harvard's highest ideals. It demonstrated in concrete ways how, by acting together, we can build a vibrant and inclusive community that embraces difference as essential to excellence. Its members—faculty, students, and staff from across the University—worked tirelessly over the past 18 months, and they have earned our deepest thanks.

The responsibility of building community does not alone belong to a task force or to a university president; it is incumbent on all of us to do our part, to reach across difference, to find ways to ensure that every person on this campus has the chance to find intellectual, professional, and social fulfillment. Harvard's leadership—our boards and senior academic and administrative personnel—is committed to these goals as foundational to all that Harvard is and does, and we anticipate working with you to advance these efforts in the days and years

HARV00096598

to come. In that spirit, I look forward to the "festival rites" that will mark this year's Commencement. When it comes time to sing our alma mater, updated at the suggestion of the task force, I will proudly give voice to the song's new final line—and its recognition that the pursuit of truth and knowledge belongs to everyone at Harvard, from all backgrounds and beliefs.

Sincerely,
Drew Faust

**WEBSITE**
Accessibility
Sitemap

**GET IN TOUCH**
Contact Harvard
Maps & Directions
Jobs
Social Media

**SECURITY & BRAND**
Privacy Statement
Report Copyright
Infringement
Report Security
Issue
Trademark Notice

Harvard Apps

© 2018 The President and Fellows of Harvard College

HARV00096599


## HARVARD
### FACULTY OF ARTS AND SCIENCES



Michael D. Smith
Edgerley Family Dean of the Faculty of Arts and Sciences
John H. Finley, Jr. Professor of Engineering and Applied Sciences

University Hall
Cambridge, MA 02138

### MEMORANDUM

| | |
|---|---|
| To: | William Fitzsimmons and Rakesh Khurana |
| From: | Michael D. Smith, Edgerley Family Dean of the Faculty of Arts and Sciences |
| Date: | April 3, 2018 |
| Re: | Committee to Study Race-Neutral Alternatives |
| cc: | Ara Gershengorn |

The next meeting of the committee to study race-neutral alternatives in Harvard College admissions is scheduled for April 6, 2018, from 4:00 PM to 5:30 PM, on the second floor of University Hall. The agenda for the meeting is as follows:

I.      Discussion of draft committee report.

II.     Vote on whether to approve committee report for submission to President Faust.

OFFICE OF THE DEAN    T (617) 495-1566    WWW.FAS.HARVARD.EDU

CONFIDENTIAL

United States District Court
District of Massachusetts
**DX 84**
Case No.      1:14-cv-14176 (ADB)
Date Entered _____
By _____
Deputy Clerk

HARV00097307

**JA5611**
DX084.0001



# HARVARD UNIVERSITY

# Presidential Task Force on Inclusion and Belonging

HOME / ABOUT /

ABOUT

Charge

Members

Subcommittees

Timetable & Workflow

Discussion Draft Meetings

# Charge

## From Diversity to Belonging

A community that draws on the widest possible pool of talent, one that fully embraces individuals from varied backgrounds, cultures, races, identities, life experiences, perspectives, beliefs, and values, is a more just community. It is also an environment in which learning, creativity, and discovery can flourish. Harvard aspires to be such a place. Diversity, inclusion, and belonging are not incidental concerns; they are fundamental to Harvard's mission and identity. As noted in a report unanimously adopted by the Faculty of Arts and Sciences in February 2016, true diversity is

> "the substance from which much human learning, understanding, and wisdom derive. It offers one of the most powerful ways of creating the intellectual energy and robustness that lead to greater knowledge, as well as the tolerance and mutual respect that are so essential to the maintenance of our civic society." (Quoting from The President's Report: 1993-95)

For nearly 400 years, Harvard has steadily—though often painfully slowly—opened its doors, as it has welcomed groups previously excluded from its faculty, staff, and student body. But, as recent events both here and elsewhere have reminded us, much work remains to be done if we are to fulfill our ideals and if we are to succeed in educating leaders and scholars who can effectively contribute to a complex and too often fractured world. It is essential that we bring together a diverse community. To realize the community's full promise, and to foster the personal and intellectual transformation at the heart of our mission, we must also

United States District Court
District of Massachusetts

**DX 100**

Case No.     1:14-cv-14176 (ADB)
Date Entered_____
By_____
Deputy Clerk

**JA5612**

DX100.0001

work affirmatively and collectively to advance a culture of belonging. This requires an openness to change, as well as a willingness to learn from and embrace difference in the spirit that defines a vibrant and respectful academic community.

Over the past several months, Harvard's Schools have undertaken a range of inquiries and initiatives designed to make this a more open and inclusive campus, an effort made more urgent by the searing experiences of marginalization and discrimination described in the broader society and by members of our community. Since so many critical decisions and policies—on issues from academic priorities and recruitments to student services—are determined at the School level, this focus has already produced important outcomes. But the promise of Harvard University, its inspiring culture of excellence and its most salient opportunities, rests beyond any individual School—in foundational institutional values and in what we contribute to and learn from one another, with each of us and all our endeavors enlarged and expanded by what we share.

To help fulfill that promise, I am convening a University-wide task force on diversity and belonging. I will ask the group, to be made up of faculty, staff, and students from across the University, to focus on four specific areas, and ultimately to recommend programs or initiatives based in an assessment of how we can make progress toward our goal of a community in which everyone may participate as a full member and everyone has the opportunity to thrive.

The task force should consider the following issues, gathering and generating qualitative and quantitative data to help inform its work:

1. **Demographic Realities**

   What are the current realities across the University? Where are we doing better; where worse? How do we increase the diversity of faculty, staff and students? How do we enhance the attractiveness of the campus to faculty, students and staff who would increase its diversity? What initiatives, incentives, processes and resources would bring positive change?

2. **The Fabric of the Institution & the Lived Experience of Belonging**

   Across and within its twelve Schools, Harvard offers its students, faculty, and staff many different experiential pathways but also elements of a common culture. What are the defining characteristics of Harvard's common culture? That is, what is the lived experience of diversity, inclusion, empowerment, and belonging among students, staff, and faculty? How can we transform that culture to achieve not just inclusion but full belonging and empowerment for all members of our community? What are the social, academic, or other structural barriers that may inhibit full membership and participation? Can we identify the critical junctures where opportunities to leverage diversity as a positive benefit for all go untapped? How do we effectively teach and create a dynamic learning environment in an increasingly diverse community? How do we help the entire

**JA5613**

DX100.0002

community understand that the work ahead is a collective opportunity and responsibility?

3. **Academic Resources & Contributions**

   Harvard is dedicated to discovery and learning as means of advancing knowledge and changing the world. What intellectual resources do we currently devote across the University to understanding and advancing issues of diversity, inclusion, and social and organizational transformation? How do these issues fit within our teaching and research agendas and in our curricula? What more can and should we do to create and disseminate knowledge that can advance our common goals?

4. **Harvard's Organizational Structures**

   Harvard has a plethora of diversity officers, programs, and initiatives. How can we ensure that these efforts work together well and are known to the community? How do we best measure and improve their effectiveness? Have we defined their roles appropriately? How does our approach compare to established best practices?

Ultimately, the work of the task force is about promise and opportunity: making sure that Harvard continues to attract the most talented people from all walks of life and creates an environment where we can be our best selves. This work will never be complete, nor does it belong to the task force alone, but the University will benefit from the sustained focus of a dedicated group that will help us continue to make progress on the path from diversity to belonging.

Powered by
OpenScholar ®    **Admin Login**

**Copyright © 2018 The President and Fellows of Harvard College |** <u>**Accessibility**</u> **|** <u>**Report Copyright Infringement**</u>

First Generation Students | Harvard College

## Harvard College Admissions & Financial Aid

# First Generation Students

## Blaze the Trail for your Family

If you are a first generation college student*, your college experience will be especially exciting for you and your family—from application to graduation. But you may find you have questions about the process of applying and about what to expect in college. We can help.

While you may be the first in your family to attend college, you won't be alone in blazing that trail at Harvard. About 15% of Harvard students are first generation students (including Harvard's Dean of Admissions and Financial Aid, William Fitzsimmons). And those who have been first before you have helped create resources and networks to support you at Harvard and beyond.

## Harvard First Generation Program

The Admissions Office's Harvard First Generation Program (HFGP) focuses on directing college awareness to future first generation college students. Our HFGP coordinators will provide support and information as you begin to navigate the college application process. Contact us with any questions about admissions, financial aid, or first generation student life at Harvard. We look forward to meeting you!

> CONTACT HFGP

*We consider you a first generation college student—or "first-gen" for short—if you will be in the first generation of your immediate family to graduate from a four-year college or the equivalent.*



United States District Court
District of Massachusetts

**DX 103**

Case No. _____1:14-cv-14176 (ADB)_____
Date Entered_____
By _____
Deputy Clerk

**JA5615**

DX103.0001

1/30/2018    First Generation Students | Harvard College






**STUDENT BLOG**

## Perspectives from First-Gen Students

Read about day-to-day life on campus from a current student's perspective. Our First-Gen students contribute to the student blog, and offer insights on what it's like to be a First-Gen student at Harvard.

**COLLEGE QUICK LINKS**

Applicant Login

Contact Us

Faculty of Arts & Sciences

Harvard.edu

Maps & Directions

Registrar

     

**JA5616**

DX103.0002

How Aid Works | Harvard College

# Harvard College Admissions & Financial Aid

HARVARD COLLEGE

⬍

## How Aid Works

## Understanding our Financial Aid Program

Once you are admitted to Harvard, we work closely with your family to ensure you can afford to come here. Because we seek the best students regardless of their ability to pay, we are committed to meeting 100 percent of demonstrated financial need for all four years. International students receive exactly the same financial aid as Americans. In fact, approximately 70 percent of our students receive some form of aid, and about 60 percent receive need–based scholarships and pay an average of $12,000 per year. Twenty percent of parents pay nothing. No loans required.

We follow two key principles:

- Admission to Harvard is need-blind, meaning your financial need will not impede your chances of admission.

- Aid is based entirely on need, not merit.

Our financial aid officers work closely with your family to determine your demonstrated need and your family's expected contribution. For many families, this is between zero and 10 percent of family income. You will also be asked to contribute to the cost of your education through term-time and summer employment.

## Eligibility for aid

Our generous financial aid program—bolstered by the Harvard Financial Aid Initiative, which seeks to increase low- and middle-income students' awareness of Harvard's affordability—aims to make Harvard accessible to any student who is admitted.

United States District Court
District of Massachusetts

**DX 106**

Case No. _____1:14-cv-14176 (ADB)_____
Date Entered_____
By_____

Deputy Clerk

**JA5617**

DX106.0001

- Our program requires no contribution from Harvard families with annual incomes below $65,000. About 20% of our families have no parent contribution.

- Families with incomes between $65,000 and $150,000 will contribute from 0-10% of their income, and those with incomes above $150,000 will be asked to pay proportionately more than 10%, based on their individual circumstances.

- Families at all income levels who have significant assets are asked to pay more than those in less fortunate circumstances.

- Home equity and retirement assets are not considered in our assessment of financial need.

Use our Net Price Calculator to quickly estimate your aid package and expected family contribution.

Explore Harvard's commitment to economic diversity.

## A variety of options

In addition to need–based scholarships, we also offer financing options such as a parent monthly payment plan, various loan programs, and the opportunity to pre-pay tuition for four years at your freshman year rate.

We will also help you find alternative sources of financial assistance, like research grants and student employment in our libraries, dining halls, museums, and academic departments.

## Here to help

Our staff is available year-round to speak with you. If your family encounters adverse financial changes, we will also help you submit an appeal for a reconsideration of your award.

Get more details on our financial aid fact sheet.

COLLEGE QUICK LINKS

Applicant Login

Contact Us

**JA5618**
DX106.0002



Faculty of Arts & Sciences

Harvard.edu

Maps & Directions

Registrar

**JA5619**

DX106.0003

6/25/2018                        Mission, Vision, and History | Harvard College





United States District Court
District of Massachusetts

**DX 109**

Case No. _____ 1:14-cv-14176 (ADB)
Date Entered _____
By _____
Deputy Clerk

## Mission, Vision, and History



## Mission

The mission of Harvard College is to educate the citizens and citizen-leaders for our society. We do this through our commitment to the transformative power of a liberal arts and sciences education.

Beginning in the classroom with exposure to new ideas, new ways of understanding, and new ways of knowing, students embark on a journey of intellectual transformation. Through a diverse living environment, where students live with people who are studying different topics, who come from different walks of life and have evolving identities, intellectual transformation is deepened and conditions for social transformation are created. From this we hope that students will begin to fashion their lives by gaining a sense of what they want to do with their gifts and talents, assessing their values and interests, and learning how they can best serve the world.

## Vision

Harvard College will set the standard for residential liberal arts and sciences education in the twenty-first century. We are committed to creating and sustaining the conditions that enable all

**JA5620**

DX109.0001

Harvard College students to experience an unparalleled educational journey that is intellectually, socially, and personally transformative.

## A Brief History

When you attend Harvard College, you become a part of the rich, storied history of the nation's oldest institutions of higher learning. Founded in 1636, Harvard has undergone countless changes over the centuries, yet has always maintained its core as a haven for the world's most ambitious scholars.



### Academics

Harvard was founded in 1636 and named for its first donor, the Reverend John Harvard.

Read more ▸



### Buildings

Many of Harvard's historic buildings, several of which date back to the 18th century, still stand today.

Read more ▸



### Diversity and Accessibility

The 20th century saw substantial efforts to open Harvard's doors to an increasingly broad range of students.

Read more ▸

JA5621

DX109.0002



### Radcliffe

Radcliffe College was founded in 1879 "to furnish instruction and the opportunities of collegiate life to women and to promote their higher education."

**Read more** ▶



COLLEGE QUICK LINKS

Applicant Login
Contact Us
Faculty of Arts & Sciences
Harvard.edu
Maps & Directions
Registrar

**JA5622**
DX109.0003



United States District Court
District of Massachusetts

**DX 119**

Case No. _____ 1:14-cv-14176 (ADB)
Date Entered _____
By _____
Deputy Clerk

SHARE

# Top Colleges Doing the Most for the American Dream

MAY 25, 2017

Welcome to the third annual College Access Index. It's a New York Times ranking of colleges — those with a five-year graduation rate of at least 75 percent — based on their commitment to economic diversity. The ranking is based on a combination of the number of lower-and middle-income students that a college enrolls and the price it charges these students. The top of the ranking is dominated by campuses in the University of California system, while the most diverse private colleges include Amherst, Pomona, Harvard and Vassar. Notably, a college's endowment does not determine its commitment to economic diversity. There are wealthy colleges and much less wealthy ones at both the top and bottom of the ranking. Read the related column.

| Rank | College | Freshman class | Pell grad share | Net price, mid. income | College Access Index▲ | Endowment per student |
|------|---------|----------------|-----------------|------------------------|----------------------|----------------------|
| 171 | University of Puget Sound | 700 | 10 | $34k | 0.28 | $129.8k |
| 170 | Emerson College | 900 | 13 | $35k | 0.35 | $31.8k |
| 169 | Saint Joseph's | 1,300 | 8 | $29k | 0.36 | $28.7k |

Sign Up

| 168 | Elon University | 1,500 | 6 | $26k | 0.38 | $34.7k |
| 166 | Quinnipiac University | 1,800 | 11 | $31k | 0.42 | $41.2k |
| 167 | Bryant University | 900 | 11 | $30k | 0.42 | $48.5k |
| 165 | Worcester Polytechnic Institute | 1,100 | 10 | $29k | 0.44 | $103.3k |
| 164 | Marist College | 1,100 | 11 | $27k | 0.52 | $9.6k |
| 162 | Rensselaer Polytechnic Institute | 1,400 | 12 | $28k | 0.54 | $94.4k |
| 163 | University of Miami | 2,100 | 12 | $28k | 0.54 | $52.5k |
| 161 | Gonzaga University | 1,200 | 12 | $28k | 0.55 | $30.5k |
| 160 | Southern Methodist University | 1,400 | 9 | $23k | 0.57 | $145.8k |
| 159 | Fordham University | 1,900 | 14 | $29k | 0.58 | $43.5k |
| 156 | George Washington University | 2,300 | 10 | $24k | 0.59 | $74.7k |
| 157 | University of Pittsburgh | 4,000 | 11 | $24k | 0.59 | $120.2k |
| 158 | Providence College | 1,000 | 11 | $25k | 0.59 | $46.8k |
| 154 | University of Dayton | 1,800 | 10 | $24k | 0.60 | $48.2k |
| 155 | Rhode Island School of Design | 500 | 14 | $28k | 0.60 | $132.9k |
| 153 | Ithaca College | 1,800 | 14 | $28k | 0.61 | $42.3k |
| 150 | Carnegie Mellon University | 1,400 | 10 | $23k | 0.62 | $109.9k |
| 151 | Santa Clara University | 1,300 | 11 | $24k | 0.62 | $69.4k |
| 152 | Penn State University-Main Campus | 8,000 | 11 | $24k | 0.62 | $39.1k |
| 147 | Marquette University | 2,000 | 12 | $24k | 0.63 | $49.7k |
| 148 | Boston University | 3,800 | 12 | $25k | 0.63 | $51.8k |
| 149 | Villanova University | 1,700 | 11 | $24k | 0.63 | $55.6k |
| 145 | Miami University (Ohio) | 3,600 | 8 | $20k | 0.64 | $33.4k |
| 146 | Loyola University Maryland | 1,100 | 13 | $25k | 0.64 | $38.1k |
| 142 | New York University | 5,200 | 18 | $30k | 0.65 | $71.1k |

**JA5624**

DX119.0002

| 143 | Furman University | 800 | 10 | $22k | 0.65 | $205.3k |
| 144 | Bucknell University | 900 | 10 | $22k | 0.65 | $206.8k |
| 141 | Pepperdine University | 800 | 14 | $25k | 0.66 | $104.1k |
| 140 | University of Portland | 800 | 16 | $27k | 0.67 | $34.6k |
| 138 | Northeastern University | 2,900 | 10 | $21k | 0.68 | $30.8k |
| 139 | University of Denver | 1,400 | 12 | $23k | 0.68 | $43.6k |
| 137 | American University | 1,600 | 14 | $25k | 0.69 | $49.5k |
| 136 | Hobart William Smith Colleges | 600 | 11 | $21k | 0.70 | $85.3k |
| 135 | Stevens Institute of Technology | 600 | 15 | $25k | 0.71 | $32.7k |
| 133 | Rhodes College | 500 | 12 | $22k | 0.72 | $162.3k |
| 134 | Muhlenberg College | 600 | 10 | $20k | 0.72 | $92.9k |
| 132 | Case Western Reserve University | 1,300 | 14 | $24k | 0.73 | $179.2k |
| 131 | Fairfield University | 1,000 | 11 | $20k | 0.74 | $66.4k |
| 130 | Centre College | 400 | 14 | $23k | 0.75 | $209.3k |
| 128 | Dickinson College | 600 | 10 | $18k | 0.76 | $167k |
| 129 | Whitman College | 400 | 10 | $19k | 0.76 | $355.9k |
| 126 | Oberlin College | 800 | 8 | $16k | 0.77 | $294.5k |
| 127 | Messiah College | 600 | 14 | $22k | 0.77 | $40.1k |
| 124 | Bentley University | 1,000 | 13 | $21k | 0.78 | $52.4k |
| 125 | Lafayette College | 600 | 9 | $17k | 0.78 | $314.4k |
| 123 | Union College | 600 | 10 | $17k | 0.80 | $172.5k |
| 122 | Wake Forest University | 1,200 | 9 | $16k | 0.81 | $151.9k |
| 120 | Trinity University | 500 | 11 | $18k | 0.82 | $485.9k |
| 121 | Babson College | 500 | 13 | $20k | 0.82 | $107.1k |
| 119 | Ursinus College | 400 | 17 | $23k | 0.83 | $85.2k |
| 118 | Connecticut College | 500 | 12 | $18k | 0.84 | $136.8k |
| 117 | Boston College | 2,300 | 11 | $16k | 0.85 | $177.9k |
| 112 | Clark University | 600 | 19 | $24k | 0.86 | $111.7k |
| 113 | Illinois Wesleyan | 500 | 16 | $22k | 0.86 | $128.6k |

**JA5625**

| | University | | | | | |
|---|---|---|---|---|---|---|
| 114 | Lehigh University | 1,200 | 12 | $17k | 0.86 | $182.3k |
| 115 | Washington University in St. Louis | 1,600 | 8 | $13k | 0.86 | $489.5k |
| 116 | Luther College | 600 | 15 | $21k | 0.86 | $62.9k |
| 110 | College of New Jersey | 1,400 | 13 | $18k | 0.87 | $4.2k |
| 111 | Stonehill College | 600 | 16 | $21k | 0.87 | $81.4k |
| 107 | Bates College | 500 | 9 | $13k | 0.88 | $147.5k |
| 108 | Willamette University | 500 | 19 | $24k | 0.88 | $89.5k |
| 109 | Syracuse University | 3,500 | 18 | $23k | 0.88 | $52.8k |
| 102 | James Madison University | 4,200 | 11 | $15k | 0.89 | $4k |
| 103 | Wofford College | 400 | 15 | $20k | 0.89 | $103.8k |
| 104 | Lawrence University | 400 | 15 | $19k | 0.89 | $178.7k |
| 105 | Gettysburg College | 700 | 12 | $16k | 0.89 | $111.7k |
| 106 | University of Wisconsin-Madison | 6,300 | 9 | $14k | 0.89 | $86.2k |
| 99 | DePauw University | 600 | 14 | $18k | 0.90 | $290.5k |
| 100 | Sewanee | 500 | 13 | $17k | 0.90 | $209.2k |
| 101 | Virginia Tech | 5,400 | 11 | $15k | 0.90 | $25.4k |
| 96 | Skidmore College | 700 | 11 | $14k | 0.92 | $129.2k |
| 97 | Kenyon College | 500 | 9 | $12k | 0.92 | $116.5k |
| 98 | Bryn Mawr College | 400 | 11 | $15k | 0.92 | $493.9k |
| 95 | College of the Holy Cross | 700 | 15 | $18k | 0.93 | $228.2k |
| 88 | University of Virginia-Main Campus | 3,500 | 11 | $13k | 0.94 | $252.6k |
| 89 | University of Southern California | 2,900 | 17 | $19k | 0.94 | $121.7k |
| 90 | University of Notre Dame | 2,100 | 10 | $13k | 0.94 | $684.4k |
| 91 | Juniata College | 400 | 19 | $22k | 0.94 | $72.7k |
| 92 | Georgetown University | 1,600 | 11 | $14k | 0.94 | $97.3k |

**JA5626**

DX119.0004

| 93 | University of Delaware | 4,200 | 10 | $13k | 0.94 | $58.4k |
|---|---|---|---|---|---|---|
| 94 | University of Connecticut | 3,700 | 13 | $16k | 0.94 | $14.1k |
| 86 | St Lawrence University | 600 | 16 | $19k | 0.95 | $117.5k |
| 87 | Hope College | 800 | 15 | $18k | 0.95 | $59.5k |
| 84 | Tufts University | 1,300 | 12 | $14k | 0.96 | $140.3k |
| 85 | University of New Hampshire-Main Campus | 2,900 | 17 | $20k | 0.96 | $22.6k |
| 82 | Macalester College | 600 | 14 | $16k | 0.98 | $387.9k |
| 83 | Siena College | 800 | 19 | $21k | 0.98 | $42.6k |
| 74 | Clemson University | 3,300 | 13 | $14k | 0.99 | $40.2k |
| 75 | Denison University | 600 | 14 | $16k | 0.99 | $363k |
| 76 | Kalamazoo College | 500 | 16 | $17k | 0.99 | $150.1k |
| 77 | Emory University | 1,900 | 17 | $18k | 0.99 | $468.8k |
| 78 | Ohio State University-Main Campus | 7,100 | 13 | $14k | 0.99 | $63.4k |
| 79 | Saint Johns University | 500 | 16 | $17k | 0.99 | $94.5k |
| 80 | Cornell University | 3,200 | 13 | $14k | 0.99 | $211.9k |
| 81 | Northwestern University | 2,000 | 13 | $14k | 0.99 | $396.2k |
| 71 | SUNY College at Geneseo | 1,100 | 14 | $14k | 1.00 | $5.3k |
| 72 | Johns Hopkins University | 1,400 | 12 | $13k | 1.00 | $149.3k |
| 73 | Carleton College | 500 | 13 | $14k | 1.00 | $390.8k |
| 70 | Brandeis University | 800 | 17 | $18k | 1.01 | $130.7k |
| 65 | Georgia Tech | 2,700 | 11 | $11k | 1.02 | $78.8k |
| 66 | St. Mary's College of Maryland | 400 | 13 | $13k | 1.02 | $17.8k |
| 67 | Mount Holyoke College | 500 | 15 | $15k | 1.02 | $300.8k |
| 68 | University of Maryland-College Park | 4,000 | 11 | $11k | 1.02 | $15.1k |
| 69 | University of Rochester | 1,500 | 16 | $17k | 1.02 | $185.7k |
| 60 | Washington & Jefferson | 300 | 21 | $21k | 1.03 | $100.7k |

**JA5627**

DX119.0005

College

| 61 | Colby College | 500 | 9 | $8k | 1.03 | $362.6k |
|----|---------------|-----|---|-----|------|---------|
| 62 | Reed College | 400 | 14 | $13k | 1.03 | $385.6k |
| 63 | Wheaton College (Illinois) | 500 | 16 | $16k | 1.03 | $139.1k |
| 64 | Claremont McKenna College | 300 | 12 | $12k | 1.03 | $543.2k |
| 56 | University of Chicago | 1,400 | 10 | $9k | 1.04 | $462.1k |
| 57 | College of William and Mary | 1,500 | 9 | $8k | 1.04 | $97.4k |
| 58 | Colorado College | 500 | 11 | $11k | 1.04 | $314.5k |
| 59 | University of Texas at Austin | 7,100 | 15 | $15k | 1.04 | $72.5k |
| 54 | St. Olaf College | 800 | 15 | $14k | 1.05 | $151.9k |
| 55 | Haverford College | 300 | 13 | $12k | 1.05 | $379k |
| 53 | Colgate University | 800 | 11 | $10k | 1.06 | $312.6k |
| 52 | Trinity College | 600 | 14 | $13k | 1.07 | $240.5k |
| 49 | Moody Bible Institute | 400 | 22 | $20k | 1.08 | $11.4k |
| 50 | University of Richmond | 800 | 14 | $13k | 1.08 | $583.9k |
| 51 | Smith College | 600 | 16 | $15k | 1.08 | $554.9k |
| 47 | Franklin and Marshall College | 600 | 16 | $14k | 1.09 | $135.5k |
| 48 | Allegheny College | 600 | 21 | $19k | 1.09 | $94.4k |
| 44 | Dartmouth College | 1,100 | 13 | $10k | 1.10 | $718.5k |
| 45 | SUNY at Binghamton | 2,600 | 19 | $17k | 1.10 | $5.9k |
| 46 | University of Pennsylvania | 2,400 | 13 | $10k | 1.10 | $427.1k |
| 41 | Swarthmore College | 400 | 15 | $12k | 1.11 | $1.173m |
| 42 | College of Saint Benedict | 500 | 21 | $19k | 1.11 | $29.3k |
| 43 | Hamilton College | 500 | 14 | $12k | 1.11 | $492.5k |
| 39 | Bowdoin College | 500 | 13 | $10k | 1.12 | $778.9k |
| 40 | University of Michigan-Ann Arbor | 6,200 | 12 | $9k | 1.12 | $220k |

**JA5628**

| 38 | University of Illinois at Urbana-Champaign | 7,300 | 18 | $15k | 1.14 | $26.2k |
| 34 | Middlebury College | 600 | 15 | $10k | 1.16 | $326k |
| 35 | Washington and Lee University | 500 | 9 | $5k | 1.16 | $679.3k |
| 36 | Gustavus Adolphus College | 600 | 21 | $17k | 1.16 | $57.7k |
| 37 | Vanderbilt University | 1,600 | 12 | $8k | 1.16 | $353.1k |
| 30 | Grinnell College | 400 | 18 | $14k | 1.17 | $1.057m |
| 31 | Rice University | 1,000 | 13 | $8k | 1.17 | $768.1k |
| 32 | Rutgers University-New Brunswick | 6,400 | 21 | $17k | 1.17 | $14.9k |
| 33 | Duke University | 1,700 | 12 | $7k | 1.17 | $478k |
| 28 | University of Georgia | 5,200 | 16 | $12k | 1.18 | $28.3k |
| 29 | Occidental College | 500 | 19 | $14k | 1.18 | $181.4k |
| 26 | Texas A & M University-College Station | 9,000 | 17 | $11k | 1.19 | $175.4k |
| 27 | Brown University | 1,600 | 15 | $10k | 1.19 | $337.2k |
| 24 | Davidson College | 500 | 13 | $7k | 1.20 | $356.8k |
| 25 | Massachusetts Institute of Technology | 1,000 | 14 | $9k | 1.20 | $1.206m |
| 22 | Westminster College | 300 | 25 | $19k | 1.21 | $80.4k |
| 23 | Wesleyan University | 800 | 17 | $12k | 1.21 | $240.3k |
| 21 | Yale University | 1,400 | 14 | $7k | 1.22 | $1.759m |
| 20 | Barnard College | 600 | 19 | $12k | 1.25 | $115.3k |
| 19 | Columbia University | 1,400 | 16 | $9k | 1.26 | $324.2k |
| 16 | Knox College | 400 | 26 | $18k | 1.30 | $92.9k |
| 17 | University of North Carolina at Chapel Hill | 4,000 | 18 | $10k | 1.30 | $103.8k |
| 18 | University of Washington-Seattle | 6,413 | 17 | $10k | 1.30 | $61k |
| 15 | Stanford University | 1,700 | 14 | $4k | 1.31 | $1.448m |
| 14 | Wellesley College | 600 | 18 | $9k | 1.32 | $763.1k |

**JA5629**

DX119.0007

| | | | | | | |
|---|---|---|---|---|---|---|
| 13 | Princeton University | 1,300 | 16 | $6k | 1.34 | $2.662m |
| 12 | Williams College | 500 | 18 | $7k | 1.35 | $1.049m |
| 10 | Harvard University | 1,700 | 15 | $5k | 1.36 | $1.51m |
| 11 | Vassar College | 700 | 21 | $11k | 1.36 | $397k |
| 9 | University of California-Berkeley | 4,700 | 22 | $11k | 1.38 | $46.3k |
| 8 | Pomona College | 500 | 20 | $7k | 1.43 | $1.288m |
| 7 | Amherst College | 500 | 22 | $9k | 1.44 | $1.141m |
| 6 | University of Florida | 6,500 | 22 | $8k | 1.46 | $33.3k |
| 5 | University of California-Los Angeles | 5,700 | 26 | $11k | 1.52 | $54.2k |
| 4 | University of California-San Diego | 5,200 | 29 | $11k | 1.58 | $22.2k |
| 3 | University of California-Davis | 5,100 | 30 | $13k | 1.60 | $11.2k |
| 2 | University of California-Santa Barbara | 4,600 | 31 | $13k | 1.61 | $7.1k |
| 1 | University of California-Irvine | 5,400 | 39 | $12k | 1.90 | $11.1k |

Pell grad share for each college is the average share of the freshman class that received a Pell grant in 2012-13, 2013-14, 2014-15 and 2015-16, multiplied by the graduation rate for recent Pell recipients. Later years count more; not all colleges released 2015-16 data. Graduation rates for Pell students at some colleges are estimated.

Net price for middle-income students covers tuition, fees, room and board, after taking into account federal, state and institutional financial aid, and it applies to students who come from households earning between $48,000 and $75,000 a year and qualifying for federal aid. Loans and wages from work-study jobs are counted in the net price as part of the students' cost.

The College Access Index is a combination of a colleges' Pell graduates and net price, compared with the average school. (The index is based on the net price for both the $48,000-to-$75,000 income range shown here and the $30,000-to-$48,000 income

**JA5630**

DX119.0008

range.) A college with an average score on the two measures in combination will receive a one. Scores above one indicate the most effort.

Endowment per student is for the year 2012-13 and includes graduate students.

Note: The original version of this chart did not include the University of Washington, which did not submit data in time to be included. It has since done so, and the rankings have been updated to include Washington. Sources: individual colleges; the Department of Education

**Correction: June 7, 2017**
An earlier version of this chart included an incorrect endowment figure for Bates College, because the figure was incorrect in the Department of Education's database. Bates's endowment-per-student is $147,500, not $513,800. An earlier version also misranked the University of Connecticut and Connecticut College based on incorrect data. The University of Connecticut is ranked 94 and Connecticut College is 118, not 118 and 85.

MORE

---

**More on NYTimes.com**

---

Chris Collins, Argentina, Bill Hybels: Your Thursday Briefing   AUG. 9, 2018



---

**NEW YORK TODAY**
New York Today: Balancing Bikes   AUG. 9, 2018



---

**CALIFORNIA TODAY**
California Today: Amid Wildfires, Bad Air Becomes a Threat, Too

AUG. 9, 2018



New York City Caps Uber and Lyft Vehicles in a Crackdown  AUG. 8, 2018



**BIG CITY**

Uber and the False Hopes of the Sharing Economy  AUG. 9, 2018



© 2018 The New York Times Company | Privacy | Terms of Service

Site Map | Help | Site Feedback

Curriculum Vita - David Card
December 2017

Business Address:        Department of Economics
                         530 Evans Hall #3880
                         University of California Berkeley
                         Berkeley, CA  94720-3880

                         phone: 510-642-5222   fax:  510-643-7042
                         email: card@econ.berkeley.edu

Citizenship:             U.S. and Canada

Current Positions:       Class of 1950 Professor of Economics
                         Director, Center for Labor Economics (CLE)
                         Director, Econometrics Laboratory (EML)
                         Director, Labor Studies Program, National Bureau of Economic Research

Previous Positions:      Assistant Professor of Business Economics
                         Graduate School of Business
                         University of Chicago, 1982-83

                         Assistant Professor of Economics
                         Princeton University, 1983-87

                         Professor of Economics
                         Princeton University, 1987-1997

                         Visiting Professor of Economics
                         Columbia University, 1990-91

                         Fellow, Center for Advanced Study in
                         Behavioral Sciences, 1996-97

                         Visiting Professor of Economics
                          Princeton University, 2000-2001

                         Visiting Professor of Economics
                          Harvard University, 2008

Education:               Queen's University (Kingston), B.A. 1978
                         Princeton University, Ph.D. 1983

Editorial Positions:     Co-editor **American Economic Review**, 2002 - 2005.
                         Co-editor **Econometrica**, 1993-97
                         Associate Editor **Journal of Labor Economics** 1988-92



United States District Court
District of Massachusetts

**DX 133**

Case No. _____ 1:14-cv-14176 (ADB)_____
Date Entered_____
By_____
Deputy Clerk

**JA5633**
DX133.0001

| | |
|---|---|
| Editorial Boards: | **Journal of Population Economics**, 2001- |
| | **AEJ: Applied Economics**, 2007- |
| | **Quarterly Journal of Economics**, 2008- |

| | |
|---|---|
| Awards and Prizes: | Doctor of Laws (Honoris Causa) University of Ottawa, 2017 |
| | Doctor of Laws (Honoris Causa) University of Guelph, 2015 |
| | BBVA Foundation Frontiers of Knowledge Award, 2015 |
| | J.K. Galbraith Fellow, American Academy of Political |
| |    and Social Science, 2013 |
| | Frisch Medal, 2007 (for 2005 paper in **Econometrica** with D. Hyslop) |
| | UC Berkeley Distinguished Service Award, 2007 |
| | IZA Prize in Labor Economics, 2006 |
| | Fellow, Society of Labor Economics, 2004 |
| | Doctor of Laws (Honoris Causa) Queen's University (Kingston), 1999 |
| | John Bates Clark Prize, American Economic Assoc., 1995 |
| | Fellow, American Academy of Arts and Sciences, 1998 |
| | Douglas Purvis Prize, 1994 |
| | Fellow of the Econometric Society, 1992 |
| | Manufacturers Hanover Preceptorship, Princeton Univ., 1983-88 |
| | Prince of Wales Prize, Queen's University, 1978 |

| | |
|---|---|
| Invited Lectures: | Condliffe Lecture, University of Canterbury, June 2014 |
| | Arrow Lectures, Stanford University, May 2013 |
| | Lampman Lecture, University of Wisconsin Madison, May 2013 |
| | Woytinsky Lecture, University of Michigan, March 2012. |
| | Snyder Lecture, UC Santa Barbara, April 2011. |
| | Ely Lecture, American Economic Association, January 2009 |
| | Woodward Lecturer, University British Columbia, March 2008. |
| | Dennis Sargan Lecture to Royal Economic Society, 2006. |
| | Adam Smith Lecture to European Labor Economics Association, 2006. |
| | Fisher-Schultz Lecture to Econometric Society, 2002. |
| | Alfred Marshall Lecture, Cambridge University, 2000. |

| | |
|---|---|
| Advisory Boards: | National Academy of Science Committee on Nat. Statistics (2012-2015) |
| | "What Works Clearinghouse" Expert Panel Review (Chair), |
| |    US Department of Education, October 2008. |
| | AEA Representative to US Census Advisory Committee, 1991-96 |
| | Statistics Canada Advisory Committee, 1990-2002 |
| | Advisory Council, ICPSR, 1994-96. |
| | Joint Center for Poverty Research, 1997-99 |
| | National Research Council Institute of Medicine Board on |
| |    Children, Youth and Families, 1998-2001. |
| | RWI – Essen Advisory Board, 2005-2011. |
| | Comitato Scientifico Labor, Laboratorio R. Revelli, 2006-2009. |

**JA5634**

DX133.0002

| Selected Review Panels and Assignments: | National Institute of Health, Social Sciences, Nursing, Epidemiology, and Methods (SNEM) Review Panel, 1998-2003 |
| | Russell Sage Foundation Immigration Advisory Committee, 1999- 2001. |
| | Government of Spain Severo Ochoa Program (2014) |
| | Campbell Collaboration (2016) |

| Professional Societies: | Elected member of the Council, Econometric Society, 2007-2012 |
| | Elected President of Society of Labor Economics for 2010/11 |
| | President of Western Economics Association for 2015/2016 |
| | Elected Vice President of American Economic Association for 2014/2015 |

**Books**:

(co-edited with Steven Raphael). *Immigration, Poverty, and Socioeconomic Inequality*. New York: Russell Sage Foundation, 2013.

(co-authored with Alan B. Krueger; edited by Randall Akee and Klaus Zimmerman). *Wages, School Quality, and Employment Demand*. Oxford: Oxford University Press, 2011.

(co-edited with Orley Ashenfelter) *Handbook of Labor Economics* (volumes 4a-4b). Amsterdam: Elsevier, 2011.

(co-edited with Alan Auerbach and John Quigley). *Poverty, the Distribution of Income, and Public Policy*. New York: Russell Sage Foundation, 2006.

(co-edited with Richard Blundell and Richard B. Freeman) *Seeking a Premier Economy*. Chicago: University of Chicago Press for NBER, 2004.

(co-edited with Rebecca M. Blank) *Finding Work: Jobs and Welfare Reform.* New York: Russell Sage Foundation, 2000.

(co-edited with Orley Ashenfelter) *Handbook of Labor Economics* Volumes 3a-3c. Amsterdam: Elsevier, 1999.

(co-authored with Alan B. Krueger) *Myth and Measurement: The New Economics of the Minimum Wage*. Princeton: Princeton University Press, 1995. Second Edition 2016.

(co-edited with Richard B. Freeman). *Small Differences that Matter: Labor Markets and Income Maintenance in Canada and the United States*. Chicago: University of Chicago Press, 1993.

**Journal Articles and Chapters in Books**:

(with Stefan Bender, Nicolas Bloom, John Van Reenen, and Stephani Wolter).  "Management Practices, Workforce Selection, and Productivity." <u>Journal of Labor Economics</u> Forthcoming 2018.

 (with Jochen Kluve and Andrea Weber). "What Works? A Meta Analysis of Recent Active Labor Market Program Evaluations. "  <u>Journal of the European Economic Association</u> October 2017.

(with Zhuan Pei, David S. Lee and Andrea Weber). "Regression Kink Design: Theory and Practice." <u>Advances in Econometrics</u> Forthcoming 2017.

(with Ana Rute Cardoso, Joerg Heining, and Patrick Kline). "Firms and Labor Market Inequality: Evidence and Some Theory." <u>Journal of Labor Economics</u> Forthcoming 2018.

(with Laura Giuliano). "Can Universal Screening Increase the Representation of Low Income and Minority Students in Gifted Education?" <u>Proceedings of the National Academy of Science</u> 113, November 2016.

(with Laura Giuliano). "Can Tracking Raise the Test Scores of High-Ability Minority Students?"  <u>American Economic Review</u> October 2016.

(with Ana Rute Cardoso and Patrick Kline). "Bargaining, Sorting, and the Gender Wage Gap: Quantifying the Impact of Firms on the Relative Pay of Women."  <u>Quarterly Journal of Economics</u> May 2016.

(with David S. Lee, Zhuan Pei and Andrea Weber).  "Inference on Causal Effects in a Generalized Regression Kink Design." <u>Econometrica</u> 83, November 2015.

(with Andrew Johnson, Pauline Leung, Alexandre Mas and Zhuan Pei). "The Effect of Unemployment Benefits on the Duration of UI Receipt: New Evidence from a Regression Kink Design in Missouri: 2003-2013." <u>American Economic Review</u> 105, May 2015.

(with Laura Giuliano). "Peer Effects and Multiple Equilibria in the Risky Behavior of Friends." <u>Review of Economics and Statistics</u>, 95 October 2014.

(with Stefano Della Vigna). "Page Limits on Economics Articles: Evidence from Two Journals." <u>Journal of Economic Perspectives</u> 28 Summer 2014.

(with Franceso Devicienti and Agata Maida). "Rent Sharing, Holdup, and Wages: Evidence from Matched Panel Data."  <u>Review of Economic Studies</u> 84,  January 2014.

(with Jörg Heining and Patrick Kline). "Workplace Heterogeneity and the Rise of West German Wage Inequality." <u>Quarterly Journal of Economics</u>, 128 August 2013.

(with Stefano Della Vigna). "Nine Facts About Top Journals in Economics." <u>Journal of Economic Literature</u>, March 2013.

(with Alexandre Mas, Enrico Moretti, and Emmanuel Saez). "Inequality at Work: The Effect of Peer Salaries on Job Satisfaction." American Economic Review, October 2012.

(with Ana Rute Cardoso). "Can Compulsory Military Service Increase Civilian Wages? Evidence from the Peacetime Draft in Portugal." American Economic Journal: Applied Economics, October 2012.

(with Christian Dustmann and Ian Preston). "Immigration, Wages, and Compositional Amenities." Journal of the European Economic Association, February 2012.

(with Pablo Ibarraran, Ferdinando Regalia, David Rosas and Yuri Soares). "The Labor Market Impacts of Youth Training in the Dominican Republic: Evidence from a Randomized Evaluation." Journal of Labor Economics, April 2011.

(with Alexandre Mas and Jesse Rothstein). "Are Mixed Neighborhoods Always Unstable?  Two-sided and One-sided Tipping."  In Harriet Newburger, Eugenie Birch and Susan M. Wachter, editors, *Neighborhood and Life Chances.*  Philadelphia: University of Pennsylvania Press, 2011.

(with Stefano Della Vigna and Ulrike Malmendier.  "The Role of Theory in Field Experiments". Journal of Economic Perspectives, Summer 2011.

"Origins of the Unemployment Rate: The Lasting Legacy of Measurement without Theory." American Economic Review, May 2011.

(with Gordon B. Dahl). "Family Violence and Football: The Effect of Unexpected Emotional Cues on Violent Behavior." Quarterly Journal of Economics, March 2011.

(with Michael Ransom).  "Pension Plan Characteristics and Framing Effects in Employee Savings Behavior." Review of Economics and Statistics, January 2011.

(with Jochen Kluve and Andrea Weber). "Active Labor Market Policy Evaluations: A Meta-Analysis." Economic Journal Features, November 2010.

(with A. Abigail Payne and Martin Dooley). "School Competition and Efficiency with Publicly-Funded Catholic Schools." American Economic Journal: Applied Economics, 2 (October 2010).

(with Kevin Hallock and Enrico Moretti). "The Geography of Giving: The Effect of Corporate Headquarters on Local Charities." Journal of Public Economics, 94 (April 2010).

 (with Dean Hyslop).  "The Dynamic Effects of an Earnings Subsidy for Long-term Welfare Recipients: Evidence from the SSP Applicant Experiment." Journal of Econometrics 153 (November 2009).

(with Carlos Dobkin and Nicole Maestas).  "Does Medicare Save Lives?" Quarterly Journal of Economics, 124 (May 2009).

"Immigration and Inequality".  American Economic Review 99 May 2009.

(with Brian McCall).  "When to Start a Fight and When to Fight Back: Workers' Compensation Liability Denials and Disputes."  Journal of Labor Economics, 27 (April 2009).

"How Immigration Affects U.S. Cities."  In Robert Inman, editor Urban Enigma: City Problems, City Prospects.  Princeton NJ: Princeton University Press, 2009.

(with Carlos Dobkin and Nicole Maestas).  "The Impact of Nearly Universal Insurance Coverage on Health Care Utilization: Evidence from Medicare".  American Economic Review, 98 December 2008.

(with Rebecca Blank). "The Changing Incidence and Severity of Poverty Spells Among Female-Headed Families." American Economic Review 98 (May 2008).

(with Alexandre Mas and Jesse Rothstein). "Tipping and the Dynamics of Segregation."  Quarterly Journal of Economics, 123 (February 2008).

(with David S. Lee). "Regression Discontinuity Inference with Specification Error."  Journal of Econometrics, 142 (February 2008).

(with Jesse Rothstein).  "Racial Segregation and the Black-White Test Score Gap."  Journal of Public Economics, 91 (December 2007).

(with Raj Chetty and Andrea Weber). "Cash-on-Hand and Competing Models of Intertemporal Behavior: New Evidence from the Labor Market."  Quarterly Journal of Economics, 122 (November 2007).

(with Enrico Moretti). "Does Voting Technology Affect Election Outcomes?  Touch-Screen Voting and the 2004 Presidential Election."  Review of Economics and Statistics, 89 (November 2007).

(with Raj Chetty and Andrea Weber). "The Spike at Benefit Exhaustion: Leaving the Unemployment System or Starting a New Job?"  American Economic Review,  97 (May 2007).

(with Ethan G. Lewis).  "The Diffusion of Mexican Immigrants During the 1990s: Explanations and Impacts." In George Borjas, editor, Mexican Immigration to the United States.  University of Chicago Press, 2007.

(with Sara de la Rica).  "The Effect of Firm-Level Contracts on the Structure of Wages: Evidence from Matched Employer-Employee Data."  Industrial and Labor Relations Review, October 2006.

"Is the New Immigration Really So Bad? " Economic Journal 115 (November 2005).

(with Dean R. Hyslop).  "Estimating the Effects of a Time-Limited Earnings Subsidy for Welfare Leavers." Econometrica, 73 (November 2005).

(with Alan B. Krueger).  "Would the Elimination of Affirmative Action Affect Highly Qualified Minority Applicants?  Evidence from California and Texas."  Industrial and Labor Relations Review 58 (April 2005).

(with Philip Robins).  "How Important Are Entry Effects in Financial Incentive Programs for Welfare Recipients?  Experimental Evidence from the Self-Sufficiency Project."  Journal of Econometrics 125 (March-April 2005).

(with Charles Michalopoulos and Philip K. Robins).  "When Financial Incentives Pay for Themselves:  Evidence from a Randomized Social Experiment for Welfare Recipients."  Journal of Public Economics 89 (January 2005).

(with Lara D. Shore-Sheppard).  "Using Discontinuous Eligibility Rules to Identify the Effects of the Federal Medicaid Expansions."  Review of Economics and Statistics, 86 (August 2004).

(with Andrew K. G. Hildreth and Lara Shore-Sheppard).  "The Measurement of Medicaid Coverage in the SIPP: Evidence from California, 1990-1996."  Journal of Business and Economic Statistics, 22 (October 2004).

(with Thomas Lemieux and W. Craig Riddell).  "Unions and Wage Inequality."  Journal of Labor Research, 25 (Fall 2004).  Reprinted in James T. Bennett and Bruce E. Kaufman, editors, What Do Unions Do? A Twenty Year Retrospective.  New Brunswick NJ: Transaction Publishers, 2007.

(with Richard B. Freeman).  "What Have Two Decades of British Economic Reform Delivered?"  In Richard Blundell, David Card, and Richard B. Freeman, editors, Seeking a Premier League Economy.  Chicago: University of Chicago Press for NBER, 2004

"Canadian Emigration to the United States."  In Charles Beach, editor, Canadian Immigration Policy for the 21st Century.  Kingston, Ontario: John Deutsch Institute for the Study of Economic Policy, 2003.

(with Thomas Lemieux and W. Craig Riddell).  "Unions and the Wage Structure."  In John T. Addison and Claus Schnabel, editors, The International Handbook of Trade Unions.  Cheltenham, UK: Edward Elgar, 2003.

(with John E. DiNardo).  "Skill Biased Technical Change and Rising Wage Inequality: Some Problems and Puzzles."  Journal of Labor Economics 20 (October 2002).

(with Orley Ashenfelter).  "Did the Elimination of Mandatory Retirement Affect Faculty Retirement Flows?"  American Economic Review 92 (September 2002).

(with A. Abigail Payne).  "School Finance Reform, the Distribution of School Spending, and the Distribution of SAT Scores."  Journal of Public Economics 83 (January 2002).

(with Thomas Lemieux).  "Education, Earnings, and the Canadian G.I. Bill."  Canadian Journal of Economics 34 (May 2001).

"Estimating the Return to Schooling: Progress on Some Persistent Econometric Problems."  Econometrica 69 (September 2001).

(with Thomas Lemieux).  "Can Falling Supply Explain the Rising Return to College for Younger Men?  A Cohort-Based Analysis."  Quarterly Journal of Economics 116 (May 2001).

(with Thomas Lemieux). "Going to College to Avoid the Draft: The Unintended Legacy of the Vietnam War."  American Economic Review 91 (May 2001).

"Immigrant Inflows, Native Outflows and the Local Labor Market Impacts of Higher Immigration." Journal of Labor Economics 19 (January 2001).

"The Effect of Unions on Wage Inequality in the U.S. Labor Market."  Industrial and Labor Relations Review 54 (January 2001).

"Welfare Reform and the Labor Market Outcomes of Women."  In Paul Ong and James R. Lincoln, editors, The State of California Labor.  Berkeley CA: Institute of Industrial Relations, 2001.

(with Thomas Lemieux).  "Dropout and Enrollment Trends in the Post-War Period: What Went Wrong in the 1970s?"  In Jonathan Gruber, editor, Risky Behavior Among Youth: An Economic Analysis.  Chicago: University of Chicago Press,  2000.

(with Alan Krueger).  "A Re-analysis of the Effect of the New Jersey Minimum Wage with Representative Payroll Data."  American Economic Review 90 (December 2000).

(with John E. DiNardo).  "Do Immigrant Inflows Lead to Native Outflows?"  American Economic Review 90 (May 2000).

(with Rebecca M. Blank and Philip K. Robins).  "Financial Incentives for Increasing Work and Income Among Low-Income Families."  In Rebecca M.. Blank and David Card, editors, Finding Work: Jobs and Welfare Reform.  New York: Russell Sage Foundation, 2000.

(with Phillip Levine).  "Extended Benefits and the Duration of UI Spells: Evidence from the New Jersey Extended Benefit Program."  Journal of Public Economics 78 (October 2000).

(with John E. DiNardo and Eugena Estes).  "The More Things Change: Immigrants and the Children of Immigrants in the 1940s, the 1970s, and the 1990s." In George J. Borjas, editor, Issues in the Economics of Immigration.  Chicago: University of Chicago Press, 2000.

"The Causal Effect of Education on Earnings".  In Orley Ashenfelter and David Card, editors, Handbook of Labor Economics Volume 3A.  Amsterdam: Elsevier, 1999.

(with Francis Kramarz and Thomas Lemieux).  "Changes in the Relative Structure of Wages and Employment: A Comparison of the United States, Canada, and France." Canadian Journal of Economics 32 (August 1999).

(with Thomas Lemieux).  "Adapting to Circumstances: The Evolution of Work, School, and Living

Arrangements Among North American Youth."  In David Blanchflower and Richard Freeman, editors, *Youth Employment and Joblessness in Advanced Countries*.  Chicago: University of Chicago Press, 1999.

(with Philip Robins). "Do Financial Incentives Encourage Welfare Recipients to Work? Evidence from a Randomized Evaluation of the Self-Sufficiency Project".  In Solomon Polachek, editor,  Research in Labor Economics  vol. 17.  Greenwich Connecticut: JAI Press, 1998.

(with Alan Krueger).  "School Resources and Student Outcomes."  Annals of the American Academy of Political and Social Sciences 559 (September 1998).

(with Thomas Lemieux). "Recent Trends in the Economic Status of North American Youth".  Annual Proceedings of the Industrial Relations Research Association (December 1997).

"Deregulation and Labor Earnings in the Airline Industry."  In James Peoples, editor, *Regulatory Reform and Labor Markets*.  Norwell, MA: Kluwer Academic Publishers, 1997.

(with W. Craig Riddell).  "Unemployment in Canada and the United States: A Further Analysis".  In  B. Curtis Eaton and Richard Harris, editors, *Trade, Technology, and Economics: Essays in Honour of Richard G. Lipsey*.  Brookfield MA: Edward Elgar, 1997.

(with Dean Hyslop). "Does Inflation 'Grease the Wheels of the Labor Market'?"  In Christina D. Romer and David H. Romer, editors, *Reducing Inflation: Motivation and Strategy*.  University of Chicago Press, 1997.

(with Alan Krueger).  "School Resources and Student Outcomes: An Overview of the Literature and New Evidence from North and South Carolina".  Journal of Economic Perspectives 10 (Fall 1996).

(with Thomas Lemieux).  "Wage Dispersion, Returns to Skill, and Black-White Wage Differentials".  Journal of Econometrics 74 (October 1996).

(with Alan Krueger). "Labor Market Effects of School Quality: Theory and Evidence".
In Gary Burtless, editor, *The Link Between Schools, Student Achievement, and Adult Success*.  Washington D.C.: Brookings Institution, 1996.

(with Brian McCall).  "Is Workers' Compensation Covering Uninsured Medical Costs? Evidence from the 'Monday Effect'".  Industrial and Labor Relations Review 49 (July 1996).

"The Effect of Unions on the Structure of Wages: A Longitudinal Analysis."  Econometrica 64 (July 1996).

"Earnings, Schooling, and Ability Revisited."  In Solomon Polachek, editor, Research in Labor Economics, vol. 14.  Greenwich Connecticut: JAI Press, 1995.

(with Alan Krueger).  "The Economic Return to School Quality: A Partial Survey."  In William Baumol and William E. Becker, editors, *Assessing Educational Practices: The Contribution of Economics*.  Cambridge, Massachusetts: MIT Press, 1995.

"Using Geographic Variation in College Proximity to Estimate the Return to Schooling".  In L.N. Christofides, E.K. Grant, and R. Swidinsky, editors, *Aspects of Labor Market Behaviour: Essays in Honour of John Vanderkamp*.  Toronto: University of Toronto Press, 1995.

(with Alan Krueger).  "Time-Series Minimum Wage Studies: A Meta-Analysis."  American Economic Review 85 (May 1995).

(with Craig Olson).  "Bargaining Power, Strike Durations, and Wage Outcomes: An Analysis of Strikes in the 1880s."  Journal of Labor Economics 13 (January 1995).

(with Alan Krueger).  "Minimum Wages and Employment: A Case Study of the Fast Food Industry in New Jersey and Pennsylvania."  American Economic Review 84 (September 1994).

(with Richard Freeman).  "Small Differences that Matter: Canada Versus the United States."  In Richard B. Freeman, editor, *Working Under Different Rules*.  New York: Russell Sage Foundation, 1994.

(with Thomas Lemieux).  "Changing Wage Structure and Black-White Wage Differentials."  American Economic Review 84 (May 1994).

"Intertemporal Labor Supply: An Assessment."  In Christopher Sims, editor, *Advances in Econometrics, Sixth World Congress*. New York: Cambridge University Press, 1994.

(with Phillip Levine). "Unemployment Insurance Taxes and the Cyclical Properties of Employment and Unemployment."  Journal of Public Economics 53 (February 1994).

(with Rebecca Blank).  "Poverty, Income, and Growth: Are They Still Connected?"  Brookings Papers on Economic Activity, 2 (Fall) 1993.

(with W. Craig Riddell). "A Comparative Analysis of Unemployment in the United States and Canada."  In David Card and Richard B. Freeman, editors, *Small Differences that Matter: Labor Markets and Income Maintenance in Canada and the United States*.  Chicago: University of Chicago Press, 1993.

(with Alan Krueger). "Trends in Relative Black-White Earnings Revisited."  American Economic Review 83 (May 1993).

"Do Minimum Wages Reduce Employment?  A Case Study of California, 1987-89."  Industrial and Labor Relations Review 46 (October 1992).

"Using Regional Variation in Wages to Measure the Effects of the Federal Minimum Wage."  Industrial and Labor Relations Review 46 (October 1992).

(with Alan Krueger). "Does School Quality Matter: Returns to Education and the Characteristics of Public Schools in the United States."  Journal of Political Economy 100 (February 1992).

(with Alan Krueger). "School Quality and Black-White Relative Earnings: A Direct Assessment."  Quarterly Journal of Economics 107 (February 1992).

(with Rebecca Blank).  "Recent Trends in Insured and Uninsured Unemployment: Is There An Explanation?"  Quarterly Journal of Economics 106 (November 1991).

(with Kristin Butcher). "Immigration and Wages: Evidence from the 1980s."  American Economic Review 81 (May 1991).

(with Joseph Altonji).  "The Effects of Immigration on the Labor Market Outcomes of Less-Skilled Natives."  In John Abowd and Richard B. Freeman, editors., Immigration, Trade and Labor. Chicago: University of Chicago Press, 1991.

"Minimum Wages and the Teenage Labor Market: A Case Study of California, 1987-89."  Annual Proceedings of the Industrial Relations Research Association (December 1990).

"Labor Supply with a Minimum Hours Threshold."  Carnegie Rochester Conference on Public Policy 33 (Autumn 1990).
"Strikes and Wages: A Test of An Asymmetric Information Model." Quarterly Journal of Economics 105 (August 1990).

"Unexpected Inflation, Real Wages, and Employment Determination in Union Contracts."  American Economic Review 80 (September 1990).

"Strikes and Bargaining: A Survey of the Recent Empirical Literature."  American Economic Review 80 (May 1990).

"The Impact of the Mariel Boatlift on the Miami Labor Market."  Industrial and Labor Relations Review 43 (January 1990).

(with John Abowd).  "On the Covariance Structure of Earnings and Hours Changes."  Econometrica 57 (March 1989).

"Longitudinal Analysis of Strike Activity."  Journal of Labor Economics 6 (April 1988).

(with Daniel Sullivan).  "Measuring the Effect of Subsidized Training Programs on Movements In and Out of Employment."  Econometrica 56 (May 1988).

(with John Abowd).  "Intertemporal Labor Supply and Long Term Employment Contracts."  American Economic Review 77 (March 1987).

"Efficient Contracts with Costly Adjustment:  Short Run Employment Determination for Airline Mechanics."  American Economic Review 76 (December 1986).

"The Impact of Deregulation on the Employment and Wages of Airline Mechanics."  Industrial and Labor Relations Review 39 (July 1986).

(with Orley Ashenfelter).  "Why Have Unemployment Rates in Canada and the United States Diverged?"

Economica 53 (Supplement 1986).

"An Empirical Model of Wage Indexation Provisions in Union Contracts." Journal of Political Economy 94 (June 1986).

(with Orley Ashenfelter). "Using the Longitudinal Structure of Earnings to Estimate the Effect of Training Programs." Review of Economics and Statistics 67 (November 1985).

"Microeconomic Models of Wage Indexation." Annual Proceedings of the Industrial Relations Research Association (December 1984).

"Cost of Living Escalators in Major Union Contracts." Industrial and Labor Relations Review, 37 (October 1983).

(with Orley Ashenfelter). "Time Series Representations of Economic Variables and Alternative Models of the Labor Market." Review of Economic Studies, 69 (September 1982).


**Unpublished Papers**:

(with Stefano Della Vigna). "What Do Editors Maximize? Evidence from Four Leading Economics Journals." NBER Working Paper Number 23282, March 2017.

(with Nicole Maestas and Patrick Purcell). "Labor Market Shocks and Early Social Security Benefit Claiming." Working Paper 2014-317. Michigan Retirement Research Center.

(with Zhuan Pei, David S. Lee and Andrea Weber). "Local Polynomial Order in Regression Discontinuity Designs." Working Paper 2014-47. Brandeis University Department of Economics. October 2014.

(with Laura Giuliano). "Does Gifted Education Work? For Which Students?" NBER Working Paper Number 204553, September 2014.

(with David S. Lee, Zhuan Pei, and Andrea Weber). "Infererence on Causal Effects in a Generalized Regression Kink Design." IZA Working Paper 8757, January 2015.

(with Pablo Ibarrarán and Juan Miguel Villa) Miguel. "Building in an Evaluation Component for Active Labor Market Programs: A Practitioner's Guide." IZA Discussion Paper 6085, 2011.

(with Thomas Lemieux). "Did Draft Avoidance Raise College Attendance During the Vietnam War?" UC Berkeley Center for Labor Economics Working Paper 46, February 2002.

(with Philip K. Robins and Charles Michalopoulos). "The Limits to Wage Growth: Measuring The Growth Rate of Wages for Recent Welfare Leavers". NBER Working Paper No. 8444, August 2001.

"Reforming the Financial Incentives of the Welfare System". IZA Discussion Paper No. 172. Institute for

the Study of Labor (IZA), Bonn Germany.

"The Effect of Unions on the Level and Distribution of Wages: A Longitudinal Analysis."  Princeton University Industrial Relations Section Working Paper Number 287, July 1991, revised March 1995.

"Supply and Demand in the Labor Market."  Princeton University Industrial Relations Section Working Paper Number 228, November 1987.

(with Orley Ashenfelter).  "Using Longitudinal Data to Measure Minimum Wage Effects."  Center for Labour Economics, London School of Economics Discussion Paper, September 1981.

**Published Reviews and Comments**:

(with Orley Ashenfelter). "Introduction to Special Issue in Honor of Robert J. Lalonde" Journal of Labor Economics , forthcoming 2017.

(with Giovanni Peri). "*Immigration Economics* by George J. Borjas – A Review".  Journal of Economic Literature, December 2016.

(with Alexandre Mas). "Introduction to Special Issue on Labor Markets in the Great Recession." Journal of Labor Economics 34, January 2016.

L'évaluation des Politiques Actives du Marché du Travail: Quels Enseignements?  Travail et Emploi 139, Juillet-Septembre 2014.

"The Elusive Search for Negative Wage Impacts of Immigration" Journal of the European Economic Association, February 2012.

Comment on Robert A. Moffitt, "Demographic Change and Public Assistance Expenditures."  In Alan Auerbach, editor, *Demographic Change and Fiscal Policy*.  New York: Cambridge University Press, 2000.

"The Research Contributions of Thomas Lemieux."  *Canadian Journal of Economics* 31 (October 1998): 975-984.

"*The Wage Curve*: A Review."  Journal of Economic Literature 33 (June 1995).

(with Lawrence Katz and Alan Krueger).  Comment on David Neumark and William Wascher, "Employment Effects of Minimum and Subminimum Wages: Panel Data on State Minimum Wage Laws".  Industrial and Labor Relations Review 47 (April 1994).

Review of Michael Goldfield's *The Decline of Organized Labor in the United States*.  Journal of Economic History 49 (December 1989).

Review of H. Gregg Lewis' *Union Relative Wage Effects: A Survey*.  Journal of Economic Literature, 25 (March 1987).

**JA5645**
DX133.0013

(with Henry Farber).  "Comments on Semi-Parametric Estimation of Employment Duration Models," by Joel Horowitz and George Neumann.  Econometric Reviews, (1988).

Comments on "Empirical Tests of Labor Market Equilibrium: An Evaluation," by J. Heckman and T. MaCurdy. Carnegie Rochester Conference Series on Public Policy, 28 (Spring 1988).

Comments on "Macroeconomic Performance and the Disadvantaged," by Lawrence Katz and David Cutler.  Brookings Papers on Economic Activity Number 2, 1991.



College Connection and Success System
11955 Democracy Drive
Reston, VA 20190
Phone: 800 626-9795
Fax: 703 842-8795
Email: enrollmentsolutions@collegeboard.org

# Descriptor PLUS™

# Cluster Description Guide

**Educational Neighborhood Clusters**

**High School Clusters**



United States District Court
District of Massachusetts

**DX 139**

Case No. _____ 1:14-cv-14176 (ADB)
Date Entered_____
By_____
Deputy Clerk

Copyright © 2011 by The College Board and its licensors. All rights reserved

**JA5647**

DX139.0001

## Educational Neighborhood Cluster Key

This description provides a general overview of the students and parents associated with this Educational Neighborhood Cluster. The description represents the attributes and factors that are most closely associated with this cluster and the degree to which each of them influences college choice behavior.

This section lists 12 key attributes of the cluster. Each attribute is displayed with the average value for the cluster and the ranking of this value among the 33 Educational Neighborhood Clusters.

**Neighborhood Cluster 51**

Residents of this neighborhood have relatively high incomes and almost always own their homes which are valued well above average. They are moderately diverse, hold professional and managerial jobs, and most have at least some college with many having graduate degrees. Students attend primarily public high schools, avail themselves of AP/honors course work, and have above average scores on standardized tests. They prefer colleges in state and, although interested in at least one public, will generally apply to a number of modestly selective privates where financial aid will be sought.

### Values & Rankings of Key Attributes

| Attribute | value | rank | Attribute | value | rank | Attribute | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $95.4 | 4 | % of Population college-aged | 8% | 8 | Mean SAT Critical Reading Score | 533 | 12 |
| % Adults w/ professional jobs | 50% | 7 | % of Students 1st generation | 30% | 27 | Mean SAT Math Score | 546 | 12 |
| % Speaking English only | 85% | 16 | % likely to apply out of state | 32% | 17 | Mean SAT Writing Score | 522 | 12 |
| % of Population non-White | 17% | 16 | % interested in Financial Aid | 57% | 26 | Ave cost targeted colleges (x $1000) | $12.8 | 25 |

### Dominant Cluster Factors

| College Prep Culture | Professional and Affluent | Highly Educated | Coed |
|---|---|---|---|

### Distribution of Neighborhood

| Number of Neighborhoods | 1427 |
|---|---|
| % of All Neighborhoods | 3.20% |
| % 18-21 year olds | 3.90% |

These are 4 of the factors that had the most impact in determining the make-up of the cluster.

The statistics and map provide a sense of the magnitude and distribution of the cluster.



## Descriptor PLUS Educational Neighborhoods -- 2011

**Neighborhood Cluster 51**

Residents of this neighborhood have relatively high incomes and almost always own their homes which are valued well above average. They are moderately diverse, hold professional and managerial jobs, and most have at least some college with many having graduate degrees. Students attend primarily public high schools, avail themselves of AP/honors course work, and have above average scores on standardized tests. They prefer colleges in state and, although interested in at least one public, will generally apply to a number of modestly selective privates where financial aid will be sought.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $95.4 | 4 | % of Population college-aged | 8% | 8 | Mean SAT Critical Reading Score | 533 | 12 |
| % Adults w/ professional jobs | 50% | 7 | % of Students 1st generation | 30% | 27 | Mean SAT Math Score | 546 | 12 |
| % Speaking English only | 85% | 16 | % likely to apply out of state | 32% | 17 | Mean SAT Writing Score | 522 | 12 |
| % of Population non-White | 17% | 16 | % interested in Financial Aid | 57% | 26 | Ave cost targeted colleges (x 1000) | $12.8 | 25 |

### Dominant Cluster Factors

| College Prep Culture | Professional and Affluent | Highly Educated | Coed |
|---|---|---|---|

### Distribution of Neighborhood

| Number of Neighborhoods | 1427 |
|---|---|
| % of All Neighborhoods | 3.20% |
| % 18-21 year olds | 3.90% |



**Neighborhood Cluster 52**

Relatively diverse, often with English as a second language, the residents of this neighborhood have moderate incomes and more often than not own their own home. Although most will not have college degrees, they hold jobs across the vocational spectrum. Most students attend public schools, although there are also a significant number attending Catholic affiliated private schools. Regardless, they tend to not have access to AP or honors coursework and score below average on standardized tests. The population tends to be stable, with modest educational aspirations. They tend towards regional non-selective sectarian and privates colleges of moderately high cost; financial aid will play a big factor in their enrollment decisions.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $63.6 | 13 | % of Population college-aged | 6% | 30 | Mean SAT Critical Reading Score | 470 | 25 |
| % Adults w/ professional jobs | 32% | 17 | % of Students 1st generation | 64% | 9 | Mean SAT Math Score | 480 | 25 |
| % Speaking English only | 66% | 27 | % likely to apply out of state | 30% | 19 | Mean SAT Writing Score | 467 | 25 |
| % of Population non-White | 31% | 8 | % interested in Financial Aid | 71% | 13 | Ave cost targeted colleges (x 1000) | $18.0 | 9 |

### Dominant Cluster Factors

| Puerto Rican/Caribbean ESL | Sectarian | Few AP/Honor | Relatively Low Grades |
|---|---|---|---|

### Distribution of Neighborhood

| Number of Neighborhoods | 1526 |
|---|---|
| % of All Neighborhoods | 3.50% |
| % 18-21 year olds | 1.80% |



**JA5649**

DX139.0003

## Descriptor PLUS Educational Neighborhoods -- 2011

**Neighborhood Cluster 53**

Residents of this neighborhood have relatively high incomes, generally own their homes, and many do not have children. Relatively diverse with a substantial Asian and ESL component, most are professional with almost all having college experience with a good proportion holding graduate degrees. Students generally attend public schools, involve themselves in AP/honors courses, and score well above average on standardized tests. They have moderately high aspirations and apply primarily to public institutions with a lower cost of attendance but may consider more selective institutions if awarded significant financial aid.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $92.6 | 5 | % of Population college-aged | 6% | 29 | Mean SAT Critical Reading Score | 544 | 10 |
| % Adults w/ professional jobs | 52% | 5 | % of Students 1st generation | 33% | 24 | Mean SAT Math Score | 561 | 7 |
| % Speaking English only | 72% | 26 | % likely to apply out of state | 32% | 16 | Mean SAT Writing Score | 544 | 8 |
| % of Population non-White | 25% | 11 | % interested in Financial Aid | 55% | 27 | Ave cost targeted colleges (x $1000) | $14.6 | 20 |

### Dominant Cluster Factors

| Professional and Affluent | Good Standardized Testers | Large Asian ESL population | Shotgun |
|---|---|---|---|

### Distribution of Neighborhood

| | |
|---|---|
| Number of Neighborhoods | 1403 |
| % of All Neighborhoods | 3.20% |
| % 18-21 year olds | 1.80% |



---

**Neighborhood Cluster 54**

Predominantly Hispanic, residents of this urban neighborhood are at the lower end of the spectrum when it comes to income and home value. They often speak English as a second language and come from working class families that are very mobile with little college experience. Students attend public high schools; they get good grades in modest academic programs but score below average on admissions tests. They look for less selective colleges close to home, tending toward public and larger urban institutions where financial aid will be a must. Those with higher aspirations will be considering state flagship publics, although regional 4-year publics and even community colleges are options for many.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $39.0 | 31 | % of Population college-aged | 8% | 3 | Mean SAT Critical Reading Score | 443 | 28 |
| % Adults w/ professional jobs | 13% | 32 | % of Students 1st generation | 77% | 6 | Mean SAT Math Score | 458 | 28 |
| % Speaking English only | 40% | 31 | % likely to apply out of state | 25% | 30 | Mean SAT Writing Score | 435 | 28 |
| % of Population non-White | 30% | 9 | % interested in Financial Aid | 76% | 3 | Ave cost targeted colleges (x $1000) | $10.5 | 32 |

### Dominant Cluster Factors

| Hispanic/Mexican ESL | Diverse Low Income | Less Educated | Weak Standardized Testers |
|---|---|---|---|

### Distribution of Neighborhood

| | |
|---|---|
| Number of Neighborhoods | 1661 |
| % of All Neighborhoods | 3.80% |
| % 18-21 year olds | 4.10% |

## JA5650

DX139.0004

## Descriptor PLUS Educational Neighborhoods -- 2011

### Neighborhood Cluster 55

Residents of this neighborhood have solid above average incomes and own homes that are well valued. They are most often college graduates with few children in the home who are pursuing professional or managerial careers. There is generally little ethnic diversity and students attend religious or private schools as often as they do publics where they excel academically in curricula which include many AP/honors courses and score well on standardized tests. They have high aspirations, are confident in their college plans, and consider national selective and other moderately selective private institutions. Many will apply for financial aid.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $71.6 | 9 | % of Population college-aged | 6% | 28 | Mean SAT Critical Reading Score | 565 | 6 |
| % Adults w/ professional jobs | 43% | 10 | % of Students 1st generation | 25% | 29 | Mean SAT Math Score | 566 | 6 |
| % Speaking English only | 89% | 11 | % likely to apply out of state | 52% | 7 | Mean SAT Writing Score | 557 | 6 |
| % of Population non-White | 13% | 22 | % interested in Financial Aid | 63% | 22 | Ave cost targeted colleges (x 1000) | $19.3 | 7 |

#### Dominant Cluster Factors

| Catholic Culture | Leadership/Organizational Achievements | Higher Ability | College Interest: National Selective |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 791 |
|---|---|
| % of All Neighborhoods | 1.80% |
| % 18-21 year olds | 2.10% |



### Neighborhood Cluster 56

Predominantly Hispanic and African-American, the residents of this neighborhood have extremely low incomes and rates of home ownership. They are primarily blue collar, most do not have college degrees, and many speak English as a second language. Most students attend public school with very average curricula and minimal AP and honors coursework; their admissions test scores are among the lowest. Most look to stay in state and apply to non-selective publics and small church-related colleges where financial aid will play an important role in their decisions and are likely to Pell eligible.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $35.3 | 32 | % of Population college-aged | 8% | 5 | Mean SAT Critical Reading Score | 411 | 31 |
| % Adults w/ professional jobs | 16% | 30 | % of Students 1st generation | 84% | 3 | Mean SAT Math Score | 420 | 31 |
| % Speaking English only | 41% | 30 | % likely to apply out of state | 29% | 20 | Mean SAT Writing Score | 405 | 31 |
| % of Population non-White | 65% | 3 | % interested in Financial Aid | 66% | 16 | Ave cost targeted colleges (x 1000) | $16.3 | 18 |

#### Dominant Cluster Factors

| Puerto Rican/Caribbean ESL | Relatively Low Grades | Diverse Low Income | Other Than Christian Culture |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 1096 |
|---|---|
| % of All Neighborhoods | 2.50% |
| % 18-21 year olds | 1.80% |

# JA5651

DX139.0005

## Descriptor PLUS Educational Neighborhoods -- 2011

### Neighborhood Cluster 57

Residents of this neighborhood are older and very middle class with most owning their homes. They are fairly diverse with a noticeable proportion of Asians who speak English as a second language, have at least some college, and are involved across the vocational spectrum. Education is valued and many students attend private or religious schools with good curricula. Their educational aspirations are slight below and their admissions test scores slightly above average. They are fairly mobile and consider a number of colleges, generally private and only moderately selective. Financial aid is an interest but not for most.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $67.4 | 12 | % of Population college-aged | 7% | 21 | Mean SAT Critical Reading Score | 519 | 15 |
| % Adults w/ professional jobs | 37% | 15 | % of Students 1st generation | 50% | 18 | Mean SAT Math Score | 541 | 13 |
| % Speaking English only | 91% | 7 | % likely to apply out of state | 52% | 9 | Mean SAT Writing Score | 515 | 15 |
| % of Population non-White | 13% | 21 | % interested in Financial Aid | 43% | 29 | Ave cost targeted colleges (x 1000) | $19.4 | 6 |

#### Dominant Cluster Factors

| College Prep School | Magnet/Focused Curriculum | Affluent | Not Athletic Participant |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 242 |
|---|---|
| % of All Neighborhoods | 0.60% |
| % 18-21 year olds | 0.50% |



### Neighborhood Cluster 58

A diverse, largely Asian, neighborhood where English is often a second language. Residents have moderate incomes, may own their homes, probably have not graduated from college, and can be found in all types of employment. Students attend public high schools where they involve themselves to a modest degree in AP and honors work; they aspire to post-baccalaureate degrees. Their admissions test scores are average to below. They are most likely to stay close to home but will apply to a number of institutions often non-selective publics where many will seek financial aid but are reluctant to take out loans.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $68.2 | 11 | % of Population college-aged | 6% | 26 | Mean SAT Critical Reading Score | 489 | 23 |
| % Adults w/ professional jobs | 34% | 16 | % of Students 1st generation | 62% | 11 | Mean SAT Math Score | 533 | 16 |
| % Speaking English only | 43% | 29 | % likely to apply out of state | 28% | 25 | Mean SAT Writing Score | 489 | 19 |
| % of Population non-White | 60% | 4 | % interested in Financial Aid | 69% | 14 | Ave cost targeted colleges (x 1000) | $13.2 | 24 |

#### Dominant Cluster Factors

| Large Asian ESL population | Shotgun | Diverse Low Income | Not Work/Vocational Orientated |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 1310 |
|---|---|
| % of All Neighborhoods | 3.00% |
| % 18-21 year olds | 1.90% |



**JA5652**

DX139.0006

## Descriptor PLUS Educational Neighborhoods -- 2011

### Neighborhood Cluster 59

Residents of this neighborhood have lower middle class incomes and own homes which are of moderate value. A traditional blue-collar community, most parents have some experience with college but less than half have earns a baccalaureate. A large majority of students attend public high schools where they engage and excel in solid curricula which include a solid number of AP/honors courses. They have very high educational aspirations and score well above the average on admissions tests. Most are mobile, interested in financial aid and likely to apply to nationally selective privates and public flagships.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $54.8 | 20 | % of Population college-aged | 7% | 14 | Mean SAT Critical Reading Score | 562 | 7 |
| % Adults w/ professional jobs | 25% | 22 | % of Students 1st generation | 36% | 23 | Mean SAT Math Score | 561 | 8 |
| % Speaking English only | 93% | 2 | % likely to apply out of state | 52% | 8 | Mean SAT Writing Score | 545 | 7 |
| % of Population non-White | 11% | 26 | % interested in Financial Aid | 74% | 7 | Ave cost targeted colleges (x 1000) | $17.0 | 14 |

#### Dominant Cluster Factors

| Academic Achievements | Leadership/Organizational Achievements | Relatively High Grades | Leadership/Organizational Achievements |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 1265 |
|---|---|
| % of All Neighborhoods | 2.90% |
| % 18-21 year olds | 7.90% |



### Neighborhood Cluster 60

This is an affluent neighborhood where many own homes almost at the top of the scale and families tend to have fewer children. Parents are generally professional and a majority holds graduate degrees. Most students attend either private or religious schools with standard curricula where they are exposed to some AP/honors level courses. They are at or near the top on standardized tests and have high educational goals. They apply to lots of colleges, generally highly selective and usually outside of their home state. Although some will look for financial aid, it's not a priority for most.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $104.2 | 3 | % of Population college-aged | 5% | 33 | Mean SAT Critical Reading Score | 590 | 3 |
| % Adults w/ professional jobs | 72% | 1 | % of Students 1st generation | 25% | 30 | Mean SAT Math Score | 589 | 4 |
| % Speaking English only | 81% | 20 | % likely to apply out of state | 63% | 3 | Mean SAT Writing Score | 591 | 1 |
| % of Population non-White | 14% | 20 | % interested in Financial Aid | 36% | 32 | Ave cost targeted colleges (x 1000) | $24.2 | 1 |

#### Dominant Cluster Factors

| College Prep School | Private Selective | Affluent | College Interest: Small Private |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 715 |
|---|---|
| % of All Neighborhoods | 1.60% |
| % 18-21 year olds | 0.70% |

**JA5653**

DX139.0007

## Descriptor PLUS Educational Neighborhoods -- 2011

**Neighborhood Cluster 61**

The residents of this neighborhood include a number of affluent families with children who own homes near the top of the scale. Most frequently professionals and managers, the parents have almost all had some higher education; half having earned graduate degrees. The students most often attend public schools with standard curricula where they only modest engage in AP and honors coursework. With most aspiring beyond the baccalaureate, they apply to a large number of very selective privates and some highly selective publics both in and outside their home state where some will seek financial aid.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $123.9 | 2 | % of Population college-aged | 7% | 12 | Mean SAT Critical Reading Score | 567 | 5 |
| % Adults w/ professional jobs | 64% | 3 | % of Students 1st generation | 28% | 28 | Mean SAT Math Score | 585 | 5 |
| % Speaking English only | 78% | 22 | % likely to apply out of state | 51% | 10 | Mean SAT Writing Score | 574 | 5 |
| % of Population non-White | 13% | 23 | % interested in Financial Aid | 40% | 30 | Ave cost targeted colleges (x $1000) | $21.0 | 4 |

### Dominant Cluster Factors

| Jewish Culture | Good Standardized Testers | College Interest: Small Private | Affluent |
|---|---|---|---|

### Distribution of Neighborhood

| Number of Neighborhoods | 385 |
|---|---|
| % of All Neighborhoods | 0.90% |
| % 18-21 year olds | 0.60% |



**Neighborhood Cluster 62**

This is an older, conservative, middle class neighborhood where many households may not have children. Vocationally diverse, a majority of parents have at least a baccalaureate. Students, most of whom attend public schools, have a decidedly academic orientation and avail themselves of AP and honors opportunities. They score very near the top on standardized tests and have very high educational goals. They are modestly focused with their applications and looking widely out of state generally at selective privates where financial aid will be a key factor for most.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $59.8 | 18 | % of Population college-aged | 7% | 17 | Mean SAT Critical Reading Score | 595 | 2 |
| % Adults w/ professional jobs | 37% | 14 | % of Students 1st generation | 24% | 31 | Mean SAT Math Score | 596 | 2 |
| % Speaking English only | 92% | 6 | % likely to apply out of state | 67% | 1 | Mean SAT Writing Score | 576 | 4 |
| % of Population non-White | 9% | 28 | % interested in Financial Aid | 72% | 9 | Ave cost targeted colleges (x $1000) | $21.0 | 5 |

### Dominant Cluster Factors

| Art Achievements | College Interest: National Selective | Higher Ability | Academic Achievements |
|---|---|---|---|

### Distribution of Neighborhood

| Number of Neighborhoods | 571 |
|---|---|
| % of All Neighborhoods | 1.30% |
| % 18-21 year olds | 2.70% |

**JA5654**

DX139.0008

## Descriptor PLUS Educational Neighborhoods -- 2011

**Neighborhood Cluster 63**

This is a solidly middle class neighborhood with little diversity where most households own their home. Residents have traditional values and are involved in a cross section of vocations with most parents having some college but less than half a four-year degree. Students are most likely in public schools where they achieve good grades and pursue a modest level of AP/honors work. They score above average on admissions tests but have somewhat lower educational aspirations than many of their peers. They tend towards private colleges and public flagships with modest selectivity, and a majority will be seeking financial aid.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $69.3 | 10 | % of Population college-aged | 7% | 22 | Mean SAT Critical Reading Score | 541 | 11 |
| % Adults w/ professional jobs | 41% | 13 | % of Students 1st generation | 31% | 25 | Mean SAT Math Score | 548 | 11 |
| % Speaking English only | 90% | 9 | % likely to apply out of state | 39% | 14 | Mean SAT Writing Score | 525 | 11 |
| % of Population non-White | 10% | 27 | % interested in Financial Aid | 65% | 19 | Ave cost targeted colleges (x 1000) | $14.5 | 21 |

### Dominant Cluster Factors

| Academic Achievements | College Interest: National Selective | Highly Educated | Focused |
|---|---|---|---|

### Distribution of Neighborhood

| | |
|---|---|
| Number of Neighborhoods | 2038 |
| % of All Neighborhoods | 4.60% |
| % 18-21 year olds | 4.10% |



**Neighborhood Cluster 64**

This neighborhood exists in older suburbs and small towns with little diversity where most households own moderately-valued homes. Predominantly blue collar, there is good vocational diversity among the very modestly educated residents. Students are exposed to traditional curricula and have very little exposure to AP or honors coursework. They have very low aspirations and below average standardized test scores. A good number will look out of state; they submit relatively few applications to very modestly selective church-related and large urban institutions and indicate only a passing interest in financial aid.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $49.8 | 25 | % of Population college-aged | 7% | 20 | Mean SAT Critical Reading Score | 466 | 26 |
| % Adults w/ professional jobs | 26% | 21 | % of Students 1st generation | 79% | 4 | Mean SAT Math Score | 466 | 26 |
| % Speaking English only | 93% | 3 | % likely to apply out of state | 48% | 11 | Mean SAT Writing Score | 455 | 26 |
| % of Population non-White | 6% | 33 | % interested in Financial Aid | 29% | 33 | Ave cost targeted colleges (x 1000) | $17.1 | 13 |

### Dominant Cluster Factors

| Not Athletic Participant | College Interest: Small Private | Other Than Christian Culture | Not Community Oriented |
|---|---|---|---|

### Distribution of Neighborhood

| | |
|---|---|
| Number of Neighborhoods | 362 |
| % of All Neighborhoods | 0.80% |
| % 18-21 year olds | 0.50% |

**JA5655**

DX139.0009

## Descriptor PLUS Educational Neighborhoods -- 2011

### Neighborhood Cluster 65

This neighborhood with below average incomes is diverse but predominantly Hispanic, with large households having many children, and fewer than half owning their homes. Residents are most likely blue collar and have only a minimal acquaintance with high education. Students attend public schools with a high level of ESL. They evidence a modest level of AP/honors involvement but score below average on admission tests. They have moderate educational goals, look to stay close to home, apply to nonselective publics and some privates, and will require substantial financial aid to attend.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $45.1 | 27 | % of Population college-aged | 8% | 2 | Mean SAT Critical Reading Score | 433 | 30 |
| % Adults w/ professional jobs | 11% | 33 | % of Students 1st generation | 85% | 2 | Mean SAT Math Score | 440 | 29 |
| % Speaking English only | 32% | 32 | % likely to apply out of state | 23% | 31 | Mean SAT Writing Score | 432 | 29 |
| % of Population non-White | 48% | 6 | % interested in Financial Aid | 78% | 2 | Ave cost targeted colleges (x $1000) | $11.0 | 28 |

#### Dominant Cluster Factors

| Hispanic/Mexican ESL | Diverse Low Income | Less Educated | Content Area Weaknesses |
|---|---|---|---|

#### Distribution of Neighborhood

| | |
|---|---|
| Number of Neighborhoods | 2041 |
| % of All Neighborhoods | 4.60% |
| % 18-21 year olds | 4.60% |



### Neighborhood Cluster 66

A solidly middle class, traditional blue collar neighborhood with very little diversity, most households own homes of relatively low value. Although few have four-year degrees, most parents have had some college. Students attend public schools and are likely to have an orientation toward work as much as to the academic. Regardless, they will take a few AP/honors courses and do perform only slightly below average on admission tests. They don't look far from home, will be very interested financial aid and are most likely to consider less selective publics and church-related privates.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $50.5 | 22 | % of Population college-aged | 7% | 22 | Mean SAT Critical Reading Score | 492 | 19 |
| % Adults w/ professional jobs | 18% | 28 | % of Students 1st generation | 62% | 12 | Mean SAT Math Score | 499 | 22 |
| % Speaking English only | 95% | 1 | % likely to apply out of state | 20% | 32 | Mean SAT Writing Score | 476 | 22 |
| % of Population non-White | 5% | 32 | % interested in Financial Aid | 76% | 4 | Ave cost targeted colleges (x $1000) | $14.0 | 22 |

#### Dominant Cluster Factors

| Work/vocational Achievements | College Interest: Small Residential | Christian Culture | Lower Ability |
|---|---|---|---|

#### Distribution of Neighborhood

| | |
|---|---|
| Number of Neighborhoods | 2342 |
| % of All Neighborhoods | 5.30% |
| % 18-21 year olds | 3.80% |



**JA5656**

DX139.0010

## Descriptor PLUS Educational Neighborhoods -- 2011

**Neighborhood Cluster 67**

This neighborhood is very diverse and includes large Jewish, Asian, and Hispanic communities, has average incomes and below average home ownership. Spread across the vocational spectrum, residents are predominantly professional but only about half have college degrees. Students attend a variety of schools where the curricula are rather general with some AP/honors. They have slightly below average test scores and above average aspirations. They consider both public and private colleges, will sometimes look out of state, and a slight majority are thinking about financial aid.

### Values & Rankings of Key Attributes

| Attribute | value | rank | Attribute | value | rank | Attribute | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $61.0 | 17 | % of Population college-aged | 6% | 31 | Mean SAT Critical Reading Score | 501 | 18 |
| % Adults w/ professional jobs | 41% | 12 | % of Students 1st generation | 58% | 14 | Mean SAT Math Score | 519 | 18 |
| % Speaking English only | 52% | 28 | % likely to apply out of state | 27% | 26 | Mean SAT Writing Score | 499 | 17 |
| % of Population non-White | 24% | 12 | % interested in Financial Aid | 59% | 25 | Ave cost targeted colleges (x 1000) | $16.5 | 16 |

### Dominant Cluster Factors

| Jewish Culture | College Prep School | Shotgun | College Interest: Single Gender |
|---|---|---|---|

### Distribution of Neighborhood

| Number of Neighborhoods | 267 |
|---|---|
| % of All Neighborhoods | 0.60% |
| % 18-21 year olds | 0.30% |



**Neighborhood Cluster 68**

A somewhat diverse neighborhood of older highly mobile households with modest incomes and relatively few children; many are likely to be retired and those that own homes have good investments. The majority of residents are professionals, most have some college and a large proportion of those have graduate degrees. Students are most likely in public schools with strong curricula, they are achievers who seek out AP and honors courses, perform well on admission tests and have modest educational aspirations. Willing to look beyond their home state, they apply to selective institutions both public and private where they will most likely be applying for financial aid.

### Values & Rankings of Key Attributes

| Attribute | value | rank | Attribute | value | rank | Attribute | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $57.9 | 19 | % of Population college-aged | 5% | 32 | Mean SAT Critical Reading Score | 558 | 8 |
| % Adults w/ professional jobs | 51% | 6 | % of Students 1st generation | 31% | 26 | Mean SAT Math Score | 552 | 9 |
| % Speaking English only | 85% | 15 | % likely to apply out of state | 52% | 6 | Mean SAT Writing Score | 543 | 9 |
| % of Population non-White | 17% | 17 | % interested in Financial Aid | 65% | 20 | Ave cost targeted colleges (x 1000) | $17.6 | 11 |

### Dominant Cluster Factors

| Activist/Community Achievements | College Interest: National Selective | Older Retired | New/ Highly Mobile |
|---|---|---|---|

### Distribution of Neighborhood

| Number of Neighborhoods | 1020 |
|---|---|
| % of All Neighborhoods | 2.30% |
| % 18-21 year olds | 1.50% |



**JA5657**

DX139.0011

## Descriptor PLUS Educational Neighborhoods -- 2011

**Neighborhood Cluster 69**

This is a stable, upper middle class, heavily Catholic neighborhood of working class families, most of who own modest homes. Residents are involved all along the vocational spectrum and most have some college, although less than half have degrees. Students attend public high schools with standard college prep curricula. They involve themselves with AP and honors courses to some extent, score in the mid-range on admission tests and have relatively low educational goals. They apply to a fair number of non-selective publics and moderately selective privates, some will look out of state, and most will seek financial aid.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $88.1 | 7 | % of Population college-aged | 7% | 18 | Mean SAT Critical Reading Score | 521 | 14 |
| % Adults w/ professional jobs | 42% | 11 | % of Students 1st generation | 40% | 20 | Mean SAT Math Score | 534 | 14 |
| % Speaking English only | 89% | 12 | % likely to apply out of state | 37% | 15 | Mean SAT Writing Score | 516 | 13 |
| % of Population non-White | 8% | 30 | % interested in Financial Aid | 65% | 17 | Ave cost targeted colleges (x $1000) | $19.0 | 8 |

### Dominant Cluster Factors

| Work/vocational Achievements | Sectarian | Good Standardized Testers | College Interest: Small Residential |
|---|---|---|---|

### Distribution of Neighborhood

| | |
|---|---|
| Number of Neighborhoods | 2340 |
| % of All Neighborhoods | 5.30% |
| % 18-21 year olds | 4.00% |



**Neighborhood Cluster 70**

Modestly affluent and highly-educated, this is a neighborhood of professionals where most families own relatively expensive homes. Almost all parents have some college with a majority holding graduate degrees. Students are most likely in public schools and consistently excel academically. They take full advantage of AP and honors coursework, at or near the top on standardized tests, and have exceedingly high educational goals. They are highly mobile and submit a reasonable number of applications to selective private across the country. A majority will be seeking some financial assistance.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $86.4 | 8 | % of Population college-aged | 7% | 16 | Mean SAT Critical Reading Score | 598 | 1 |
| % Adults w/ professional jobs | 52% | 4 | % of Students 1st generation | 17% | 33 | Mean SAT Math Score | 613 | 1 |
| % Speaking English only | 87% | 13 | % likely to apply out of state | 65% | 2 | Mean SAT Writing Score | 588 | 2 |
| % of Population non-White | 12% | 24 | % interested in Financial Aid | 61% | 24 | Ave cost targeted colleges (x $1000) | $21.3 | 2 |

### Dominant Cluster Factors

| Higher Ability | Academic Achievements | Coed | College Interest: National Selective |
|---|---|---|---|

### Distribution of Neighborhood

| | |
|---|---|
| Number of Neighborhoods | 1243 |
| % of All Neighborhoods | 2.80% |
| % 18-21 year olds | 3.60% |

**JA5658**

DX139.0012

## Descriptor PLUS Educational Neighborhoods -- 2011

### Neighborhood Cluster 71

This is a fairly low income, largely African-American community with children present in many households.  Predominantly blue collar, home ownership is low and most parents have not completed college.  Students are generally enrolled in public schools where they pursue fairly general curricula.  They have very low admission test scores and only a few access AP and honors level courses.  They have average educational goals and consider non-selective publics and moderately selective privates with financial aid, while willing to consider out-of-state options more often than not they end up attending colleges in their home state.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $42.7 | 29 | % of Population college-aged | 8% | 4 | Mean SAT Critical Reading Score | 408 | 32 |
| % Adults w/ professional jobs | 19% | 27 | % of Students 1st generation | 78% | 5 | Mean SAT Math Score | 405 | 32 |
| % Speaking English only | 80% | 21 | % likely to apply out of state | 39% | 13 | Mean SAT Writing Score | 402 | 32 |
| % of Population non-White | 86% | 1 | % interested in Financial Aid | 68% | 15 | Ave cost targeted colleges (x $1000) | $15.3 | 19 |

#### Dominant Cluster Factors

| Primarily African-American | Black Inner City | Relatively Low Grades | Few AP/Honor |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 1334 |
|---|---|
| % of All Neighborhoods | 3.00% |
| % 18-21 year olds | 1.90% |



### Neighborhood Cluster 72

This urban, transitional neighborhood is made up of very low income, blue-collar, African-American and Hispanic families.  Some families own very modest homes and, although a few parents are professionals with exposure to higher education, most are not.  Students generally attend public schools and achieve good grades in very general programs.  They are very unlikely to have taken AP or honors courses and have very low standardized test scores.  They apply to a reasonable number of colleges, some out of state, which are often large, public, and relatively non-selective.  Many see financial aid as a must.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $32.7 | 33 | % of Population college-aged | 8% | 6 | Mean SAT Critical Reading Score | 397 | 33 |
| % Adults w/ professional jobs | 13% | 31 | % of Students 1st generation | 87% | 1 | Mean SAT Math Score | 399 | 33 |
| % Speaking English only | 73% | 25 | % likely to apply out of state | 31% | 18 | Mean SAT Writing Score | 392 | 33 |
| % of Population non-White | 57% | 5 | % interested in Financial Aid | 47% | 28 | Ave cost targeted colleges (x $1000) | $12.0 | 26 |

#### Dominant Cluster Factors

| Primarily African-American | Not Community Oriented | College Interest: Large Urban | Weak Standardized Testers |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 352 |
|---|---|
| % of All Neighborhoods | 0.80% |
| % 18-21 year olds | 0.50% |



## JA5659

DX139.0013

## Descriptor PLUS Educational Neighborhoods -- 2011

### Neighborhood Cluster 73

This is a mixed and relatively diverse urban neighborhood which has many affluent families who generally own homes with above average value. Parents are mostly professionals and managers, and almost all have some experience with higher education. Students attend mostly public schools with solid AP/honors curricula of which they take good advantage. Their educational aspirations not the highest and their admission test scores are modest. They apply to a fair number of somewhat selective colleges, some private and/or religious and most often in state. A majority will be applying for financial aid.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $90.8 | 6 | % of Population college-aged | 7% | 13 | Mean SAT Critical Reading Score | 514 | 16 |
| % Adults w/ professional jobs | 45% | 9 | % of Students 1st generation | 38% | 22 | Mean SAT Math Score | 528 | 17 |
| % Speaking English only | 78% | 23 | % likely to apply out of state | 29% | 23 | Mean SAT Writing Score | 503 | 16 |
| % of Population non-White | 82% | 13 | % interested in Financial Aid | 62% | 23 | Ave cost targeted colleges (x 1000) | $11.5 | 27 |

#### Dominant Cluster Factors

| College Prep Culture | Dense Non-Residential | Large Families | Christian Culture |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 236 |
|---|---|
| % of All Neighborhoods | 0.50% |
| % 18-21 year olds | 1.80% |



### Neighborhood Cluster 74

This is a low income, predominantly African-American neighborhood where many families own homes of fairly low value. Parents hold blue collar jobs and only a few have college degrees. Students attend public schools with undistinguished curricula where they tend to focus on activities as much as academics. They will get involved with AP honors coursework but score relatively low on standardized tests. They have moderate aspirations and consider public universities with some degree of selectivity, predominantly. Almost all will require financial aid to make college possible.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $44.1 | 28 | % of Population college-aged | 8% | 7 | Mean SAT Critical Reading Score | 435 | 29 |
| % Adults w/ professional jobs | 19% | 25 | % of Students 1st generation | 69% | 7 | Mean SAT Math Score | 433 | 30 |
| % Speaking English only | 86% | 14 | % likely to apply out of state | 29% | 21 | Mean SAT Writing Score | 426 | 30 |
| % of Population non-White | 69% | 2 | % interested in Financial Aid | 79% | 1 | Ave cost targeted colleges (x 1000) | $10.9 | 30 |

#### Dominant Cluster Factors

| Primarily African-American | Athletic Achievements | White Suburban | Weak Standardized Testers |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 2594 |
|---|---|
| % of All Neighborhoods | 5.90% |
| % 18-21 year olds | 5.70% |

**JA5660**

DX139.0014

## Descriptor PLUS Educational Neighborhoods -- 2011

**Neighborhood Cluster 75**

The residents of this neighborhood are mostly Hispanic and many speak English as a second language. They are middle income and have jobs across the vocational spectrum, although most do not hold college degrees. Some students attend religious high schools but most attend public schools with very broad curricula. They are moderately involved in AP/honors coursework but score below average on admission tests. They have fairly high aspirations and apply to a measured number of colleges with relatively high selectivity. For most of them financial aid will be very important.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $50.4 | 23 | % of Population college-aged | 7% | 24 | Mean SAT Critical Reading Score | 457 | 27 |
| % Adults w/ professional jobs | 23% | 23 | % of Students 1st generation | 67% | 8 | Mean SAT Math Score | 459 | 27 |
| % Speaking English only | 31% | 33 | % likely to apply out of state | 28% | 24 | Mean SAT Writing Score | 448 | 27 |
| % of Population non-White | 26% | 10 | % interested in Financial Aid | 72% | 11 | Ave cost targeted colleges (x 1000) | $13.4 | 23 |

### Dominant Cluster Factors

| Puerto Rican/Caribbean ESL | Hispanic/Mexican ESL | Diverse Low Income | Less Educated |
|---|---|---|---|

### Distribution of Neighborhood

| Number of Neighborhoods | 613 |
|---|---|
| % of All Neighborhoods | 1.40% |
| % 18-21 year olds | 1.20% |

**Neighborhood Cluster 76**

This neighborhood is well established, somewhat diverse, and solidly middle income. Most parents own their homes, have experience with higher education, and are well distributed across the vocational spectrum. Students attend public schools with good curricula where they perform well, often in AP and honors courses. With modest aspirations and mid-range test scores, they apply to a small number of moderately selective schools within their home state, with a tendency to favor large urban and flagship publics. Many see themselves as having financial need and will be applying for aid.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $61.3 | 16 | % of Population college-aged | 6% | 25 | Mean SAT Critical Reading Score | 509 | 17 |
| % Adults w/ professional jobs | 28% | 18 | % of Students 1st generation | 51% | 17 | Mean SAT Math Score | 514 | 19 |
| % Speaking English only | 82% | 19 | % likely to apply out of state | 27% | 28 | Mean SAT Writing Score | 494 | 18 |
| % of Population non-White | 16% | 18 | % interested in Financial Aid | 64% | 21 | Ave cost targeted colleges (x 1000) | $10.7 | 31 |

### Dominant Cluster Factors

| Many AP/Honors Curriculum | College Interest: Large Urban | Less Academic Curriculum | Residential |
|---|---|---|---|

### Distribution of Neighborhood

| Number of Neighborhoods | 3299 |
|---|---|
| % of All Neighborhoods | 7.50% |
| % 18-21 year olds | 5.30% |



**JA5661**

DX139.0015

## Descriptor PLUS Educational Neighborhoods -- 2011

### Neighborhood Cluster 77

This stable, middle income, blue collar neighborhood is most often found in small towns and distant suburbs with very little diversity. Most parents own their homes and have at least some college experience. Although some students will attend religious high schools, most are in public high schools with fairly basic college prep offerings. They take very modest advantage of AP/honors coursework and score just below average on standardized tests. They tend to have fairly low aspirations, stay in state and consider only slightly selective public and private colleges. Most will be seeking financial aid.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $62.4 | 15 | % of Population college-aged | 6% | 27 | Mean SAT Critical Reading Score | 492 | 20 |
| % Adults w/ professional jobs | 27% | 19 | % of Students 1st generation | 56% | 16 | Mean SAT Math Score | 502 | 20 |
| % Speaking English only | 90% | 10 | % likely to apply out of state | 26% | 29 | Mean SAT Writing Score | 484 | 20 |
| % of Population non-White | 7% | 31 | % interested in Financial Aid | 75% | 6 | Ave cost targeted colleges (x 1000) | $17.4 | 12 |

#### Dominant Cluster Factors

| Catholic Culture | Work/vocational Achievements | College Interest: Small Residential | Lower Ability |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 1766 |
|---|---|
| % of All Neighborhoods | 4.00% |
| % 18-21 year olds | 2.30% |

### Neighborhood Cluster 78

This neighborhood is at the top of the economic heap with top salaries and home values. There is a little diversity among the highly educated, professional residents, and both students and parents value education. Some students choose private and religious schools but all attend schools with good academic programs. They take advantage of AP and honors coursework and perform near the top on admission tests. They submit a prolific number of applications to a variety of colleges, often private, across the country. Although some will apply, financial aid is not a high priority.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $134.4 | 1 | % of Population college-aged | 7% | 9 | Mean SAT Critical Reading Score | 578 | 4 |
| % Adults w/ professional jobs | 70% | 2 | % of Students 1st generation | 19% | 32 | Mean SAT Math Score | 594 | 3 |
| % Speaking English only | 84% | 18 | % likely to apply out of state | 56% | 5 | Mean SAT Writing Score | 579 | 3 |
| % of Population non-White | 12% | 25 | % interested in Financial Aid | 39% | 31 | Ave cost targeted colleges (x 1000) | $21.2 | 3 |

#### Dominant Cluster Factors

| Professional and Affluent | Good Standardized Testers | College Interest: Small Private | Highly Educated |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 1221 |
|---|---|
| % of All Neighborhoods | 2.80% |
| % 18-21 year olds | 1.90% |



**JA5662**

DX139.0016

## Descriptor PLUS Educational Neighborhoods -- 2011

**Neighborhood Cluster 79**

This is a unique, urban, blue collar neighborhood of low income families with very high educational aspirations. It is modestly diverse with parents who generally have had at least some college. Students attend schools with solid curricula where they take advantage of the AP and honors offerings. They get good grades; have solidly above average test scores and extremely high aspirations. They look at a modest number of selective privates and public flagships across the country. Financial aid is sought by most and will play a big role in their attendance.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $40.9 | 30 | % of Population college-aged | 7% | 10 | Mean SAT Critical Reading Score | 551 | 9 |
| % Adults w/ professional jobs | 18% | 29 | % of Students 1st generation | 41% | 19 | Mean SAT Math Score | 550 | 10 |
| % Speaking English only | 92% | 5 | % likely to apply out of state | 57% | 4 | Mean SAT Writing Score | 536 | 10 |
| % of Population non-White | 20% | 15 | % interested in Financial Aid | 74% | 8 | Ave cost targeted colleges (x 1000) | $17.7 | 10 |

### Dominant Cluster Factors

| Residential | Leadership/Organizational Achievements | College Interest: National Selective | Relatively High Grades |
|---|---|---|---|

### Distribution of Neighborhood

| | |
|---|---|
| Number of Neighborhoods | 386 |
| % of All Neighborhoods | 0.90% |
| % 18-21 year olds | 7.00% |

**Neighborhood Cluster 80**

Lower middle class in terms of income and home ownership, this transitional urban or close in suburban neighborhood is somewhat diverse with African-American and some newer Asian families. While predominantly professional, parents fall across the vocational spectrum and have at least some college experience. Students attend predominantly public high schools offering traditional college prep curricula. Their participation in AP honors and their performance on admission tests are pretty average. They apply to some selective privates and non-selective publics where many will seek financial aid.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x 1000) | $49.9 | 24 | % of Population college-aged | 24% | 1 | Mean SAT Critical Reading Score | 527 | 13 |
| % Adults w/ professional jobs | 46% | 8 | % of Students 1st generation | 39% | 21 | Mean SAT Math Score | 534 | 15 |
| % Speaking English only | 85% | 17 | % likely to apply out of state | 39% | 12 | Mean SAT Writing Score | 515 | 14 |
| % of Population non-White | 20% | 14 | % interested in Financial Aid | 65% | 18 | Ave cost targeted colleges (x 1000) | $16.6 | 15 |

### Dominant Cluster Factors

| New/ Highly Mobile | Residential | Large Families | White Suburban |
|---|---|---|---|

### Distribution of Neighborhood

| | |
|---|---|
| Number of Neighborhoods | 315 |
| % of All Neighborhoods | 0.70% |
| % 18-21 year olds | 4.00% |



# JA5663

DX139.0017

## Descriptor PLUS Educational Neighborhoods -- 2011

### Neighborhood Cluster 81

This neighborhood is quite diverse, highly mobile, middle income, and urban with many households having children. Parents work across the vocational spectrum and most have some college experience. Students attend public high schools and pursue solid academic programs which include some AP and honors work. They have modest aspirations and perform a bit below average on standardized tests. They tend to file a reasonable number of applications to mostly in state publics and a few privates. Financial aid is important to most and may be a deciding factor.

#### Values & Rankings of Key Attributes

|  | value | rank |  | value | rank |  | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $63.0 | 14 | % of Population college-aged | 7% | 11 | Mean SAT Critical Reading Score | 483 | 24 |
| % Adults w/ professional jobs | 26% | 20 | % of Students 1st generation | 57% | 15 | Mean SAT Math Score | 491 | 24 |
| % Speaking English only | 77% | 24 | % likely to apply out of state | 27% | 27 | Mean SAT Writing Score | 470 | 24 |
| % of Population non-White | 32% | 7 | % interested in Financial Aid | 72% | 10 | Ave cost targeted colleges (x $1000) | $11.0 | 29 |

#### Dominant Cluster Factors

| Dense Non-Residential | College Prep Culture | Athletic Achievements | Middle Class |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 1889 |
|---|---|
| % of All Neighborhoods | 4.30% |
| % 18-21 year olds | 5.60% |



### Neighborhood Cluster 82

This is a lower middle income, economically declining, older, white suburban neighborhood where home values are very low. Many parents have some experience with college and, although a large proportion is blue collar, they span the vocational spectrum. Students attend public schools with traditional college prep curricula. They score just slightly below average on admission tests and don't get involved with AP or honors coursework. They have very low educational aspirations and submit a relatively small number of applications to moderately selective institutions. Financial aid is seen as critical to attending college.

#### Values & Rankings of Key Attributes

|  | value | rank |  | value | rank |  | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $53.5 | 21 | % of Population college-aged | 7% | 19 | Mean SAT Critical Reading Score | 491 | 21 |
| % Adults w/ professional jobs | 21% | 24 | % of Students 1st generation | 63% | 10 | Mean SAT Math Score | 496 | 23 |
| % Speaking English only | 92% | 4 | % likely to apply out of state | 29% | 22 | Mean SAT Writing Score | 477 | 23 |
| % of Population non-White | 9% | 29 | % interested in Financial Aid | 75% | 5 | Ave cost targeted colleges (x $1000) | $16.4 | 17 |

#### Dominant Cluster Factors

| College Interest: Small Residential | Sectarian | Work/vocational Achievements | Academic Achievements |
|---|---|---|---|

#### Distribution of Neighborhood

| Number of Neighborhoods | 2169 |
|---|---|
| % of All Neighborhoods | 4.90% |
| % 18-21 year olds | 3.00% |



## JA5664

DX139.0018

## Descriptor PLUS Educational Neighborhoods -- 2011

**Neighborhood Cluster 83**

This traditional neighborhood is suburban and made up of predominantly blue collar families with low incomes and home values. There are some parents in professional and managerial vocations, and most have at least some college. Students attend high schools with good curricula, get solid grades, and will get involved in AP and honors courses. With very average test scores and extremely modest aspirations, they do not look very far a field for colleges; generally seeking public and privates that are not particularly selective. Financial aid will be particularly important as they see themselves as high need.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Median family income (x $1000) | $49.3 | 26 | % of Population college-aged | 7% | 15 | Mean SAT Critical Reading Score | 490 | 22 |
| % Adults w/ professional jobs | 19% | 26 | % of Students 1st generation | 59% | 13 | Mean SAT Math Score | 500 | 21 |
| % Speaking English only | 91% | 8 | % likely to apply out of state | 19% | 33 | Mean SAT Writing Score | 474 | 23 |
| % of Population non-White | 14% | 19 | % interested in Financial Aid | 71% | 12 | Ave cost targeted colleges (x $1000) | $10.4 | 33 |

### Dominant Cluster Factors

| Focused | Relatively High Grades | Academic Achievements | Magnet/Focused Curriculum |
|---|---|---|---|

### Distribution of Neighborhood

| Number of Neighborhoods | 3731 |
|---|---|
| % of All Neighborhoods | 8.50% |
| % 18-21 year olds | 7.90% |



**JA5665**

DX139.0019

## Descriptor PLUS
### Educational Neighborhood Attributes

**Attribute**

**Attribute Value**

| Educational Neighborhood | Median family income (x $1000) | % Adults w/ professional jobs | % Speaking English only | % of Population non-White | % of Population college-aged | % of Students 1st generation | Mean SAT Critical Reading Score | Mean SAT Math Score | Mean SAT Writing Score | % likely to apply out of state | Ave cost of targeted colleges (x $1000) | % interested in Financial Aid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 51 | $95.4 | 50% | 85% | 17% | 7% | 30% | 533 | 546 | 522 | 32% | $12.8 | 57% |
| 52 | $63.6 | 32% | 66% | 31% | 6% | 64% | 470 | 480 | 467 | 30% | $18.0 | 71% |
| 53 | $92.6 | 52% | 72% | 25% | 6% | 33% | 544 | 561 | 544 | 32% | $14.6 | 55% |
| 54 | $39.0 | 13% | 40% | 30% | 8% | 77% | 443 | 458 | 435 | 25% | $10.5 | 76% |
| 55 | $71.6 | 43% | 89% | 13% | 6% | 25% | 565 | 566 | 557 | 52% | $19.3 | 63% |
| 56 | $35.3 | 16% | 41% | 65% | 8% | 84% | 411 | 420 | 405 | 29% | $16.3 | 66% |
| 57 | $67.4 | 37% | 91% | 13% | 7% | 50% | 519 | 541 | 515 | 52% | $19.4 | 43% |
| 58 | $68.2 | 34% | 43% | 60% | 6% | 62% | 489 | 533 | 489 | 28% | $13.2 | 69% |
| 59 | $54.7 | 25% | 93% | 11% | 7% | 36% | 562 | 561 | 545 | 52% | $17.0 | 74% |
| 60 | $104.2 | 72% | 81% | 14% | 5% | 25% | 590 | 589 | 591 | 63% | $24.2 | 36% |
| 61 | $123.9 | 64% | 78% | 13% | 7% | 28% | 567 | 585 | 574 | 51% | $21.0 | 40% |
| 62 | $59.8 | 37% | 92% | 9% | 7% | 24% | 595 | 596 | 576 | 67% | $21.0 | 72% |
| 63 | $69.3 | 40% | 90% | 10% | 7% | 31% | 541 | 548 | 525 | 39% | $14.5 | 65% |
| 64 | $49.8 | 26% | 93% | 4% | 7% | 79% | 466 | 466 | 455 | 48% | $17.1 | 29% |
| 65 | $45.1 | 11% | 32% | 48% | 8% | 85% | 433 | 440 | 432 | 23% | $11.0 | 78% |
| 66 | $50.5 | 18% | 95% | 5% | 7% | 62% | 492 | 499 | 476 | 20% | $14.0 | 76% |
| 67 | $61.0 | 41% | 52% | 24% | 6% | 58% | 501 | 519 | 499 | 27% | $16.5 | 59% |
| 68 | $57.9 | 51% | 85% | 16% | 5% | 31% | 558 | 552 | 543 | 52% | $17.6 | 65% |
| 69 | $88.1 | 42% | 89% | 8% | 7% | 40% | 521 | 534 | 516 | 37% | $19.0 | 65% |
| 70 | $86.4 | 52% | 87% | 12% | 7% | 17% | 598 | 613 | 588 | 65% | $21.3 | 61% |
| 71 | $42.7 | 19% | 80% | 86% | 8% | 78% | 408 | 405 | 402 | 39% | $15.3 | 68% |
| 72 | $32.7 | 13% | 73% | 57% | 8% | 87% | 397 | 399 | 392 | 31% | $12.0 | 47% |
| 73 | $90.8 | 45% | 78% | 22% | 7% | 38% | 514 | 528 | 503 | 29% | $11.5 | 62% |
| 74 | $44.1 | 19% | 86% | 69% | 8% | 69% | 435 | 433 | 426 | 29% | $10.9 | 79% |
| 75 | $50.4 | 23% | 31% | 26% | 7% | 67% | 457 | 459 | 448 | 28% | $13.4 | 72% |
| 76 | $61.3 | 28% | 81% | 16% | 6% | 51% | 509 | 514 | 494 | 27% | $10.7 | 64% |
| 77 | $62.4 | 27% | 90% | 7% | 6% | 56% | 492 | 502 | 484 | 26% | $17.4 | 75% |
| 78 | $134.4 | 70% | 84% | 12% | 7% | 19% | 578 | 594 | 579 | 56% | $21.2 | 39% |
| 79 | $40.9 | 18% | 92% | 19% | 7% | 41% | 551 | 550 | 536 | 57% | $17.7 | 74% |
| 80 | $49.9 | 46% | 85% | 20% | 24% | 39% | 527 | 534 | 515 | 39% | $16.6 | 65% |
| 81 | $63.0 | 26% | 77% | 32% | 7% | 57% | 483 | 491 | 470 | 27% | $11.0 | 72% |
| 82 | $53.5 | 21% | 92% | 9% | 7% | 63% | 491 | 496 | 477 | 29% | $16.4 | 75% |
| 83 | $49.3 | 19% | 91% | 14% | 7% | 59% | 490 | 500 | 474 | 19% | $10.4 | 71% |

**Attribute Rank**

| Educational Neighborhood | Median family income (x $1000) | % Adults w/ professional jobs | % Speaking English only | % of Population non-White | % of Population college-aged | % of Students 1st generation | Mean SAT Critical Reading Score | Mean SAT Math Score | Mean SAT Writing Score | % likely to apply out of state | Ave cost of targeted colleges (x $1000) | % interested in Financial Aid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 51 | 4 | 7 | 16 | 16 | 8 | 27 | 12 | 12 | 12 | 17 | 25 | 26 |
| 52 | 13 | 17 | 27 | 8 | 30 | 9 | 25 | 25 | 25 | 19 | 9 | 13 |
| 53 | 5 | 5 | 26 | 11 | 29 | 24 | 10 | 7 | 8 | 16 | 20 | 27 |
| 54 | 31 | 32 | 31 | 9 | 3 | 6 | 28 | 28 | 28 | 30 | 32 | 3 |
| 55 | 9 | 10 | 11 | 22 | 28 | 29 | 6 | 6 | 6 | 7 | 7 | 22 |
| 56 | 32 | 30 | 30 | 3 | 5 | 3 | 31 | 31 | 31 | 20 | 18 | 16 |
| 57 | 12 | 15 | 7 | 21 | 21 | 18 | 15 | 13 | 15 | 9 | 6 | 29 |
| 58 | 11 | 16 | 29 | 4 | 26 | 11 | 23 | 16 | 19 | 25 | 24 | 14 |
| 59 | 20 | 22 | 2 | 26 | 14 | 23 | 7 | 8 | 7 | 8 | 14 | 7 |
| 60 | 3 | 1 | 20 | 20 | 33 | 30 | 3 | 4 | 1 | 3 | 1 | 32 |
| 61 | 2 | 3 | 22 | 23 | 12 | 28 | 5 | 5 | 5 | 10 | 4 | 30 |
| 62 | 18 | 14 | 6 | 28 | 17 | 31 | 2 | 2 | 4 | 1 | 5 | 9 |
| 63 | 10 | 13 | 9 | 27 | 22 | 25 | 11 | 11 | 11 | 14 | 21 | 19 |
| 64 | 25 | 21 | 3 | 33 | 20 | 4 | 26 | 26 | 26 | 11 | 13 | 33 |
| 65 | 27 | 33 | 32 | 6 | 2 | 2 | 30 | 29 | 29 | 31 | 28 | 2 |
| 66 | 22 | 28 | 1 | 32 | 22 | 12 | 19 | 22 | 32 | 32 | 22 | 4 |
| 67 | 17 | 12 | 28 | 12 | 31 | 14 | 18 | 18 | 17 | 26 | 16 | 25 |
| 68 | 19 | 6 | 15 | 17 | 32 | 26 | 8 | 9 | 9 | 6 | 11 | 20 |
| 69 | 7 | 11 | 12 | 30 | 18 | 20 | 14 | 14 | 13 | 15 | 8 | 17 |
| 70 | 8 | 4 | 13 | 24 | 16 | 33 | 1 | 1 | 2 | 2 | 2 | 24 |
| 71 | 29 | 27 | 21 | 1 | 4 | 5 | 32 | 32 | 32 | 13 | 19 | 15 |
| 72 | 33 | 31 | 25 | 5 | 6 | 1 | 33 | 33 | 33 | 18 | 26 | 28 |
| 73 | 6 | 9 | 23 | 13 | 13 | 22 | 16 | 17 | 16 | 23 | 27 | 23 |
| 74 | 28 | 25 | 14 | 2 | 7 | 7 | 29 | 30 | 30 | 21 | 30 | 1 |
| 75 | 23 | 23 | 33 | 10 | 24 | 8 | 27 | 27 | 27 | 24 | 23 | 11 |
| 76 | 16 | 18 | 19 | 18 | 25 | 17 | 17 | 19 | 18 | 28 | 31 | 21 |
| 77 | 15 | 19 | 10 | 31 | 27 | 16 | 20 | 20 | 20 | 29 | 12 | 6 |
| 78 | 1 | 2 | 18 | 25 | 9 | 32 | 4 | 3 | 3 | 5 | 3 | 31 |
| 79 | 30 | 29 | 5 | 15 | 10 | 19 | 9 | 10 | 10 | 4 | 10 | 8 |
| 80 | 24 | 8 | 17 | 14 | 1 | 21 | 13 | 15 | 14 | 12 | 15 | 18 |
| 81 | 14 | 20 | 24 | 7 | 11 | 15 | 24 | 24 | 24 | 27 | 29 | 10 |
| 82 | 21 | 24 | 4 | 29 | 19 | 10 | 21 | 23 | 21 | 22 | 17 | 5 |
| 83 | 26 | 26 | 8 | 19 | 15 | 13 | 22 | 21 | 23 | 33 | 33 | 12 |

**JA5666**

## High School Cluster Key

This description provides a general overview of the students and parents associated with this High School Cluster. The description represents the attributes and factors that are most closely associated with this cluster and the degree to which each of them influences college choice behavior.

This section lists 12 key attributes of the cluster. Each attribute is displayed with the average value for the cluster and the ranking of this value among the 29 High School Clusters.

**High School Cluster 51**

These high schools are predominantly public and serve traditional, blue-collar communities with very low home values. Families are mature and own their homes but have relatively low incomes. Students often will be the first in their family to graduate from college and have modest curricular preparation, below average test scores, and low degree aspirations. They submit relatively few applications and set their sights on low cost, less selective institutions and local community colleges within their home state. Many will be applying for financial aid, particularly if they are going away to school.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 457 | 22 | % of Students 1st generation | 71% | 7 | Ave cost targeted colleges (x $1000) | $8.3 | 29 |
| Mean SAT Math Score | 462 | 23 | Ave Admit Rate at Targeted Colleges | 61% | 3 | % of students non-White | 33% | 22 |
| Mean SAT Writing Score | 445 | 22 | Ave Number of AP Exams per Student | 0.91 | 22 | % of families below poverty | 14% | 8 |
| Ave Number of Advanced Courses | 0.55 | 18 | % likely to apply out of state | 14% | 29 | % interested in Financial Aid | 68% | 12 |

### Dominant Cluster Factors

| Focused/Early Decision | Few AP/Honors | College Interest: Local Technical | Cost Not an Object |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 859 |
|---|---|
| % of All High Schools | 2.56% |



These are 4 of the factors that had the most impact in determining the make-up of the cluster.

The statistics and map provide a sense of the magnitude and distribution of the cluster.

## Descriptor PLUS High School Clusters -- 2011

**High School Cluster 51**

These high schools are predominantly public and serve traditional, blue-collar communities with very low home values. Families are mature and own their homes but have relatively low incomes. Students often will be the first in their family to graduate from college and have modest curricular preparation, below average test scores, and low degree aspirations. They submit relatively few applications and set their sights on low cost, less selective institutions and local community colleges within their home state. Many will be applying for financial aid, particularly if they are going away to school.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 457 | 22 | % of Students 1st generation | 71% | 7 | Ave cost targeted colleges (x $1000) | $8.3 | 29 |
| Mean SAT Math Score | 462 | 23 | Ave Admit Rate at Targeted Colleges | 61% | 3 | % of students non-White | 33% | 22 |
| Mean SAT Writing Score | 445 | 22 | Ave Number of AP Exams per Student | 0.91 | 22 | % of families below poverty | 14% | 8 |
| Ave Number of Advanced Courses | 0.55 | 18 | % likely to apply out of state | 14% | 29 | % interested in Financial Aid | 68% | 12 |

### Dominant Cluster Factors

| Focused/Early Decision | Few AP/Honors | College Interest: Local Technical | Cost Not an Object |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 859 |
|---|---|
| % of All High Schools | 2.56% |

**High School Cluster 52**

The high schools in this cluster are primarily religious or private and serve populations which are well-educated with a significant Hispanic influence. Although incomes are only slightly above average, families tend to own their own homes. Frequently dealing with English as a second language, students have access to good academic curricula and take advantage of AP/honors coursework but have slightly below average test scores. They are highly mobile and aspire to high levels of educational attainment generally at selective private or flagship public institutions with relatively high costs…financial aid is seen as a must.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 496 | 16 | % of Students 1st generation | 35% | 23 | Ave cost targeted colleges (x $1000) | $22.4 | 3 |
| Mean SAT Math Score | 489 | 17 | Ave Admit Rate at Targeted Colleges | 48% | 24 | % of students non-White | 99% | 1 |
| Mean SAT Writing Score | 487 | 16 | Ave Number of AP Exams per Student | 1.15 | 4 | % of families below poverty | 9% | 16 |
| Ave Number of Advanced Courses | 1.15 | 13 | % likely to apply out of state | 81% | 1 | % interested in Financial Aid | 77% | 3 |

### Dominant Cluster Factors

| Puerto Rican/Caribbean ESL | Strong Academic Curriculum | College Interest: National Selective | Weak Standardized Testers |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 106 |
|---|---|
| % of All High Schools | 0.32% |



**JA5668**

DX139.0022

**Descriptor PLUS High School Clusters -- 2011**

**High School Cluster 53**

These high schools are often religiously affiliated and serve middle class communities with a mix of professional, managerial and blue-collar households.  Most of the families have some acquaintance with college although only a modest proportion includes a college graduate.  Although students tend to get good grades, their test scores are below average and their involvement in AP and honors courses is minimal.  Their degree aspirations are quite low and their college choices tend to less selective and lower cost church-related institutions close to home.   Many will be applying for financial aid.

**Values & Rankings of Key Attributes**

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 484 | 18 | % of Students 1st generation | 51% | 13 | Ave cost targeted colleges (x $1000) | $11.4 | 26 |
| Mean SAT Math Score | 471 | 22 | Ave Admit Rate at Targeted Colleges | 61% | 4 | % of students non-White | 38% | 19 |
| Mean SAT Writing Score | 470 | 18 | Ave Number of AP Exams per Student | 0.54 | 23 | % of families below poverty | 8% | 17 |
| Ave Number of Advanced Courses | 0.78 | 20 | % likely to apply out of state | 28% | 25 | % interested in Financial Aid | 62% | 16 |

**Dominant Cluster Factors**

| Religious Curriculum | Few AP/Honors | College Interest: Local Technical | Lower Ability |
|---|---|---|---|

**Distribution of High Schools**

| Number of High Schools | 1011 |
|---|---|
| % of All High Schools | 3.01% |



**High School Cluster 54**

These high schools serve predominantly rural, working-class African-American and Hispanic families at the lowest end of the economic scale.  Few parents have any experience with college.  Students have access to a general curriculum which has few AP or honors opportunities; their test scores are at or near the bottom.  Although they are willing to look out of state and to apply to moderately selective institutions, as well as local two-year and technical colleges, students from these schools seem to have low aspirations and little guidance or information regarding financial aid.

**Values & Rankings of Key Attributes**

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 371 | 28 | % of Students 1st generation | 91% | 1 | Ave cost targeted colleges (x $1000) | $13.5 | 21 |
| Mean SAT Math Score | 376 | 29 | Ave Admit Rate at Targeted Colleges | 55% | 15 | % of students non-White | 96% | 3 |
| Mean SAT Writing Score | 366 | 29 | Ave Number of AP Exams per Student | 0.32 | 27 | % of families below poverty | 22% | 1 |
| Ave Number of Advanced Courses | 0.28 | 28 | % likely to apply out of state | 33% | 20 | % interested in Financial Aid | 38% | 24 |

**Dominant Cluster Factors**

| Primarily African-American | Black Inner City | College Interest: Small Private | Not Athletic Participant |
|---|---|---|---|

**Distribution of High Schools**

| Number of High Schools | 433 |
|---|---|
| % of All High Schools | 1.29% |



**JA5669**

DX139.0023

## Descriptor PLUS High School Clusters -- 2011

**High School Cluster 55**

The high schools in this cluster are primarily private or religiously affiliated and serve predominantly male, racially mixed populations from homes with modestly above average incomes. Most parents have attended college and hold predominantly professional or managerial positions. Although education is a community value, student participation in AP and honors courses, standardized test scores, and aspirations beyond high school are all below average. Willing to consider going out-of-state, students tend toward moderately priced and relatively selective institutions.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 481 | 19 | % of Students 1st generation | 46% | 18 | Ave cost targeted colleges (x $1000) | $16.1 | 16 |
| Mean SAT Math Score | 489 | 18 | Ave Admit Rate at Targeted Colleges | 56% | 11 | % of students non-White | 66% | 14 |
| Mean SAT Writing Score | 469 | 19 | Ave Number of AP Exams per Student | 0.47 | 24 | % of families below poverty | 8% | 18 |
| Ave Number of Advanced Courses | 0.65 | 21 | % likely to apply out of state | 39% | 13 | % interested in Financial Aid | 44% | 22 |

### Dominant Cluster Factors

| College Prep School | Coed | College Interest: Lower Cost Satellite public | Relatively Low Grades |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 949 |
|---|---|
| % of All High Schools | 2.83% |



**High School Cluster 56**

These high schools, sometimes religious, serve solidly middle class, racially mixed, and slightly older communities with a mix of professional, managerial and blue-collar households and may have a strong athletic traditions. Most families have a parent with at least some college experience. Although not involved in many AP or honors courses, students have access to a math science curriculum and perform at an above average level on standardized tests. While not applying to many institutions they tend towards selective privates with higher costs, quite often outside their home state. Interest in financial aid is moderate.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 508 | 12 | % of Students 1st generation | 40% | 19 | Ave cost targeted colleges (x $1000) | $20.5 | 7 |
| Mean SAT Math Score | 536 | 9 | Ave Admit Rate at Targeted Colleges | 51% | 20 | % of students non-White | 43% | 17 |
| Mean SAT Writing Score | 505 | 12 | Ave Number of AP Exams per Student | 0.44 | 25 | % of families below poverty | 9% | 13 |
| Ave Number of Advanced Courses | 0.62 | 22 | % likely to apply out of state | 73% | 3 | % interested in Financial Aid | 49% | 19 |

### Dominant Cluster Factors

| Athletic Achievements | Relatively Low Grades | Not Community Oriented | Few AP/Honors |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 969 |
|---|---|
| % of All High Schools | 2.89% |



**JA5670**

DX139.0024

## Descriptor PLUS High School Clusters -- 2011

**High School Cluster 57**

The high schools in this cluster are overwhelmingly public and serve predominantly low income, urban, African-American communities.  Although there are some professionals, these are blue-collar families with very only a few college graduates among them.  Students tend to be active in their schools, and avail themselves of AP and honors opportunities, although their standardized test performance is below average.  Highly dependent on financial aid, they are likely to stay in state and apply to less selective publics.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 435 | 24 | % of Students 1st generation | 69% | 8 | Ave cost targeted colleges (x $1000) | $11.1 | 27 |
| Mean SAT Math Score | 434 | 26 | Ave Admit Rate at Targeted Colleges | 57% | 9 | % of students non-White | 82% | 10 |
| Mean SAT Writing Score | 425 | 24 | Ave Number of AP Exams per Student | 0.80 | 15 | % of families below poverty | 14% | 7 |
| Ave Number of Advanced Courses | 1.34 | 11 | % likely to apply out of state | 29% | 22 | % interested in Financial Aid | 79% | 2 |

### Dominant Cluster Factors

| Primarily African-American | Ethnic Activities | Black Inner City | Weak Standardized Testers |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 1697 |
|---|---|
| % of All High Schools | 5.06% |



**High School Cluster 58**

These high schools often serve very wealthy non-Christian religious communities which place a high value on education.  Parents are most often professionals and have at least a baccalaureate degree.  Students have high aspirations and take advantage of the AP and honors coursework offered.  Their standardized test scores are well above average.  They apply to a number of institutions, mostly highly selective privates pretty evenly divided between in-state and out-of-state.  There is only a moderate interest in financial aid.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 577 | 5 | % of Students 1st generation | 40% | 20 | Ave cost targeted colleges (x $1000) | $20.5 | 6 |
| Mean SAT Math Score | 592 | 7 | Ave Admit Rate at Targeted Colleges | 45% | 26 | % of students non-White | 27% | 24 |
| Mean SAT Writing Score | 580 | 3 | Ave Number of AP Exams per Student | 0.82 | 12 | % of families below poverty | 4% | 28 |
| Ave Number of Advanced Courses | 1.44 | 8 | % likely to apply out of state | 51% | 9 | % interested in Financial Aid | 32% | 26 |

### Dominant Cluster Factors

| Jewish Culture | Professional and Affluent | College Interest:  Private Selective | Coed |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 261 |
|---|---|
| % of All High Schools | 0.78% |



## JA5671

DX139.0025

## Descriptor PLUS High School Clusters -- 2011

### High School Cluster 59

These are public high schools serving older, economically depressed, white, blue-collar, suburban communities.  While a majority of parents have some college, of the small proportion who have earned degrees most have also earned graduate degrees and are professionals or managers.  Students tend to perform well in the classroom, take modest advantage of the advanced courses offered, and have very modest aspirations and standardized test scores.  They don't apply to many institutions, but tend to favor less selective publics and community colleges in their home state.  Financial aid will be a large factor.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 489 | 17 | % of Students 1st generation | 62% | 10 | Ave cost targeted colleges (x $1000) | $11.5 | 25 |
| Mean SAT Math Score | 499 | 15 | Ave Admit Rate at Targeted Colleges | 65% | 1 | % of students non-White | 18% | 29 |
| Mean SAT Writing Score | 473 | 15 | Ave Number of AP Exams per Student | 0.79 | 16 | % of families below poverty | 9% | 12 |
| Ave Number of Advanced Courses | 1.35 | 10 | % likely to apply out of state | 19% | 28 | % interested in Financial Aid | 74% | 6 |

#### Dominant Cluster Factors

| Relatively High Grades | Working Class | College Interest: Lower Cost Satellite public | Non-Sectarian Curriculum |
|---|---|---|---|

#### Distribution of High Schools

| Number of High Schools | 5405 |
|---|---|
| % of All High Schools | 16.11% |



### High School Cluster 60

The high schools in this cluster are primarily private or sectarian; serving mostly women with professional, college-educated parents who are often from non-Christian communities.  Household incomes and home values are above average.  Students are academically oriented and perform well in class and on standardized tests, although they are generally uninvolved in AP and honors coursework.  They tend to make a few focused applications, usually to moderately priced, relatively selective privates.  They tend to stay close to home and have a below average interest in financial aid.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 549 | 6 | % of Students 1st generation | 61% | 11 | Ave cost targeted colleges (x $1000) | $17.2 | 14 |
| Mean SAT Math Score | 523 | 12 | Ave Admit Rate at Targeted Colleges | 55% | 14 | % of students non-White | 30% | 23 |
| Mean SAT Writing Score | 544 | 8 | Ave Number of AP Exams per Student | 0.42 | 26 | % of families below poverty | 9% | 14 |
| Ave Number of Advanced Courses | 0.59 | 24 | % likely to apply out of state | 23% | 27 | % interested in Financial Aid | 33% | 25 |

#### Dominant Cluster Factors

| Jewish Culture | Single Gender | Cost Not an Object | Not Athletic Participant |
|---|---|---|---|

#### Distribution of High Schools

| Number of High Schools | 159 |
|---|---|
| % of All High Schools | 0.47% |

**JA5672**

DX139.0026

## Descriptor PLUS High School Clusters -- 2011

| High School Cluster 61 | These are predominantly private high schools serving older, racially-mixed, inner-city communities where some of the population deals with English as a second language. There is an almost equal split between professional, managerial, and blue-collar occupations. Students are exposed to college prep curricula but not AP and honors courses. Standardized test scores are below average and lowest on language-related sections. They aspire beyond the baccalaureate and apply to a small number of moderately selective, private schools. They seem disinterested in financial aid despite very average family incomes, which may suggest that only the most affluent go on to college. |

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 370 | 29 | % of Students 1st generation | 85% | 2 | Ave cost targeted colleges (x $1000) | $19.2 | 10 |
| Mean SAT Math Score | 485 | 19 | Ave Admit Rate at Targeted Colleges | 51% | 21 | % of students non-White | 89% | 6 |
| Mean SAT Writing Score | 408 | 26 | Ave Number of AP Exams per Student | 0.14 | 29 | % of families below poverty | 12% | 9 |
| Ave Number of Advanced Courses | 0.08 | 29 | % likely to apply out of state | 33% | 19 | % interested in Financial Aid | 9% | 29 |

### Dominant Cluster Factors

| Strong Academic Curriculum | Small Private | Other Than Christian Culture | Not Athletic Participant |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 303 |
|---|---|
| % of All High Schools | 0.90% |



| High School Cluster 62 | The high schools in this cluster serve predominantly lower middle class, bilingual Hispanic families with strong traditional values. Many parents have had some experience in higher education which is reflected in a mix of professional, managerial, and blue-collar occupations. Students take a range of college prep offerings and frequently have access to AP and honors level courses, but their standardized test results are below average. Moderately mobile, they tend towards lower cost, relatively selective privates where financial aid will be important. |

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 473 | 20 | % of Students 1st generation | 59% | 12 | Ave cost targeted colleges (x $1000) | $14.8 | 19 |
| Mean SAT Math Score | 474 | 20 | Ave Admit Rate at Targeted Colleges | 47% | 25 | % of students non-White | 92% | 5 |
| Mean SAT Writing Score | 463 | 20 | Ave Number of AP Exams per Student | 0.93 | 8 | % of families below poverty | 11% | 10 |
| Ave Number of Advanced Courses | 1.71 | 4 | % likely to apply out of state | 34% | 18 | % interested in Financial Aid | 67% | 13 |

### Dominant Cluster Factors

| Hispanic | Diverse Low Income | Other Than Mexican | Non-Religious Activities |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 433 |
|---|---|
| % of All High Schools | 1.29% |



## JA5673

DX139.0027

## Descriptor PLUS High School Clusters -- 2011

**High School Cluster 63**

These public high schools serve an inner-city mix of non-white populations about half of whom speak English as a second language. Often with younger children, the parents have below average incomes, generally do not own their homes, have completed high school or some college, and are in blue-collar or lower level professional jobs. Students have moderate educational goals and are involved in some AP and honors coursework, but score consistently below average on admission tests. They tend to look at in-state publics or reasonably priced and moderately selective privates, from which they will expect financial aid.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 427 | 25 | % of Students 1st generation | 77% | 6 | Ave cost targeted colleges (x $1000) | $15.0 | 18 |
| Mean SAT Math Score | 440 | 25 | Ave Admit Rate at Targeted Colleges | 52% | 18 | % of students non-White | 85% | 9 |
| Mean SAT Writing Score | 422 | 25 | Ave Number of AP Exams per Student | 0.73 | 17 | % of families below poverty | 16% | 6 |
| Ave Number of Advanced Courses | 0.94 | 17 | % likely to apply out of state | 28% | 24 | % interested in Financial Aid | 72% | 8 |

### Dominant Cluster Factors

| Hispanic | African-American | Less Educated | Relatively Low Grades |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 809 |
|---|---|
| % of All High Schools | 2.41% |



**High School Cluster 64**

The high schools in this cluster are mostly public and serve predominantly younger, Asian families, many of whom are bilingual. The parents have broad experience with higher education, well above average incomes, and hold professional or managerial positions. Students pursue both math/science and liberal arts curricula, take full advantage of AP and honors courses, and score well on standardized tests. Although not overly mobile and with only an average interest in financial aid, they are cost conscious in their consideration and will likely apply at many different colleges across a range of selectivity.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 542 | 9 | % of Students 1st generation | 50% | 15 | Ave cost targeted colleges (x $1000) | $16.6 | 15 |
| Mean SAT Math Score | 606 | 2 | Ave Admit Rate at Targeted Colleges | 49% | 23 | % of students non-White | 89% | 7 |
| Mean SAT Writing Score | 547 | 7 | Ave Number of AP Exams per Student | 1.24 | 2 | % of families below poverty | 7% | 21 |
| Ave Number of Advanced Courses | 1.45 | 7 | % likely to apply out of state | 37% | 14 | % interested in Financial Aid | 57% | 18 |

### Dominant Cluster Factors

| Large Asian ESL population | College Prep School | College Interest: Private Selective | Non-Sectarian |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 638 |
|---|---|
| % of All High Schools | 1.90% |



**JA5674**

DX139.0028

## Descriptor PLUS High School Clusters -- 2011

**High School Cluster 65**

These public schools serve relatively diverse, close-in suburbs where affluent younger families with above average incomes have recently moved from the city. Parents are primarily professionals and managers, although there also is a sizeable blue-collar population; most have at least some college experience. Students have modest aspirations and standardized test score but pursue solid academic curricula including a good number of AP and honors courses. They tend towards selective public institutions including in-state flagships and have an average interest in financial aid.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 503 | 14 | % of Students 1st generation | 47% | 17 | Ave cost targeted colleges (x $1000) | $11.6 | 24 |
| Mean SAT Math Score | 515 | 13 | Ave Admit Rate at Targeted Colleges | 59% | 7 | % of students non-White | 43% | 16 |
| Mean SAT Writing Score | 491 | 15 | Ave Number of AP Exams per Student | 1.01 | 7 | % of families below poverty | 7% | 22 |
| Ave Number of Advanced Courses | 1.65 | 5 | % likely to apply out of state | 28% | 23 | % interested in Financial Aid | 65% | 14 |

### Dominant Cluster Factors

| College Prep Culture | Large Families | Non-Sectarian | New/ Highly Mobile |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 2779 |
|---|---|
| % of All High Schools | 8.29% |



**High School Cluster 66**

The high schools in this cluster serve racially-mixed middle class communities with younger children. Most parents have some acquaintance with, if not a degree from, high education and hold jobs from professional to blue-collar. Students are disproportionately women and are involved in a number of extra-curricular activities. They have an academic orientation but do not evidence strong disciplinary interests or educational aspirations; their standardized test performances are not much beyond average. Their college choices are generally less selective, modestly priced privates where they will most likely be seeking financial aid.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 515 | 11 | % of Students 1st generation | 50% | 16 | Ave cost targeted colleges (x $1000) | $13.5 | 22 |
| Mean SAT Math Score | 498 | 16 | Ave Admit Rate at Targeted Colleges | 61% | 5 | % of students non-White | 37% | 20 |
| Mean SAT Writing Score | 494 | 13 | Ave Number of AP Exams per Student | 0.72 | 18 | % of families below poverty | 9% | 15 |
| Ave Number of Advanced Courses | 1.15 | 14 | % likely to apply out of state | 37% | 15 | % interested in Financial Aid | 73% | 7 |

### Dominant Cluster Factors

| Activist/Community Achievements | Few AP/Honors | Not Athletic Participant | Not Leadership Oriented |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 1255 |
|---|---|
| % of All High Schools | 3.74% |

**JA5675**

DX139.0029



### Descriptor PLUS High School Clusters -- 2011

**High School Cluster 67**

The schools in this cluster are most often religiously affiliated and predominantly serve women from older upper middle class communities. Most parents have at least some college and are either professionals or managers. Students are academically oriented and involved in a number of activities, their curricula are solid in both math/science and AP/honors, and they score above average on standardized tests. They have fairly high educational aspirations, are relatively mobile, and apply to a good number of selective privates where financial aid will be sought by many.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 546 | 7 | % of Students 1st generation | 37% | 21 | Ave cost targeted colleges (x $1000) | $20.1 | 8 |
| Mean SAT Math Score | 526 | 11 | Ave Admit Rate at Targeted Colleges | 54% | 16 | % of students non-White | 41% | 18 |
| Mean SAT Writing Score | 547 | 6 | Ave Number of AP Exams per Student | 1.08 | 5 | % of families below poverty | 7% | 20 |
| Ave Number of Advanced Courses | 1.84 | 3 | % likely to apply out of state | 48% | 10 | % interested in Financial Aid | 69% | 11 |

#### Dominant Cluster Factors

| Single Gender | College Interest: National Selective | Leadership/Organizational Achievements | Art Achievements |
|---|---|---|---|

#### Distribution of High Schools

| Number of High Schools | 1558 |
|---|---|
| % of All High Schools | 4.65% |



**High School Cluster 68**

Almost exclusively religious, and predominantly Catholic, these high schools serve communities with extensive home ownership and household incomes well above average. Almost all parents have some college and most are either professionals or managers. Students are active in their communities and athletics, and tend to have moderate educational aspirations, solid involvement in AP and honors coursework, and good above average test scores. They apply to a fair number of schools, more in-state than out, and mostly selective, moderately-priced privates and sectarian colleges. Financial aid is on the minds of a majority.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 540 | 10 | % of Students 1st generation | 31% | 25 | Ave cost targeted colleges (x $1000) | $19.0 | 11 |
| Mean SAT Math Score | 541 | 8 | Ave Admit Rate at Targeted Colleges | 56% | 12 | % of students non-White | 26% | 25 |
| Mean SAT Writing Score | 537 | 9 | Ave Number of AP Exams per Student | 0.91 | 10 | % of families below poverty | 5% | 25 |
| Ave Number of Advanced Courses | 1.60 | 6 | % likely to apply out of state | 41% | 12 | % interested in Financial Aid | 62% | 17 |

#### Dominant Cluster Factors

| Catholic Culture | Financially Constrained | Highly Educated | Coed |
|---|---|---|---|

#### Distribution of High Schools

| Number of High Schools | 854 |
|---|---|
| % of All High Schools | 2.55% |



## JA5676

DX139.0030

**Descriptor PLUS High School Clusters -- 2011**

**High School Cluster 69**

These high schools serve very low income, predominantly African-American communities.  Although the largest proportion of parents hold blue collar job and have only a high school education, there is also a noticeable professional and managerial presence.  Students tend to be active in school and have an academic orientation, although participation in advanced course work is quite low and test scores are near the bottom.  Some students will look out of state at somewhat selective, moderately priced privates, but many will choose a public two or four college close to home.  Financial aid will be essential for most.

**Values & Rankings of Key Attributes**

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 395 | 27 | % of Students 1st generation | 79% | 4 | % of students non-White | 92% | 4 |
| Mean SAT Math Score | 390 | 28 | Ave Admit Rate at Targeted Colleges | 56% | 13 | % of families below poverty | 19% | 3 |
| Mean SAT Writing Score | 390 | 28 | Ave Number of AP Exams per Student | 0.60 | 21 | % interested in Financial Aid | 74% | 5 |
| Ave Number of Advanced Courses | 0.49 | 26 | % likely to apply out of state | 36% | 16 | Ave cost targeted colleges (x $1000) | $14.2 | 20 |

**Dominant Cluster Factors**

| Primarily African-American | Single Gender | Black Inner City | Less Educated |
|---|---|---|---|

**Distribution of High Schools**

| Number of High Schools | 705 |
|---|---|
| % of All High Schools | 2.10% |



**High School Cluster 70**

These primarily public schools serve established, very affluent suburban communities.  Parents overwhelmingly are in professional or managerial positions, with over half having a degree beyond the baccalaureate.  Students have access to strong curricula, take advantage of AP and honors coursework, are active and involved, and perform very well on standardized tests.  Overwhelmingly committed to earning a degree, they send applications to many highly selective, public and private colleges both in and out of state.  Despite the costs associated with their college choices, slightly less than one-half will seek financial aid.

**Values & Rankings of Key Attributes**

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 581 | 3 | % of Students 1st generation | 22% | 29 | Ave cost targeted colleges (x $1000) | $21.0 | 5 |
| Mean SAT Math Score | 595 | 5 | Ave Admit Rate at Targeted Colleges | 50% | 22 | % of students non-White | 33% | 21 |
| Mean SAT Writing Score | 580 | 2 | Ave Number of AP Exams per Student | 1.23 | 3 | % of families below poverty | 4% | 29 |
| Ave Number of Advanced Courses | 1.91 | 2 | % likely to apply out of state | 56% | 8 | % interested in Financial Aid | 48% | 20 |

**Dominant Cluster Factors**

| Professional and Affluent | Good Standardized Testers | Activist/Community Achievements | National Selective |
|---|---|---|---|

**Distribution of High Schools**

| Number of High Schools | 1291 |
|---|---|
| % of All High Schools | 3.85% |



**JA5677**

DX139.0031

## Descriptor PLUS High School Clusters -- 2011

**High School Cluster 71**

The high schools in this cluster, about one-third of which are private or religiously affiliated, serve very low income Hispanic communities with lots of children. Most parents had had at least some college but largest proportion is in blue-collar occupations. Students tend towards softer coursework but perform well in them; a few get involved with AP and honors courses. Their standardized test scores are near the bottom. They tend to be rather focused in their college choices often looking at either public flagships or somewhat selective, moderately-priced privates where financial aid would be a must.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 412 | 26 | % of Students 1st generation | 68% | 9 | Ave cost targeted colleges (x $1000) | $13.2 | 23 |
| Mean SAT Math Score | 400 | 27 | Ave Admit Rate at Targeted Colleges | 52% | 19 | % of students non-White | 98% | 2 |
| Mean SAT Writing Score | 392 | 27 | Ave Number of AP Exams per Student | 0.72 | 19 | % of families below poverty | 18% | 4 |
| Ave Number of Advanced Courses | 0.49 | 27 | % likely to apply out of state | 57% | 7 | % interested in Financial Aid | 80% | 1 |

### Dominant Cluster Factors

| Puerto Rican/Caribbean ESL | Focused/Early Decision | College Interest: Flagship Public | Few AP/Honors |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 187 |
|---|---|
| % of All High Schools | 0.56% |



**High School Cluster 72**

These schools, which are predominantly Christian affiliated and may include homeschoolers, serve upper middle class communities where most families own their homes. Parents work in a variety of vocations across the spectrum and almost all have at least some experience with higher education. Students generally have are exposed to good to above average curricula, are involved in AP and honors coursework, and attain above average standardized test scores. Their educational aspirations are very modest; they apply to fewer schools than most and generally consider less selective, private, church-related institutions. Their interest in financial aid is about average.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 544 | 8 | % of Students 1st generation | 32% | 24 | Ave cost targeted colleges (x $1000) | $15.6 | 17 |
| Mean SAT Math Score | 528 | 10 | Ave Admit Rate at Targeted Colleges | 63% | 2 | % of students non-White | 25% | 27 |
| Mean SAT Writing Score | 527 | 10 | Ave Number of AP Exams per Student | 0.82 | 11 | % of families below poverty | 6% | 24 |
| Ave Number of Advanced Courses | 1.10 | 15 | % likely to apply out of state | 35% | 17 | % interested in Financial Aid | 64% | 15 |

### Dominant Cluster Factors

| Religious Activities | Christian Culture | College Interest: Sectarian | Relatively High Grades |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 2221 |
|---|---|
| % of All High Schools | 6.62% |

**JA5678**

DX139.0032

## Descriptor PLUS High School Clusters -- 2011

**High School Cluster 73**

The schools in this cluster are generally public and serve urban families with modest incomes and lots of children.  Although there is some diversity, families are largely blue collar, with large Mexican and other Hispanic populations, speak English as a second language, and have little or no experience with college.  Although they test below average, students avail themselves of academic opportunities and frequently seek out AP and honors coursework.  They apply to a reasonable number of public two and four year colleges, mostly within their home state, along with some less selective and relatively low cost privates.  Financial aid is seen as being a key to attendance.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 438 | 23 | % of Students 1st generation | 80% | 3 | Ave cost targeted colleges (x $1000) | $10.6 | 28 |
| Mean SAT Math Score | 451 | 24 | Ave Admit Rate at Targeted Colleges | 58% | 8 | % of students non-White | 89% | 8 |
| Mean SAT Writing Score | 435 | 23 | Ave Number of AP Exams per Student | 1.03 | 6 | % of families below poverty | 17% | 5 |
| Ave Number of Advanced Courses | 1.37 | 9 | % likely to apply out of state | 24% | 26 | % interested in Financial Aid | 76% | 4 |

### Dominant Cluster Factors

| Mexican | Large Families | Less Educated | Diverse Low Income |
|---|---|---|---|

### Distribution of High Schools

| | |
|---|---|
| Number of High Schools | 1212 |
| % of All High Schools | 3.61% |



**High School Cluster 74**

These schools are most often private and serve highly educated, relatively small, middle class families.  They are more likely to be professional than blue collar, and the largest ethnic group is Asian.  Students seek out strong curricula, although their involvement in AP and honors courses is modest.  They have extremely high aspirations and score at or near the top on standardized tests.  They are highly mobile and apply to a number of institutions, generally to some of the most selective and expensive private colleges.  Despite only modest income levels, their interest in financial aid is slightly below average.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 579 | 4 | % of Students 1st generation | 30% | 26 | Ave cost targeted colleges (x $1000) | $28.1 | 1 |
| Mean SAT Math Score | 654 | 1 | Ave Admit Rate at Targeted Colleges | 34% | 29 | % of students non-White | 80% | 11 |
| Mean SAT Writing Score | 579 | 4 | Ave Number of AP Exams per Student | 0.80 | 14 | % of families below poverty | 10% | 11 |
| Ave Number of Advanced Courses | 0.61 | 23 | % likely to apply out of state | 76% | 2 | % interested in Financial Aid | 46% | 21 |

### Dominant Cluster Factors

| Large Asian ESL population | College Interest: Private Selective | Higher Ability | Leadership/Organizational Achievements |
|---|---|---|---|

### Distribution of High Schools

| | |
|---|---|
| Number of High Schools | 886 |
| % of All High Schools | 2.64% |



# JA5679

DX139.0033

## Descriptor PLUS High School Clusters -- 2011

**High School Cluster 75**

The schools in this cluster are overwhelmingly public and represent well established small town and rural communities where almost everyone owns a home and households have comfortable incomes. Most parents have traditional values, some experience with college and represent the breadth of the vocational spectrum. Students tend towards basic college prep curricula and only modestly get involved in AP and honors level coursework. Their educational aspirations are low and they are very average testers. They tend to seek colleges close to home that are somewhat selective and moderately priced, where financial aid will be available.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 502 | 15 | % of Students 1st generation | 51% | 14 | Ave cost targeted colleges (x $1000) | $17.4 | 13 |
| Mean SAT Math Score | 514 | 14 | Ave Admit Rate at Targeted Colleges | 57% | 10 | % of students non-White | 20% | 28 |
| Mean SAT Writing Score | 494 | 14 | Ave Number of AP Exams per Student | 0.71 | 20 | % of families below poverty | 5% | 27 |
| Ave Number of Advanced Courses | 1.32 | 12 | % likely to apply out of state | 31% | 21 | % interested in Financial Aid | 71% | 10 |

### Dominant Cluster Factors

| Multiple Apps | Athletic Achievements | College Interest: Sectarian | Lower Ability |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 1967 |
|---|---|
| % of All High Schools | 5.86% |



**High School Cluster 76**

Overwhelmingly private, the schools in this cluster serve, somewhat racially/ethnically mixed, upper income families with few children. Parents are almost all professionals or managers and highly educated. Students have good curricula which include solid math and science, and some AP and honors level courses. They have test scores at or near the top and generally aspire to education beyond the baccalaureate. They are willing to travel and consider a large number of colleges, generally highly selective and expensive privates where only some will apply for financial aid.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 584 | 2 | % of Students 1st generation | 32% | 23 | Ave cost targeted colleges (x $1000) | $27.6 | 2 |
| Mean SAT Math Score | 600 | 3 | Ave Admit Rate at Targeted Colleges | 41% | 28 | % of students non-White | 50% | 13 |
| Mean SAT Writing Score | 587 | 1 | Ave Number of AP Exams per Student | 0.81 | 13 | % of families below poverty | 5% | 26 |
| Ave Number of Advanced Courses | 1.06 | 16 | % likely to apply out of state | 72% | 4 | % interested in Financial Aid | 28% | 27 |

### Dominant Cluster Factors

| College Prep School | Affluent | College Interest: Small Private | Older Retired |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 476 |
|---|---|
| % of All High Schools | 1.42% |



## JA5680

DX139.0034

## Descriptor PLUS High School Clusters -- 2011

### High School Cluster 77

The schools in this cluster are mostly private and serve highly mobile, mixed inner-city and urban immigrant neighborhoods with significant diversity. Although a significant proportion of the community has very low incomes, parents are most frequently professionals and have college degrees. Students, often dealing with English as a second language, tend towards humanities and social studies courses with some AP and honors work. Their language-based test scores are average, while their math scores are near the top. They have high educational aspirations, are willing to go away to college, and apply to mainly highly selective, private institutions where many will apply for financial aid.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 508 | 13 | % of Students 1st generation | 30% | 27 | Ave cost targeted colleges (x $1000) | $22.1 | 4 |
| Mean SAT Math Score | 595 | 4 | Ave Admit Rate at Targeted Colleges | 45% | 27 | % of students non-White | 75% | 12 |
| Mean SAT Writing Score | 518 | 11 | Ave Number of AP Exams per Student | 0.92 | 9 | % of families below poverty | 19% | 2 |
| Ave Number of Advanced Courses | 0.80 | 19 | % likely to apply out of state | 64% | 5 | % interested in Financial Aid | 39% | 23 |

#### Dominant Cluster Factors

| New/ Highly Mobile | Large Asian ESL population | Black Inner City | Higher Ability |
|---|---|---|---|

#### Distribution of High Schools

| Number of High Schools | 72 |
|---|---|
| % of All High Schools | 0.21% |



### High School Cluster 78

These schools serve small towns and outlying middle class suburbs with little diversity where many people own homes of moderate value. Parents have had some exposure to higher education and, although a significant proportion is blue collar, they pursue a variety of vocations. Students tend towards very traditional curricula without much AP/honors content, have relatively low educational aspirations, and score below average on standardized tests. They will look beyond their home state and do apply to a number of less selective privates. They express relatively little interest in financial aid.

#### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 468 | 21 | % of Students 1st generation | 79% | 5 | Ave cost targeted colleges (x $1000) | $18.1 | 12 |
| Mean SAT Math Score | 473 | 21 | Ave Admit Rate at Targeted Colleges | 60% | 6 | % of students non-White | 43% | 15 |
| Mean SAT Writing Score | 458 | 21 | Ave Number of AP Exams per Student | 0.24 | 28 | % of families below poverty | 8% | 19 |
| Ave Number of Advanced Courses | 0.53 | 25 | % likely to apply out of state | 48% | 11 | % interested in Financial Aid | 22% | 28 |

#### Dominant Cluster Factors

| College Prep School | Other Than Christian Culture | Small Private | Not Athletic Participant |
|---|---|---|---|

#### Distribution of High Schools

| Number of High Schools | 668 |
|---|---|
| % of All High Schools | 1.99% |



**JA5681**

DX139.0035

## Descriptor PLUS High School Clusters -- 2011

**High School Cluster 79**

10.1%

The schools in this cluster are almost all public and serve solid, highly educated, middle class communities, perhaps with a local high education presence. Parents almost all have some college experience with many holding post-baccalaureate degrees and pursuing professional or managerial vocations. Students tend towards leadership opportunities while pursuing good grades in curricula with lots of AP and honors coursework. They have high aspirations that often include post-graduate work, and score at or near the top on standardized tests. They are focused in their college choices, willing to venture out of state, and concentrating on selective privates and flagship publics with good financial aid.

### Values & Rankings of Key Attributes

| | value | rank | | value | rank | | value | rank |
|---|---|---|---|---|---|---|---|---|
| Mean SAT Critical Reading Score | 585 | 1 | % of Students 1st generation | 27% | 28 | Ave cost targeted colleges (x $1000) | $19.3 | 9 |
| Mean SAT Math Score | 594 | 6 | Ave Admit Rate at Targeted Colleges | 53% | 17 | % of students non-White | 26% | 26 |
| Mean SAT Writing Score | 570 | 5 | Ave Number of AP Exams per Student | 1.94 | 1 | % of families below poverty | 6% | 23 |
| Ave Number of Advanced Courses | 2.55 | 1 | % likely to apply out of state | 61% | 6 | % interested in Financial Aid | 71% | 9 |

### Dominant Cluster Factors

| Higher Ability | College Interest: National Selective | College Interest: Flagship Public | Leadership/Organizational Achievements |
|---|---|---|---|

### Distribution of High Schools

| Number of High Schools | 3378 |
|---|---|
| % of All High Schools | 10.07% |



**JA5682**

DX139.0036

## Descriptor PLUS
### High School Cluster Attributes

| | | Mean SAT Critical Reading Score | Mean SAT Math Score | Mean SAT Writing Score | Ave Number of Advanced Courses | Ave Number of AP Exams per Student | % likely to apply out of state | % of Students 1st generation | Ave Admit Rate at Targeted Colleges | Ave Cost of Targeted Colleges (x $1000) | % of students non-White | % of families below poverty | % interested in Financial Aid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Attribute Value** | | | | | | |
| | 51 | 457 | 462 | 445 | 0.9 | 0.6 | 14% | 71% | 61% | $8.3 | 33% | 14% | 68% |
| | 52 | 496 | 489 | 487 | 1.2 | 1.1 | 81% | 35% | 48% | $22.4 | 99% | 9% | 77% |
| | 53 | 484 | 471 | 470 | 0.8 | 0.5 | 28% | 51% | 61% | $11.4 | 38% | 8% | 62% |
| | 54 | 371 | 376 | 366 | 0.3 | 0.3 | 33% | 91% | 55% | $13.5 | 96% | 22% | 38% |
| | 55 | 481 | 489 | 469 | 0.7 | 0.5 | 39% | 46% | 56% | $16.1 | 46% | 8% | 44% |
| | 56 | 508 | 536 | 505 | 0.6 | 0.4 | 73% | 40% | 51% | $20.5 | 43% | 9% | 49% |
| | 57 | 435 | 434 | 425 | 1.3 | 0.8 | 29% | 69% | 57% | $11.1 | 82% | 14% | 79% |
| | 58 | 577 | 592 | 580 | 1.4 | 0.8 | 51% | 40% | 45% | $20.5 | 27% | 4% | 32% |
| | 59 | 489 | 499 | 473 | 1.3 | 0.8 | 19% | 62% | 65% | $11.5 | 18% | 9% | 74% |
| High School Cluster | 60 | 549 | 523 | 544 | 0.6 | 0.4 | 23% | 61% | 55% | $17.2 | 30% | 9% | 33% |
| | 61 | 370 | 485 | 408 | 0.1 | 0.1 | 33% | 85% | 51% | $19.2 | 89% | 12% | 9% |
| | 62 | 473 | 474 | 463 | 1.7 | 0.9 | 34% | 59% | 47% | $14.8 | 92% | 11% | 67% |
| | 63 | 427 | 440 | 422 | 0.9 | **0.7** | 28% | 77% | 52% | $15.0 | 86% | 16% | 72% |
| | 64 | 542 | 606 | 547 | 1.5 | 1.2 | 37% | 50% | 49% | $16.6 | 89% | 7% | 57% |
| | 65 | 503 | 515 | 491 | 1.7 | 1.0 | 28% | 47% | 59% | $11.6 | 43% | 6% | 65% |
| | 66 | 515 | 498 | 494 | 1.1 | 0.7 | 37% | 50% | 61% | $13.5 | 37% | 9% | 73% |
| | 67 | 546 | 526 | 547 | 1.8 | 1.1 | 48% | 37% | 54% | $20.1 | 41% | 7% | 69% |
| | 68 | 540 | 541 | 537 | 1.6 | 0.9 | 41% | 31% | 56% | $19.0 | 26% | 5% | 62% |
| | 69 | 395 | 390 | 390 | 0.5 | 0.6 | 36% | 79% | 56% | $14.2 | 92% | 19% | 74% |
| | 70 | 581 | 595 | 580 | 1.9 | 1.2 | 56% | 22% | 50% | $21.0 | 33% | 4% | 48% |
| | 71 | 412 | 400 | 392 | 0.5 | 0.7 | 57% | 68% | 52% | $13.2 | 98% | 18% | 80% |
| | 72 | 544 | 528 | 527 | 1.1 | 0.8 | 35% | 32% | 63% | $15.6 | 25% | 6% | 64% |
| | 73 | 438 | 451 | 435 | 1.4 | 1.0 | 24% | 80% | 58% | $10.6 | 89% | 17% | 76% |
| | 74 | 579 | 654 | 579 | 0.6 | 0.8 | 76% | 30% | 34% | $28.1 | 80% | 10% | 46% |
| | 75 | 502 | 514 | 494 | 1.3 | 0.7 | 31% | 51% | 57% | $17.4 | 20% | 5% | 71% |
| | 76 | 584 | 600 | 587 | 1.1 | 0.8 | 72% | 32% | 41% | $27.6 | 50% | 5% | 28% |
| | 77 | 508 | 595 | 518 | 0.8 | 0.9 | 64% | 30% | 45% | $22.1 | 75% | 19% | 39% |
| | 78 | 468 | 473 | 458 | 0.5 | 0.2 | 48% | 79% | 60% | $18.1 | 43% | 8% | 22% |
| | 79 | 585 | 594 | 570 | 2.6 | 1.9 | 61% | 27% | 53% | $19.3 | 26% | 6% | 71% |
| | | | | | | | | **Attribute Rank** | | | | | | |
| | 51 | 22 | 23 | 22 | 18 | 22 | 29 | 7 | 3 | 29 | 22 | 8 | 12 |
| | 52 | 16 | 17 | 16 | 13 | 4 | 1 | 22 | 24 | 3 | 1 | 16 | 3 |
| | 53 | 18 | 22 | 18 | 20 | 23 | 25 | 13 | 4 | 26 | 19 | 17 | 16 |
| | 54 | 28 | 29 | 29 | 28 | 27 | 20 | 1 | 15 | 21 | 3 | 1 | 24 |
| | 55 | 19 | 18 | 19 | 21 | 24 | 13 | 18 | 11 | 16 | 14 | 18 | 22 |
| | 56 | 12 | 9 | 12 | 22 | 25 | 3 | 19 | 20 | 7 | 17 | 13 | 19 |
| | 57 | 24 | 26 | 24 | 11 | 15 | 22 | 8 | 9 | 27 | 10 | 7 | 2 |
| | 58 | 5 | 7 | 3 | 8 | 12 | 9 | 20 | 26 | 6 | 24 | 28 | 26 |
| | 59 | 17 | 15 | 17 | 10 | 16 | 28 | 10 | 1 | 25 | 29 | 12 | 6 |
| High School Cluster | 60 | 6 | 12 | 8 | 24 | 26 | 27 | 11 | 14 | 14 | 23 | 14 | 25 |
| | 61 | 29 | 19 | 26 | 29 | 29 | 19 | 2 | 21 | 10 | 6 | 9 | 29 |
| | 62 | 20 | 20 | 20 | 4 | 8 | 18 | 12 | 25 | 19 | 5 | 10 | 13 |
| | 63 | 25 | 25 | 25 | 17 | 17 | 24 | 6 | 18 | 18 | 9 | 6 | 11 |
| | 64 | 9 | 2 | 7 | 7 | 2 | 14 | 15 | 23 | 15 | 7 | 21 | 18 |
| | 65 | 14 | 13 | 15 | 5 | 7 | 23 | 17 | 7 | 24 | 16 | 22 | 14 |
| | 66 | 11 | 16 | 13 | 14 | 18 | 15 | 16 | 5 | 22 | 20 | 15 | 7 |
| | 67 | 7 | 11 | 6 | 3 | 5 | 10 | 21 | 16 | 8 | 18 | 20 | 11 |
| | 68 | 10 | 8 | 9 | 6 | 10 | 12 | 25 | 12 | 11 | 25 | 25 | 17 |
| | 69 | 27 | 28 | 28 | 26 | 21 | 16 | 4 | 13 | 20 | 4 | 3 | 5 |
| | 70 | 3 | 5 | 2 | 2 | 3 | 8 | 29 | 22 | 5 | 21 | 29 | 20 |
| | 71 | 26 | 27 | 27 | 27 | 19 | 7 | 9 | 19 | 23 | 2 | 4 | 1 |
| | 72 | 8 | 10 | 10 | 15 | 11 | 17 | 24 | 2 | 17 | 27 | 24 | 15 |
| | 73 | 23 | 24 | 23 | 9 | 6 | 26 | 3 | 8 | 28 | 8 | 5 | 4 |
| | 74 | 4 | 1 | 4 | 23 | 14 | 2 | 26 | 29 | 1 | 11 | 11 | 21 |
| | 75 | 15 | 14 | 14 | 12 | 20 | 21 | 14 | 10 | 13 | 28 | 27 | 10 |
| | 76 | 2 | 3 | 1 | 16 | 13 | 4 | 23 | 28 | 2 | 13 | 26 | 27 |
| | 77 | 13 | 4 | 11 | 19 | 9 | 5 | 27 | 27 | 4 | 12 | 2 | 23 |
| | 78 | 21 | 21 | 21 | 25 | 28 | 11 | 5 | 6 | 12 | 15 | 19 | 28 |
| | 79 | 1 | 6 | 5 | 1 | 1 | 6 | 28 | 17 | 9 | 26 | 23 | 9 |

United States District Court
District of Massachusetts

**DX 669**

Case No. _1:14-cv-14176 (ADB)_
Date Entered _____
By _____ Deputy Clerk

# Domestic applicants, admitted students, and admission rates at Harvard by year

| Class | Number of Applicants | Number of Admitted Students | Admission Rate |
|-------|---------------------|----------------------------|----------------|
| 1. **2014** | 22,669 | 1,984 | 8.75% |
| 2. **2015** | 26,071 | 1,920 | 7.36% |
| 3. **2016** | 25,068 | 1,829 | 7.30% |
| 4. **2017** | 25,117 | 1,804 | 7.18% |
| 5. **2018** | 25,208 | 1,775 | 7.04% |
| 6. **2019** | 26,568 | 1,756 | 6.61% |
| **Total** | **150,701** | **11,068** | **7.34%** |

Source: Arcidiacono Data

Note: Data consist of Prof. Arcidiacono's original expanded sample including athletes.

DX669.0001



# Cumulative distribution of applicants' predicted probability of admission

**Share of Applicant Pool**

**Predicted Probability of Admission**

United States District Court
District of Massachusetts

**DX 670**

Case No.  1:14-cv-14176 (ADB)
Date Entered
By            Deputy Clerk

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data.

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. Predicted probabilities are computed separately for each year using Card's preferred year-by-year model including perfect predictions.

DX670.0001



# Number of applicants to the class of 2019 with high test scores or GPAs

Source: Arcidiacono Data

Note: Data are from applicants to the class of 2019 using Prof. Arcidiacono's original expanded sample. Harvard converts applicant GPAs to a 35–80 scale.

United States District Court
District of Massachusetts

**DX 671**

Case No.    1:14-cv-14176 (ADB)
Date Entered
By          Deputy Clerk

DX671.0001

# Mean and median SAT score, ACT score, and converted GPA for admitted students

| Class | Composite SAT Score | | Composite ACT Score | | Converted GPA | |
|---|---|---|---|---|---|---|
| | Mean | Median | Mean | Median | Mean | Median |
| 1. **2014** | 2227 | 2260 | 33 | 33 | 76 | 77 |
| 2. **2015** | 2222 | 2260 | 33 | 33 | 77 | 77 |
| 3. **2016** | 2237 | 2270 | 33 | 34 | 77 | 77 |
| 4. **2017** | 2237 | 2270 | 33 | 34 | 77 | 77 |
| 5. **2018** | 2243 | 2280 | 33 | 34 | 77 | 77 |
| 6. **2019** | 2241 | 2270 | 33 | 34 | 77 | 78 |
| **Total** | **2234** | **2270** | **33** | **34** | **77** | **77** |

Source: Arcidiacono Data

Note: Data are from admitted students to the classes of 2014 – 2019 using Prof. Arcidiacono's original expanded sample including athletes.

DX671.0002

**JA5687**



**Percentage of applicants with a rating of 2 or better on Harvard's Profile Ratings**

Source: Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 using Professor Arcidiacono's original expanded sample including athletes.

DX671.0003

# Applicants and admitted students by profile ratings combination

| Profile Ratings Combination | Number of Applicants | Number of Admitted Students | Admission Rate | Share of Admitted Students |
|---|---|---|---|---|
| **Applicants with at least one rating of 1** | | | | |
| **Three 1 ratings** | 1 | 1 | 100.00% | 0.01% |
| **Two 1 ratings:** | | | | |
| **Two 2 ratings** | 2 | 2 | 100.00% | 0.02% |
| **One 2 rating** | 9 | 9 | 100.00% | 0.08% |
| **No 2 ratings** | 5 | 5 | 100.00% | 0.05% |
| **One 1 rating:** | | | | |
| **One Academic 1 rating:** | | | | |
| **Three 2 ratings** | 8 | 8 | 100.00% | 0.07% |
| **Two 2 ratings** | 192 | 180 | 93.75% | 1.64% |
| **One 2 rating** | 230 | 172 | 74.78% | 1.56% |
| **No 2 ratings** | 231 | 92 | 39.83% | 0.84% |
| **One Extracurricular 1 rating:** | | | | |
| **Three 2 ratings** | 3 | 2 | 66.67% | 0.02% |
| **Two 2 ratings** | 136 | 113 | 83.09% | 1.03% |
| **One 2 rating** | 222 | 95 | 42.79% | 0.86% |
| **No 2 ratings** | 91 | 6 | 6.59% | 0.05% |
| **One Personal 1 rating:** | | | | |
| **Three 2 ratings** | 7 | 7 | 100.00% | 0.06% |
| **Two 2 ratings** | 13 | 11 | 84.62% | 0.10% |
| **One 2 rating** | 17 | 9 | 52.94% | 0.08% |
| **No 2 ratings** | 4 | 0 | 0.00% | 0.00% |
| **One Athletic 1 rating:** | | | | |
| **Three 2 ratings** | 31 | 31 | 100.00% | 0.28% |
| **Two 2 ratings** | 196 | 191 | 97.45% | 1.74% |
| **One 2 rating** | 539 | 487 | 90.35% | 4.43% |
| **No 2 ratings** | 574 | 467 | 81.36% | 4.24% |
| **Applicants with no ratings of 1** | | | | |
| **Four 2 ratings** | 622 | 421 | 67.68% | 3.83% |
| **Three 2 ratings** | 9,444 | 4,115 | 43.57% | 37.40% |
| **Two 2 ratings:** | | | | |
| **Two 3 ratings** | 17,497 | 2,068 | 11.82% | 18.79% |
| **One 3 rating** | 10,825 | 1,377 | 12.72% | 12.51% |
| **No 3 ratings** | 424 | 3 | 0.71% | 0.03% |
| **One 2 rating:** | | | | |
| **Three 3 ratings** | 28,373 | 556 | 1.96% | 5.05% |
| **Two 3 ratings** | 22,506 | 489 | 2.17% | 4.44% |
| **One 3 rating** | 2,188 | 4 | 0.18% | 0.04% |
| **No 3 ratings** | 32 | 0 | 0.00% | 0.00% |
| **No 2 ratings** | 55,690 | 83 | 0.15% | 0.75% |

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 using Professor Arcidiacono's expanded sample including athletes.



United States District Court
District of Massachusetts

**DX 672**

Case No.＿＿＿1:14-cv-14176 (ADB)＿＿＿
Date Entered＿＿＿＿＿＿＿＿＿＿＿＿＿
By＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Deputy Clerk

United States District Court
District of Massachusetts

**DX 673**

1:14-cv-14176 (ADB)

Case No.
Date Entered
By          Deputy Clerk

# Probability of admission for applicant with four profile ratings of 2 relative to applicant with three profile ratings of 2 and an athletic rating of 3 or worse

| Profile Ratings | Applicants | Admitted Students | Admission Rate |
|---|---|---|---|
| 1. Athletic: 2<br>Academic: 2<br>Personal: 2<br>Extracurricular: 2 | 622 | 421 | 68% |
| 2. Athletic: 3 or Worse<br>Academic: 2<br>Personal: 2<br>Extracurricular: 2 | 6,928 | 3,336 | 48% |

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 using Prof. Arcidiacono's original expanded sample including athletes.

DX673.0001

United States District Court
District of Massachusetts

**DX 674**

Case No. ___1:14-cv-14176 (ADB)___
Date Entered _____
By _____ Deputy Clerk

**Admission rates for applicants who are not athletic recruits, lineage applicants, on Dean's or Director's Interest List, or children of Harvard faculty and staff (ALDCs)**

| Class | White Admission Rate | Asian-American Admission Rate | Difference (Percentage Points) |
|---|---|---|---|
| 1. **2014** | 6.46% | 6.30% | -0.15 |
| 2. **2015** | 5.28% | 5.07% | -0.21 |
| 3. **2016** | 5.07% | 5.48% | 0.41 |
| 4. **2017** | 4.50% | 5.04% | 0.54 |
| 5. **2018** | 4.24% | 4.40% | 0.16 |
| 6. **2019** | 3.91% | 4.77% | 0.86 |
| **Total** | 4.91% | 5.15% | 0.24 |

Source: Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's original baseline sample with Early Action applicants.

DX674.0001

# Intended Careers for Asian-American and White Applicants

| Intended Career | Number of Applicants (All Races) | Share of White Applicants | Share of Asian-American Applicants | Percent Difference (White vs. Asian-American) | Overall Admission Rate (All Races) |
|---|---|---|---|---|---|
| 1. Medicine or health | 35,915 | 19% | 30% | -37% | 5% |
| 2. Science | 36,112 | 25% | 26% | -5% | 7% |
| 3. Business | 14,503 | 10% | 10% | -3% | 6% |
| 4. Other | 11,050 | 8% | 6% | 24% | 8% |
| 5. Teaching | 2,556 | 2% | 2% | 25% | 10% |
| 6. Undecided | 23,583 | 18% | 14% | 30% | 10% |
| 7. Government or law | 19,762 | 14% | 9% | 52% | 8% |
| 8. Arts, communications, design, or social service | 7,220 | 5% | 3% | 55% | 8% |

Source: Augmented Arcidiacono Data

Note: Data consist of applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's original expanded sample including athletes. The "Other" category includes applicants whose intended careers are academic, library, religion, trade, other, or unknown. The categories for intended career can vary year to year.

United States District Court
District of Massachusetts

**DX 677**

Case No. ___1:14-cv-14176 (ADB)___
Date Entered _____
By _____
Deputy Clerk

DX677.0001

United States District Court
District of Massachusetts

**DX 678**

Case No.    1:14-cv-14176 (ADB)
Date Entered
By                Deputy Clerk

# Intended concentrations for Asian-American and White applicants

| | Intended Concentration | Number of Applicants (All Races) | Share of White Applicants | Share of Asian-American Applicants | Percent Difference (White vs. Asian-American) | Overall Admission Rate (All Races) |
|---|---|---|---|---|---|---|
| 1. | **Humanities** | 20,864 | 16% | 10% | 60% | 9% |
| 2. | **Physical Science** | 10,015 | 8% | 6% | 37% | 9% |
| 3. | **Mathematics** | 8,290 | 7% | 5% | 30% | 9% |
| 4. | **Social Sciences** | 33,421 | 23% | 19% | 21% | 8% |
| 5. | **Unspecified** | 5,727 | 3% | 3% | 20% | 6% |
| 6. | **Engineering** | 22,629 | 15% | 16% | -10% | 6% |
| 7. | **Biological Sciences** | 43,342 | 24% | 35% | -31% | 6% |
| 8. | **Computer Science** | 5,824 | 3% | 5% | -36% | 6% |

Source: Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Professor Arcidiacono's expanded sample including athletes.

DX678.0001

**JA5693**

# ALDC attributes for Asian-American and White applicants

| ALDC Status | Number of Applicants (All Races) | Share of White Applicants | Share of Asian-American Applicants | Percent Difference (White vs. Asian-American) | Overall Admission Rate (All Races) |
|---|---|---|---|---|---|
| 1. ALDC | 7,384 | 8% | 2% | 292% | 44% |
| 2. Non-ALDC | 142,728 | 92% | 98% | -6% | 5% |

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. ALDC applicants include recruited athletes, applicants on the Dean or Director's list, lineage applicants, and children of Harvard faculty and staff.

United States District Court
District of Massachusetts

**DX 679**

Case No.  1:14-cv-14176 (ADB)
Date Entered
By                Deputy Clerk

DX679.0001

# Admission rates of ALDC applicants by race

| ALDC Category | White | | | Asian-American | | |
|---|---|---|---|---|---|---|
| | Number of Applicants | Number Admitted | Admit Rate | Number of Applicants | Number Admitted | Admit Rate |
| Athlete | 927 | 817 | 88.1% | 114 | 101 | 88.6% |
| Lineage | 3,061 | 1,079 | 35.2% | 463 | 163 | 35.2% |
| Child of Faculty or Staff | 1,625 | 700 | 43.1% | 279 | 133 | 47.7% |
| Dean or Director's Interest List | 167 | 80 | 47.9% | 81 | 39 | 48.1% |
| **All ALDCs** | **5,002** | **2,179** | **43.6%** | **841** | **371** | **44.1%** |
| **Non-ALDCs** | **57,582** | **2,814** | **4.9%** | **40,415** | **2,072** | **5.1%** |

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. ALDC categories are not mutually exclusive.

# Primary extracurricular activity by race

| Primary Activity | White | Asian-American | African-American | Hispanic or Other | Race Missing |
|---|---|---|---|---|---|
| 1. **Varsity athletics** | 26% | 16% | 26% | 24% | 16% |
| 2. **Community service** | 22% | 27% | 25% | 27% | 26% |
| 3. **Other** | 14% | 14% | 14% | 14% | 15% |
| 4. **JV athletics** | 13% | 7% | 12% | 11% | 11% |
| 5. **Instrumental music** | 12% | 17% | 9% | 10% | 15% |
| 6. **Academic** | 11% | 11% | 13% | 13% | 10% |
| 7. **Politics** | 10% | 9% | 11% | 10% | 9% |
| 8. **Work** | 9% | 7% | 8% | 8% | 8% |
| 9. **Science or math** | 8% | 18% | 5% | 7% | 14% |
| 10. **Speech and debate** | 7% | 9% | 6% | 6% | 8% |
| 11. **Club athletics** | 6% | 4% | 5% | 6% | 5% |
| 12. **Drama** | 6% | 2% | 4% | 4% | 4% |
| 13. **Journalism** | 5% | 6% | 3% | 4% | 6% |
| 14. **Career** | 5% | 8% | 5% | 5% | 8% |
| 15. **Religious** | 3% | 3% | 5% | 4% | 2% |
| 16. **Vocal music** | 3% | 2% | 3% | 3% | 2% |
| 17. **Dance** | 3% | 3% | 4% | 3% | 3% |
| 18. **Computer** | 2% | 4% | 2% | 2% | 4% |
| 19. **Foreign language** | 2% | 2% | 2% | 2% | 2% |
| 20. **Art** | 2% | 2% | 2% | 2% | 3% |
| 21. **Missing** | 2% | 1% | 6% | 4% | 1% |
| 22. **Environmental** | 1% | 2% | 1% | 1% | 1% |
| 23. **Foreign exchange** | 1% | 1% | 1% | 1% | 1% |
| 24. **Cultural** | 1% | 2% | 3% | 2% | 1% |
| 25. **Robotics** | 1% | 1% | 1% | 1% | 1% |
| 26. **Family** | 1% | 1% | 1% | 1% | 1% |
| 27. **LGBT** | 1% | 0% | 0% | 1% | 0% |
| 28. **School spirit** | 0% | 0% | 1% | 1% | 0% |
| 29. **Junior ROTC** | 0% | 0% | 1% | 1% | 0% |

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2017 – 2019 in Prof. Arcidiacono's original expanded sample including athletes. Primary activities are defined as those activities that applicants listed as either activity 1 or activity 2. Categories for activities can vary from year to year.

United States District Court
District of Massachusetts

**DX 680**

Case No.     1:14-cv-14176 (ADB)
Date Entered_____
By_____
Deputy Clerk

**JA5696**
DX680.0001

# Mother's occupation by race

| | Occupation Category | White | Asian-American | African-American | Hispanic or Other | Race Missing |
|---|---|---|---|---|---|---|
| 1. | Homemaker | 16.8% | 18.5% | 7.1% | 15.9% | 17.1% |
| 2. | Other | 15.8% | 14.9% | 24.2% | 22.3% | 17.3% |
| 3. | Pre-K through Grade 12 Educational Instruction & Library | 10.0% | 4.3% | 8.0% | 9.6% | 7.0% |
| 4. | Health Diagnosing and Treating Practitioners | 8.0% | 8.0% | 6.6% | 4.3% | 8.0% |
| 5. | Business Executive (management, administrator) | 7.4% | 5.1% | 6.7% | 5.6% | 6.5% |
| 6. | Lawyers, Judges and Related Workers | 4.3% | 0.7% | 2.6% | 2.2% | 3.4% |
| 7. | Other Healthcare Occupations Incl. Nurses | 4.2% | 3.7% | 9.6% | 3.2% | 3.6% |
| 8. | Unemployed | 4.0% | 6.3% | 8.3% | 7.6% | 5.2% |
| 9. | Office and Administrative Support | 3.7% | 2.7% | 4.2% | 4.4% | 2.5% |
| 10. | Self-Employed | 3.4% | 3.9% | 2.2% | 3.2% | 3.7% |
| 11. | Business and Financial Operations | 3.3% | 4.8% | 3.6% | 2.7% | 3.5% |
| 12. | Art, Design and Media | 3.0% | 1.0% | 0.9% | 1.4% | 2.6% |
| 13. | Postsecondary Teachers | 2.4% | 2.1% | 1.2% | 1.3% | 2.4% |
| 14. | Sales and Related | 2.4% | 1.8% | 1.9% | 2.3% | 1.7% |
| 15. | Life, Physical and Social Sciences | 2.0% | 4.9% | 0.7% | 1.0% | 3.4% |
| 16. | Architecture and Engineering | 1.8% | 4.9% | 0.8% | 1.5% | 3.8% |
| 17. | Counselors, Social Workers, Community Service | 1.8% | 0.7% | 3.3% | 1.9% | 1.4% |
| 18. | Other Management (Excl. Business Execs) | 1.7% | 1.1% | 1.7% | 1.5% | 1.0% |
| 19. | Computer and Mathematical | 1.4% | 6.1% | 1.1% | 0.8% | 3.8% |
| 20. | Skilled Trades Incl. Construction and Extraction | 1.2% | 3.3% | 2.9% | 5.3% | 1.3% |
| 21. | Low Skill | 0.6% | 0.9% | 1.4% | 1.6% | 0.3% |
| 22. | Entertainers, Performers and Sports Related Workers | 0.5% | 0.4% | 0.2% | 0.2% | 0.4% |
| 23. | Protective Service | 0.1% | 0.0% | 0.6% | 0.3% | 0.1% |
| 24. | Military | 0.1% | 0.0% | 0.4% | 0.1% | 0.0% |

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 − 2019 in Prof. Arcidiacono's original expanded sample. For the class of 2018, the "Unemployed" category is combined with the "Homemaker" category in my year-by-year models, affecting 10 observations.

United States District Court
District of Massachusetts

**DX 681**

Case No.    1:14-cv-14176 (ADB)
Date Entered_____
By_____
Deputy Clerk

**JA5697**
DX681.0001

# Father's occupation by race

| | Occupation Category | White | Asian-American | African-American | Hispanic or Other | Race Missing |
|---|---|---|---|---|---|---|
| 1. | Business Executive (management, administrator) | 17.2% | 11.8% | 7.8% | 11.4% | 14.5% |
| 2. | Other | 13.9% | 13.4% | 31.0% | 24.1% | 15.5% |
| 3. | Health Diagnosing and Treating Practitioners | 9.7% | 9.6% | 6.6% | 6.1% | 10.4% |
| 4. | Architecture and Engineering | 9.1% | 17.7% | 5.8% | 6.8% | 13.8% |
| 5. | Self-Employed | 8.2% | 7.5% | 4.6% | 6.8% | 7.7% |
| 6. | Lawyers, Judges and Related Workers | 7.7% | 1.3% | 2.6% | 3.9% | 5.4% |
| 7. | Skilled Trades Incl. Construction and Extraction | 4.8% | 4.2% | 7.4% | 13.6% | 3.3% |
| 8. | Computer and Mathematical | 4.0% | 8.8% | 2.7% | 2.3% | 6.8% |
| 9. | Sales and Related | 3.8% | 1.8% | 2.6% | 3.5% | 2.5% |
| 10. | Postsecondary Teachers | 3.1% | 4.9% | 1.9% | 1.4% | 4.1% |
| 11. | Business and Financial Operations | 3.0% | 2.3% | 2.7% | 2.2% | 2.1% |
| 12. | Life, Physical and Social Sciences | 2.6% | 6.6% | 1.0% | 1.2% | 4.4% |
| 13. | Pre-K through Grade 12 Educational Instruction & Library | 2.4% | 0.7% | 2.4% | 2.0% | 1.3% |
| 14. | Other Management (Excl. Business Execs) | 2.2% | 1.3% | 1.3% | 1.8% | 1.2% |
| 15. | Unemployed | 2.2% | 3.2% | 8.0% | 4.8% | 2.7% |
| 16. | Art, Design and Media | 1.4% | 0.5% | 0.7% | 0.8% | 1.0% |
| 17. | Protective Service | 0.9% | 0.2% | 1.9% | 1.8% | 0.5% |
| 18. | Counselors, Social Workers, Community Service | 0.9% | 1.0% | 2.4% | 0.7% | 0.8% |
| 19. | Military | 0.9% | 0.3% | 1.6% | 0.9% | 0.3% |
| 20. | Low Skill | 0.6% | 0.8% | 1.4% | 1.8% | 0.2% |
| 21. | Office and Administrative Support | 0.6% | 0.8% | 1.2% | 1.0% | 0.5% |
| 22. | Entertainers, Performers and Sports Related Workers | 0.4% | 0.2% | 0.5% | 0.4% | 0.4% |
| 23. | Other Healthcare Occupations Incl. Nurses | 0.4% | 0.7% | 1.5% | 0.5% | 0.4% |
| 24. | Homemaker | 0.3% | 0.2% | 0.2% | 0.3% | 0.3% |

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's original expanded sample. For the class of 2018, the "Unemployed" category is combined with the "Homemaker" category in my year-by-year models, affecting 5 observations.

United States District Court
District of Massachusetts

**DX 683**

Case No. _____ 1:14-cv-14176 (ADB)
Date Entered _____
By _____ Deputy Clerk

# Average marginal effect of Asian-American ethnicity in Prof. Card's model after parental occupation variables are modified to address Prof. Arcidiacono's critiques

| Class | Average Marginal Effect of Asian-American Ethnicity (Not Statistically Significant) |
|---|---|
| 1. 2014 | -0.43 |
| 2. 2015 | -0.04 |
| 3. 2016 | 0.06 |
| 4. 2017 | 0.12 |
| 5. 2018 | -0.43 |
| 6. 2019 | 0.27 |
| **Overall** | -0.07 |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Table shows the average marginal effect of race on admission for Asian-American applicants relative to White applicants using the updated Card model with modifications to parental occupation controls, grouping 'Laborer (Unskilled)', 'Low Skill', 'Self-Employed', 'Unemployed', 'Homemaker', and 'Other' as one occupation category. Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. * indicates significance at the 5% level. Marginal effects are reported as percentage point values.

DX683.0001

# Average marginal effect of Asian-American ethnicity in Prof. Card's model after parental occupation variables are modified to address Prof. Arcidiacono's critiques

**Average Marginal Effect of Asian-American Ethnicity**
**(Not Statistically Significant)**

| | Class | Categorizing "Laborer (Unskilled)" as low skill | Creating new category for self-employed, homemaker, unemployed, and other | Both modifications |
|---|---|---|---|---|
| 1. | **2014** | -0.39 | -0.39 | -0.39 |
| 2. | **2015** | -0.06 | -0.04 | -0.05 |
| 3. | **2016** | 0.09 | 0.07 | 0.06 |
| 4. | **2017** | 0.11 | 0.11 | 0.11 |
| 5. | **2018** | -0.43 | -0.42 | -0.43 |
| 6. | **2019** | 0.31 | 0.32 | 0.29 |
| | **Overall** | -0.06 | -0.05 | -0.06 |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Table shows the average marginal effect of race on admission for Asian-American applicants relative to White applicants using Prof. Arcidiacono's expanded sample including athletes. * indicates significance at the 5% level. Marginal effects are reported as percentage point values.

DX683.0002

United States District Court
District of Massachusetts

**DX 685**

Case No.  1:14-cv-14176 (ADB)
Date Entered
By          Deputy Clerk

# Average marginal effect of Asian-American ethnicity and confidence intervals in Prof. Card's model

| Class | Average Marginal Effect of Asian-American Ethnicity (Not Statistically Significant) | 95% Confidence Interval | |
|---|---|---|---|
| | | Lower Bound | Upper Bound |
| 1. 2014 | -0.39 | -1.12 | 0.34 |
| 2. 2015 | -0.05 | -0.66 | 0.57 |
| 3. 2016 | 0.09 | -0.59 | 0.77 |
| 4. 2017 | 0.11 | -0.51 | 0.73 |
| 5. 2018 | -0.42 | -1.05 | 0.20 |
| 6. 2019 | 0.34 | -0.29 | 0.96 |
| **Overall** | -0.05 | -0.32 | 0.21 |

Source: Card Rebuttal, Exhibit 12 Backup

DX685.0001



# Percentage of Asian-American applicants with profile ratings of 2 or better by gender

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. Ratings of 2- and above are classified as "2 or better" in this analysis. +/- rating designations are available in the data beginning with the class of 2019.

United States District Court
District of Massachusetts

**DX 686**

Case No. _____ 1:14-cv-14176 (ADB)
Date Entered _____
By _____ Deputy Clerk

DX686.0001

# Average marginal effect of Asian-American ethnicity in Prof. Card's model for female applicants

| Class | Average Marginal Effect of Asian-American Ethnicity (Not Statistically Significant) |
|---|---|
| 1. 2014 | 0.21 |
| 2. 2015 | 0.55 |
| 3. 2016 | 0.05 |
| 4. 2017 | -0.01 |
| 5. 2018 | -0.34 |
| 6. 2019 | 0.33 |
| **Overall** | 0.14 |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Table shows the average marginal effect of race on admission for Asian-American applicants relative to White applicants using the updated Card model on the sample of female applicants. * indicates significance at the 5% level. Marginal effects are reported as percentage point values.

DX686.0002

**JA5703**

## Average marginal effect of Asian-American ethnicity in Prof. Card's model for applicants from California

| Class | Average Marginal Effect of Asian-American Ethnicity (Not Statistically Significant) |
|---|---|
| 1. 2014 | -0.03 |
| 2. 2015 | 0.63 |
| 3. 2016 | 0.60 |
| 4. 2017 | 0.12 |
| 5. 2018 | 0.45 |
| 6. 2019 | 0.12 |
| **Overall** | 0.32 |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Table shows the average marginal effect of race on admission for Asian-American applicants relative to White applicants using the updated Card model on the sample of applicants applying from California dockets. * indicates significance at the 5% level. Marginal effects are reported as percentage point values.

DX686.0003



**Share of Asian-American applicants who are either female or from California**

■ Asian-American applicants who are either female or from California

■ All other Asian-American applicants

64%

36%

Source: Augmented Arcidiacono Data

Note: Data are from domestic applicants to the classes of 2014 – 2019.

DX686.0004

# Average marginal effect of Asian-American ethnicity on profile ratings in Prof. Arcidiacono's models

| Rating | Model 1 | Model 2 | Model 3 | Model 4 | Model 5 | Model 6 |
|---|---|---|---|---|---|---|
| **Academic Rating** | | | | | | |
| 1. **1** | 0.35 * | 0.01 | 0.03 * | 0.07 * | 0.10 * | 0.10 * |
| 2. **2** | 12.65 * | 0.14 | 0.06 | 0.55 * | 0.75 * | 0.72 * |
| 3. **3** | -8.61 * | -0.14 | -0.15 | -0.56 * | -0.75 * | -0.73 * |
| 4. **4** | -3.46 * | -0.01 | 0.03 | -0.06 | -0.09 * | -0.09 * |
| 5. **5** | -0.93 * | 0.01 | 0.04 | 0.00 | -0.01 | 0.00 |
| **Extracurricular Rating** | | | | | | |
| 6. **1** | 0.08 * | 0.04 * | 0.05 * | 0.07 * | 0.06 * | 0.07 * |
| 7. **2** | 4.43 * | 2.15 * | 2.24 * | 3.44 * | 2.94 * | 3.32 * |
| 8. **3** | -3.80 * | -1.87 * | -1.99 * | -3.01 * | -2.56 * | -2.90 * |
| 9. **4** | -0.59 * | -0.27 * | -0.25 * | -0.41 * | -0.36 * | -0.41 * |
| 10. **5** | -0.13 * | -0.06 * | -0.05 * | -0.09 * | -0.08 * | -0.09 * |
| **Personal Rating** | | | | | | |
| 11. **1** | -0.01 * | -0.02 * | -0.02 * | -0.01 * | -0.01 * | |
| 12. **2** | -5.15 * | -7.10 * | -7.12 * | -5.92 * | -3.69 * | |
| 13. **3** | 5.00 * | 6.93 * | 6.94 * | 5.77 * | 3.56 * | |
| 14. **4** | 0.15 * | 0.18 * | 0.19 * | 0.16 * | 0.13 * | |
| 15. **5** | 0.01 * | 0.01 * | 0.01 * | 0.01 * | 0.01 * | |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Data are from applicants to the classes of 2014 − 2019 in Prof. Arcidiacono's expanded sample excluding athletes. Marginal effect of race on probability of receiving a given rating is relative of the estimated probability of White applicants receiving that rating. * indicates significance at the 5% level. Marginal effects are reported as percentage point values.

United States District Court
District of Massachusetts

**DX 688**

Case No.    1:14-cv-14176 (ADB)
Date Entered
By            Deputy Clerk

DX688.0001

JA5706



**Pseudo R-Squared for Prof. Arcidiacono's profile ratings regressions**

Source: Arcidiacono Rebuttal, Table B.6.5R and Table B.6.7R

Note: Sample consists of applicants to the classes of 2014 – 2019 in Professor Arcidiacono's expanded sample excluding athletes. Pseudo r-squared values are calculated using Prof. Arcidiacono's preferred profile ratings models (model 5).

DX688.0002



**Average marginal effect of Asian-American ethnicity on receiving a personal rating of 2 or better in Prof. Arcidiacono's regression models 2-5**

Model 5: Add ratings variables
-3.70

Model 4: Add context variables
-5.93

Model 3: Add interactions
-7.14

Model 2: Demographics and academic variables
-7.12

Average Marginal Effect of Asian-American Ethnicity

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample excluding athletes. Marginal effects are reported as percentage point values.

DX688.0003

# Average marginal effect of Asian-American ethnicity on receiving a personal rating of 2 or better, modifications to Prof. Arcidiacono's Model 5

| Personal Rating Model | Average Marginal Effect of Asian-American Ethnicity [1] |
|---|---|
| 1. Prof. Arcidiacono's preferred model (5) | -3.70 |
| 2. Run year-by-year, add additional Card model variables [2] | -3.23 |
| 3. Add additional extracurricular variables | -3.01 |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: [1] Data are from Prof. Arcidiacono's expanded sample excluding athletes. Marginal effects are calculated relative to White applicants. [2] Additional controls include intended career, indicator for receiving a staff rating, parental occupations, measures of participation in extracurricular activities, and indicators for being born in the United States and having lived outside of the United States.

DX688.0004

# Share of applicants with a personal rating of 2 or better accurately predicted by Prof. Arcidiacono's personal rating model

| Personal Rating | Percent of Applicants Correctly Predicted |
|---|---|
| 1. 1 | 0% |
| 2. 2 | 45% |

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 using Prof. Arcidiacono's original expanded sample including athletes. Model estimates are taken from Prof. Arcidiacono's preferred personal rating model (model 5).

DX688.0005

# Share of applicants in top deciles of the non-academic admissions index, by race

| Non-Academic Admissions Index Decile | White | Asian-American | African-American | Hispanic |
|---|---|---|---|---|
| **Without Removing Additional Effects** | | | | |
| 1. **5 or lower** | 46.46% | 51.80% | 55.27% | 54.33% |
| 2. **6** | 10.10% | 10.35% | 9.04% | 9.48% |
| 3. **7** | 10.12% | 10.53% | 9.00% | 9.26% |
| 4. **8** | 10.47% | 10.10% | 8.85% | 8.90% |
| 5. **9** | 10.81% | 9.47% | 9.06% | 9.18% |
| 6. **10** | 12.03% | 7.75% | 8.79% | 8.85% |
| **Remove Effect of ALDC Attributes** | | | | |
| 7. **5 or lower** | 46.98% | 51.28% | 55.04% | 53.81% |
| 8. **6** | 10.20% | 10.24% | 8.95% | 9.42% |
| 9. **7** | 10.31% | 10.25% | 8.82% | 9.39% |
| 10. **8** | 10.69% | 9.98% | 8.80% | 8.58% |
| 11. **9** | 10.80% | 9.56% | 9.02% | 9.02% |
| 12. **10** | 11.03% | 8.69% | 9.37% | 9.77% |
| **Remove Effect of Personal Rating** | | | | |
| 13. **5 or lower** | 46.45% | 51.59% | 55.70% | 54.63% |
| 14. **6** | 10.36% | 10.14% | 9.02% | 9.16% |
| 15. **7** | 10.30% | 10.19% | 8.90% | 9.27% |
| 16. **8** | 10.34% | 10.28% | 9.13% | 8.96% |
| 17. **9** | 10.61% | 9.84% | 8.76% | 9.02% |
| 18. **10** | 11.94% | 7.96% | 8.50% | 8.96% |
| **Remove Effect of Personal Rating and ALDC Attributes** | | | | |
| 19. **5 or lower** | 47.02% | 50.92% | 55.42% | 54.20% |
| 20. **6** | 10.46% | 10.02% | 8.89% | 9.14% |
| 21. **7** | 10.59% | 9.91% | 8.79% | 9.06% |
| 22. **8** | 10.53% | 10.02% | 9.12% | 8.77% |
| 23. **9** | 10.84% | 9.69% | 8.64% | 8.96% |
| 24. **10** | 10.56% | 9.42% | 9.14% | 9.88% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. The non-academic admissions index is constructed using the updated approach put forth by Prof. Arcidiacono in Tables 7.4R and 7.5R in Appendix C of his rebuttal report. The shares within each panel for a given race sum to 100%.

United States District Court
District of Massachusetts
**DX 692**
Case No.     1:14-cv-14176 (ADB)
Date Entered
By
Deputy Clerk

**JA5711**
DX692.0001



**Percentage of Asian-American and White applicants with profile ratings of 2 or better**

Source: Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's original expanded sample including athletes. Ratings of 2- and above are classified as "2 or better" in this analysis. +/- rating designations are available in the data beginning with the class of 2019.

DX692.0002

**Percentage of Asian-American and White applicants with school support and alumni ratings of 2 or better, by academic rating**

| Academic Rating | Share With Teacher 1 Rating of 2 or Better | | Share With Teacher 2 Rating of 2 or Better | | Share With Guidance Counselor Rating of 2 or Better | | Share With Alumni Personal Rating of 2 or Better | | Share With Alumni Overall Rating of 2 or Better | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Asian-American | White | Asian-American | White | Asian-American | White | Asian-American | White | Asian-American | White |
| 1. 1 or 2 | 39% | 44% * | 39% | 45% * | 34% | 39% * | 68% | 71% * | 63% | 62% * |
| 2. 1 | 81% | 88% * | 80% | 86% | 76% | 84% * | 80% | 81% | 88% | 86% |
| 3. 2 | 39% | 43% * | 39% | 45% * | 33% | 39% * | 68% | 71% * | 62% | 62% |
| 4. 3 | 21% | 24% * | 22% | 25% * | 17% | 19% * | 54% | 60% * | 34% | 37% * |
| 5. 4 | 11% | 11% | 12% | 11% | 7% | 6% | 44% | 47% * | 15% | 17% |
| 6. 5 | 7% | 6% | 10% | 7% | 3% | 3% | 39% | 38% | 11% | 12% |

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. Shares exclude applicants who are missing the relevant rating. * indicates that the shares of Asian-American and White applicants are significantly different at the 5% level.

DX692.0003

**JA5713**

# Share of applicants who receive collectively strong school support, alumni interview, and non-academic profile ratings, by academic rating and race

| Academic Rating | Share With School Support Ratings that Sum to 7 or Less | | Share With School Support and Alumni Interview Ratings that Sum to 11 or Less | | Share With School Support, Alumni Interview, and Non-Academic Profile Ratings that Sum to 18 or Less | | Share With School Support, Alumni Interview, Extracurricular, and Athletic Ratings that Sum to 16 or Less | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Asian-American | White | Asian-American | White | Asian-American | White | Asian-American | White |
| 1. 1 or 2 | 37% | 43% * | 39% | 43% * | 19% | 24% * | 26% | 31% * |
| 2. 1 | 86% | 94% * | 85% | 90% | 58% | 71% * | 72% | 78% |
| 3. 2 | 36% | 43% * | 38% | 42% * | 18% | 24% * | 25% | 31% * |
| 4. 3 | 16% | 19% * | 15% | 19% * | 6% | 10% * | 8% | 13% * |
| 5. 4 | 7% | 6% | 5% | 5% | 1% | 1% | 2% | 3% * |
| 6. 5 | 5% | 3% | 2% | 2% | 1% | 0% | 1% | 0% |

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. School support ratings include Teacher 1, Teacher 2, and guidance counselor ratings. Alumni interview ratings include the alumni interview personal and overall ratings. Non-academic profile ratings include the athletic, personal, and extracurricular profile ratings. Shares exclude applicants who are missing any ratings included in the sum. For sums that include extracurricular or athletic ratings, shares exclude applicants with ratings corresponding to "Special Circumstances".

DX692.0004

**JA5714**

# Share of Asian-American and White applicants with strong non-academic ratings, by academic rating

| Academic Rating | Share of Applicants with Non-Academic Ratings that Sum to 7 or Less | | |
| --- | --- | --- | --- |
| | All | White | Asian-American |
| 1. 1 | 20% | 25% | 16% |
| 2. 2 | 11% | 14% | 8% |
| 3. 3 | 10% | 12% | 6% |
| 4. 4 | 4% | 6% | 3% |
| 5. 5 | 1% | 2% | 1% |
| Total | 9% | 12% | 7% |

Source: Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Professor Arcidiacono's original expanded sample. Non-academic ratings include the personal, extracurricular, and athletic profile ratings.

DX692.0005

# Distribution of sum of school support and alumni interview ratings for White and Asian-American applicants by academic rating

| Sum of School Support and Alumni Interview Ratings | Academic Rating | | | | | | | | | |
| | 1 | | 2 | | 3 | | 4 | | 5 | |
| | White | Asian-American | White | Asian-American | White | Asian-American | White | Asian-American | White | Asian-American |
| 1. 5 | 2.7% | 2.0% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 2. 6 | 8.1% | 6.3% | 0.3% | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 3. 7 | 13.4% | 8.3% | 1.2% | 1.0% | 0.2% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| 4. 8 | 17.7% | 18.3% | 3.8% | 3.2% | 0.7% | 0.7% | 0.0% | 0.0% | 0.0% | 0.0% |
| 5. 9 | 21.5% | 21.5% | 7.6% | 6.6% | 2.2% | 1.6% | 0.3% | 0.4% | 0.0% | 0.5% |
| 6. 10 | 12.9% | 15.8% | 13.1% | 11.4% | 5.5% | 3.9% | 1.0% | 1.3% | 0.3% | 0.0% |
| 7. 11 | 14.0% | 12.9% | 16.4% | 15.8% | 10.1% | 9.1% | 3.7% | 3.5% | 1.9% | 1.6% |
| 8. 12 | 4.8% | 6.6% | 17.9% | 17.5% | 14.7% | 12.8% | 7.9% | 7.1% | 6.1% | 7.0% |
| 9. 13 | 2.2% | 4.6% | 16.7% | 18.2% | 19.7% | 20.6% | 13.8% | 13.9% | 11.0% | 12.9% |
| 10. 14 | 1.6% | 1.7% | 11.1% | 11.7% | 18.4% | 18.4% | 20.1% | 18.4% | 14.9% | 19.9% |
| 11. 15 | 0.0% | 0.9% | 7.4% | 9.1% | 15.2% | 16.2% | 19.3% | 18.9% | 17.5% | 18.3% |
| 12. 16 | 1.1% | 0.6% | 2.8% | 3.2% | 8.9% | 10.4% | 20.1% | 21.6% | 24.3% | 22.0% |
| 13. 17 | 0.0% | 0.6% | 1.3% | 1.6% | 3.3% | 4.7% | 9.3% | 10.2% | 11.3% | 8.1% |
| 14. 18 | 0.0% | 0.0% | 0.3% | 0.3% | 0.9% | 1.4% | 3.4% | 4.1% | 9.1% | 8.6% |
| 15. 19 | 0.0% | 0.0% | 0.1% | 0.1% | 0.2% | 0.3% | 0.8% | 0.5% | 3.2% | 1.1% |
| 16. 20 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.3% | 0.0% |
| 17. Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Source: Augmented Arcidiacono Data

Note: Lower sums indicate stronger collective ratings. Sums consist of Teacher 1, Teacher 2, guidance counselor, alumni interview personal, and alumni interview overall ratings. Shares exclude applicants missing any rating included in the sum. Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes.

DX692.0006

# Distribution of sum of school support ratings for White and Asian-American applicants by academic rating

| Sum of School Support Ratings | Academic Rating | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | | 2 | | 3 | | 4 | | 5 | |
| | White | Asian-American | White | Asian-American | White | Asian-American | White | Asian-American | White | Asian-American |
| 1. **3** | 5.6% | 5.0% | 0.2% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 2. **4** | 17.2% | 14.7% | 1.0% | 0.7% | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| 3. **5** | 30.3% | 19.9% | 4.0% | 2.9% | 0.9% | 0.6% | 0.2% | 0.2% | 0.0% | 0.0% |
| 4. **6** | 26.3% | 27.4% | 15.1% | 11.2% | 5.3% | 4.2% | 1.1% | 1.4% | 0.4% | 0.3% |
| 5. **7** | 14.6% | 18.8% | 22.7% | 20.9% | 13.1% | 11.2% | 5.0% | 5.2% | 2.1% | 4.5% |
| 6. **8** | 5.1% | 10.2% | 28.1% | 29.4% | 27.3% | 25.4% | 16.5% | 17.1% | 11.8% | 13.4% |
| 7. **9** | 1.0% | 3.6% | 28.6% | 34.2% | 52.3% | 57.1% | 73.4% | 71.4% | 76.2% | 72.9% |
| 8. **10** | 0.0% | 0.3% | 0.4% | 0.5% | 1.0% | 1.3% | 3.2% | 4.0% | 6.6% | 6.5% |
| 9. **11** | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.5% | 0.6% | 2.1% | 0.7% |
| 10. **12** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.8% | 1.7% |
| 11. **13** | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 12. **Total** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Source: Augmented Arcidiacono Data

Note: Lower sums indicate stronger collective ratings. Sums consist of Teacher 1, Teacher 2, and guidance counselor ratings. Shares exclude applicants missing any rating included in the sum. Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes.

DX692.0007

## Distribution of sum of school support, alumni interview, and non-academic profile ratings for White and Asian-American applicants by academic rating

| Sum of School Support, Alumni Interview, and Non-Academic Profile Ratings | Academic Rating | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | | 2 | | 3 | | 4 | | 5 | |
| | White | Asian-American | White | Asian-American | White | Asian-American | White | Asian-American | White | Asian-American |
| 1. 10 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 2. 11 | 0.0% | 0.3% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 3. 12 | 1.1% | 0.6% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 4. 13 | 4.5% | 2.9% | 0.2% | 0.1% | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| 5. 14 | 7.3% | 5.5% | 0.9% | 0.5% | 0.2% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| 6. 15 | 10.6% | 8.0% | 2.2% | 1.5% | 0.5% | 0.3% | 0.1% | 0.0% | 0.0% | 0.0% |
| 7. 16 | 16.2% | 12.4% | 4.4% | 2.8% | 1.3% | 0.8% | 0.1% | 0.0% | 0.0% | 0.0% |
| 8. 17 | 17.3% | 14.7% | 6.8% | 5.1% | 2.8% | 1.5% | 0.6% | 0.4% | 0.0% | 0.0% |
| 9. 18 | 14.0% | 13.8% | 9.7% | 8.0% | 4.9% | 3.2% | 0.8% | 0.6% | 0.0% | 0.6% |
| 10. 19 | 9.5% | 15.5% | 12.2% | 10.7% | 7.2% | 5.5% | 3.5% | 2.1% | 0.3% | 0.0% |
| 11. 20 | 8.4% | 10.9% | 13.2% | 13.2% | 10.3% | 7.8% | 4.7% | 4.6% | 3.5% | 2.2% |
| 12. 21 | 4.5% | 6.3% | 14.4% | 14.9% | 13.6% | 12.0% | 7.8% | 6.5% | 5.5% | 4.5% |
| 13. 22 | 3.4% | 3.2% | 13.4% | 15.0% | 15.4% | 16.6% | 13.4% | 11.8% | 9.7% | 12.9% |
| 14. 23 | 1.7% | 3.7% | 10.1% | 11.7% | 15.5% | 16.2% | 16.0% | 14.5% | 12.5% | 15.7% |
| 15. 24 | 1.1% | 1.1% | 6.7% | 8.2% | 13.2% | 14.8% | 18.4% | 17.1% | 16.6% | 16.3% |
| 16. 25 | 0.6% | 0.0% | 3.4% | 5.0% | 8.8% | 10.7% | 17.0% | 18.3% | 18.3% | 21.3% |
| 17. 26 | 0.0% | 0.9% | 1.6% | 2.1% | 4.0% | 6.6% | 9.7% | 14.0% | 14.2% | 11.8% |
| 18. 27 | 0.0% | 0.3% | 0.6% | 0.9% | 1.6% | 2.8% | 5.1% | 7.3% | 11.1% | 10.1% |
| 19. 28 | 0.0% | 0.0% | 0.2% | 0.2% | 0.4% | 0.8% | 2.2% | 2.4% | 5.2% | 2.8% |
| 20. 29 | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.2% | 0.4% | 0.5% | 2.4% | 1.7% |
| 21. 30 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.2% | 0.1% | 0.3% | 0.0% |
| 22. 31 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.3% | 0.0% |
| 23. Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Source: Augmented Arcidiacono Data

Note: Lower sums indicate stronger collective ratings. Sums consist of Teacher 1, Teacher 2, guidance counselor, alumni interview overall, athletic, personal, and extracurricular ratings. Shares exclude applicants with extracurricular and athletic ratings corresponding to "Special Circumstances," as well as applicants missing any rating included in the sum. Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes.

DX692.0008

JA5718

# Distribution of sum of school support, alumni interview, extracurricular, and athletic ratings for White and Asian-American applicants by academic rating

| Sum of School Support, Alumni Interview, Extracurricular, and Athletic Ratings | Academic Rating | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | | 2 | | 3 | | 4 | | 5 | |
| | White | Asian-American | White | Asian-American | White | Asian-American | White | Asian-American | White | Asian-American |
| 1. 9 | 0.0% | 0.3% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 2. 10 | 1.7% | 0.6% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 3. 11 | 5.0% | 4.0% | 0.3% | 0.2% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 4. 12 | 9.5% | 6.0% | 1.0% | 0.6% | 0.2% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| 5. 13 | 11.7% | 9.8% | 2.6% | 2.0% | 0.6% | 0.3% | 0.1% | 0.0% | 0.0% | 0.0% |
| 6. 14 | 19.6% | 15.8% | 5.3% | 3.9% | 1.5% | 1.0% | 0.3% | 0.1% | 0.0% | 0.0% |
| 7. 15 | 15.6% | 18.4% | 8.8% | 7.1% | 3.8% | 2.1% | 0.6% | 0.4% | 0.0% | 0.6% |
| 8. 16 | 15.1% | 17.2% | 12.7% | 10.9% | 6.6% | 4.8% | 2.3% | 1.3% | 0.0% | 0.0% |
| 9. 17 | 10.6% | 10.9% | 14.8% | 14.0% | 10.4% | 7.8% | 4.3% | 4.3% | 2.1% | 1.7% |
| 10. 18 | 4.5% | 7.8% | 15.8% | 16.1% | 14.2% | 12.1% | 8.2% | 6.0% | 6.2% | 4.5% |
| 11. 19 | 3.4% | 2.9% | 14.5% | 16.1% | 16.5% | 17.0% | 13.7% | 11.8% | 8.7% | 12.4% |
| 12. 20 | 1.7% | 4.0% | 11.0% | 12.2% | 16.6% | 17.4% | 16.2% | 14.9% | 13.1% | 15.7% |
| 13. 21 | 0.6% | 1.1% | 7.1% | 8.5% | 13.8% | 15.4% | 18.7% | 17.3% | 15.6% | 17.4% |
| 14. 22 | 1.1% | 0.0% | 3.5% | 5.2% | 9.2% | 11.4% | 17.5% | 19.2% | 20.8% | 20.8% |
| 15. 23 | 0.0% | 0.9% | 1.7% | 2.2% | 4.3% | 6.7% | 10.2% | 14.4% | 14.5% | 12.4% |
| 16. 24 | 0.0% | 0.3% | 0.6% | 0.9% | 1.6% | 2.8% | 5.3% | 7.5% | 11.1% | 10.1% |
| 17. 25 | 0.0% | 0.0% | 0.2% | 0.2% | 0.4% | 0.8% | 2.1% | 2.2% | 4.8% | 3.4% |
| 18. 26 | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.2% | 0.4% | 0.5% | 2.4% | 1.1% |
| 19. 27 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.7% | 0.0% |
| 20. Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Source: Augmented Arcidiacono Data

Note: Lower sums indicate stronger collective ratings. Sums consist of Teacher 1, Teacher 2, guidance counselor, alumni interview personal, alumni interview overall, athletic, and extracurricular ratings. Shares exclude applicants with extracurricular and athletic ratings corresponding to "Special Circumstances," as well as applicants missing any rating included in the sum. Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes.

DX692.0009

United States District Court
District of Massachusetts

**DX 694**

Case No.    1:14-cv-14176 (ADB)
Date Entered
By           Deputy Clerk

# Average marginal effect of Asian-American ethnicity in Prof. Card's model with profile ratings adjusted to remove what Prof. Arcidiacono claims to be racial effects

| Class | Average Marginal Effect of Asian-American Ethnicity (Not Statistically Significant) |
|---|---|
| 1. 2014 | -0.27 |
| 2. 2015 | -0.18 |
| 3. 2016 | -0.38 |
| 4. 2017 | 0.36 |
| 5. 2018 | -0.46 |
| 6. 2019 | 0.29 |
| **Overall** | -0.11 |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Table shows the average marginal effect of race on admission for Asian-American applicants relative to White applicants from updated Card model using adjusted academic, extracurricular, and personal ratings. Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. An applicant's adjusted rating is the rating with the highest predicted probability according to Prof. Arcidiacono's rating model excluding other profile ratings from the controls and turning off the effect of race. * indicates significance at the 5% level. Marginal effects are reported as percentage point values.

DX694.0001

United States District Court
District of Massachusetts

**DX 695**

1:14-cv-14176 (ADB)

Case No. _____
Date Entered _____
By _____    Deputy Clerk

# Average marginal effect of Asian-American ethnicity in Prof. Card's model, Prof. Arcidiacono's model, and several sensitivity analyses

| Model | Average Marginal Effect of Asian-American Ethnicity [1] |
|---|---|
| 1. Preferred Card Model, including perfect predictions | -0.05 |
| 2. Remove perfect predictions from average marginal effect | -0.05 |
| 3. Add interactions other than disadvantaged and race [2] | 0.02 |
| 4. Add interaction between disadvantaged and race | -0.08 |
| 5. Remove intended career and staff rating indicator | -0.19 |
| 6. Remove parental occupation controls | -0.38 * |
| 7. Remove personal rating | -0.79 * |
| 8. Run pooled, remove controls available in some years only [3] | -0.81 * |
| 9. Exclude ALDC applicants (Prof. Arcidiacono's preferred model) [4] | -1.02 * |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: [1] Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's sample. Marginal effects are calculated relative to White applicants. * indicates significance at the 5% level. Marginal effects are reported as percentage point values. [2] Includes interactions of female with intended concentration and race, interactions of race with indicator for Early Action, and interactions of race with missing SAT II average, missing alumni rating, and indicator for having a converted GPA of 35. [3] Additional controls include measures of participation in extracurricular activities and indicators for being born in the United States and having lived outside of the United States. [4] ALDC applicants include lineage applicants, children of Harvard faculty and staff, recruited athletes, and applicants on the Dean or Director's interest lists. Such applicants are removed from the sample and indicators for ALDC groups are removed from the model.

DX695.0001

United States District Court
District of Massachusetts

**DX 699**

Case No. _____ 1:14-cv-14176 (ADB)
Date Entered _____
By _____ Deputy Clerk

# Average marginal effect of Asian-American ethnicity in Prof. Card's model, interacting disadvantaged status with race

| Class | Average Marginal Effect of Asian-American Ethnicity (Not Statistically Significant) |
|---|---|
| 1. 2014 | -0.46 |
| 2. 2015 | -0.13 |
| 3. 2016 | -0.01 |
| 4. 2017 | 0.05 |
| 5. 2018 | -0.53 |
| 6. 2019 | 0.21 |
| **Overall** | -0.14 |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Table shows the average marginal effect of race on admission for Asian-American applicants relative to White applicants using the updated Card model with interaction of race and indicator for disadvantaged. Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. * indicates significance at the 5% level. Marginal effects are reported as percentage point values.

DX699.0001

# Standard Error of Card and Arcidiacono Models

| Class | Standard Error | Number of Asian-American Applicants | Total Number of Applicants |
|---|---|---|---|
| **Arcidiacono Model, Estimated by Year** | | | |
| 1. **2014** | 0.42 | 6,036 | 21,238 |
| 2. **2015** | 0.37 | 6,991 | 24,845 |
| 3. **2016** | 0.40 | 6,305 | 23,906 |
| 4. **2017** | 0.37 | 6,255 | 23,949 |
| 5. **2018** | 0.36 | 6,931 | 23,987 |
| 6. **2019** | 0.35 | 6,935 | 25,228 |
| **Overall** | 0.15 | 39,453 | 143,153 |
| **Arcidiacono Model, Pooled** | | | |
| 7. **2014 – 2019** | 0.15 | 39,453 | 143,153 |
| **Card Year-by-Year Model** | | | |
| 8. **Overall** | 0.14 | 39,408 | 142,838 |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Models are estimated on Prof. Arcidiacono's expanded sample including athletes. The first panel shows standard errors for Prof. Arcidiacono's model estimated year-by-year. The overall standard error (0.15) is the standard error for the weighted average of the yearly effects. The second panel shows the standard error for Prof. Arcidiacono's pooled model. The third panel shows the overall standard error for the weighted average of the yearly effects as estimated from the Card model.

United States District Court
District of Massachusetts

**DX 702**

Case No. _____1:14-cv-14176 (ADB)_____
Date Entered_____
By_____

Deputy Clerk

**JA5723**

# Pseudo R-Squared for Prof. Card's and Prof. Arcidiacono's preferred models

| | Model | Pseudo R-Squared |
|---|---|---|
| 1. | Prof. Card's preferred year-by-year model [1] | 0.64 |
| 2. | Prof. Arcidiacono's preferred model [2] | 0.56 |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data; Arcidiacono Rebuttal, Table B.7.1R

Note: [1] Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. Predicted probabilities are computed separately for each year, from which the pooled Pseudo R-Squared value is computed. [2] Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's baseline sample including Early Action applicants.



Proportion of applicants by intended concentration

Source: Augmented Arcidiacono Data

Note: Sample consists of applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. Applicants with missing and "Unspecified" intended concentrations are excluded from this chart.

DX703.0001

United States District Court
District of Massachusetts

**DX 703**

Case No. _____ 1:14-cv-14176 (ADB) _____
Date Entered _____
By _____ Deputy Clerk



United States District Court
District of Massachusetts

**DX 704**

1:14-cv-14176 (ADB)

Case No.
Date Entered
By

Deputy Clerk

# Number of Harvard applicants receiving an application fee waiver by year

| | Class | Number of Applicants Receiving an Application Fee Waiver |
|---|---|---|
| 1. | 2014 | 3,126 |
| 2. | 2015 | 3,157 |
| 3. | 2016 | 3,923 |
| 4. | 2017 | 3,690 |
| 5. | 2018 | 5,140 |
| 6. | 2019 | 5,548 |

Source: Augmented Arcidiacono Data

Note: Sample consists of applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes.

DX 704.0001

**JA5726**

# Number of Harvard applicants identified as "disadvantaged" by year

| | Class | Number of "Disadvantaged" Applicants |
|---|---|---|
| 1. | 2014 | 2,308 |
| 2. | 2015 | 3,146 |
| 3. | 2016 | 2,931 |
| 4. | 2017 | 2,508 |
| 5. | 2018 | 2,484 |
| 6. | 2019 | 4,729 |

Source: Augmented Arcidiacono Data

Note: Sample consists of applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes.

DX 704.0002



## Predicted probability of admission for ALDC and non-ALDC applicants with the effect of ALDC attributes set to zero

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. ALDC applicants' predicted probability of admission is calculated removing the effect of being an ALDC applicant (i.e. removing the effect of being a recruited athlete, on the Dean's or Director's list, a lineage applicant, or a child of Harvard faculty and staff.)

United States District Court
District of Massachusetts

**DX 705**

Case No. ___1:14-cv-14176 (ADB)___
Date Entered _____
By _____ Deputy Clerk

DX705.0001



## Proportion of ALDC and non-ALDC applicants receiving ratings of 1 or 2

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. ALDC applicants include recruited athletes, applicants on the Dean or Director's list, lineage applicants, and children of Harvard faculty and staff.

DX705.0002



**Proportion of LDC and non-LDC applicants receiving ratings of 1 or 2**

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes.  LDC applicants include applicants on the Dean or Director's list, lineage applicants, and children of Harvard faculty and staff.

DX705.0003



United States District Court
District of Massachusetts

**DX 706**

Case No.    1:14-cv-14176 (ADB)
Date Entered
By                Deputy Clerk

# Share of admitted students in ALDC categories



■ Not ALDC
■ ALDC

71%

29%

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. ALDC applicants include recruited athletes, applicants on the Dean or Director's list, lineage applicants, and children of Harvard faculty and staff.

DX706.0001

**JA5731**

United States District Court
District of Massachusetts

**DX 707**

Case No. ___ 1:14-cv-14176 (ADB)
Date Entered ___
By ___ Deputy Clerk

# Average marginal effect of Asian-American ethnicity on likelihood of admission for LDC applicants, from Prof. Arcidiacono's preferred model

| Applicants | Average Marginal Effect of Asian-American Ethnicity |
|---|---|
| 1. Lineage applicants | 3.12 * |
| 2. Applicants on Dean or Director's Interest Lists and children of Harvard Faculty and Staff | 3.15 |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. (Athletes are included in the regression sample.) LDC applicants include applicants on the Dean or Director's list, lineage applicants, and children of Harvard faculty and staff. Marginal effects are calculated relative to White applicants. * indicates significance at the 5% level. Marginal effects are reported as percentage point values.

DX707.0001



# Share of applicants who received staff interviews who are in ALDC Categories



Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. ALDC applicants include recruited athletes, applicants on the Dean or Director's list, lineage applicants, and children of Harvard faculty and staff.

DX708.0001

United States District Court
District of Massachusetts

**DX 709**

Case No. 1:14-cv-14176 (ADB)
Date Entered
By                    Deputy Clerk

# Average sum of profile ratings for Asian-American and White applicants described as "Standard Strong"

| | Average Sum of Profile Ratings (Difference Not Statistically Significant) |
|---|---|
| **1. Asian-American** | 11.51 |
| **2. White** | 11.53 |
| **Difference** | -0.02 |

Source: Arcidiacono Data

Note: Sample consists of domestic applicants to the class of 2018 described as "Standard Strong," the same sample Prof. Arcidiacono uses in his Table C.1 in his first report. Applicants with missing or special circumstances extracurricular and athletic ratings are excluded. Table shows the average sum of academic, extracurricular, personal, and athletic ratings.

DX709.0001

**JA5734**



# Annual percentage change in White proportion of admitted students

**Percent Change from Prior Year**

**Class**

Source: HARV00032509 – 32511; Augmented Arcidiacono Data.

Note: Sample consists of domestic applicants to the classes of 2000 – 2019.

United States District Court
District of Massachusetts

**DX 711**

1:14-cv-14176 (ADB)

Case No. _____
Date Entered _____
By _____ Deputy Clerk

DX 711.0001



# Annual percentage change in Asian-American proportion of admitted students

Source: HARV00032509 – 32511; Augmented Arcidiacono Data

Note: Sample consists of domestic applicants to the classes of 2000 – 2019.

DX 711.0002



Source: HARV00032509 – 32511; Augmented Arcidiacono Data

Note: Sample consists of domestic applicants to the classes of 2000 – 2019.

DX 711.0003

# Annual percentage change in Hispanic proportion of admitted students



**Class**

**Percent Change from Prior Year**

| Year | Value |
|------|-------|
| 2001 | 5% |
| 2002 | -4% |
| 2003 | 3% |
| 2004 | 2% |
| 2005 | 3% |
| 2006 | -12% |
| 2007 | 10% |
| 2008 | 8% |
| 2009 | -10% |
| 2010 | 18% |
| 2011 | 2% |
| 2012 | -10% |
| 2013 | 20% |
| 2014 | -17% |
| 2015 | 27% |
| 2016 | -15% |
| 2017 | 11% |
| 2018 | 11% |
| 2019 | 1% |

Source: HARV00032509 – 32511; Augmented Arcidiacono Data

Note: Sample consists of domestic applicants to the classes of 2000 – 2019.

DX 711.0004



**Annual percentage change in White proportion of matriculating students**

Source: HARV00032509 – 32511; Augmented Arcidiacono Data

Note: Sample consists of domestic applicants to the classes of 2000 – 2019.

DX 711.0005



Source: HARV00032509 – 32511; Augmented Arcidiacono Data

Note: Sample consists of domestic applicants to the classes of 2000 – 2019.

DX 711.0006



**Annual percentage change in African-American proportion of matriculating students**

Source: HARV00032509 – 32511; Augmented Arcidiacono Data

Note: Sample consists of domestic applicants to the classes of 2000 – 2019.

DX 711.0007



**Annual percentage change in Hispanic proportion of matriculating students**

Source: HARV0003250 – 32511; Augmented Arcidiacono Data

Note: Sample consists of domestic applicants to the classes of 2000 – 2019.

DX 711.0008

# Asian-American, African-American and Hispanic shares of applicants to the classes of 1980 – 2019

| Class | Total Applicants | Asian-American | | African-American | | Hispanic | |
|---|---|---|---|---|---|---|---|
| | | Applicants | Share of Total | Applicants | Share of Total | Applicants | Share of Total |
| 1980 | 11,293 | 461 | 4.1% | 666 | 5.9% | 260 | 2.3% |
| 1981 | 11,922 | 567 | 4.8% | 664 | 5.6% | 325 | 2.7% |
| 1982 | 12,733 | 814 | 6.4% | 631 | 5.0% | 360 | 2.8% |
| 1983 | 13,085 | 869 | 6.6% | 665 | 5.1% | 409 | 3.1% |
| 1984 | 13,851 | 1,231 | 8.9% | 664 | 4.8% | 417 | 3.0% |
| 1985 | 13,513 | 1,224 | 9.1% | 696 | 5.2% | 529 | 3.9% |
| 1986 | 13,341 | 1,491 | 11.2% | 649 | 4.9% | 507 | 3.8% |
| 1987 | 12,537 | 1,529 | 12.2% | 687 | 5.5% | 572 | 4.6% |
| 1988 | 13,221 | 1,605 | 12.1% | 590 | 4.5% | 523 | 4.0% |
| 1989 | 13,617 | 1,840 | 13.5% | 624 | 4.6% | 491 | 3.6% |
| 1990 | 13,654 | 2,054 | 15.0% | 679 | 5.0% | 592 | 4.3% |
| 1991 | 14,220 | 2,167 | 15.2% | 783 | 5.5% | 625 | 4.4% |
| 1992 | 14,436 | 2,262 | 15.7% | 843 | 5.8% | 758 | 5.3% |
| 1993 | 12,843 | 2,244 | 17.5% | 724 | 5.6% | 698 | 5.4% |
| 1994 | 12,190 | 2,341 | 19.2% | 651 | 5.3% | 758 | 6.2% |
| 1995 | 12,589 | 2,604 | 20.7% | 720 | 5.7% | 834 | 6.6% |
| 1996 | 13,029 | 2,661 | 20.4% | 691 | 5.3% | 865 | 6.6% |
| 1997 | 13,865 | 2,838 | 20.5% | 846 | 6.1% | 955 | 6.9% |
| 1998 | 15,261 | 3,267 | 21.4% | 877 | 5.7% | 1,050 | 6.9% |
| 1999 | 17,852 | 3,520 | 19.7% | 1,035 | 5.8% | 1,229 | 6.9% |
| 2000 | 18,183 | 3,683 | 20.3% | 964 | 5.3% | 1,140 | 6.3% |
| 2001 | 16,597 | 3,314 | 20.0% | 909 | 5.5% | 1,111 | 6.7% |
| 2002 | 16,818 | 3,321 | 19.7% | 1,005 | 6.0% | 1,138 | 6.8% |
| 2003 | 18,161 | 3,537 | 19.5% | 1,081 | 6.0% | 1,270 | 7.0% |
| 2004 | 18,693 | 3,637 | 19.5% | 1,177 | 6.3% | 1,185 | 6.3% |
| 2005 | 19,014 | 3,736 | 19.6% | 1,139 | 6.0% | 1,415 | 7.4% |
| 2006 | 19,608 | 4,022 | 20.5% | 1,226 | 6.3% | 1,396 | 7.1% |
| 2007 | 20,987 | 4,459 | 21.2% | 1,277 | 6.1% | 1,690 | 8.1% |
| 2008 | 19,752 | 4,290 | 21.7% | 1,263 | 6.4% | 1,681 | 8.5% |
| 2009 | 22,796 | 4,804 | 21.1% | 1,716 | 7.5% | 1,906 | 8.4% |
| 2010 | 22,754 | 4,865 | 21.4% | 1,984 | 8.7% | 2,084 | 9.2% |
| 2011 | 22,955 | 4,803 | 20.9% | 2,052 | 8.9% | 2,180 | 9.5% |
| 2012 | 27,462 | 5,378 | 19.6% | 2,765 | 10.1% | 2,675 | 9.7% |
| 2013 | 29,114 | 5,784 | 19.9% | 2,975 | 10.2% | 2,974 | 10.2% |
| 2014 | 30,489 | 6,872 | 22.5% | 2,953 | 9.7% | 3,037 | 10.0% |
| 2015 | 34,950 | 7,767 | 22.2% | 3,624 | 10.4% | 3,613 | 10.3% |
| 2016 | 34,303 | 7,011 | 20.4% | 3,342 | 9.7% | 3,464 | 10.1% |
| 2017 | 35,023 | 7,133 | 20.4% | 3,440 | 9.8% | 3,514 | 10.0% |
| 2018 | 34,295 | 7,680 | 22.4% | 3,469 | 10.1% | 3,637 | 10.6% |
| 2019 | 37,307 | 7,926 | 21.2% | 3,733 | 10.0% | 4,166 | 11.2% |

Source: HARV00023173 – 8; HARV00032509 – 24; Augmented Arcidiacono Data

Note:  HARV00023173 – 8 is used to construct data for the classes of 1980 – 1999, HARV00032509 – 24 is used to construct data for the classes of 2000 – 2017, and Augmented Arcidiacono Data is used to construct data for the classes of 2018 – 2019. Total number of applicants includes foreign applicants. Share of applicants is calculated over the total number of applicants including foreign applicants.



United States District Court
District of Massachusetts

**DX 713**

Case No.  1:14-cv-14176 (ADB)
Date Entered_____
By_____
Deputy Clerk

**JA5743**

DX713.0001

# Asian-American, African-American and Hispanic shares of students admitted to the classes of 1980 – 2019

| Class | Total Admitted Students | Asian-American | | African-American | | Hispanic | |
|---|---|---|---|---|---|---|---|
| | | Admitted Students | Share of Total | Admitted Students | Share of Total | Admitted Students | Share of Total |
| 1980 | 2,222 | 75 | 3.4% | 185 | 8.3% | 60 | 2.7% |
| 1981 | 2,193 | 94 | 4.3% | 174 | 7.9% | 83 | 3.8% |
| 1982 | 2,234 | 125 | 5.6% | 178 | 8.0% | 102 | 4.6% |
| 1983 | 2,263 | 134 | 5.9% | 195 | 8.6% | 111 | 4.9% |
| 1984 | 2,150 | 161 | 7.5% | 176 | 8.2% | 107 | 5.0% |
| 1985 | 2,164 | 185 | 8.5% | 181 | 8.4% | 120 | 5.5% |
| 1986 | 2,316 | 198 | 8.5% | 171 | 7.4% | 109 | 4.7% |
| 1987 | 2,292 | 209 | 9.1% | 188 | 8.2% | 102 | 4.5% |
| 1988 | 2,238 | 204 | 9.1% | 180 | 8.0% | 106 | 4.7% |
| 1989 | 2,192 | 220 | 10.0% | 170 | 7.8% | 98 | 4.5% |
| 1990 | 2,274 | 232 | 10.2% | 196 | 8.6% | 126 | 5.5% |
| 1991 | 2,187 | 267 | 12.2% | 211 | 9.6% | 135 | 6.2% |
| 1992 | 2,193 | 291 | 13.3% | 212 | 9.7% | 151 | 6.9% |
| 1993 | 2,256 | 341 | 15.1% | 211 | 9.4% | 150 | 6.6% |
| 1994 | 2,206 | 395 | 17.9% | 205 | 9.3% | 151 | 6.8% |
| 1995 | 2,163 | 388 | 17.9% | 194 | 9.0% | 164 | 7.6% |
| 1996 | 2,135 | 369 | 17.3% | 168 | 7.9% | 161 | 7.5% |
| 1997 | 2,165 | 359 | 16.6% | 217 | 10.0% | 177 | 8.2% |
| 1998 | 2,149 | 401 | 18.7% | 207 | 9.6% | 182 | 8.5% |
| 1999 | 2,150 | 370 | 17.2% | 215 | 10.0% | 188 | 8.7% |
| 2000 | 2,074 | 340 | 16.4% | 185 | 8.9% | 171 | 8.2% |
| 2001 | 2,153 | 367 | 17.0% | 184 | 8.5% | 185 | 8.6% |
| 2002 | 2,086 | 375 | 18.0% | 205 | 9.8% | 174 | 8.3% |
| 2003 | 2,068 | 339 | 16.4% | 202 | 9.8% | 177 | 8.6% |
| 2004 | 2,082 | 332 | 15.9% | 202 | 9.7% | 181 | 8.7% |
| 2005 | 2,110 | 297 | 14.1% | 185 | 8.8% | 187 | 8.9% |
| 2006 | 2,066 | 340 | 16.5% | 183 | 8.9% | 162 | 7.8% |
| 2007 | 2,095 | 339 | 16.2% | 209 | 10.0% | 180 | 8.6% |
| 2008 | 2,110 | 403 | 19.1% | 211 | 10.0% | 194 | 9.2% |
| 2009 | 2,102 | 371 | 17.6% | 221 | 10.5% | 173 | 8.2% |
| 2010 | 2,125 | 375 | 17.6% | 220 | 10.4% | 207 | 9.7% |
| 2011 | 2,108 | 411 | 19.5% | 221 | 10.5% | 208 | 9.9% |
| 2012 | 2,175 | 415 | 19.1% | 217 | 10.0% | 193 | 8.9% |
| 2013 | 2,175 | 380 | 17.5% | 226 | 10.4% | 231 | 10.6% |
| 2014 | 2,205 | 437 | 19.8% | 244 | 11.1% | 195 | 8.8% |
| 2015 | 2,188 | 423 | 19.3% | 254 | 11.6% | 242 | 11.1% |
| 2016 | 2,076 | 422 | 20.3% | 208 | 10.0% | 194 | 9.3% |
| 2017 | 2,047 | 400 | 19.5% | 233 | 11.4% | 213 | 10.4% |
| 2018 | 2,045 | 390 | 19.1% | 239 | 11.7% | 236 | 11.5% |
| 2019 | 2,080 | 429 | 20.6% | 241 | 11.6% | 241 | 11.6% |

Source: HARV00023173 – 8; HARV00032509 – 24; Augmented Arcidiacono Data

Note: HARV00023173 – 8 is used to construct data for the classes of 1980 – 1999, HARV00032509 – 24 is used to construct data for the classes of 2000 – 2017, and Augmented Arcidiacono Data is used to construct data for the classes of 2018 – 2019. Total number of admitted students includes foreign applicants. Share of admitted students is calculated over the total number of admitted students including foreign applicants.



# Pseudo R-Squared values of admissions models containing various controls

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Data are from applicants to the class of 2019 in Professor Arcidiacono's expanded sample including athletes.

United States District Court
District of Massachusetts

**DX 715**

Case No.    1:14-cv-14176 (ADB)
Date Entered
By    Deputy Clerk

DX715.0001

# Change in the explanatory power of Prof. Card's model of admissions when the effects of different variables are removed

| Specification | Pooled Pseudo R-Squared | | |
|---|---|---|---|
| | Value | Change | Percent Change |
| 1. Card Model | 0.64 | | |
| 2. Removing Only Race Effect | 0.57 | -0.07 | -10% |
| 3. Removing Only Academic Rating Effect | 0.53 | -0.11 | -17% |
| 4. Removing Only Extracurricular Rating Effect | 0.55 | -0.08 | -13% |
| 5. Removing Only Personal Rating Effect | 0.52 | -0.12 | -19% |
| 6. Removing Only Teacher and Alumni Rating Effects | 0.32 | -0.32 | -50% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. Predicted probabilities are computed separately for each year, from which the pooled Pseudo R-Squared values are computed.

United States District Court
District of Massachusetts

**DX 716**

Case No. ___1:14-cv-14176 (ADB)___
Date Entered_____
By_____
Deputy Clerk

# Average marginal effect of various factors, by admissions index decile

### Average Marginal Effect

| Predicted Probability of Admission Decile | African-American Applicants | Hispanic or Other Applicants | Lineage Applicants | Applicants with an Academic Rating of 1 | Applicants with an Extracurricular Rating of 1 | Applicants with a Personal Rating of 1 |
|---|---|---|---|---|---|---|
| 1. 1 (Weakest) | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| 2. 2 | 0.02 | 0.00 | 0.02 | 0.13 | 0.08 | - |
| 3. 3 | 0.12 | 0.02 | 0.08 | 1.03 | 0.39 | 0.00 |
| 4. 4 | 0.44 | 0.09 | 0.25 | 3.56 | 1.32 | 0.79 |
| 5. 5 | 1.26 | 0.26 | 0.66 | 8.39 | 3.98 | - |
| 6. 6 | 3.39 | 0.72 | 1.69 | 17.43 | 9.82 | 2.10 |
| 7. 7 | 9.08 | 2.00 | 4.37 | 40.42 | 21.88 | 27.61 |
| 8. 8 | 24.01 | 6.08 | 12.02 | 65.32 | 45.69 | 45.72 |
| 9. 9 | 53.04 | 21.49 | 32.55 | 78.98 | 70.80 | 49.86 |
| 10. 10 (Strongest) | 41.28 | 30.34 | 26.34 | 43.20 | 39.74 | 21.58 |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes. Deciles are constructed by year, across the full sample, based on the predicted probabilities of admission after removing the effect of the given characteristic. Marginal effects are computed for applicants with the given characteristic relative to the baseline (i.e. White, non-lineage, academic rating of 3, extracurricular rating of 3, and personal rating of 3). Marginal effects are reported as percentage point values. "-" indicates that there are no applicants with a given characteristic in a given decile.

**JA5747**

DX718.0001

United States District Court
District of Massachusetts
**DX 718**
Case No. 1:14-cv-14176 (ADB)
Date Entered
By _____ Deputy Clerk

United States District Court
District of Massachusetts

**DX 720**

Case No. ___ 1:14-cv-14176 (ADB)
Date Entered ___
By ___ Deputy Clerk



**Simulated racial composition of the admitted class, after eliminating the consideration of race, lineage, athletic-recruit status, whether an applicant's parents are Harvard faculty and staff, and the Dean's and Director's interest lists**

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty or staff, whether an applicant is on the Dean's or Director's interest list, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating.

DX720.0001





**Estimated change in racial composition of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, and eliminating practices alleged to benefit White applicants**

Legend: ■ White  ■ Asian-American  ■ Hispanic or Other  ■ African-American  ■ Race Missing

Y-axis: Share of Admitted Class (0% to 100%)

X-axis: Value of the low-SES boost as multiples of its baseline value, removing consideration of race and factors that allegedly advantage White applicants

| Category | White | African-American | Hispanic or Other | Asian-American | Race Missing |
|---|---|---|---|---|---|
| Actual Admitted Class | 40% | 24% | 14% | 14% | 8% |
| Removing Consideration of Race | 48% | 27% | 9% | 6% | 10% |
| 1X | 42% | 31% | 11% | 6% | 10% |
| 2X | 40% | 31% | 13% | 7% | 9% |
| 3X | 38% | 31% | 15% | 8% | 8% |
| 4X | 35% | 30% | 17% | 10% | 8% |
| 5X | 33% | 30% | 20% | 11% | 7% |
| 6X | 31% | 29% | 22% | 12% | 6% |
| 10X | 26% | 28% | 26% | 14% | 5% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000.

DX721.0001

DX 721
United States District Court
District of Massachusetts
Case No._____ 1:14-cv-14176 (ADB)
Date Entered_____
By_____ Deputy Clerk

JA5749

**Estimated change in racial composition of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, and eliminating the practices alleged to benefit White applicants**

| | | Change from Actual Class | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Race | Actual Admitted Class | 1x Low-SES Boost | 2x Low-SES Boost | 3x Low-SES Boost | 4x Low-SES Boost | 5x Low-SES Boost | 6x Low-SES Boost | 10x Low-SES Boost |
| 1. **White** | 676 | +34 | -4 | -44 | -87 | -127 | -162 | -236 |
| 2. **Asian-American** | 402 | +120 | +118 | +113 | +106 | +98 | +90 | +71 |
| 3. **Hispanic or Other** | 233 | -51 | -18 | +19 | +60 | +99 | +133 | +204 |
| 4. **African-American** | 234 | -130 | -112 | -92 | -71 | -51 | -34 | +4 |
| 5. **Race Missing** | 134 | +27 | +16 | +4 | -7 | -18 | -26 | -43 |

| | | % Change from Actual Class | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Race | Actual Admitted Class | 1x Low-SES Boost | 2x Low-SES Boost | 3x Low-SES Boost | 4x Low-SES Boost | 5x Low-SES Boost | 6x Low-SES Boost | 10x Low-SES Boost |
| 1. **White** | 40% | +5% | -1% | -7% | -13% | -19% | -24% | -35% |
| 2. **Asian-American** | 24% | +30% | +29% | +28% | +26% | +24% | +22% | +18% |
| 3. **Hispanic or Other** | 14% | -22% | -8% | +8% | +26% | +42% | +57% | +88% |
| 4. **African-American** | 14% | -55% | -48% | -39% | -30% | -22% | -15% | +2% |
| 5. **Race Missing** | 8% | +20% | +12% | +3% | -6% | -13% | -20% | -32% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000.

**Estimated change in characteristics of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, and eliminating practices alleged to benefit White applicants**

| Outcome Measures | Actual Admitted Class [A] | 3x Low-SES Boost | | 4x Low-SES Boost | | 5x Low-SES Boost | |
|---|---|---|---|---|---|---|---|
| | | Predicted Value [B] | % Change ([B]-[A])/[A] | Predicted Value [C] | % Change ([C]-[A])/[A] | Predicted Value [D] | % Change ([D]-[A])/[A] |
| **Race** | | | | | | | |
| 1. White | 676 | 632 | -7% | 589 | -13% | 549 | -19% |
| 2. Asian-American | 402 | 515 | +28% | 508 | +26% | 500 | +24% |
| 3. Hispanic or Other | 233 | 252 | +8% | 293 | +26% | 332 | +42% |
| 4. African-American | 234 | 142 | -39% | 163 | -30% | 183 | -22% |
| 5. Race Missing | 134 | 138 | +3% | 127 | -6% | 116 | -13% |
| **Academic** | | | | | | | |
| 6. Average Composite SAT Score | 2244 | 2213 | -1% | 2189 | -2% | 2164 | -4% |
| 7. Average Composite ACT Score | 33.1 | 33.0 | -0.5% | 32.7 | -1% | 32.4 | -2% |
| 8. Average Converted GPA | 77.0 | 77.2 | +0.3% | 77.1 | +0.1% | 76.9 | -0.1% |
| 9. Average Academic Index | 228 | 227 | -0.4% | 225 | -1% | 224 | -2% |
| **Fraction with Profile Rating of 1 or 2** | | | | | | | |
| 10. Academic | 76% | 72% | -5% | 66% | -13% | 59% | -22% |
| 11. Extracurricular | 62% | 61% | -2% | 57% | -9% | 52% | -17% |
| 12. Personal | 71% | 68% | -5% | 64% | -11% | 59% | -17% |
| 13. Athletic | 27% | 19% | -30% | 18% | -33% | 17% | -38% |
| **Applicant Characteristics** | | | | | | | |
| 14. Number of Lineage Students | 259 | 104 | -60% | 86 | -67% | 68 | -74% |
| 15. Number of Double Lineage Students | 72 | 24 | -67% | 19 | -73% | 15 | -79% |
| 16. Number of Recruited Athletes | 180 | 89 | -51% | 88 | -51% | 88 | -51% |
| 17. Number of Children of Harvard Faculty and Staff | 44 | 20 | -54% | 17 | -61% | 13 | -69% |
| 18. Number of Students on Dean's and Director's Interest Lists | 192 | 72 | -63% | 62 | -68% | 51 | -73% |
| 19. Number of Female Students | 839 | 848 | +1% | 851 | +1% | 855 | +2% |
| **Concentration** | | | | | | | |
| 20. Social Sciences | 25% | 24% | -4% | 24% | -5% | 23% | -7% |
| 21. Humanities | 15% | 14% | -7% | 13% | -9% | 13% | -12% |
| 22. Biological Sciences | 21% | 23% | +8% | 23% | +11% | 24% | +15% |
| 23. Physical Science | 7% | 8% | +8% | 8% | +6% | 8% | +3% |
| 24. Engineering | 13% | 13% | +4% | 13% | +5% | 14% | +8% |
| 25. Computer Science | 6% | 6% | -4% | 6% | -7% | 6% | -9% |
| 26. Mathematics | 6% | 7% | +5% | 7% | +3% | 6% | +2% |
| 27. Unspecified | 7% | 6% | -12% | 6% | -9% | 6% | -6% |
| **Geography** | | | | | | | |
| 28. Number Rural | 59 | 80 | +35% | 87 | +48% | 94 | +59% |
| 29. Number in Northeast | 694 | 627 | -10% | 604 | -13% | 582 | -16% |
| 30. Number in Midwest | 207 | 221 | +7% | 217 | +5% | 214 | +3% |
| 31. Number in South | 379 | 395 | +4% | 407 | +7% | 419 | +11% |
| 32. Number in West | 399 | 437 | +10% | 451 | +13% | 464 | +16% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000.

**Estimated change in financial need of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, and eliminating practices alleged to benefit White applicants**

| Socioeconomic Status | Actual Admitted Class [A] | 3x Low-SES Boost | | 4x Low-SES Boost | | 5x Low-SES Boost | |
|---|---|---|---|---|---|---|---|
| | | Predicted Value [B] | % Change ([B]-[A])/[A] | Predicted Value [C] | % Change ([C]-[A])/[A] | Predicted Value [D] | % Change ([D]-[A])/[A] |
| 1. Number First Generation College | 120 | 342 | +185% | 428 | +257% | 508 | +323% |
| 2. Number Disadvantaged | 297 | 714 | +140% | 875 | +195% | 1024 | +245% |
| 3. Number with Fee Waiver | 309 | 718 | +132% | 880 | +185% | 1031 | +234% |
| 4. Number with Financial Aid | 1102 | 1328 | +21% | 1396 | +27% | 1458 | +32% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether the applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000.

# Estimated change in racial composition of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, eliminating practices alleged to benefit White applicants, and eliminating consideration of standardized test scores

**Legend:** ■ White　■ Asian-American　■ Hispanic or Other　■ African-American　■ Race Missing



| Share of Admitted Class | Actual Admitted Class | Removing Consideration of Race | 1X | 2X | 3X | 4X | 5X | 6X | 10X |
|---|---|---|---|---|---|---|---|---|---|
| White | 40% | 48% | 42% | 39% | 36% | 33% | 31% | 29% | 25% |
| Asian-American | 24% | 27% | 29% | 28% | 28% | 28% | 27% | 27% | 27% |
| Hispanic or Other | 14% | 9% | 13% | 15% | 18% | 20% | 23% | 24% | 27% |
| African-American | 14% | 6% | 8% | 9% | 10% | 12% | 13% | 14% | 15% |
| Race Missing | 8% | 10% | 9% | 8% | 7% | 7% | 6% | 6% | 5% |

**Value of the low-SES boost as multiples of its baseline value, removing consideration of race and factors that allegedly advantage White applicants**

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, standardized test scores, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000.

United States District Court
District of Massachusetts

**DX 722**

Case No.　1:14-cv-14176 (ADB)
Date Entered
By　　　　　Deputy Clerk

DX722.0001

**Estimated change in racial composition of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, eliminating practices alleged to benefit White applicants, and eliminating consideration of standardized test scores**

| | | Change from Actual Class | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Race | Actual Admitted Class | 1x Low-SES Boost | 2x Low-SES Boost | 3x Low-SES Boost | 4x Low-SES Boost | 5x Low-SES Boost | 6x Low-SES Boost | 10x Low-SES Boost |
| 1. White | 676 | +25 | -22 | -70 | -117 | -158 | -190 | -252 |
| 2. Asian-American | 402 | +77 | +74 | +69 | +63 | +58 | +53 | +47 |
| 3. Hispanic or Other | 233 | -13 | +26 | +68 | +110 | +147 | +176 | +229 |
| 4. African-American | 234 | -104 | -82 | -58 | -36 | -17 | -2 | +23 |
| 5. Race Missing | 134 | +16 | +4 | -9 | -20 | -29 | -36 | -47 |

| | | % Change from Actual Class | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Race | Actual Admitted Class | 1x Low-SES Boost | 2x Low-SES Boost | 3x Low-SES Boost | 4x Low-SES Boost | 5x Low-SES Boost | 6x Low-SES Boost | 10x Low-SES Boost |
| 1. White | 40% | +4% | -3% | -10% | -17% | -23% | -28% | -37% |
| 2. Asian-American | 24% | +19% | +18% | +17% | +16% | +14% | +13% | +12% |
| 3. Hispanic or Other | 14% | -6% | +11% | +29% | +47% | +63% | +76% | +98% |
| 4. African-American | 14% | -45% | -35% | -25% | -15% | -7% | -1% | +10% |
| 5. Race Missing | 8% | +12% | +3% | -6% | -15% | -22% | -27% | -35% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, standardized test scores, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000.

**JA5755**

**Estimated change in characteristics of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, eliminating practices alleged to benefit White applicants, and eliminating consideration of standardized test scores**

| Outcome Measures | Actual Admitted Class [A] | 2x Low-SES Boost | | 3x Low-SES Boost | | 4x Low-SES Boost | |
|---|---|---|---|---|---|---|---|
| | | Predicted Value [B] | % Change ([B]-[A])/[A] | Predicted Value [C] | % Change ([C]-[A])/[A] | Predicted Value [D] | % Change ([D]-[A])/[A] |
| **Race** | | | | | | | |
| 1. White | 676 | 654 | -3% | 606 | -10% | 559 | -17% |
| 2. Asian-American | 402 | 476 | +18% | 471 | +17% | 465 | +16% |
| 3. Hispanic or Other | 233 | 259 | +11% | 301 | +29% | 343 | +47% |
| 4. African-American | 234 | 152 | -35% | 176 | -25% | 198 | -15% |
| 5. Race Missing | 134 | 138 | +3% | 125 | -6% | 114 | -15% |
| **Academic** | | | | | | | |
| 6. Average Composite SAT Score | 2244 | 2198 | -2% | 2172 | -3% | 2145 | -4% |
| 7. Average Composite ACT Score | 33.1 | 32.7 | -1% | 32.4 | -2% | 32.1 | -3% |
| 8. Average Converted GPA | 77.0 | 76.8 | -0.2% | 76.6 | -0.4% | 76.5 | -1% |
| 9. Average Academic Index | 228 | 225 | -1% | 224 | -2% | 222 | -3% |
| **Fraction with Profile Rating of 1 or 2** | | | | | | | |
| 10. Academic | 76% | 69% | -9% | 63% | -17% | 56% | -26% |
| 11. Extracurricular | 62% | 62% | +0.3% | 58% | -7% | 53% | -15% |
| 12. Personal | 71% | 70% | -1% | 66% | -7% | 61% | -14% |
| 13. Athletic | 27% | 20% | -23% | 19% | -27% | 18% | -31% |
| **Applicant Characteristics** | | | | | | | |
| 14. Number of Lineage Students | 259 | 112 | -57% | 93 | -64% | 73 | -72% |
| 15. Number of Double Lineage Students | 72 | 25 | -65% | 20 | -72% | 16 | -78% |
| 16. Number of Recruited Athletes | 180 | 93 | -48% | 92 | -49% | 91 | -49% |
| 17. Number of Children of Harvard Faculty and Staff | 44 | 22 | -51% | 18 | -59% | 14 | -67% |
| 18. Number of Students on Dean's and Director's Interest Lists | 192 | 79 | -59% | 68 | -64% | 56 | -71% |
| 19. Number of Female Students | 839 | 866 | +3% | 869 | +4% | 872 | +4% |
| **Concentration** | | | | | | | |
| 20. Social Sciences | 25% | 24% | -2% | 24% | -3% | 23% | -6% |
| 21. Humanities | 15% | 14% | -3% | 14% | -6% | 13% | -10% |
| 22. Biological Sciences | 21% | 23% | +7% | 24% | +11% | 25% | +16% |
| 23. Physical Science | 7% | 8% | +2% | 7% | +0.03% | 7% | -2% |
| 24. Engineering | 13% | 13% | +1% | 13% | +2% | 13% | +5% |
| 25. Computer Science | 6% | 6% | -8% | 6% | -11% | 5% | -12% |
| 26. Mathematics | 6% | 7% | +2% | 6% | +1% | 6% | -0.3% |
| 27. Unspecified | 7% | 6% | -8% | 6% | -5% | 7% | -3% |
| **Geography** | | | | | | | |
| 28. Number Rural | 59 | 77 | +30% | 85 | +43% | 92 | +55% |
| 29. Number in Northeast | 694 | 646 | -7% | 622 | -10% | 597 | -14% |
| 30. Number in Midwest | 207 | 224 | +8% | 219 | +6% | 216 | +4% |
| 31. Number in South | 379 | 379 | -0.1% | 390 | +3% | 403 | +6% |
| 32. Number in West | 399 | 431 | +8% | 448 | +12% | 463 | +16% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, standardized test scores, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000.

**Estimated change in financial need of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, eliminating practices alleged to benefit White applicants, and eliminating consideration of standardized test scores**

| Socioeconomic Status | Actual Admitted Class [A] | 2x Low-SES Boost | | 3x Low-SES Boost | | 4x Low-SES Boost | |
|---|---|---|---|---|---|---|---|
| | | Predicted Value [B] | % Change ([B]-[A])/[A] | Predicted Value [C] | % Change ([C]-[A])/[A] | Predicted Value [D] | % Change ([D]-[A])/[A] |
| 1. Number First Generation College | 120 | 303 | +152% | 395 | +229% | 483 | +303% |
| 2. Number Disadvantaged | 297 | 649 | +118% | 820 | +176% | 981 | +230% |
| 3. Number with Fee Waiver | 309 | 662 | +114% | 835 | +170% | 1001 | +224% |
| 4. Number with Financial Aid | 1102 | 1306 | +19% | 1378 | +25% | 1445 | +31% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether the applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, standardized test scores, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000.

# Estimated change in racial composition of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, eliminating practices alleged to benefit White applicants, eliminating consideration of standardized test scores, and doubling number of disadvantaged applicants



**Value of the low-SES boost as multiples of its baseline value, removing consideration of race and factors that allegedly advantage White applicants**

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, standardized test scores, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000. Further, the number of disadvantaged applicants is doubled.

DX723.0001

United States District Court
District of Massachusetts

**DX 723**

Case No. _____ 1:14-cv-14176 (ADB)
Date Entered _____
By _____ Deputy Clerk

**Estimated change in racial composition of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, eliminating practices alleged to benefit White applicants, eliminating consideration of standardized test scores, and doubling number of disadvantaged applicants**

| Race | Actual Admitted Class | Change from Actual Class | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 1x Low-SES Boost | 2x Low-SES Boost | 3x Low-SES Boost | 4x Low-SES Boost | 5x Low-SES Boost | 6x Low-SES Boost | 10x Low-SES Boost |
| 1. White | 676 | -35 | -97 | -154 | -201 | -236 | -259 | -295 |
| 2. Asian-American | 402 | +79 | +80 | +78 | +74 | +69 | +65 | +55 |
| 3. Hispanic or Other | 233 | +33 | +83 | +131 | +173 | +206 | +230 | +276 |
| 4. African-American | 234 | -82 | -56 | -32 | -13 | -0 | +8 | +18 |
| 5. Race Missing | 134 | +4 | -9 | -22 | -32 | -39 | -44 | -53 |

| Race | Actual Admitted Class | % Change from Actual Class | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 1x Low-SES Boost | 2x Low-SES Boost | 3x Low-SES Boost | 4x Low-SES Boost | 5x Low-SES Boost | 6x Low-SES Boost | 10x Low-SES Boost |
| 1. White | 40% | -5% | -14% | -23% | -30% | -35% | -38% | -44% |
| 2. Asian-American | 24% | +20% | +20% | +19% | +18% | +17% | +16% | +14% |
| 3. Hispanic or Other | 14% | +14% | +36% | +56% | +74% | +88% | +99% | +118% |
| 4. African-American | 14% | -35% | -24% | -14% | -6% | -0% | +3% | +7% |
| 5. Race Missing | 8% | +3% | -7% | -16% | -24% | -29% | -33% | -40% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, standardized test scores, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000. Further, the number of disadvantaged applicants is doubled.

**Estimated change in characteristics of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, eliminating practices alleged to benefit White applicants, eliminating consideration of standardized test scores, and doubling number of disadvantaged applicants**

| Outcome Measures | Actual Admitted Class [A] | 1x Low-SES Boost | | 2x Low-SES Boost | | 3x Low-SES Boost | |
|---|---|---|---|---|---|---|---|
| | | Predicted Value [B] | % Change ([B]-[A])/[A] | Predicted Value [C] | % Change ([C]-[A])/[A] | Predicted Value [D] | % Change ([D]-[A])/[A] |
| **Race** | | | | | | | |
| 1. White | 676 | 641 | -5% | 579 | -14% | 522 | -23% |
| 2. Asian-American | 402 | 481 | +20% | 482 | +20% | 480 | +19% |
| 3. Hispanic or Other | 233 | 266 | +14% | 316 | +36% | 364 | +56% |
| 4. African-American | 234 | 152 | -35% | 178 | -24% | 202 | -14% |
| 5. Race Missing | 134 | 138 | +3% | 125 | -7% | 112 | -16% |
| **Academic** | | | | | | | |
| 6. Average Composite SAT Score | 2244 | 2200 | -2% | 2171 | -3% | 2142 | -5% |
| 7. Average Composite ACT Score | 33.1 | 32.8 | -1% | 32.5 | -2% | 32.1 | -3% |
| 8. Average Converted GPA | 77.0 | 76.7 | -0.3% | 76.6 | -0.5% | 76.4 | -1% |
| 9. Average Academic Index | 228 | 226 | -1% | 224 | -2% | 222 | -3% |
| **Fraction with Profile Rating of 1 or 2** | | | | | | | |
| 10. Academic | 76% | 70% | -7% | 63% | -17% | 56% | -26% |
| 11. Extracurricular | 62% | 65% | +5% | 62% | -1% | 57% | -9% |
| 12. Personal | 71% | 75% | +6% | 73% | +3% | 69% | -3% |
| 13. Athletic | 27% | 20% | -24% | 19% | -27% | 18% | -31% |
| **Applicant Characteristics** | | | | | | | |
| 14. Number of Lineage Students | 259 | 107 | -59% | 83 | -68% | 60 | -77% |
| 15. Number of Double Lineage Students | 72 | 24 | -67% | 18 | -75% | 13 | -82% |
| 16. Number of Recruited Athletes | 180 | 94 | -48% | 93 | -48% | 92 | -49% |
| 17. Number of Children of Harvard Faculty and Staff | 44 | 20 | -54% | 16 | -64% | 12 | -74% |
| 18. Number of Students on Dean's and Director's Interest Lists | 192 | 77 | -60% | 65 | -66% | 52 | -73% |
| 19. Number of Female Students | 839 | 865 | +3% | 869 | +4% | 871 | +4% |
| **Concentration** | | | | | | | |
| 20. Social Sciences | 25% | 25% | -0.3% | 25% | -0.4% | 24% | -2% |
| 21. Humanities | 15% | 14% | -3% | 14% | -6% | 13% | -10% |
| 22. Biological Sciences | 21% | 23% | +6% | 23% | +10% | 24% | +14% |
| 23. Physical Science | 7% | 8% | +5% | 8% | +3% | 7% | -0.5% |
| 24. Engineering | 13% | 13% | -0.3% | 13% | +0.3% | 13% | +3% |
| 25. Computer Science | 6% | 6% | -8% | 6% | -12% | 5% | -14% |
| 26. Mathematics | 6% | 6% | -0.5% | 6% | -2% | 6% | -3% |
| 27. Unspecified | 7% | 6% | -9% | 6% | -6% | 7% | -3% |
| **Geography** | | | | | | | |
| 28. Number Rural | 59 | 74 | +25% | 81 | +38% | 90 | +52% |
| 29. Number in Northeast | 694 | 665 | -4% | 642 | -8% | 617 | -11% |
| 30. Number in Midwest | 207 | 238 | +15% | 232 | +12% | 228 | +10% |
| 31. Number in South | 379 | 362 | -4% | 371 | -2% | 382 | +1% |
| 32. Number in West | 399 | 414 | +4% | 434 | +9% | 452 | +13% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, standardized test scores, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000. Further, the number of disadvantaged applicants is doubled.

**Estimated change in financial need of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, eliminating practices alleged to benefit White applicants, eliminating consideration of standardized test scores, and doubling number of disadvantaged applicants**

| Socioeconomic Status | Actual Admitted Class [A] | 1x Low-SES Boost | | 2x Low-SES Boost | | 3x Low-SES Boost | |
|---|---|---|---|---|---|---|---|
| | | Predicted Value [B] | % Change ([B]-[A])/[A] | Predicted Value [C] | % Change ([C]-[A])/[A] | Predicted Value [D] | % Change ([D]-[A])/[A] |
| 1. Number First Generation College | 120 | 309 | +157% | 426 | +255% | 542 | +352% |
| 2. Number Disadvantaged | 297 | 773 | +160% | 980 | +230% | 1168 | +293% |
| 3. Number with Fee Waiver | 309 | 713 | +131% | 920 | +198% | 1110 | +259% |
| 4. Number with Financial Aid | 1102 | 1332 | +21% | 1415 | +28% | 1489 | +35% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether the applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, standardized test scores, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000. Further, the number of disadvantaged applicants is doubled.



**Number of Harvard admitted students compared to the total number of U.S. high schools and total number of ZIP codes**

Source: Augmented Arcidiacono Data; National Center for Education Statistics; U.S. Census Data

Note: Sample consists of all applicants to the class of 2019 on domestic dockets in Prof. Arcidiacono's expanded sample with athletes. Total number of public and private high schools in 2013 – 2014 (i.e. classes of 2017 – 2018) includes schools with both elementary and secondary grades. ZIP Code Tabulation Areas are representations of ZIP code service areas created by the U.S. Census Bureau to represent statistical data from censuses and surveys. Total number of ZIP Code Tabulation Areas in 2016 is shown.

DX724.0001

United States District Court
District of Massachusetts
**DX 724**
1:14-cv-14176 (ADB)
Case No. _____
Date Entered _____
By _____
Deputy Clerk

**JA5764**



# Racial composition of top students from each high school

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of all applicants to the class of 2019 on domestic dockets in Prof. Arcidiacono's expanded sample with athletes. Students are ranked based on a sum of the four profile ratings: academic, athletic, extracurricular, and personal. The top students are selected based on rank within each school, allowing for ties. Low-income schools are defined as schools with average median income less than or equal to $65,000.

United States District Court
District of Massachusetts

DX 725

Case No.    1:14-cv-14176 (ADB)
Date Entered _____
By _____
        Deputy Clerk

DX725.0001

## Comparison of admitted class of 2019 to top students at high schools

| Outcome Measures | Actual Admitted Class [A] | Top students, all schools (9,758) | | Top students, public schools (7,830) | |
|---|---|---|---|---|---|
| | | Average [B] | % Difference ([B]-[A]) / [A] | Average [C] | % Difference ([C]-[A]) / [A] |
| **Academic** | | | | | |
| 1. Average Composite SAT Score | 2242 | 2082 | -7% | 2071 | -8% |
| 2. Average Composite ACT Score | 33 | 32 | -4% | 32 | -5% |
| 3. Average Converted GPA | 76.9 | 76.4 | -1% | 76.6 | -0.5% |
| 4. Average Academic Index | 228 | 218 | -4% | 218 | -4% |
| **Fraction with Profile Rating of 1 or 2** | | | | | |
| 5. Academic | 75% | 49% | -35% | 48% | -37% |
| 6. Extracurricular | 62% | 33% | -47% | 33% | -48% |
| 7. Personal | 71% | 30% | -58% | 29% | -59% |
| 8. Athletic | 27% | 18% | -34% | 17% | -38% |

| Outcome Measures | Actual Admitted Class [A] | Top students, low-income schools (1,853) | | Top students, rural schools (450) | |
|---|---|---|---|---|---|
| | | Average [B] | % Difference ([B]-[A]) / [A] | Average [C] | % Difference ([C]-[A]) / [A] |
| **Academic** | | | | | |
| 9. Average Composite SAT Score | 2242 | 1884 | -16% | 2032 | -9% |
| 10. Average Composite ACT Score | 33 | 29 | -11% | 31 | -6% |
| 11. Average Converted GPA | 76.9 | 75.2 | -2% | 76.0 | -1% |
| 12. Average Academic Index | 228 | 206 | -10% | 216 | -5% |
| **Fraction with Profile Rating of 1 or 2** | | | | | |
| 13. Academic | 75% | 20% | -73% | 38% | -50% |
| 14. Extracurricular | 62% | 22% | -65% | 23% | -64% |
| 15. Personal | 71% | 19% | -73% | 25% | -65% |
| 16. Athletic | 27% | 11% | -59% | 15% | -45% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of all applicants to the class of 2019 on domestic dockets in Prof. Arcidiacono's expanded sample including athletes. Students are ranked based on a sum of the four profile ratings: academic, athletic, extracurricular, and personal. The top students are selected based on rank within each school, allowing for ties. Low-income schools are defined as schools with average median income less than or equal to $65,000.



**Estimated change in racial composition of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, eliminating practices alleged to benefit White applicants, eliminating consideration of standardized test scores, doubling number of disadvantaged applicants, and admitting an equal number of students from each neighborhood cluster**

Legend: ■ White  ■ Asian-American  ■ Hispanic or Other  ■ African-American  ■ Race Missing

Share of Admitted Class

| | Actual Admitted Class | Removing Consideration of Race (1x) | 2x | 3x | 4x | 5x | 6x | 10x |
|---|---|---|---|---|---|---|---|---|
| Race Missing | 8% | 10% | 7% | 6% | 6% | 6% | 6% | 6% |
| African-American | 14% | 6% | 13% | 14% | 15% | 15% | 15% | 15% |
| Hispanic or Other | 14% | 9% | 18% | 20% | 20% | 21% | 21% | 23% |
| Asian-American | 24% | 27% | 25% | 25% | 25% | 26% | 25% | 25% |
| White | 40% | 48% | 37% | 36% | 35% | 34% | 33% | 33% | 31% |

**Value of the low-SES boost as multiples of its baseline value, removing consideration of race and factors that allegedly advantage White applicants**

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, standardized test scores, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000. Further, the number of disadvantaged applicants is doubled. Applicants are ranked in descending order of admission index within each neighborhood cluster and an approximately equal number of applicants are admitted from each cluster to fill the class.

United States District Court
District of Massachusetts
**DX 726**
Case No. __1:14-cv-14176 (ADB)__
Date Entered _____
By _____
Deputy Clerk

DX726.0001

**Estimated change in racial composition of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, eliminating practices alleged to benefit White applicants, eliminating consideration of standardized test scores, doubling number of disadvantaged applicants, and admitting an equal number of students from each neighborhood cluster**

| | | Change from Actual Class | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Race | Actual Admitted Class | 1x Low-SES Boost | 2x Low-SES Boost | 3x Low-SES Boost | 4x Low-SES Boost | 5x Low-SES Boost | 6x Low-SES Boost | 10x Low-SES Boost |
| 1. White | 676 | -62 | -72 | -96 | -107 | -117 | -122 | -159 |
| 2. Asian-American | 402 | +12 | -4 | +11 | +16 | +27 | +16 | +21 |
| 3. Hispanic or Other | 233 | +77 | +101 | +110 | +117 | +113 | +124 | +150 |
| 4. African-American | 234 | -14 | -5 | +4 | +10 | +13 | +17 | +24 |
| 5. Race Missing | 134 | -13 | -20 | -29 | -36 | -36 | -35 | -36 |

| | | % Change from Actual Class | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Race | Actual Admitted Class | 1x Low-SES Boost | 2x Low-SES Boost | 3x Low-SES Boost | 4x Low-SES Boost | 5x Low-SES Boost | 6x Low-SES Boost | 10x Low-SES Boost |
| 1. White | 40% | -9% | -11% | -14% | -16% | -17% | -18% | -24% |
| 2. Asian-American | 24% | +3% | -1% | +3% | +4% | +7% | +4% | +5% |
| 3. Hispanic or Other | 14% | +33% | +43% | +47% | +50% | +48% | +53% | +64% |
| 4. African-American | 14% | -6% | -2% | +2% | +4% | +6% | +7% | +10% |
| 5. Race Missing | 8% | -10% | -15% | -22% | -27% | -27% | -26% | -27% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, standardized test scores, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000. Further, the number of disadvantaged applicants is doubled. Applicants are ranked in descending order of admission index within each neighborhood cluster and an approximately equal number of applicants are admitted from each cluster to fill the class.

**Estimated change in characteristics of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, eliminating practices alleged to benefit White applicants, eliminating consideration of standardized test scores, doubling number of disadvantaged applicants, and admitting an equal number of students from each neighborhood cluster**

| Outcome Measures | Actual Admitted Class [A] | 1x Low-SES Boost | | 2x Low-SES Boost | | 3x Low-SES Boost | |
|---|---|---|---|---|---|---|---|
| | | Predicted Value [B] | % Change ([B]-[A])/[A] | Predicted Value [C] | % Change ([C]-[A])/[A] | Predicted Value [D] | % Change ([D]-[A])/[A] |
| **Race** | | | | | | | |
| 1. White | 676 | 614 | -9% | 604 | -11% | 580 | -14% |
| 2. Asian-American | 402 | 414 | +3% | 398 | -1% | 413 | +3% |
| 3. Hispanic or Other | 233 | 310 | +33% | 334 | +43% | 343 | +47% |
| 4. African-American | 234 | 220 | -6% | 229 | -2% | 238 | +2% |
| 5. Race Missing | 134 | 121 | -10% | 114 | -15% | 105 | -22% |
| **Academic** | | | | | | | |
| 6. Average Composite SAT Score | 2244 | 2163 | -4% | 2149 | -4% | 2136 | -5% |
| 7. Average Composite ACT Score | 33.1 | 32.5 | -2% | 32.2 | -3% | 32.0 | -3% |
| 8. Average Converted GPA | 77.0 | 76.5 | -1% | 76.5 | -1% | 76.3 | -1% |
| 9. Average Academic Index | 228 | 223 | -2% | 222 | -2% | 221 | -3% |
| **Fraction with Profile Rating of 1 or 2** | | | | | | | |
| 10. Academic | 76% | 63% | -17% | 59% | -23% | 54% | -29% |
| 11. Extracurricular | 62% | 60% | -3% | 56% | -10% | 53% | -15% |
| 12. Personal | 71% | 73% | +3% | 70% | -1% | 67% | -6% |
| 13. Athletic | 27% | 20% | -25% | 20% | -24% | 19% | -30% |
| **Applicant Characteristics** | | | | | | | |
| 14. Number of Lineage Students | 259 | 67 | -74% | 61 | -76% | 47 | -82% |
| 15. Number of Double Lineage Students | 72 | 13 | -82% | 13 | -82% | 11 | -85% |
| 16. Number of Recruited Athletes | 180 | 94 | -48% | 95 | -47% | 94 | -48% |
| 17. Number of Children of Harvard Faculty and Staff | 44 | 12 | -73% | 12 | -73% | 10 | -77% |
| 18. Number of Students on Dean's and Director's Interest Lists | 192 | 51 | -73% | 49 | -74% | 43 | -78% |
| 19. Number of Female Students | 839 | 846 | +1% | 843 | +0.5% | 843 | +0.5% |
| **Concentration** | | | | | | | |
| 20. Social Sciences | 25% | 24% | -3% | 24% | -3% | 24% | -4% |
| 21. Humanities | 15% | 14% | -7% | 13% | -10% | 13% | -9% |
| 22. Biological Sciences | 21% | 22% | +4% | 23% | +9% | 23% | +10% |
| 23. Physical Science | 7% | 8% | +11% | 9% | +16% | 8% | +12% |
| 24. Engineering | 13% | 13% | +3% | 13% | 0.00% | 13% | +3% |
| 25. Computer Science | 6% | 5% | -20% | 5% | -21% | 5% | -19% |
| 26. Mathematics | 6% | 7% | +12% | 7% | +4% | 6% | -3% |
| 27. Unspecified | 7% | 7% | +1% | 7% | +3% | 7% | +4% |
| **Geography** | | | | | | | |
| 28. Number Rural | 59 | 130 | +120% | 133 | +125% | 137 | +132% |
| 29. Number in Northeast | 694 | 590 | -15% | 592 | -15% | 593 | -15% |
| 30. Number in Midwest | 207 | 279 | +35% | 274 | +32% | 279 | +35% |
| 31. Number in South | 379 | 435 | +15% | 431 | +14% | 438 | +16% |
| 32. Number in West | 399 | 375 | -6% | 382 | -4% | 369 | -8% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, standardized test scores, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000. Further, the number of disadvantaged applicants is doubled. Applicants are ranked in descending order of admission index within each neighborhood cluster and an approximately equal number of applicants are admitted from each cluster to fill the class.

**Estimated change in financial need of Harvard's admitted class after removing consideration of race, increasing preference for lower-SES applicants, eliminating practices alleged to benefit White applicants, eliminating consideration of standardized test scores, doubling number of disadvantaged applicants, and admitting an equal number of students from each neighborhood cluster**

| Socioeconomic Status | Actual Admitted Class [A] | 1x Low-SES Boost | | 2x Low-SES Boost | | 3x Low-SES Boost | |
|---|---|---|---|---|---|---|---|
| | | Predicted Value [B] | % Change ([B]-[A])/[A] | Predicted Value [C] | % Change ([C]-[A])/[A] | Predicted Value [D] | % Change ([D]-[A])/[A] |
| 1.  Number First Generation College | 120 | 344 | +187% | 427 | +256% | 530 | +342% |
| 2.  Number Disadvantaged | 297 | 906 | +205% | 1047 | +253% | 1176 | +296% |
| 3.  Number with Fee Waiver | 309 | 853 | +176% | 1000 | +224% | 1127 | +265% |
| 4.  Number with Financial Aid | 1102 | 1431 | +30% | 1471 | +33% | 1507 | +37% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data

Note: Sample consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample with athletes who are in my preferred year-by-year regression model. Simulation eliminates consideration of race, lineage status, recruited-athlete status, whether the applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, standardized test scores, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 0.5 multiplied by a given integer multiplier, multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000. Further, the number of disadvantaged applicants is doubled. Applicants are ranked in descending order of admission index within each neighborhood cluster and an approximately equal number of applicants are admitted from each cluster to fill the class.



**Share of applicants by race, before and after changes to financial aid policies**

Source: HARV00032509 – 24; HARV00031667; HARV00016122; HARV00010744; HARV00067792; Augmented Arcidiacono Data

Note: Applicants who identify as "Native American / Hawaiian" are grouped with applicants who identify as "Other." Data for classes 2018 – 2019 are reconstructed using a methodology that replicates the produced aggregate data for classes 2000 – 2017.

DX727.0001

United States District Court
District of Massachusetts

**DX 727**

Case No.  1:14-cv-14176 (ADB)
Date Entered
By                    Deputy Clerk



Share of applicants by race applying for financial aid before and after changes to financial aid policies

Source: Augmented Arcidiacono Data

Note: Applicants who identify as "Native American / Hawaiian" are grouped with applicants who identify as "Other." Racial categories are constructed using a methodology that replicates the racial categories in the produced aggregate data.

DX727.0002



**Share of admitted students by race before and after changes to financial aid policies**

Source: HARV00032509 – 24; HARV00031667; HARV00016122; HARV00010744; HARV00067792; Augmented Arcidiacono Data

Note: Applicants who identify as "Native American / Hawaiian" are grouped with applicants who identify as "Other." Data for classes 2018 – 2019 are reconstructed using a methodology that replicates the produced aggregate data for classes 2000 – 2017.

DX727.0003

**JA5774**



Matriculation rates by race before and after changes to financial aid policies

Source: HARV00032509 – 24; HARV0003667; HARV00031667; HARV0001744; HARV00061122; HARV00067792; Augmented Arcidiacono Data

Note: Applicants who identify as "Native American / Hawaiian" are grouped with applicants who identify as "Other." Data for classes 2018 – 2019 are reconstructed using a methodology that replicates the produced aggregate data for classes 2000 – 2017.

DX727.0004



Share of applicants by race before and after changes to early admission policy

Source: HARV00032509 – 24; HARV00031695; Augmented Arcidiacono Data

Note: Applicants who identify as "Native American / Hawaiian" are grouped with applicants who identify as "Other." Data for classes 2018 – 2019 are reconstructed using a methodology that replicates the produced aggregate data for classes 2000 – 2017.

DX728.0001

United States District Court
District of Massachusetts

**DX 728**

Case No.    1:14-cv-14176 (ADB)
Date Entered
By              Deputy Clerk



# Share of admitted students by race before and after changes to early admission policy

Source: HARV00032509 – 24; HARV00031695; Augmented Arcidiacono Data

Note: Applicants who identify as "Native American / Hawaiian" are grouped with applicants who identify as "Other." Data for classes 2018 – 2019 are reconstructed using a methodology that replicates the produced aggregate data for classes 2000 – 2017.

DX728.0002

# Matriculation rates by race before and after changes to early admission policy

| | | Matriculation Rate | | |
| --- | --- | :---: | :---: | :---: |
| | | **Early Action Available 2000 − 2011** | **Early Action Abolished 2012 − 2015** | **Early Action Reinstated 2016 − 2019** |
| 1. | White | 79% | 76% | 82% |
| 2. | Asian American | 82% | 83% | 85% |
| 3. | African-American, Hispanic, or Other | 70% | 65% | 71% |
| 4. | Unknown | 80% | 78% | 81% |

Source: HARV00032509 − 24; HARV00031695; Augmented Arcidiacono Data

Note: Applicants who identify as "Native American / Hawaiian" are grouped with applicants who identify as "Other". Data for classes 2018 − 2019 are reconstructed using a methodology that replicates the produced aggregate data for classes 2000 − 2017.

# Mr. Kahlenberg's Simulation 1: Impact on class quality and composition [1]

| Outcome Measures | Model Baseline: Status Quo[3] | Simulated Class: Removing Consideration of Race, Preferences, Athletes; Preference Disadvantaged Students [2] | |
|---|---|---|---|
| | | Predicted Value | % Change |
| **Race** | | | |
| 1. White | 40.4% | 38.3% | -5% |
| 2. Asian-American | 23.7% | 34.0% | +43% |
| 3. Hispanic | 12.9% | 11.4% | -12% |
| 4. African-American | 13.6% | 6.6% | -51% |
| 5. Other | 9.3% | 9.7% | +4% |
| **Academic** | | | |
| 6. Average Composite SAT Score | 2239 | 2235 | -0.2% |
| 7. Average Composite ACT Score | 33.3 | 33.4 | +0.3% |
| 8. Average Converted GPA | 77.0 | 77.3 | +0.5% |
| 9. Average Academic Index | 228.2 | 228.7 | +0.3% |
| **Fraction with Profile Rating of 1 or 2** | | | |
| 10. Academic | 76% | 78% | +2% |
| 11. Extracurricular | 61% | 63% | +4% |
| 12. Personal | 73% | 69% | -5% |
| 13. Athletic | 27% | 15% | -44% |
| **Average Profile Rating (higher is worse)** | | | |
| 14. Academic | 2.22 | 2.19 | -1% |
| 15. Extracurricular | 2.40 | 2.38 | -0.4% |
| 16. Personal | 2.27 | 2.31 | +2% |
| 17. Athletic | 3.04 | 3.41 | +12% |
| **Applicant Characteristics** | | | |
| 18. Number of Lineage Students | 293 | 89 | -70% |
| 19. Number of Double Lineage Students | 78 | 20 | -74% |
| 20. Number of Recruited Athletes | 186 | 14 | -93% |
| 21. Number of Children of Harvard Faculty or Staff | 50 | 36 | -28% |
| 22. Number of Students on Dean's and Director's Interest Lists | 209 | 64 | -69% |
| 23. Number of Female | 859 | 844 | -2% |

United States District Court
District of Massachusetts

**DX 729**

Case No. _____1:14-cv-14176 (ADB)_____
Date Entered_____
By_____
Deputy Clerk

## Mr. Kahlenberg's Simulation 1: Impact on class quality and composition [1]

| Outcome Measures | Model Baseline: Status Quo [3] | Simulated Class: Removing Consideration of Race, Preferences, Athletes; Preference Disadvantaged Students [2] | |
|---|---|---|---|
| | | Predicted Value | % Change |
| **Socioeconomic Status** | | | |
| 24. Number First Generation College | 120 | 236 | +97% |
| 25. Number Disadvantaged | 305 | 808 | +165% |
| 26. Number Fee Waiver | 303 | 623 | +106% |
| 27. Number Financial Aid | 1141 | 1354 | +19% |
| **Concentrations** | | | |
| 28. Social Sciences | 25% | 24% | -6% |
| 29. Humanities | 14% | 12% | -10% |
| 30. Biological Sciences | 21% | 23% | +9% |
| 31. Physical Science | 6.9% | 7.8% | +12% |
| 32. Engineering | 13% | 15% | +10% |
| 33. Computer Science | 6.1% | 6.5% | +6% |
| 34. Mathematics | 6.5% | 6.6% | +1% |
| 35. Unspecified | 6.7% | 5.1% | -23% |

Source: Arcidiacono Data

Note:

[1] Sample consists of applicants to the class of 2019 in Dr. Arcidiacono's original expanded sample. Dr. Arcidiacono's Model 6 is used with interactions between race and year, disadvantaged and year, and with the exclusion of the overall rating.

[2] Mr. Kahlenberg removes consideration of an applicant's race and lineage status, whether the applicant applied Early Action, whether the applicant's parents are Harvard faculty or staff, whether the applicant appeared on the Dean's or Director's interest list, whether the applicant was identified as disadvantaged, whether the applicant applied for a waiver of the application fee, whether the applicant is a first-generation college student, whether the applicant applied for financial aid, and whether the applicant is a recruited athlete. In addition, recruited athletes are assigned extracurricular and athletic ratings of 2. Mr. Kahlenberg gives a boost to disadvantaged applicants by adding to their admission index a value equal to half the value of the "athlete" coefficient in the model.

[3] This analysis reports values entirely from the predicted class. In his report, Mr. Kahlenberg reports average academic index, extracurricular rating, and personal rating values from the actul admitted class, while reporting the racial composition and share of disadvantaged students from the predicted class, under the "Status Quo" specification.

# Mr. Kahlenberg's Simulation 2: Impact on class quality and composition [1]

| Outcome Measures | Model Baseline: Status Quo [3] | Predicted Value | % Change |
|---|---|---|---|
| | | **Simulated Class: Removing Consideration of Race, Preferences, Athletes; Preference Disadvantaged Students; Double Number of Disadvantaged Applicants** [2] | |
| **Race** | | | |
| 1. White | 40.4% | 34.6% | -14% |
| 2. Asian-American | 23.7% | 34.5% | +45% |
| 3. Hispanic | 12.9% | 13.7% | +6% |
| 4. African-American | 13.6% | 8.0% | -41% |
| 5. Other | 9.3% | 9.1% | -1% |
| **Academic** | | | |
| 6. Average Composite SAT Score | 2239 | 2214 | -1% |
| 7. Average Composite ACT Score | 33.3 | 33.2 | -0.3% |
| 8. Average Converted GPA | 77.0 | 77.2 | +0.4% |
| 9. Average Academic Index | 228.2 | 227.6 | -0.2% |
| **Fraction with Profile Rating of 1 or 2** | | | |
| 10. Academic | 76% | 74% | -3% |
| 11. Extracurricular | 61% | 63% | +3% |
| 12. Personal | 73% | 71% | -2% |
| 13. Athletic | 27% | 14% | -50% |
| **Average Profile Rating (higher is worse)** | | | |
| 14. Academic | 2.22 | 2.24 | +1% |
| 15. Extracurricular | 2.40 | 2.40 | +0.4% |
| 16. Personal | 2.27 | 2.29 | +1% |
| 17. Athletic | 3.04 | 3.51 | +15% |
| **Applicant Characteristics** | | | |
| 18. Number of Lineage Students | 293 | 61 | -79% |
| 19. Number of Double Lineage Students | 78 | 14 | -82% |
| 20. Number of Recruited Athletes | 186 | 11 | -94% |
| 21. Number of Children of Harvard Faculty or Staff | 50 | 28 | -44% |
| 22. Number of Students on Dean's and Director's Interest Lists | 209 | 51 | -75% |
| 23. Number of Female | 859 | 842 | -2% |

# Mr. Kahlenberg's Simulation 2: Impact on class quality and composition [1]

| Outcome Measures | Model Baseline: Status Quo [3] | Predicted Value | % Change |
|---|---|---|---|
| **Simulated Class: Removing Consideration of Race, Preferences, Athletes; Preference Disadvantaged Students; Double Number of Disadvantaged Applicants [2]** | | | |
| **Socioeconomic Status** | | | |
| 24. Number First Generation College | 120 | 328 | +173% |
| 25. Number Disadvantaged | 305 | 1197 | +292% |
| 26. Number Fee Waiver | 303 | 885 | +192% |
| 27. Number Financial Aid | 1141 | 1503 | +32% |
| **Concentrations** | | | |
| 28. Social Sciences | 25% | 24% | -5% |
| 29. Humanities | 14% | 12% | -13% |
| 30. Biological Sciences | 21% | 24% | +13% |
| 31. Physical Science | 6.9% | 8.1% | +16% |
| 32. Engineering | 13% | 15% | +11% |
| 33. Computer Science | 6.1% | 6.1% | -0.1% |
| 34. Mathematics | 6.5% | 6.2% | -5% |
| 35. Unspecified | 6.7% | 4.9% | -26% |

Source: Arcidiacono Data

Note:

[1] Sample consists of applicants to the class of 2019 in Dr. Arcidiacono's original expanded sample. Dr. Arcidiacono's Model 6 is used with interactions between race and year, disadvantaged and year, and with the exclusion of the overall rating.

[2] Mr. Kahlenberg doubles the number of disadvantaged applicants. Mr. Kahlenberg removes consideration of an applicant's race and lineage status, whether the applicant applied Early Action, whether the applicant's parents are Harvard faculty or staff, whether the applicant appeared on the Dean's or Director's interest list, whether the applicant was identified as disadvantaged, whether the applicant applied for a waiver of the application fee, whether the applicant is a first-generation college student, whether the applicant applied for financial aid, and whether the applicant is a recruited athlete. In addition, recruited athletes are assigned extracurricular and athletic ratings of 2. Mr. Kahlenberg gives a boost to disadvantaged applicants by adding to their admission index a value equal to half the value of the "athlete" coefficient in the model.

[3] This analysis reports values entirely from the predicted class. In his report, Mr. Kahlenberg reports average academic index, extracurricular rating, and personal rating values from the actual admitted class, while reporting the racial composition and share of disadvantaged students from the predicted class, under the "Status Quo" specification.

# Mr. Kahlenberg's Simulation 3: Impact on class quality and composition [1]

| Outcome Measures | Model Baseline: Status Quo [3] | Simulated Class Using Cluster-Based Admission: Removing Consideration of Race, Preferences, Athletes; Preference Disadvantaged Students [2] | |
|---|---|---|---|
| | | Predicted Value | % Change |
| **Race** | | | |
| 1. White | 40.4% | 37.9% | -6% |
| 2. Asian-American | 23.7% | 29.5% | +24% |
| 3. Hispanic | 12.9% | 13.7% | +6% |
| 4. African-American | 13.6% | 9.6% | -29% |
| 5. Other | 9.3% | 9.3% | +0.4% |
| **Academic** | | | |
| 6. Average Composite SAT Score | 2239 | 2206 | -1% |
| 7. Average Composite ACT Score | 33.3 | 33.1 | -1% |
| 8. Average Converted GPA | 77.0 | 77.2 | +0.3% |
| 9. Average Academic Index | 228.2 | 227.0 | -1% |
| **Fraction with Profile Rating of 1 or 2** | | | |
| 10. Academic | 76% | 70% | -8% |
| 11. Extracurricular | 61% | 58% | -5% |
| 12. Personal | 73% | 66% | -9% |
| 13. Athletic | 27% | 14% | -49% |
| **Average Profile Rating (higher is worse)** | | | |
| 14. Academic | 2.22 | 2.28 | +2% |
| 15. Extracurricular | 2.40 | 2.45 | +2% |
| 16. Personal | 2.27 | 2.34 | +3% |
| 17. Athletic | 3.04 | 3.50 | +15% |
| **Applicant Characteristics** | | | |
| 18. Number of Lineage Students | 293 | 66 | -77% |
| 19. Number of Double Lineage Students | 78 | 16 | -80% |
| 20. Number of Recruited Athletes | 186 | 9 | -95% |
| 21. Number of Children of Harvard Faculty or Staff | 50 | 28 | -43% |
| 22. Number of Students on Dean's and Director's Interest Lists | 209 | 53 | -75% |
| 23. Number of Female | 859 | 844 | -2% |

## Mr. Kahlenberg's Simulation 3: Impact on class quality and composition [1]

| Outcome Measures | Model Baseline: Status Quo [3] | Simulated Class Using Cluster-Based Admission: Removing Consideration of Race, Preferences, Athletes; Preference Disadvantaged Students [2] | |
| --- | --- | --- | --- |
| | | Predicted Value | % Change |
| **Socioeconomic Status** | | | |
| 24. Number First Generation College | 120 | 294 | +145% |
| 25. Number Disadvantaged | 305 | 996 | +227% |
| 26. Number Fee Waiver | 303 | 784 | +159% |
| 27. Number Financial Aid | 1141 | 1465 | +28% |
| **Concentrations** | | | |
| 28. Social Sciences | 25% | 23% | -9% |
| 29. Humanities | 14% | 12% | -16% |
| 30. Biological Sciences | 21% | 23% | +6% |
| 31. Physical Science | 6.9% | 8.2% | +18% |
| 32. Engineering | 13% | 15% | +14% |
| 33. Computer Science | 6.1% | 6.5% | +6% |
| 34. Mathematics | 6.5% | 7.4% | +13% |
| 35. Unspecified | 6.7% | 5.4% | -19% |

Source: Arcidiacono Data

Note:

[1] Sample consists of applicants to the class of 2019 in Dr. Arcidiacono's original expanded sample. Dr. Arcidiacono's Model 6 is used with interactions between race and year, disadvantaged and year, and with the exclusion of the overall rating.

[2] Applicants are ranked in descending order of admission index and an equal number of applicants are admitted from each neighborhood cluster. Mr. Kahlenberg removes consideration of an applicant's race and lineage status, whether the applicant applied Early Action, whether the applicant's parents are Harvard faculty or staff, whether the applicant appeared on the Dean's or Director's interest list, whether the applicant was identified as disadvantaged, whether the applicant applied for a waiver of the application fee, whether the applicant is a first-generation college student, whether the applicant applied for financial aid, and whether the applicant is a recruited athlete. In addition, recruited athletes are assigned extracurricular and athletic ratings of 2. Mr. Kahlenberg gives a boost to disadvantaged applicants by adding to their admission index a value equal to half the value of the "athlete" coefficient in the model.

[3] This analysis reports values entirely from the predicted class. In his report, Mr. Kahlenberg reports average academic index, extracurricular rating, and personal rating values from the actul admitted class, while reporting the racial composition and share of disadvantaged students from the predicted class, under the "Status Quo" specification.

# Mr. Kahlenberg's Simulation 4: Impact on class quality and composition [1]

| Outcome Measures | Model Baseline: Status Quo [3] | Simulated Class Using Cluster-Based Admission: Removing Consideration of Race, Preferences; Preference Disadvantaged Students [2] | |
|---|---|---|---|
| | | Predicted Value | % Change |
| **Race** | | | |
| 1. White | 40.4% | 39.6% | -2% |
| 2. Asian-American | 23.7% | 27.6% | +16% |
| 3. Hispanic | 12.9% | 13.5% | +4% |
| 4. African-American | 13.6% | 10.1% | -26% |
| 5. Other | 9.3% | 9.2% | -1% |
| **Academic** | | | |
| 6. Average Composite SAT Score | 2239 | 2191 | -2% |
| 7. Average Composite ACT Score | 33.3 | 32.9 | -1% |
| 8. Average Converted GPA | 77.0 | 77.1 | +0.2% |
| 9. Average Academic Index | 228.2 | 225.9 | -1% |
| **Fraction with Profile Rating of 1 or 2** | | | |
| 10. Academic | 76% | 66% | -13% |
| 11. Extracurricular | 61% | 54% | -13% |
| 12. Personal | 73% | 65% | -10% |
| 13. Athletic | 27% | 20% | -25% |
| **Average Profile Rating (higher is worse)** | | | |
| 14. Academic | 2.22 | 2.33 | +5% |
| 15. Extracurricular | 2.40 | 2.50 | +4% |
| 16. Personal | 2.27 | 2.34 | +3% |
| 17. Athletic | 3.04 | 3.31 | +9% |
| **Applicant Characteristics** | | | |
| 18. Number of Lineage Students | 293 | 57 | -81% |
| 19. Number of Double Lineage Students | 78 | 12 | -85% |
| 20. Number of Recruited Athletes | 186 | 150 | -20% |
| 21. Number of Children of Harvard Faculty or Staff | 50 | 19 | -62% |
| 22. Number of Students on Dean's and Director's Interest Lists | 209 | 55 | -74% |
| 23. Number of Female | 859 | 827 | -4% |

# Mr. Kahlenberg's Simulation 4: Impact on class quality and composition [1]

| Outcome Measures | Model Baseline: Status Quo [3] | Simulated Class Using Cluster-Based Admission: Removing Consideration of Race, Preferences; Preference Disadvantaged Students [2] | |
|---|---|---|---|
| | | Predicted Value | % Change |
| **Socioeconomic Status** | | | |
| 24. Number First Generation College | 120 | 289 | +141% |
| 25. Number Disadvantaged | 305 | 949 | +211% |
| 26. Number Fee Waiver | 303 | 753 | +149% |
| 27. Number Financial Aid | 1141 | 1450 | +27% |
| **Concentrations** | | | |
| 28. Social Sciences | 25% | 23% | -7% |
| 29. Humanities | 14% | 11% | -19% |
| 30. Biological Sciences | 21% | 23% | +8% |
| 31. Physical Science | 6.9% | 7.7% | +11% |
| 32. Engineering | 13% | 15% | +11% |
| 33. Computer Science | 6.1% | 6.1% | -0.2% |
| 34. Mathematics | 6.5% | 7.5% | +15% |
| 35. Unspecified | 6.7% | 6.2% | -7% |

Source: Arcidiacono Data

Note:

[1] Sample consists of applicants to the class of 2019 in Dr. Arcidiacono's original expanded sample. Dr. Arcidiacono's Model 6 is used with interactions between race and year, disadvantaged and year, and with the exclusion of the overall rating.

[2] Applicants are ranked in descending order of admission index and an equal number of applicants are admitted from each neighborhood cluster. Mr. Kahlenberg removes consideration of an applicant's race and lineage status, whether the applicant applied Early Action, whether the applicant's parents are Harvard faculty or staff, whether the applicant appeared on the Dean's or Director's interest list, whether the applicant was identified as disadvantaged, whether the applicant applied for a waiver of the application fee, whether the applicant is a first-generation college student, whether the applicant applied for financial aid. Mr. Kahlenberg gives a boost to disadvantaged applicants by adding to their admission index a value equal to half the value of the "athlete" coefficient in the model.

[3] This analysis reports values entirely from the predicted class. In his report, Mr. Kahlenberg reports average academic index, extracurricular rating, and personal rating values from the actul admitted class, while reporting the racial composition and share of disadvantaged students from the predicted class, under the "Status Quo" specification.

# Mr. Kahlenberg's Simulation 5: Impact on class quality and composition [1]

| Outcome Measures | Model Baseline: Status Quo [3] | Simulated Class Using Cluster-Based Admission: Removing Consideration of Race, Preferences, Athletes; Preference Disadvantaged Students; Double Number of Disadvantaged Applicants [2] | |
|---|---|---|---|
| | | Predicted Value | % Change |
| **Race** | | | |
| 1. White | 40.4% | 36.1% | -11% |
| 2. Asian-American | 23.7% | 30.0% | +26% |
| 3. Hispanic | 12.9% | 14.6% | +13% |
| 4. African-American | 13.6% | 10.6% | -22% |
| 5. Other | 9.3% | 8.8% | -5% |
| **Academic** | | | |
| 6. Average Composite SAT Score | 2239 | 2205 | -2% |
| 7. Average Composite ACT Score | 33.3 | 33.1 | -1% |
| 8. Average Converted GPA | 77.0 | 77.1 | +0.2% |
| 9. Average Academic Index | 228.2 | 226.8 | -1% |
| **Fraction with Profile Rating of 1 or 2** | | | |
| 10. Academic | 76% | 70% | -8% |
| 11. Extracurricular | 61% | 60% | -2% |
| 12. Personal | 73% | 70% | -3% |
| 13. Athletic | 27% | 13% | -52% |
| **Average Profile Rating (higher is worse)** | | | |
| 14. Academic | 2.22 | 2.28 | +2% |
| 15. Extracurricular | 2.40 | 2.44 | +2% |
| 16. Personal | 2.27 | 2.30 | +1% |
| 17. Athletic | 3.04 | 3.54 | +16% |
| **Applicant Characteristics** | | | |
| 18. Number of Lineage Students | 293 | 48 | -84% |
| 19. Number of Double Lineage Students | 78 | 13 | -83% |
| 20. Number of Recruited Athletes | 186 | 11 | -94% |
| 21. Number of Children of Harvard Faculty or Staff | 50 | 23 | -54% |
| 22. Number of Students on Dean's and Director's Interest Lists | 209 | 53 | -75% |
| 23. Number of Female | 859 | 814 | -5% |

# Mr. Kahlenberg's Simulation 5: Impact on class quality and composition [1]

| Outcome Measures | Model Baseline: Status Quo [3] | Simulated Class Using Cluster-Based Admission: Removing Consideration of Race, Preferences, Athletes; Preference Disadvantaged Students; Double Number of Disadvantaged Applicants [2] | |
| | | Predicted Value | % Change |
|---|---|---|---|
| **Socioeconomic Status** | | | |
| 24. Number First Generation College | 120 | 349 | +191% |
| 25. Number Disadvantaged | 305 | 1298 | +326% |
| 26. Number Fee Waiver | 303 | 971 | +221% |
| 27. Number Financial Aid | 1141 | 1561 | +37% |
| **Concentrations** | | | |
| 28. Social Sciences | 25% | 24% | -3% |
| 29. Humanities | 14% | 12% | -15% |
| 30. Biological Sciences | 21% | 23% | +9% |
| 31. Physical Science | 6.9% | 8.4% | +21% |
| 32. Engineering | 13% | 15% | +15% |
| 33. Computer Science | 6.1% | 5.3% | -12% |
| 34. Mathematics | 6.5% | 6.7% | +4% |
| 35. Unspecified | 6.7% | 4.9% | -27% |

Source: Arcidiacono Data

Note:

[1] Sample consists of applicants to the class of 2019 in Dr. Arcidiacono's original expanded sample. Dr. Arcidiacono's Model 6 is used with interactions between race and year, disadvantaged and year, and with the exclusion of the overall rating.

[2] Mr. Kahlenberg doubles the number of disadvantaged applicants. Applicants are ranked in descending order of admission index and an equal number of applicants are admitted from each neighborhood cluster. Mr. Kahlenberg removes consideration of an applicant's race and lineage status, whether the applicant applied Early Action, whether the applicant's parents are Harvard faculty or staff, whether the applicant appeared on the Dean's or Director's interest list, whether the applicant was identified as disadvantaged, whether the applicant applied for a waiver of the application fee, whether the applicant is a first-generation college student, whether the applicant applied for financial aid, and whether the applicant is a recruited athlete. In addition, recruited athletes are assigned extracurricular and athletic ratings of 2. Mr. Kahlenberg gives a boost to disadvantaged applicants by adding to their admission index a value equal to half the value of the "athlete" coefficient in the model.

[3] This analysis reports values entirely from the predicted class. In his report, Mr. Kahlenberg reports average academic index, extracurricular rating, and personal rating values from the actul admitted class, while reporting the racial composition and share of disadvantaged students from the predicted class, under the "Status Quo" specification.

## Kahlenberg's Simulation 6 and 7: Impact on class characteristics

| | | Predicted Class Without Consideration of Race and Factors that Allegedly Advantage White Applicants | | | | | |
|---|---|---|---|---|---|---|---|
| | | Card's Simulation (4x SES Boost) | | Kahlenberg's Simulation 6 | | Kahlenberg's Simulation 7 | |
| | Actual Admitted Class | Predicted Value | % Change | Predicted Value | % Change | Predicted Value | % Change |
| Outcome Measures | [A] | [B] | ([B]-[A])/[A] | [C] | ([C]-[A])/[A] | [D] | ([D]-[A])/[A] |
| **Race** | | | | | | | |
| 1. White | 676 | 589 | -13% | 541 | -20% | 561 | -17% |
| 2. Asian-American | 402 | 508 | +26% | 523 | +30% | 521 | +30% |
| 3. Hispanic or Other | 233 | 293 | +26% | 330 | +42% | 313 | +34% |
| 4. African-American | 234 | 163 | -30% | 164 | -30% | 160 | -32% |
| 5. Race Missing | 134 | 127 | -6% | 121 | -10% | 123 | -8% |
| **Academic** | | | | | | | |
| 6. Average Composite SAT Score | 2244 | 2189 | -2% | 2173 | -3% | 2180 | -3% |
| 7. Average Composite ACT Score | 33.1 | 32.7 | -1% | 32.5 | -2% | 32.5 | -2% |
| 8. Average Converted GPA | 77.0 | 77.1 | +0.1% | 77.0 | +0.02% | 77.0 | +0.02% |
| 9. Average Academic Index | 228 | 225 | -1% | 225 | -1% | 225 | -1% |
| **Fraction with Profile Rating of 1 or 2** | | | | | | | |
| 10. Academic | 76% | 66% | -13% | 61% | -19% | 63% | -17% |
| 11. Extracurricular | 62% | 57% | -9% | 54% | -13% | 55% | -12% |
| 12. Personal | 71% | 64% | -11% | 62% | -13% | 63% | -11% |
| 13. Athletic | 27% | 18% | -33% | 20% | -26% | 21% | -22% |
| **Applicant Characteristics** | | | | | | | |
| 14. Number of Lineage Students | 259 | 86 | -67% | 61 | -76% | 81 | -69% |
| 15. Number of Double Lineage Students | 72 | 19 | -73% | 13 | -81% | 18 | -75% |
| 16. Number of Recruited Athletes | 180 | 88 | -51% | 144 | -20% | 159 | -11% |
| 17. Number of Children of Harvard Faculty and Staff | 44 | 17 | -61% | 12 | -74% | 16 | -64% |
| 18. Number of Students on Dean's and Director's Interest Lists | 192 | 62 | -68% | 44 | -77% | 57 | -71% |
| 19. Number of Female Students | 839 | 851 | +1% | 858 | +2% | 851 | +1% |
| **Concentration** | | | | | | | |
| 20. Social Sciences | 25% | 24% | -5% | 24% | -4% | 24% | -2% |
| 21. Humanities | 15% | 13% | -9% | 12% | -15% | 12% | -14% |
| 22. Biological Sciences | 21% | 23% | +11% | 24% | +12% | 24% | +12% |
| 23. Physical Science | 7% | 8% | +6% | 7% | -5% | 7% | -5% |
| 24. Engineering | 13% | 13% | +5% | 14% | +14% | 14% | +8% |
| 25. Computer Science | 6% | 6% | -7% | 6% | -4% | 6% | -6% |
| 26. Mathematics | 6% | 7% | +3% | 6% | +1% | 6% | +0.5% |
| 27. Unspecified | 7% | 6% | -9% | 6% | -6% | 7% | -3% |
| **Geography** | | | | | | | |
| 28. Number Rural | 59 | 87 | +48% | 87 | +47% | 82 | +39% |
| 29. Number in Northeast | 694 | 604 | -13% | 615 | -11% | 630 | -9% |
| 30. Number in Midwest | 207 | 217 | +5% | 164 | -21% | 170 | -18% |
| 31. Number in South | 379 | 407 | +7% | 392 | +3% | 391 | +3% |
| 32. Number in West | 399 | 451 | +13% | 509 | +27% | 488 | +22% |

Source: Augmented Arcidiacono Data; College Board Cluster Data; U.S. Census Data; Kahlenberg Production

Note: My simulation ("Card's Simulation (4x SES Boost)") consists of applicants to the class of 2019 in Prof. Arcidiacono's expanded sample including athletes, who are in my preferred year-by-year regression model from my affirmative report. The simulation eliminates consideration of race, lineage status, recruited-athlete status, whether an applicant's parents are Harvard faculty and staff, whether the applicant appears on the Dean's or Director's interest list, and the proportion of the applicant's high school and neighborhood that is African-American, Hispanic, and White. In addition, recruited athletes are reassigned to rating combinations in the regression sample that contain the next highest athletic rating. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 2 multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, neighborhood median income less than or equal to $65,000. Kahlenberg's simulation 6 retains the same sample and regression model from my simulation. Simulation 6 eliminates consideration of the same characteristics as my simulation except for recruited-athlete status. Simulation 6 also eliminates consideration of Early Action status. Applicants with certain socioeconomic characteristics are given a low-SES boost by adding a value to their admission index. The value is equal to 1.6 multiplied by the number of characteristics an applicant displays out of the following: disadvantaged, requested a fee waiver, first generation college student, applicant obtains a neighborhood SES index score in the bottom third of the distribution, applicant obtains a high school SES index score in the bottom third of the distribution. The neighborhood and high school SES indices are constructed by equally-weighting three standardized factors: parental income, parental education, and percentage of families speaking a language other than English at home. Kahlenberg's simulation 7 is the same as simulation 6 except that it retains consideration of Early Action status.

# Academic qualifications and profile ratings of transfer applicants

| | Statistic | Transfer Applicants | Non-Transfer Applicants |
|---|---|---|---|
| 1. | Number of Applicants | 5,429 | 171,840 |
| 2. | Average SAT Score | 1,972.0 | 2,090.9 |
| 3. | Average SAT II Score | 71.6 | 71.9 |
| 4. | Average Composite ACT Score | 29.0 | 31.2 |
| 5. | Average Converted GPA | 69.8 | 75.1 |
| 6. | Average Academic Index | 207.1 | 218.0 |
| 7. | Fraction with Academic Rating of 1 or 2 | 18.2% | 39.4% |
| 8. | Fraction with Personal Rating of 1 or 2 | 8.0% | 19.5% |
| 9. | Fraction with Extracurricular Rating of 1 or 2 | 17.1% | 22.7% |
| 10. | Fraction with Athletic Rating of 1 or 2 | 5.9% | 9.9% |

Source: Arcidiacono Data

Note: Sample consists of domestic applicants to the classes of 2014 – 2019.

**JA5791**

DX730.0001

United States District Court
District of Massachusetts

**DX 730**

Case No.    1:14-cv-14176 (ADB)
Date Entered
By
Deputy Clerk

# Demographic profile of transfer applicants

| Statistic | Transfer Applicants | Non-Transfer Applicants |
|---|---|---|
| 1. Number of Applicants | 5,429 | 171,840 |
| 2. Fraction of Applicants White | 41.4% | 40.6% |
| 3. Fraction of Applicants Asian-American | 17.7% | 25.8% |
| 4. Fraction of Applicants African-American | 12.8% | 12.0% |
| 5. Fraction of Applicants Hispanic or Other | 14.0% | 13.7% |
| 6. Fraction of Applicants Race Missing | 14.1% | 7.9% |

Source: Arcidiacono Data

Note: Sample consists of domestic applicants to the classes of 2014 – 2019.

DX730.0002

# Pursuing Excellence on a
# **Foundation of Inclusion**

Harvard University
Presidential Task Force
on Inclusion and Belonging



HARVARD
UNIVERSITY

United States District Court
District of Massachusetts

**DX 740**

Case No.     1:14-cv-14176 (ADB)
Date Entered_____
By_____
Deputy Clerk

**JA5793**

DX740.0001

HARV00096600



For nearly 400 years, Harvard has steadily — though often painfully slowly — opened its doors, as it has welcomed groups previously excluded from its faculty, staff, and student body. But, as recent events both here and elsewhere have reminded us, much work remains to be done if we are to fulfill our ideals and if we are to succeed in educating leaders and scholars who can effectively contribute to a complex and too often fractured world. It is essential that we bring together a diverse community. To realize the community's full promise, and to foster the personal and intellectual transformation at the heart of our mission, we must also work affirmatively and collectively to advance a culture of belonging. This requires an openness to change, as well as a willingness to learn from and embrace difference in the spirit that defines a vibrant and respectful academic community.

**PRESIDENT DREW GILPIN FAUST**

*Charge to the Presidential Task Force
on Inclusion and Belonging – May 2016*

*Credit: Rose Lincoln/Harvard Staff Photographer*

**JA5794**

DX740.0002

HARV00096601

I.   **Introduction** ............................................................... 1

II.  **Where Matters Stand:**
     *Data and Details* ..................................................... 7

III. **Four Goals and Four Tools:**
     *A Recommended Framework for Pursuing*
     *Excellence on a Foundation of Inclusion* ............... 18

     **FOUR GOALS FOR INCLUSIVE EXCELLENCE AT HARVARD**

     Goal 1: Recruitment, Retention, and Development Practices for Excellence

     Goal 2: Academic, Professional, and Social Integration

     Goal 3: Union of Academic Freedom and a Culture of
             Mutual Respect and Concern

     Goal 4: Inclusive Values, Symbols, and Spaces

     **FOUR TOOLS FOR INCLUSIVE EXCELLENCE AT HARVARD**

     Tool 1: Leadership From the Top

     Tool 2: School and Business Unit Strategic Planning

     Tool 3: Aligned Organizational Structures

     Tool 4: Data, Transparency, and Dialogue

IV.  **Eight Recommendations** ......................................... 29

     **HIGH-IMPACT FIRST STEPS**

     1. Inclusive Symbols and Spaces

     2. Two University-Wide Research Centers to Expand the University's
        Research Agenda

     3. Resources to Enhance Mental Health Services in Support of Well-Being

     **SUSTAINED FOCUS ON INCLUSIVE EXCELLENCE**

     4. School and Business Unit Strategic Planning Work

     5. Alignment and Coordination of Inclusive Excellence Work in the
        Office of the President and Provost

     6. Increased Focus of University Human Resources on Enabling Staff
        Talent and Improving Organizational Culture

     7. Transparency, Feedback, and Dialogue: OPP Sponsors a Triennial
        Assessment of the University's Progress Toward Inclusive Excellence

     8. Increased Resources for Faculty Renewal and Development

V.   **Conclusion** ............................................................... 37

*The materials listed in sections VI and VII
are available on the Task Force website:*
*inclusionandbelongingtaskforce.harvard.edu*

VI.  **Accompanying Materials
     for the Community**

     A. Acting According to Harvard's Values:
        A Call to Action

     B. Inclusion and Belonging Promising Practices
        Catalog Teaser

     C. Draft Inclusion and Belonging Survey Module

     D. Inclusion and Belonging Essential Readings

VII. **Appendices**

     A. Task Force Charge

     B. Task Force Process

     C. Key Terms

     D. Revised Values Statement

     E. Revised *Alma Mater*

     F. Report of the Afternoon of Engagement

     G. Solution Space: Insights from the Community

     H. Benchmarking Peer Diversity
        and Inclusion Action Plans

**JA5795**

HARV00096602

DX740.0004



*Folarera Tasawe, left, and Jane Riccardi, both of the Medical School, work together at the Afternoon of Engagement at Sanders Theatre, a community-wide workshop and opportunity for reflection.*
*Credit: Rose Lincoln/Harvard Staff Photographer*

HARV00096603



# I. Introduction

Members of the Harvard community are united by a shared commitment to inspired teaching, innovative scholarship, scientific discovery, path breaking creativity, and professional expertise that can help address society's hardest challenges. Achieving excellence across these pursuits requires bringing a broad diversity of perspectives, methods, and experiences to bear on any given area of study or discovery. In other words, academic excellence requires diversity and inclusion. Our shared pursuits also depend on the open and direct expression of ideas and on criteria of evaluation established by the judgments of experts. Excellence therefore also requires academic freedom. Inclusion and academic freedom — these principles are linked in each being necessary to the pursuit of truth. They are also mutually reinforcing. Academic freedom protects participation in the intellectual enterprise; inclusion makes the value of academic freedom real by ensuring that all voices gain from its protections. Both ideals are core to Harvard's mission.

Although the search for truth has inspired Harvard's pursuit of academic excellence since its earliest days, over time our understanding of that search has changed. It would be hard to designate academic freedom as a principle of the University's Puritan founders, and the principle faced great pressure during the period of McCarthyism. Since then, however, it has come to be recognized as an anchoring ideal. Excellence rests on a foundation of academic freedom. Similarly, we can now see that the pursuit of excellence also requires a foundation of inclusion, another anchoring ideal. In the words of the *alma mater*, we aspire to be heralds of light *and* bearers of love.

Over the course of the 20th century, Harvard steadily endeavored to overcome a history of closed doors, opening the intellectual enterprise to people from all backgrounds. Many students, staff, and faculty members and academic personnel all over the University have worked to advance the principle of inclusion. For example, Harvard's entering College classes are now

DX740.0005                                                                                    HARV00096604

> Harvard now has an opportunity to achieve still greater intellectual heights — to unleash innovation in our research agendas and curricula with fresh questions emerging from the diverse perspectives of new members of this community. Yet hard work will be necessary to take advantage of this opportunity.

the most diverse in the University's history. Alongside great ethnic and racial diversity, we have also achieved gender parity, an increased presence of international students, strong commitments to financial aid that bring us meaningful socioeconomic diversity, and ever-deepening commitments to accessibility for those with disabilities. Our community also benefits from a diversity of sexual identities, political viewpoints, and religions.

Thanks to the purposeful efforts of members of the campus community and to demographic changes here and in the broader national and global context, Harvard now has an opportunity to achieve still greater intellectual heights — to unleash innovation in our research agendas and curricula with fresh questions emerging from the diverse perspectives of new members of this community. Yet hard work will be necessary to take advantage of this opportunity.

The aim of this Task Force is to strengthen Harvard's capacity to pursue excellence on a foundation of inclusion by addressing four critical challenges. These are challenges that community members throughout the University are already working strenuously to address, but which we might tackle with greater intentionality and impact.

First, not all Schools at Harvard have made the same progress in diversifying their student bodies as is reflected in the College. Nor has the same degree of progress been achieved with the faculty and the upper ranks of staff. We continue to need attention to issues of recruitment, development, and promotion.

Achieving diversity and inclusion requires deliberate attention and effort, not merely the absence of intentional discrimination or ill will. Those of us who hire teams, bring on new faculty, or admit students may easily fall into the habit of recruiting people who resemble ourselves — not merely in qualities we all hope to embody, such as integrity, creativity, diligence, and potential for significant intellectual development, but also in social background, cultural style, and previous life experience. The resulting homogeneity leads to intellectual blind spots that weaken both decision-making and scholarship. It is easy to forget that our teams will be stronger if we take the time and energy to tap into the broadest spectrum of talent, rather than follow the familiar habits and procedures that replicate our own.

Second, the intellectual fruits of a community's inner diversity do not harvest themselves. To gain the benefit of diversity, Harvard must fully integrate all members of the University into academic, professional, and social contexts that support their individual flourishing and activate

HARV00096605

their potential. Excellence requires successful practices of inclusion at all levels, from the interpersonal to the organizational. As captured powerfully by the 2014 "I, Too, Am Harvard" multimedia project, some groups within student bodies, faculties, and staffs experience low levels of *inclusion and belonging*. Many of us have sat in meetings and classes where some people do not speak, and are never invited to do so. Many of us have heard newly arrived students or staff members ask good questions that are disregarded or dismissed by experts because they come from outside the paradigms of a discipline or professional specialization. And many of us have at some point experienced social isolation that undermines our ability to function effectively in our academic and professional work. When these sorts of things occur, the University loses the benefit of the resources that the silent, the dismissed, and the isolated might have brought to the table. Even more importantly, these people lose the chance to benefit from the University's rich educational opportunities.

When students, staff, faculty members, or academic personnel are integrated into our community in ways that permit them to do their best work, we anticipate that they will experience a sense of full belonging. We hope for this result for their sakes as well as for the sake of the institution. *Belonging* is the experience that flows from

participating fully in the chances Harvard offers to learn, to create, to discover, and to achieve. The experience of belonging also supports full embrace of the responsibilities of stewardship that we all have for the ongoing improvement of our community.

Third, the increasing diversity of our campus can also bring conflict. Our Task Force discussed many dimensions of diversity — race, ethnicity, gender, sexual identity, religion and spiritual experience, political viewpoint, socioeconomic and immigration status, geographic origins and language, disability, veteran status, and discipline and scholarly methodology. All

of these differences are of great potential value to an academic community that seeks to maximize its knowledge resources in pursuit of academic excellence. Yet these differences can also generate sharp disagreement. Harnessing the power of diversity for academic excellence requires us to build a world where it is possible for us periodically to strive as adversaries yet nonetheless eat and drink as friends, to paraphrase a motto painted on the wall of a Harvard Law School eatery. For Harvard to excel intellectually, we need to advance both the principle of academic freedom and a culture of mutual respect.



*The Afternoon of Engagement was hosted by Harvard University President Drew Faust at Sanders Theatre and was a community-wide workshop and opportunity for reflection with students, staff, and faculty and academic personnel. Credit: Rose Lincoln/Harvard Staff Photographer*

HARV00096606

Some will say that pursuing both of these principles is impossible; that for all to convey their views openly and frankly, some must put up with being harmed; that for some to feel respected, others must cease to speak. In our outreach sessions, we heard a clear theme that many conservative students on campus engage in self-censorship to avoid possible alienation from peer groups. We cannot afford to presume a necessary conflict between protecting academic freedom and achieving a culture of mutual respect. Both principles contribute to the foundation on which academic excellence rests. Individually and collectively, we must strive to discover how to combine them.

The educators among us have the job of finding the pedagogic tools to bring together the principle of academic freedom with a culture of mutual respect. We can build level playing fields for intellectual engagement; open up space for expression of dissenting views; cultivate a sense of responsibility for proving ourselves trustworthy to one another; and help build up resources for resilience in the face of enduring, and even painful, disagreement or disappointment. Similarly, the managers and leaders among us also have the job of creating spaces where respectful dissent can be expressed safely and where all members of a team can participate in difficult conversations, while experienc-

ing and conveying respect for others. We may not yet understand all the relevant pedagogic tools for the work of simultaneously upholding principles of academic freedom and inclusion, or how to clarify fully the distinctions between productive discomfort, pointless harm, and actual trauma, but we will find the answers only if we seek them. And we must find them, if we are to make good on the opportunity our diversity presents us to build a solid foundation for the pursuit of excellence. Our enduring commitments to discovery and creativity should themselves help us find the way forward.

When students, staff, faculty members, or academic personnel are integrated into our community in ways that permit them to do their best work, we anticipate that they will experience a sense of full belonging …. *Belonging* is the experience that flows from participating fully in the chances Harvard offers to learn, to create, to discover, and to achieve. The experience of belonging also supports full embrace of the responsibilities of stewardship that we all have for the ongoing improvement of our community.

Fourth, and finally, there is the challenge of weaving together the past — in its glories and its failures — with a picture of the present and future to which we aspire. Many to whom we spoke asked how the work of the Task Force addresses issues of historical equity, the fact that in its earlier history Harvard barred people from attending or working at Harvard on account of their social origins or identities. Moreover, in so doing, and even as it also in many ways advanced the public good, Harvard contributed to broader social inequities. While such questions may be painful to hear, hear them we must, for they capture real experiences of this University for many in our community. As a part of our work, we will need an honest institutional history and efforts to revisit

HARV00096607

how we weave past to present and future through our repertoire of symbols.

Yet we believe that the best way to address the past is to tackle all four of these challenges together, strategically. By continuing the ongoing efforts to transform Harvard, by establishing the pursuit of excellence on a solid foundation — including a foundation of inclusion — we address past inequities. To write words such as these does not suffice, however. Only evidence of change can begin to heal past transgressions.

Four linked propositions, all directed at our central goal of intellectual achievement, have therefore framed the work of this Task Force. We believe that Harvard will achieve its highest level of academic and organizational excellence by:

1. Recruiting from the broadest possible pool of exceptional talent;

2. Supporting the flourishing of all members of the campus community, regardless of background;

3. Developing pedagogic and mentoring strategies that simultaneously uphold the principle of academic freedom and advance a culture of mutual respect and concern; and

4. Conveying through its symbols how these aspirations, which rest on recognition of basic human dignity, both grow from and transcend our history.

By doing these four things, Harvard can draw nearer to its best self, enabling members of the Harvard community to achieve academic excellence and human fulfillment in a diversity to which we all belong, for our own good and for the public good.

Importantly, many on our campus already have been working over many years to advance these four propositions. We quote from President Faust's charge to our Task Force:

*Harvard's Schools have undertaken a range of inquiries and initiatives designed to make this a more open and inclusive campus, an effort made more urgent by the searing experiences of marginalization and discrimination described in the broader society and by members of our community. Since so many critical decisions and policies — on issues from academic priorities and recruitments to student services — are determined at the School level, this focus has already produced important outcomes. But the promise of Harvard University, its inspiring culture of excellence and its most salient opportunities, rests beyond any individual School — in foundational institutional values and in what we contribute to and learn from one another, with each of us and all our endeavors enlarged and expanded by what we share.*

President Faust established our 60-member Task Force — representing students, staff, and faculty and academic personnel at

all of Harvard's Schools — to answer questions about institutional values and goals for what we can contribute to and learn from one another to advance the work of inclusive excellence.

In this report, we provide a framework for pursuing these goals ("Four Goals and Four Tools"), as well as concrete recommendations to launch the work ("Eight Recommendations"). The report is the result of 18 months of intensive study of this University and other institutions in and out of higher education, of broad campus outreach, and of repeated Task Force deliberations (see Appendix B, Task Force Process). Our theory of change is that a highly informed campus, with overlapping goals and vocabulary, supported by an Office of the President and Provost that can solve collective action and coordination problems, will succeed at building the foundation of inclusion necessary for true excellence. We also recognize that achieving our goals depends on meeting our aspiration to be a community of honesty and goodwill, and all of us will need to do our part (see "Acting According to Harvard's Values: A Call to Action").

Will we fall short in ways we cannot anticipate? Yes, surely. Can we reach greater heights of achievement than we yet have? Yes. Can we afford to set our faces in any other direction? We think not.

HARV00096608



## Constituencies

Harvard University aspires to provide education and scholarship of the highest quality — to advance the frontiers of knowledge; to equip students, staff, and faculty and academic personnel for fulfilling experiences of life, work, and inclusive leadership in a diverse world; and to provide all members of the community with opportunities for growth. Achieving these aims depends on the efforts of thousands of diverse students, staff, and faculty and academic personnel across the University, including in our virtual endeavors. Some make their contributions by engaging directly in teaching, learning, and research; others contribute by supporting and enabling those core activities in essential ways, while also pursuing professional growth. With some variation School to School, the category "academic personnel" includes lecturers, preceptors, postdoctoral fellows, academic personnel in the hospitals, and other researchers. The first three core University constituencies are students, staff, and faculty and academic personnel. Alumni and friends constitute an additional core constituency. Because this Task Force included the staff constituency in its focus, we talk routinely not only about Schools — which house most faculty, academic personnel, students, and staff — but also about business units. These are central organizational units that house staff, such as Human Resources, Information Technology, and Campus Services, where janitorial and dining services staff are housed.

*Credit: Kris Snibbe/Harvard Staff Photographer*

HARV00096609

# II. Where Matters Stand:
## Data and Details

For nearly 400 years, Harvard has step by step opened its doors, first slowly, then faster, as it has welcomed groups previously excluded from its student body, staff, faculty, and academic personnel. Those of us on the Task Force found it inspiring just how much good work is underway across campus to continue to improve the diversity of the University and experiences of inclusion and belonging for all members of our community.

On the other hand, we also found that the breadth of ongoing efforts tends to be invisible, leading many in our community to think that these issues are going unaddressed, and that while trends toward an increasingly diverse community at Harvard continue, progress is frustratingly uneven.

**University-wide Demographic Data 2016**

NOTE: Minority includes those reporting: Black or African-American, Hispanic or Latino, American Indian or Alaska Native, Native Hawaiian and Other Pacific Islander, and Asian.

*Source: SIS Enrollment.*



**48.32%** Female
**30.92%** Minority
**22.66%** International
**STUDENTS**
21,891

**56.02%** Female
**22.33%** Minority
**9.21%** International
**STAFF**
16,029

**33.89%** Female
**17.96%** Minority
**9.30%** International
**FACULTY**
2,517

**JA5803**

HARV00096610



## Voices and Perspectives

Over the course of 18 months, we heard all sorts of perspectives in outreach sessions, the Afternoon of Engagement, and through our Solution Space. We've selected some that we think capture particularly important perceptions about our community.

For example, students were 31 percent minority[1] in 2016, faculty 18 percent, and staff 22 percent, and while all of those percentages are greater than they were the decade prior, they do not fully reflect the pace of change in the racial and ethnic diversity of our country and the world. While women represent approximately half of the student (48 percent) and staff (56 percent) populations, and those percentages have been constant since 2006, women represent just 34 percent of faculty ranks, only a modest increase from 30 percent a decade ago. In keeping with national trends, for every degree level at Harvard, the percentage of female and underrepresented minority[2] (URM) students is smaller in STEM (science, technology, engineering, and mathematics) than in non-STEM fields. Life science fields, however, are characterized by levels of gender diversity on par with non-STEM fields. Harvard is a highly global institution — with nearly a quarter of students, and more than 50 percent of postdocs, having non-resident immigration status, and with more than a third of faculty having been born or educated abroad — but the ratio of international individuals varies tremendously from School to School. The unevenness in these trends is not particularly surprising, and arguably, variation across constituency groups, fields, Schools, and units is to be

expected, given Harvard's breadth and complexity. We believe, however, that there is substantial room for improvement.

Furthermore, the picture of growing demographic diversity against the backdrop of substantial cross-unit differences, while an important part of the story, is not the full story of inclusion and belonging. There are other important dimensions of diversity, such as identity and experience — captured in part by religious background and belief, veteran status, disability, immigration, and political viewpoint, among other factors. Data about these sorts of dimensions are less available and more anecdotal in nature, but we can glean some preliminary insights nonetheless, and climate surveys give us other windows into variations in inclusion and belonging on campus as well.

For example, according to a survey of incoming undergraduates conducted by the student newspaper[3] *The Crimson*, no religious group was in the majority in the entering undergraduate class of 2021. Forty-three percent of the members of the class of 2021 characterized themselves as somewhat religious, religious, or very religious, and we know that Harvard's 35 chaplains provide guidance to student, staff, and faculty and academic personnel from a wide range of faith traditions. In terms of politics, *The Crimson* reports

---

1   Minority includes those reporting: Black or African-American, Hispanic or Latino, American Indian or Alaska Native, Native Hawaiian and Other Pacific Islander, and Asian.

2   Underrepresented minority includes those reporting: Black or African-American, Hispanic or Latino, American Indian or Alaska Native, and Native Hawaiian and Other Pacific Islander.

3   *The Crimson* reported a "more than 50 percent" response rate to the e-mail survey, which is conducted annually.

DX740.0012                                                                                        HARV00096611

# Recruitment, Retention, Promotion

Perceptions and suggestions about recruitment, retention, and promotion came up in many comments we received, as did suggestions about how to reduce bias and build a culture of research and change in the way Harvard addresses these issues.

As a doctoral student of color at the Harvard Graduate School of Education I chose to attend Harvard specifically because of the diversity of my cohort.
— *Solution Space*

"Here, when you interview for an administrative job, it seems as if the only people ever doing the interviewing are white. That wasn't true when I worked in D.C. before coming here.
— *Outreach session*

"It can be hard for a manager commenting on performance to get the right tone or words when managing someone from a different cultural background. Is there a way to develop shared vocabulary around performance?"
— *Solution Space*

"Many urgent questions of our time concern race, ethnicity, and inequality, but Harvard lags behind its peers in fostering research on these topics across the University.
— *Solution Space*

"Hiring departments can ... include work-sample tests for their candidates, which are related to the tasks the job candidate will have to perform [and] have been shown to predict future performance in a more accurate way when compared to interviews, resumes, or any other traditional hiring process. Removing unconscious bias ... is a way to debias our hiring procedures and also let Harvard hire the best talent ...
— *Solution Space*

"I can see candidates [for staff positions] just as capable as myself, but with less moral support, becoming completely disillusioned ... and convinced they're incapable ... I can see them being broken, so to speak, by a system that strains to prove they aren't a 'natural' fit.
— *Solution Space*



*Archon Fung speaks at the Afternoon of Engagement. Credit: Rose Lincoln/ Harvard Staff Photographer*

HARV00096612

### Postdoctoral Fellows 2017-2018

**1,602** TOTAL POSTDOCS



Female **35%**    **60%** International

URM **4%**

**(11%** domestic postdocs are URM)

*Source: PeopleSoft*



**8.9%**
of **ALL U.S. POSTDOCS** are Harvard plus affiliates

**12.7%**
of **U.S. LIFE SCIENCES POSTDOCS** are Harvard plus affiliates
*(defined as the NSF categories biological sciences, health fields, and neuroscience)*

*Source: National Science Foundation (NSF) data in 2015.*

NOTE: URM is defined as: Black or African-American, Hispanic or Latino, American Indian or Alaska Native, and Native Hawaiian and Other Pacific Islander.

that 9 percent of seniors who were likely to vote said they were registered Republicans, compared with 52 percent who were registered Democrats and 39 percent who were not registered members of a political party or who were registered as independents. Across the ideological spectrum, according to the National Study of Learning, Voting, and Engagement, Harvard students are politically engaged — with 58 percent turning out for the 2016 presidential election (approximately five percentage points higher than benchmark institutions). In terms of the veteran community, in 2011 President Faust welcomed ROTC back to campus, and while difficult to track systematically across Harvard's Schools, we know there is a significant community of students who have served in the military. We also know that roughly 10 percent of Harvard College students report a disability to the Accessible Education Office. And from the sexual climate survey administered to all Harvard students in 2015, we saw that 11.8 percent of respondents reported an orientation other than heterosexual[4], and 0.6 percent chose a non-binary gender option[5].

Responses to the <u>faculty climate survey</u>, administered in 2007 and again in 2013 (and to be administered in the fall of 2018), indicate that we have made substantial progress in mentoring and general measures of department atmosphere. Even so, in 2013, approximately one in four faculty reported feeling "excluded from an informal network," with higher figures among female and minority respondents. And 55 percent of female URM faculty agreed with the statement "I have to work harder than my colleagues to be perceived as a legitimate scholar," compared with 37 percent of female non-URM faculty, 38 percent of male URM faculty, and 27 percent of male non-URM faculty.

Among staff, according to a <u>2015 University-wide engagement survey</u>, 80 percent "feel respected as a person regardless of my … background." Despite general feelings of respect, women and particularly minority respondents were less likely to agree than other groups. Nearly half of respondents did not believe their unit was "progressing toward greater diversity and inclusion," most did not report trusting their supervisors, and more than a third disagreed with the idea that "Harvard values differences in education, experience, ideas, work styles, and perspectives." Sixty-one percent of women and 52 percent of men did *not* agree that "It is safe to speak up and constructively challenge things here." And whereas 89 percent of staff agreed or strongly agreed that "This is a physically safe place to work," only

---

4    These categories included: gay or lesbian, bisexual, asexual, questioning, not listed, and decline to state.

5    Non-binary response categories included: transgender male, transgender female, gender queer or non-conforming gender, questioning, not listed, and decline to state.

HARV00096613

# Symbols and Spaces

Many comments we received attested to failures to transcend habits of exclusion from our past, in both our spaces and our symbols.

"When the physical space itself is designed to welcome people of all physical abilities, it will improve access for people with mobility impairments and also symbolize that we welcome all people.
— *Solution Space*

"The Musalla (prayer space), the Harvard College Women s Center, and the Harvard College Office for Equity, Diversity, and Inclusion are all located in basements. What message does it send when all of these centers are in dark, underground spaces?"
— *Task Force Member*

"I met last Friday with eight conservative students. As a group they said they feel deeply chilled … One of them also said that 'inclusion and belonging' means 'conservatives not welcome' — which is exactly what those words mean to many conservatives, including me.
— *Emailed comment*

"Work to bridge the gap between the Cambridge and Longwood campuses.  Find a way to bring Longwood and Cambridge together. Maybe have some large events in Longwood instead of Cambridge or have mini versions of same events in Longwood.
— *Outreach session*



*Kalan Chang speaks at the Afternoon of Engagement. Credit: Rose Lincoln/ Harvard Staff Photographer*

DX740.0015

HARV00096614

12  /  Pursuing Excellence on a Foundation of Inclusion

60 percent agreed or strongly agreed with "This is a psychologically and emotionally healthy place to work."

We see similar patterns among students. For example, one-third of Harvard College seniors reported not being satisfied with the sense of community on campus, and the lack of satisfaction was stronger among those who reported belonging to minority groups. Similarly, we see from a Harvard University Health Services report that patient feedback (qualitative and quanti-tative) and focus groups revealed missteps in sensitivity to cultural differences and out-of-date language when interacting with, for example, transgender individuals.

The Task Force's outreach and listening sessions throughout campus during the 2016–17 academic year underscore, like the survey responses above, that diversity does not automatically yield inclusion. They also reveal some consistent themes, highlighted in the call-out boxes. One that stands out in particular is that the contributions of staff at Harvard often go unrecognized by faculty, academic personnel, and students. There are structural aspects of our institution that have come to connect with cultural norms that we believe merit re-examination. For example, the status that comes with tenure, deeply connected to our research University's standards of academic excellence and valuable though it is, sometimes seems to become connected to cultures of disrespect and indifference to the contributions that those outside the tenured ranks make to the institution's

## Percentage Minority, International, and Female Students by School (2006 and 2016)



NOTES: Degree-seeking students only. Students are counted multiple times if simultaneously enrolled in multiple Schools.
URM includes those reporting: Black or African-American, Hispanic or Latino, American Indian or Alaska Native, and Native Hawaiian and Other Pacific Islander.

GSAS = Graduate School of Arts and Sciences

*Source: SIS Enrollment.*

# Belonging in the Academy

Students, staff, and faculty and academic personnel shared their experiences of doing academic work and scholarship in our community — and how those experiences are affected by gender, race, sexuality, and political viewpoint.

"It often feels like my male professors and teaching fellows either connect more or are more personable with male students in my STEM classes.
— *Outreach session*

"We need more acceptance of ideological outliers: If you don't fit into the ideological worldview of your [colleagues] you're seen as an outsider.
— *Afternoon of Engagement*

Getting a Ph.D. is hard enough ...

"Staff members would benefit from formal mentorship programs. Mentorship is too ad hoc and often doesn't happen at all.
— *Solution Space*

As an undergraduate ... I was committed to studying societal disparities and history of Latin@s in the United States. [Harvard was] ... lacking in course offerings, advisers, and relevant research opportunities. One of my academic advisers suggested I would have better luck finding support ... had I gone to a University of California or University of Texas campus.
— *Solution Space*

"I was asked recently to participate as a featured reader in a poetry series put on by the ... Harvard Divinity School. At first I was intimidated. ... You see, I work as a faculty assistant ... the organizer ... reminded me of my own literary background ... Most of us [staff] work in the field that we do, because we have some sort of personal connection to it. In the end, I participated. ... I will tell you, I could not have felt a higher sense of inclusion and belonging.
— *Afternoon of Engagement*



*Eden Girma speaks at the Afternoon of Engagement. Credit: Rose Lincoln/ Harvard Staff Photographer*

HARV00096616

14 / Pursuing Excellence on a Foundation of Inclusion

academic mission. We need to work to refashion such features of our culture.

Indeed, we suggest that leadership and new norms will be required to ensure that necessary hierarchies are nonetheless linked to a broad and deep culture of interpersonal respect for all. (See sidebar, "Falling Short on a Culture of Respect.") The outreach efforts of the Task Force also made clear that Harvard operates with a reliance on relationships, tacit knowledge, and social networks. Some called this a "Harvard code," and said that encounters with tacit social norms are often experienced as privileging particular identities — typically white, male, secular, and politically liberal. (See sidebar, "Belonging in the Academy.")

We also heard that the place of race, sexuality, gender, and other features of identity in the curriculum and in interpersonal interactions leaves many unsatisfied — either because these topics go unaddressed, even though they are germane to an area of study, or because efforts to communicate and interact across lines of social difference misfire. The end result is that members of the Harvard community convey an uneven sense of belonging, with people from minority groups (of identity and viewpoint) and staff members conveying the sharpest senses of alienation. (See sidebar, "Symbols and Spaces.")

A final observation about where matters stand relates to Harvard's ability to track progress toward diversity, inclusion, and belonging goals effectively. We cannot

**Percentage Minority, International, and Female Faculty by School** (2006 and 2016)



NOTES: Faculty head counts. URM includes those reporting: Black or African-American, Hispanic or Latino, American Indian or Alaska Native, and Native Hawaiian and Other Pacific Islander.

SEAS = Engineering and Applied Sciences, FAS = Faculty of Arts and Sciences

*Source: PeopleSoft*

HARV00096617

# Falling Short on a Culture of Respect

Many told us of their difficulties learning and navigating Harvard's hierarchies — and the absence of visibility and respect they felt within them.

"People at Harvard just don't introduce themselves to one another, even for instance at the first meeting of a new committee that one is sitting on.
*— Afternoon of Engagement*

"Dispute and counseling experience reveals that people, and postdocs in particular, have a sense of disempowerment.
*— Outreach session*

"It would go a long way for staff morale if faculty made more of an effort to learn names of staff and to say hello.
*— Afternoon of Engagement*

"Faculty-staff committees would work better if faculty remembered to ask staff, 'You've got a lot of experience on this subject. What are your thoughts?'"
*— Afternoon of Engagement*

"There are no 'rules of the road.' We allow lines to get crossed by faculty and some staff that affect feelings of inclusion and belonging. Do we have different cultural expectations of behavior for some but not others?"
*Outreach session*



*Scott Abell speaks at the Afternoon of Engagement. Credit: Rose Lincoln/ Harvard Staff Photographer*

HARV00096618

16   /   Pursuing Excellence on a Foundation of Inclusion

currently convey the range of our challenges — nor the extent of our successes — through existing data. Measuring all the relevant criteria of diversity, inclusion, and belonging — consistently and comparably — is a central challenge for each School and the University as a whole. For good reason, data on socioeconomic status, religiosity or religious affiliation, non-binary gender identification, sexual orientation, "primary" language, disability status, political beliefs and ideology, or veteran status are particularly hard to gather in a way that respects privacy while providing useful information about the Harvard community. Some of these data are available only at the School level, some are gathered unevenly or with divergent definitions, and some are not collected at all. Climate surveys, particularly for students, tend not to be aligned across units. Thus, although the Task Force spent months gathering data from the many offices around campus, we can only offer a partial picture of the state of affairs on campus. *A key institutional need is a more comprehensive and intentional institutional research infrastructure to support strategic action on behalf of inclusive excellence.* We suggest this will benefit not only strategic action on behalf of inclusive excellence, but also many other strategic initiatives of importance.

### Percentage Minority, International, and Female Staff by School/Unit (2006 and 2016)



NOTES: Central Administration (CADM) includes vice presidential areas (e.g., development and HR), service units (e.g., HUIT and Campus Services), libraries, museums, and other support units.
URM includes those reporting: Black or African-American, Hispanic or Latino, American Indian or Alaska Native, and Native Hawaiian and Other Pacific Islander.

CADM = Central Administration, SEAS = Engineering and Applied Sciences, FAS = Faculty of Arts and Sciences

*Source: PeopleSoft*

# Combining Academic Freedom and a Culture of Respect and Concern

It was clear from comments we received that the increasing diversity of our campus can also bring conflict, for example, putting pressure on instructors to devise new pedagogical tools and the general need to expand skill sets brought to challenging conversations. Also, while issues of academic freedom are, as a technical matter, pertinent mainly to faculty and students, we heard that staff, too, need time and space for difficult conversations as well as a culture that supports the expression of dissenting views.

"Staff need spaces for small group conversations … about issues in the world. Space to be vulnerable … and have support.
— *Afternoon of Engagement*

"Some people innocently use terms that could be offensive to other people. Would the community benefit from some role-playing with actors where they use terms that land flat to raise their sensitivity to this?" — *Outreach session*

A lot of people need training in how to listen. Just that. How to hear the whole of what someone else is trying to tell them. If we focused more on listening and less on speaking, it would go a long way.
— *Solution Space*

"Sometimes people felt that there are not safe spaces to speak up … [we need to cultivate a culture] in a way that it's truly OK to dissent — for example is it risky if I say this totally risky/creative idea?"
— *Afternoon of Engagement*

"Faculty have a hard time teaching when there are dramatically different perspectives or views.
— *Outreach session*

"Don't be afraid of healthy, respectful conflict. When planning academic and social programs, people shouldn't be afraid of constructive/intellectually challenging conflict.
— *Solution Space*

As an East Coast-born liberal, I feel comfortably embraced at Harvard … However, I have heard from many conservative alumni and students that they don't see their beliefs recognized as valid or acceptable here.  — *Solution Space*



*Danielle Allen welcomes the community to the Afternoon of Engagement. Credit: Rose Lincoln/ Harvard Staff Photographer*

HARV00096620

# III. Four Goals and Four Tools:

## A Recommended Framework for Pursuing Excellence on a Foundation of Inclusion

In order that Harvard can become its best self, enabling members of the Harvard community to achieve academic excellence and human fulfillment in a diversity to which we all belong, for our own good and for the public good, we recommend in this section a framework of Four Goals and Four Tools. We recommend this framework as a guide to strategic innovation on behalf of diversity, inclusion, and belonging in every School and

business unit on campus. The value of the framework is to encourage systematic and integrated thought across the domains that are relevant to pursuing excellence on a solid foundation of inclusion.

To initiate this work, we also make in the next section Eight Recommendations to the Office of the President and Provost for concrete action steps both to initiate the work and also to establish a sustained focus on inclusive excellence.

DX740.0022

HARV00096621

1. Recruitment, Retention, and Development Practices for Excellence

2. Academic, Professional, and Social Integration

3. Union of Academic Freedom and a Culture of Mutual Respect and Concern

4. Inclusive Values, Symbols, and Spaces

4 GOALS

**A FOUNDATION FOR INCLUSION**

1. Leadership From the Top

2. School and Business Unit Strategic Planning

3. Aligned Organizational Structures

4. Data, Transparency, and Dialogue

4 TOOLS

**JA5815**
DX740.0023

HARV00096622



*Susan Zawalich, staff at GSAS, and Ahmed Sadik,*
*Law School student, complete an activity together at*
*the Afternoon of Engagement at Sanders Theatre.*
*Credit: Rose Lincoln/Harvard Staff Photographer*

# Four Goals for Inclusive Excellence at Harvard

We propose the following four goals — and related areas of focus — for the pursuit of inclusive excellence. These goals emerged from the hundreds of conversations that we have had across campus with students, staff, faculty and academic personnel, deans, and leaders of business units. They express the aspirations of many, though not all, of the members of the Harvard community. The view of the Task Force is that by focusing their diversity, inclusion, and belonging work and planning on these goals and focus areas, Schools and business units can achieve the foundation of inclusion necessary to advance Harvard's mission of academic and organizational excellence.

Over the course of a strategic planning process, Schools and business units may, of course, identify other priorities of greater urgency, and they will develop their own prioritizations and timelines. Nonetheless, this framework synthesizes the work and learning of the Task Force and therefore also of the broader community we have canvassed. It is built on the basis of substantial experience, data-gathering, and bold thinking. We therefore recommend this framework as a tool the campus can use to come together to work toward shared goals.

**4 GOALS**

## GOAL 1

## Recruitment, Retention, and Development Practices for Excellence

Each part of Harvard should recruit and retain a community that draws on the widest possible pool of exceptional talent, unifying excellence and diversity; promotion processes should be characterized by nondiscrimination and should recognize excellence in all its forms.

### RECOMMENDED AREAS OF FOCUS INCLUDE:

*Inclusive Excellence:* The goal of recruitment, promotion, and retention is to maximize excellence and diversity simultaneously (i.e., to pursue inclusive excellence); this requires proactive talent-spotting, contextualization for standardized metrics, and recruitment practices that utilize inclusive social networks and the power of pipeline programs. Achieving inclusive excellence also requires expanding our perception of areas worthy of research and teaching. Finally, the goal of achieving inclusive excellence should operate with equal rigor at the point of promotion as at the point of recruitment.

*Inclusive Leadership:* Rather than wholly delegating diversity, inclusion, and belonging work to others, School and business unit leaders should take direct responsibility for diversification through recruitment, promotion, retention, and ongoing development strategies. In their efforts, they should attend to all three constituencies of students, staff, and faculty and academic personnel.

*Potential for Growth:* For students and entry-level staff, recruitment should be organized around practices for judging growth potential, with a recognition that observed past performance alone may not capture the potential of an entry-level applicant, given differential opportunities and differential degrees of difficulty encountered.

DX740.0025

HARV00096624

### GOAL 2

## Academic, Professional, and Social Integration

All members of our community should be integrated into academic, professional, and social contexts that permit them to be their authentic selves and that support their academic and professional success, even while challenging them to grow.

#### RECOMMENDED AREAS OF FOCUS INCLUDE:

*Academic and Professional Excellence:* Initiatives to advance diversity, inclusion, and belonging should start and end with a focus on the academic and professional flourishing of all members of our campus community, rather than being formulated primarily as social problems. High-quality community-building experiences should, however, be recognized as a necessary support for academic and professional success.

*Responsive Curricula:* Within the parameters of a School's mission, Schools and departments should seek to incorporate input from students into faculty-led curricular planning processes. Examples around campus show that responsive curricula can be built at several levels:

a.  Some individual instructors build syllabi that allow students to choose among a set of readings;

b.  Some individual instructors redesign their courses in response to expressions of student interest and need;

c.  Some departments and Schools decide to redesign or add core courses;

d.  Some departments and Schools decide to add courses/faculty members in key areas where there is a lot of student demand;

e.  Some departments and Schools provide transparency around curricular planning, offering regular avenues for student input to the planning process.

*Collaboration and Teamwork:* We should increase and make effective use of collaborative and/or team structures to support learning, work, mentoring, advising, and the achievement of academic and professional goals. Relatedly, our policies and practices should, wherever possible, prioritize sharing resources and opportunities over efforts to maintain exclusive control of resources and opportunities. In particular, we should increase opportunities for course cross-registration and space-sharing.

*Improved Mentoring:* For all constituencies, we should improve our approach to mentoring, in particular by seeking a more holistic approach that goes beyond support for academic and professional development to include professionally appropriate support along psychosocial dimensions and equitable distribution of both kinds of support. Holistic mentoring involves taking an interest in one another as human beings; it typically requires partnerships among a range of kinds of advisers and mentors, some who focus more on the academic end and others more on the psychosocial end of a mentee's experience. To achieve a holistic view of a mentee is likely to require more information-sharing among the people who play mentorship roles in relation to any given individual. Improved use of data, within the parameters of privacy constraints, should support improvements in mentoring. For students, improved mentoring also depends on a well-functioning interface with mental health counseling and effective training for staff, faculty, and academic personnel in how to help students navigate the set of complementary resources spanning the spectrum from academic advising to mental health counseling.

HARV00096625

**GOAL 3**

## Union of Academic Freedom and a Culture of Mutual Respect and Concern

All members of the Harvard community can, in a thoughtful and concrete manner, work to discover and develop teaching, learning, mentoring, and interpersonal engagement strategies that promote academic freedom alongside mutual respect and concern. This goal invites consideration of pedagogy, the structure of public programs, the norms and modes of interpersonal exchanges, and trust-building. This goal also calls for consideration of research into ways to support difficult conversations. While broader public conversations often cast academic freedom and inclusion as antagonistic goals or, at best, two distinct values that must be accommodated to each other, we propose a richer understanding. The values of academic freedom and inclusion and belonging provide each other with synergistic and mutual reinforcement. Academic freedom is necessary to help us fully realize the value of inclusion and belonging. It anchors the principle that heterodox views should be protected in their expression and that we should bring the best principles of academic debate — not *ad hominem* argument, not personal invective, not threats, not unwitting insult — to the work of evaluating those views. Similarly, inclusion makes the value of academic freedom real by ensuring that all voices gain from its protections. Fostering synergistic mutual reinforcement of these two values will require refinement of thinking and practice.

RECOMMENDED AREAS OF FOCUS INCLUDE:

*Trust-Building:* How can insights from disciplines such as history, negotiation, education, psychology, and theater help us cultivate and disseminate skills of connecting with one another, even across deep fissures?

*Skills for Difficult Conversations:* How do we equip everyone on campus — students, staff, and faculty and academic personnel — with skills to engage across difference, support freewheeling debate, productively navigate difficult conversations, and make space for minority viewpoints (whether of religious students, conservative students, or students from underrepresented identity groups or backgrounds)?

*Time and Space for Difficult Conversations:* How can Schools create opportunities, whether in the curriculum or co-curriculum, for all on campus to explore issues in the world, hear differing points of view, and reflect on hard questions, in formats that both foster and model free academic expression and mutual respect and concern?

DX740.0027

HARV00096626

**GOAL 4**

## Inclusive Values, Symbols, and Spaces

Our symbols and spaces should convey our values of excellence, inclusion, and openness as well as conveying how those aspirations both grow from but also transcend our history.

RECOMMENDED AREAS OF FOCUS INCLUDE:

*Community:* The values statements of the University, Schools, and business units should include attention to values of community as well as to values of individual autonomy. Organizational decisions and practices should align with those core values.

*Present and Past in Proportion:* Symbols and communications materials should convey the openness and accessibility of our campus and of an academic life to people from all backgrounds. While continuing to respect our distinguished past, we should nonetheless shift the emphasis in our images, portraits, and public art to the present and future. This will permit us to represent the campus' current and anticipated diversity.

## The Relationship between Academic Freedom and Inclusion and Belonging

Harvard's commitment to truth, excellence, and opportunity requires us to pursue two core ideals at the same time: academic freedom, and inclusion and belonging. How do these ideals relate to one another? Consider three different ways.

On the first account, academic freedom and inclusion and belonging stand in deep and irreconcilable conflict. From this perspective, proponents of academic freedom may see many efforts to enhance inclusion and belonging as thinly veiled efforts to stifle, curtail, or even censor certain ideas or forms of speech, all in the name of avoiding harm or offense to others. Meanwhile, proponents of inclusion and belonging may see appeals to academic freedom as thinly veiled excuses for perpetuating norms and behaviors that cause unnecessary and unproductive wounds, either intentionally or unreflectively. From either

DX740.0028                                                    HARV00096627

perspective, the conflict between the two ideals leads to a common conclusion: One must win out over the other.

The second account, by contrast, views academic freedom and inclusion and belonging as two sometimes competing ideals that nonetheless can and must coexist alongside each other within an institution of higher learning. On this account, the hard work of reconciling these ideals requires us to identify when they conflict and then to articulate how our communal commitments ought to favor one or the other. Within this mindset, a university could be viewed as an amalgam of both safe and brave spaces — that is to say, as an institution that safeguards individuals' abilities to build bonds of affinity and solidarity with fellow travelers, while at the same time promoting the equally necessary and sometimes uncomfortable exchange of ideas that allows truth to emerge from debate and thereby promotes building bridges that connect different social, experiential, and ideological perspectives. From this second perspective, a university's goal is to find that potentially fragile point of equilibrium where academic freedom and inclusion and belonging accommodate each other.

Finally, the third account rejects the conflict presumed by the first two: Academic freedom and inclusion and belonging are not competing ideals, but rather mutually reinforcing and indeed codependent requirements of higher education. Neither can fulfill its true purpose without the other. On this account, one core benefit of diversity is the opportunity it affords to learn from others: Only by exposing ourselves to ideas, experiences, and perspectives outside of our own can we fulfill our shared pursuit of truth and excellence. Academic freedom, in other words, guarantees the full and free exchange of ideas that permits an institution's diversity to produce new knowledge, new insights, and deeper personal enrichment for every member of the community. At the same time, however, that very same exchange of ideas will necessarily be diminished, degraded, and ultimately devalued if some ideas, perspectives, or arguments rise to the top because some voices or speakers are presumed, by virtue of silent privileges, to be worth more than others. True academic freedom, in other words, requires that all perspectives — including those sometimes marginalized or excluded from the center of the conversation — be fully considered and valued in the shared pursuit of knowledge.

At Harvard, we believe that a diverse university without academic freedom is not a university at all, because it deprives its members of the opportunity to learn from one another. Meanwhile, academic freedom without the full inclusion of all voices produces something far less than the free and open exchange of ideas for which the university exists. We thus reject any account in which academic freedom and inclusion and belonging exist in hopeless conflict. Rather, we aspire to a world in which each is understood to reinforce the other.

We recognize that fulfilling this aspiration requires hard and enduring work: We have to build deep and lasting trust across our differences. Only with such trust can we enter the sometimes difficult conversations that true academic freedom demands with a spirit of charitable engagement, a genuine appreciation for differences of view, and confidence that our own voices and those of all members of the community will be heard and considered. As we work to build such trust, we will inevitably confront many challenges inherent in accommodating academic freedom and inclusion and belonging to one another. We must, however, always remember that our ultimate goal is to produce in time a community where tension between these ideals fades away, allowing their mutual reinforcement to cement the free and inclusive pursuit of knowledge as Harvard's core ideal.

*Credit: Jon Chase/Harvard Staff Photographer*

HARV00096628

# Four Tools for Inclusive Excellence at Harvard

For Harvard to pursue excellence on a foundation of inclusion, the University needs 1) leadership from the top ready to partner in this work with all campus constituencies; 2) institutional capacity for ongoing strategic planning and implementation; 3) data to help us measure our successes and shortcomings; and 4) processes of transparency and self-critique by which we can learn and hold ourselves accountable. We believe that these Four Tools are especially important for achieving the Four Goals of inclusive excellence. All of these tools are already in use all over campus. We recommend their more systematic and coordinated use in a process of continuous improvement.

### TOOL 1

## Leadership From the Top

At every level, from the Office of the President and the Provost to the vice presidents heading business units, from deans and department chairs to student organization presidents, leaders at the top need to be committed to the pursuit of excellence on a foundation of inclusion. Importantly, successful leadership for inclusive excellence requires strong practices of partnership that link all three constituencies: students, staff, and faculty and academic personnel.



**4 TOOLS**

## Continuous Improvement Process

These four tools should be used together in a cycle of continuous improvement, on a model analogous to this one, the RIDES Integrative Coaching Model, developed at the Harvard Graduate School of Education for school improvement.

**TOOL 2**

## School and Business Unit Strategic Planning

Too often, efforts at diversity, inclusion, and belonging lead to well-intentioned but nonstrategic and uncoordinated ad hoc efforts. The result is "diversity clutter": a host of programs that do not add up to more than the sum of their parts. We should bring the tools of strategic planning to the pursuit of inclusive excellence. In addition, that work should draw on scholarly research and practitioner expertise to avoid reinventing the wheel and to meet a high standard of expertise.

**TOOL 3**

## Aligned Organizational Structures

The pursuit of inclusive excellence should be supported by organizational structures that align responsibility with authority. Most importantly, each School or business unit should develop its organization and policies so that those with responsibility for diversity, inclusion, and belonging work also have the authority to make decisions for the constituency to whom their work pertains (i.e., students, staff, or faculty and academic personnel) and/or strong and effective partnerships with those with such authority. This may mean more frequently asking faculty members to take leadership roles in this space, or it may mean developing innovative forms of staff-faculty partnerships. There may also be still other solutions.

**TOOL 4**

## Data, Transparency, and Dialogue

Each unit should have the institutional research capacity, or access to it at the level of the central University, to diagnose disparities in the quality of experience for each constituency by demographic group. Each unit should also have the institutional research capacity to measure its progress toward inclusive excellence. Finally, School- and unit-wide community discussions about data and progress reports in venues like town halls can help build cultures of transparency and contribute to iterative improvement.



**6. REFLECT**
Reflect, plan, and build continuous improvement process

**5. ACT**
Make specific improvements

**4. PLAN**
Set clear/measurable goals and structure accountability/support

**1. GROUP**
Create a shared vision

**2. COLLECT**
Gather data to understand current reality

**3. DIAGNOSE**
Analyze gap between current reality and shared vision

Source: *Reimagining Integration: Diverse & Equitable Schools (RIDES) at the Harvard Graduate School of Education*

HARV00096630



Participants at the Afternoon of Engagement. Credit: Rose Lincoln/ Harvard Staff Photographer

**JA5824**

HARV00096631



# IV. Eight Recommendations

We recommend eight concrete steps to strengthen the foundation of inclusion for the pursuit of excellence. The first three are steps that can be taken in the near term. Then we propose a set of five that would build the infrastructure to support a long-term initiative for inclusive excellence and advancement of the Four Goals and Four Tools framework.

**HIGH-IMPACT FIRST STEPS**

1. Inclusive Symbols and Spaces
2. Two University-Wide Research Centers to Expand the University's Research Agenda
3. Resources to Enhance Mental Health Services in Support of Well-Being

**SUSTAINED FOCUS ON INCLUSIVE EXCELLENCE**

4. School and Business Unit Strategic-Planning Work
5. Alignment and Coordination of Inclusive Excellence Work in the Office of the President and Provost
6. Increased Focus of University Human Resources on Enabling Staff Talent and Improving Organizational Culture
7. Transparency, Feedback, and Dialogue: OPP Sponsors a Triennial Assessment of the University's Progress Toward Inclusive Excellence
8. Increased Resources for Faculty Renewal and Development

DX740.0033

HARV00096632

# High-Impact First Steps

## 1.

## Inclusive Symbols and Spaces

A revised values statement (Appendix C);

A revised *alma mater* (Appendix D);

Public art; and

Introduction of maps, signage, and improved navigational guides for campus and websites, including identification of accessible spaces, routes, and sites.

The current values statement of Harvard University was adopted in 2002 under President Lawrence Summers. We recommend revisions (Appendix C) that emphasize features of community that support academic, professional, and social integration. We recommend that the University adopt this revised statement of values and routinely utilize it in University-level communications. We also propose a revision for the final line of the *alma mater* (Appendix D), so that it serves to welcome people from all backgrounds into the pursuit of truth. We urge that the new Smith Campus Center be treated as a model for fresh approaches to how we design our shared spaces, deploy public art, and use shared space to build bridges. This common space open to all members of the University should also be a center for programming that supports civil disagreement and productive engagement with one another. Finally, we recommend that the University proactively refashion the fabric of the institution through portraiture, public art, and the introduction of maps and signage to help newcomers navigate our physical and digital spaces.

DX740.0034
HARV00096633

## 2.

### Two University-Wide Research Centers to Expand the University's Research Agenda

**An interfaculty initiative in identity, politics, and culture, or a variant**

Across campus, Schools have introduced any number of course offerings and programs in areas pertaining to race, gender, sexuality, inequality, diversity, access, opportunity, inclusion, and belonging, yet the siloes among Schools mean that the number and range of available offerings and events are not typically visible to students. A first coordinating University-wide interfaculty initiative would bring these many efforts together and provide an opportunity to build a whole that is greater than the sum of its parts, supporting innovation in research agendas and curricula across campus. We recommend the appointment of a faculty committee to assess the desirability and feasibility of launching such a University-wide interfaculty initiative and the potential design of such an entity.

**An interfaculty initiative on higher education, inclusion and belonging, and organizational change**

While the corporate world has built and synthesized a research base for moving forward on diversity and inclusion and belonging, and the military has also made great strides on these dimensions, higher education lags behind. Few resources are available connecting the vast bodies of research on identity, social experience, sense of belonging, and the law of association to literatures on higher education organizational management and policy. A second University-wide interfaculty initiative in this space could provide ongoing research in support of efforts at Harvard to move forward on inclusive excellence. Such an entity could also provide a leadership role for the higher education landscape more generally. A faculty committee should be appointed to assess the desirability and feasibility of launching such a University-wide interfaculty initiative and the potential design of such an entity.

## 3.

### Resources to Enhance Mental Health Services in Support of Well-Being

We understand that, working with the Office of the Provost, University Health Services is currently reviewing the Counseling and Mental Health Services' (CAMHS) interface with different Schools. As part of that effort, it will conduct strategic planning to support more effective allocation of resources and more effective processes for routing students to the support contexts appropriate to their needs. The Task Force recommends that CAMHS receive appropriate resources to conduct this strategic planning effectively and that the Office of Institutional Research be equipped to continue the mental health and well-being surveys across campus in a systematic way. We also recommend that the reorganization in the Office of the President and Provost (proposed in Recommendation 5) include attention to provision of central support for this initiative. This effort is necessary to address disparities in usage and experience of mental health services across different student populations. It is also foundational to developing improved approaches to mentoring that route students more appropriately in relation to their academic advising needs and mental health needs.

HARV00096634

# Sustained Focus on Inclusive Excellence

## 4.

### School and Business Unit Strategic-Planning Work

The Office of the President and Provost should ask each School and business unit:

1.  To engage regularly with its community — including students, staff, and faculty and academic personnel;

2.  To identify several priority areas that it regards as most important for inclusive excellence, with a view to the Four Goals (i.e., recruitment and promotion, integration, uniting academic freedom and a culture of respect and concern, and values);

3.  To articulate how those priorities will be advanced, including leadership, primary responsibility, resource requirements, anticipated timelines, and plans for evaluating progress (i.e., the Four Tools); and

4.  To inform and engage both their own communities and the President, Provost, and Governing Boards on their progress toward these priorities.

In support of the work, the Task Force has started creating an online Promising Practices Catalog that will include more than 120 examples of how colleagues all over Harvard are already working to advance the Four Goals and Four Tools laid out in this report. A teaser of the catalog is available on the Task Force website.

DX740.0036                                                                          HARV00096635

## 5.

### Alignment and Coordination of Inclusive Excellence Work in the Office of the President and Provost

This Task Force recommends that the Office of the President and Provost reorganize its approach to providing central support and coordinating functions for inclusive excellence work throughout Harvard.

While we recognize that many factors affect the decisions made by University leadership about how to structure the Office of President and Provost and that this Task Force is unlikely to know the full range of relevant factors, we nonetheless wish to underscore the importance of ensuring that work on diversity, inclusion, belonging, and campus community for *all three constituencies* is well-integrated at the top of the organization in a location central to the academic mission of the University. Currently, the structure lacks capacity to support strategic work on inclusive excellence on behalf of students.

The Task Force recognizes that the nature and extent of central administration's role differs in regard to students, staff, and faculty and academic personnel, and that its focus should be on how, within and across these constituencies, it can add value in ways that meaningfully complement, enhance, and coordinate across the efforts of the Schools and business units to reach our goals.

## 6.

### Increased Focus of University Human Resources on Enabling Staff Talent and Improving Organizational Culture

The Task Force recommends that, as a part of its effort at reorganization, the Office of the President and Provost improve the capacity of University Human Resources to enable staff talent and improve organizational culture. Such efforts might involve offering services and training to managers directed toward moving more job candidates from underrepresented groups from finalist to appointee, and on the development of diverse teams. We recommend concentration on the promotion patterns of staff in grades 53–57 and that the Center for Workplace Development (CWD) revisit its curriculum with an emphasis on providing skills for promotion to this group; reconfigure the Administrative Fellows Program (AFP) to include underrepresented minorities and others from a broader array of fields, specifically fields that align with Harvard's hiring needs; and reorient the AFP to be a recruiting mechanism for Harvard.

HARV00096636

# 7.

## Transparency, Feedback, and Dialogue: OPP Sponsors a Triennial Assessment of the University's Progress Toward Inclusive Excellence

The Task Force recommends that, as a part of its effort at reorganization, the Office of the President and Provost enhance the University's institutional research capacities, so as to support the use of data for the pursuit of inclusive excellence. In particular, every three years, beginning in 2020, the University should report on key demographic features of students, staff, and faculty and academic personnel in all academic units, using common definitions, and indicating trends over time. The report and aggregate data should be made available to the public. In support of this triennial reporting process, annual data-gathering by central administration, Schools, and business units would benefit from several improvements:

### a.  Inclusion and belonging survey module

The Task Force established a survey study group to review existing surveys on campus as well as relevant surveys from other institutions. The survey study group found that most campus surveys include many questions that are relevant to tracking progress on inclusion and belonging dimensions but that this survey data is, for the most part, not used systematically and with intentionality to support ongoing strategic work in this area. To facilitate improvements in these survey instruments and the development of intentionality around their use to support this work, we are recommending adding a brief inclusion and belonging module to the faculty climate survey, the staff engagement survey, and student exit surveys at each School. The module should be designed in a coordinated fashion to permit comparisons across Schools and units and over time. (See Section VI.C. for the draft module.)

### b.  Scope and standardization

To the extent possible, within the parameters of law and privacy requirements, student and employee data forms should be standardized and broadened to include socioeconomic indicators and veteran status. Since issues of inclusion and belonging also pertain to religious and ideological diversity and to disability, the University also needs to experiment with anonymous, opt-out, and/or other privacy-protecting modes of capturing the experiences of religious and political minorities on campus as well as the experiences of community members with disabilities.

### c.  Survey methodology

The University should consider modern survey techniques to ensure efficient, privacy-appropriate measurement of progress toward inclusion and belonging.

### d.  University-wide participatory process

The University should encourage "bottom-up" approaches to achieving triennial assessment, leveraging advances and innovations in quantitative and qualitative data collection and analysis related to diversity, inclusion, and belonging that are widespread but still siloed throughout the University.

HARV00096637

# 8.

## Increased Resources for Faculty Renewal and Development

Faculties evolve more slowly in relation to both demographics and curriculum than do either student or staff constituencies. In the current period of rapid social and demographic transformation, the tensions caused by different rates of change become more challenging. In recent years, Schools across the Harvard campus have sometimes met pressures for more rapid evolution of curriculum and research agendas by relying on non-ladder faculty. As Harvard President *Emeritus* Derek Bok argues in his new book, *The Struggle to Reform Our Colleges*, the health of the University requires that the faculty take full responsibility for intellectual evolution and for new areas of study. Diversifying the faculty and integrating curricular innovation within the faculty purview require frameworks for faculty hiring that recognize these goals when authorizing faculty searches, conducting the searches themselves, and reviewing search committee recommendations. While deans across campus have sought strategic approaches to renewal, diversification, and innovation, many constituencies on campus express frustration with the pace of change, with regard to both demographic diversification of the faculty and the development of the curriculum to serve our contemporary and increasingly diverse student body.

In support of efforts to accelerate faculty development and diversification, we recommend that:

- The University work with the Governing Boards and the deans to develop financial strategies — whether through fundraising or other means — to increase the resources dedicated to faculty renewal;

- The University and Schools develop budget frameworks that support cluster hiring both across Schools and in Schools;

- In Schools where faculty hiring plans at the level of the hiring unit are currently handled on a year-to-year basis, deans consider transitioning to multiyear plans; and

- The University support Schools that have faculty retirement programs in assessing their effectiveness, adapting them if necessary in relation to best practices in the sector and the highest standards of success for such programs. For Schools that do not have such programs, the University should work with them to revisit the question of whether their inclusion and belonging strategy should include one.

In addition, we recommend:

- More coordination of programs across campus that are building pipelines to graduate school and developing the future faculty;

- Fundraising to support an expansion of the number of Radcliffe professorships available to support diversification and curricular innovation in faculty hiring; and

- More coordination between the Radcliffe Institute and the Schools to facilitate the deployment of Radcliffe exploratory seminars in support of curricular innovation.

DX740.0039                                                    HARV00096638



*Meredith Weenick, Tracy Palandjian,
and Drew Faust, participate in the
Afternoon of Engagement. Credit: Rose
Lincoln/Harvard Staff Photographer*

**JA5832**

HARV00096639

# V.  Conclusion

Over its long history, Harvard has become home to students, staff, and faculty and academic personnel from an increasingly wide range of circumstances, places, identities, and backgrounds. We also bring a multitude of perspectives, commitments, and passions. Justice and excellence require that we build our work on a foundation of inclusion and belonging. The University achieves excellence by fostering the learning, creativity, and discovery of its members. That is why Harvard should become an inclusive community that supports the flourishing of all by fully integrating everyone into its social, academic, and professional life.

This Task Force is far from the first effort to address diversity and inclusion at Harvard and we will not be the last. The work of building the bonds and bridges that create inclusion requires ongoing attention; in the course of meeting today's challenges, we will inevitably discover new obstacles to be overcome. We aspire to strengthen Harvard as a learning community, ready to bring reflection, intelligence, and generosity to taking this work forward. We are blessed to have throughout our University many energetic and talented individuals who will continue to devote themselves to building those bonds and bridges in our culture, relationships, and organizations. Please join them; building a deep culture of inclusion and belonging requires people in every corner of the University to participate. To those who continue to grapple with the challenges faced by our Task Force and many who preceded us, we hope that the ideas and recommendations in this report strengthen the foundation on which you work and provide useful tools for you to accelerate the pace of transformation.

What would success look like? At the broadest level, the goal of pursuing excellence on a foundation of inclusion is intended to orient everyone in our community by expanding the horizons of Harvard's perennial devotion to excellence with the corollary recognition that full integration of a wide diversity of perspectives and talents is essential for achieving excellence.

More concretely, we urge that leaders — of Schools, faculties, business units, student groups, and of the University itself — elevate the priority of inclusion and belonging in their planning, policy-making, and actions. We ask that those leaders engage their communities in regular, searching deliberations about how we can

**JA5833**

HARV00096640

all overcome barriers to incorporating those who feel that they do not belong at Harvard. This would, for instance, entail senior administrators' taking on programmatic inclusion and belonging initiatives, such as increasing voluntary mentoring programs, improving engagement through better management training, and increased management discussion of these issues.

We anticipate that the University's values of mutual respect, integrity, pursuit of excellence, accountability, and trust-building will deepen the culture of inclusion and belonging through shared academic and professional norms. Ultimately, our goal is that this synthesis of orientation, leadership, community engagement, and cultural transformation will create an environment in which all of us can — and feel that we can — take full advantage of the rich opportunities that enable each of us to flourish.

Finally, the combination of institutional and cultural work promises to increase our comfort with a continuously growing and transforming campus community. As we become more flexible and learn better how to activate the power inherent in being a diverse community, we strengthen Harvard as a research and teaching engine and as a force for innovation and the public good.

Our goal is no less than ensuring that Harvard realize its full potential.

## Acknowledgments

We are deeply grateful to the thousands of people on campus who, in one way or another, contributed to the conversations that informed the Task Force deliberations. All across campus, and in all kinds of locations within Harvard's professional and academic hierarchy, we encountered leaders of vision and generous spirit committed to the health of our campus community. Many are experimenting with new practices and sharing good ideas. All affirmed our sense that this work has urgency. We are thankful for their help in bringing this project to completion. Their example convinces us that we can realize the vision of place where "We Are All Harvard."

The Task Force would like to thank the following people in particular for their contributions to our work and this report:

School and business unit leadership and diversity, inclusion, and belonging teams around the University for supporting and advancing our work in countless ways.

Staff assistants for the Task Force members, particularly **Michael Blackmore**, **Emily Bromley**, **Stephanie Hazelwood**, **Jennifer Howe**, and **Cathy Prod'homme**.

**Whitney Benns**, **Amy Edmondson**, **Bruce Patton**, and **Doug Stone** for creating and facilitating trainings on "Leading Sensitive Discussions."

**Scott Abell** and **Kalan Chang** for telling their stories at the Afternoon of Engagement.

**Lilly Anderson**, **Zennon Black**, **Christine Ficula**, **Nancy Kaufman**, **Lea Thau**, **Lisa Thomas**, and **Christina Thyssen** for organizing the complex Afternoon of Engagement.

**Michael Blauw**, **Alejandro Garcia Fernandez**, **Danielle Glazer**, and **Jess Tollette** for their research contributions and assistance.

**Leah Downey**, **Natasha DuMerville**, **Naima Green**, **David Kidd**, **Siri Uotila**, **Britta van Staalduinen**, and **Tyler VanderWeele** for their work to create the inclusion survey module.

**Roland Davis**, **Natasha DuMerville**, **Tracie Jones**, and **Domonic Rollins** for their work on the Promising Practices Catalog.

**Steph Burt**, **Kurt Crowley**, **Franklin Leonard**, **Marcyliena Morgan**, and **Carol Oja** for serving as judges in the competition to revise the last line of the *alma mater*.

**Maggie Gates** for organizing the competition to revise the last line of the *alma mater*.

**Salma Abdelrahman** for co-leading the undergraduate space working group.

**Aly Kassam-Remtulla**, **Beverly Tatum**, and **John Wilson** for reviewing the draft report and providing helpful feedback.

**Office of Institutional Research** for providing data and analytic support.

**Anna Cowenhoven** and **Kate Kondayen** for providing communications support.

Copy editor: **Lucia Huntington**

Design: **Design & Co.**

# VI. Accompanying Materials for the Community

DX740.0043                                                                                    HARV00096642

# A. Acting According to Harvard's Values: A Call to Action

We each have the opportunity — and the responsibility — to create a greater sense of inclusion and belonging throughout our campus communities. Consider the various communities to which you belong — your department, your section, your School, your extracurricular organizations, your lab, or simply the people who live and work beside you. Each of us should think about the numerous roles we occupy within the broader Harvard context and their connection to other parts of the University. Identify the communities in which you have the power to create change and the communities where you can support efforts of those who are already engaged in creating a more inclusive Harvard. How can we each play a part in shaping our own experience and the experiences of those around us through our actions? How can we engage in the activities of our School or department and Harvard more broadly to further the goals, tools, and recommendations within this Task Force report?

In our outreach sessions, we asked what word came to mind when people heard "Harvard." While many connected with pride to their own School, community, or unit, several expressed less connectedness with "Harvard" more broadly. Words shared included: elite, privilege, pretentious, old, and wealth. There was a hunger for improving upon our culture to grow into a more hospitable Harvard — a community of excellence that welcomes growth and challenge, with responsibility and humility. To create that cultural shift, there was a realization that such change requires prioritizing this work in our busy lives and redefining how we achieve excellence. It requires us to reflect on the value we place on an inclusive community and culture. It requires us to realize that inclusivity and belonging are not exclusive of excellence but rather are its foundations.

By thinking and acting intentionally, we can enable each and every member of our community to be an integral and active part of it. To sustain this work, we have to ask questions constantly of ourselves and each other from a place of humility: What would you like Harvard to be? How do you envision a cultural change? How might you take action and ensure steps are carried forward in your realm of possibilities? Through this work together, we will realize our aspiration of inclusive excellence in our academic pursuits and professional development while building a strong Harvard community to serve society for generations to come.

Harvard University's five core values provide a framework to organize how each of us can act to create that inclusive and hospitable culture. We invite everyone to embrace these values. If we can achieve that, we will together strengthen the foundation of inclusion needed for the pursuit of excellence at Harvard. Many ideas about how to enact those values came out of conversations that the Task Force hosted. We provide some of them below.

DX740.0044

HARV00096643

## 1.
## Respect the rights, differences, and dignity of others

The University's first value is to respect the rights, differences, and dignity of others.

- We can live this value more deeply by engaging critically with colleagues through respectful dialogue and taking others seriously by being present and invested, assuming best intentions, and listening first to understand rather than to judge.

- To understand, respect, and bridge differences, we should be aware of how our culture and experiences shape our perspectives and, conversely, try to understand how others' backgrounds inform their views.

- Finally, each of us should model the behavior that is appropriate for the communities in which we want to live and work by trying to generate thoughtful solutions and creating space for others to speak and be heard.

## 2.
## Demonstrate honesty and integrity in all dealings

The University's second value, demonstrating honesty and integrity in all dealings, can increase inclusion and belonging by fostering trust and engagement that bridges differences.

- We can each build that trust by being forthright about our interests, intentions, and actions.

- We can each become more trustworthy by making the time, taking the initiative, and following through on our commitments.

- We can encourage the spread of trust in our communities by modeling an ethic of generosity, sharing, and collaboration.

## 3.
## Pursue excellence conscientiously in one's work

The University's third core value is to pursue excellence conscientiously. Inclusive excellence, a key idea of the Task Force's report, offers a guide to achieving greater excellence through inclusion.

- For example, we can each work to ensure there is representation across all constituents in our inquiries, meetings, and decision-making efforts.

- In creating inclusive and diverse teams, we can tap best practices, such as understanding implicit bias, building teams, and using teaching/learning tools for creating healthy norms across differences.

- The pursuit of excellence requires self-respect as well as respect from others; we can open up to others and stand up for ourselves when we need support.

- We can consider how inclusion and belonging concepts connect to the fields and professions in which we work and develop pathways for additional learning.

- We can be attentive to opportunities to integrate inclusion and belonging ideas into ongoing work, research, learning, and our living environment.

HARV00096644

## 4.
## Be accountable for actions and conduct in the community

We can each enact the University's fourth value — being accountable for our actions and conduct — to increase inclusion and belonging in several ways.

- We can strive to understand that we are all teachers/learners and show compassion, as we all will make mistakes in growth.

- As student leaders, staff, and faculty and academic personnel, we can each develop skills of inclusive leadership, considering how hierarchies and power asymmetries affect decisions, actions, and communications.

- Each of us can reconsider our group's stated values, mission, purpose, and norms to consider what traditions or practices could be changed to better foster inclusive excellence.

## 5.
## Cultivate bonds and bridges that enable all to grow with and learn from one another

The Task Force recommends that the University adopt a fifth value: to cultivate the bonds and bridges that enable all to grow and learn from one another in the recognition that inclusion, belonging, and community are essentially relational ideas. We can cultivate these bonds and bridges in many ways.

- For example, we can practice acts of inclusion each day to foster a welcoming environment for all — we can say hello and welcome newcomers; we can learn and use people's names; we can share stories.

- We can proactively engage with groups who might have different views or interests.

- We can make time to actively participate in more events and initiatives across Harvard, beyond our School or business unit.

- We can seek opportunities to collaborate with people from a different School or business unit toward greater inclusive excellence.

- We can listen, care, and support — we can ask someone about his, her, or their personal story and share our own.

Beyond embracing Harvard's five values, there are many ways that everyone in the community can help spread the ideas of this Task Force and advance inclusion and belonging. Here are some suggestions that emerged:

- We can pick one book/article on the Task Force resource list to read and discuss each month to deepen our understanding of the Task Force report and framework.

- We can engage in town halls and feedback processes connected to the University's triennial assessments.

- We can consider how inclusion and belonging concepts connect to our field or profession and develop pathways to further learnings.

- We can learn about diversity and inclusion efforts underway and how they can support our own work, learning, and personal growth regardless of our background.

**JA5838**

DX740.0046

HARV00096645

## B. Inclusion and Belonging Promising Practices Catalog Teaser

For each of the Four Goals and Four Tools, the Task Force has gathered examples of promising practices from across the University. The following teaser includes 18 practices that represent at least one practice for each goal or tool area and at least one practice per School. Each goal or tool area includes the definition followed by the promising practice and the takeaway for that practice. The full Promising Practices catalog includes more than 120 practices that could be made into a searchable online database.

### GOAL 1.1
## Inclusive Excellence

*The goal of recruitment, promotion, and retention is to maximize excellence and diversity simultaneously (i.e., to pursue inclusive excellence); this requires proactive talent-spotting, contextualization for standardized metrics, and recruitment practices that utilize inclusive social networks and the power of pipeline programs. Achieving inclusive excellence also requires expanding our perception of areas worthy of research and teaching. Finally, the goal of achieving inclusive excellence should operate with equal rigor at the point of promotion as at the point of recruitment.*

### Harvard Medical School

The School's entrance interviews with all first-year underrepresented minority (URM) students and feedback from the Office of Recruitment & Multicultural Affairs (ORMA) Student Advisory Group (SAG) are essential to providing negative and positive insights from the applicants' perspective on the interview experience and the subsequent implementation of changes to enhance it the following year. In 2017, ORMA initiated post-interview (pre-decision) anonymous surveying of URM applicants to identify best practices and also challenges on the interview day from the applicants' perspective.

### Takeaway

This School uses an impressive process of data-gathering, self-study, and reflection in support of continuous efforts to improve its ability to recruit successfully from underrepresented student populations.

### GOAL 1.2
## Inclusive Leadership

*Rather than wholly delegating diversity, inclusion, and belonging work to others, School and business unit leaders should take direct responsibility for diversification through recruitment, promotion, retention, and ongoing development strategies. In their efforts, they should attend to all three constituencies of staff, students, and faculty and academic personnel.*

### Harvard Business School

The governance model of HBS is much like that of Harvard more broadly — a matrix where strategy, decisions, and activities bubble up or exist or are made at the local level (e.g., within a particular department or program), but then are hopefully woven together in service of a School-wide strategy. One of the most significant factors in causing inclusion to be felt and experienced as a shared responsibility at HBS was the dean early in his tenure naming "inclusion" as among his "5i" priorities (innovation,

DX740.0047

HARV00096646

A.6   /   Pursuing Excellence on a Foundation of Inclusion

intellectual ambition, internationalization, inclusion, and integration — specifically, "to make HBS a place where everyone is able to thrive and do their best work." The priorities are widely known throughout the community; progress toward them is shared annually through forums like the town hall (for staff) or the annual update (a letter to alumni and the on-campus community). The dean also adopted a mantra of "make difficult issues discussable" (also phrased as "sunshine is the best disinfectant"). Questions like why women were failing to achieve honors in the M.B.A. program at a rate proportional to their representation there, questions that had been thought but not articulated for a number of years, became topics of discussion at faculty meetings, and then part of more systematic study. Similarly, whether male and female faculty members were being promoted at the same rate could then be examined and analyzed.

### Takeaway

It is widely acknowledged that increasing inclusion and belonging requires a culture change as well as structures and processes. This example highlights two key pieces of culture change. First, senior leaders need to publicly and repeatedly make clear that inclusion and belonging are strategic priorities. Second, they have to provide a forum for having uncomfortable conversations about where we are falling short on our commitments to diversity, inclusion, and belonging.

<span style="background-color:orange">GOAL 1.3</span>

## Potential for Growth

*For students and entry-level staff, recruitment should be organized around practices for judging growth potential, with a recognition that observed past performance may not alone capture the potential of an entry-level applicant, given differential opportunities and differential degrees of difficulty encountered.*

### Harvard John A. Paulson School of Engineering and Applied Sciences

A guide on implementing blind grading on various software platforms used at SEAS is being developed. Additionally, Women in Computer Science (WiCS) hosts a variety of community events to encourage collaboration among all levels of students pursuing a concentration in computer science (CS). As a result of an area-wide diversity committee, CS also launched a freshman advising initiative to provide each female student who indicates a primary interest in CS with a CS faculty member as a freshman adviser. This required collaboration with admissions and faculty.

### Takeaway

Schools and programs may increase inclusive practices for students using a variety of approaches to level the playing field and build community — and many of these can be simple and low-cost. SEAS' efforts to support blind grading not only help remove bias, but also give students

who identify as marginalized confidence that they will be treated equitably. Likewise, efforts to increase collaboration and community can be informal and organic, such as social events.

<span style="background-color:orange">GOAL 2.1</span>

## Academic and Professional Excellence

*Initiatives to advance diversity, inclusion, and belonging should start and end with a focus on the academic and professional flourishing of all members of our campus community, rather than being formulated primarily as social problems. High-quality community-building experiences should, however, be recognized as a necessary support for academic and professional success.*

### Harvard John A. Paulson School of Engineering and Applied Sciences

SEAS encourages staff to utilize training sessions and professional development conference funds to develop and/or improve skills used in their daily roles, or to develop a deeper knowledge in new areas of interest to their overall career paths. The FAS and the University have programs/offices/centers in place which offer professional development opportunities, research and funding application support, and teaching support to all faculty. There is a particular emphasis on providing mentoring support to tenure-track faculty.

HARV00096647

*Takeaway*

This practice highlights the importance of offering continuing professional development opportunities to staff, who may sometimes feel that their professional goals are neglected relative to those in academic appointments. SEAS takes advantage of and subsidizes courses from the Center for Workforce Development (CWD) for all staff. This policy has value both for signaling the inherent worth of investing in staff and building capacity for more satisfying and inclusive work environments. Likewise, supporting training opportunities for tenure-track faculty not only helps them flourish but also signals that the School is invested in them.

GOAL 2.2

## Responsive Curricula

*Within the parameters of a School's mission, Schools and departments should seek to incorporate input from students into faculty-led curricular planning processes.*

### Harvard Division of Continuing Education

While it's difficult to know which courses explicitly incorporate content related to inclusion and belonging into the curriculum, ongoing efforts have been made to increase the number of courses that address

related topics, such as race, sexuality, gender, religion, and culture. The Harvard Extension School (HES) currently offers more than 41 courses on these topics, including "Understanding Islam and Contemporary Muslim Societies" and "Gender, Leadership, and Management." These types of courses are very popular among HES students and receive strong reviews each semester.

*Takeaway*

This practice highlights the important recognition that diversity in intellectual agendas (i.e., curricular and research agendas) is critical to providing a foundation for academic flourishing to a diverse community.

GOAL 2.3

## Collaboration and Teamwork

*We should increase and make effective use of collaborative and/or team structures to support learning, work, mentoring, advising, and the achievement of academic and professional goals. Relatedly, our policies and practices should, wherever possible, prioritize sharing resources and opportunities over efforts to maintain exclusive control of resources and opportunities. In particular, we should increase opportunities for course cross-registration and space-sharing.*

### Harvard Graduate School of Arts and Sciences

Because GSAS students may have "dual citizenship" in other Schools, there are also collaborative efforts with offices in these Schools. For example, GSAS has collaborated with colleagues in the Chan School of Public Health, Harvard Business School, and the Kennedy School of Government to develop GSAS-wide pipeline and retention programs. Collaborations exist with diversity and inclusion (D&I) offices across Harvard on recruitment efforts. Finally, under the leadership of the Office of the Assistant to the President for Institutional Diversity and Equity, individuals involved in D&I efforts across Harvard come together periodically to learn about and share best practices with each other.

*Takeaway*

This practice provides a good example of recognition that cross-School collaborations can enhance diversity and inclusion work in particular Schools, especially when those collaborations help Schools build communities for students from minority groups.

HARV00096648

GOAL 2.4

# Improved Mentoring

*For all constituencies, we should improve our approach to mentoring, in particular by seeking a more holistic approach that goes beyond support for academic and professional development to include professionally appropriate support along psychosocial dimensions and equitable distribution of both kinds of support. Holistic mentoring involves taking an interest in one another as human beings; it typically requires partnerships among a range of kinds of advisers and mentors, some who focus more on the academic end and others more on the psychosocial end of a mentee's experience. Achieving a holistic view of a mentee is likely to require more information-sharing among the people who play mentorship roles in relation to any given individual. Improved use of data, within the parameters of privacy constraints, should support improvements in mentoring. For students, improved mentoring also depends on a well-functioning interface with mental health counseling and effective training for staff, faculty, and academic personnel in how to help students navigate the set of complementary resources spanning the spectrum from academic advising to mental health counseling.*

### Harvard Faculty of Arts and Sciences

The dean of FAS made mentoring of tenure-track faculty a central topic at his fall 2015 retreat for the FAS academic deans.

Together, the deans reviewed the principles underlying the FAS's AY 2009–10 approach to mentoring and professional development, discussed fresh approaches, and formulated benchmarks to help them evaluate at the upcoming academic planning meetings how well departments/areas were doing. Throughout fall 2015, as these academic planning discussions took place, the Office for Faculty Affairs (OFA) separately conducted focus groups with tenure-track and recently tenured faculty to discuss their experiences on the tenure track. In addition, every ladder faculty member was asked about mentoring in his or her activity report, an annual survey in which faculty describe their accomplishments over the last year. From these reports, OFA culled best practices on mentoring. In addition, OFA researched the literature on mentoring. Synthesizing information from these sources and from the academic planning meetings, in spring 2016 OFA created and distributed to all FAS ladder faculty its "Guide to Faculty Mentoring in the Faculty of Arts and Sciences." These efforts have continued. For example, the FAS held a fall 2016 workshop for tenure-track faculty on giving and receiving feedback. During spring 2017, OFA held a panel discussion on advising graduate students and piloted laser-coaching sessions for tenure-track faculty that have continued to be offered in AY 2017–18. In February 2017, the Standing Committee on Women

(SCW) held more mini-symposia for women faculty in the Science Division and SEAS, and mini-symposia in the divisions of the Arts and Humanities and Social Sciences were scheduled in AY 2017–18. A series of workshops on research management, for tenure-track and recently tenured faculty, co-organized by OFA and Research Administration Services, also launched in AY 2017–18.

### Takeaway

This practice is a good example of how to move forward strategically on an inclusion and belonging agenda item, in this case mentoring. This case models the following steps:

- Make mentoring a top leadership priority and incorporate it into strategic planning processes.

- Allocate resources to develop practices for how effective mentoring takes place in your own context and tap a broad range of constituents to provide input and feedback.

- Offer a range of events and workshops to bring practices alive and share learnings with each other.

- Determine key points to gather feedback to assess the effectiveness of the mentoring efforts and improve over time.

HARV00096649

**GOAL 3.1**

## Trust-Building

*How can insights from disciplines such as history, negotiation, education, psychology, and theater help us cultivate and disseminate skills of connecting with one another even across deep fissures?*

### Harvard Graduate School of Design

A joint faculty-staff meeting at the start of each academic year promotes a sense of shared vision in which the dean, faculty, and administrative leadership lay out selected accomplishments and goals. Human Resources (HR) provides staff and faculty opportunities to connect outside of the regular daily routine. HR coordinates regular Druker Design Gallery tours of current exhibitions led by faculty curators. In collaboration with the GSD Joint Council, HR hosts an annual "Design Today" lecture given by a GSD faculty member to provide an opportunity for staff to learn about the intellectual content of the School.

Staff orientation to the GSD now includes a staff luncheon that helps foster a sense of community. Staff events throughout the year, especially around the holidays, reinforce this ethos.

### Takeaway

This practice is an example of how to use convenings around goal-setting as a part of trust-building. Schools can create a shared vision in which the dean, faculty, and administrative leadership lay a foundation for select goals and accomplishments. This can be done for the academic year or beyond. Two ways to accomplish this are:

- Introducing new employees to the community by way of a staff luncheon. This practice fosters a sense of community and belonging.

- Creating community events throughout the academic year to build and sustain the sense of community that already exists, while allowing new members to enter the space and build relationships.

**GOAL 3.2**

## Skills for Difficult Conversations

*How do we equip everyone on campus — faculty and academic personnel, staff, and students — with skills to engage across difference, support freewheeling debate, navigate difficult conversations productively, and make space for minority viewpoints (whether of religious students, conservative students, or students from underrepresented identity groups or backgrounds)?*

### Harvard Law School

Each summer two or three of the faculty workshops focus on teaching, including topics such as gender and race in the class-room; experiential learning; and learning outcomes and assessments. These are workshops in which faculty share best practices for creating environments that foster inclusion and belonging in teaching and learning.

### Takeaway

This practice provides an example of how to schedule formal time and space for faculty members to share how they create and foster inclusion and belonging through teaching and learning. The broader practice of sharing knowledge and skills can be adopted by all community members. Examples can be workshops, trainings, diversity dialogues, and community readings led by and for members of the community. A designated time and space should be formally set aside for these activities.

**GOAL 3.3**

## Time and Space for Difficult Conversations

*How can Schools create opportunities, whether in the curriculum or co-curriculum, for all on campus to explore issues in the world, hear differing points of view, and reflect on hard questions, in formats that both foster and model free academic expression and mutual respect and concern?*

DX740.0051

HARV00096650

### Harvard Divinity School

The Divinity School introduced a daylong conversation and presentation series during incoming student orientation titled Vital Conversations, which focused on addressing racism and sexual and gender-based violence, and offered a continued series of community conversations throughout the year with the same title, but touching on other aspects of diversity and inclusion. There were many events and programs organized within the community, particularly by the student group HDS Racial Justice and Healing Initiative:

- A conference on Buddhism and race.
- A three-part series of dialogues on racial justice called the REAL Dialogues.
- Weekly affinity group meetings.
- The Black Religions, Spirituality, and Culture conference.
- Diversity and Explorations, a recruitment event where HDS brings in 45 students, who are usually from marginalized identity groups or are focused on social justice initiatives, to come and experience the School.

### Takeaway

This touches on a range of initiatives, starting with orientation, when students have time to devote to learning about the values and the commitment of their School/community. HDS has created continuity

and reinforced its commitment to difficult conversations by continuing programming throughout the year. Bringing students from marginalized communities to campus for recruitment is a positive pipeline program.

**GOAL 4.1**

## Community

*The values statements of the University, Schools, and business units should include attention to values of community as well as to values of individual autonomy. Organizational decisions and practices should align with those core values.*

### Harvard School of Dental Medicine

In conjunction with the 150th anniversary celebration and the launch of the Freeman, Grant, and Franklin Scholarship (named for key African-American alumni), the Office of Diversity and Inclusion and the Office of Development and Alumni Relations are working on creating a wall of portraits to celebrate alumni of color. There is also a discussion about displaying flags that represent students' countries of origin in the lobby of the Research Education Building. HSDM is also working on replacing gendered signs of single-stall bathrooms with gender-neutral ones.

### Takeaway

This School is reviewing how well portraiture, symbols, and signage convey openness to its current student body, and its full alumni community.

**GOAL 4.2**

## Present and Past in Proportion

*Symbols and communications materials should convey the openness and accessibility of our campus and of an academic life to people from all backgrounds. While continuing to respect our distinguished past, we should nonetheless shift the emphasis in our images, portraits, and public art to the present and future. This will permit us to represent the campus' current and anticipated diversity.*

### Harvard Kennedy School of Government

HKS has hired a consultant to help develop a visual design that will pull together the old and new buildings on its campus. After that design has been set, the School will examine the use of spaces to enhance diversity, inclusion, and belonging.

### Takeaway

This School is reviewing art and iconography to create appropriately inclusive spaces.

DX740.0052

HARV00096651

TOOL 1

# Leadership From the Top

*At every level, from the Office of the President and the Provost to the vice presidents heading business units, from deans and department chairs to student organization presidents, leaders at the top need to be committed to the pursuit of excellence on a foundation of inclusion. Importantly, successful leadership for inclusive excellence requires strong practices of partnership that link all three constituencies: students, staff, and faculty and academic personnel.*

### Harvard Graduate School of Education

The Center for Education Policy Research (CEPR) successfully created OneCEPR, a space where information related to diversity, equity, and inclusion (DEI) is shared, and began making more connections between DEI and CEPR's work. This was prompted after CEPR's leadership reflected on the following:

- What are our core values?
- Is diversity at the organizational level reflected here?
- Does the Center value people's individual diversity?
- Are folks satisfied with CEPR's culture?

Had the leadership not posed such questions and made space to process the answers, OneCEPR would not exist.

### *Takeaway*

This practice is an example of department heads/leads ascertaining insights about the values, culture, and climate of their departments. In addition, leadership should create space and time to discuss the results in a productive way (i.e., "We are here … we want to be here … let's put together a plan to address challenges and gaps as they relate to cultivating a more inclusive workplace"). Finally, leaders must support whatever strategic DEI priorities are decided upon, particularly in cases where the intervention does not come from the leadership/management.

TOOL 2

# School and Business Unit Strategic Planning

*Too often, efforts at diversity, inclusion, and belonging work lead to many well-intentioned but non-strategic and uncoordinated ad hoc efforts. The result is "diversity clutter": a host of programs that do not add up to more than the sum of their parts. We should bring the tools of strategic planning to the pursuit of inclusive excellence. In addition, that work should draw on scholarly research and practitioner expertise to avoid reinven-tion of wheels and to meet a high standard of expertise.*

### Harvard College

Senior leaders are held accountable to ensure that the areas they oversee achieve the diversity, inclusion, and belonging goals as defined — and included in this are strategic planning efforts such as multiyear planning to create and populate pipelines. An annual "state of the department" staff diversity report is shared with individual senior leaders by the dean, and a conversation about obstacles to staff diversity is part of the performance review process.

### *Takeaway*

This practice is an example of elevating diversity, inclusion, and belonging work to the same accountability level as budget work.

TOOL 3

# Aligned Organizational Structures

*The pursuit of inclusive excellence should be supported by organizational structures that align responsibility with authority. Most importantly, each School or business unit should develop its organization and policies so that those with responsibility for diversity, inclusion, and belonging work also have the authority to make decisions for the constituency*

HARV00096652

*to which their work pertains (i.e., students, staff, or faculty and academic personnel) and/ or strong and effective partnerships with those with such authority. This may mean more frequently asking faculty members to take leadership roles in this space, or it may mean developing innovative forms of staff-faculty partnerships. There may be still other solutions.*

### Harvard T.H. Chan School of Public Health

The associate dean for diversity is formally responsible for all aspects of strategy related to diversity, inclusion, and belonging. In addition, the senior director of human resources, associate dean for faculty affairs, and associate dean for student services are responsible for specific aspects of diversity and inclusion strategy for staff, faculty, and students, respectively. These latter officials have specific compliance obligations related to diversity — e.g., affirmative action reporting, annual student diversity reporting to the Association of Schools and Programs of Public Health (ASPPH) — and to meeting Title IX requirements (some but not all of which would fall under the category of inclusion). The associate dean for diversity has authority over the Office of Diversity and Inclusion (ODI), which is a stand-alone office of the School that serves all constituents and is responsible for many of the tactics that support its strategic priorities. There are four staff

in the ODI, which has a modest operating budget funded by the Dean's Office. The associate dean for diversity also works as a collaborator to support the strategic efforts to improve diversity and inclusion of the offices of Human Resources, Faculty Affairs, and Student Services, but has no specific authority over those offices. Accountability has been largely accomplished through reporting and transparency. ODI gathers and reports data, including a recent climate survey, which are disseminated and made available on its website; a data dashboard provides tracking data as well. The dean and associate dean for diversity host diversity and inclusion town halls to update the community on policies and programs and identify new priorities, successes, and failures. As noted, each constituent group also has reporting requirements to the University and outside agencies. The School as a whole (across all groups) is held accountable for diversity efforts through the accreditation process, which is currently underway with the Council on Education in Public Health.

### Takeaway

This practice is an example of assigning top-level leadership responsibility for diversity, inclusion, and belonging work to a faculty member and of constructing strong faculty-staff partnerships to advance diversity, inclusion, and belonging work.

### Radcliffe Institute for Advanced Study

Over the past several years Radcliffe has worked proactively to ensure that all staff with formal responsibility have the autonomy, staff, and fiscal resources to achieve the diversity and inclusion goals set in their strategic plans. While the positions listed above have formal responsibility, the dean has repeatedly emphasized that all Radcliffe staff members, regardless of department or grade level, play an essential role in creating a diverse and inclusive community.

### Takeaway

This practice is about a School's thinking explicitly about how to align authority and responsibility for diversity and inclusion and belonging work. This School has developed three models: incorporation of the responsibilities in job descriptions; incorporation of the responsibilities in strategic plans; and cultivation of a culture in which everyone has a personal responsibility to advance inclusion and belonging work.

TOOL 4

# Data, Transparency, and Dialogue

*Each unit should have the institutional research capacity, or access to it at the level of the central University, to diagnose disparities*

HARV00096653

*in the quality of experience for each constituency by demographic group. Each unit should also have the institutional research capacity to measure its progress toward inclusive excellence. Finally, School- and unit-wide community discussions about data and progress reports in venues like town halls can help build cultures of transparency and contribute to iterative improvement.*

### Harvard T.H. Chan School of Public Health

In 2016 the Chan School completed a Schoolwide climate survey that examined inclusion and belonging for all constituents. The survey data were collected and analyzed by an outside agency (the Culturally Engaging Campus Environments Project) and are available to all, and the findings were also presented in a number of live forums. During the last three years, the School has included questions on diversity and inclusion in student and staff exit surveys and has also added these questions to course evaluations. Exit survey and course evaluation D&I questions are used for quality-improvement purposes and the results are not published — data are fed back to faculty in aggregate and conversations are initiated by the associate dean for diversity/senior associate dean for education, as needed (in the case of concerning patterns).

### Takeaway

This practice is an example of using expert resources, wrap-around survey processes, transparent dissemination of data, and community forums to reflect on the data in order to build a solid foundation of understanding to support problem identification and continuous improvement.

### Harvard Kennedy School of Government

HKS is prototyping cloud-based software that tracks how frequently — or infrequently — students join class discussions. The software can produce charts that show students' gender and nationality, ranking them by those who have participated least. This system is just one tool faculty can adopt to create a classroom environment where more students feel welcome to chime in and professors can level the playing field. Nine faculty members are using this new software in 13 classes with more than 300 students.

### Takeaway

This School is developing systems to leverage data in order to enhance the classroom experience and teaching and learning. The system helps faculty better leverage diversity in class discussions and ensure that all voices are heard.

# C. Draft Inclusion and Belonging Survey Module

The Inclusion and Belonging Task Force developed the 10-item survey module below with the intention that it be deployed University-wide on a regular basis to measure, and monitor improvement in, inclusion and belonging among Harvard students, staff, and faculty and academic personnel.

Ordinarily this module is not meant to stand alone as an instrument. It is expected to be incorporated into other surveys that are planned or already in place. Following the module, we recommend other types of information that could be collected to better understand and help to improve inclusion and belonging at Harvard. We suggest these other elements be used together with this module within an existing survey or forming a separate instrument.

**Guidelines and instructions for deploying the Harvard University Inclusion and Belonging Survey module:**

1. Administer the module on a single page or form as illustrated here: http://bit.ly/huibsm

2. The responses will be summarized as a single scale value. ***Please do not change item wording, item order, or the response scale.***

3. Required elements of the survey into which this module is embedded:

   a. **Survey introduction.** Following best practices for survey design, the introduction to the survey should specify why the respondent is being contacted, what the purpose of the survey is, and how survey responses will be kept confidential.

   b. **Demographic information.** Standard prompts for gender and race/ethnicity, as well as additional demographic information as described in the Inclusion and Belonging Task Force Report, are critical. These demographic variables are necessary to identify relevant differences in inclusion and belonging and monitor improvement in all groups over time. They will need to be analyzed together with responses to the module below.

4. The suggested *introduction to the module* below may be adjusted if there is redundancy with the overall survey introduction.

---

### Core module

The next 10 items relate to your feelings and experiences of inclusion and belonging at Harvard. Your honest responses are essential to our efforts to measure and improve in this area. Responses are voluntary and will be confidential. All responses will be compiled together and analyzed as a group.

**RESPONSE SCALE**

| 1. Strongly Disagree | 2. Disagree | 3. Slightly Disagree | 4. Neither Agree nor Disagree | 5. Slightly Agree | 6. Agree | 7. Strongly Agree |
|---|---|---|---|---|---|---|

1.   I feel like I belong at Harvard.
2.   I feel like people at Harvard value me.
3.   I feel like I can be my authentic self at Harvard.
4.   I feel like I receive proper recognition at Harvard.
5.   While at Harvard, I have been able to make progress toward my professional aspirations.
6.   I feel a sense of accomplishment from my work at Harvard.
7.   I am content with my friendships at Harvard.
8.   My relationships at Harvard are as satisfying as I would want them to be.
9a.  The academic goals I have for myself are being met at Harvard. *(for students and faculty/academic personnel)*
9b.  The professional goals I have for myself are being met at Harvard. *(for staff)*
10.  I feel like I am a part of the Harvard community.

---

## Optional elements to consider using with the core module

The elements outlined below, together with the core module, will help the University and individual Schools/units to understand more about inclusion and belonging experiences, illuminate possible moderating or mediating variables, and point to actionable next steps. They are meant to be optional; however, we suggest that they be embedded with the core module into other surveys. Should a School/unit wish to deploy a standalone inclusion and belonging survey, it might combine the core module with some or all of these elements.

As always, we recommend that supplemental survey items be piloted with their desired respondent populations before deployment. Please be in touch with the Office of Institutional Research to discuss any questions, for help to pilot survey items, or for help with analysis.

*1. Validated General Flourishing Module.* Items that assess flourishing more broadly can help to clarify both the determinants of and the outcomes of inclusion and belonging. Harvard professor Tyler VanderWeele has developed a module that measures flourishing in six dimensions and is used at Harvard and elsewhere. Using a validated instrument will allow for helpful comparisons by population group. Note that two of the items on the core module above (7 and 8) are adapted from this instrument (domain 5: close social relationships); when this module is added to the core, we recommend removing those questions so that they are not redundant. Use this link to read the journal article and full set of survey questions. Four suggested examples of the other general flourishing items, using a 1-7 or a 1-10 response scale, are:

> Overall, how satisfied are you with life as a whole these days?
> *[0 = Not Satisfied at All,*
> *10 = Completely Satisfied]*
>
> In general, how happy or unhappy do you usually feel?
> *[0 = Extremely Unhappy,*
> *10 = Extremely Happy]*
>
> Overall, to what extent do you feel the things you do in your life are worthwhile?
> *[0 = Not at All Worthwhile,*
> *10 = Completely Worthwhile]*
>
> I understand my purpose in life.
> *[0–10 Agreement Scale]*

*2. Information about observed behaviors and direct experiences.* Specific behavioral prompts may help to generate statements such "XX percent of respondents report YY" or "XX percent of group A relative to XX percent of group B report YY." These may also help in understanding the determinants of inclusion and belonging and identifying specific areas in which action might be taken. Four suggested examples of this kind of question, using a 1-7 frequency scale:

> I have experienced the following in my primary School/unit:
>
> • Interruptions when I'm speaking in settings such as classes or meetings.
>
> • My ideas being attributed to other people.
>
> • Non-majority opinions being devalued.
>
> • Disrespectful behavior taking place without comment or sanction.

HARV00096656

**3. *Questions about local processes and climate.*** Questions of this kind might already exist in a full survey into which the core module is embedded. For example, a faculty climate survey might include questions such as "My performance is evaluated fairly within my department." These kinds of questions, if they are not included in a full survey, can provide meaningful context for the full inclusion and belonging responses and may also help in understanding where action might be taken to improve inclusion and belonging. Three suggested examples of this kind of question, using a 1-7 agreement scale:

> I am satisfied with my ability to influence decision-making at [Harvard/School/unit].
>
> I know what I need to do to succeed at [Harvard/School/unit].
>
> People from all backgrounds have equal opportunities to succeed at [Harvard/School/unit].

**4. *One or more open-ended questions.*** Many individuals find it helpful to be able to write comments, voicing their concerns or specific ideas in their own words. In addition to the core module, it may be helpful to add a question or more that allows them to do so. Note that open-ended questions <u>typically come at the end of a full survey</u>. An example of this kind of prompt is:

> Please make specific suggestions about what would improve your sense of inclusion and belonging within the School/unit that represents your primary affiliation at Harvard.

HARV00096657

# D. Inclusion and Belonging Essential Readings

Allen, Danielle. "Toward a Connected Society." In *Our Compelling Interests: The Value of Diversity for Democracy and a Prosperous Society*, edited by Earl Lewis and Nancy Cantor, 71–105. Princeton, NJ: Princeton University Press, 2016.

Banaji, Mahzarin R., and Anthony G. Greenwald. *Blindspot: Hidden Biases of Good People.* New York: Delacorte Press, 2013.

Bohnet, Iris. *What Works: Gender Equality by Design.* Cambridge, MA: The Belknap Press of Harvard University Press, 2016.

Brooks, Arthur C. "Academia's Rejection of Diversity." *The New York Times*, 2015.

Cheryan, Sapna, Victoria C. Plaut, Paul G. Davies, and Claude M. Steele. "Ambient belonging: How stereotypical cues impact gender participation in computer science." *Journal of Personality and Social Psychology* 97, no. 6 (2009): 1045–1060.

"Complete Mentor Curricula." Center for the Improvement of Mentored Experiences in Research (CIMER). 2017. https://www.cimerproject.org/#/completeCurricula.

Crenshaw, Kimberle. "Demarginalizing the Intersection of Race and Sex: A Black Feminist Critique of Antidiscrimination Doctrine, Feminist Theory and Antiracist Policies." *University of Chicago Legal Forum* 1989, no. 1 (1989): 139–167.

Dobbin, Frank, and Alexandra Kalev. "Why Diversity Programs Fail." *Harvard Business Review*, 2016.

Frey, William H. "The 'Diversity Explosion' Is America's Twenty-first-Century Baby Boom." In *Our Compelling Interests: The Value of Diversity for Democracy and a Prosperous Society*, 16–38. Princeton, NJ: Princeton University Press, 2016.

Lareau, Annette. "Cultural Knowledge and Social Inequality." *American Sociological Review* 80, no. 1 (2015): 1–27.

Moss-Racusin, Corinne A., John F. Dovidio, Victoria L. Brescoll, Mark J. Graham, and Jo Handelsman. "Science faculty's subtle gender biases favor male students." *Proceedings of the National Academy of Sciences* 109, no. 41 (2012): 16474–16479.

Paul, Annie Murphy. "Are College Lectures Unfair?" *The New York Times*, 2015.

Walton, Gregory M. "The Myth of Intelligence." In *Education, Justice, and Democracy*, edited by Danielle Allen and Rob Reich. Chicago: The University of Chicago Press, 2013.

Walton, Jonathan L., et al. *Report of the College Working Group on Diversity and Inclusion.* Harvard College Office for Equity, Diversity, and Inclusion, 2015.

Weingarten, Elizabeth. "Why companies that take pride in diversity programs still wind up hiring white guys." *Quartz*, 2016.

Williams, Damon A., Joseph B. Berger, and Shederick A. McClendon. *Toward a Model of Inclusive Excellence and Change in Postsecondary Institutions.* Washington, D.C.: Association for American Colleges & Universities, 2005.

Wu, Ellen D. "Introduction: Imperatives of Asian American Citizenship; and The Melting Pot of the Pacific." In *The Color of Success: Asian Americans and the Origins of the Model Minority*, 1–10; 210–241. Princeton University Press, 2014.

HARV00096658

A.18    /    Pursuing Excellence on a Foundation of Inclusion

HARV00096659

# VII.  Appendices

DX740.0061
HARV00096660

# Appendix A.
## Task Force Charge

### From Diversity to Belonging

A community that draws on the widest possible pool of talent, one that fully embraces individuals from varied backgrounds, cultures, races, identities, life experiences, perspectives, beliefs, and values, is a more just community. It is also an environment in which learning, creativity, and discovery can flourish. Harvard aspires to be such a place. Diversity, inclusion, and belonging are not incidental concerns; they are fundamental to Harvard's mission and identity. As noted in a report unanimously adopted by the Faculty of Arts and Sciences in February 2016, true diversity is:

> "… the substance from which much human learning, understanding, and wisdom derive. It offers one of the most powerful ways of creating the intellectual energy and robustness that lead to greater knowledge, as well as the tolerance and mutual respect that are so essential to the maintenance of our civic society." (Quoting from *The President's Report: 1993–95*)

For nearly 400 years, Harvard has steadily — though often painfully slowly — opened its doors, as it has welcomed groups previously excluded from its faculty, staff, and student body. But, as recent events both here and elsewhere have reminded us, much work remains to be done if we are to fulfill our ideals and if we are to succeed in educating leaders and scholars who can effectively contribute to a complex and too often fractured world. It is essential that we bring together a diverse community. To realize the community's full promise, and to foster the personal and intellectual transformation at the heart of our mission, we must also work affirmatively and collectively to advance a culture of belonging. This requires an openness to change, as well as a willingness to learn from and embrace difference in the spirit that defines a vibrant and respectful academic community.

Over the past several months, Harvard's Schools have undertaken a range of inquiries and initiatives designed to make this a more open and inclusive campus, an effort made more urgent by the searing experiences of marginalization and discrimination described in the broader society and by members of our community. Since so many critical decisions and policies — on issues from academic priorities and recruitments to student services — are determined at the School level, this focus has already produced important outcomes. But the promise of Harvard University, its inspiring culture of excellence and its most salient opportunities, rests beyond any individual School — in foundational institutional values and in what we contribute to and learn from one another, with each of us and all our endeavors enlarged and expanded by what we share.

**JA5854**

DX740.0062

HARV00096661

To help fulfill that promise, I am convening a University-wide task force on diversity and belonging. I will ask the group, to be made up of faculty, staff, and students from across the University, to focus on four specific areas, and ultimately to recommend programs or initiatives based in an assessment of how we can make progress toward our goal of a community in which everyone may participate as a full member and everyone has the opportunity to thrive.

The task force should consider the following issues, gathering and generating qualitative and quantitative data to help inform its work:

### 1. Demographic Realities

What are the current realities across the University? Where are we doing better; where worse? How do we increase the diversity of faculty, staff, and students? How do we enhance the attractiveness of the campus to faculty, students, and staff who would increase its diversity? What initiatives, incentives, processes, and resources would bring positive change?

### 2. The Fabric of the Institution & the Lived Experience of Belonging

Across and within its 12 Schools, Harvard offers its students, faculty, and staff many different experiential path-ways but also elements of a common culture. What are the defining characteristics of Harvard's common culture? That is, what is the lived experience of diversity, inclusion, empowerment, and belonging among students, staff, and faculty? How can we transform that culture to achieve not just inclusion but full belonging and empowerment for all members of our community? What are the social, academic, or other structural barriers that may inhibit full membership and participation? Can we identify the critical junctures where opportunities to leverage diversity as a positive benefit for all go untapped? How do we effectively teach and create a dynamic learning environment in an increasingly diverse community? How do we help the entire community understand that the work ahead is a collective opportunity and responsibility?

### 3. Academic Resources & Contributions

Harvard is dedicated to discovery and learning as means of advancing knowledge and changing the world. What intellectual resources do we currently devote across the University to understanding and advancing issues of diversity, inclusion, and social and organizational transformation? How do these issues fit within our teaching and research agendas and in our curricula? What more can and should we do to create and disseminate knowledge that can advance our common goals?

### 4. Harvard's Organizational Structures

Harvard has a plethora of diversity officers, programs, and initiatives. How can we ensure that these efforts work together well and are known to the community? How do we best measure and improve their effectiveness? Have we defined their roles appropriately? How does our approach compare to established best practices?

Ultimately, the work of the task force is about promise and opportunity: making sure that Harvard continues to attract the most talented people from all walks of life and creates an environment where we can be our best selves. This work will never be complete, nor does it belong to the task force alone, but the University will benefit from the sustained focus of a dedicated group that will help us continue to make progress on the path from diversity to belonging.

*May 2016*

HARV00096662

# Appendix B.
## Task Force Process

In spring and summer of 2016, President Faust invited 51 individuals from across the University to serve on the Task Force, and five staff members were asked to staff the Task Force. Danielle Allen, Archon Fung, and Meredith Weenick were appointed as co-chairs of the Task Force. This group of 56 individuals represented all the Schools and all three constituencies on campus — students, staff, and faculty and academic personnel — as well as alumni. Student representatives included undergraduate, graduate, and professional students. Staff representatives included administrative and professional staff as well as members with direct experience serving in nonexempt positions in dining services and facilities. Faculty representatives included tenure-track as well as clinical faculty members.

The Task Force divided its work into three phases: 1) a preparatory and organizational phase; 2) a listening and discovery phase; and, finally, 3) a solution generation and prioritization phase.

### Preparatory and Organizational Work

In summer 2016, the three co-chairs developed a bibliography to inform the work of the Task Force and sought assistance from the Office of Institutional Research to develop initial data portraits of diversity, inclusion, and belonging at the University for students, staff, and faculty and academic personnel. In addition, the co-chairs established a structure for moving its work forward with five subcommittees that aligned with the Task Force's charge:

- Demographic Realities, chaired by Andrew Ho.

- Fabric of the Institution, co-chaired by Pat Byrne, Diane Lopez, and Frances Frei.

- Academic Resources, co-chaired by Katrina Armstrong and Jonathan Walton.

- Organizational Structures, chaired by Meredith Rosenthal.

- Outreach, chaired by Stephanie Khurana.

The Task Force met in plenary 11 times over the course of roughly 16 months. It also met during an all-day retreat in September on the Longwood campus. The co-chairs met weekly and convened the subcommittee chairs monthly.

### Listening and Discovery Work

The Task Force listening and discovery work was completed over the course of fall 2016 and spring 2017. We were mindful that our listening and discovery work could lead to discussions that were potentially personal and sensitive, so we sought to provide Task Force members with training on how to facilitate sensitive conversations. We were able to engage a few members of the Harvard community with expertise in this area to lead these trainings:

HARV00096663

- Amy Edmondson, Novartis Professor of Leadership and Management at Harvard Business School, who has done research on psychological safety.

- Bruce Patton, co-founder and Distinguished Fellow of the Harvard Negotiation Project, who co-authored *Difficult Conversations: How to Discuss What Matters Most*.

- Douglas Stone, lecturer on law at Harvard Law School, who co-authored *Difficult Conversations: How to Discuss What Matters Most*.

- Whitney Benns, teaching assistant in education at Harvard Graduate School of Education, who teaches negotiation.

### Leadership Meetings

The Outreach subcommittee met with key leadership personnel at each School and business unit (see list below) to develop an understanding of how diversity, inclusion, and belonging efforts are furthered within their specific context. The subcommittee gathered insights into strategies and tactics, along with successes and shortcomings. The co-chairs and the Outreach subcommittee met with more than 30 leadership teams, including hundreds of people across the University. Learnings were organized and shared with the other subcommittees as well as codified in the Promising Practices catalog. The co-chairs also met with the governing boards in December 2016 to get their support for the work ahead and to gain insights about successes and failures in other contexts and industries.

### School Narrative Descriptions

Each School prepared a confidential, detailed narrative based upon key questions and themes developed by each subcommittee. These questions enabled both the Schools and the Task Force to reflect upon the practices, tools, and structures currently in place that might foster or limit diversity, inclusion, and belonging efforts. School teams contributed hundreds of pages of responses to these key questions, informing the overall structure and content of the Task Force report.

### Outreach Engagement Sessions

The Outreach subcommittee also conducted 16 workshops directly with students, staff, and faculty and academic personnel across Schools and business units. Participants in these grassroots efforts shared their direct experiences and sense of belonging at Harvard. In addition, the subcommittee held numerous individual and small group meetings. With input from more than 600 people, the Outreach subcommittee gathered thousands of ideas that informed the Task Force's work as well as connected directly to actions and behaviors that each Harvard community member can take to underscore our newly stated values.

The listening and discovery phase of the Task Force's work concluded on April 5, 2017, with an Afternoon of Engagement. The University-wide event filled Sanders Theatre and the Joseph B. Martin Conference Center in Longwood with an engaged audience of staff, students, and academic personnel for an innovative program of storytelling and small group participatory reflection. Using digital tools, scribes, and a "theme team," we were able to capture notes from all those conversations. Thanks to the terrific energy and engagement in the room, we gathered 1,536 distinct comments about experiences of inclusion and belonging (or non-belonging) on the Harvard campus and about potential solutions for problems. (For a full report, please see appendix H.)

At the Afternoon of Engagement, we also implemented two of our first preliminary recommendations: 1) that the *Alma Mater* be revised to ensure a more affirmative connection between Harvard's distinguished past and its present and future; and 2) that the University improve methods of University-wide communication around key strategic themes. To implement these two ideas we launched a competition to revise the *Alma Mater* (see appendix E) and an online tool, the Solution Space, that permits members of the Harvard community to add to the Task Force's conversation by contributing solutions (see appendix H).

HARV00096664

## Solution Generation and Prioritization Work

The Task Force gathered a tremendous amount of information and data over the seven-month listening and discovery phase that needed to be synthesized in order to generate solutions that could then be prioritized. A group of graduate student research assistants coded the notes from the leadership team meetings to identify each comment's type (e.g., grievance, existing solution, new solution, or value) and topic (e.g., organizational structure, teaching, research, lived experience). The subcommittees reviewed the coding as well as the notes from leadership meetings to identify the most important issues for their focus areas.

At an all-day retreat in September 2017, the Task Force drafted an executive summary of a report that could be shared with the Harvard community for discussion and feedback. The discussion draft proposed a framework of shared standards to articulate aspirations for the community, and recommendations for the Office of the President and Provost to help support the Schools and business units in achieving the goals set in relation to the shared standards.

The Task Force released the discussion draft executive summary on its website at the end of September 2017 and accepted comments and suggestions through the Solution Space through November 30. We also organized meetings with various groups around campus (see list below), including student councils, faculty meetings, and staff groups including the Harvard Administrative Innovation Group comprising 100 administrators representing all Schools and central units. Finally, to encourage broader discussion of the draft executive summary, we created a "DIY Discussion Toolkit" that provided members of the community with discussion topics and resources. The feedback from these discussions was invaluable for us to refine our approach and presentation to make sure that the final report would be meaningful, clear, and responsive to the needs of the community.

## Summary of Outreach to the Harvard Community

### School Leadership Team Meetings

1. Harvard Business School
2. Harvard College
3. Harvard Divinity School
4. Harvard Division of Continuing Education
5. Harvard Faculty of Arts and Sciences
6. Harvard Graduate School of Arts and Sciences
7. Harvard Graduate School of Design
8. Harvard Graduate School of Education
9. Harvard John A. Paulson School of Engineering and Applied Sciences
10. Harvard Kennedy School of Government
11. Harvard Law School
12. Harvard Medical School
13. Harvard School of Dental Medicine
14. Harvard T.H. Chan School of Public Health
15. Radcliffe Institute for Advanced Study at Harvard University

### Business Unit and University–wide Office Leadership Team Meetings

1. American Repertory Theater (A.R.T.) at Harvard University
2. Arnold Arboretum of Harvard University
3. Harvard Administrative Deans Council
4. Harvard Alumni Association
5. Harvard Art Museums
6. Harvard Campus Services
7. Harvard Corporation and Board of Overseers
8. Harvard Financial Administration Department
9. Harvard Human Resources
10. Harvard Initiative for Learning and Teaching (HILT) Teaching and Learning Consortium
11. Harvard Library

HARV00096665

12. Harvard Memorial Church and Chaplains
13. Harvard Office of Technology Development
14. Harvard Office of the Assistant to the President for Institutional Diversity and Equity
15. Harvard Office of the General Counsel
16. Harvard Public Affairs and Communications
17. Harvard University Disability Services
18. Harvard University Health Services
19. Harvard University Information Technology
20. Harvard University Ombudsman Office and Longwood Ombuds Office
21. Harvard University Police Department
22. Harvard University Press
23. HarvardX
24. Interfaculty Initiatives including the Berkman Klein Center for Internet & Society; David Rockefeller Center for Latin American Studies; and Harvard University Center for the Environment
25. Nieman Foundation for Journalism at Harvard

*Outreach Workshops*
1. Harvard Business School student leaders of clubs and section values and international reps
2. Harvard Business School students
3. Harvard College senior staff

4. Harvard College student-faculty Committee on Undergraduate Education
5. Harvard employee resource groups (i.e., Association of Black Faculty, Administrators, and Fellows; Association of Harvard Latino Faculty and Staff; Committee on the Concerns for Women; Association of Harvard Asian and Asian American Faculty and Staff; LGBT Faculty & Staff Group)
6. Harvard Faculty of Arts and Sciences Office of Physical Resources and Planning
7. Harvard Graduate School of Education students, staff, and faculty and academic personnel
8. Harvard Kennedy School of Government students, staff, and faculty and academic personnel
9. Harvard School of Dental Medicine faculty and academic personnel
10. Harvard School of Dental Medicine staff
11. Harvard School of Dental Medicine students
12. Harvard T.H. Chan School of Public Health students, staff, and faculty and academic personnel
13. Radcliffe Institute for Advanced Study all-staff meeting

*Discussion Draft Report Outreach*
1. Accreditation Evaluation Visiting Team
2. Harvard Academic Deans
3. Harvard Administrative Deans Council

4. Harvard Administrative Innovation Group
5. Harvard Business School Community Meeting
6. Harvard Council of Deans
7. Harvard Council of Deans of Students
8. Harvard Corporation
9. Harvard Divinity School Faculty Meeting
10. Harvard Faculty Affairs Deans
11. Harvard Faculty of Arts and Sciences Academic Planning Group
12. Harvard Faculty of Arts and Sciences Faculty Council
13. Harvard Faculty of Arts and Sciences Faculty Meeting
14. Harvard Graduate School of Education Faculty Meeting
15. Harvard Graduate (Student) Council
16. Harvard Human Resources Deans
17. Harvard Kennedy School Faculty Meeting
18. Harvard Law School Faculty Meeting
19. Harvard Medical School Faculty Council Meeting
20. Harvard Undergraduate Council General Meeting
21. Harvard T.H. Chan School of Public Health Faculty Meeting
22. *The Crimson* Editorial Board

HARV00096666

# Appendix C.
## Key Terms

### Constituencies

Harvard University aspires to provide education and scholarship of the highest quality — to advance the frontiers of knowledge; to equip students, staff, and faculty and academic personnel for fulfilling experiences of life, work, and inclusive leadership in a diverse world; and to provide all members of the community with opportunities for growth. Achieving these aims depends on the efforts of thousands of diverse students, staff, and faculty and academic personnel across the University, including in our virtual endeavors. Some make their contributions by engaging directly in teaching, learning, and research; others contribute by supporting and enabling those core activities in essential ways, while also pursuing professional growth. With some variation School to School, the category "academic personnel" includes lecturers, preceptors, postdoctoral fellows, academic personnel in the hospitals, and other researchers. The first three core University constituencies are students, staff, and faculty and academic personnel. Alumni and friends constitute an additional core constituency. Because this Task Force included the staff constituency in its focus, we talk routinely not only about Schools — which house most faculty, academic personnel, students, and staff — but also about business units. These are central organizational units that

house staff, such as Human Resources, Information Technology, and Campus Services, where janitorial and dining services staff are housed.

### Diversity and Inclusive Excellence

A community that draws on the widest possible pool of talent, one that fully embraces individuals from varied backgrounds, cultures, races, identities, life experiences, perspectives, beliefs, and values, unifies excellence and diversity. In so doing, it achieves inclusive excellence. The aspiration to achieve inclusive excellence moves beyond the goal of nondiscrimination and toward embrace of the value that flows from bringing diversity of experience and thought to campus, and the rich and varied forms of excellence that can emerge from that diversity.

By diversity, we mean simply social heterogeneity, the idea that a given community has a membership deriving from plural backgrounds, experiences, and identities. Race, ethnicity, gender identity, sexual orientation, socioeconomic background, disability, religion, political outlook, nationality, citizenship, and other forms of formal status have all been among the backgrounds, experiences, and identities to which the Task Force has given special attention, but we have also attended to issues of language, differences in prior

HARV00096667

educational background, veteran status, and even differences in research methodologies and styles.

In addition, we recognize that identities are "intersectional" — each of us has multiple facets of identity, some of which are salient in one context, others of which are salient in others. Sometimes these facets of identity intersect in ways that amplify challenges; in other contexts, they may work in contradictory ways. Our expectation is that in communities characterized by social heterogeneity, a routine part of a campus' self-assessment should be consideration of whether patterned disparities of experience have emerged where those patterns correlate to differences in background, prior experience, and/or identity. We take it that for reasons of justice, intellectual excellence, and organizational excellence, Harvard should aspire to maximize the diversity of the cohorts of talented students, staff, and academic personnel who contribute to its educational and research mission. The faculties of each School define the modes of excellence they pursue; as they draw people from a diverse pool of highly talented individuals into their pursuits of excellence, they achieve mission-specific forms of inclusive excellence. Inclusive excellence, in other words, is about the simultaneous pursuit of our own individual excellence and — equally importantly — the vibrant and multifaceted excellence

of our community. It captures the goal of working together to achieve excellence across a diversity of domains, missions, and purposes.

## Integration

The term "integration" refers to the question of whether each person in our community is successfully connected to an academic program or professional context that richly supports individual growth and whether each person is also connected to a personally meaningful social context that supports well-being. In this definition, the term refers to the integration of individuals with contexts in which they can thrive, rather than referring in the first instance to the integration of "groups" with one another. A focus on the "intersectionality" of identity in fact makes it harder to think in terms of stable, separable "groups."

## Inclusion

Inclusion has had two meanings within the work of the Task Force. Just as campuses need to pursue inclusive excellence, drawing upon talent wherever it may be found to build the cohorts of students, staff, and academic personnel that define the campus, so too those who control opportunities and resources on campus, and those who supervise the campus' decision-making practices, should pursue inclusive approaches to distributing opportunities

and resources and inclusive practices of decision-making. In this usage, inclusion refers to the incorporation of people from all backgrounds, experiences, identities, and formal national residency statuses on campus and in the provision of campus opportunities and resources, and the formal participation of people from all backgrounds in campus decision-making. But inclusion in itself — incorporation and participation — does not suffice to achieve academic and social integration. For instance, women may be included in a decision-making committee but find that they are not given opportunities to speak. In these cases, people are included but do not yet experience full integration, or full belonging.

## Belonging

Belonging connotes full membership in the Harvard community. This entails success in achieving not merely formal participation but also rewarding participation for all members of a diverse campus community in the opportunities, resources, and decision-making structures of the campus. Because membership entails not only rights but also responsibilities, our success requires that each of us understands how he, she, or they contributes to crafting this community, to supporting academic excellence, to fostering individual well-being, and to respecting each other's

HARV00096668

dignity. Every member of our community has the right to experiences of inclusion and belonging. And all members of our community, deliberately or not, contribute to our ability to deliver experiences of inclusion and belonging for ourselves and others.

Belonging is a challenging concept because it has both a psychological and a behavioral meaning. As a psychological term, belonging connotes the opposite of feelings of alienation. We can measure an individual's subjective experiences of feelings of belonging, or the lack thereof, as part of a diagnostic strategy for assessing how well we are doing at enabling the academic and professional flourishing of all members of our community. Drawing on the literature on sense of community, we can say that belonging entails the following elements:

- **Experiences of membership:** Individuals have an ownership stake in a community.

- **Influence:** Positive influence from others and ability to be a positive influence and role model to others.

- **Integration and fulfillment of needs:** Members find their participation in the community rewarding.

- **Shared emotional connection:** Opportunity to bond through formal and informal events and interactions.

Yet at the end of the day, the work of promoting belonging must focus on crafting the kinds of experiences that are recognized in the scholarly literature as being most likely to generate such feelings of belonging because they support the forms of growth and flourishing on which feelings of belonging depend. In this regard, the key components of belonging relevant to the work of this Task Force — the elements of belonging that are within the control of our direct actions — are behavioral, the policies, practices, and rituals out of which we construct life at Harvard University.

HARV00096669

# Appendix D.
## Revised Values Statement

Harvard University aspires to provide education and scholarship of the highest quality — to advance the frontiers of knowledge; to equip students, staff, and faculty and academic personnel for fulfilling experiences of life, work, and inclusive leadership in a complex world; and to provide all members of our diverse community with opportunities for growth. We pursue these goals for our own good and for the public good through the many ways that advancing and sharing knowledge can improve human flourishing and through the service and leadership of our community members on campus and beyond. Achieving these aims depends on the efforts of thousands of students, staff, and faculty and academic personnel across the University. Some make their contributions by engaging directly in teaching, learning, and research; others contribute by supporting and enabling those core activities in essential ways, while also pursuing professional growth.

Whatever each person's individual role or location within Harvard, we owe it to one another to uphold certain basic values of the community. These include:

- Respect for the rights, differences, and dignity of others.

- Honesty and integrity in all dealings.

- Conscientious pursuit of excellence in our work.

- Accountability for actions and conduct in the community.

- Responsibility for the bonds and bridges that enable all to grow with and learn from one another.

The more we embrace these values in our daily lives, the more we will prove ourselves trustworthy to one another, build a foundation of inclusion, and create an environment of cooperation, lively inquiry, and mutual understanding, thus advancing a shared commitment to education, scholarship, and excellence.

HARV00096670

## Appendix E.
## Revised
## *Alma Mater*

**Lyrics to Fair Harvard**

*Fair Harvard! we join in thy Jubilee throng,*
*And with blessings surrender thee o'er*
*By these Festival-rites, from the Age that is past,*
*To the Age that is waiting before.*
*O Relic and Type of our ancestors' worth,*
*That hast long kept their memory warm,*
*First flow'r of their wilderness! Star of their night!*
*Calm rising thro' change and thro' storm.*

*Farewell! be thy destinies onward and bright!*
*To thy children the lesson still give,*
*With freedom to think, and with patience to bear,*
*And for Right ever bravely to live.*
*Let not moss-covered Error moor thee at its side,*
*As the world on Truth's current glides by;*
*Be the herald of Light, and the bearer of Love,*
*Till the stars in the firmament die.*

New last line by Janet Pascal, A.B. '84.

**JA5864**

DX740.0072

HARV00096671

## About the Competition to Revise the Last Line of the *Alma Mater*

The Task Force launched the competition to affirm that Harvard's motto, Veritas, speaks to and on behalf of all members of the Harvard community, regardless of background, identity, religious affiliation, or viewpoint. The University's *Alma Mater* is a powerful element in its repertoire of rituals, anchoring its culture and values and framing each student's Harvard experience: It is a living symbol used to welcome each incoming College class, and to celebrate the conclusion of each class' journey at Commencement.

The line to be replaced was, "Till the stock of the Puritans die." The metaphor of the final line fails in its own aspiration to project a valuable Puritan commitment to education into the future. The line reduces human experience to biology with the word "stock," and ties the commitment to education to ethnic lineage and to the rise and fall of racial groupings.

This is not the first time the *Alma Mater* has been altered. In 1998, the lyrics were adapted, also through a community competition, to achieve gender inclusivity. The campus community also no longer employs the middle verses of the *Alma Mater* and has not done so for many years.

Entries were submitted online from April through September 2017. The Task Force received 168 entries from Harvard students, staff, faculty and academic personnel, and alumni. A subcommittee of the Task Force selected a long list of 20 entries that were then passed along to a panel of distinguished campus community judges:

- Steph Burt, professor of English
- Kurt Crowley, A.B. '06, associate conductor of *Hamilton*
- Franklin Leonard, A.B. '00, founder of The Black List
- Marcyliena Morgan, professor of African and African American Studies
- Carol Oja (chair), William Powell Mason Professor of Music

The judges selected three finalists to move forward to the University to select the winner:

- "Till the shadows of ignorance die."
- "Till the stars in the firmament die."
- "Till the end of the ages draws nigh."

The three entries work within the constraints of the rhymes, rhythm, and sense of the existing *Alma Mater* lyrics to convey the accessibility and value of the pursuit of truth to people from all backgrounds and to affirm the University's commitment to inclusive excellence.

# Appendix F.
## Report of the Afternoon of Engagement

On April 5, 2017, students, staff, and faculty and academic personnel filled Sanders Theatre and the Joseph B. Martin Conference Center in Longwood. The afternoon included an innovative program of storytelling and small group participatory reflection. Using digital tools, scribes, and a "theme team," we were able to capture notes from all those conversations. Thanks to the terrific energy and engagement in the room, we gathered 1,536 distinct comments. Here is a summary of what we learned:

1. Staff turnout was much higher than turnout by students or academic personnel. The timing of the event during classes was surely an issue, as were the challenges of communicating to these constituencies and fatigue, particularly among students, with the thematic area arising from the numerous School-based task forces that have been underway for the past few years.

2. Harvard is a very hierarchical organization, with tenured faculty at the top. The basic hierarchical structure is unlikely to change, but this makes it all the more important to increase empathy and respect. Many people commented that people who should know their names did not, that people who know them pass them on campus without acknowledging them, and that they are infrequently invited to comment (for instance during committee meetings) on their domains and areas of expertise. Many specific suggestions were made for how we might develop a culture of empathy and build bridges across the lines dividing students, staff, and academic personnel. These can be found in the Solution Space.

3. Harvard operates with a reliance on relationships, tacit knowledge, and social networks. This is evident in the prolific use of acronyms and the minimal use of signage. Newcomers especially find navigating Harvard a challenge unless someone takes them under his, her, or their wing. The difficulty of acquiring all the relevant tacit knowledge means that people feel like newcomers for longer than they think they should. The fact that improvements of this situation rely on what feels like the contingent acquisition of a mentor, guide, or adviser was troubling to people. The basic message is that life, study, and work at Harvard need to be easier to navigate. We need more in the way of guidebooks, or the equivalent. Also, we need to make sure that mentorship, guidance, and advising are provided equitably. Again, many specific suggestions were made, which can be found in the Solution Space.

HARV00096673

4. We heard concerns about marginalization and exclusion connected to specific identities and experiences: religious minorities; second-language speakers; people with disabilities; LGBTQ individuals; low-income students; students of color; ideological minorities; and staff, students, and academic personnel who spend most of their time at the Longwood campus.

5. Participants offered many suggestions about ways to increase inclusion and belonging at Harvard for staff especially. These included increasing "One Harvard" events, activities, and opportunities to mix across Schools and units. Many suggestions focused on increasing staff inclusion such as providing more opportunities for professional development; increasing voice and influence for staff; making diversity, inclusion, and belonging a more general priority among managers; and improving onboarding.

6. Participants committed themselves to taking action immediately to increase inclusion and belonging in their offices, classrooms, and Schools. Some committed to meeting and greeting colleagues whom they work with but do not know. Others committed to spending more energy mentoring others. Several committed to meet others from their Afternoon of Engagement small group to continue conversations across Schools and, especially, student-staff divides. Some committed to increasing recognition and respect, for example by "learning the names of security guards and dining hall staff" and "taking time to get to know people instead of racing by them." Some committed to trying to overcome the "imposter syndrome" by, for example "being brave enough to share my own opinions" and calling out the imposter phenomenon with graduate students and colleagues.

7. Finally, after the event, we heard from many both how rewarding and how difficult the conversations had been. The conversations were in randomly mixed small groups and brought together people from very different positions. In the moment, participants rose to the occasion. This was experienced as liberating by very many but also as personally difficult and emotionally taxing by others. We have, however, consistently received feedback from people that they wished Harvard had more events of this kind and more events that made the aspiration to be "One Harvard" a reality.

HARV00096674

A.34    /    Pursuing Excellence on a Foundation of Inclusion

# Appendix G.
# Solution Space: Insights from the Community

The Harvard Solution Space was a forum for open discussion that was designed to engage our community's collective wisdom. As its name implies, it was a space to share thoughts and suggestions directly with University leadership and with the Harvard community at large, so that together we might discover — through honest, trustworthy, respectful, and open engagement — solutions to major issues at Harvard that may elude any one of us individually. The Harvard Solution Space is modelled on the MIT Idea Bank; we thank colleagues at MIT for their willingness to share code and templates.

Members of the Harvard community submitted 299 entries to the Solution Space. In December 2017, Task Force members coded 260 posts submitted through the end of October 2017 to identify themes in the solutions submitted and supported by the community. Posts specifically acknowledged the particular needs of BGLTQ+ individuals, workers, staff, women, individuals with disabilities, undocumented students, individuals with a criminal record, veterans, people of color, Extension School students, alumni, individuals with limited financial resources, and short-term or contracted hires. Posts could be tagged with specific categories; the categories discussed most in the posts included: work environment (104); fostering a healthy climate (97); supporting community well-being (90); coordination



*Word cloud of coded Solution Space posts*

HARV00096675

and sharing (64); cultivating a resilient campus (60); authority, responsibility, and accountability (57); enabling difficult conversations (47); retention (45); combining free expression and trustworthiness (44); and residential experience (42).

As part of a deeper analysis of more than 50 individual posts, we received the following *recommendations* to enhance diversity, inclusion, and belonging. This is a summary of the most common or highly rated recommendations. Many recommendations were suggested by multiple people and/or endorsed by voting. Not included in the list below are the numerous personal stories and reflections about the current environment. These suggestions have not been assessed for effectiveness or feasibility but provide a community-generated list of solutions at every scale.

### Hiring and Staff

- Increase funding and hire additional staff for current diversity and inclusion efforts across the University.

- Anonymize resumes for students, staff, and faculty to ensure unbiased selection processes.

- Support career development, promotions and retention of community members who enhance our diversity.

### Programs and Tools

- Establish a center for research on race and ethnicity that would serve as a national hub for this work. This center would support the study of race and ethnicity among Harvard's Schools, including a robust undergraduate and graduate ethnic studies program within FAS. (This recommendation was the most supported, with 591 votes.)

- Expand mentoring programs to cut across different Schools and units on campus.

- Host facilitated group conversations, including town halls, community sharing, and in-depth interviews.

- Provide interactive tools that increase access to current resources and reports.

- Host more frequent social events that create a culture of collaboration, connection, and friendliness among all members of the Harvard community.

- Develop Solution Space portals for each School so suggestions can continue to be shared among all community members.

### Symbols and Space

- Declare Harvard University a Sanctuary Campus and provide legal counsel for those affected by immigration enforcement.

- Create a reporting mechanism for areas where physical access is impaired (e.g. obstructions, lack of ADA ramps, etc.) to alert community members with disabilities and expedite solutions across the campus.

- Remove Columbus Day from Harvard's calendars and replace it with Indigenous People's Day.

- Promote clear labels and signage to ensure the campus is accessible for all members of the community.

- Commission a new statue on the main campus that illustrates a more inclusive, dynamic image of Harvard.

- Create or reinvigorate physical spaces that promote social cohesion between underrepresented minority community members at Harvard.

- Within the Coop campus store and for giveaways, expand T-shirt size offerings to encompass XS to 3XL.

The Solution Space served as a valuable tool to hear from the diverse members of the Harvard community. These insights are publicly available on solutionspace.harvard.edu. We encourage you to read these posts as you think about ways to make a more inclusive Harvard community.

HARV00096676

# Appendix H.
## Benchmarking Peer Diversity and Inclusion Action Plans

*Office of Institutional Research / May 18, 2017*

This document includes a matrix summarizing themes across "Ivy Plus" institutional plans for creating more diverse and inclusive communities. Our research process was informal. We read each peer plan to identify major themes, and if new themes emerged in the reading, returned to code prior plans. While not exhaustive or necessarily fully comparable across institutions (given differing levels of specificity, for example), we believe this approach captures the range of thinking represented among our peers.

While many of the institutions here consider all campus constituents (students, faculty, and staff), three developed plans that focus on faculty and non-faculty academic positions. The centralized structure of some of the institutions allowed for more cohesive institutional-level frameworks. Some frameworks may be suitable for a more decentralized structure, in which each department and affiliated School develops plans for addressing its unique needs. To maintain accountability and oversee progress of department-level plans, one institution reported establishing a permanent committee structure.

While some Ivy Plus peers had diversity and inclusion initiatives or offices focused on these issues among particular constituents (e.g., faculty or students), they did not appear to have a comprehensive plan. The following matrix reflects proposed initiatives comprised within reports and does not necessarily reflect an institution's broader strategic plan or existing initiatives for creating more diverse and inclusive communities.

HARV00096677

## Benchmarking Peer Action Plans

● Institution  |  ● Students  |  ● Faculty  |  ● Staff

| THEMES OF RECOMMENDATIONS | Peer A | Peer B | Peer C | Peer D | Peer E | Peer F | Peer G | Peer H | Peer I | Peer J |
|---|---|---|---|---|---|---|---|---|---|---|
| Add visible statement about diversity strategic vision at university | ● | ● | ● | ● | ● | ● | ● |  | ● | ● |
| Hire administrative leadership to coordinate and lead diversity strategic vision | ● |  |  |  | ● | ● |  |  | ● | ● |
| Develop diversity action plans at the department, division, and/or school level | ● | ● | ● | ● | ● | ● |  | ● | ● |  |
| Recruit and retain diverse students, faculty, and/or staff | ●● | ●● | ●●● | ●● | ● | ●● | ● |  |  | ● |
| Integrate diversity- and inclusion-related courses to curriculum | ● | ● | ● | ● |  | ● |  | ● | ● |  |
| Engage students in curricular decision-making | ● |  |  |  |  |  |  |  | ● |  |
| Develop diversity- and inclusion-related educational training for students, faculty, and/or staff | ●●● | ●● | ●●● | ● |  | ●●● | ●● | ● | ●● | ● |
| Enhance advising and mentorship for students, faculty, and/or staff | ●● | ● | ●● | ● |  | ●● | ●● | ● | ● | ●● |
| Build in co-curricular and community events that relate to issues of diversity and inclusion | ● | ● | ● |  | ● |  | ● |  | ● |  |
| Include questions related to diversity, equity, inclusion, and classroom climate to course evaluations |  | ● |  |  |  |  |  |  | ● |  |
| Clarify policies and reporting structure for concerns involving bias, harassment, and discrimination | ● | ● | ● | ● |  | ● | ● |  | ● |  |
| Invest in pipeline programs for diverse students, faculty, and/or staff | ●●● |  | ●●● | ● | ● | ●● | ● |  |  | ● |
| Create, expand, and/or invest in centers for supporting underrepresented groups and/or studying issues related to diversity and inclusion | ● | ● | ● |  | ● |  | ● |  |  |  |
| Align benefits to meet diverse employee needs |  |  |  |  |  | ●● | ●● | ● |  | ● |
| Enhance mental health access and services |  | ● |  |  |  | ● | ● |  |  |  |
| Engage with diverse local community | ● | ● | ● |  |  | ● | ● |  |  |  |
| Improve data collection and analysis to fill in gaps of knowledge regarding campus climate | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Increase transparency of diversity trends | ● |  | ● |  | ● | ● | ● | ● | ● | ● |
| Establish plan for accountability | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |

**JA5871**
DX740.0079

HARV00096678

DX740.0080                                                                                          HARV00096679



**"FAIR HARVARD"**

Fair Harvard! we join in thy Jubilee throng,
And with blessings surrender thee o'er
By these Festival-rites, from the Age that is past,
To the Age that is waiting before.
O Relic and Type of our ancestors' worth,
That hast long kept their memory warm,
First flow'r of their wilderness! Star of their night!
Calm rising thro' change and thro' storm.

Farewell! be thy destinies onward and bright!
To thy children the lesson still give,
With freedom to think, and with patience to bear,
And for Right ever bravely to live.
Let not moss-covered Error moor thee at its side,
As the world on Truth's current glides by;
Be the herald of Light, and the bearer of Love,
Till the stars in the firmament die.

**SAMUEL GILMAN**, Class of 1811
*(Revised 1998 and 2018)*

*Credit: Rose Lincoln/Harvard Staff Photographer*

HARV00096680

# Harvard University Presidential Task Force on Inclusion and Belonging

**Danielle Allen**, *Task Force co-chair*
James Bryant Conant University Professor;
Director of the Edmond J. Safra Center for Ethics

**Archon Fung**, *Task Force co-chair*
Winthrop Laflin McCormack Professor of
Citizenship and Self-Government, and
Academic Dean, Kennedy School

**Meredith Weenick**, *Task Force co-chair*
Vice President for Campus Services

**Katrina Armstrong**, *subcommittee co-chair*
Jackson Professor of Clinical Medicine, Medical
School; Head of the Department of Medicine,
Massachusetts General Hospital

**Ali Asani**, Professor of Indo-Muslim and Islamic
Religion and Cultures, Faculty of Arts and Sciences

**Anita Berrizbeitia**, Professor of Landscape
Architecture, and Chair of the Department
of Landscape Architecture, Graduate School
of Design

**Iris Bohnet**, Roy E. Larsen Professor of
Public Policy, and Director of the Women
and Public Policy Program, Kennedy School

**Mohan Boodram**, Dean for Admissions
and Financial Aid, Graduate School of Arts
and Sciences

**Pat Byrne**, *subcommittee co-chair*
Executive Dean, Divinity School

**Elson Callejas**, Custodial Manager

**Tez "Bank" Chantaruchirakorn**, *staff*
Associate Director for Special Projects,
Office of the Provost

**Eric Chavez**, M.B.A. '18

**Daniel Cnossen**, M.P.A. '16, M.T.S. '18

**Andrew Manuel Crespo**, Assistant Professor
of Law, Law School

**Chuck Curti**, Director of Human Resources,
Radcliffe Institute for Advanced Study

**Tania deLuzuriaga**, *staff*
Director of Media Relations, Public Affairs and
Communications

**Alberto de Salvatierra**, M.L.A. '17, M.Des. '17

**Erin Driver-Linn**, Associate Provost for
Institutional Research; Director of the Harvard
Initiative for Learning and Teaching

**Erika Eitland**, S.D. '20

**Frances Frei**, *subcommittee co-chair*
UPS Foundation Professor of Service
Management, Business School

**Eden Girma**, A.B. '18

**Marc Goodheart**, Vice President, Secretary
of the University, Assistant to the President

**Annette Gordon-Reed**, Charles Warren
Professor of American Legal History, Law School;
Professor of History, Faculty of Arts and Sciences

**Kent Haeffner**, A.B. '18

**Natasha Hicks**, M.U.P. '19, M.Des. '19

**Elizabeth Hinton**, Assistant Professor of History
and of African and African American Studies,
Faculty of Arts and Sciences

**Andrew Ho**, *subcommittee chair*
Professor of Education, Graduate School
of Education

**Chris Hopson**, A.B. '19

**Kiera Hudson**, Ph.D. '20

**Bob Iuliano**, *staff*
Senior Vice President and General Counsel,
Deputy to the President

**Vincent James**, Director of Admissions,
T.H. Chan School of Public Health

**Jack Jennings**, Executive Dean for
Administration, Graduate School of Education

**Lisa Kamisher**, *staff*
Associate Director for Research and Programs,
Office of the President

**Jordan Kennedy**, Ph.D. '21

**Cameron Khansarinia**, A.B. '18

**Stephanie Khurana**, *subcommittee chair*
Faculty Dean of Cabot House,
Faculty of Arts and Sciences

**Avi Loeb**, Frank B. Baird, Jr. Professor
of Science, and Chair of the Department
of Astronomy, Faculty of Arts and Sciences;
Director of the Institute for Theory
and Computation

**Diane Lopez**, *subcommittee co-chair*
Deputy General Counsel

**Sophia Lozano**, Assistant Manager,
Winthrop House Dining Services

**Michael Lynton**, Chairman, Snap Inc.;
Member of the Board of Overseers
(A.B. '82, M.B.A. '87)

**Vinny Manoharan**, Wagner Family Professor
of Chemical Engineering and Professor of
Physics, John A. Paulson School of
Engineering and Applied Sciences

**Dave Miller**, M.B.A. '17

**Anshi Moreno-Jimenez**, A.B. '19

**Tim Murphy**, The Thomas Stephenson
Family Head Coach for Harvard Football

**William Oh**, A.B. '18

**Shaiba Rather**, A.B. '17

**Joan Reede**, Professor of Medicine,
and Dean for Diversity and Community
Partnership, Medical School; Professor
in the Department of Social and Behavioral
Sciences, T.H. Chan School of Public Health

**Meredith Rosenthal**, *subcommittee chair*
C. Boyden Gray Professor of Health
Economics and Policy, and Senior
Associate Dean for Academic Affairs,
T.H. Chan School of Public Health

**Liam Schwartz**, *staff*
Assistant Provost, Institutional Research

**Marcia Sells**, Associate Dean and
Dean of Students, Law School

**Edirin Sido**, A.B. '14, D.M.D. '19

**Judy Singer**, James Bryant Conant
Professor of Education, Graduate School
of Education; Senior Vice Provost for
Faculty Development and Diversity

**Jonathan Walton**, *subcommittee co-chair*
Pusey Minister in the Memorial Church,
Plummer Professor of Christian Morals;
Professor of Religion and Society, Divinity School

**Sarah Wu**, A.B. '19

**Kenji Yoshino**, Chief Justice Earl Warren
Professor of Constitutional Law; and Director
of the Center for Diversity, Inclusion, and
Belonging; New York University School of Law;
Former President, Board of Overseers (A.B. '91)

**LEARN MORE** inclusionandbelongingtaskforce.harvard.edu



**HARVARD** UNIVERSITY

HARV00096681

# Reading Procedures, Class of 2021

## I.     UPDATED PROCEDURES

The Summary Sheet captures information as supplied on the application and will be updated as new information is added.  Late information can change the likelihood of admission and updates can be provided later for those initially considered less competitive. If any information is **missing** or **incorrect** for competitive candidates, changes should be made on the First Reader Rating Form and noted with prose in the reader comments or "Notes for Summary Sheet" box. This prose will feed onto the Summary Sheet when the rating form is submitted.

<u>One exception</u>: School code changes are NOT made on the First Reader Rating Form; see instructions below on how to do this.

We report exactly what the applicant reports as ethnicity on the application.  The ethnic codes on the Summary Sheet will come from the demographic fields the candidate checked on the application.

**Note that foreign citizens are listed as such. If they opted to check an identifying ethnic code it will appear but is not used for statistics and reporting.**

- **CITIZENSHIP CODE / COUNTRY OF CITIZENSHIP**:  There are four options on the application that can be checked: (1) U.S. Citizenship, (2) U.S. Dual Citizenship, (3) U.S. permanent resident and (4) "Other" or foreign citizen.

    <u>The applicant holds only American citizenship</u>.

    *APP*: Citizenship status will be "US Citizen or US National" and no other country of citizenship will be listed.

    *SUMMARY SHEET*:  Should read "Citizenship:  United States"

    <u>The applicant is a dual U.S. citizen</u> (a citizen of both the U.S. and another country).

    *APP*: Citizenship status will be "Dual US Citizen"-Other citizenships will show a country (e.g. Sweden)

    *SUMMARY SHEET*:  Should read "Citizenship:  United States/<other country>"

    <u>The applicant is a U.S. Permanent Resident</u>.

    *APP*: Citizenship status will be "U.S. Permanent Resident or Refugee" and Other Citizenships will list one or more countries checked with another country listed.

    *SUMMARY SHEET*:   Should read "Citizenship:  PERM RES / <other country>"

    *Caveat*:  If an applicant has checked the U.S. Permanent Resident box but notes that his or her application for permanent residency (or "green card") is <u>pending</u>, that applicant should be recoded as "Other citizenship."  Request this change by using the Admin Problems update form. We must prepare an I-20 form if the applicant is admitted and the application for residency is still pending, and the citizenship code is the only way we know to do this.

1

United States District Court
District of Massachusetts

**DX 742**

Case No. _____1:14-cv-14176 (ADB)_____
Date Entered_____
By_____
Deputy Clerk

The applicant is a foreign citizen.

*APP*: Citizenship status will be "Other (Non-US)".  Other citizenship will show a country (e.g. Poland)

*SUMMARY SHEET*:   Should read "Citizenship:   <other country>"

**PLEASE NOTE**:  The accuracy of our citizenship coding is CRUCIAL.  Miscoding affects many of the important statistics we are required to compile (including ethnicity), and we need to keep careful track of who needs a visa to study in the United States.

- **SCHOOL CODE**:  If an applicant is coded to the wrong school, and if the required recoding alters the docket and first reader assignment, please use the Admin Problems update form and route this to the Admin Problems bin immediately so that the operations team can ensure that the interview is reassigned to the appropriate club and group and the file is available for the appropriate reader to download into his/her queue.  If an applicant is coded to the wrong school but does not alter the docket and first reader, proceed to read and rate the file, but submit a "Follow up to do" update form indicating that a change in school code is needed, with known details (i.e. what the new docket/school should be) so that the Records Room staff can make the change.

- **GENDER**:  Occasionally the gender designation reported on the Common Application is coded incorrectly in our system.  Such a coding error should be corrected. Please note that gender coding is optional and in the case of an applicant who does not designate a gender on the Common Application, any previous gender designation by that applicant (on tests, etc.) will override a blank gender designation.

- **LINEAGE:**  The folder should be read by WRF ("4th" bin) following the normal reading process if the decision might require special handling or if another reading might be helpful.  Errors in coding should be noted with specific details about the error using the Follow-Up Update Form and routed to the Admin problems bin.

- **FACULTY, STAFF**:  Code <u>ONLY</u> children of professors at the Faculty of Arts and Sciences as an "F"; children of faculty from other parts of the University as well as children of administrative staff should be coded "S".  If an update is needed, use the First Reader rating form. **Please be careful to apply faculty and staff coding where appropriate as we need to keep accurate statistics on these applicants.  All "F" and "S" folders should be routed to the "4th bin" (WRF) after the normal reading process has been completed.**

- **ACCESSIBLE EDUCATION OFFICE (AEO) REFERRALS**: Code all applicants who may require special accommodations due to disabilities or special needs with the AEO flag on the First Reader Rating Form.  We can then provide a list to assist the AEO and FDO in providing accommodations when appropriate.

- **ATHLETE**: Be sure the appropriate sport is listed as the first extracurricular activity. Changes can be made on the app update tab on the Student Record. **DO NOT CHANGE ANY PRE-CODED ATHLETE**.

2

- **FIRST-GEN:** First readers should check this box if the student is of the first generation in the family to graduate from a four-year higher education institution. If first readers do not, chairs should do so

- **SCORES**: Applicants will know by checking their Applicant Status website whether their scores requirement has been fulfilled though not all scores will be listed.  They can report scores (which will be marked 'self-reported' in the student record) as they like.  You can check scores by looking under the "Scores" tab in each Student Record of an applicant. The Summary Sheet will reflect the highest verified scores.

  Applicants are on notice that they are responsible for changing 'unofficial' to 'official,' which they can only do by getting scores sent by CEEB/ACT. Paper copies of scores sent via fax, email attachment or U.S. mail are not considered official.

  We receive secure web downloads of scores, so we do not have to wait for the scores to be mailed to us.  Applicants are told not to use 'rush reports,' but if they do, they will arrive electronically as soon as they are scored.


## II.    CODING GUIDELINES FOR SUMMARY SHEETS

All readers must code a preliminary overall rating and a profile (using the codes below and pluses and minuses) for all candidates. Writing prose comments is left to the discretion of the reader and should generally be done only for competitive candidates, those who might become competitive later, or those who might be of interest to the Committee.

Overall
1. Tops for admission:  Exceptional – a clear admit with very strong objective and subjective support .
2. Very strong credentials but not an inevitable admit .
3. Solid contender: An applicant with good credentials and support .
3- Somewhat Neutral: Respectable credentials.
4. Neutral: Generally respectable credentials.
5. Negative: Credentials are generally below those of other candidates.


For all categories, use "+" and "-" primarily in the 2 and 3 range to indicate relative strength. A rating of 2+ or 3+ is very different from a 2- or 3- respectively.

Academic

1. Summa potential.  Genuine scholar; near-perfect scores and grades (in most cases combined with unusual creativity and possible evidence of original scholarship, often substantiated by our faculty.)
2. Magna potential.  Excellent student with top grades and,
   a. SAT prior to March 2016 and SAT Subject tests: mid 700 scores
   b. SAT after March 2016: 750+ scores
   c. 33+ ACT
3. Cum laude potential: Very good student with excellent grades and,

3

    a. SAT prior to March 2016 and SAT Subject tests: mid-600 to low-700 scores

    b. SAT after March 2016: high-600 to mid-700 scores

    c. 29 to 32 ACT

4. Adequate preparation. Respectable grades and low-to mid-600 scores on the old or new SAT and subject tests (26 to 29 ACT).

5. Marginal potential. Modest grades and 500 scores on the old or new SAT and subject tests (25 and below ACT).

<u>Extracurricular, Community Employment, Family Commitments</u>

1. Unusual strength in one or more areas. Possible national-level achievement or professional experience. A potential major contributor at Harvard. Truly unusual achievement.

2. Strong secondary school contribution in one or more areas such as class president, newspaper editor, concertmaster etc. and/or significant involvement in organizations outside of school. Possible local or regional recognition; major accomplishment(s) that have had an impact outside of the classroom. Can include significant term-time work or family responsibilities coupled with extracurriculars.

3. Solid participation but without special distinction. (Upgrade 3+ to 2- in some cases if the e/c is particularly extensive and substantive.)

4. Little or no participation.

5. Substantial activity outside of conventional EC participation such as family commitments, term-time work or a significant commute (Important: should be included with other e/c to boost the rating or left as a "5" if that is more representative of the student's commitment).

6 Special circumstances limit or prevent participation (e.g. a physical condition, gap year(s), compulsory service of some kind).

<u>Athletic</u>
1. Unusually strong prospect for varsity sports at Harvard, desired by Harvard coaches.

2. Strong secondary school and/or travel team contribution in one or more sports; leadership role(s) such as captain or co-captain; possible walk-on to a varsity team; potentially has an IRF of a 4 from a Harvard coach

3. Active participation, possible leadership role.

4. Little or no participation(this is not a negative).

5. Substantial activity outside of conventional EC participation such as family commitments or term-time work (could be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).

6. Physical condition or other special circumstances prevent significant activity.

<u>Personal</u>
1. Rare personal appeal and character

2+ or 2 Extremely strong personal appeal and character

2- Very strong personal appeal and character

3+ Above average personal appeal and character; positive

3. Generally positive, perhaps somewhat neutral

3- Slightly negative impression

4. Distinctly poor impression; questionable or worrisome personal qualities

4

School Support
1. Strikingly unusual support. "The best ever," "one of the best in many years," truly over the top.
2. Very strong support. "One of the best" or "the best this year."
3+ Well above average, consistently positive
3. Generally positive, perhaps somewhat neutral or generic
3- Somewhat neutral or slightly negative.
4. Negative or worrisome report.
6. For teacher reports: prose is not in the file.
8. Placeholder for teacher reports.
9. For secondary school report: transcript is in the file but there is no SSR prose.

PLEASE NOTE: School support ratings for teacher one, teacher two and a counselor are mandatory ratings for competitive candidates. Teacher three and teacher four are optional, if applicable.

**GPA and GPA Scale**:
We must try to report an Academic Index to the IVY LEAGUE for EVERY matriculant.
If grades are available, please report a GPA and GPA Scale for your strongest candidates.

The Academic Index is calculated using GPA and GPA Scale. These will be converted automatically to the 20 to 80 scale in Slate.

Here are the rules according to the AI instructions provided by the Ivy League and send to staff separately:

A. ACADEMIC INDEX CALCULATIONS: CGS

1. **GPAs generally:** The secondary school GPA should be taken as presented on the secondary school transcript; when both unweighted and weighted GPAs are presented, the unweighted GPA should be used. (If there is a question as to whether the school is using an unweighted or 'what the A grade earns in a regular course.) Other questions in providing the GPA are addressed in this section.

2. **GPA scales and conversions from Table II:** Table II, the "CGS General Conversion Tables" should be used for the GPA scales shown (100-points, 11.0/12.0, 7.0, 6.0, 4.0, A-D) even if the transcript or secondary school profile provides a conversion to a Table II scale.

   - The "4.0 Weighted" scale applies to any 4.0 based GPA that is weighted. It should be used only when Unweighted GPA is not available.
   - The" 4.0 Unweighted Scale" applies to any 4.0 based GPA that is unweighted.
   - Note Table II includes a scale to use to convert International Baccalaureate GPAs to a CGS.

5

3. **Scales not provided on Table II:** Given the relatively small number of admitted and matriculated students for whom Table II scales are not provided, it is preferable not to create new scales if possible. In such cases, a GPA on a 4.0 scale should be calculated using the following formula, and a CGS then derived using the 4.0 scale on Table II: HSGPA/HSGPA scale = "x"/4.0, where "x" becomes the value from which the CGS is derived. For example, if on a 5.0 scale a student has a 4.8 GPA (whether the scale's top grade is A or A+), the formula is 4.8/5.0 = x/4.0, x-3.84 and the CGS = 73.

4. **Calculating GPA when not provided by the secondary school:** When the secondary school does not calculate/report a GPA, the institution should calculate an unweighted GPA based on the secondary school's grading scale, using all courses for which grades and credit hours are provided, and weighting semester grades as one-half full-year grades.

   NOTE: the following grade scale is used to convert grades on a non-traditional scale to a 4.0 Unweighted Scale: HH- 4.0, H- 3.5, HP- 2.5, P- 1.5, U- 0

5. **GPA period:** GPA data always should be for more than one year, including 10th and 11th grades, 9th grade when available, and official trimester or semester grades (as opposed to term grades) in the student's current year if available at the time the athlete's decision is made. If "official" grades from the current year are available but not counted in the school's cumulative GPA, they should be added to the cumulative GPA and weighted appropriately: e.g., grades for first semester or trimester of senior year would be weighted as one-half or one-third year.

6. **GPAs from multiple schools and repeat years:** When a student has attended multiple secondary schools (including a post-graduate year), all GPAs provided by the schools should be used to the extent possible and weighted as in #5 above. If the institution believes this result is not logical and fair, it should describe what approach it believes is better, subject to the Admissions Committee's agreement.

7. **Transfer students:** CGS should be calculated using 50% secondary school GPA and 50% college GPA .

CONFIDENTIAL

HARV00097961

B. <u>INTERNATIONAL-SYSTEM  GPA  CALCULATIONS</u>

1.  **Generally:** Each school should calculate GPAs from international schools using the   attached Appendix of International Calculations. If an international country is not listed   on the Appendix, we should calculate an AI as it seems most appropriate. (In this   circumstance, we should default to the Committee, using the NCAA International   Standards as a reference point, but not necessarily a policy.)

2.  **Canadian systems:** Table IIA, for establishing value of CGS of Canadian Students should be used  to determine CGS based on the Province of the secondary school.  Provinces where a passing grade is 50% use the first column on Table II A (Alberta, British Columbia, Manitoba, Newfoundland, NW Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island, Saskatchawan, Yukon); Provinces where a passing grade is 60% use the second column on Table IIA (New Brunswick, Quebec).

1.  <u>British systems</u>:

Count all GCSE (= O Level), AS and A level results in order to calculate a GPA:   A* (same as A+) = 4.3

A = 4:0

B = 3.0

C = 2.0

D = 1.0

- If the applicant is taking a gap year, actual A-Level results should be used.
- A Level scores are given double the weight of AS and GCSE scores.
- Internal grades are usually not available, and should <u>not</u> be used if they are.
- Predicted A-Level scores should be used when available.
- All courses should be included in calculating the GPA, including physical   education courses if the student receives a grade and credit for the course.

2.  <u>Pre-U:</u>

**The scale for Pre-U were decided on as follows, for Principal Subjects only:**

D1 = A+/4.3

D2 = A+/4.3

D3 = A/4.0

M1 = B/3.0

M2 – B/3.0

7

M3 = B-/2.7

P1 – C-/1.7

P2 – D/1.0

P3 – D-/0.7

5. International Baccalaureate systems:

Average grades from the last two years of the IB program are preferred to calculate a GPA:

7 = A+ = 4.3

6 = A = 4.0

5 = B = 3.0

4 = C = 2.0

3 = D = 1.0

- If the applicant is still in school, use one year for Early applicants and one year plus one term for Regular applicants.
- If the applicant is taking a gap year, actual two-year IB results are used.
- Use IB predicted grades if available, and only if not available use internal grades.
- For IB schools in the U.S., use the course values given on the transcript; for IB schools outside the U.S., double the weight for Higher Level courses (as opposed to the Subsidiary Level courses).
- All Higher Level/Subsidiary Level courses will be counted from international schools.
- Scales: When IB predictions give split results, use the average of the split (i.e., 5/6 is given, use 5.5 for calculation).

6. **Notes on Selected Countries (added fall 2010):**

Australia – Require schools to provide a transcript of some sort, but if all else fails and they give the state final exam result or prediction (ex: UAI for NSW, OP for Queensland, usually out of 99.95) use that.

New Zealand –The scale for NZ is as follows…but ONLY for courses in which there is the possibility to get more than Achieved (Achieved/Not Achieved is basically Pass/Fail so we won't count those courses):

[E] Excellent = A/4.0

[M] Merit = B/3.0

[A] Achieved = C/2.0

[N] Not Achieved = F/0

Singapore – for schools using standard Junior College grading conventions – Include H1(General Paper, Project, etc.) & H2 predictions on a 4.0 scale to calculate GPA. Double weight for H2 marks.

For H3, the scale is:

8

Distinction = A/4.0
Merit = B/3.0
Pass – C/2.0
Double H3s as well

If provided, include O Level/GCSE marks in calculation of GPA with a single weight like we  do with the British System.

General notes – For all national curriculums, the general rule of thumb is to include all courses as part of the GPA calculations.
    '

### 7. Additional International Scales for Relevant Countries

For GPA scales of other countries Table III has been sent separately and is include in the Ivy League Academic Index Memo. Please see CGM if you need a copy.

9

**JA5883**

DX 742.0009

HARV00097964

| TABLE II: For establishing value of CGS | | | | | | | |
|---|---|---|---|---|---|---|---|
| Revised May 2015/UPDATED AUGUST 2016 | | | | | | | |
| Percentage Average | International Baccalaureate | 11.0/12.0 Scale *USE FOR WEIGHTED AND UNWEIGHTED GPAS WHERE A= 11.0 AND A+ >11.0* | 5.0/6.0 Scale *USE FOR WEIGHTED AND UNWEIGHTED GPAS WHERE A= 5.0 AND A+ >5.0* | 4.0 Scale **WEIGHTED** *USE ONLY WHEN UNWEIGHTED NOT AVAILABLE* | Letter Grade Equivalent to 4.0 | 4.0 Scale UNWEIGHTED | CGS |
| 98.00 and above | 7 | 12.00 and above | 6.00 and above | 4.30 and above | A+ | 4.0 | 80 |
| 97.00 - 97.99 | 6/7 | 11.70 - 11.99 | 5.70 - 5.99 | 4.20 - 4.29 | | 3.91 - 3.99 | 79 |
| 96.00 - 96.99 | | 11.40 - 11.69 | 5.40 - 5.69 | 4.10 - 4.19 | | 3.81 - 3.90 | 78 |
| 95.00 - 95.99 | 6 | 11.00 - 11.39 | 5.00 - 5.39 | 4.00 - 4.09 | A | 3.72 - 3.80 | 77 |
| 94.00 - 94.99 | | 10.70 - 10.99 | 4.90 - 4.99 | 3.90 - 3.99 | | 3.63 - 3.71 | 75 |
| 93.00 - 93.99 | | 10.40 - 10.69 | 4.80 - 4.89 | 3.80 - 3.89 | | 3.53 - 3.62 | 73 |
| 92.00 - 92.99 | 5/6 | 10.00 - 10.39 | 4.70 - 4.79 | 3.70 - 3.79 | A- | 3.44 - 3.52 | 71 |
| 91.00 - 91.99 | | 9.80 - 9.99 | 4.60 - 4.69 | 3.60 - 3.69 | | 3.35 - 3.43 | 70 |
| 90.00 - 90.99 | | 9.50 - 9.79 | 4.50 - 4.59 | 3.50 - 3.59 | | 3.26 - 3.34 | 69 |
| 89.00 - 89.99 | | 9.30 - 9.49 | 4.40 - 4.49 | 3.40 - 3.49 | | 3.16 - 3.25 | 68 |
| 88.00 - 88.99 | | 9.00 - 9.29 | 4.30 - 4.39 | 3.30 - 3.39 | B+ | 3.07 - 3.15 | 67 |
| 87.00 - 87.99 | | 8.70 - 8.99 | 4.20 - 4.29 | 3.20 - 3.29 | | 2.98 - 3.06 | 66 |
| 86.00 - 86.99 | | 8.40 - 8.69 | 4.10 - 4.19 | 3.10 - 3.19 | | 2.88 - 2.97 | 65 |
| 85.00 - 85.99 | 5 | 8.00 - 8.39 | 4.00 - 4.09 | 3.00 - 3.09 | B | 2.79 - 2.87 | 63 |
| 84.00 - 84.99 | | 7.70 - 7.99 | 3.90 - 3.99 | 2.90 - 2.99 | | 2.70 - 2.78 | 61 |
| 83.00 - 83.99 | | 7.40 - 7.69 | 3.80 - 3.89 | 2.80 - 2.89 | | 2.61 - 2.69 | 59 |
| 82.00 - 82.99 | 4/5 | 7.00 - 7.39 | 3.70 - 3.79 | 2.70 -2.79 | B- | 2.51 - 2.60 | 57 |
| 81.00 - 81.99 | | 6.75 - 6.99 | 3.60 - 3.69 | 2.60 - 2.69 | | 2.42 - 2.50 | 55 |
| 80.00 - 80.99 | | 6.50 - 6.74 | 3.50 - 3.59 | 2.50 - 2.59 | | 2.33 - 2.41 | 53 |
| 79.00 - 79.99 | | 6.25 - 6.49 | 3.40 - 3.49 | 2.40 - 2.49 | | 2.23 - 2.32 | 51 |
| 78.00 - 78.99 | | 6.00 - 6.24 | 3.30 - 3.39 | 2.30 - 2.39 | C+ | 2.14 - 2.22 | 49 |
| 77.00 - 77.99 | | 5.70 - 5.99 | 3.20 - 3.29 | 2.20 - 2.29 | | 2.05 - 2.13 | 48 |
| 76.00 - 76.99 | | 5.40 - 5.69 | 3.10 - 3.19 | 2.10 - 2.19 | | 1.95 - 2.04 | 47 |
| 75.00 - 75.99 | 4 | 5.00 - 5.39 | 3.00 - 3.09 | 2.00 - 2.09 | C | 1.86 - 1.94 | 46 |
| 74.00 - 74.99 | | 4.70 - 4.99 | 2.90 - 2.99 | 1.90 - 1.99 | | 1.77 - 1.85 | 45 |
| 73.00 - 73.99 | | 4.40 - 4.69 | 2.80 - 2.89 | 1.80 - 1.89 | | 1.67 - 1.76 | 44 |
| 72.00 - 72.99 | 3/4 | 4.00 - 4.39 | 2.70 - 2.79 | 1.70 - 1.79 | C- | 1.58 - 1.66 | 42 |
| 71.00 - 71.99 | | 3.5 - 3.99 | 2.60 - 2.69 | 1.60 - 1.69 | | 1.49 - 1.57 | 40 |
| 70.00 - 70.99 | | 2.5 - 3.49 | 2.50 - 2.59 | 1.50 - 1.59 | D+ | 1.40 - 1.56 | 38 |
| Below 70.00 | 3 | Below 2.5 | Below 2.5 | Below 1.5 | D | Below 1.4 | 35 |

10

**JA5884**

DX 742.0010

**TABLE IIA:  For establishing value of CGS of Canadian Students**

**Revised May 2015, Effective for Class Entering Fall 2017**

| United States  100 Point Scale | Letter Grade Equivalent | Canada Where passing grade is 50% [1] | CanadaWhere passing grade is 60% [2] | CGS |
|---|---|---|---|---|
| 98.00 and above | A+ | 90.00 and above | 88.00 and above | 80 |
| 97.00 --- 97.99 |  | 88.00 --- 89.99 | 87.00 --- 87.99 | 79 |
| 96.00 --- 96.99 |  | 86.00 --- 87.99 | 86.00 --- 86.99 | 78 |
| 95.00 --- 95.99 | A | 84.00 --- 85.99 | 85.00 --- 85.99 | 77 |
| 94.00 --- 94.99 |  | 82.00 --- 83.99 | 84.00 --- 84.99 | 75 |
| 93.00 --- 93.99 |  | 80.00 --- 81.99 | 83.00 --- 83.99 | 73 |
| 92.00 --- 92.99 | A--- | 79.00 --- 79.99 | 82.00 --- 82.99 | 71 |
| 91.00 --- 91.99 |  | 78.00 --- 78.99 | 81.00 --- 81.99 | 70 |
| 90.00 --- 90.99 |  | 77.00 --- 77.99 | 80.00 --- 80.99 | 69 |
| 89.00 --- 89.99 |  | 76.00 --- 76.99 | 79.00 --- 79.99 | 68 |
| 88.00 --- 88.99 | B+ | 75.00 --- 75.99 | 78.00 --- 78.99 | 67 |
| 87.00 --- 87.99 |  | 74.00 --- 74.99 | 77.00 --- 77.99 | 66 |
| 86.00 --- 86.99 |  | 73.00 --- 73.99 | 76.00 --- 76.99 | 65 |
| 85.00 --- 85.99 | B | 72.00 --- 72.99 | 75.00 --- 75.99 | 63 |
| 84.00 --- 84.99 |  | 71.00 --- 71.99 | 74.00 --- 74.99 | 61 |
| 83.00 --- 83.99 |  | 70.00 --- 70.99 | 73.00 --- 73.99 | 59 |
| 82.00 --- 82.99 | B--- | 69.00 --- 69.99 | 72.00 --- 72.99 | 57 |
| 81.00 --- 81.99 |  | 68.00 --- 68.99 | 71.00 --- 71.99 | 55 |
| 80.00 --- 80.99 |  | 67.00 --- 67.99 | 70.00 --- 70.99 | 53 |
| 79.00 --- 79.99 |  | 66.00 --- 66.99 | 69.00 --- 69.99 | 51 |
| 78.00 --- 78.99 | C+ | 65.00 --- 65.99 | 68.00 --- 68.99 | 49 |
| 77.00 --- 77.99 |  | 64.00 --- 64.99 | 67.00 --- 67.99 | 48 |
| 76.00 --- 76.99 |  | 63.00 --- 63.99 | 66.00 --- 66.99 | 47 |
| 75.00 --- 75.99 | C | 62.00 --- 62.99 | 65.00 --- 65.99 | 46 |
| 74.00 --- 74.99 |  | 61.00 --- 61..99 | 64.00 --- 64.99 | 45 |
| 73.00 --- 73.99 |  | 60.00 --- 60.99 | 63.00 --- 63.99 | 44 |
| 72.00 --- 72.99 | C--- | Below 60.00 | 62.00 --- 62.99 | 42 |
| 71.00 --- 71.99 |  |  | 61.00 --- 61..99 | 40 |
| 70.00 --- 70.99 | D+ |  | 60.00 --- 60.99 | 38 |
| Below 70.00 | D |  | Below 60.00 | 35 |
|  |  |  |  |  |

[1] Passing grade is 50% for the following Provinces: Alberta, British Columbia, Manitoba,   Newfoundland, NW Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island,  Saskatchawan, Yukon

[2] Passing grade is 60% for the following Provinces: New Brunswick, Quebec

11

**INTERVIEW PROFILE (IVP):**

Below is the language for uniform implementation of the Interview Profile number (IVP) for use with all Schools and Scholarship Chairs. The IVP will serve as a guide for Chairs to know when our office needs the reports, and therefore how quickly they need to be assigned. All interviewers will be told that they should submit their interview report no later than two weeks after receiving the interview assignment.

1. An applicant for whom the committee needs more information to reach a decision - please have interview report in as soon as possible.
2. An applicant for whom more information would be very helpful during our deliberations - please have interview report in by the sub-committee deadline.
3. Please have interview report in by December 1 (EA) or March 1 (RA).
4. Based on the materials currently available, the committee needs no additional information at this time.

This language has been distributed to the S&S chairs via email and can also be found in the updated handbook and website instructions. (Please ask Bryce Gilfillian if you need help accessing the site). **Please have a conversation with your chairs to determine if you wish to use the IVP, and please make clear that this information should not be shared with other interviewers or applicants.** If your chairs have additional clerical or operational questions about the IVP, please direct them to email Bryce/alum assistant at SSinfo@fas.harvard.edu.

When reading, please input your IVP code on the First Reader Rating Form. You should input an IVP for all cases. Continue to pass on the folder to your chair and/or code out to Committee Review bin.

**BRIEF ANNOTATIONS FOR SUMMARY SHEET:**

You may choose to insert information about a case – a maximum of three lines – which will appear on the second page of the summary sheet at the top and also on the printed docket (unlike prose comments below). These notes should be informational only and not evaluative. They can aid in your preparation of cases. Examples could be: PE on grandmother, Harvard Book, or international credentials not easily captured elsewhere (A level est, Physics A, Math A, Lit A – etc).

**PROSE COMMENTS**:

When making prose comments, first readers should note the important academic and extracurricular accomplishments that are particularly pertinent to the case. It is also helpful to reference teacher reports or other items that may be crucial to our evaluation. In addition to numerical ratings, readers should try to summarize the strengths and weaknesses of the folder in brief paragraphs or comments. Avoid slang and jargon and REMEMBER - your comments may be open to public view at a later time.

12

## III.    FILE ROUTING

**INADVERTENTLY CLEARED FILES**:  Occasionally, files will be mistakenly "cleared" (considered complete) and placed in your first read bin.  Open the Admin Problems Form and note the issue.  Then route the file to the Admin Problems bin.

**FILES SHOULD BE READ AND PASSED IN A TIMELY FASHION**: Readers should take care not to allow files to pile up.  First readers need to read files from all assigned dockets as they clear, not just those whose subcommittee meets first.  However, because all files will clear regardless of round readers should read early action files first, as soon as possible. Regular action files can generally wait until after December 1 but you can read them prior to that if you are able to.  This is important, and we will monitor reading progress centrally.  If you need help keeping up for whatever reason, let us know immediately.  Readers should code out files to the Committee Review bin or pass to the Chair.  First-time readers will use the Optional Additional bin for their first 50 files during Early Action.

**SECOND READERS (OPTIONAL ADDITIONAL READER)**: Except by new readers (for whom special routing instructions are provided below), second readings should be used only in the rarest of instances:

  A)  If three readings are needed for a complex case.

  B)  If the case raises issues of policy.

  C)  If the case would be greatly helped by a second reading from the former area person or someone with special knowledge of an area or type of case.

No second reader will ordinarily be assigned.  If you want/need a second reading, consult the enclosed docket assignment sheet to identify other readers on your docket. Try not to burden one person inordinately. You should choose "Optional Additional Reader" as the next bin and enter the name of that person which will place the file in their queue. You can add a note for the second reader such as "Please give V docket context" You should also send an email to special second readers to alert them to your requested reading.

**FIRST-TIME READERS**:  New readers should have their first fifty Early Action files passed to the Optional Additional Reader bin or to the chair bin, based on relative strength. Some chairs may wish to use different approaches for first year readers.

**GENERAL ROUTING RULES:**

1)  A file should be passed <u>directly</u> to the chair:

  • If the first reader rates a file a "2-" or better (i.e. a case the first reader thinks has a very good chance of being admitted)

13

- If the case will likely (or almost certainly) be discussed in Committee.

- If you want the docket chair's opinion or want simply to have the docket chair informed about the case.

    **If the first reader has a significant degree of uncertainty about how to proceed with the case, he or she should consult the docket chair.**

2) A case rated a 3+ may be passed to the chair or routed straight to the Committee Review bin. The first reader should consider carefully the likelihood that additional anticipated information (e.g., a superior music rating) will make the case more compelling, in which case the folder should be passed to the chair. If there is no further information anticipated and the case is qualitatively a 3+ (a strong case but like many others), an experienced first reader does not need to pass it on.

3) Typically a case rated a "3" or less with no particular attribute that would make it competitive can be routed directly to the Committee Review bin. Obviously late information or school context could change this initial evaluation. The first reader, as an advocate, must be doubly certain to check all late information that might make a difference to the case prior to the Committee meetings. This is particularly important for candidates whose outstanding personal qualities become evident once we have the alumni/ae interview.

Readers new to a docket should discuss with the docket chair any special guidelines about which files should be passed on and which files should not.

**SPECIAL READINGS**

- WRF should see cases that could be particularly sensitive or controversial or that raise issues of fundamental policy. When in doubt, send the file on by routing to the 4th reader bin.

- Folders of <u>competitive</u> candidates who attended secondary school outside the U.S. and Canada may be passed on to the appropriate U, V or W docket area person or RMW if help in assessing foreign credentials is needed. <u>Be selective</u>- don't pass on a case unless you are sure the applicant is both competitive and appealing or has some <u>unusual</u> attributes.

- A faculty readings memorandum will be distributed later regarding specific procedures.

- Supplemental music/art/dance/academic materials of <u>clearly competitive</u> candidates with an unusually strong talent may be assessed through a supplementary process - through Slideroom (for music and dance) or through the faculty read process (for art or academic

14

work). Handling of this material will be addressed through memoranda over the course of the fall.

IV.   **ECONOMICALLY DISADVANTAGED APPLICANTS**

It has long been a priority for Harvard to seek talented students from all backgrounds, including those extraordinary individuals who are able to transcend economic disadvantages and achieve unusual academic distinction.

- **STAFF DISADVANTAGED**
  **After reviewing the folder, if you believe the applicant is from a very modest economic background, please check "Yes" under Staff Disadvantaged on the Reader Rating Form.** In the past, admitted students who had been staff identified as "Disadvantaged=Y" were found to be economically needy 78% of the time.

  We have included other parameters to help with your evaluation of the applicant's economic background.  They are:
  - Low Income Predictor (Low Inc on Summary Sheet): A value between 0 and 1 based on application information that predicts how likely a student is to be low income and have a $0 parent contribution.  The higher the value (closer to 1) the more likely the student will be low income.
  - Pell Grant (P on Summary Sheet): An indication if the student is likely to qualify for a Pell Grant. This information will only be available if a student has submitted sufficient information for Financial Aid to make a determination.
- **FEE STATUS**

  *Please note: In addition to the fee waiver forms we currently accept, we now include waivers issued by Expanding College Opportunities (ECO).  ECO is a research initiative aimed at increasing the number of high-achieving, low-income students who apply to selective colleges and universities

V.   **OTHER ITEMS**

- **Slate is made up of data downloaded from the application and supplemental forms. We currently do not have the ability to enter all the information by hand for those applicants who do not submit their forms on-line.  However, the data entry staff will enter the most critical bio/demo information as they have in the past.  This means that the dockets will be correct, but the summary sheets for these applicants will be primarily blank.  You should double-check the data that is important - i.e. parent education, ethnicity, aid status, etc. - basically every field that's on the summary sheet.  About 1% of all our applicants will fall into this category.**

15

- <u>Acknowledgments to guidance counselors, teachers, and others</u>:  The area person may occasionally feel it worthwhile to acknowledge unusually helpful TRs and SSRs by writing a note to the author.  The note should acknowledge that the candidate may or may not be admitted.  **Supplementary letters of recommendation may have already been acknowledged with a card or letter, but if not, particularly with recommenders who are alumni or others about whom Harvard might be concerned, you should call the letter to the attention of MEM or WRF and an acknowledgment will be sent.  This is important!**

- <u>Support Materials:</u> ALL manually submitted support material should be dropped into the appropriate basket in the mailroom for sorting and scanning.

- <u>Misfiled and missing materials</u>:  If a teacher report, school report or any other material that would be helpful to a competitive candidate is missing, first readers should request a copy be re-sent. Files should be sent on to other readers unless the missing pieces are crucial.  In such cases, first readers should hold onto the file by routing the file to the "Area Person Follow Up" bin.

- <u>File items that require attention</u>:  Unanswered letters should be handled by first readers where appropriate or others including MEM or WRF.


## VI.    <u>SCANNING AND INDEXING</u>

We have added a basket in the mailroom to collect and sort documents received. The forms collected in these baskets should have content that is \*specific\* to the admission decision of the applicant and are marked as such. For example, mailed applications or supplements, letters of support, teacher reports, Harvard evaluation, (coach, arts, music, Harvard faculty), midyear reports, SSR's etc.  We will scan almost everything. If that's not possible, an "oversized support" form will be scanned and added to the file to let you know there is material sitting in the bookcase in Conference Room 5.

Relevant emails to officers from applicants or about an applicant should be saved as a PDF file and indexed directly into the applicant file by the officer. To do so, go into the student record in Slate select the current round tab and down to the "Materials" header. Click to add new material and make the appropriate selection from the drop down menu. If you receive materials electronically and in paper you do not need to have the paper material scanned.

Documents displayed in the viewer are named by the document type that follows the menu down the left side of the Slate e-reader.

- Application (and supplement)
- SSR
- TRs
- Interviews

16

- Additional academic (additional transcripts, etc)
- Midyear
- Final Report (potentially hidden until admitted)
- Ratings Forms (includes IRFs)
- Miscellaneous (notes from family/friends, alums, correspondence, noting of oversized support, etc)
- Waitlist
- Previous App
- Portfolio (NOTE: a tab in Slate we do not use at this time).

17

**JA5891**

HARV00097972

DX 742.0017

**Reading Procedures, Class of 2020**

## I.  <u>UPDATED PROCEDURES</u>

The Summary Sheet captures information as supplied on the application and will be updated as new information is added.  Late information can change the likelihood of admission and updates can be provided later for those initially considered less competitive.  If any information is **missing** or **incorrect** for competitive candidates, changes should be made on the First Reader Rating Form and noted with prose in the reader comments or "Notes for Summary Sheet" box. This prose will feed onto the Summary Sheet when it is refreshed.

<u>One exception</u>: School code changes are NOT made on the First Reader Rating Form; please describe the need for a school code change as an "Admin Problem" <u>if it needs to be coded to another docket and/or it needs to be in a different school.</u> Then route the file into the "Admin Problems" bin.

We report exactly what the applicant reports as ethnicity on the application.  The ethnic codes on the Summary Sheet will come from the demographic fields the candidate checked on the application.

**Note that foreign citizens are listed as such. If they opted to check an identifying ethnic code it will appear but is not used for statistics and reporting.**

- **CITIZENSHIP CODE / COUNTRY OF CITIZENSHIP**:  There are four options on the application that can be checked: (1) U.S. Citizenship, (2) U.S. Dual Citizenship, (3) U.S. permanent resident and (4) "Other" or foreign citizen.

<u>The applicant holds only American citizenship</u>.

*APP*: The box "U.S citizen" is checked with no other country of citizenship listed.

*SUMMARY SHEET*:  Should read "CITZ:  United States of America"

<u>The applicant is a dual U.S. citizen</u> (a citizen of both the U.S. and another country).

*APP*: The box "U.S./dual U.S. citizen" is checked with another country listed to the right.

*SUMMARY SHEET*:  Should read "CITZ:  United States/<other country>"

<u>The applicant is a U.S. Permanent Resident</u>.

*APP*: The box "U.S. Permanent Resident" is checked with another country listed.

1

United States District Court
District of Massachusetts

**DX 743**

Case No. _____1:14-cv-14176 (ADB)_____
Date Entered_____
By_____
Deputy Clerk

CONFIDENTIAL

**JA5892**

DX 743.0001

HARV00097973

*SUMMARY SHEET*:   Should read "CITZ:  PERM RES / <other country>"

*Caveat*:  If an applicant has checked the U.S. Permanent Resident box but notes that his or her application for permanent residency (or "green card") is pending, that applicant should be recoded as "Other citizenship."  We must prepare an I-20 form if the applicant is admitted and the application for residency is still pending, and the citizenship code is the only way we know to do this.

The applicant is a foreign citizen.

*APP*: The box "Other citizenship" is checked with a foreign country listed to the right.

*SUMMARY SHEET*:   Should read "CITZ:   <other country>"

**PLEASE NOTE**:  The accuracy of our citizenship coding is CRUCIAL.  Miscoding affects many of the important statistics we are required to compile (including ethnicity), and we need to keep careful track of who needs a visa to study in the United States.

- **SCHOOL CODE**:  If an applicant is coded to the wrong school, and if the required recoding alters the docket and first reader assignment, please route this to the Admin Problems bin immediately so that the operations team can ensure that the interview is reassigned to the appropriate club and group and the file is available for the appropriate reader to download into his/her queue.  If an applicant is coded to the wrong school but does not alter the docket and first reader, proceed to read and rate the file, but note under "Follow up To Do Items" list that a change in school code is needed, with known details so that the Records Room staff can make the change.

- **GENDER**:  Occasionally the gender designation reported on the Common Application is coded incorrectly in our system.  Such a coding error should be corrected. Please note that gender coding is optional and in the case of an applicant who does not designate a gender on the Common Application, any previous gender designation by that applicant (on tests, etc.) will override a blank gender designation.

- **COMMUTER**:  Readers should use "C" (commuter) or "R" (resident).

- **LINEAGE:**  The folder should be read by WRF ("4th" bin) following the normal reading process if the decision might require special handling or if another reading

**JA5893**
DX 743.0002

might be helpful.  Errors in coding should be put in the Admin problems bin.

- **FACULTY, STAFF**:  Code <u>ONLY</u> children of professors at <u>the Faculty of Arts and Sciences</u> as an "F"; children of faculty from other parts of the University as well as children of administrative staff should be coded "S".  If an update is needed, use the First Reader rating form. **Please be careful to apply faculty and staff coding where appropriate as we need to keep accurate statistics on these applicants.  All "F" and "S" folders should be routed to the "4th bin" (WRF) after the normal reading process has been completed.**

- **ACCESSIBLE EDUCATION OFFICE (AEO) REFERRALS**: Code all applicants who may require special accommodations due to disabilities or special needs with the AEO flag on the First Reader Rating Form.  We can then provide a list to assist the AEO and FDO in providing accommodations when appropriate.

- **ATHLETE**: Be sure the appropriate sport is listed as the first extracurricular activity. **DO NOT CHANGE ANY PRE-CODED ATHLETE**.

- **FIRST-GEN:** First readers should check this box if the student is of the first generation in the family to graduate from a four-year higher ed institution. If first readers do not, chairs should do so

- **SCORES**: Applicants will know by checking the website whether their scores requirement has been fulfilled though not all scores will be listed.  They can report scores (which will be marked 'self-reported' in the student record) as they like.  You can check scores by looking under the "Scores" tab in each Student Record of an applicant.

  Applicants are on notice that they are responsible for changing 'unofficial' to 'official,' which they can only do by getting scores sent by CEEB/ACT. Paper copies of scores sent via fax, email attachment or U.S. mail are not considered official.

  We receive secure web downloads of scores, so we do not have to wait for the scores to be mailed to us.  Applicants are told not to use 'rush reports,' but if they do, they will arrive electronically as soon as they are scored.

- **FERPA:**
  We will be importing the applicant's FERPA selection as indicated on the Secondary School Report (SSR), alleviating the need for readers to record the FERPA selection. The import is intended to capture all online submitted SSR FERPA selections. A final spot-check on the admitted class (waitlist and deferred included) will then be performed, updating applicant files as needed.

CONFIDENTIAL

HARV00097975

## II.    <u>CODING GUIDELINES FOR SUMMARY SHEETS</u>

All readers must code a preliminary overall rating and a profile (using the codes below and pluses and minuses) for all candidates.  The full profile, including the school support, should be coded for all competitive candidates and those who have a reasonable chance of becoming competitive with positive late information.  Writing prose comments is left to the discretion of the reader and should generally be done only for competitive candidates, those who might become competitive later, or those who present credentials or have attributes that might be of interest to the Committee.

<u>Overall</u>

1. Tops for admission:  Exceptional – a clear admit with very strong objective and subjective support (90+% admission).
2. Very strong credentials but not an inevitable admit (50-90% admission).
3. Solid contender: An applicant with good credentials and support (20-40% admission).
4. Neutral: Respectable credentials.
5. Negative: Credentials are generally below those of other candidates.
6. Unread.

Use "+" and "-" in the 2 and 3 range to indicate relative strength.

<u>Academic</u>

1. Summa potential. Genuine scholar; near-perfect scores and grades (in most cases combined with unusual creativity and possible evidence of original scholarship.)
2. Magna potential: Excellent student with top grades and low to mid 700 scores (33+ ACT).
3. Cum laude potential: Very good student with excellent grades and mid-600 to low-700 scores (29 to 32 ACT).
4. Adequate preparation. Respectable grades and low-to mid-600 scores (26 to 29 ACT).
5. Marginal potential. Modest grades and 500 scores (25 and below ACT).

<u>Extracurricular, Community Employment, Family Commitments</u>

1. Unusual strength in one or more areas.  Possible national-level achievement or professional experience.  A potential major contributor at Harvard.  Truly unusual achievement.
2. Strong secondary school contribution in one or more areas such as class president, newspaper editor, etc.  Local or regional recognition; major

4

accomplishment(s).
3. Solid participation but without special distinction. (Upgrade 3+ to 2- in some cases if the e/c is particularly extensive and substantive.)
4. Little or no participation.
5. Substantial activity outside of conventional EC participation such as family commitments or term-time work (Important: should be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).
6. Special circumstances limit or prevent participation (e.g. a physical condition).

Athletic
1. Unusually strong prospect for varsity sports at Harvard, desired by Harvard coaches.
2. Strong secondary school or travel team contribution in one or more sports; possible leadership role(s) such as captain or co-captain.
3. Active participation.
4. Little or no interest.
5. Substantial activity outside of conventional EC participation such as family commitments or term-time work (could be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).
6. Physical condition prevents significant activity.

Personal
1. Rare personal appeal and character
2. Very strong personal appeal and character
3. Above average personal appeal and character; generally positive
4. Somewhat neutral or slightly negative impression
5. Distinctly poor impression; questionable or worrisome personal qualities

School Support
1. Strikingly unusual support. "The best ever," "one of the best in x years," truly over the top.
2. Very strong support. "One of the best" or "the best this year."
3. Above average positive support.
4. Somewhat neutral or slightly negative.
5. Negative or worrisome report.
6. Neither the transcript nor prose is in the folder.
8. Placeholder.
9. Transcript only. No SSR prose.

PLEASE NOTE: School support ratings for teacher one, teacher two and a counselor are mandatory ratings for competitive candidates. Teacher three and teacher four are

CONFIDENTIAL        **JA5896**        HARV00097977
DX 743.0005

optional, if applicable.

**GPA and GPA Scale**:
We must try to report an Academic Index to the IVY league for EVERY matriculant. If grades are available, please report a GPA and GPA Scale for your strongest candidates.

The Academic Index is calculated using GPA and GPA Scale.  These will be converted automatically to the 20 to 80 scale in Slate.

Here are the rules according to the AI instructions:

1. **GPAs generally:**  The secondary school GPA should be taken as presented on the secondary school transcript; when both unweighted and weighted GPAs are presented, the unweighted GPA should be used.  The Summary Sheet will indicate if a weighted or unweighted GPA is being pulled onto the summary sheet. **For all competitive cases, please use the First Reader Rating Form to change the GPA to unweighted GPA if there is an unweighted GPA being reported on the transcript.**  (If there is a question as to whether the school is using an unweighted or weighted system, the scale should be defined as unweighted, based on what the A grade earns in a regular course.)

2. **GPA scales and conversions from Table II:**  Slate can convert any of the scales shown in Table II, the "CGS General Conversion Table" (formerly Table III, the values are unchanged), (100-points, 11.0/12.0, 7.0, 6.0, 4.0, A-D)

3. **"High" GPA systems:**  Although some secondary school transcripts show that GPAs may be routinely higher than the nominal highest grade on the scale, it is difficult to generalize about these practices. For example, especially with regard to schools that use 4.0 scales, there are high schools in which a high percentage of GPAs may be above 4.0 but also schools in which the highest GPA achieved is routinely far below 4.0.   For 2015-16, Table II will continue to provide, based on experience across the league to date, that for some scales the highest nominal GPA will have a CGS below 80 and for others a CGS of 80 will begin at the highest nominal GPA.

4. **Scales not provided on Table II:**  Given the relatively small number of admitted and matriculated students for whom Table II scales are not provided, it is preferable not to create new scales if possible.  In such cases, a GPA on a 4.0 scale should be calculated using the following formula, and a CGS then derived using the 4.0 scale on Table II: HSGPA/HSGPA scale = "x"/4.0, where "x" becomes the value from which the CGS is derived.  For example, if on a 5.0 scale a student has a 4.8 GPA

6

(whether the scale's top grade is A or A+), the formula is 4.8/5.0 = x/4.0. X=3.84 and the CGS = 73.

*This calculation will be done automatically when you provide the GPA and GPA Scale used by the school.*

5. **Calculating GPA when not provided by the secondary school:**  When the secondary school does not calculate/report a GPA, the first reader should calculate an unweighted GPA based on the secondary school's grading scale, using all courses for which grades and credit hours are provided, and weighting semester grades as one-half full-year grades. *Enter the GPA and GPA Scale on the Reader Rating Form.*

6. **GPA period:**  GPA data always should be for more than one year, including 10th and 11th grades, 9th grade when available, and official trimester or semester grades (as opposed to midterm grades) in the student's current year if available at the time the decision is made.  If "official" grades from the current year are available but are not counted in the school's cumulative GPA, they should be added to the cumulative GPA and weighted appropriately:  e.g., grades for first semester or trimester of senior year would be weighted as one-half or one-third year, respectively.∗

7. **GPAs from multiple schools and repeat years:**  When a student has attended multiple secondary schools (including a post-graduate year), all GPAs provided by the schools should be used to the extent possible (see #5 above when a school has not provided a GPA) and weighted as in #6 above.  If the institution believes this result is not logical and fair, it should describe what approach it believes is better, subject to the Ivy League Admissions Committee's agreement.

8. **For applicants from Canada:** For a Canadian GPA where the passing grade is 50%, add 15 points to the academic average before determining the CGS.  If the passing grade is 60% add 10 points.  If the passing grade is 70%, add nothing. *Please add the extra points to the GPA – i.e.. for a GPA of 86 where 50% is passing, 101 should be entered in GPA.*

9. Follow the procedures listed below for AI calculations for students from schools that do not follow the American curricular system.

## "International School" AI calculations

---

∗ When institutions calculate "final" all-class AI data for full admit cohorts in the spring and matriculant cohorts in the fall, athletes' AIs should be calculated in the same manner as non-athletes' AIs so that all AIs in the cohort data are calculated identically.  The athlete's individually reported AI will continue to be the AI used at the time s/he received a likely or admissions decision, unless later testing or GPA information raised the AI (see **E-8** below).

For all national curricula, unless specified otherwise elsewhere, include all courses as part of the GPA calculations.

**Generally:**  Except as provided here, each school should calculate GPAs from international schools as it seems most appropriate; such calculations then should be reviewed during the spring meetings to determine what standardization might be agreed on.  Institutions are encouraged to circulate questions during the year to determine what other institutions are doing and if a consensus exists that could or should be followed.

1. **International Baccalaureate Systems:**
   Use the following equivalents to calculate a GPA:
   7 = A+ = 4.3
   6 = A = 4.0
   5 = B = 3.0
   4 = C = 2.0
   3 = D = 1.0

   - If the applicant is taking a gap year, actual two-year IB results are used.
   - In the absence of final marks, use predicted marks. If predicted marks are not available, use internal grades.
   - For IB schools in the U.S., use the course values given on the transcript; for IB schools outside the U.S., double the weight for Higher Level courses as opposed to the Standard Level courses.
   - Use the same standards for "domestic" applicants as to "academic" versus "all" courses.

2. **British systems:**
   Count all GCSE (= O Level), AS and A level results in order to calculate a GPA:
   A* (same as A+) = 4.3
   A = 4.0
   B = 3.0
   C = 2.0
   D = 1.0

   - If the applicant is taking a gap year, actual A-Level results should be used.
   - A Level grades are given double the weight of AS and GCSE grades.
   - Internal grades are usually not available and should <u>not</u> be used if they are.
   - In the absence of final marks, predicted A-Level grades should be used when available.

3. <u>**Pre-U Program (New British System)**</u>
   Use only Principal Subjects with the following conversions for British Pre-U programs:

8

D1 = A+/4.3
D2 = A+/4.3
D3 = A/4.0
M1 = B+/3.3
M2 = B/3.0
M3 = B-/2.7
P1 = C-/1.7
P2 = D/1.0
P3 = D-/0.7

### 4. <u>Singapore schools following standard JC grading conventions</u>
Include H1 (GP, Project, etc.) & H2 predictions on a 4.0 scale to calculate GPA.

Double weight for H2 marks.  For H3, the scale is:

- Distinction = A/4.0
- Merit = B/3.0
- Pass = C/2.0

Double H3s as well.  If provided, include O Level/GCSE marks in calculation of GPA with a single weight like we do with the British System.

### 5. <u>Australia</u>
Push schools for a transcript of some sort.  If all else fails and you are given the state final exam result or prediction (ex: UAI for NSW, OP for Queensland), use that.

### 6. <u>New Zealand</u>
For courses in which there is the possibility to get more than a grade of Achieved:

- Excellent = A/4.0
- Merit = B/3.0
- Achieved = C/2.0
- Not Achieved = F/0

For courses graded only Achieved/Not Achieved, we will consider these the same as Pass/Fail, so a mark of Achieved will <u>not</u> be included when calculating GPA.

**TABLE II : Used for calculating Converted Gradepoint Score (CGS)**

9

| Percentage Average | 11.0/12.0 Scale Average | 7.0 Scale Average | 6.0 Scale Average | 4.0 Scale Average | Letter Grade Equivalent to 4.0 | CGS |
|---|---|---|---|---|---|---|
| 98.00 and above | 12.00 and above | 7.00 and above | 6.00 and above | 4.30 and above | A+ | 80 |
| 97.00 - 97.99 | 11.70 - 11.99 | 6.70 - 6.99 | 5.70 - 5.99 | 4.20 - 4.29 | | 79 |
| 96.00 - 96.99 | 11.40 - 11.69 | 6.40 - 6.69 | 5.40 - 5.69 | 4.10 - 4.19 | | 78 |
| 95.00 - 95.99 | 11.00 - 11.39 | 6.00 - 6.39 | 5.00 - 5.39 | 4.00 - 4.09 | A | 77 |
| 94.00 - 94.99 | 10.70 - 10.99 | 5.90 - 5.99 | 4.90 - 4.99 | 3.90 - 3.99 | | 75 |
| 93.00 - 93.99 | 10.40 - 10.69 | 5.80 - 5.89 | 4.80 - 4.89 | 3.80 - 3.89 | | 73 |
| 92.00 - 92.99 | 10.00 - 10.39 | 5.70 - 5.79 | 4.70 - 4.79 | 3.70 - 3.79 | A- | 71 |
| 91.00 - 91.99 | 9.80 - 9.99 | 5.60 - 5.69 | 4.60 - 4.69 | 3.60 - 3.69 | | 70 |
| 90.00 - 90.99 | 9.50 - 9.79 | 5.50 - 5.59 | 4.50 - 4.59 | 3.50 - 3.59 | | 69 |
| 89.00 - 89.99 | 9.30 - 9.49 | 5.40 - 5.49 | 4.40 - 4.49 | 3.40 - 3.49 | | 68 |
| 88.00 - 88.99 | 9.00 - 9.29 | 5.30 - 5.39 | 4.30 - 4.39 | 3.30 - 3.39 | B+ | 67 |
| 87.00 - 87.99 | 8.70 - 8.99 | 5.20 - 5.29 | 4.20 - 4.29 | 3.20 - 3.29 | | 66 |
| 86.00 - 86.99 | 8.40 - 8.69 | 5.10 - 5.19 | 4.10 - 4.19 | 3.10 - 3.19 | | 65 |
| 85.00 - 85.99 | 8.00 - 8.39 | 5.00 - 5.09 | 4.00 - 4.09 | 3.00 - 3.09 | B | 63 |
| 84.00 - 84.99 | 7.70 - 7.99 | 4.90 - 4.99 | 3.90 - 3.99 | 2.90 - 2.99 | | 61 |
| 83.00 - 83.99 | 7.40 - 7.69 | 4.80 - 4.89 | 3.80 - 3.89 | 2.80 - 2.89 | | 59 |
| 82.00 - 82.99 | 7.00 - 7.39 | 4.70 - 4.79 | 3.70 - 3.79 | 2.70 - 2.79 | B- | 57 |
| 81.00 - 81.99 | 6.75 - 6.99 | 4.60 - 4.69 | 3.60 - 3.69 | 2.60 - 2.69 | | 55 |
| 80.00 - 80.99 | 6.50 - 6.74 | 4.50 - 4.59 | 3.50 - 3.59 | 2.50 - 2.59 | | 53 |
| 79.00 - 79.99 | 6.25 - 6.49 | 4.40 - 4.49 | 3.40 - 3.49 | 2.40 - 2.49 | | 51 |
| 78.00 - 78.99 | 6.00 - 6.24 | 4.30 - 4.39 | 3.30 - 3.39 | 2.30 - 2.39 | C+ | 49 |
| 77.00 - 77.99 | 5.70 - 5.99 | 4.20 - 4.29 | 3.20 - 3.29 | 2.20 - 2.29 | | 48 |
| 76.00 - 76.99 | 5.40 - 5.69 | 4.10 - 4.19 | 3.10 - 3.19 | 2.10 - 2.19 | | 47 |
| 75.00 - 75.99 | 5.00 - 5.39 | 4.00 - 4.09 | 3.00 - 3.09 | 2.00 - 2.09 | C | 46 |
| 74.00 - 74.99 | 4.70 - 4.99 | 3.90 - 3.99 | 2.90 - 2.99 | 1.90 - 1.99 | | 45 |
| 73.00 - 73.99 | 4.40 - 4.69 | 3.80 - 3.89 | 2.80 - 2.89 | 1.80 - 1.89 | | 44 |
| 72.00 - 72.99 | 4.00 - 4.39 | 3.70 - 3.79 | 2.70 - 2.79 | 1.70 - 1.79 | C- | 42 |
| 71.00 - 71.99 | 3.5 - 3.99 | 3.60. - 3.69 | 2.60 - 2.69 | 1.60 - 1.69 | | 40 |
| 70.00 - 70.99 | 2.5 - 3.49 | 3.50 - 3.59 | 2.50 - 2.59 | 1.50 - 1.59 | D+ | 38 |
| Below 70.00 | Below 2.5 | Below 3.5 | Below 2.5 | Below 1.50 | D | 35 |

### INTERVIEW PROFILE (IVP):

Below is the language for uniform implementation of the Interview Profile number (IVP) for use with all Schools and Scholarship Chairs. The IVP will serve as a guide for Chairs to know when our office needs the reports, and therefore how quickly they need to be assigned. All interviewers will be told that they should submit their interview report no later than two weeks after receiving the interview assignment.

1. Please have interview report in as soon as possible.
2. Please have interview report in by the sub-committee deadline.
3. Please have interview report in by December 1 (EA) or March 1 (RA).

CONFIDENTIAL                    **JA5901**                    HARV00097982
DX 743.0010

4. No additional information needed at this time.

This language has been distributed to the S&S chairs via email and can also be found in the updated handbook and website instructions. (Please ask Bryce Gilfillian if you need help accessing the site). **Please have a conversation with your chairs to determine if you wish to use the IVP, and please make clear that this information should not be shared with other interviewers or applicants.** If your chairs have additional clerical or operational questions about the IVP, please direct them to email Bryce/alum assistant at SSinfo@fas.harvard.edu.

When reading, please input your IVP code on the First Reader Rating Form. Continue to pass on the folder to your chair and/or code out to Committee Review bin.

**PROSE COMMENTS**:
When making prose comments, first readers should note the important academic and extracurricular accomplishments that are particularly pertinent to the case. It is also helpful to reference teacher reports or other items that may be crucial to our evaluation. In addition to numerical ratings, readers should try to summarize the strengths and weaknesses of the folder in brief paragraphs or comments. Avoid slang and jargon and REMEMBER - your comments may be open to public view at a later time.

## III.   FILE ROUTING

**INADVERTENTLY CLEARED FILES**: Occasionally, files will be mistakenly "cleared" (considered complete) and placed in your first read bin. Open the Admin Problems Form and note the issue. Then route the file back to the Admin Problems bin.

**FILES SHOULD BE READ AND PASSED IN A TIMELY FASHION**: Readers should take care not to allow files to pile up. First readers need to read files from all assigned dockets as they clear, not just those whose subcommittee meets first. However, because all files will clear regardless of round readers should read early action files first, as soon as possible. Regular action files can generally wait until after December 1. This is important, and we will monitor reading progress centrally. If you need help keeping up for whatever reason, let us know immediately. Readers should code out files to the Committee Review bin. First-time readers will use the Optional Additional bin for their first 50 files during Early Action.

**SECOND READERS (OPTIONAL ADDITIONAL READER)**: Except by new readers (for whom special routing instructions are provided below), second readings should be used only in the rarest of instances:

11

A) If three readings are needed for a complex case.

B) If the case raises issues of policy.

C) If the case would be greatly helped by a second reading from the former area person or someone with special knowledge of an area or type of case.

No second reader will ordinarily be assigned. If you want/need a second reading, consult the enclosed docket assignment sheet to identify other readers on your docket. Try not to burden one person inordinately. You should choose "Optional Additional Reader" as the next bin and enter the name of that person which will place the file in their queue. You should also send an email to special second readers to alert them to your requested reading.

**FIRST-TIME READERS**: New readers should have their first fifty Early Action files passed to the Optional Additional Reader bin as well as any other subsequent files that might help instruct the new reader in future evaluations. Some chairs may wish to use different approaches for first year readers.

**GENERAL ROUTING RULES:**

1) A file should be passed <u>directly</u> to the chair:

   - If the first reader rates a file a "2-" or better (i.e. a case the first reader thinks has a very good chance of being admitted)

   - If the case will likely (or almost certainly) be discussed in Committee.

   - If you want the third reader's opinion or want simply to have the third reader informed about the case.

   **If the first reader has a significant degree of uncertainty about how to proceed with the case, he or she should consult the docket chair.**

2) A case rated a 3+ may be passed to the chair or routed straight to the Committee Review bin. The first reader should consider carefully the likelihood that additional anticipated information (e.g., a superior music rating) will make the case more compelling, in which case the folder should be passed to the chair. If there is no further information anticipated and the case is qualitatively a 3+ (a strong case but like many others), an experienced first reader does not need to pass it on.

3) Typically a case rated a "3" or less with no particular attribute that would make it

12

competitive can be routed directly to the Committee Review bin. Obviously late information or school context could change this initial evaluation. The first reader, as an advocate, must be doubly certain to check all late information that might make a difference to the case prior to the Committee meetings. This is particularly important for candidates whose outstanding personal qualities become evident once we have the alumni/ae interview.

Readers new to a docket should discuss with the docket chair any special guidelines about which files should be passed on and which files should not.

**SPECIAL READINGS**

- WRF should see cases that could be particularly sensitive or controversial or that raise issues of fundamental policy. When in doubt, send the file on.

- Folders of <u>competitive</u> candidates who attended secondary school outside the U.S. and Canada may be passed on to the appropriate U, V or W docket area person or RMW if help in assessing foreign credentials is needed. <u>Be selective</u>-don't pass on a case unless you are sure the applicant is both competitive and appealing or has some <u>unusual</u> attributes.

- A faculty readings memorandum will be distributed later regarding specific procedures.

- Supplemental music/art/dance/academic materials of <u>clearly competitive</u> candidates with an unusually strong talent may be assessed through a supplementary process - through Slideroom or in a manual fashion. Handling of this material will be addressed through memoranda over the course of the fall.

## IV.   <u>ECONOMICALLY DISADVANTAGED APPLICANTS</u>

It has long been a priority for Harvard to seek talented students from all backgrounds, including those extraordinary individuals who are able to transcend economic disadvantages and achieve unusual academic distinction.

- **STAFF DISADVANTAGED**
  **After thoroughly reviewing the folder, if you believe the applicant is from a very modest economic background, please check "Yes" under Staff Disadvantaged on the Reader Rating Form.** In the past, admitted students who had been staff identified as "Disadvantaged=Y" were found to be

13

economically needy 78% of the time.

We have included other parameters to help with your evaluation of the applicant's economic background.  They are:

- **FEE STATUS**

  *Please note: In addition to the fee waiver forms we currently accept, we now include waivers issued by Expanding College Opportunities (ECO).  ECO is a research initiative aimed at increasing the number of high-achieving, low-income students who apply to selective colleges and universities

## V.    <u>OTHER ITEMS</u>

- **Slate is made up of data downloaded from the application and supplement forms.  We currently do not have the ability to enter all the information by hand for those applicants who do not submit their forms on-line.  However, the data entry staff will enter the information they have in the past.  This means that the dockets will be correct, but the new reader sheets for these applicants will be primarily blank.  You should double-check the data that is important  - i.e. parent education, ethnicity, aid status, etc. - basically every field that's on the summary sheet.  About 1% of all our applicants will fall into this category.**

- <u>Acknowledgments to guidance counselors, teachers, and others</u>:  The area person may occasionally feel it worthwhile to acknowledge unusually helpful TRs and SSRs by writing a note to the author.  The note should acknowledge that the candidate may or may not be admitted.  **Supplementary letters of recommendation may have already been acknowledged with a card or letter, but if not, particularly with recommenders who are alumni or others about whom Harvard might be concerned, you should call the letter to the attention of MEM or WRF and an acknowledgment will be sent.  This is important!**

- <u>Support Materials:</u> ALL manually submitted support material should be dropped into the appropriate bucket in the mailroom for sorting and scanning.

- <u>Misfiled and missing materials</u>:  If a teacher report, school report or any other material that would be helpful to a competitive candidate is missing, first readers should request a copy be re-sent. Files should be sent on to other readers unless the missing pieces are crucial.  In such cases, first readers should hold onto the file by routing the file to the "Area Person Follow Up" bin.

CONFIDENTIAL            **JA5905**            HARV00097986

DX 743.0014

- <u>File items that require attention</u>:  Unanswered letters should be handled by first readers where appropriate or others including MEM or WRF.

- <u>Fee Waivers</u>: Any requests for a fee waiver should **not** be removed from the file. However, if a fee waiver request is in the file and was not recorded on the summary sheet, you should add it to the "notes for summary sheet."

- <u>Twins, etc</u>:  Twins or triplets may confound our score file.  Please be extra careful in checking these cases.

## VI.    <u>SCANNING AND INDEXING</u>

We have added a basket in the mailroom to collect and sort documents received. The forms collected in these baskets should have content that is *specific* to the admission decision of the applicant and are marked as such. For example, mailed applications or supplements, letters of support, teacher reports, Harvard eval, (coach, arts, music, Harvard faculty), midyear reports, SSR's etc.  We will scan almost everything. If that's not possible, an "oversized support" form will be scanned and added to the file to let you know there is material sitting in the bookcase in the Fileroom Annex.
Relevant emails to officers from applicants or about an applicant should be saved as a PDF file and indexed directly into the applicant file by the officer. To do so, go into the student record in Slate select the current round tab and down to the "Materials" header. Click to add new material and make the appropriate selection from the drop down menu. If you receive materials electronically and in paper you do not need to have the paper material scanned.

Documents displayed in the viewer are named by the document type that follows the menu down the left side of the Slate e-reader.
- Application (and supplement)
- SSR
- TRs
- Interviews
- Additional academic (additional transcripts, etc)
- Midyear
- Final Report (potentially hidden until admitted)
- Ratings Forms (includes IRFs)
- Miscellaneous (notes from family/friends, alums, noting of oversized support, etc)
- Waitlist
- Previous App

15

- Portfolio (NOTE: a tab in Slate we do not use at this time).

16

**JA5907**
DX 743.0016

# Reading Procedures, Class of 2022

## I.    UPDATED PROCEDURES

The Summary Sheet captures information as supplied on the application and will be updated as new information is added.  Late information can change the likelihood of admission and updates can be provided later for those initially considered less competitive. If any information is **missing** or **incorrect** for competitive candidates, changes should be made on the First Reader Rating Form and noted with prose in the reader comments or "Notes for Summary Sheet" box. This prose will feed onto the Summary Sheet when the rating form is submitted.

<u>One exception</u>: School code changes are NOT made on the First Reader Rating Form; see instructions below on how to do this.

We report exactly what the applicant reports as ethnicity on the application.  The ethnic codes on the Summary Sheet will come from the demographic fields the candidate checked on the application.

**Note that foreign citizens are listed as such. If they opted to check an identifying ethnic code it will appear but is not used for statistics and reporting.**

- **CITIZENSHIP CODE / COUNTRY OF CITIZENSHIP**:  There are four options on the application that can be checked: (1) U.S. Citizenship, (2) U.S. Dual Citizenship, (3) U.S. permanent resident and (4) "Other" or foreign citizen.

   <u>The applicant holds only American citizenship</u>.

   *APP*: Citizenship status will be "US Citizen or US National" and no other country of citizenship will be listed.

   *SUMMARY SHEET*:  Should read "Citizenship:  United States"

   <u>The applicant is a dual U.S. citizen</u> (a citizen of both the U.S. and another country).

   *APP*: Citizenship status will be "Dual US Citizen"-Other citizenships will show a country (e.g. Sweden)

   *SUMMARY SHEET*:  Should read "Citizenship:  United States/<other country>"

   <u>The applicant is a U.S. Permanent Resident</u>.

   *APP*: Citizenship status will be "U.S. Permanent Resident or Refugee" and Other Citizenships will list one or more countries checked with another country listed.

   *SUMMARY SHEET*:   Should read "Citizenship:  PR / <other country>"

   *Caveat*:  If an applicant has checked the U.S. Permanent Resident box but notes that his or her application for permanent residency (or "green card") is <u>pending</u>, that applicant should be recoded as "Other citizenship."  Request this change by using the Admin Problems update form. We must prepare an I-20 form if the applicant is admitted and the application for residency is still pending, and the citizenship code is the only way we know to do this.

1

United States District Court
District of Massachusetts

**DX 744**

Case No. _____1:14-cv-14176 (ADB)_____
Date Entered _____
By _____
        Deputy Clerk

The applicant is a foreign citizen.

*APP*: Citizenship status will be "Other (Non-US)".  Other citizenship will show a country (e.g. Poland)

*SUMMARY SHEET*:   Should read "Citizenship:   <other country>"


**PLEASE NOTE**:  The accuracy of our citizenship coding is CRUCIAL.  Miscoding affects many of the important statistics we are required to compile (including ethnicity), and we need to keep careful track of who needs a visa to study in the United States.

- **SCHOOL CODE**:  If an applicant is coded to the wrong school, please use the Admin Problems update form and route this to the Admin Problems bin immediately so that the operations team can ensure that the interview is reassigned to the appropriate club and group.

- **GENDER**:  Occasionally the gender designation reported on the application is coded incorrectly in our system.  Such a coding error should be corrected by submitting the Admin Problems form and routing the file to the Admin Problems bin.

- **LINEAGE:**  The folder should be read by WRF ("4th" bin) following the normal reading process if the decision might require special handling or if another reading might be helpful.  Errors in coding should be noted with specific details about the error using the Follow-Up Update Form and routed to the Admin problems bin.

- **FACULTY, STAFF**:  Code <u>ONLY</u> children of professors at <u>the Faculty of Arts and Sciences</u> as an "F"; children of faculty from other parts of the University as well as children of administrative staff should be coded "S".  If an update is needed, use the First Reader rating form. **Please be careful to apply faculty and staff coding where appropriate as we need to keep accurate statistics on these applicants.  All "F" and "S" folders should be routed to the "4th bin" (WRF) after the normal reading process has been completed.**

- **ACCESSIBLE EDUCATION OFFICE (AEO) REFERRALS**: Code all applicants who may require special accommodations due to disabilities or special needs with the AEO flag on the First Reader Rating Form.  We can then provide a list to assist the AEO and FDO in providing accommodations when appropriate.

- **ATHLETE**: Be sure the appropriate sport is listed as the first extracurricular activity.  Changes can be made on the app update tab on the Student Record. **DO NOT CHANGE ANY PRE-CODED ATHLETE**.

- **FIRST-GEN:** First readers should check this box on the first reader rating form if the student is of the first generation in the family to graduate from a four-year higher education institution. If first readers do not, chairs should do so on the chair rating form

- **SCORES**: Applicants will know by checking their Applicant Status website whether their scores requirement has been fulfilled though not all scores will be listed.  They can report scores (which will be marked 'self-reported' in the student record) as they like.  You can

2

check scores by looking under the "Scores" tab in each Student Record of an applicant. The Summary Sheet will reflect the highest verified scores.

Applicants are on notice that they are responsible for changing 'unofficial' to 'official,' which they can only do by getting scores sent by CEEB/ACT. Paper copies of scores sent via fax, email attachment or U.S. mail are not considered official.

We receive secure web downloads of scores, so we do not have to wait for the scores to be mailed to us. Applicants are told not to use 'rush reports,' but if they do, they will arrive electronically as soon as they are scored.

## II. <u>CODING GUIDELINES FOR SUMMARY SHEETS</u>

All readers must code a preliminary overall rating and a profile (using the codes below and pluses and minuses) for all candidates. Writing prose comments is left to the discretion of the reader and should generally be done only for competitive candidates, those who might become competitive later, or those who might be of interest to the Committee.

For all categories, use "+" and "-" primarily in the 2 and 3 range to indicate relative strength. A rating of 2+ or 3+ is stronger and very different from a 2- or 3- respectively. Readers should take all factors into account as they assign ratings. E.g, students who have taken a strong academic program and/or present other positive evidence of academic achievement should receive higher academic ratings: an applicant with low 700 scores could be rated a "2-" rather than a "3+" in some instances especially if there is academic strength in a particular field.

<u>Overall</u>
1. Tops for admission: Exceptional – a clear admit with very strong objective and subjective support .
2. Very strong credentials but not an inevitable admit .
3. Solid contender: An applicant with good credentials and support .
3- Somewhat Neutral: Respectable credentials.
4. Neutral: Generally respectable credentials.
5. Negative: Credentials are generally below those of other candidates.

<u>Academic</u>

1. Summa potential. Genuine scholar; near-perfect scores and grades (in most cases combined with unusual creativity and possible evidence of original scholarship, often substantiated by our faculty.)
2. Magna potential. Excellent student with top grades and,
   SAT and SAT Subject tests: mid 700 scores and up
   a.

   b. 33+ ACT

3. Cum laude potential: Very good student with excellent grades and,
   a. SAT and SAT Subject tests: mid-600 through low-700 scores

3

      b.  29 to 32 ACT

4.  Adequate preparation. Respectable grades and low-to mid-600 scores on SAT and subject tests or 26 to 29 ACT.

5.  Marginal potential. Modest grades and 500 scores on SAT and subject tests (25 and below ACT).

<u>Extracurricular, Community Employment, Family Commitments</u>

1.  Unusual strength in one or more areas.  Possible national-level achievement or professional experience.  A potential major contributor at Harvard.  Truly unusual achievement.

2.  Strong secondary school contribution in one or more areas such as class president, newspaper editor, concertmaster etc.  and/or significant involvement in organizations outside of school. Possible local or regional recognition; major accomplishment(s) that have had an impact outside of the classroom. Can include significant term-time work or family responsibilities coupled with extracurriculars.

3.  Solid participation but without special distinction. (Upgrade 3+ to 2- in some cases if the e/c is particularly extensive and substantive.)

4.  Little or no participation.

5.  Substantial activity outside of conventional EC participation such as family commitments, term-time work or a significant commute (Important: should be included with other e/c to boost the rating or left as a "5" if that  is more representative of the student's commitment).

6  Special circumstances limit or prevent participation (e.g. a physical condition, gap year(s), compulsory service of some kind).

<u>Athletic</u>

1.  Unusually strong prospect for varsity sports at Harvard, desired by Harvard coaches.

2.  Strong secondary school and/or travel team contribution in one or more sports; leadership role(s) such as captain or co-captain; possible walk-on to a varsity team; potentially has an IRF of a 4 from a Harvard coach

3.  Active participation, possible leadership role.

4.  Little or no participation(this is not a negative).

5.  Substantial activity outside of conventional EC participation such as family commitments or term-time work (could be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).

6.  Physical condition or other special circumstances prevent significant activity.

<u>Personal</u>

1.    Rare personal appeal and character

2+ or 2  Extremely strong personal appeal and character

2-    Very strong personal appeal and character

3+    Above average personal appeal and character; positive

3.    Generally positive, perhaps somewhat neutral

3-    Slightly negative impression

4.    Distinctly poor impression; questionable or worrisome personal qualities

4

<u>School Support</u>

1. Strikingly unusual support. "The best ever," "one of the best in many years," truly over the top.
2. Very strong support. "One of the best" or "the best this year."
3+ Well above average, consistently positive
3. Generally positive, perhaps somewhat neutral or generic
3- Somewhat neutral or slightly negative.
4. Negative or worrisome report.
6. For teacher reports: prose is not in the file.
8. Placeholder for teacher reports.
9. For secondary school report: transcript is in the file but there is no SSR prose.

<u>PLEASE NOTE</u>:  <u>School support ratings for teacher one, teacher two and a counselor are mandatory ratings for competitive candidates.</u> Teacher three and teacher four are optional, if applicable.

**GPA and GPA Scale**:
We must try to report an Academic Index to the IVY League for EVERY matriculant.
If grades are available, please report a GPA and GPA Scale for your strongest candidates.

The Academic Index is calculated using GPA and GPA Scale.  These will be converted automatically to the 20 to 80 scale in Slate.

Here are the rules according to the AI instructions provided by the Ivy League and send to staff separately:

A. <u>ACADEMIC INDEX CALCULATIONS: CGS</u>

1. **GPAs generally:** The secondary school GPA should be taken as presented on the secondary school transcript; when both unweighted and weighted  GPAs are presented, the unweighted GPA should be used.  (If there is a question as to  whether the school is using an unweighted or 'what the A grade earns in a regular course.)  Other  questions in providing the GPA are addressed in this section.

2. **GPA scales and conversions from Table II:** Table II, the "CGS General Conversion  Tables" should be used for the GPA scales shown (100-points, 11.0/12.0, 7.0, 6.0, 4.0, A-D) even if the transcript or secondary school profile provides a conversion to a Table II  scale.

   - The "<u>4.0 Weighted</u>" scale applies to any 4.0 based GPA that is weighted. It should be used only when Unweighted GPA is not available.
   - The" 4.0 Unweighted Scale" applies  to any 4.0 based GPA that is unweighted.
   - Note Table II includes a scale to use to convert International Baccalaureate GPAs to a CGS.

3. **Scales not provided on Table II:** Given the relatively small number of admitted and  matriculated students for whom Table II scales are not

CONFIDENTIAL

HARV00097993

provided, it is preferable not to   create new scales if possible.  In such cases, a GPA on a 4.0 scale should be calculated   using the following formula, and a CGS then derived using the 4.0 scale on Table II: HSGPA/HSGPA scale = "x"/4.0, where "x" becomes the value from which the CGS is  derived.  For example, if on a 5.0 scale a student has a 4.8 GPA (whether the scale's top  grade is A or A+), the formula is 4.8/5.0 = x/4.0, x-3.84 and the CGS = 73.

4. **Calculating GPA when not provided by the secondary school:**  When the secondary  school does not calculate/report a GPA, the institution should calculate an unweighted   GPA based on the secondary school's grading scale, using all courses for which grades   and credit hours are provided, and weighting semester grades as one-half full-year   grades.

   NOTE:  the following grade scale is used to convert grades on a non-traditional scale to a 4.0 Unweighted Scale:  HH- 4.0, H- 3.5, HP- 2.5, P- 1.5, U- 0

5. **GPA period:**  GPA data always should be for more than one year, including 10th and 11th  grades, 9th grade when available, and official trimester or semester grades (as opposed   to term grades) in the student's current year if available at the time the athlete's   decision is made.  If "official" grades from the current year are available but not counted   in the school's cumulative GPA, they should be added to the cumulative GPA and   weighted appropriately: e.g., grades for first semester or trimester of senior year would   be weighted as one-half or one-third year.

6. **GPAs from multiple schools and repeat years:**  When a student has attended multiple   secondary schools (including a post-graduate year), all GPAs provided by the schools   should be used to the extent possible and weighted as in #5 above.  If the institution   believes this result is not logical and fair, it should describe what approach it believes is   better, subject to the Admissions Committee's agreement.

7. **Transfer students:**  CGS should be calculated using 50% secondary school GPA and   50% college GPA .

CONFIDENTIAL
**JA5913**
DX 744.0006
HARV00097994

B. INTERNATIONAL-SYSTEM  GPA  CALCULATIONS

1. **Generally:** Each school should calculate GPAs from international schools using the   attached Appendix of International Calculations. If an international country is not listed   on the Appendix, we should calculate an AI as it seems most appropriate. (In this   circumstance, we should default to the Committee, using the NCAA International   Standards as a reference point, but not necessarily a policy.)

2. **Canadian systems:**  Table IIA, for establishing value of CGS of Canadian Students should be used  to determine CGS based on the Province of the secondary school.  Provinces where a passing grade is 50% use the first column on Table II A (Alberta, British Columbia, Manitoba, Newfoundland, NW Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island, Saskatchewan, Yukon); Provinces where a passing grade is 60% use the second column on Table IIA (New Brunswick, Quebec).

1. British systems:

   Count all GCSE (= O Level), AS and A level results in order to calculate a GPA:   A* (same as A+) = 4.3

   A = 4:0

   B = 3.0

   C = 2.0

   D = 1.0

   - If the applicant is taking a gap year, actual A-Level results should be used.
   - A Level scores are given double the weight of AS and GCSE scores.
   - Internal grades are usually not available, and should <u>not</u> be used if they are.
   - Predicted A-Level scores should be used when available.
   - All courses should be included in calculating the GPA, including physical   education courses if the student receives a grade and   credit for the course.

2. Pre-U:

   **The scale for Pre-U were decided on as follows, for Principal Subjects only:**

   D1 = A+/4.3

   D2 = A+/4.3

   D3 = A/4.0

   M1 = B/3.0

   M2 – B/3.0

7

M3 = B-/2.7

P1 – C-/1.7

P2 – D/1.0

P3 – D-/0.7

5. <u>International Baccalaureate systems</u>:

Average grades from the last two years of the IB program are preferred to calculate a GPA:

7 = A+ = 4.3

6 = A = 4.0

5 = B = 3.0

4 = C = 2.0

3 = D = 1.0

- If the applicant is still in school, use one year for Early applicants and one year plus one term for Regular applicants.
- If the applicant is taking a gap year, actual two-year IB results are used.
- Use IB predicted grades if available, and only if not available use internal grades.
- For IB schools in the U.S., use the course values given on the transcript; for IB schools outside the U.S., double the weight for Higher Level courses (as opposed to the Subsidiary Level courses).
- All Higher Level/Subsidiary Level courses will be counted from international schools.
- Scales: When IB predictions give split results, use the average of the split (i.e., 5/6 is given, use 5.5 for calculation).

6.**Notes on Selected Countries (added fall 2010):**

<u>Australia</u> – Require schools to provide a transcript of some sort, but if all else fails and they give the state final exam result or prediction (ex: UAI for NSW, OP for Queensland, usually out of 99.95) use that.

<u>New Zealand</u> –The scale for NZ is as follows…but ONLY for courses in which there is the possibility to get more than Achieved (Achieved/Not Achieved is basically Pass/Fail so we won't count those courses):

[E] Excellent = A/4.0

[M] Merit = B/3.0

[A] Achieved = C/2.0

[N] Not Achieved = F/0

<u>Singapore</u> – for schools using standard Junior College grading conventions – Include H1(General Paper, Project, etc.) & H2 predictions on a 4.0 scale to calculate GPA. Double weight for H2 marks.

For H3, the scale is:

8

CONFIDENTIAL

HARV00097996

Distinction = A/4.0
Merit = B/3.0
Pass – C/2.0
Double H3s as well

If provided, include O Level/GCSE marks in calculation of GPA with a single weight like we  do with the British System.

General notes – For all national curriculums, the general rule of thumb is to include all courses as part of the GPA calculations.
 '

**7.**Additional International Scales for Relevant Countries

For GPA scales of other countries Table III has been sent separately and is include in the Ivy League Academic Index Memo. Please see CGM if you need a copy.

CONFIDENTIAL

HARV00097997

| TABLE II: For establishing value of CGS | | | | | | | |
| Revised May 2015/UPDATED AUGUST 2016 | | | | | | | |
| Percentage Average | International Baccalaureate | 11.0/12.0 Scale *USE FOR WEIGHTED AND UNWEIGHTED GPAS WHERE A= 11.0 AND A+ >11.0* | 5.0/6.0 Scale *USE FOR WEIGHTED AND UNWEIGHTED GPAS WHERE A= 5.0 AND A+ >5.0* | 4.0 Scale **WEIGHTED** *USE ONLY WHEN UNWEIGHTED NOT AVAILABLE* | Letter Grade Equivalent to 4.0 | 4.0 Scale **UNWEIGHTED** | CGS |
|---|---|---|---|---|---|---|---|
| 98.00 and above | 7 | 12.00 and above | 6.00 and above | 4.30 and above | A+ | 4.0 | 80 |
| 97.00 - 97.99 | 6/7 | 11.70 - 11.99 | 5.70 - 5.99 | 4.20 - 4.29 | | 3.91 - 3.99 | 79 |
| 96.00 - 96.99 | | 11.40 - 11.69 | 5.40 - 5.69 | 4.10 - 4.19 | | 3.81 - 3.90 | 78 |
| 95.00 - 95.99 | 6 | 11.00 - 11.39 | 5.00 - 5.39 | 4.00 - 4.09 | A | 3.72 - 3.80 | 77 |
| 94.00 - 94.99 | | 10.70 - 10.99 | 4.90 - 4.99 | 3.90 - 3.99 | | 3.63 - 3.71 | 75 |
| 93.00 - 93.99 | | 10.40 - 10.69 | 4.80 - 4.89 | 3.80 - 3.89 | | 3.53 - 3.62 | 73 |
| 92.00 - 92.99 | 5/6 | 10.00 - 10.39 | 4.70 - 4.79 | 3.70 - 3.79 | A- | 3.44 - 3.52 | 71 |
| 91.00 - 91.99 | | 9.80 - 9.99 | 4.60 - 4.69 | 3.60 - 3.69 | | 3.35 - 3.43 | 70 |
| 90.00 - 90.99 | | 9.50 - 9.79 | 4.50 - 4.59 | 3.50 - 3.59 | | 3.26 - 3.34 | 69 |
| 89.00 - 89.99 | | 9.30 - 9.49 | 4.40 - 4.49 | 3.40 - 3.49 | | 3.16 - 3.25 | 68 |
| 88.00 - 88.99 | | 9.00 - 9.29 | 4.30 - 4.39 | 3.30 - 3.39 | B+ | 3.07 - 3.15 | 67 |
| 87.00 - 87.99 | | 8.70 - 8.99 | 4.20 - 4.29 | 3.20 - 3.29 | | 2.98 -3.06 | 66 |
| 86.00 - 86.99 | | 8.40 - 8.69 | 4.10 - 4.19 | 3.10 - 3.19 | | 2.88 - 2.97 | 65 |
| 85.00 - 85.99 | 5 | 8.00 - 8.39 | 4.00 - 4.09 | 3.00 - 3.09 | B | 2.79 - 2.87 | 63 |
| 84.00 - 84.99 | | 7.70 - 7.99 | 3.90 - 3.99 | 2.90 - 2.99 | | 2.70 - 2.78 | 61 |
| 83.00 - 83.99 | | 7.40 - 7.69 | 3.80 - 3.89 | 2.80 - 2.89 | | 2.61 - 2.69 | 59 |
| 82.00 - 82.99 | 4/5 | 7.00 - 7.39 | 3.70 - 3.79 | 2.70 -2.79 | B- | 2.51 - 2.60 | 57 |
| 81.00 - 81.99 | | 6.75 - 6.99 | 3.60 - 3.69 | 2.60 - 2.69 | | 2.42 - 2.50 | 55 |
| 80.00 - 80.99 | | 6.50 - 6.74 | 3.50 - 3.59 | 2.50 - 2.59 | | 2.33 - 2.41 | 53 |
| 79.00 - 79.99 | | 6.25 - 6.49 | 3.40 - 3.49 | 2.40 - 2.49 | | 2.23 - 2.32 | 51 |
| 78.00 - 78.99 | | 6.00 - 6.24 | 3.30 - 3.39 | 2.30 - 2.39 | C+ | 2.14 - 2.22 | 49 |
| 77.00 - 77.99 | | 5.70 - 5.99 | 3.20 - 3.29 | 2.20 - 2.29 | | 2.05 - 2.13 | 48 |
| 76.00 - 76.99 | | 5.40 - 5.69 | 3.10 - 3.19 | 2.10 - 2.19 | | 1.95 - 2.04 | 47 |
| 75.00 - 75.99 | 4 | 5.00 - 5.39 | 3.00 - 3.09 | 2.00 - 2.09 | C | 1.86 - 1.94 | 46 |
| 74.00 - 74.99 | | 4.70 - 4.99 | 2.90 - 2.99 | 1.90 - 1.99 | | 1.77 - 1.85 | 45 |
| 73.00 - 73.99 | | 4.40 - 4.69 | 2.80 - 2.89 | 1.80 - 1.89 | | 1.67 - 1.76 | 44 |
| 72.00 - 72.99 | 3/4 | 4.00 - 4.39 | 2.70 - 2.79 | 1.70 - 1.79 | C- | 1.58 - 1.66 | 42 |
| 71.00 - 71.99 | | 3.5 - 3.99 | 2.60 - 2.69 | 1.60 - 1.69 | | 1.49 - 1.57 | 40 |
| 70.00 - 70.99 | | 2.5 - 3.49 | 2.50 - 2.59 | 1.50 - 1.59 | D+ | 1.40 - 1.56 | 38 |
| Below 70.00 | 3 | Below 2.5 | Below 2.5 | Below 1.5 | D | Below 1.4 | 35 |

10

**JA5917**

DX 744.0010

HARV00097998

**TABLE IIA:  For establishing value of CGS of Canadian Students**

**Revised May 2015, Effective for Class Entering Fall 2017**

| United States  100 Point Scale | Letter Grade Equivalent | Canada Where passing grade is 50% [1] | CanadaWhere passing grade is 60% [2] | CGS |
|---|---|---|---|---|
| 98.00 and above | A+ | 90.00 and above | 88.00 and above | 80 |
| 97.00 --- 97.99 | | 88.00 --- 89.99 | 87.00 --- 87.99 | 79 |
| 96.00 --- 96.99 | | 86.00 --- 87.99 | 86.00 --- 86.99 | 78 |
| 95.00 --- 95.99 | A | 84.00 --- 85.99 | 85.00 --- 85.99 | 77 |
| 94.00 --- 94.99 | | 82.00 --- 83.99 | 84.00 --- 84.99 | 75 |
| 93.00 --- 93.99 | | 80.00 --- 81.99 | 83.00 --- 83.99 | 73 |
| 92.00 --- 92.99 | A--- | 79.00 --- 79.99 | 82.00 --- 82.99 | 71 |
| 91.00 --- 91.99 | | 78.00 --- 78.99 | 81.00 --- 81.99 | 70 |
| 90.00 --- 90.99 | | 77.00 --- 77.99 | 80.00 --- 80.99 | 69 |
| 89.00 --- 89.99 | | 76.00 --- 76.99 | 79.00 --- 79.99 | 68 |
| 88.00 --- 88.99 | B+ | 75.00 --- 75.99 | 78.00 --- 78.99 | 67 |
| 87.00 --- 87.99 | | 74.00 --- 74.99 | 77.00 --- 77.99 | 66 |
| 86.00 --- 86.99 | | 73.00 --- 73.99 | 76.00 --- 76.99 | 65 |
| 85.00 --- 85.99 | B | 72.00 --- 72.99 | 75.00 --- 75.99 | 63 |
| 84.00 --- 84.99 | | 71.00 --- 71.99 | 74.00 --- 74.99 | 61 |
| 83.00 --- 83.99 | | 70.00 --- 70.99 | 73.00 --- 73.99 | 59 |
| 82.00 --- 82.99 | B--- | 69.00 --- 69.99 | 72.00 --- 72.99 | 57 |
| 81.00 --- 81.99 | | 68.00 --- 68.99 | 71.00 --- 71.99 | 55 |
| 80.00 --- 80.99 | | 67.00 --- 67.99 | 70.00 --- 70.99 | 53 |
| 79.00 --- 79.99 | | 66.00 --- 66.99 | 69.00 --- 69.99 | 51 |
| 78.00 --- 78.99 | C+ | 65.00 --- 65.99 | 68.00 --- 68.99 | 49 |
| 77.00 --- 77.99 | | 64.00 --- 64.99 | 67.00 --- 67.99 | 48 |
| 76.00 --- 76.99 | | 63.00 --- 63.99 | 66.00 --- 66.99 | 47 |
| 75.00 --- 75.99 | C | 62.00 --- 62.99 | 65.00 --- 65.99 | 46 |
| 74.00 --- 74.99 | | 61.00 --- 61..99 | 64.00 --- 64.99 | 45 |
| 73.00 --- 73.99 | | 60.00 --- 60.99 | 63.00 --- 63.99 | 44 |
| 72.00 --- 72.99 | C--- | Below 60.00 | 62.00 --- 62.99 | 42 |
| 71.00 --- 71.99 | | | 61.00 --- 61..99 | 40 |
| 70.00 --- 70.99 | D+ | | 60.00 --- 60.99 | 38 |
| Below 70.00 | D | | Below 60.00 | 35 |
| | | | | |

[1] Passing grade is 50% for the following Provinces: Alberta, British Columbia, Manitoba,   Newfoundland, NW Territories, Nova Scotia, Nunavut, Ontario, Prince Edward Island,  Saskatchawan, Yukon

[2] Passing grade is 60% for the following Provinces: New Brunswick, Quebec

11

CONFIDENTIAL

HARV00097999

**INTERVIEW PROFILE (IVP):**
Below is the language for uniform implementation of the Interview Profile number (IVP) for use with all Schools and Scholarship Chairs. The IVP will serve as a guide for Chairs to know when our office needs the reports, and therefore how quickly they need to be assigned. All interviewers will be told that they should submit their interview report no later than two weeks after receiving the interview assignment.

1. An applicant for whom the committee needs more information to reach a decision - please have interview report in as soon as possible.
2. An applicant for whom more information would be very helpful during our deliberations - please have interview report in by the sub-committee deadline.
3. Please have interview report in by December 1 (EA) or March 1 (RA).
4. Based on the materials currently available, the committee needs no additional information at this time.

This language has been distributed to the S&S chairs via email and can also be found in the updated handbook and website instructions. (Please ask Bryce Gilfillian if you need help accessing the site). **Please have a conversation with your chairs to determine if you wish to use the IVP, and please make clear that this information should not be shared with other interviewers or applicants.** If your chairs have additional clerical or operational questions about the IVP, please direct them to email Bryce/alum assistant at SSinfo@fas.harvard.edu.

When reading, please input your IVP code on the First Reader Rating Form. You should input an IVP for all cases for clubs that use this system or if the coding could be helpful for your own interview tracking purposes. Continue to pass on the folder to your chair and/or code out to Committee Review bin.

**BRIEF ANNOTATIONS FOR SUMMARY SHEET:**

You may choose to insert information about a case – a maximum of three lines – which will appear on the second page of the summary sheet at the top and also on the printed docket (unlike prose comments below). These notes should be informational only and not evaluative. They can aid in your preparation of cases. Examples could be: PE on grandmother, Harvard Book, or international credentials not easily captured elsewhere (A level est, Physics A, Math A, Lit A – etc).

**PROSE COMMENTS**:
When making prose comments, first readers should note the important academic and extracurricular accomplishments that are particularly pertinent to the case. It is also helpful to reference teacher reports or other items that may be crucial to our evaluation. In addition to numerical ratings, readers should try to summarize the strengths and weaknesses of the folder in brief paragraphs or comments. Avoid slang and jargon and REMEMBER - your comments may be open to public view at a later time.

### III.   **FILE ROUTING**

**INADVERTENTLY CLEARED FILES**:  Occasionally, files will be mistakenly "cleared" (considered complete) and placed in your first read bin.  Open the Admin Problems Form and note the issue.  Then route the file to the Admin Problems bin.

**FILES SHOULD BE READ AND PASSED IN A TIMELY FASHION**: Readers should take care not to allow files to pile up.  First readers need to read files from all assigned dockets as they clear, not just those whose subcommittee meets first.  However, because all files will clear regardless of round readers should read early action files first, as soon as possible. Regular action files can generally wait until after December 1 but you can read them prior to that if you are able to.  <u>This is important, and we will monitor reading progress centrally.</u>  If you need help keeping up for whatever reason, let us know immediately.  Readers should code out files to the Committee Review bin or pass to the Chair.  First-time readers will use the Optional Additional bin for their first 50 files during Early Action.

**SECOND READERS (OPTIONAL ADDITIONAL READER)**: Except by new readers (for whom special routing instructions are provided below), second readings should be used only in the rarest of instances:

A)  If three readings are needed for a complex case.

B)  If the case raises issues of policy.

C)  If the case would be greatly helped by a second reading from the former area person or someone with special knowledge of an area or type of case.

No second reader will ordinarily be assigned.  If you want/need a second reading, consult the enclosed docket assignment sheet to identify other readers on your docket. Try not to burden one person inordinately. You should choose "Optional Additional Reader" as the next bin and enter the name of that person which will place the file in their queue. You can add a note for the second reader such as "Please give V docket context" You should also send an email to special second readers to alert them to your requested reading.

**FIRST-TIME READERS**:  New readers should have their first fifty Early Action files passed to the Optional Additional Reader bin or to the chair bin, based on relative strength. Some chairs may wish to use different approaches for first year readers.

**GENERAL ROUTING RULES:**

1)  A file should be passed <u>directly</u> to the chair:

- If the first reader rates a file a "2-" or better (i.e. a case the first reader thinks has a very

13

good chance of being admitted)

- If the case will likely (or almost certainly) be discussed in Committee.

- If you want the docket chair's opinion or want simply to have the docket chair informed about the case.

**If the first reader has a significant degree of uncertainty about how to proceed with the case, he or she should consult the docket chair.**

2) A case rated a 3+ may be passed to the chair or routed straight to the Committee Review bin. The first reader should consider carefully the likelihood that additional anticipated information (e.g., a superior music rating) will make the case more compelling, in which case the folder should be passed to the chair.  If there is no further information anticipated and the case is qualitatively a 3+ (a strong case but like many others), an experienced first reader does not need to pass it on.

3) Typically a case rated a "3" or less with no particular attribute that would make it competitive can be routed directly to the Committee Review bin. Obviously late information or school context could change this initial evaluation.  The first reader, as an advocate, must be doubly certain to check all late information that might make a difference to the case prior to the Committee meetings.  This is particularly important for candidates whose outstanding personal qualities become evident once we have the alumni/ae interview.

Readers new to a docket should discuss with the docket chair any special guidelines about which files should be passed on and which files should not.

BINS
In Slate, various "bins" are used to track an application file's progress through the application cycle. The layout of bins can be viewed in the Slate Reader using the Browse tab (Note: the "Freshman Only" preset filter in Reader displays all freshman applicants and previous admits in the current application period).

Each bin column represents a different phase of the application cycle, and generally, work flows from left to right:
- Pre-Review: Folders are incomplete, incorrectly coded, or withdrawn
- Reads: Folders are complete ("cleared") and ready for review by readers
- Committee: Folders are ready for discussion by committee
- Working Decision: Folders have been discussed by the committee and a decision has been recommended
- Final Decision: Decisions have been checked and confirmed; ready for decision release

14

## CHANGING BIN ASSIGNMENTS

Readers normally change a folder's bin assignment during the reading process using the Review Form in the Slate Reader. Occasionally it will be necessary to change a folder's bin assignment after the Review Form has been submitted. In these cases, the bin assignment can be changed in the Student Record. To edit a bin assignment in the Student Record, click the "Edit Application Details" tab on the right, and select the desired bin from the Bin dropdown menu.

## CLEARING INCOMPLETES

**Readers should be sure to check the "Not Cleared" bin before each of their subcommittees and then periodically before decisions are final to check for any cases that could be read with the materials in the file. Sometimes, transcripts may be in various tabs aside from the "SSR" tab. Readers should use their discretion or consult with their chairs but in general, a file that has an application and a transcript can be read and evaluated.**

## SPECIAL READINGS

- WRF should see cases that could be particularly sensitive or controversial or that raise issues of fundamental policy. When in doubt, send the file on by routing to the 4th reader bin.

- Folders of <u>competitive</u> candidates who attended secondary school outside the U.S. and Canada may be passed on to the appropriate U, V or W docket area person or RMW if help in assessing foreign credentials is needed. <u>Be selective</u>- don't pass on a case unless you are sure the applicant is both competitive and appealing or has some <u>unusual</u> attributes.

- A faculty readings memorandum will be distributed later regarding specific procedures.

- Supplemental music/art/dance/academic materials of <u>clearly competitive</u> candidates with an unusually strong talent may be assessed through a supplementary process - through Slideroom (for music and dance) or through the faculty read process (for art or academic work). Handling of this material will be addressed through memoranda over the course of the fall.

## IV.    ECONOMICALLY DISADVANTAGED APPLICANTS

It has long been a priority for Harvard to seek talented students from all backgrounds, including those extraordinary individuals who are able to transcend economic disadvantages and achieve unusual academic distinction.

15

- **STAFF DISADVANTAGED**
  **After reviewing the folder, if you believe the applicant is from a very modest economic background, please check "Yes" under Staff Disadvantaged on the Reader Rating Form.** In the past, admitted students who had been staff identified as "Disadvantaged=Y" were found to be economically needy 78% of the time.

  We have included other parameters to help with your evaluation of the applicant's economic background. They are:
  - o Low Income Predictor (Low Inc on Summary Sheet): A value between 0 and 1 based on application information that predicts how likely a student is to be low income and have a $0 parent contribution. The higher the value (closer to 1) the more likely the student will be low income.
  - o Pell Grant (P on Summary Sheet): An indication if the student is likely to qualify for a Pell Grant. This information will only be available if a student has submitted sufficient information for Financial Aid to make a determination.
  - o FH info ("Yes, Likely, Unlikely, No" on the summary sheet): After subcommittee meetings, if information is available, a simple indication of a student's possible eligibility for the HFAI initiative may be present on the summary sheet.
- **FEE STATUS**

  *Please note: In addition to the fee waiver forms we currently accept, we now include waivers issued by Expanding College Opportunities (ECO). ECO is a research initiative aimed at increasing the number of high-achieving, low-income students who apply to selective colleges and universities

## V.   OTHER ITEMS

- **Slate is made up of data downloaded from the application and supplemental forms. We currently do not have the ability to enter all the information by hand for those applicants who do not submit their forms on-line. However, the data entry staff will enter the most critical bio/demo information as they have in the past. This means that the dockets will be correct, but the summary sheets for these applicants will be primarily blank. You should double-check the data that is important - i.e. parent education, ethnicity, aid status, etc. - basically every field that's on the summary sheet. About 1% of all our applicants will fall into this category.**

- Acknowledgments to guidance counselors, teachers, and others: The area person may occasionally feel it worthwhile to acknowledge unusually helpful TRs and SSRs by writing a note to the author. The note should acknowledge that the candidate may or may not be admitted. **Supplementary letters of recommendation may have already been acknowledged with a card or letter, but if not, particularly with recommenders who are alumni or others about whom Harvard might be concerned, you should call the letter to the attention of MEM or WRF and an acknowledgment will be sent. This is important!**

16

- <u>Support Materials:</u> ALL manually submitted support material should be dropped into the appropriate basket in the mailroom for sorting and scanning.

- <u>Misfiled and Missing materials:</u>  If a teacher report, school report or any other material that would be helpful to a competitive candidate is missing, first readers should request a copy be re-sent. Files should be sent on to other readers unless the missing pieces are crucial.  In such cases, first readers should hold onto the file by routing the file to the "Area Person Follow Up" bin. Detailed instructions on how to add new materials to an applicant's file can be found in the "Documentation" tab of the Slate welcome page.

- <u>File items that require attention:</u>  Unanswered letters should be handled by first readers where appropriate or others including MEM or WRF.

## VI.    <u>SCANNING AND INDEXING</u>

There is a basket in the mailroom to collect and sort hard-copy documents received. The forms collected in these baskets should have content that is *specific* to the admission decision of the applicant and are marked as such. For example, mailed applications or supplements, letters of support, teacher reports, Harvard evaluation, (coach, arts, music, Harvard faculty), midyear reports, SSR's etc.  We will scan almost everything. If that's not possible, an "oversized support" form will be scanned and added to the file to let you know there is material sitting in the bookcase in Conference Room 5.

Relevant emails to officers from applicants or about an applicant should be saved as a PDF file and indexed directly into the applicant file by the officer. To do so, go into the student record in Slate select the current round tab and scroll down to the "Materials" header. Click to add new material and make the appropriate selection from the drop down menu. If you receive materials both electronically and in paper you do not need to have the paper material scanned.

Documents displayed in the Reader are named by the document type that follows the menu down the left side of the Slate e-reader.

- Application (and supplement)
- SSR
- TRs
- Interviews
- Additional academic (additional transcripts, etc)
- Midyear
- Final Report (potentially greyed out  until admitted)
- Ratings Forms (includes IRFs)
- Miscellaneous (notes from family/friends, alums, correspondence, noting of oversized support, etc)
- Waitlist

17

- Previous App
- Portfolio (NOTE: a tab in Slate we do not use at this time).

CONFIDENTIAL **JA5925** HARV00098006

DX 744.0018

# Racial Composition of Admitted ALDC Students In Each Class and Across All Classes

| Class | Number of Admitted Students | | | | | Share of Admitted Students | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | White | Asian-American | African-American | Hispanic or Other | Race Missing | White | Asian-American | African-American | Hispanic or Other | Race Missing |
| **Athletes** | | | | | | | | | | |
| 1. **2014** | 151 | 14 | 19 | 9 | 13 | 73% | 7% | 9% | 4% | 6% |
| 2. **2015** | 150 | 17 | 17 | 16 | 16 | 69% | 8% | 8% | 7% | 7% |
| 3. **2016** | 124 | 20 | 16 | 8 | 12 | 69% | 11% | 9% | 4% | 7% |
| 4. **2017** | 121 | 19 | 28 | 9 | 16 | 63% | 10% | 15% | 5% | 8% |
| 5. **2018** | 142 | 18 | 20 | 3 | 10 | 74% | 9% | 10% | 2% | 5% |
| 6. **2019** | 129 | 13 | 24 | 12 | 13 | 68% | 7% | 13% | 6% | 7% |
| 7. **Overall** | 817 | 101 | 124 | 57 | 80 | 69% | 9% | 11% | 5% | 7% |
| **Legacies** | | | | | | | | | | |
| 8. **2014** | 193 | 16 | 9 | 12 | 10 | 80% | 7% | 4% | 5% | 4% |
| 9. **2015** | 183 | 23 | 9 | 11 | 15 | 76% | 10% | 4% | 5% | 6% |
| 10. **2016** | 179 | 33 | 7 | 13 | 31 | 68% | 13% | 3% | 5% | 12% |
| 11. **2017** | 187 | 32 | 17 | 21 | 28 | 66% | 11% | 6% | 7% | 10% |
| 12. **2018** | 171 | 24 | 9 | 17 | 20 | 71% | 10% | 4% | 7% | 8% |
| 13. **2019** | 166 | 35 | 16 | 23 | 30 | 61% | 13% | 6% | 9% | 11% |
| 14. **Overall** | 1,079 | 163 | 67 | 97 | 134 | 70% | 11% | 4% | 6% | 9% |
| **Dean/Director's List** | | | | | | | | | | |
| 15. **2014** | 102 | 11 | 6 | 6 | 9 | 76% | 8% | 4% | 4% | 7% |
| 16. **2015** | 95 | 17 | 3 | 7 | 16 | 69% | 12% | 2% | 5% | 12% |
| 17. **2016** | 124 | 19 | 3 | 9 | 17 | 72% | 11% | 2% | 5% | 10% |
| 18. **2017** | 123 | 23 | 8 | 12 | 20 | 66% | 12% | 4% | 6% | 11% |
| 19. **2018** | 135 | 28 | 3 | 13 | 17 | 69% | 14% | 2% | 7% | 9% |
| 20. **2019** | 121 | 35 | 6 | 19 | 25 | 59% | 17% | 3% | 9% | 12% |
| 21. **Overall** | 700 | 133 | 29 | 66 | 104 | 68% | 13% | 3% | 6% | 10% |
| **Children of Faculty/Staff** | | | | | | | | | | |
| 22. **2014** | 9 | 2 | 0 | 0 | 2 | 69% | 15% | 0% | 0% | 15% |
| 23. **2015** | 11 | 3 | 0 | 2 | 3 | 58% | 16% | 0% | 11% | 16% |
| 24. **2016** | 11 | 4 | 1 | 0 | 1 | 65% | 24% | 6% | 0% | 6% |
| 25. **2017** | 10 | 8 | 0 | 2 | 4 | 42% | 33% | 0% | 8% | 17% |
| 26. **2018** | 18 | 5 | 0 | 3 | 6 | 56% | 16% | 0% | 9% | 19% |
| 27. **2019** | 21 | 17 | 1 | 1 | 4 | 48% | 39% | 2% | 2% | 9% |
| 28. **Overall** | 80 | 39 | 2 | 8 | 20 | 54% | 26% | 1% | 5% | 13% |
| **ALDCs** | | | | | | | | | | |
| 29. **2014** | 387 | 39 | 33 | 23 | 29 | 76% | 8% | 6% | 5% | 6% |
| 30. **2015** | 359 | 51 | 27 | 33 | 43 | 70% | 10% | 5% | 6% | 8% |
| 31. **2016** | 355 | 64 | 23 | 26 | 49 | 69% | 12% | 4% | 5% | 9% |
| 32. **2017** | 359 | 71 | 48 | 34 | 58 | 63% | 12% | 8% | 6% | 10% |
| 33. **2018** | 384 | 67 | 31 | 32 | 40 | 69% | 12% | 6% | 6% | 7% |
| 34. **2019** | 335 | 79 | 43 | 43 | 55 | 60% | 14% | 8% | 8% | 10% |
| 35. **Overall** | 2,179 | 371 | 205 | 191 | 274 | 68% | 12% | 6% | 6% | 9% |

Source: Augmented Arcidiacono Data

Note: Data are from applicants to the classes of 2014 – 2019 in Prof. Arcidiacono's expanded sample including athletes.



United States District Court
District of Massachusetts

**DX 746**

Case No. ___1:14-cv-14176 (ADB)___
Date Entered_____
By_____
Deputy Clerk

**CERTIFICATE OF SERVICE**

I mailed copies of this appendix to the Court and to the following counsel:

William F. Lee
Felicia H. Ellsworth
Andrew S. Dulberg
Elizabeth Connell Mooney
Joseph H. Mueller
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com
sarah.frazier@wilmerhale.com
joseph.mueller@wilmerhale.com

Dated: February 18, 2020                    _s/ William S. Consovoy_____